UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIDAMERICA C2L INCORPORATED, a )
Nevada corporation; and SECURE ENERGY, )
INC., a Nevada corporation, )
    )
    )
    Plaintiffs/Counter- )
    Defendants, )    Case No. 6:17-cv-171-Orl-18KRS
    )
v. )
    )    <u>**Dispositive Motion**</u>
SIEMENS ENERGY, INC., a Delaware )
corporation, )
    )
    Defendant/Counter- )
    Plaintiff. )

<u>**SIEMENS ENERGY, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE
ALTERNATIVE, PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF
LAW IN SUPPORT**</u>

Defendant Siemens Energy, Inc. ("Siemens"), pursuant to Rule 56 of the Federal Rules

of Civil Procedure, hereby submits its Motion for Summary Judgment or, in the Alternative,

Partial Summary Judgment and Memorandum of Law in Support.

## I.    INTRODUCTION

This case is about a buyer that purchased large-scale industrial equipment for use in a

plant—and over time, a series of five different hoped-for plants—without having the necessary

financing or business plan to design, build, or operate any iteration of its hoped-for plant.  The

buyer's self-inflicted wounds worsened when the market required to sustain the buyer's hoped-

for plant (which reached an estimated cost of $1.98 billion) collapsed, due to the falling

domestic prices of alternative energy sources.  Nine years after the purchase, the buyer had

raised little beyond the money to buy the equipment—the buyer could not even raise enough

money to pay the license and support fees for the equipment. With its hoped-for plants dead in the water, the buyer started trying to liquidate the equipment and contemplated winding up its affairs. Then, the buyer learned that the seller of the equipment, seeing the same market constraints, planned to stop selling new equipment—while still supporting all of the seller's equipment in the field as necessary. The buyer hatched a new plan: falsely blame its decade-long business failures on the seller, thus starting this litigation.

The seller here is Siemens, which sold coal gasification equipment and the basic engineering and design packages ("BEDP") necessary to help engineer the gasification block in its customers' projects. Gasification is a process for converting a hydrocarbon feedstock (e.g., coal) into gaseous components by applying heat under pressure in the presence of steam.

The buyer is MidAmerica C2L Incorporated ("C2L") and Secure Energy, Inc. ("Secure") (collectively, "Plaintiffs"[1]). In December 2007, Plaintiffs purchased from Siemens two 500 $MW_{th}$ gasifiers and a BEDP and licensed Siemens' gasification technology.

Plaintiffs never had a consistent business plan and never progressed with any of their hoped-for plants. When Plaintiffs purchased the equipment, a coal-to-substitute natural gas project in Decatur, Illinois was the gleam in Plaintiffs' eye. That project never got off the ground and Plaintiffs could not pay for Siemens' support and services when payment came due in 2009. For the next several years, Plaintiffs tried to change the product of their plant (from substitute natural gas to gasoline to methanol to fertilizer) and the planned location (from Decatur, Illinois to West Paducah, Kentucky). To accommodate their evolving plans, Plaintiffs asked Siemens in 2009, 2010, and 2012 to extend Plaintiffs' payment deadlines and Siemens'

---

[1] C2L is a wholly owned subsidiary of Secure.

performance guarantees, and change the configuration and/or location of their hoped-for plant. Siemens agreed to every one of Plaintiffs' requests. Plaintiffs gained no traction in Kentucky either and their financial statements as of 2015 reflected no ability to continue as a going concern. It is undisputed that Plaintiffs never had the funding necessary for any iteration of their project at any time—Plaintiffs' largest investor had cut and run in 2010, because Plaintiffs had no sustainable business or prospects.

By mid-2015, Siemens, like Plaintiffs, saw the unfavorable market conditions for a domestic coal gasification business and decided to stop seeking new gasification customers or sales, which it advised Plaintiffs. Siemens' decision played no part in Plaintiffs' inability to develop a coal gasification project. Then and now, Siemens is able to perform under the operative license and service agreement if Plaintiffs performed their end of the deal by paying the approximately €12.2M license and support fee long past due (since 2009). Since Plaintiffs had not paid any of that sum, Siemens invoiced Plaintiffs €11.4M for the termination fee (by contract, 92% of the license fee), which Plaintiffs also failed to pay.

Instead, Plaintiffs sued Siemens for fraud and breach of contract. In Plaintiffs' fraud claims, they allege (seven years after delivery of the equipment) that Siemens defectively designed the two Secure gasifiers. Although Plaintiffs have not even unpacked, let alone attempted to operate, their gasifiers, they claim over $86M in economic losses as fraud damages, claiming the gasifiers have zero value and that Plaintiffs should recover all its alleged expenses related to the West Paducah plant.

Plaintiffs' breach of contract claims stem from Siemens' decision to exit the business, which Plaintiffs allege is akin to repudiation—even though Plaintiffs were never willing or

able to honor their end of the bargain and pay Siemens for its technology and support—and Plaintiffs claim the same alleged $86M in economic losses as contract damages. Plaintiffs also claim breach of an implied warranty (even though they disclaimed those warranties) based on the alleged defects in the gasifiers.

The Court should grant Siemens summary judgment on each of these claims. As to Plaintiffs' fraud claims, the relevant law (Kentucky) imposes an economic-loss rule that prevents Plaintiffs from recovering in tort that which the parties' contracts cover.[2] As to the contract claims, Plaintiffs cannot enforce contracts they failed to perform. The only viable claim here is Siemens' counterclaim for breach of contract based on Plaintiffs' undisputed failure to pay the €11.4M termination fee required under the license and service agreement. Siemens is entitled to summary judgment on all of Plaintiffs' claims and its own counterclaim.

## II.    STATEMENT OF FACTS

### A.    Siemens agrees to sell its gasifiers and license its technology to Plaintiffs in 2007, and then agrees to several guarantee and payment deadline extensions when Plaintiffs fail to build any plant.

In December 2007, Secure's subsidiary purchased from Siemens two 500 $MW_{th}$ gasifiers and related equipment and engineering specifications to be used in furtherance of Secure's planned substitute natural gas plant in Decatur, Illinois at a price of €27.7M.[3] (Kenny Depo. 180:20-185:24, Ex. 5.) The Equipment Supply Agreement[4] ("2007 ESA") contained

---

[2] The result is the same under Missouri law. Alternatively, if Florida law applies, Florida's independent tort doctrine likewise precludes recovery.

