**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **MIDAMERICA C2L INC., et al.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| **v.** ) | Case No. 6:17-cv-171-Orl-40LRH |
| ) | |
| **SIEMENS ENERGY, INC.,** ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |
| ) | |

<u>**DEFENDANT SIEMENS ENERGY, INC.'S OPPOSITION TO PLAINTIFFS'**
**MOTION TO EXCLUDE CERTAIN TESTIMONY OF DEFENDANT'S EXPERT**
**JOHN A. WILLIAMS, PH.D.**</u>

Defendant Siemens Energy, Inc. ("Siemens"), by and through undersigned counsel, submits this memorandum of law in opposition to the motion by Plaintiffs MidAmerica C2L Incorporated ("C2L") and Secure Energy, Inc. ("Secure") (collectively, "Plaintiffs") to exclude certain expert opinion testimony of John A. Williams, Ph.D. ("Williams").

## I.    INTRODUCTION

Plaintiffs assert a hodgepodge of arguments in their attempt to exclude testimony from Williams.  None of these arguments provides a basis for exclusion.  Plaintiffs' motion grossly overreaches, misstates, or mischaracterizes testimony, and attempts to convert subjects for cross-examination into reasons for exclusion.  Nor can Plaintiffs' motion obscure what the record actually shows: Williams' opinions—as to the value of Plaintiffs' gasification equipment and calculations of amounts due to Siemens—are relevant, admissible, and well-supported.  Plaintiffs simply does not like what he has to say, and their

motion accordingly should be denied.

First, Plaintiffs argue that Williams is not qualified to render the engineering analysis that forms part of the basis for his appraisal of Plaintiffs' gasification equipment. Plaintiffs argue that Williams applies "no known standards" in his analysis of the coal and operating conditions at the NCPP project—where Siemens' Chinese customer successfully installed and operated Siemens gasifiers in a polypropylene plant. Plaintiffs stake their entire "design defect" claim as to their own never-operated gasifiers on misplaced assumptions and illogical leaps by their expert, Dr. Herbert Kosstrin ("Kosstrin"), who equates operational issues at the NCPP project with "design defects" in Plaintiffs' gasifiers. In rebuttal, Williams applied several fully-disclosed chemical and combustion engineering principles that boil down to the following: "the successful operation of combustion systems depends on how well the supplied fuel [e.g. coal] complies with the design range for that operation." (D.N. 148-1 at 59-68.) And in the case of the NCPP project, it is undisputed fact that the customer-supplied fuel failed to comply with the design range for that project. Plaintiffs' attempt to divine "design defect" in their own gasifiers based on experiences at the NCPP project is total speculation. The successful operation of the NCPP project and the customer's July 2013 certification that the gasifiers achieved all performance guarantees further supports Williams' opinion that the gasifiers have significant value. Williams also backs up his analysis with a Ph.D. in Chemical and Fuels Engineering, a 32-year industrial career, professional engineering licensure in the industry (including hand-on experience with gasification and combustion systems like the Siemens gasifiers at issue here), and active membership in five professional engineering societies, including recognition as a Fellow of the American

Institute of Chemical Engineers.  He is well-qualified.

Second, Plaintiffs argue that Williams' opinions should be struck as "irrelevant." Plaintiffs start from a false premise, claiming that Williams just "assumes" no design defect (even though that argument contradicts their effort to exclude his engineering analysis). Williams did his own well-founded analysis of Plaintiffs' design defect claims and that analysis is part of his appraisal.  Moreover, Plaintiffs put the value of Plaintiffs' gasifiers at issue.  Plaintiffs allege multiple times in their First Amended Complaint that various alleged conduct by Siemens caused the value of the gasifiers to decrease from $40.2M to $0 and they seek damages based on that alleged decrease in value.  They also seek rescission based on an alleged lack of consideration—i.e., that the gasifiers had no value at the time of the 2007 sale.  Also, their expert, Kosstrin, opines (without qualification or foundation) that the gasifiers are worth no more than "scrap value."  Siemens is permitted to rebut those claims and that opinion with Williams' testimony.