[3] By the time Plaintiffs embarked on their relationship with Siemens, Plaintiffs had already abandoned a plan to produce and sell town gas to an Archer Daniels Midland facility in Decatur—their first iteration of the project. (Kenny Depo. 47:13-50:18.)

[4] A negotiated and fully integrated agreement, all the contracts between the parties. (RFA No. 14.)

Siemens' equipment warranties and performance guarantees for the gasification equipment. (*Id.*) One key aspect of the warranties and guarantees is that they would eventually expire— upon the earliest of 12 months after Secure's "Acceptance" (a defined term based on actual performance of the equipment, which never happened since Secure never built a plant) or 24 months after delivery of the last major component of the equipment (in this case March 2011 since delivery occurred in March 2009). (Kenny Depo. 180:20-185:24, Ex. 5 at §§5.1.1, 5.5.3.)

Siemens and Secure's subsidiary also entered into a December 31, 2007 Project License Agreement for continuing access to the Siemens' proprietary technology and the engineering support services necessary to plan for, set up, operate, and maintain the coal gasification equipment. (Kenny Depo. 199:23-200:25, Ex. 7.) The Project License Agreement required Secure's subsidiary to pay €11.7M to Siemens for the license and access to Siemens' service and support. (*Id.*, Ex. 7 at §3.0.) The bulk of the license fee—€8.2M—was due upon delivery of the gasifier feeder vessels in March 2009. (*Id.*)

Plaintiffs have never paid the license fees owed to Siemens. (Kenny Depo. 199:23-200:25.) Plaintiffs never obtained any of the necessary financing, permitting, or project vendor contracts to proceed with their hoped-for plant—in any iteration. (RFA No. 22; Scott Depo. 149:5-151:20, Ex. 87; Kenny 156:3-159:5; Kenny 30(b)(6) Depo. 125:19-128:25, 393:13-396:9.) Plaintiffs abandoned their substitute natural gas plant plans in 2009, by which time the prospects for such a plant were dim because the low price of natural gas made it uneconomic. (Kenny 30(b)(6) Depo. 56:25-59:8.) Plaintiffs adopted a new plan for a coal-to-gasoline plant in either Decatur or West Paducah, Kentucky (where new tax incentives were available to Plaintiffs). (Kenny Depo. 285:15-21.)

At Plaintiffs' request, Siemens agreed to terminate the 2007 ESA and Project License Agreement as part of a mutual agreement in March 2010 that Siemens had fulfilled all of its obligations under those contracts. (RFA Nos. 11-13.) The parties also agreed in a March 2010 Completion Agreement that neither had any claim under the ESA, the Project License Agreement **and/or any theory of law against the other.** (Kenny Depo. Ex. 11.) Plaintiffs admit that each of the material recitals in the 2010 Completion Agreement are true: (1) Siemens fulfilled all of its obligations under the ESA except as to systems for which the parties had agreed to defer delivery; (2) Secure fulfilled its payment obligations under the ESA—but not the Project License Agreement; and (3) Siemens had to extend the payment deadlines under the Project License Agreement due to Plaintiffs' failure to pay. (Kenny Depo. 281:7-286:10.)

Simultaneously with the 2010 Completion Agreement, Secure and Siemens entered into a new 2010 License and Service Agreement based on Plaintiffs' then-existing plans (coal-to-gasoline in Illinois or Kentucky). (Kenny Depo. Ex. 13.) The material terms were, on the whole, more favorable to Plaintiffs than the equivalent terms under the 2007 ESA and Project License Agreement. For example, under the 2007 ESA, the equipment warranties would have expired in March 2011 which, due to Plaintiffs' failure to advance their project as of 2010, turned out to be well before they could make meaningful progress on their project. (Kenny Depo. 281:7:19, Ex. 5 at §5.1.1.) But under the 2010 License and Service Agreement, Siemens agreed to extend the equipment warranties until the earliest of 12 months after Secure's Acceptance or August 31, 2015, on condition that Secure pay by August 30, 2011 a warranty extension fee of €1.0M. (Kenny Depo. Ex. 13 at §§ 3.3.2, 7.2.1.) Secure never paid for the €1.0M warranty extension and therefore abandoned any equipment warranty. (Kenny Depo.

282:12-15.)

The payment schedule for the license fees was also more favorable to Secure under the 2010 License and Service Agreement than the 2007 Project License Agreement. (*Id*. Exs. 7 at §3.0, 13 at §3.0.) The license fees were already past due under the 2007 Project License Agreement, but Siemens agreed to extend the deadlines for payment in the 2010 License and Service Agreement. This time, the bulk of the license fee—€10.2M—was due upon Financial Close (a defined term meaning Plaintiffs had construction funding arranged and adequate commercial loans secured—which never happened because Plaintiffs failed to raise the required funds) but in no event later than August 30, 2011. (*Id*. Ex. 13 at §3.2.1.)

Secure did not pay the fees due under the 2010 License and Service Agreement either. (Kenny 30(b)(6) Depo. Ex. 133 at 13.) Plaintiffs' plans for a gasoline plant also went nowhere, and by October 2011, Plaintiffs had abandoned Decatur. (*Id*. 181:7-182:24; 221:24-222:9.) Instead, Plaintiffs told Siemens they had a new plan (their fourth) to build a coal-to-methanol plant in West Paducah using a new subsidiary—C2L. (Morehead Decl. ¶ 9; Kenny Depo. 118:24-119:24.) So, the parties entered into a new Completion Agreement in July 2012 in which they terminated the 2010 License and Service Agreement, agreed to releases that neither had any claims against the other and terminated the 2010 License and Service Agreement. (Kenny Depo. Ex. 30.) Simultaneously, Siemens and C2L entered into the 2012 License and Service Agreement, to further Plaintiffs' new plan for a methanol plant in West Paducah. (*Id*. Ex. 29.)