Third, Plaintiffs misstate various aspects of Williams' report and opinions in an effort to attack his credibility.  Plaintiffs accuse Williams of selecting unrepresentative sample sizes of the relevant coal data for the NCPP project, but the evidence proves he used every available operational data point in his analysis.  Plaintiffs argue that his review of the basic engineering and design package[1] ("BEDP") was not thorough enough, but fail to mention that Williams reviewed all 2,714 pages of the BEDP and compared it to the standards set forth in the parties' contract.  Plaintiffs also unfairly attack Williams for not exploring the internals of the gasifiers—which Plaintiffs prevented Williams from investigating.  Plaintiffs

---

[1] Engineering drawings that accompanied the gasification equipment with the sale from Siemens to Plaintiffs.

take Williams to task for not speaking to Siemens' witnesses, even though all the objective data necessary for his analysis was in Siemens witness deposition transcripts (all of whom had been deposed at least once by the time of his report) and the voluminous and complete set of documents he reviewed. And Plaintiffs accuse Williams of opining without foundation on Plaintiffs' consistent failures to achieve financing for their projects, which is an opinion he does not express. While Plaintiffs are free to explore these meritless points on cross-examination, they hardly provide a basis to exclude any of Williams' opinions.

Fourth, Plaintiffs take issue with Williams' (who also has an MBA in finance and extensive experience with capital project costs in both business and academia) calculations of fees which may be due from Plaintiffs to Siemens, in the event that the operative 2012 License and Support Agreement has not been terminated by Siemens. (Siemens' position is that it properly terminated the contract and therefore Plaintiffs owe 92% of the license fee—that is the basis of Siemens' counterclaim—but the possibility exists that the fact finder will conclude that the contract remains in effect, in which case more complicated sets of calculations are required.) Plaintiffs object on the purported ground that the calculations are improper narrative. But the law is clear that an expert can offer narrative testimony as long as the expert is not offering only narrative testimony. While Williams does offer some narrative (namely, that Plaintiffs have not paid Siemens since 2012), he does so to explain his calculations, which require accounting for LIBOR, different currency conversions from euros to dollars over time, and different payment schedules over time based on when Plaintiffs failed to make payment.

There is, in sum, no merit to any of Plaintiffs' efforts at exclusion, and this Court

should deny the motion addressed here and so hold.

## II. LEGAL STANDARD

The Eleventh Circuit summarized the *Daubert* standard and related issues of expert

exclusion as follows (internal citations and quotation marks omitted):

> [T]rial courts determining the admissibility of expert testimony under Federal Rule of Evidence 702 must engage in a rigorous three-part inquiry, considering whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them.
>
> Further, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. A district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury. Quite the contrary, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Indeed, in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility. *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal citations omitted).

## III. WILLIAMS' OPINIONS SHOULD BE ADMITTED

### A. Williams is well-qualified to testify about the value of Plaintiffs' gasification equipment and that includes his evaluation of alleged design defects in the equipment.

"[E]xperts may be qualified in various ways, including by...training, education, and

experience." *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016)

(quoting *United States v. Frazier*, 387 F.3d 1244, 1260–61 (11th Cir. 2004)) (internal

quotation marks omitted). Other indicia of an expert's qualifications may include licenses

held by the expert, publication in the pertinent field, and membership in relevant professional societies. *See Ferrara & DiMercurio v. St. Paul Mercury Ins.*, 240 F.3d 1, 8 (1st Cir. 2001) (considering expert's licenses); *Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990) (considering expert's membership in professional societies).

Here, Siemens retained Williams to consider Kosstrin's report and render his independent opinion on the value of Plaintiffs' gasification equipment, as well as to account for the license fee amounts that may be due to Siemens. Williams is highly qualified to address those issues. He is a licensed professional engineer (including licenses in the states of Florida, Kentucky, Missouri, and Illinois), an Accredited Senior Appraiser (by the American Society of Appraisers) and an instructor in the areas of capital project development and finance for the American Institute of Chemical Engineers, considered the world's leading organization for chemical engineering professionals. (D.N. 148-1 at 90-91.) He has undergraduate and graduate degrees in the applicable technical fields—a Bachelor's Degree in Chemistry, a Master's Degree in Chemical and Fuels Engineering, and a Ph.D. in Chemical and Fuels Engineering. (D.N. 148-1 at 90.) He also has an M.B.A from the University of Chicago, with a concentration in finance. (*Id.*) For the past 22 years, Williams has also taught capital project development at the American Institute of Chemical Engineers and the American Society of Mechanical Engineers. (App. Ex. 1 (Williams Depo. 209:8-14).) During the course of Williams' 32-year career as a practicing engineer plus seven years of University research, he has worked on several projects involving the coal flow technology that forms a basis of Siemens' proprietary gasification technology, including at least three different entrained flow systems involving gasification (of either coal or biomass, another

possible feedstock in a gasification system). (*Id.* (Williams Depo. 55:2-58:25); D.N. 148-1 at 88-90.) Williams is also a member of five relevant professional societies: American Institute of Chemical Engineers (where he is a Fellow), the American Society of Mechanical Engineers, the American Society of Appraisers, the American Chemical Society, and the Association for Advancement of Cost Engineering International (among others). (D.N. 148-1 at 91.)