Once again, the material terms of the 2012 License and Service Agreement were more favorable to Plaintiffs than the prior agreement. (*Id*.) Siemens still agreed to maintain all of

Siemens' existing performance guarantees for the gasification equipment through December 31, 2015.[5]  Siemens also agreed (again) to give Plaintiffs more time to pay Siemens the past due license and service support fees.  Under the 2012 License and Service Agreement, the bulk of the license fee—€10.9M—was due upon the earlier of Financial Close or February 28, 2013.  (*Id.* Ex. 29 at §3.2.1.)  But Plaintiffs never made payments under the 2012 License and Service Agreement either.  (Kenny Depo. Ex. 12 at 15.)  Since Plaintiffs never paid for the warranty extension, all equipment warranties had already expired.

By the end of March 2015, Plaintiffs had suspended their business operations.  (Kenny 30(b)(6) Depo. 262:17-25.)  Plaintiffs had no paid employees and Plaintiffs' contemporaneous Consolidated Financial Statements reveal Plaintiffs' precarious condition: "[Plaintiffs'] prior losses and other factors raise substantial doubt about [Plaintiffs'] ability to continue as a going concern."  (Kenny Depo. Ex. 12 at 18.)  Plaintiffs' management believed Plaintiffs would be unable "to see the planned coal to methanol project to fruition" and therefore began to explore selling assets while also exploring a fifth iteration of its project—to build a nitrogen fertilizer plant.[6]  (*Id.* at 18-19.)  Paying Siemens, however, was not part of Plaintiffs' plans.  Although Plaintiffs recognized that they were "required" to pay Siemens the license fee on February 28, 2013, they were "of the opinion" (i.e., hoped) that payment would be further extended to an indefinite financial close of their hoped-for fertilizer plant because Siemens had agreed to earlier extensions.  (*Id.* at 15.)  There was no agreement to extend the payment due dates.

**B.**     **Siemens terminates the 2012 License and Service Agreement because**

[5] Siemens performance guarantees are in Appendix 7 to the 2012 License and Service Agreement.  (Kenny Depo. Ex. 27.)

[6] To do so, Plaintiffs would have required a new license from Siemens, since the 2012 License and Service Agreement was for a coal-to-methanol plant only.  This is yet another reason why none of Siemens' alleged conduct could have caused any injury to Plaintiffs' plans for its project in February 2016.

**Plaintiffs refuse to pay for their license.**

By mid-2015, the same domestic market constraints that for over eight years had rendered Plaintiffs' projects uneconomic adversely affected Siemens' efforts to sell new gasification equipment. Siemens decided to exit the business of selling gasifiers in May 2015 but continued to support existing projects and its equipment in the field, including retaining a team of experienced engineers to assist. (Kenny Depo. Exs. 49, 50; Ruesseler 309:12-313:13.) After working out the internal plan for continued support, Siemens (specifically, an employee of Siemens Fuel Gasification Technology named Rolf Ruesseler) discussed Siemens' decision and plan with Plaintiffs (specifically, co-founder Kenny) on February 2, 2016. (*Id.*) Kenny claims that Ruesseler told him that Siemens would not honor Siemens' contractual commitments to C2L and would not provide the relevant technology or assistance to Plaintiffs under any circumstances.[7] (Kenny 30(b)(6) Depo. 405:10-25.) Manufacturing a reason not to pay Siemens the amounts owed, on February 11, 2016, Plaintiffs stated that they understood Siemens' position to be that Siemens would not honor its contractual commitments and was abandoning the Secure project. (Kenny Depo. Ex. 48.) On February 17, 2016, Siemens responded, informing Plaintiffs that "Siemens will not violate any contractual obligation by its strategic exit from [the coal gasification] business." (*Id*. Ex. 49.) Siemens also notified Plaintiffs that they were in breach of the 2012 License and Service Agreement for failure to pay the past-due amounts and that Siemens intended to terminate the 2012 License and Service Agreement. (*Id*.)

---

[7] Kenny's testimony is not credible, but this factual dispute is not material to resolution of summary judgment in Siemens' favor. The parties' subsequent written correspondence shows Siemens' continued willingness and ability to perform the 2012 License and Service Agreement.

Shortly thereafter, Plaintiffs expressed renewed confidence that they could obtain partial financing for their project by July 2016, thus acknowledging that Siemens was still willing to perform (assuming Plaintiffs performed as well). (*Id*. Ex. 50.) To show their willingness to continue to support the project, Siemens offered one final contractual amendment in Plaintiffs' favor. Siemens would extend the deadline for the past-due license fees until July 1, 2016 and the deadline for performance tests from December 31, 2015 to December 31, 2021—if Plaintiffs paid Siemens by July 1, 2016. (*Id*.) But Plaintiffs rejected Siemens' proposed amendment, summarily claiming (as a non-sequitur) that Siemens' decision to exit the business rendered Plaintiffs' 2007 equipment useless and unsalable. (*Id*. Ex. 51.)

Plaintiffs' March 2016 rejection letter confirmed that Plaintiffs still had no realistic plan for developing the Secure project (which discovery of Plaintiffs' financial statements has since also confirmed). In April 2016, Siemens thus revoked its offer to extend payment deadlines and performance guarantees and issued Plaintiffs the final invoice for the €11.4M termination fee under the 2012 License and Service Agreement, which remains unpaid. (*Id*. Ex. 52; Morehead Depo. Ex. 59.)

### C. Plaintiffs' claims and Siemens' counterclaim.

Plaintiffs allege that, beginning October 31, 2010, Siemens concealed from Plaintiffs alleged design defects in the gasifiers which somehow kept Plaintiffs from making any progress in the gasification business. Plaintiffs further allege that Siemens' conduct caused Plaintiffs to suffer $86.3M in damages, which Plaintiffs allege fall into two categories: (1) the equipment and technology has "decreased in value" from $40.3M to $0; and (2) Plaintiffs have

expended $46M "to develop, design, and engineer" their hoped-for plant in West Paducah. (D.N. 63 ¶¶ 27, 34, 58.)  Siemens answered and counterclaimed for breach of contract based on C2L's undisputed failure to pay the termination fee due Siemens.  (D.N. 75.)

Each of Plaintiffs' design defect theories are based—not on the gasifiers and design package Siemens delivered to Secure—but on the experiences of Shenhua, a different Siemens customer producing a different product under different operating conditions at the so-called "NCPP project" in China.[8]  (Kosstrin Depo. 70:9-72:11; Ruesseler Depo. 130:23-131:5.)  In 2007, Shenhua purchased five 500 MW$_{th}$ gasifiers and an engineering package from Siemens. (Ruesseler 30(b)(6) Depo. Ex. 117.)