For the past 24 years, Williams has owned and operated his own engineering consulting firm with a focus on engineering, procurement, and construction management for energy, materials, chemical, and refining facilities. (D.N. 148-1 at 88.) Over the course of more than two decades of consulting, Williams' work has run the gamut from appraisals on one side to engineering, procurement, and construction management services on the other. Williams' engineering, procurement, and construction management services include: project technical analysis, conceptual plant and facilities design, due diligence on technologies, evaluation of potential capital investments, and process and maintenance engineering including momentum dynamics, mass, energy, heat, and transport design within the plant equipment, among other things.[2] (App. Ex. 1 (Williams Depo. 15:17-20:22).)

Despite Williams' wealth of engineering qualifications and experience, Plaintiffs argue he should not be allowed to opine as to whether Plaintiffs' gasification equipment is

---

[2] Williams is certainly more qualified to offer an opinion in this case than Kosstrin, Plaintiffs' designated expert. Unlike Williams, Kosstrin is not an appraiser (certified or otherwise), has never appraised anything, and has no hands-on experience with the commissioning of any coal gasification plant—as a banker's engineer his experience is limited to "witnessing" the commission of a single coal gasification plant. (D.N. 150-3 at 5, 6-7 (Kosstrin Depo. 13:4-13:25, 21:10-23:19).) And though well-educated, Kosstrin's Ph.D. is in mechanical and aerospace engineering—not the chemical and fuel engineering education that would be necessary for a thorough analysis of Plaintiffs' design defect theories in this case. (*Id.*)

defective (though Plaintiffs concede that Williams is a qualified appraiser and he "possesses advance degrees in the field of engineering").[3]  (D.N. 148 at 8-10.)  But a proper consideration of alleged defects is a material aspect of any meaningful appraisal, since defects in the equipment could affect value.  In fact, "functional obsolescences" (defined in relevant part as "loss in value or usefulness of a property caused by inefficiencies or inadequacies of the property itself") are part of the Machinery and American Society of Appraisers' standard for the cost approach in valuing gasification equipment, which Williams considered and applied in this case (among other approaches). (D.N. 148-1 at 34.)  To complete his findings and opinion, Williams evaluated whether there are any material design defects in Plaintiffs' gasification equipment, as Plaintiffs' claim in the First Amended Complaint, which affects the value of the equipment.  And Williams is well-qualified to make that evaluation and render those opinions himself given his extensive engineering credentials and educational and experiential work in the field of coal gasification.

Plaintiffs argue that "a substantial part of [Williams'] work is related to conducting appraisals," but that non-sequitur does not diminish the breadth and depth of Williams' qualifications as a chemicals and fuels engineer—the two go hand-in-hand.  (D.N. 148 at 9.)  Further, Plaintiffs' argument marks another liberty they take with the record, since they fail to point out that "substantial" in this context means that, over the past three years, about one-third of Williams' work has been on the appraisal side of his business—while the remaining two-thirds has been on the engineering, procurement, and construction management services side that Plaintiffs somehow claim fails to establish Williams as a qualified engineering

_____
[3] Section C of Plaintiffs' motion.

expert.  (App. Ex. 1 (Williams Depo. 15:22-16:25).)

Plaintiffs also wrongly suggest that Williams relied solely on his decades of operating experience in rendering his opinions about the condition of Plaintiffs' gasification equipment.[4]  (D.N. 148 at 9.)  That too is false.  As an initial matter, the testimony that Plaintiffs identify to try to support their suggestion is specific to the issue of certain alleged modifications to the Siemens technology undertaken at the NCPP project—not a general description of all the methods Williams undertook in rendering his opinions about Plaintiffs' gasification equipment.  (App. Ex. 1 (Williams Depo. 109:6-114:14).)  Moreover, Williams testified that, as to the specific issue of the alleged modifications, he relied on his analysis of the technical discovery documents (including the exhibits marked by Plaintiffs and the exhibits marked by Siemens) and the operating data for the NCPP plant in concluding there was nothing to substantiate that the modifications occurred or indicated design defects.  (*Id.*)