The NCPP project produces polypropylene (a thermoplastic polymer).  (Ruesseler Depo. 130:23-131:5.)  The unique operating conditions there forced Shenhua and Siemens to design and engineer adjustments to the NCPP project, including the gasifiers—but even so, Siemens passed its performance tests in September 2011.  (Hannemann Depo. 69:23-72:3, Ex. 63.)  With Shenhua's permission, Siemens invited its customers—Plaintiffs among them—to tour the Shenhua plant in October 2011 and observe the gasifiers in action.  (Kenny Depo. 366:25-369:25.)  Shenhua formally certified its acceptance that the gasifiers were fit and had achieved Siemens' performance guarantees in July 2013.  (Morehead Depo. Ex. 47.)  The warranty period expired in July 2014, and the gasifiers have remained in regular commercial operation ever since.  (Morehead Depo. 372:21-373:15; Hannemann 370:3-371:17.)  And Shenhua bought another 24 500 MW$_{th}$ gasifiers from Siemens—hardly the conduct on an

---

[8] Plaintiffs failed to seek any discovery from the Shenhua customer itself.

unsatisfied customer.[9] (Morehead Depo. 144:16-20.)

Most importantly for purpose of summary judgment, Plaintiffs' fraud claims for their own two gasifiers are coextensive with their contract claims. Plaintiffs' sole expert opines that any "shortfalls"[10] in the performance guarantees stated in the Secure 2012 License and Service Agreement qualifies as a "design defect" in the gasifiers. (Kosstrin Depo. 113:24-114:22, 116:15-5.) Plaintiffs' fraud claims therefore relate exclusively to Siemens' performance of the contract—namely, to Siemens' guarantee as stated in Appendix 7 of the 2012 License and Service Agreement. (Kosstrin Depo. 117:6-118:25, Ex. 29 at App. 7.)

## III. LEGAL ARGUMENT AND CITATION TO AUTHORITY

Each of Plaintiffs' claims fails as a matter of law, and because C2L never paid Siemens under the License and Service Agreement, the Court should grant Siemens partial summary judgment on its breach of contract counterclaim.

### A. <u>Plaintiffs' Fraud Claims (Counts IV and V)</u>: Plaintiffs' alleged fraud is dependent on the parties' contracts.

The Court previously held that one of Kentucky (where the last-stated project was to be), Missouri (where Plaintiffs are—though C2L, the company Secure created for the coal-to-methanol project, is a Nevada corporation), or Florida law (where Siemens is) applies to Plaintiffs' fraud claims, but deferred any final decision until the record was better developed.[11]

---

[9] As set forth in Siemens' accompanying *Daubert* motion, Plaintiffs are improperly trying to use Siemens' experiences in start-up and commissioning the Shenhua gasifiers to prop-up Plaintiffs' allegations that there were embedded design defects in the two Secure gasifiers. No such connection exists. The cause of the most significant operational issues at the Shenhua project was Shenhua's well-documented failures to follow the design coal requirements, fuel specifications, and safety protocols that Siemens provided (which Plaintiffs' expert simply failed to consider). Shenhua accepted the performance of the gasifiers in July 2013 and bought two dozen more—those facts are undisputed, but ignored by Plaintiffs' expert.

[10] All of which are speculative and hypothetical since Plaintiffs have never progressed with a plant.

[11] The Court applied Illinois' "most significant relationship test" to determine choice of law because Plaintiffs initiated this action in Illinois state court. D.N. 74 at 8; Restatement (Second) § 145.

With the factual record complete, the Court should apply Kentucky law to Counts IV and V[12] (which relate to the 2012 License and Service Agreement, made "for the West Paducah, Kentucky plant"), but summary judgment is warranted regardless of the law applied.  (Kenny Depo. Ex. 29.)

1.      **Kentucky law should apply to Plaintiffs' fraud claims relating to the 2012 License and Service Agreement.**

The Court should apply Kentucky law to Counts IV and V because Kentucky has the most significant relationship to the 2012 License and Service Agreement at the heart of those Counts.   Since the engineering and support services under the 2012 License and Service Agreement were to be provided at the West Paducah, Kentucky site, Kentucky is where the alleged injury was felt, and the place where performance would have occurred, if Plaintiffs had paid. (Kenny Depo. Ex. 29.)  Plaintiff C2L's, the current licensee, sole purpose was to advance the Kentucky-located project.   (Kenny Depo. 118:18-119:18.)  Plaintiffs' hoped-for project was the subject of public scrutiny in Kentucky, including four public hearings.  (Kenny Depo. 340:6-341:15.)   Further, Plaintiffs submitted a comprehensive tax incentive application to Kentucky to try to advance their hoped-for plant based in part on Siemens' commitments to license a coal-to-methanol plant in the state.  (Scott Depo. 117:15-138:2, Exs. 84-85.)   In contrast, neither Missouri nor Florida was the site for any hearing for the project or the source of any tax incentive plan.  Since Kentucky is the place for the hoped-for project, Kentucky law applies.[13]

---

[12]  After Defendant filed a motion to dismiss, Plaintiffs voluntarily dismissed Count III: "fraudulent misrepresentation - Siemens' support of project."  Doc. No. 74 at 5.