More generally, Williams applied standard chemical and combustion engineering principles in rendering his opinions that there is no credible evidence of any design defect in Plaintiffs' gasification equipment.  Those principles include: (1) "the successful operation of combustion systems depends on how well the supplied fuel complies with the design range for that operation;" (2) the coal feedstock provided to a gasification system can create combustion related issues which would include "flame shape and pattern, flame temperature fluctuations, degree of combustion completeness, and dust production"; (3) the effects of nonconforming fuel properties will "appear across a variety of [downstream] systems and have a cascading effect": (4) in combustion engineering, the ash contents in feedstock

---

[4]  Though this is really a challenge to Williams' methodology and not his credentials, Siemens addresses it here because Plaintiffs consider it a "qualifications" issue in their motion.  (D.N. 148 at 9-10.)

"impact combustion by influencing the furnace size and burner arrangement and the resulting flame temperature and residence time [that is, the time available for the reaction];" (5) fuel heating value is an important design parameter for combustion systems because it affects "sizing of the fuel handling equipment, furnace volume, and furnace temperature profile"; (6) when the lower heating value ("LHV") is lower than the value for which the system is designed, a cascading effect can occur "as more fuel is added to achieve the desired system performance, potentially stressing fuel feed systems beyond their design rating, reducing furnace residence time, and lowering furnace temperature time"; and (7) increasing fuel loading can also create additional ash since more fuel is added to the system, which "coupled with higher than [designed-for] ash content creates a truly multiplicative effect." (D.N. 148-1 at 59-68.)

Williams concluded these principles apply based on both his own experience and the engineering texts Williams consulted in connection with his work in this case, including most prominently Babcock and Wilcox's *Steam-Its Generation and Use* (now in its 42nd edition)[5]. (D.N. 148-1 at 67 (excerpting from *Steam*) and 113.) Williams also consulted *Gasification* by Christopher Higman[6] and the *Handbook of Synfuel[7] Technology* by Robert Meyers, as

---

[5] First published in 1875, Babcock and Wilcox touts its treatise as "a highly technical and comprehensive reference for advanced steam generation and emissions control technologies, steam fundamentals, metallurgy, advanced materials science and related subjects, and is relied upon by educators, students, engineers and other utility and industry professionals around the world." (App. Ex. 3.) The most recent edition "has been completely updated to reflect the cutting-edge technologies that could pave the way to cleaner energy production in the 21st Century – advanced ultra-supercritical boilers; innovative alloys and materials; state-of-the-art emissions control technologies for greenhouse gases and hazardous air pollutants; waste-to-energy, biomass, solar steam generation and other forms of renewable energy; and more." (*Id.*)

[6] Williams mistakenly referred to the author's last name (Higman) as "Wigham" during his deposition. (Williams Depo. 54:22-55:1, 75:22-77:7.)

[7] Synfuel is fuel made from coal, corn, or other feedstock as a substitute for a petroleum product.

well as articles in periodicals on the subject of gasification. (App. Ex. 1 (Williams Depo. 75:13-77:7).)

The facts in this case are readily distinguishable from the facts in *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 611–12 (7th Cir. 2002), the principal authority on which Plaintiffs rely. In *Dura*, the plaintiff designated a hydrogeologist who worked for a consulting firm as plaintiff's only expert. *Id.* The hydrogeologist later admitted that he was not an expert in the mathematical models on which he relied for his opinions and that the modeling work was done by other, undisclosed experts at the consulting firm. He was therefore excluded as to the modeling. *Id.* In this case, on the other hand, Williams explained at great length his extensive engineering qualifications—also set forth in his report—and all of the opinions and analysis in his report are his own. Unlike the *Dura* hydrogeologist, Williams relied on his expertise, did his own analysis, and is qualified to address all the topics in his report.

In sum, Williams is well-qualified to opine on the condition of Plaintiffs' gasification equipment, including his consideration and elimination of Plaintiffs' claimed "design defects" as a major detractor to that value, and that is precisely what he did in this case.[8] And the evidence shows that his approach to the engineering aspects of his opinion is methodologically sound and based on reliable and verifiable chemical and combustion engineering principles derived from a 40-plus year career in the field and applicable texts and treatises. There are no grounds to exclude his testimony. *See Anderson v. Techtronic Indus.*

---

[8] Plaintiffs mischaracterize other aspects of Williams' "qualifications" as well. Contrary to Plaintiffs' assertions, Williams did not "recalculate coal density" or calculate "overburden pressures" in support of his opinions, and his analysis of the coal data from the NCPP project included all available data points. As set forth in Section III.C, Williams did not "select" or "exclude" any available coal data from the NCPP project.