[13]  Missouri has the second-most significant relationship to Plaintiffs' fraud claims.  Plaintiffs are there and planned several other non-gasification "islands" required for their anticipated plants from there.  (Kenny Depo. Ex. 29.)  Florida has the most attenuated relationship with Plaintiffs' fraud claims—Siemens is there, but Siemens'

## 2. The economic loss rule under Kentucky law (or Missouri law) compels summary judgment in Siemens' favor.

Kentucky endorses a broad economic loss rule, which "prevents the commercial purchaser of a product from suing in tort to recover for economic losses arising from the malfunction of the product itself, recognizing that such damages must be recovered, if at all, pursuant to contract law."[14] *Giddings & Lewis, Inc. v. Indus. Risk Ins.,* 348 S.W.3d 729, 733 (Ky. 2011). In *Giddings & Lewis,* the Kentucky Supreme Court held that "the economic loss rule applies in Kentucky to negligence and strict liability claims arising from the malfunction of commercial products" because "economic losses ... deprive the purchaser of the benefit of his bargain and that such losses are best addressed by the parties' contract and relevant provisions of Article 2 in the Uniform Commercial Code."[15] *Id.* at 736, 739–40. The court also applied the rule to negligent misrepresentation claims, reasoning that "when the alleged [negligent] misrepresentations relate solely to the character, nature and performance of the product itself, the claim is essentially an attempt to make an end-run around the negotiated warranty in the parties' contract and the economic loss rule should apply just as it does to negligence and strict liability theories." *Id.* at 744. However, the court declined to consider the rule's applicability to fraud claims because "the plaintiffs in this case pled fraud by omission, a claim that is unsustainable on the record before us, irrespective of the economic

---

communications with Plaintiffs emanated from both Florida and Germany, where Siemens' technical expertise was located. (Morehead Decl. ¶ 3.)

[14] Missouri also applies a broad economic loss rule that bars Counts IV and V. *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.,* 53 F.3d 195, 198 (8th Cir. 1995) ("Missouri prohibits a cause of action in tort where the losses are purely economic"); *OS33 v. CenturyLink Commc'ns, L.L.C.,* No. 4:17-CV-2603 CAS, 2018 WL 6064865, at *6 (E.D. Mo. Nov. 20, 2018) ("fraud claims are barred by the economic loss doctrine under Missouri law, unless they are independent of the contract").

[15] Plaintiffs pleaded that the 2012 License and Service Agreement "constitutes a sale of goods under the Uniform Commercial Code." D.N. 63 ¶ 30.

loss rule." *Id.* at 733.

Federal courts in Kentucky predict the Kentucky Supreme Court would apply the economic loss rule to fraud claims because of its "preference for broader application of the doctrine." *Ashland Hosp. Corp. v. Provation Med., Inc.*, No. CIV.A. 14-44-DLB-EBA, 2014 WL 5486217, at *7 (E.D. Ky. Oct. 29, 2014) (economic loss rule prohibits fraud claims that relate solely to product character and quality and seek damages for purely economic losses resulting therefrom); *Stapleton v. Hartman & Co., Inc.*, No. CV 17-40-HRW, 2018 WL 1546622, at *2 (E.D. Ky. Mar. 29, 2018) (motion to dismiss granted; no fraud based upon alleged statements concerning fitness of equipment being leased for defendant's project); *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 955, 969 (W.D. Ky. 2007 ) (summary judgment granted since economic loss doctrine prohibits fraud claim, "as it is a tort claim arising from a business purchase which is intertwined with the underlying contract action"); *Biszantz v. Stephens Thoroughbreds, LLC*, No. 5:13-CV-348-REW, 2015 WL 574594, at *13 (E.D. Ky. Feb. 11, 2015), *aff'd sub nom. Biszantz v. Stephens Thoroughbreds*, 620 F. App'x 535 (6th Cir. 2015) (summary judgment granted; plaintiff alleges, essentially, a defective good resulting only in loss of  bargain, the rule dictates that damages must be recovered, if at all, pursuant to contract).[16]

Here, Plaintiffs' alleged damages are economic losses compensable through contract law.  Plaintiffs allege that, as a result of their reliance on Siemens' alleged misrepresentation

---

[16] One Kentucky district court decision limits the economic loss rule's application but that decision supports its application here.  In *Corizon Health, Inc. v. CorrecTek, Inc.*, 2018 WL 2768883 (W.D. Ky. June 8, 2018), the court held that "[t]he economic loss doctrine precludes a plaintiff from recovering under a fraud theory *when that claim is intertwined with a breach of contract claim.*" *Id.* at 9.  (Emphasis in original.)  Here, Plaintiffs intertwine their fraud claims with their claim for breach of the warranty for particular purpose—the allegations in paragraph 33 of Plaintiffs' breach claim are virtually identical to those in paragraphs 44 and 62 for Plaintiffs' fraud claims.

by omission: (1) the value of the "Siemens Equipment and Technology" decreased in value from $40.2M to $0; and (2) Plaintiffs spent an additional $46M on development, design, and engineering of the West Paducah plant based on "Siemens Equipment and Technology"— clearly, and exclusively, economic loss. (D.N. 63 ¶¶ 27, 34, 58.)

Moreover, Plaintiffs' fraud claims are that Siemens "was aware of multiple design defects in the Siemens Equipment and Technology" through its experiences at the NCPP project and failed to disclose the alleged design defects to Plaintiffs. (D.N. 63 ¶49.) But Siemens' obligations to deliver non-defective equipment to Plaintiffs derive entirely from contract. (Kenny Depo. Ex. 29.) Section 7 the 2012 License and Service Agreement provides that, based on performance tests of the Secure gasifiers, Siemens has the contractual obligation to "Remedy the nonconformity" (defined by the contract as "*correction of warranty nonconformity or defect*…by repair, replacement or modification as Siemens deems necessary to correct such nonconformity") (emphasis added). (*Id.* §§7.5.4, 7.9.3.2, 1.0 (definition of Remedy).) Thus, the contract requires Siemens to deliver Plaintiffs non-defective gasifiers and to repair, replace, or modify the gasifiers if Siemens does not achieve its performance guarantees. Plaintiffs' fraud theories based on their alleged economic losses fail as a matter of law.

### 3. The independent tort doctrine compels summary judgment in Siemens' favor under Florida law too.

The result is the same if Florida law is applied since it prohibits a contracting party from pursuing tort claims instead of contract claims to avoid the benefits (and limits) of its bargain. *See Travelers Indem. Co. of Connecticut v. Richard McKenzie & Sons, Inc.*, 326 F. Supp. 3d 1332, 1345 (M.D. Fla. 2018). "If a contract imposes a duty and the defendant

breaches that duty, the plaintiff must sue for breach of contract. If society imposes the duty, the plaintiff must sue in tort." *Id.* (internal citations omitted).