*N. Am., Inc.*, 2015 WL 7429060, at *7 (M.D. Fla. Nov. 23, 2015) (denying motion for new trial in part because expert testimony supported by articulated scientific principles and engineering handbooks).

      **B.    Williams' testimony is relevant because his appraisal is connected to Plaintiffs' claims about the value of their gasification equipment.**

Relevant evidence is anything that "(a) has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." F.R.E. 401. Rule 702 adds that expert evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue." F.R.E. 702. Expert testimony assists the jury when it "concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier,* 387 F.3d 1244, 1262 (11th Cir. 2004), *cert. denied* 544 U.S. 1063 (2005). In addition, the expert evidence "must have a valid scientific connection to the disputed facts in the case." *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1312 (11th Cir. 1999). That is, there must be an adequate "fit" between the evidence and the case. *Rider v. Sandoz Pharmaceuticals Corp.,* 295 F.3d 1194, 1202 (11th Cir. 2002).

Here, Williams evaluated the value of Plaintiffs' gasification equipment using a cost approach and a sales comparison approach—standard methods for the appraisal of large-scale industrial equipment like Plaintiffs' gasification equipment.[9] (D.N. 148-1 at 25-56.) Since the gasification equipment has sat undisturbed in Plaintiffs' storage facilities for nearly

---

[9] Dr. Williams' methods are also consistent with the Uniform Standards of Professional Appraisal Practice ("USPAP"). (D.N. 148-1 at 14-19.) USPAP is issued by The Appraisal Foundation, the body which is authorized by Congress as the source of appraisal standards and appraiser qualifications. These standards are based on the original 1986–87 by the Ad Hoc Committee on Uniform Standards and are updated biannually with the most recent update is 2018-2019. USPAP's purpose is to establish the acceptable and credible methodologies for providing expert valuations and certifying the individuals who can credibly provide the opinions of value and appraisals. (*Id.*)

a decade, Williams appraised the value of the gasifiers at three different times: (1) February 28, 2009 (when delivery of all major components to Plaintiffs was complete); (2) July 31, 2014 (when Plaintiffs enlisted Siemens to help Plaintiffs offer the equipment for sale on the secondary market and after the period of alleged fraud in Plaintiffs' First Amended Complaint); and (3) February 28, 2016 (after Plaintiffs claim the value of the gasification equipment decreased to $0 as a consequence of Siemens alleged "repudiation"). (D.N. 148-1 at 25-56.) Williams also evaluated Plaintiffs' design defect claims and Kosstrin's report in reaching his opinions.[10] Based on his analysis, he concludes the present value of the gasification equipment is in line with ordinary depreciation in the industry and that there is nothing about the current state of Siemens' technology that would impede a sale by Plaintiffs. (*Id*.)

Williams' testimony is relevant because the value of Plaintiffs' gasification equipment is a disputed issue in this case. It is, in fact, a fundamental element of Plaintiffs' damages claim. Plaintiffs allege in their First Amended Complaint that Siemens repudiated the 2012 License and Service Agreement, and that Siemens' alleged repudiation caused Plaintiffs' gasification equipment to decrease in value from $40.2M to $0. (D.N. 63 at ¶¶26-27.) Plaintiffs also allege that their equipment is unfit for the purpose of building a coal to methanol plant in Paducah, Kentucky (though they never built one) and that the alleged unfitness caused the same decrease in value. (*Id*. at ¶34.) Plaintiffs also allege that "design defects" in the gasification equipment sold to another Siemens customer (a customer that

---

[10] Plaintiffs wrongly assert that Williams simply assumes that the equipment is not defective (an assertion Plaintiffs themselves contradict later in their motion in seeking to exclude Williams' analysis of Plaintiffs' design defect analysis). (D.N. 148 at 5.) Williams assumed no such thing—he did his own independent evaluation described in his report. (D.N. 148-1 at 59-68.)

certified that the gasification equipment achieved all performance guarantees in July 2013) caused the same decrease in value. (*Id.* at ¶34.) Plaintiffs also seek rescission of their original purchase agreement (the 2007 Equipment Supply Agreement) on the grounds that they received "no consideration" for their purchase. (*Id.* at ¶¶88-89.) And Plaintiffs' expert, Kosstrin, concludes with no competent analysis that the equipment is "worthless, except for scrap value." (D.N. 150-2 at 13.)