In *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 407 (Fla. 2013), the Florida Supreme Court held that the economic loss rule applies only to product liability claims. But *Tiara* does not give plaintiffs carte blanche to assert tort claims that derive from contract obligations. A tort claim still requires a tort "independent of any breach of contract claim." 110 So.3d at 408 (Pariente, J., concurring). Indeed, the post–*Tiara* decisions continue to bar tort claims dependent on a contractual duty. *See Monsoon, Inc. v. Bizjet Int'l Sales & Support, Inc.*, No. 16-80722-CIV, 2017 WL 747555, at *10 (S.D. Fla. Feb. 27, 2017) ("the alleged pre- and post-contract misrepresentations relate exclusively to the Defendant's performance of the contract and cannot therefore be said to give rise to an independent cause of action in tort"); *Kaye v. Ingenio, Filiale de Loto–Quebec, Inc.*, 2014 WL 2215770, at *5 (S.D. Fla. May 29, 2014) (dismissing fraud claims that "are precisely the same as a potential breach-of-contract claim").

At the pleading stage, the Court found that the alleged misrepresentations are "closely tied to Siemens contractual duties" but that Plaintiffs might be able to prove an independent tort duty. (D.N. 74 at 11.) With the record now complete, however, it is clear that Plaintiffs cannot. Each of Plaintiffs' design defect theories entirely depends upon the performance guarantees that Siemens made to C2L in the 2012 License and Service Agreement. (Kosstrin Depo. 110:10-118:25.) Dr. Kosstrin, the only expert Plaintiffs offer, defined a design defect to be any change to the equipment required to meet the performance guarantees in the 2012 License and Service Agreement. In other words, the contract is what defines a "design defect."

(Kosstrin Depo. 113:24-114:22, 116:15-5.)  Dr. Kosstrin did not ground his opinions in any other benchmark whatsoever: he offers no opinion on alternative equipment designs or alternative BEDPs, nor any analysis as to how the "design defects" he identifies impacts the performance of the gasifiers.  (Kosstrin Depo. 110:10-118:25; 119:1-19.)  Instead, Dr. Kosstrin hypothesizes that any change Siemens would have had to make to the Secure gasifiers to achieve Siemens' contractual performance guarantees must, by definition, be a design defect.

The evidence shows that Plaintiffs' fraud claims relate exclusively to Siemens' performance of the contract—namely, to Siemens' performance guarantee as stated in Appendix 7 of the 2012 License and Service Agreement.  (Kosstrin Depo. 117:6-118:25, Ex. 29 at App. 7.)  In other words, Plaintiffs' fraud claims are coextensive with their contract claims and therefore those claims fail as a matter of law.

4. **Plaintiffs have no viable "fraud by omission" claim under Kentucky, Missouri, or Florida law.**

As to "fraud by omission," there is no actual fraud or causation.[17]  An action for fraud cannot be predicated on statements of opinion or promises of future action, but instead must be based on a statement concerning a past or existing fact.  *See Giddings & Lewis, Inc.,* 348 S.W.3d at 748 (Kentucky); *Arthur v. Medtronic, Inc.*, 123 F. Supp. 3d 1145, 1149 (E.D. Mo. 2015) (Missouri); *Mejia v. Jurich,* 781 So.2d 1175 (Fla. 3d DCA 2001) (Florida).

Here, undisputed evidence shows that Siemens made only a promise of future action during the October 31, 2012 meeting that forms the basis of Plaintiffs' alleged "fraud by

---

[17] At the pleading stage, the Court recognized that there generally is no duty to disclose in an arms-length transaction, but noted that Plaintiffs might be able to prove that Siemens voluntarily undertook to disclose information relating to the alleged equipment defects "on October 31, 2012, when representatives told Plaintiffs that 'lessons learned' from the Chinese plant would inform the plans for the Kentucky plant."  D.N. 74 at 11.

omission" theory.  (D.N. 63 ¶50.)  Specifically, Siemens stated—in response to a question from another of Plaintiffs' potential vendors—as follows:

> SK (Igor Ribakovs) asked if Siemens will incorporate lessons learned from their Chinese gasifiers.  Siemens (Rolf Rüsseler) stated that these design improvements will be included in the MidAmerica C2L design, subject to Midamerica C2L paying for the re-engineering (item 5).

(Ruesseler Depo., Ex. 75.)  Plaintiffs concede that the meeting minutes are accurate and that Siemens promised future action—to incorporate the lessons learned from the NCPP project into Plaintiffs' gasifiers, provided that Plaintiffs pay for their reengineering.  (Kenny 30(b)(6) Depo. 364:16-365:15.)  And there is no evidence that Siemens made its promise without any intent to perform—the only evidence is to the contrary.  Siemens' statement is therefore not actionable fraud.

Moreover, there can be no inducement by Siemens nor reliance by Plaintiffs because Plaintiffs had already signed the 2012 License and Service Agreement in July 2012, months before the statement was made in October 2012.  Indeed, Plaintiffs allege they relied on the alleged omission in "enter[ing] the 2012 License Agreement" on July 18, 2012, and "continu[ing] to develop the project" based on Siemens' technology, but Siemens made its statement that Plaintiffs allege triggered a disclosure duty on October 31, 2012.  (D.N. 63 ¶50.)  The Court should grant summary judgment in Siemens' favor on Counts IV and V.

### B.  Plaintiffs' Contract Claims

#### 1.  Count I: Plaintiffs were not ready, willing, or able to perform their obligations.

In Count I, Plaintiffs allege that Siemens repudiated the 2012 License and Service Agreement by deciding to exit the coal gasification market.  D.N. 63 ¶ 25.  But to recover

damages for any alleged repudiation, Plaintiffs must prove they were ready, willing, and able to perform their end of the contract—something Plaintiffs cannot do.[18]

Under New York law[19], anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty. *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). If an anticipatory repudiation occurs, the non-breaching party has two mutually exclusive options. He may elect to treat the contract as terminated and exercise his remedies or continue to treat the contract as valid. *Lucente*, 310 F.3d at 258; *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F.Supp.2d 383, 388 (S.D.N.Y. 1999). If he elects to terminate the contract and sue for breach, he is excused from tendering his own performance. *See* Jur.2d, Contracts § 452, at 139–40 (1996).