Plaintiffs clearly put the value of their gasification equipment at issue—again and again—and Siemens is entitled to rebut Plaintiffs' allegations and Kosstrin's "opinion" with Williams' testimony. But remarkably, Plaintiffs argue that his opinions are irrelevant for lack of fit because "the value of the equipment not in a defective state, is not relevant."[11] (D.N. 148 at 5.) This is not a valid relevance argument. Plaintiffs are merely bickering with Williams' conclusion as to value. Plaintiffs say the gasifiers are defective, and thus any contrary testimony is irrelevant. That's cross-examination material, not *Daubert* material. Plaintiffs also offer far too narrow a read of what they have put at issue. For example, Plaintiffs' "repudiation" claim (Count I) is based on Siemens' willingness to perform—at some uncertain date in the future since Plaintiffs have no project—to achieve the performance guarantees in the contract. For another example, Plaintiffs' "rescission—lack of consideration" claim (Count VI) depends on Plaintiffs proving the equipment had no value when delivered—equipment may be "defective" but still have value sufficient to show consideration. Williams' testimony is relevant and should not be excluded for lack of "fit."

---

[11] Section A of Plaintiffs' motion.

**C. Plaintiffs mischaracterize Williams' appraisal opinions in their attempt to support their motion.**

The remainder of Plaintiffs' motion as to Williams' appraisal opinions mischaracterizes his opinions and constitutes meritless criticism of the weight that a factfinder should give those opinions. Plaintiffs' arguments have nothing to do with the admissibility of Williams' opinions and the Court should reject them.

**Williams' evaluation of the operational coal data at NCPP further supports his appraisal of the equipment.** Plaintiffs argue that Williams' evaluation of the operational coal data at the NCPP plant is improper because, Plaintiffs claim, Williams did not use "representative sample sizes" of the operational ash content and LHV content for the coal at the NCPP plant.[12] (D.N. 148 at 11-13.) Plaintiffs are wrong. Williams used all of the available operational coal data for the NCPP plant. He did not select any sample sizes at all. Plaintiffs' argument is premised on a complete misreading of the underlying coal data and of Williams' report and testimony. The underlying coal data is contained in a Siemens spreadsheet[13] in which 1,938 total samples (each sample is a row) were taken at the NCPP plant over a nearly four year period. Williams looked at each sample. (App. Ex. 1 (Williams Depo. 171:17-173:3).) But not every property of the coal was measured for each sample—it depended on what the customer was interested in measuring. The data unequivocally shows that not every property is measured in every row. (App. Ex. 2 (Def. Ex. 58).) The ash content of the coal was measured 684 times, and Williams analyzed all 684 data points

---

[12] Section E of Plaintiffs' motion.

[13] SIEMENS_DEU_0101362 (Def. Ex. 58), an excerpt of which is submitted with this opposition as part of Appendix Exhibit 2.

(100%). The LHV of the coal was measured 459 times, and Williams analyzed all 459 data points. (100%). Plaintiffs are simply wrong in their assertion that Williams engaged in any "sampling" at all.[14]

More broadly, Plaintiffs are correct that it is inappropriate to compare the operational experiences at NCPP (using low quality off-specification Chinese coal) with the entirely hypothetical experience of what may have happened at Secure (where Plaintiffs promised to use high quality Illinois basin coal) to draw any conclusions about what might have happened at Secure.[15] (D.N. 148 at 12.) Gasifiers are configured for a specific coal, not universally operated in the same conditions for all coals. That is Siemens' biggest issue with Plaintiffs' expert, Kosstrin, who premised his entire opinion on alleged operational experiences at NCPP without considering or analyzing the fundamental lack of comparability of the NCPP project to this case. That is one reason why Kosstrin's opinions should be excluded.

**Williams' evaluation of Secure's BEDP was thorough and Plaintiffs' criticism goes to weight, not to admissibility.** Plaintiffs argue that Williams' evaluation of the BEDP that was part of the sale of gasification equipment from Siemens to Plaintiffs was "not Based on a Thorough Review of the substance of the BEDP."[16] (D.N. 148 at 10-11.) This argument is both incorrect and, for purposes of *Daubert*, irrelevant. As an initial matter, Williams did a complete review of the entire BEDP that Siemens provided to Plaintiffs (and

---

[14] The number of data points for each variable (684 for ash content, 459 for LHV) was transposed in one table (10.1) of Williams' report (and correctly stated in his graphs in Figures 10.5 and 10.6). The typographical error has been corrected in an errata. (App. Ex. 4.)