To recover damages, however, the non-breaching party must also show that he was ready, willing and able to perform his own obligations but for the repudiation. *Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 523 (2d Cir. 1990); *In re Randall's Island Family Golf Ctr.*, 272 B.R. 521, 524 (S.D.N.Y. 2002). "This principle is merely the application of the general rule that the complaining party must demonstrate that the breach caused him injury; '[t]o do this he must prove that he intended to and was able to perform when his performance was due.'" *Record Club of Am., Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1275 (2d Cir. 1989) (quoting *Scholle v. Cuban–Venezuelan Oil Voting Trust*, 285 F.2d 318, 320 (2d Cir. 1960)). Thus, even where a party breaches by repudiation, "[h]is duty to pay

---

[18] Whether or not repudiation occurred is a triable issue, but Siemens is entitled to summary judgment regardless since Plaintiffs were not ready, willing, and able.

[19] New York law applies to Plaintiffs' breach of contract and warranty claims because the 2012 License and Service Agreement provides that the "validity, construction, and performance of the contract shall be in accordance with the laws of the State of New York, without application of its choice-of-law rules." (D.N. 62, fn. 2.)

damages is discharged if it subsequently appears that there would have been a total failure of performance by the injured party ... sufficient to have discharged any remaining duties of the party in breach to render performance." Restatement (Second) of Contracts § 254(1), cmt a.16

Here, the 2012 License and Service Agreement required C2L to pay €12.18M for the license "in no event later than December 31, 2015"—two months before C2L alleges Siemens repudiated the contract in February 2016. (Kenny Depo. Ex. 29 at §3.2.1.) Siemens demanded the €12.18M license payment but Plaintiffs could not pay it at any time. (RFA No. 27.) In fact, Plaintiffs admit, and their contemporaneous financial statements confirm, that they never had the funding necessary for any iteration of their project. (RFA No. 22; Kenny Depo. Ex. 12 at 4, 15-19; Scott Depo. 162:13-164:16, Ex. 91.) Plaintiffs similarly concede that they would only be able to pay the license fees once the plant was under construction—and not before. (Kenny 30(b)(6) Depo. 234:6-235:7.) In sum, C2L was not ready, willing, or able to perform its own obligations but for the alleged repudiation, and therefore the Court should grant summary judgment in Siemens' favor.

### 2. Count II: There is no warranty of fitness for a particular purpose in the 2012 License and Service Agreement.

Plaintiffs' claim for breach of the implied warranty of fitness for a particular purpose in the 2012 License and Service Agreement (Count II) fails because the agreement expressly disclaims any implied warranty. To disclaim a warranty of fitness for purpose, it is sufficient for the contract to state that "there are no warranties that extend beyond the description on the face hereof." N.Y. U.C.C. §2–316(2). If the written disclaimer is agreed-upon, a "party cannot justifiably rely on a representation that is specifically disclaimed in an agreement." *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 785 (2d Cir. 2003); *Maltz v. Union Carbide*

*Chemicals & Plastics* Co., 992 F. Supp. 286, 304 (S.D.N.Y. 1998) (implied warranty of fitness for a particular purpose claims fail as matter of law if purchase agreement specifically disclaims them).

In this case, the parties agreed to a written, clear, and conspicuous disclaimer of any implied warranty, including for fitness for purpose, in Section 7.12 of the 2012 License and Service Agreement. (Kenny Depo. Ex. 29.) The same disclaimer is in the 2007 ESA and 2010 License and Service Agreement. (Kenny Depo., Exs. 5 at §5.8 and 13 at §7.12.) At the pleading stage, the Court denied Siemens' motion to dismiss Count II, reasoning that Plaintiffs should be able to challenge the disclaimer as unconscionable.[20] (D.N. 62 at 6.) The undisputed evidence demonstrates Plaintiffs cannot do so. Plaintiffs considered at least five other gasifier suppliers at the time they made their decision to purchase and license from Siemens in 2007, the subsequent agreements between the parties were entered because Siemens accommodated Plaintiffs' request to extend their payment deadlines, and Plaintiffs were represented by the Devereux law firm throughout the parties' negotiations of the 2012 License and Service Agreement (and the parties' negotiations of every other agreement). (Scott Depo., Ex. 88; Kenny Depo. 173:17-179:22; RFAs 10, 14, 18.) Plaintiffs concede they could have looked to any of the other gasifier suppliers if they perceived any unfairness in Siemens' negotiating

---

[20] An unconscionable contract is one so grossly unreasonable as to be unenforceable because of an absence of meaningful choice by one of the parties together with contract terms unreasonably favorable to the other party. *Simar Holding Corp. v. GSC*, 87 A.D.3d 688, 689 (2011). There are two major elements: procedural unconscionability (contract formation and choice) and substantive unconscionability (the content of the contract itself). *Id.* The determination of unconscionability is a matter of law. *Industralease Automated & Sci. Equip. Corp. v. R.M.E. Enterprises, Inc.*, 58 A.D.2d 482, 488 (1977). A contract that is negotiated between sophisticated entities represented by counsel and that contains a disclaimer of implied warranties is not unconscionable.

tactics or terms. (Kenny Depo. 198:18-22.) The evidence shows no unconscionability and entitles Siemens to summary judgment.

### 3. Count VI: There is no rescission for "failure of consideration" under applicable law and the claim is untimely.

Plaintiffs' final claim is for rescission of the 2007 ESA based on a failure of consideration (Count VI). The Court was dubious about this claim at the pleading stage because Florida rejects the theory of rescission based on a failure of consideration, as does Missouri. *Webb v. Kirkland*, 899 So. 2d 344, 346 (Fla. 2d D.C.A. 2005) (quoting *Rennolds v. Rennolds*, 312 So. 2d 538, 541 (Fla. 2d D.C.A. 1975)); *Signature Pool & Court, a Div. of Classic Pools, Inc. v. City of Manchester*, 743 S.W.2d 538, 541 (Mo. Ct. App. 1987). But Kentucky recognizes the theory and the Court decided to defer its decision.

Now, on a complete record, the Court should discard Kentucky law for Count VI. Unlike the 2012 License and Service Agreement, Kentucky has no connection to the 2007 ESA. (Kenny Depo. Ex. 5.) Kentucky did not enter the picture until 2010, when Plaintiffs tried to refashion their plans to take advantage of a potential tax incentive from Kentucky. (Scott Depo. 117:15-138:2, Exs. 84-85.) Siemens is entitled to summary judgment under either Missouri or Florida law.