[15] That is why Williams does not express any opinions about what might have happened at Secure. He instead opines that the value of Plaintiffs' gasification equipment is not detrimentally affected by the alleged experiences at the NCPP project since the NCPP project provides no evidence of design defect.

[16] Section D of Plaintiffs' motion.

compared it against what Siemens has promised to deliver to Plaintiffs in the 2007 Equipment Supply Agreement ("ESA")). (D.N. 148-1 at 26-27.) Plaintiffs' BEDP has 18 different categories and 2,714 pages, and Williams brought a box containing the BEDP to his deposition to which he referred Plaintiffs' counsel if Plaintiffs had questions about specific drawings (none were asked). (App. Ex. 1 (Williams Depo. 216:3-217:1).) Further, based on Williams' review and comparison of the BEDP as delivered and the specifications in the 2007 ESA and articulated engineering principles about when and how to redraft a BEDP, he concluded that the BEDP was in material order and that there is a failure of proof as to Kosstrin's opinion that the BEDP is somehow unfit for the purpose of converting coal to syngas. (App. Ex. 1 (Williams Depo. 139:23-141:23); D.N. 148-1 at 26-27.) And in any event, Plaintiffs' assertion that Williams' review of the BEDP was not thorough enough goes entirely to weight, not to admissibility. *See Jones v. Otis Elevator Co.,* 861 F.2d 655, 663 (11th Cir. 1988) (weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility); *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (*Daubert* inquiry "is not intended to supplant" cross-examination).

**Williams' report is reliable and well-supported and he needs no "excuse" from *Daubert*.** Plaintiffs' other criticisms of Williams' appraisal analysis are misleading and meritless. (D.N. 148 at 16-17.)[17]

First, Plaintiffs criticize Williams for not looking at the internals of their gasifiers to support his appraisal opinion, but fail to mention that Plaintiffs refused an internal inspection because the equipment is under nitrogen pressure—the gasifiers are blanketed with nitrogen

---

[17] Section G of Plaintiffs' motion.

to prevent degradation. (D.N. 148-1 at 80.) The irony is not lost that Plaintiffs appear to understand that unsealing the gasifiers would diminish their substantial value. (D.N. 148 at 16; D.N. 148-1 at 79-80.) And the visual inspection Williams did perform was far more comprehensive than was Kosstrin's—he never looked at the equipment at all. (*Id.* at 81-87.)

Second, Plaintiffs also criticize Williams because he did not speak to anyone from Siemens in formulating his opinions. Plaintiffs fail to mention that all of the Siemens witnesses had been deposed at least once by the time Williams rendered his opinions, that Williams reviewed each of those deposition transcripts, and that the Siemens witnesses addressed each issue Plaintiffs identify at the end of their motion. (D.N. 148-1 at 94-105.) A further interview of the Siemens witnesses was unnecessary for Williams to opine. Williams produced a 71-page, comprehensive report with verifiable results and well-supported conclusions, based on his review of over 975 discovery documents (including all deposition transcripts). (D.N. 148-1.) And this is yet another argument from Plaintiffs that goes to weight, not admissibility. *See Schenone v. Zimmer Holdings, Inc.*, 2014 WL 9879924, at *11 (M.D. Fla. July 30, 2014) (admitting expert opinion; the fact that expert did not speak with plaintiff is inadequate basis for excluding expert opinion).

**Williams expressed no opinions about Plaintiffs' long and documented history of failures to finance their planned projects.** Plaintiffs also argue that Williams' opinions as to why Secure failed to get financing for their project should be excluded. (D.N. 148 at 13-15.)[18] But Williams does not opine on why Secure failed to get financing for their project (Siemens' other expert witness, Steve Jenkins, does), so there is nothing to exclude.

---

[18] Section F of Plaintiffs' motion.

### D. Williams' calculations as to what Plaintiffs owe Siemens are reliable and not improper narrative testimony.

In addition to his appraisal opinion, Williams, who has an MBA in finance and 22 years of teaching experience in the areas of capital project development, provides accountings of fees owed to Siemens under certain circumstances, including whether or not the operative 2012 License and Service Agreement has been terminated. Williams avoids any legal conclusions and instead calculates: (1) what C2L would owe Siemens if the 2012 License and Service Agreement remains in effect. If the contract remains in effect, currency conversions and interest calculations equal to the annual rate of LIBOR plus four percent (4%) applied to the overdue payment are required.[19] (D.N. 149-5 at 57 (§3.4.3).) (On the other hand, if Siemens properly terminated the 2012 License and Service Agreement as is Siemens' position in this case, C2L owes Siemens a termination fee which is 92% of the license fee.) Williams makes the interest calculations, accounting for the different currency conversions from euros to dollars over time, LIBOR, and time as to interest based on when earlier payments were due. (D.N. 148-1 at 70-72.) Williams' opinions are clearly reliable under Federal Rule of Evidence 702 and admissible. *See City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 566 (11th Cir. 1998) (matters of arithmetic or algebra are