Count VI also fails because it is untimely under either Missouri or Florida law. The statute of limitations under Missouri law is five years for all actions upon contracts, with limited exception not applicable here. Mo. Ann. Stat. § 516.120. The statute of limitations under Florida law is four years for an action to rescind the contract.[21] Fla. Stat. § 95.11(3).

---

[21] There can be no "delayed discovery" as to Count VI since Count VI is founded upon an alleged lack of consideration, not any alleged fraud. Plaintiffs failed to initiate this action until July 2016, over eight years after the December 24, 2007 ESA. (D.N. 1-2, 63 ¶8.)

The Court should grant Siemens summary judgment of Count VI.

**C.     Plaintiffs' alleged recoverable damages are no greater than €5.8M.**

If Plaintiffs are allowed to proceed on any liability theory, the Court should cap Plaintiffs' alleged recoverable damages.  There are two possible scenarios.  If the Court rejects Plaintiffs' rescission claim as to the 2012 License and Service Agreement (Count V), it should cap Plaintiffs' damages claim at €4.78.  On the other hand, if the Court allows Plaintiffs to proceed with its rescission claim, it should cap Plaintiffs' damages claim at €5.8M.  Plaintiffs cannot recover more than €5.8M under either scenario.

Starting with the former scenario, the 2012 License and Service Agreement restrains Plaintiffs' claims for $86.3M in damages since the aggregate cap for liquidated damages for Siemens' non-achievement of the contractually mandated performance guarantees is €4.78M. (Kenny Depo. Ex. 29 at §7.10.2.)  Siemens is not liable to Plaintiffs for any special, incidental, or consequential loss or damage resulting from an alleged breach of contract.  (*Id*. §14.1.)  As set forth above, each of Plaintiffs' design defect theories entirely depends upon the performance guarantees that Siemens made to C2L in the 2012 License and Service Agreement.  (Kosstrin Depo. 110:10-118:25.)  Accordingly, Plaintiffs' damages claims would be capped at €4.78M.

As for the latter scenario (that is, a claim for rescission of the 2012 License and Service Agreement survives), Plaintiffs would be entitled to a return to the status quo as it existed before the parties entered into 2012 License and Service Agreement.  *See Royal v. Parado,* 462 So.2d 849 (Fla. 1st DCA 1985).  The 2010 License and Service Agreement was the status quo before the 2012 License and Service Agreement.  The 2010 License and Service Agreement

contains the same limitations on liability—a cap on damages for Siemens' non-achievement of the contractually mandated performance guarantees and a disclaimer of any special damages. (Kenny Depo. Ex. 13 at §§7.10.2, 14.1.) The only difference is that the amount of the aggregate cap for liquidated damages for Siemens' non-achievement of guaranteed performance is €5.8M—the most Plaintiffs could possibly recover here.

**D.** **Siemens' Counterclaim: Siemens is entitled to summary judgment because C2L breached the 2012 License and Service Agreement.**

Because Plaintiffs were not ready, willing or able to perform the 2012 License and Service Agreement in February 2016, Plaintiffs could not have "terminated" the contract based on Siemens' alleged repudiation. Instead, the 2012 License and Service Agreement remained enforceable by either party. And on February 17, 2016, Siemens notified Plaintiffs that C2L was in breach of the agreementfor failure to pay the past-due amounts and that Siemens intended to terminate under Section 11.3. (Kenny Depo. Ex. 49.) C2L failed to pay any of the past-due amounts. (Kenny Depo. 527:13-528:13.) Siemens therefore terminated the agreement on April 19, 2016 and invoiced Plaintiffs for the €11.4M termination fee, which C2L also has not paid. (*Id.*) Each of the elements of a breach of contract is satisfied: C2L breached the 2012 License and Service Agreement by failing to pay the termination fee (or compensate Siemens for any of the work Siemens performed without pay from December 2007 to February 2016) and Siemens has suffered damages in the amount of the unpaid €11.4M termination fee, plus pre-judgment interest.

**IV.    CONCLUSION**

Based on the foregoing undisputed facts, authority, and arguments, Siemens respectfully requests that the Court grant its Motion for Summary Judgment.

Dated: February 19, 2019

Respectfully submitted,


By:    */s/ James A. Daire*
              Robert W. Thielhelm, Jr.
              Florida Bar No. 889679
              P. Alexander Quimby
              Florida Bar No. 099954
              **Baker & Hostetler LLP**
              SunTrust Center, Suite 2300
              200 South Orange Avenue
              Orlando, FL 32801-3432
              Telephone: 407.649.4000
              Facsimile: 407.841.0168
              Email: rthielhelm@bakerlaw.com
              Email: aquimby@bakerlaw.com

              Scott D. Baker (admitted pro hac vice)
              James A. Daire (admitted pro hac vice)
              Christopher J. Pulido (admitted pro hac vice)
              **Reed Smith** LLP
              101 Second Street, Suite 1800
              San Francisco, CA 94105-3659
              Telephone: 415.543.8700
              Facsimile: 415.391.8269
              Email: sbaker@reedsmith.com
              Email: jdaire@reedsmith.com
              Email: cpulido@reedsmith.com

              *Counsel for Siemens Energy, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on February 19, 2019, a true and correct copy of the foregoing was submitted to the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to the following listed counsel:

Michael R. Cherba
Robert L. Devereux
Jeffrey R. Schmitt
**Danna McKitrick, P.C.**
7701 Forsyth Blvd., Suite 800
St Louis, MO 63105
Telephone: (314) 726-1000
Fax: (314) 725-6592
Email: mcherba@dmfirm.com
Email: rdevereux@dmfirm.com
Email: jschmitt@dmfirm.com

Walter A. Ketcham , Jr.
**Grower, Ketcham, Eide, Telan & Meltz, PA**
901 N Lake Destiny Rd., Suite 450
PO Box 538065
Orlando, FL 32853-8065
Telephone: (407) 423-9545
Fax: (407) 425-7104
Email: enotice@growerketcham.com

DATED:  February 19, 2019.

*/s/ James A. Daire*
James A. Daire