---

[19] At Plaintiffs' request (due to their lack of funds), Siemens did not submit an invoice to Plaintiffs until February 17, 2016, when it sent a signed letter to Plaintiffs for the past-due license amounts. (D.N. 149-7 at 70-71.) In Plaintiffs' motion, they wrongly assert—without any citation—that "the contract specifically states that Secure does not owe any sum under the [2012 License and Service Agreement] unless and until Siemens submits an invoice." (D.N. 148 at 7.) Instead, the 2012 License and Service Agreement actually states that all payments "shall be due" by dates certain (with the last payment due by December 31, 2015), so that any such payments are past due and accrue interest. The contract also provides that amounts due "shall be paid" against submission of a signed invoice. (D.N. 149-5 at 56 (§3.2.1).) The 2012 License and Service Agreement further provides that the failure of either party to immediately enforce any provision of the contract is not a waiver of the right of either party to later enforce the provision. (D.N. 149-6 at 8 (§22.2).) Plaintiffs cannot use Siemens' efforts to help Plaintiffs by not immediately invoicing Plaintiffs against Siemens.

"well-established as reliable.")

Nonetheless, Plaintiffs seek to exclude Williams' opinions (which Plaintiffs erroneously characterize as a "prejudgment interest" calculation) on the grounds that it is narrative.[20]  (D.N. 148 at 6-8.)  But, as this Court has held, an expert can convey factual narratives to the jury as long as the expert is not used "*exclusively* for this purpose."  *Halaoui v. Renaissance Hotel Operating Co.*, 2015 WL 2250941, at *5 (M.D. Fla. May 13, 2015) (emphasis in original).  While Williams' opinions are based in part on the narrative that Plaintiffs failed to pay Siemens for seven years when payments were due, the amounts that may be due to Siemens are based on far more than only narrative information, including the calculative conversions of euros to dollars (which varied over time) and LIBOR over a three year period.  There is no basis to exclude his opinion based on any "narrative" objection.

## IV.    CONCLUSION

Siemens respectfully requests that the Court deny Plaintiffs' motion to exclude certain expert opinion testimony of John A. Williams, Ph.D.


Dated:  March 5, 2019

<div style="margin-left:40%">

Respectfully submitted,

By: */s/ James A. Daire*_____
    Robert W. Thielhelm, Jr.
    Florida Bar No. 889679
    P. Alexander Quimby
    Florida Bar No. 099954
    Baker & Hostetler LLP
    SunTrust Center, Suite 2300
    200 South Orange Avenue
    Orlando, FL 32801-3432
    Telephone: 407.649.4000

</div>

---

[20] Section B of Plaintiffs' motion.

Facsimile: 407.841.0168
Email: rthielhelm@bakerlaw.com
Email: aquimby@bakerlaw.com

and

Scott D. Baker (admitted *pro hac vice*)
Email: sbaker@reedsmith.com
James A. Daire (admitted *pro hac vice*)
Email: jdaire@reedsmith.com
Christopher J. Pulido (admitted *pro hac vice)*
Email: cpulido@reedsmith.com
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA  94105-3659
Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

*Counsel for Siemens Energy, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 5, 2019, a true and correct copy of the foregoing was submitted to the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to the following listed counsel:

Michael R. Cherba
Robert L. Devereux
Jeffrey R. Schmitt
**Danna McKitrick, P.C.**
7701 Forsyth Blvd., Suite 800
St Louis, MO 63105
Telephone: (314) 726-1000
Fax: (314) 725-6592
Email: mcherba@dmfirm.com
Email: rdevereux@dmfirm.com
Email: jschmitt@dmfirm.com

Walter A. Ketcham , Jr.
**Grower, Ketcham, Eide, Telan & Meltz, PA**
901 N Lake Destiny Rd., Suite 450
PO Box 538065
Orlando, FL 32853-8065
Telephone: (407) 423-9545
Fax: (407) 425-7104
Email: enotice@growerketcham.com

DATED: March 5, 2019.

_/s/ James A. Daire_
James A. Daire