UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIDAMERICA C2L INCORPORATED, a )
Nevada corporation; and SECURE ENERGY, )
INC., a Nevada corporation, )
           )
           Plaintiffs/Counter- )
           Defendants, )      Case No. 6:17-cv-171-Orl-40LHR
           )
v. )
           )
SIEMENS ENERGY, INC., a Delaware )
corporation, )
           )
           Defendant/Counter- )
           Plaintiff.

## SIEMENS ENERGY, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiffs' motion is rife with unsupported speculation, innuendo, and factual disputes that preclude partial summary judgment of rescission. One tell that Plaintiffs cannot sustain their burden is that they spend almost their entire motion on legal theories and factual allegations that are not in the case. Plaintiffs avoid any element-by-element analysis of the two—and only two—claims for rescission they plead in their operative First Amended Complaint. When the spotlight shines on those two claims, each fails as a matter of law, without the Court having to resolve any material fact issue.

A short procedural history helps contextualize Plaintiffs' motion for partial summary judgment. Plaintiffs' only rescission claims are: (1) rescission of the 2012 License and Service Agreement and the 2012 Completion Agreement, for alleged fraud (Count V); and (2) rescission of the 2007 Equipment Supply Agreement ("ESA") and all subsequent agreements,

on the purported grounds that Plaintiffs' purchase of the gasification equipment from Siemens lacked any consideration (Count VI).[1]  Since both of these claims are defective as a matter of law, Plaintiffs embarked—on the virtual eve of the dispositive motion deadline—on a fruitless effort to add to the case more futile claims and factual allegations.

Initially, in late December 2018, Plaintiffs moved for leave to file a Second Amended Complaint to add, for the first time, the same fraud and rescission theories and factual allegations they attempt to advance in this motion.  The Court denied Plaintiffs' motion for leave to file the Second Amended Complaint on January 17, 2019.  (D.N. 137.)

Next, Plaintiffs attempted to circumvent the Order by moving for reconsideration under the guise of a February 5, 2019 "motion to continue trial setting."  Then, Plaintiffs ignored the Order and filed their February 19, 2019 motion for partial summary judgment as if all of their eleventh hour theories—fraud based on non-pleaded alleged facts, rescission due to mistake, and rescission due to impossibility among them—were at issue.  The Court issued a second Order on February 26, 2019 denying Plaintiffs' motion for reconsideration.   Nonetheless, Plaintiffs continue to act as if non-pleaded fraud and rescission theories are at issue.

For Siemens' part, it objects to Plaintiffs' motion for partial summary judgment as to the non-pleaded claims and allegations, which the Court should summarily deny.  Moreover, Plaintiffs' bid for partial summary judgment of the two claims that are actually in the case—Counts V and VI—also fails, albeit for different reasons.

In Count V, Plaintiffs seek rescission of the 2012 License and Service Agreement for

---

[1] D.N. 63 at ¶¶60-92.  The only factual allegation that Plaintiffs pleaded with any particularity as to the alleged fraud relates to a meeting held in Washington D.C. on October 31, 2012.  *Id.* at ¶68.

alleged fraud as to the existence of alleged "design defects" in Plaintiffs' gasification equipment. But there is no evidence of any such alleged design defect in Plaintiffs' equipment. Plaintiffs' theory hinges entirely on the alleged operational experience of a different Siemens customer in China (Shenhua) operating a different process plant (to produce polypropylene at the NCPP project) under different conditions (different coal, different fuel gas for the burners in the gasifiers, and disregarded Siemens safety instructions, among other things). The fatal problem for Plaintiffs is that they have not and cannot show any foundation for the comparison they try to make between the alleged operational experiences of the gasifiers at the NCPP project and the (entirely hypothetical) experiences of the gasifiers at their project—assuming Plaintiffs had ever unpacked and operated their gasifiers—for a host of reasons.

For one reason, the coal used to feed the gasifiers at the NCPP project (low quality coal mined in China) was different from the coal Plaintiffs promised to use (high quality Illinois basin coal)—there is no dispute about that. To compare the NCPP project experience with the hypothetical Secure project experience as if they were identical, Plaintiffs or their expert needed to account for the differences in feedstock materials. They did not.

For two other reasons, (1) the coal used to feed the gasifiers and (2) the fuel gas used to operate the burners at the NCPP project were not the coal and fuel gas that Siemens had designed for, and not the coal and fuel gas Shenhua had promised Siemens it would use for, that project. That too is beyond dispute. To make the NCPP project experiences comparable to their hypothetical project, Plaintiffs needed to account for Shenhua's use of off-specification coal and fuel gas in its gasifiers. They did not.

For a fourth reason, Shenhua is satisfied with their performance and continues to use

them in commercial operation today. In fact, Shenhua certified in July 2013, years before this dispute arose, that their gasifiers had achieved each of the performance guarantees that Siemens had made. Plaintiffs thus stake their entire case on alleged "design defects" in equipment that the owner/operator affirms is fit for use, and has successfully used in commercial operation for nearly six years.

In addition to the foundational deficiencies with Count V, Plaintiffs' request to rescind the July 2012 License and Service Agreement for alleged fraud suffers from another fatal flaw. Plaintiffs are not entitled to any rescission remedy as to the 2012 License and Service Agreement because it is impossible that Siemens' alleged statements induced Plaintiffs to enter it. The only alleged misrepresentation Plaintiffs state with requisite particularity in the First Amended Complaint allegedly occurred in October 2012, over three months after the parties signed the 2012 License and Service Agreement. (D.N. 63 ¶ 68.) These flaws are why Plaintiffs are so desperate to inject new fraud claims and factual allegations. The unspecific new claims and allegations are also futile, since their subject matter (Siemens' alleged misrepresentations or silence as to their gasifiers at NCPP) is the same subject matter as Section 5 of the 2012 License and Service Agreement.

As for Count VI—in which Plaintiffs seek to rescind the 2007 ESA and all subsequent agreements for lack of consideration—that claim is also legally infirm for several reasons. As set forth in Siemens' motion for summary judgment, Plaintiffs' claim does not exist under applicable Florida or Missouri law, it is time-barred,[2] and it fails because Plaintiffs terminated

---

[2] To the extent Plaintiffs argue that New York law applies to Count VI, they do so in violation of the Court's Order holding that New York law does not apply. D.N. 74 at 13-14. Regardless, the limitations period under New York law is six years, so the action would time-barred under New York law too. *See Rubin v. Rubin*, 275 A.D.2d 404, 405 (2000); CPLR 213[1].

the 2007 ESA and affirmed that Siemens had performed all material obligations.[3]  Further, Plaintiffs cannot prove the original 2007 ESA lacked consideration.  There is no evidence that Plaintiffs' equipment was worthless when they purchased it in 2007, and even Dr. Herbert Kosstrin, Plaintiffs' expert, testified it is worth at least "scrap value" today.  Plaintiffs' own financial statements further belie Plaintiffs' claim.  In Plaintiffs' two most recent annual statements, in 2016 and 2017 (each prepared after Plaintiffs initiated this litigation), Plaintiffs admit the Siemens equipment constitutes $40M of Plaintiffs' $56M in total assets (with most of the remaining $16M coming from the value of the 2012 License and Service Agreement they claim to have rescinded).  The evidence shows Plaintiffs received consideration for their purchase of gasification equipment in 2007, which is all that is required to scotch Count VI.

At bottom, Plaintiffs' motion seeks to confuse rather than clarify.  Since Plaintiffs cannot sustain their actual rescission claims as a matter of law, let alone show the absence of any dispute of material fact, the Court need not wade into Plaintiffs' thicket of non-asserted claims and 69 disputed and/or immaterial facts.  Plaintiffs' motion should be denied.

## II.    STATEMENT OF DISPUTED "MATERIAL FACTS"

Siemens disputes the following statements, which Plaintiffs assert are "undisputed material facts" necessary to support partial summary judgment, and the basis for the dispute.

| Plaintiffs' ¶ No. | Evidence of Dispute |
|---|---|
| 1 | Secure was founded to develop and construct a facility to convert coal to town gas (a gaseous mixture created when bituminous coal burns), not natural gas (a gaseous mixture that is mostly methane and has much higher heat content than town gas).  After Secure's plans for a town gas plant collapsed, Plaintiffs |

---

[3] The 2010 Completion Agreement provides that Siemens performed all material obligations under the 2007 ESA. Plaintiffs' confirmed that provision's accuracy.  (Kenny Depo. 281:7-286:10.)

| Plaintiffs' ¶ No. | Evidence of Dispute |
|---|---|
| | decided to try to advance a substitute natural gas plant instead. (Kenny 30(b)(6) Depo, 22:11-22, 24:10-15, 27:15-20, 52:23-53:7, 65:6-11.) |
| 4 | Siemens required Plaintiffs buy the gasifiers to obtain the Siemens BEDP, not the "necessary BEDP." Plaintiffs could have obtained a BEDP from any of the four other gasifier suppliers (General Electric, Shell Sasol Lurgi, British Gas Lurgi) they met with before entering a contract with Siemens. (Kenny Depo. 198:20-199:19; Kenny 30(b)(6) Depo. 16:23-19:19, Def. Ex. 88 at 31.) |
| 9 | Secure did not pay the $40.2M. Secure acquired a loan from ARC Financial (convertible by ARC to an equity interest) specifically for the purpose of purchasing the equipment and BEDP and used the loan to purchase the equipment. (Smith Depo. 16:17-20:12, Def. Exs. 138-139.) |
| 10 | Siemens' 200 MW gasifer had been used on a commercial scale in Schwarze Pumpe, Germany, and Siemens' cooling screen gasification technology was proven to perform properly. (Ruesseler Decl. ¶¶16-23, Exs. 2-3; Morehead Decl. ¶¶7-8, Exs.1-4.) Plaintiffs' gasifiers are rated at 500 MW. Siemens used the data obtained from the existing gasifiers in Schwarze Pumpe, Germany in Freiberg, Germany, as well as equilibrium-based software, to scale up from 200 MW to 500 MW. The 500 MW design had not been tested in the field as of 2007, and NCPP was the first project that would employ these gasifiers. Siemens disclosed each of these facts to Plaintiffs prior to the 2007 Contract. (*Id.*; Kosstrin Depo. 182:14-184:3, Def. Ex. 104 at 13-14.)<br><br>Plaintiffs' paragraph 10 is also immaterial and should be stricken under Federal Rule of Civil Procedure 12(f), since it is an (insufficient and futile) allegation that Plaintiffs tried to make in their twice-rejected, proposed Second Amended Complaint. Further, Plaintiffs' paragraph 10 is inadmissible parol evidence. (Kenny Depo., Def. Ex. 29 at § 23.0 ("Neither Party will be bound by any prior obligations, conditions, warranties or representations with respect to the subject matter of this Contract.").)[4] |
| 12 | Siemens' gasification technology was proven to perform. (Ruesseler Decl. ¶¶16-23, Exs. 2-3; Morehead Decl. ¶¶7-8, Exs.1-4.) Siemens gained the gasification technology to be utilized for the various iterations of Plaintiffs' project through Siemens AG's acquisition of Future Energy GmbH (a subsidiary of Sustec Holding AG) in 2006. Siemens also hired many of the Future Energy engineers as part of the acquisition. (Ex. 104 at 3.) Future |

[4] This issue recurs throughout Plaintiffs' statement and Siemens objects throughout where indicated. Alleged representations that pre-date October 31, 2010 are outside the boundaries of Plaintiffs' pleadings as set forth in the briefing related to Plaintiffs' motion for leave to file a Second Amended Complaint and Motion to Continue Trial Setting.

| Plaintiffs' ¶ No. | Evidence of Dispute |
|---|---|
| | Energy had itself acquired the gasification technology from other companies, as Siemens fully explained to Plaintiffs. (Ruesseler Decl. Ex. 2 at 1; Morehead Decl. Ex. 1.)<br><br>Siemens acquired over 20 years of successful operating. Since 1984, the Schwarze Pumpe facility has used a variety of feedstocks (including coal) to produce a variety of products (including syngas for methanol). (*Id.*)<br><br>Anticipated benefits to using Siemens' gasification technology (assuming design coal is used and the owner-operator keeps all other operational and start-up promises) include high availability (90% expected for a single train) and very high total carbon conversion (> 99%). But Siemens' performance guarantees were contained in each of its license agreements, and were based on coal consumption, oxygen consumption, and syngas production. (Ruesseler Decl. Ex. 1 at App. 7.)<br><br>The life of the cooling screen was proven. The Schwarze Pumpe cooling screen was in service for eight years. It had to be taken out in 1998 as the German Pressure Vessel Code required and was replaced by a new one at that time; further inspection showed that the removed cooling screen would have sustained operation beyond the eight years. (Ruesseler Decl. Ex. 3 at 7.)<br><br>The Siemens gasification technology works with no restriction on ash content or composition, but the design of specific gasifiers (including whether to use cooling screens or refractory lining) depends on ash content and composition, as does the configuration of the gasifiers. (Morehead Decl. Ex. 10.) Siemens' performance guarantees for Plaintiffs' project are contained in the 2012 License & Service Agreement and premised on Plaintiffs' use of the design coal they promised they would use. (Ruesseler Decl. Ex. 1 at App. 7.)<br><br>Siemens also objects to Plaintiffs' paragraph 12 on the grounds it is immaterial and inadmissible parol evidence. |
| 13 | Burners are one component of a gasifier. The one-burner configuration in Siemens' 500 MW gasifier was based on the design of Siemens' three-burner configuration in the 200MW gasifier.[5] (Hannemann Depo. 159:21-160:20.) The one-burner configuration was also modeled using flow testing on a |

---

[5] Plaintiffs again misrepresent evidence in support of their assertion that it is "undisputed" the burners in the 500 MW gasifier were "new and novel." Hannemann, the Siemens Fuel Gasification Technology CTO, testified the single-burner design was *not* a dramatic design change and explained why. (Hannemann Depo. 159:21-160:20.)

| Plaintiffs' ¶ No. | Evidence of Dispute |
|---|---|
|  | smaller scale and tested in the field at the NCPP project, consistent with best practices in scaling-up. (Ruesseler 30(b)(6) 79:20-80:22, Kosstrin Depo., Ex. 104 at 14 (Kosstrin: "Siemens' approach to scale-up appears to take into consideration the appropriate parameters.").) |
| 14 | The five gasifiers delivered to the Chinese plant were of an identical class to the two gasifiers that Plaintiffs purchased. (Hannemann Depo. 215:21-24). |
| 15 | The one-burner configuration in Siemens' 500 MW gasifier utilized the same design principles as the commercially proven 200 MW gasifier and was not dramatically different. (Hannemann Depo. 159:21-160:20.) |
| 16 | The 200 MW gasifier was manufactured and produced by GDR, which was acquired by Sustec, which was acquired by Siemens. (Schuld Depo. 76:14-78:17.) |
| 19 | Siemens coal gasification technology was based on other activities in addition to those that took place at Schwarze Pumpe. Siemens' predecessor constructed test facilities in Freiberg, Germany from 1994 to 1998. These facilities were used to gasify more than 100 candidate gasification feeds—including 35 coal types—to investigate their gasification behaviour and to analyze the quality and the characteristics of the resulting synthesis gas. (Ruesseler Decl. ¶18; Morehead Decl. ¶7.) |
| 20 | Siemens had operational experience with coal gasification as a result of its acquisition from Sustec/Future Energy (which included Sustec/Future Energy engineers). The experience was summarized, among other places, in Siemens' public presentations and a document that Siemens provided to Plaintiffs in 2008. (Ruesseler Decl. Exs. 2-3; Morehead Decl. Ex. 1.) |
| 21 | Siemens had operating records from 1984-1989 that are summarized, among other places, in a document that Siemens provided to Plaintiffs in 2008. (Ruesseler Decl. Ex. 3 at 1.) |
| 22 | Siemens was engaged in a joint venture in order to license its intellectual property into the Chinese market. The Chinese gasification plant itself was not a joint venture. Siemens had no interest other than as a supplier in the NCPP project. (Morehead Depo 193:23-194:5, Pl. Ex. 29 at 5.) |
| 23 | The pins in Plaintiffs' gasifiers are not defective and Siemens did not "switch" the pins from Plaintiffs' project to the NCPP project in the manner Plaintiffs claim. Cooling screens with 14-millimeter ("mm") pins were manufactured first. Cooling screens with 15 mm pins were manufactured second, and delivered to the NCPP project in their five gasifiers. Siemens did not and could not have "switched" the pins, since Plaintiffs' project was for two gasifiers and the NCPP project was for five gasifiers. Further, a difference of |

| Plaintiffs' ¶ No. | Evidence of Dispute |
|---|---|
| | one mm in pin length in the cooling screen would have no impact on the performance of Plaintiffs' gasifiers. (Plaintiffs' expert, Dr. Kosstrin, failed to address pin length of the cooling screen in his report.) Moreover, if Plaintiffs had ever started-up their project and asked that Siemens replace the 14 mm pins with 15 mm pins, Siemens would have done so. (Hannemann Depo. 213:16-219:3; Ruesseler 30(b)(6) Depo. 73:24-78:3.)<br><br>Siemens also objects to Plaintiffs' paragraph 23 on the grounds it is immaterial and outside the scope of Plaintiffs' fraud claims, which are entirely premised on alleged design defect, not alleged manufacturing error. |
| 24 | The cooling screens in Plaintiffs' gasifiers were on-specification. Pins in the cooling screen were off-specification by one mm. Moreover, Ruesseler testified about the 14 mm pins: "I learned this during the last couple of days, yeah, but I mean, at the time when that happened, I was not aware of this, no." (Ruesseler 30(b)(6) 217:8-219:19.)[6]<br><br>Siemens also objects to Plaintiffs' paragraph 24 on the grounds it is immaterial and outside the scope of Plaintiffs' fraud claims. |
| 25 | The cooling screens in Plaintiffs' gasifiers were on-specification. Pins in the cooling screen were off-specification by one mm. (Hannemann Depo. 213:16-2:19:3; Ruesseler 30(b)(6) Depo. 73:24-78:4.)<br><br>Siemens also objects to Plaintiffs' paragraph 25 on the grounds it is immaterial and outside the scope of Plaintiffs' fraud claims. |
| 26 | Siemens, through its expert Dr. Williams, sought to inspect the current condition of the interior of the gasifiers but Plaintiffs prevented the inspection to preserve the value of the gasifiers. (D.N. 148-1 at 80.)<br><br>Siemens also objects to Plaintiffs' paragraph 26 on the grounds it is immaterial and outside the scope of Plaintiffs' fraud claims. |
| 28 | The 2010 License Agreement was for a technology license, inspection and refurbishment work (if required), engineering service, and technical field assistance. (Kenny Depo., Def. Ex. 13 at §2.0.) "Equipment related to Siemens coal gasification and technology" was not within the scope of the contract. (*Id.*) |

---

[6] Ruesseler was a Siemens 30(b)(6) witness, but the cooling screens were not a 30(b)(6) topic and the Plaintiffs did not allege the manufacture of the pins in the cooling screen to be a "defect" in their operative First Amended Complaint or identified as a "defect" in Dr. Kosstrin's opinions. (Ruesseler 30(b)(6) Depo. 7:18-8:19, P. Ex. 105-1, D.N.s 63, 150-2.)

| Plaintiffs' ¶ No. | Evidence of Dispute |
|---|---|
| 29 | The 2010 License Agreement provides that the license fee "shall be due and paid" in installments between March 31, 2010 and December 31, 2014 and "shall be paid" against submission of an invoice. (*Id*. at §3.2.1.) |
| 30 | Siemens started a burner modification program for the NCPP project in November 2009, before commissioning began, to add a layer of nickel to the burners as a precautionary safety measure, not to correct any defect. |
| 32 | Siemens made no representations to Plaintiffs about the performance of the Siemens technology at the NCPP project before execution of the March 2010 License Agreement. The Chinese customer did not even finish building the plant at the NCPP project until August 2010. Commissioning began in October 2010 and Siemens informed Plaintiffs, in writing, of the status of commissioning, and the schedule for beginning operation in January 2011. (Kenny Depo, Def. Ex. 15.)  Siemens also objects to Plaintiffs' paragraph 32 on the grounds it is immaterial and inadmissible parol evidence. |
| 33 | Commissioning of the gasifiers began in October 2010. Pre-commercial operation of the Chinese plant did not start until April 2011. (Morehead Depo. Pl. Ex. 29 at 9.) |
| 34 | A burner and cooling screen in a gasifier in one of three lines in commissioning was damaged during testing through no fault of Siemens. The other two gasifiers achieved dozens of hours of continuous operation and produced methanol during the same testing period. (Morehead Depo., Pl. Ex. 26 at 2.) |
| 36 | There were no design defects with the gasifiers' pilot burners at the NCPP project. The reason the operator removed the pilot burners on two of the five gasifiers was due to the operator using the wrong fuel gas and disregarding Siemens' instructions. (Ruesseler Depo. 104:15-105:5.) |
| 37 | There was no defect with the gasifiers' sprayer and quench nozzles at the NCPP project. Part replacement was required on two gasifiers because the fuel the Chinese customer provided had a much higher ash content than what the contract stipulated. (Schuld Depo. 208:8-209:9.)[7] |
| 38 | Some of the cooling screens required repair based on operating conditions. Other cooling screens did not. (D.N. 146-24 at 3 (describing successes).) The fact that some required repair and others did not require repair further shows there was no design defect, since a design defect would have affected all the cooling screens in the same way. (D.N. 147-1 at ¶145.) |

[7] Plaintiffs cut off their citation to Schuld's answer in mid-sentence (at 209:3), thereby avoiding the reason for the replacement parts.

| Plaintiffs' ¶ No. | Evidence of Dispute |
|---|---|
| 39 | Siemens was not a joint venture partner on the Chinese plant. (Morehead Depo 193:23-194:5, Pl. Ex. 29 at 5.) Siemens received a letter from its customer, Shenhua, with a list of 31 "cost items" totaling €53.3. Siemens responded to the letter and pointed out it had achieved its performance guarantees and would not pay the cost items. (Hannemann Depo. 55:15-:59:11, Def. Ex. 61.) The customer never made any formal claim and never pursued the costs. (Ruesseler 30(b)(6) Depo. 280:8-281:24, Hannemann Depo. 370:10-371:17.) |
| 40 | There was no claim relating to the Chinese plant. (*See* evidence in response to paragraph 39.) |
| 41 | The NCPP project was not a gasification plant, it was a polypropylene plant. The purpose of a general overhaul in a process plant is to bring the whole plant down (not just the gasification island) for a maintenance period. It had nothing to do with the performance of the gasifiers. (Morehead Depo. 378:7-379:2; Schuld Depo. 265:16-25.) |
| 43 | Siemens was not a joint venture partner on the Chinese plant. (Morehead Depo 193:23-194:5, Pl. Ex. 29 at 5.) Siemens formed a joint venture in order to license its gasification technology into China. The joint venture company licensed the technology to Shenhua, the sole owner/operator of the plant. (*Id.*) |
| 44 | The March 15, 2012 presentation was made during a meeting with a non-party, SK E&C. (D.N. 146-19 at 2.) It was not presented to Secure. (Morehead Decl. ¶15, Exs. 11-12.) |
| 49 | The pictures in Plaintiffs' Exhibit 79 are from a Siemens gasifier in Vresova, Czech Republic that uses refractory lining. They are not photographs from the Chinese project. (D.N. 146-42 at 3.) |
| 50 | The Secure project is not the subject of the email excerpted in Exhibit 78. The subject is an onerous request made by SK E&C, Secure's potential contractor, to convert all of the metric units Siemens used in the design of Plaintiffs' gasifiers into U.S. units. (Ruesseler Decl. ¶25; Ruesseler Depo. 250:20-258:6.) |
| 51 | The estimate in Plaintiffs' Exhibit 98 was for optional engineering services, not to modify the technology for the Siemens project. (Ruesseler Depo. 330:10-333:19.) |
| 53 | The quoted excerpt in Plaintiffs' Ex. 83-1 relates to a hypothetical response from a potential customer and is not "with respect to Siemens' gasifier burner." Siemens' burner had the same performance as a Chinese |

| Plaintiffs' ¶ No. | Evidence of Dispute |
|---|---|
| | competitor's burner (the 711) which had been copied from Siemens' design. (Schuld Depo. 181:24-198:21.) |
| 54 | Mr. Urban's email in Plaintiffs' 83-1 concerns a pitch for a different gasification project (neither NCPP nor Secure). And Mr. Urban did not believe any such collaboration for improvement was necessary, as his statement two sentences earlier demonstrates: "We will provide all information available to show how the performance of ou[r] burner really is. The team led by [Hannemann] and [Ruesseler] is preparing already a presentation to support our statements." (D.N. 146-43.) |
| 55 | The 500 MW gasifier was a first time application at NCPP, and a gasifier of that class had not been tested in the field before NCPP. More generally, the Siemens gasification technology was successfully demonstrated in several applications and was proven mature. (Ruesseler Decl. ¶¶16-23, Exs. 2-3; Morehead Decl. ¶¶7-8, Exs.1-4.) The draft PowerPoint (P. Ex. 46) is specific to the "500 MW$_{th}$ technology." (D.N. 146-36 at 4.) |
| 56 | As stated in the Plaintiffs' Exhibit 69-2, modifications at the NCPP project were necessary because:

Siemens designed the gasifiers for [the NCPP project] under the assumption that the coal quality used for commissioning, testing and operation would be the same coal as specified in the Siemens contract. This was not the case. The plant and gasifiers were commissioned, tested, and now operate using an alternate coal, different and of lesser quality than the design coal. In any case Siemens achieved the guaranteed performance with this alternate coal(s). (D.N. 146-40 at 7.) |
| 58 | There was no availability guarantee in any contract, nor did Siemens know Plaintiffs claim to have needed such a guarantee to achieve financing. Siemens knew in mid-2007 that Plaintiffs sought an availability guarantee of 57% the first year, 70% the second and 85% the third tied to some type of service agreement, but no such agreement was reached. Instead, Siemens guaranteed a set amount of syngas production per hour, which Plaintiffs represented to Siemens would be sufficient for them to obtain financing for their project. (Kenny Depo. 385:6-387:24, Def. Ex. 29 at App. 7.)

This is also inadmissible parol evidence. |
| 59 | To calculate availability, one needs to account for other process units in the polypropylene plant at the NCPP project. Ruesseler specifically testified that he disagreed with how Plaintiffs' counsel tried to calculate availability and explained why. (Ruesseler Depo. 208:23-211:18.) |

| Plaintiffs' ¶ No. | Evidence of Dispute |
|---|---|
| 60 | According to Jenkins, the availability of liquid and coal/solid feedstock IGCC and coal gasification plants during the first two years of operation typically ranges from 4-32% for Year 1 and 15-58% for Year 2. (D.N. 146-7 at 4-5; 147-1 ¶¶30-31.) |
| 61 | There were no material problems with the Siemens gasification equipment. The issues encountered during commissioning and start up at NCPP resulted from the customer's undisputed use of the wrong coal and fuel gas, among other things. (Morehead Depo., Pl. Ex. 29 at 12, Kosstrin Depo. 70:20-72:4.) And the customer certified in July 2013 that Siemens had achieved each of its performance guarantees. (P. Ex. 47.) |
| 62 | It is unclear what Plaintiffs means by "Siemens maintained its representations," which is unspecific. Siemens' material representations to Plaintiffs during the relevant time were true, as set forth herein. |
| 66 | Siemens had operational burners in commercial application for coal gasification at the NCPP project. (Ruesseler 30(b)(6) Depo. 29:5-30:2, 199:23-206:21.) Plaintiffs mischaracterize the Hannemann testimony, which was Siemens developed a fifth generation of burner in 2014 that was not deployed. (Hannemann Depo. 344:17-345:5.) |
| 67 | Siemens made no material misrepresentations to Plaintiffs. (Ruesseler Decl. ¶¶16-23, Exs. 2-3; Morehead Decl. ¶¶7-8, Exs.1-12.) Siemens also objects to Plaintiffs' paragraph 24 on the grounds it is immaterial and outside the scope of Plaintiffs' fraud claims. |
| 68 | Siemens' coal gasification equipment and technology works and actually achieved all performance guarantees at the NCPP project, and it would work as intended at the Secure project. (Morehead Depo., Pl. Ex. 47; Ruesseler 30(b)(6) Depo. 29:5-30:2.) |
| 69 | Plaintiffs purported to rescind only the original 2007 Equipment Supply Agreement (which Plaintiffs had already terminated, as they concede in paragraph 27 of their motion.) (Morehead Depo., Pl. Ex. 54.) |

## III.   MATERIAL FACTS THAT PLAINTIFFS IGNORE

Plaintiffs also omit facts that compel denial of their motion, including as follows:

### A.   Plaintiffs' inability to advance their project was due to their own self-inflicted wounds and changing market conditions.

In their motion, Plaintiffs speculate that their nine-years gestating project would have been an "inevitable engineering failure," for which Plaintiffs blame Siemens' gasification equipment.   In so speculating, Plaintiffs ignore the overwhelming evidence that the principal

causes of Plaintiffs' failures to advance their projects were their own ill-conceived business plans and operations, continually evolving project targets, and the changing market for coal gasification between 2006 and 2015. Plaintiffs never developed the necessary in-house expertise to credibly design and build a sophisticated process plant. (Scott Depo. 31:24-33:12.) At the inception of Plaintiffs' business, when they simply wanted to produce town gas and sell it to the nearby Archer Daniels Midland, this may have been passable. (Kenny 30(b)(6) Depo. 22:11-26:14.) But as Plaintiffs reconfigured their plans again and again for more sophisticated plants—from town gas to substitute natural gas to gasoline to methanol to fertilizer (and Plaintiffs' estimated construction cost rose from $50 million to nearly $2 billion)—Plaintiffs should not have relied on their "self-build" strategy. (*Id.* 180:18-181:25.)

This is not just Siemens' view. Plaintiffs' deficient business design and operation plans were principal reasons why the U.S. Department of Energy ("DOE") rejected Secure's loan guarantee application in 2009. (Kenny Depo. 229:4-266:25, Def. Ex. 9.) The DOE questioned the following aspects, among others, of Secure's then-planned coal-to-methanol plant:

- Secure's lack of experience in the industry and with "self-management" of a project of this size and scope;

- The lack of credibility, financial viability, quality of workmanship, and ability to provide necessary support and services, as to any of Secure's proposed vendors other than Siemens;

- Secure's deliberate decision during the early stages of the project not to seek a lump sum, fixed price, turnkey contractor;

- Secure's evolving project size and scope over the course of its design and development. (*Id.*)

The changing domestic energy market likewise did Plaintiffs no favors. When Plaintiffs first conceived of their coal-to-town gas and coal-to-syngas projects, they planned to

use the off-take from Plaintiffs' plants as a substitute for natural gas.  But the low price of natural gas made that idea a non-starter for both prospective investors and customers.  Next, Plaintiffs changed their plans a couple of more times, first to produce gasoline and then to produce methanol, instead of raw syngas.  But the falling price of oil effectively extinguished Plaintiffs' prospects for those plans, too.  (Kenny Depo., Def. Ex. 12 at 18-19.)

Plaintiffs' co-founder Jack Kenny's checkered history also contributed to Plaintiffs' failures.   In an August 1999 initial determination, the Securities and Exchange Commission ("SEC") found Kenny had participated in a scheme to defraud clients, misrepresented facts, and breached fiduciary duties while working as a securities broker.  (Kenny Depo. at 552:3-562:10.)  The full SEC and the Eighth Circuit affirmed.  (*Id*.)  The SEC barred Kenny from association with any broker, dealer, or investment adviser and ordered him to pay $2 million in disgorgement and civil penalties.   A significant prospective investor declined to invest because of Kenny's SEC history, and there were undoubtedly others.  (Scott Depo. 96:7-105:2, Def Exs. 80-82.)

**B.      The NCPP project was a success where Siemens' gasifiers passed all performance tests and exceeded guaranteed performance achievements.**

Plaintiffs ignore all of the evidence that shows the NCPP project was a success. Siemens passed its performance test for the NCPP gasifiers in September 2011 and documented its success in a comprehensive, contemporaneous 41-page test report it delivered to Shenhua.  (Hannemann Depo. Ex. 63.)   Shenhua never questioned any aspect of the September 2011 test results.  (Hannemann Depo. 69:14-72:3.)  Plaintiffs make much ado about the list of 31 cost items that Shenhua presented to Siemens in March 2012, but they ignore the undisputed facts that Shenhua never pursued any claim that the gasifiers were defective and

Siemens never paid anything to Shenhua in response to the "list of costs." (Ruesseler 30(b)(6) Depo. 280:18-281:24.)  Instead, Siemens passed a *second* performance test for the NCPP gasifiers in August 2012.  (Hannemann Depo. 98:14-104:24.)  Shenhua next certified, in July 2013, that the Siemens gasifiers had achieved all of Siemens' performance guarantees (which were different than Siemens' guarantees for the Secure project).  (Morehead Depo, Pl. Ex. 47.)  Under Siemens' contract with Shenhua, the July 2013 acceptance certificate started the one-year warranty period for Siemens' equipment.  The project closed, a success, at the end of the warranty period. (Hannemann Depo. 369:25-371:17, Ex. 71; Morehead Depo. 372:20-373:15.)

In fact, the project was so successful that Shenhua bought from Siemens 24 additional gasifiers for a different project.  Plaintiffs cannot dispute this fact, so they quibble that Shenhua bought the burners for those 24 gasifiers from a local Chinese company, 711, instead of Siemens.[8]  (D.N. 158 at 16.)  Shenhua simply made an economic choice to contract with a cheaper supplier.  Indeed, Shenhua was so confident in the Siemens gasifiers that it paired them with cheaper burners.  And the Siemens gasification technology worked with the 711 burners, just as it had before with Siemens' burners.  (Morehead Depo. 144:16-20.)  No partial summary judgment can be granted based on "defect" in the gasifiers at the NCPP project.

Nor have Plaintiffs laid the requisite foundation for any comparability between the NCPP project and their own in the first place.  The operating conditions at the NCPP project were different than the (entirely hypothetical) conditions at the Secure project—another material fact that Plaintiffs ignore—which renders the comparability Plaintiffs attempt entirely

---

[8] Before Shenhua switched its burner supplier, 711 gained access to Siemens' proprietary burner design.  A few months later, 711 began to offer for sale burners that were identical to the Siemens design save for a few cosmetic differences.  (Hannemann 76:21-82:22, Def. Exs. 65-67.)

unreliable. The feedstock coal that Shenhua used at the NCPP project was low quality sub-bituminous (the second-to-lowest rank of coal), whereas the feedstock coal that Plaintiffs promised to use for their project was higher quality bituminous coal. (Hannemann Depo. 333:7-24; Jenkins Depo. 217:3-15.) Further, Shenhua consistently used coal that was "outside the range" of the coal for which the NCPP gasifiers had been designed. (Kosstrin Depo. 70:20-72:4.) Plaintiffs, on the other hand, promised to use the design coal and comply with Siemens' specifications if they ever proceeded with their project. (Kenny Depo., Def. Ex. 29 at Appx. 2.) Further still, Shenhua used liquid petroleum gas as its fuel for the pilot burner in the gasifier, even though the pilot burner was designed for natural gas. (Schuld Depo. 354:2-19.) Plaintiffs promised to use natural gas if they ever proceeded with their project, in accordance with their contractual commitments to Siemens. (Kenny Depo., Def. Ex. 29 at Appx. 2.) In sum, there is no evidence to support Plaintiffs' view that NCPP was their "sister project in China"—all of the evidence points to the contrary.

### C. Plaintiffs' gasifiers had value when Plaintiffs purchased them and they retain significant value today.

Plaintiffs also have no evidence to support their claim that their original 2007 purchase is void because of a lack of consideration. The only competent evidence and Plaintiffs' own documents show the gasifiers had value when Secure purchased them and retain value today.

As to Plaintiffs' purchase, Defendants' expert, Dr. John Williams, ascertained the fair value of the gasifiers at the time Siemens delivered the equipment to Plaintiffs in March 2009 using two well-settled appraisal methodologies—the cost approach and the sales comparison approach—and appraised the value at $48.1 million. (D.N. 148-1 at 23-57.) Plaintiffs, on the other hand, offer no evidence that the equipment was somehow worthless, either when

purchased or when Siemens delivered the equipment in March 2009.[9]  (D.N. 150-2.)

Moreover, Plaintiffs' own financial statements continue to state the gasification equipment retains substantial value, even after Plaintiffs filed this lawsuit in July 2016 claiming the equipment "decreased in value from the $40,298,436.00 paid to $0.00." (D.N. 1-2 ¶24.)  Indeed, five months later, Plaintiffs reported that, as of December 31, 2016, the value of the gasification equipment was $40,864,000. (Kenny 30(b)(6) Depo. 305:9-310:11, Def. Ex. 125 at 4.)  And a year after that, as of December 31, 2017, Plaintiffs reported the gasification equipment was worth $40,863,016.  (Kenny 30(b)(6) Depo. 305:9-310:11, Def. Ex. 126 at 4).[10]

## IV. PLAINTIFFS' TWO "FRAUD" AND "LACK OF CONSIDERATION" RESCISSION COUNTS FAIL AS A MATTER OF LAW

### A. At the threshold, Plaintiffs fail to show that their legal remedies are inadequate as to either Count V or Count VI.

"Rescission is an equitable remedy," the purpose of which "is to undo the original transaction and restore the former status of the parties." *Billian v. Mobil Corp.,* 710 So.2d 984, 990–91 (Fla. 4th DCA 1998).  As the court has ruled, a claim for rescission under Florida law requires, among other things, no adequate remedy at law.[11]  (D.N. 74 at 14.)

As a threshold issue that applies to both counts, Plaintiffs fail to even address the adequacy of their legal remedies in their motion, let alone carry their burden to show they are inadequate.  Moreover, the evidence shows that Plaintiffs have an adequate remedy for any alleged defect in the gasifiers; namely, an action for breach of contract should Plaintiffs'

---

[9] Plaintiffs' expert, Kosstrin, opines that the equipment presently has at least "scrap value"—and therefore has worth.  (D.N. 150-2 at 13.)

[10] Plaintiffs did not produce an annual financial statement for 2018.

[11] Plaintiffs seek partial summary judgment under Florida law or New York law.  The Court has already ruled that New York law does not apply to Counts V and VI (D.N. 74 at 13-14), but New York law also requires that plaintiffs show their legal remedies are inadequate to seek rescission.

gasifiers not work according to Siemens' performance guarantees.  Siemens has the contractual obligation to "Remedy the nonconformity" (defined by the contract as "***correction of warranty nonconformity or defect***…by repair, replacement or modification as Siemens deems necessary to correct such nonconformity") (emphasis added).  (Kenny Depo. Def. Ex. 29 §§7.5.4, 7.9.3.2, 1.0 (definition of Remedy)).  Plaintiffs were required to pay Siemens for past-due fees, but that does not render the breach of contract remedies inadequate.  *See Acquafredda v. Messina*, 408 So. 2d 828, 829 (Fla. Dist. Ct. App. 1982) (plaintiff's assertion that he was unable to post the required attachment bond did not make remedy inadequate).

> **B.     Plaintiffs' gasifiers are fit for their intended use and Plaintiffs cannot prevail on their rescission-fraud claim (Count V).**

Plaintiffs argue that the Court should rescind the 2012 License and Service Agreement (Count V) based entirely upon fraud "allegations" that are not at issue in this case.  In Plaintiffs' operative First Amended Complaint, Plaintiffs only put communications "[b]etween October 31, 2010 and July 18, 2012" at issue and only alleged a single meeting—in October 2012— with the requisite particularity to survive scrutiny under Rule 9(b).  (D.N. 63 ¶¶67-68.)  In Plaintiffs' motion for summary judgment, however, they ignore the October 2012 meeting entirely and seek rescission of the 2012 License and Service Agreement based on non-pleaded alleged misrepresentations going back to the inception of the parties' dealings in 2006.  (D.N. 146 at 20-22.)  Plaintiffs' motion fails for the following reasons.

**Plaintiffs' assertions as to all non-alleged conduct and events are not in the case.**
The Court has twice ordered that Plaintiffs cannot pursue the (futile) claims and allegations in their hoped-for Second Amended Complaint.  Plaintiffs have ignored both Orders.  Their motion should therefore be denied.  *See Dooley Mack Constructors, Inc. v. M & I Marshall &*

*Ilsley Bank*, 2010 WL 2035139, at *6 (M.D. Fla. May 21, 2010) (granting defendants' motion for summary judgment as to fraudulent inducement because plaintiff failed to plead this claim with sufficient particularity); *Lustig v. Bear Stearns Residential Mortg. Corp.*, 2010 WL 11519401, at *3 (S.D. Fla. Jan. 13, 2010) (same).

**The merger doctrine bars Plaintiffs' new claims and allegations.** The gravamen of Plaintiffs' new claims and allegations (that is, everything but the October 2012 meeting alleged in the First Amended Complaint) is that Siemens either misrepresented or was silent about several specific developments (or specific alleged defects, according to Plaintiffs) in the gasifiers at the NCPP project before Plaintiff C2L signed the 2012 License and Service Agreement. But, as Plaintiffs concede, Section 5 of the 2012 License and Service Agreement specifically addresses Siemens' obligations to inform Plaintiffs of all improvements, modifications, and developments to Siemens' gasification technology, including those experienced at other plants. (Kenny Depo., Def. Ex. 29 §5; D.N. 146 at 21, fn. 3.) Plaintiffs' new claims and allegations are therefore barred by the merger doctrine, which precludes reliance on a prior representation if the subject matter of the representation is adequately covered in the parties' subsequent agreement. *Schubot v. McDonalds Corp.,* 757 F.Supp. 1351, 1358 (S.D. Fla. 1990); *S & B Investments, LLC v. Motiva Enterprises, L.L.C.,* 2004 WL 3250306, at *4 (S.D. Fla. Dec. 6, 2004) (collecting cases[12]). The merger doctrine does not bar fraud in the inducement claims when the only "subject matter" in the underlying contract is a

---

[12] Some cases couch the principle as a branch of the economic loss rule, while others frame it as being unreasonable for a party to rely on prior representations when the subject matter is covered in the agreement and expressed contrary to the representation. Regardless, the rule is the same: a fraud action may not be based on the subject matter of a prior representation if it is covered in the parties' subsequent agreement. *Id.*

boilerplate integration clause.  But it does when, as here, the contract makes specific reference to the subject matter of the alleged prior representations.[13]  *See Larach v. Standard Chartered Bank Int'l (Americas) Ltd.,* 2011 WL 13173896, at *10 (S.D. Fla. June 7, 2011) ("'inducing' misrepresentation must relate to an issue that *falls outside* of the four corners of the written contract").  Since the contract speaks to the same specific subject matter as the alleged pre-contract misrepresentations, Count V fails as a matter of law.

**Plaintiffs had notice of all material facts at all times.**  Plaintiffs' motion also fails because they cannot carry their burden that Siemens made any material misrepresentation that induced Plaintiffs to enter the 2012 License and Service Agreement (as described in the evidence summarized in Section II above).  Siemens maintained minutes of technical meetings and contemporaneously provided those minutes to Plaintiffs for review and comment. (Morehead Decl. ¶¶9-14.)  To pick just a few examples, Siemens convened a comprehensive three-day meeting in June 2007 in Freiberg, Germany to review all technical details of the gasification equipment with Plaintiffs and their engineering consultant before the 2007 contract signings.  (Morehead Decl. Ex. 5.)  After contract signing, Siemens convened another meeting in Orlando in January 2008 to go over all technical aspects of the gasifiers and the BEDP.  (*Id*. Ex. 6.)  In May 2008, Siemens visited Plaintiffs in St. Louis and reviewed the manufacturing schedule for Plaintiffs' gasification equipment again, as well as the protocol for Plaintiffs' inspection of the gasification equipment once it arrived.  (*Id*.)  (Plaintiffs never raised any

---

[13] According to Plaintiffs, Section 5 imposes on Siemens "a continuing 'duty to speak' in advising Secure with respect to defects and modifications to the gasification technology."  (D.N. 146 at 21, fn. 3.)  Although Plaintiffs mischaracterize the scope of Siemens' obligations, which require Siemens to inform C2L of any improvements to the gasification technology developed or acquired and released for commercial application by Siemens, that mischaracterization makes no difference to the merger doctrine.

issues as to their inspections.) (*Id*. Ex. 7.) In September 2008, Siemens invited Kenny to meet the third party manufacturer of the gasifiers' burners in Freiberg and tour the manufacturer's facilities. (*Id*. Ex. 8.) Siemens did not disclose "defects" in the NCPP project gasification equipment to Plaintiffs because no defects ever existed. (Ruesseler Decl. ¶28.) To the contrary, in July 2013, after start up and commissioning at the NCPP project was complete, Shenhua certified that Siemens had achieved all performance guarantees. (D.N. 146-37 at 3.)

Moreover, much of Plaintiffs' motion distorts or misrepresents facts to try to create new fraud theories. Paragraph 44 of Plaintiffs' motion is illustrative. Plaintiffs contend that the March 15, 2012 PowerPoint they summarize was a "presentation to Secure," but offer no evidence to substantiate that assertion. (D.N. 146 ¶44.) Indeed, Plaintiffs' assertion is demonstrably false. The presentation was directed to SK E&C USA ("SK") in Houston, Texas. (D.N. 146-19 at 2.) At the time, SK was a potential contractor for two different Siemens' customer projects—Secure and TCEP. Neither Plaintiffs, nor their principals, were on the invitation list and Plaintiffs do not have the presentation. (Morehead Decl. ¶ 15, Exs. 11-12.) The document Plaintiffs claim was "presented to Secure" was lifted from Siemens' document production in this case—an attachment that Siemens sent to SK. (*Id*.) Plaintiffs could not have relied on anything in the PowerPoint.

### C.    Plaintiffs received consideration for their purchase, so they cannot prevail on their rescission-lack of consideration claim (Count VI).

Count VI fails as a matter of law as set forth in Siemens' motion for summary judgment. Plaintiffs' motion reveals other fatal flaws.

**Plaintiffs' assertion that "it did not receive the object it sought from Siemens as a result of this relationship" is irrelevant**. (D.N. 146 at 19.) A promise, no matter how slight,

qualifies as consideration for a contract if the promisor agrees to do something that he or she is not already obligated to do. *Crystal Colony Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 6 F. Supp. 3d 1295, 1299 (S.D. Fla. 2014) (citations omitted). The consideration required to support a contract need not be money or anything having monetary value, but may consist of either a benefit to the promisor or a detriment to the promisee. *Owings v. T-Mobile USA, Inc.*, 978 F. Supp. 2d 1215, 1220 (M.D. Fla. 2013). To conclude that consideration is fair or unfair, rather than merely extant, is not the proper province of the court. *Diaz v. Rood*, 851 So. 2d 843, 846 (Fla. Dist. Ct. App. 2003). The following is undisputed: (1) Siemens delivered gasification equipment to Plaintiffs though it was not already obligated to do so; (2) the equipment was and always has been worth at least scrap value; and (3) Plaintiffs' financial statements in 2016 and 2017 show that Plaintiffs acknowledge that the current value of the gasifiers is in excess of $40M. The Court's inquiry can stop there.

**Siemens never made the availability guarantees Plaintiffs claim in any contract (and the alleged failure to achieve availability guarantees does not constitute lack of consideration).** To the extent Plaintiffs continue to argue Siemens made Plaintiffs an "availability guarantee" that Plaintiffs never received, Plaintiffs mischaracterize the contracts between the parties based on inadmissible parol evidence. In the operative and fully integrated 2012 License and Service Agreement, Siemens' performance guarantees are contained in Appendix 7, where Siemens' guarantees as to coal and oxygen intake and syngas output—not general availability—are clear and unambiguous. Those are the parameters that are within Siemens' control, assuming the operator complies with its contractual commitments. Each of the contracts between Siemens and Secure, including the 2007 ESA, contain performance

guarantees on those metrics. "Availability" is not a basis to rescind all of the contracts between the parties.

**Two stray emails prove nothing.** The sum total of Plaintiffs' "evidence" for their $40.5M rescission claim are two statements that Plaintiffs pluck from two Ruesseler emails (one in 2012, the other in 2014). Plaintiffs then divorce those two statements from all context and ignore Ruesseler's testimony about their meanings. The evidence shows that neither statement has anything to do with condition of the BEDP Siemens delivered to Plaintiffs in 2008 or the equipment they delivered to Plaintiffs in 2009. (Ruesseler Decl. ¶25, Ex. 4.) Each relates to the effects of possible changes Plaintiffs were considering years after the fact—in 2012, an onerous possible change in the measuring units for the entire BEDP and in 2014, a possible swap of the design coal. In any event, Ruesseler's statements in 2012 and 2014 are immaterial to Plaintiffs' claim that there was no consideration furnished for the equipment Plaintiffs purchased in 2007 and received in 2008-2009.

> **D.     Plaintiffs did not plead mutual mistake or impossibility of performance, and neither applies here.**

The Court also should summarily dispose of Plaintiffs' arguments as to mutual mistake and impossibility of performance, which Plaintiffs did not plead in the First Amended Complaint. *See Caloosa Prop. Owners Ass'n, Inc. v. Capitol Specialty Ins. Corp.*, 2012 WL 12845876, at *6 (S.D. Fla. Oct. 11, 2012), *aff'd*, 522 F. App'x 638 (11th Cir. 2013) (failure to allege mutual mistake in amended complaint entitled defendant to summary judgment). Moreover, Plaintiffs' arguments as to each are premised on the same set of disputed facts that compels the denial of Plaintiffs' motion as to Counts V and VI.

As to "mistake" (mutual or otherwise), there is no material mistake of fact here. The

evidence shows there were no design defects in the gasifiers at the NCPP project, there were no availability guarantees in the parties' contracts, and Siemens has an operational burner for fuel gasification.  (*See, e.g.*, Ruesseler 30(b)(6) Depo. 29:5-30:2, 199:23-206:21; Ruesseler Decl. ¶¶16-23, Exs. 2-3; Morehead Decl. ¶¶7-8, Exs.1-4.)

As to "impossibility," Siemens' decision to wind down its fuel gasification division did not adversely affect its ability to perform the 2012 License and Service Agreement, either as of February 2016 or today.  Siemens did not formally close the division until May 2018. Moreover, Siemens retains to this day the key engineers responsible for the gasification business, including Ruesseler and Hannemann.  (Hannemann, it is worth noting, is one of the world's experts on gasification, an inventor of 20 issued patents in the field, and a published book author on the subject.  (Hannemann Depo. 26:10-31:10.))   In fact, Siemens offered to *extend* the deadline for its performance guarantees to December 31, 2021 if Plaintiffs agreed to pay the past-due license fees by July 2016 (Plaintiffs refused).  (Kenny Depo. Ex. 50.)  And Siemens always retained the right to delegate its obligations to subcontractors or other vendors, remaining contractually liable to Plaintiffs for all obligations.  (Stip. Fact ¶3; Kenny Depo., Def. Ex. 29 at §1.0.)  Siemens' decision to close its gasification division did not render it difficult for Siemens to perform the contract, let alone impossible.  *See Valencia Ctr., Inc. v. Publix Super Markets, Inc.,* 464 So. 2d 1267, 1269 (Fla. Dist. Ct. App. 1985) (even performance that is inconvenient, profitless, and expensive is not impossible).

## V.     CONCLUSION

Based on the foregoing disputed facts, authority, and arguments, Siemens respectfully requests that the Court deny Plaintiffs' motion for partial summary judgment.

Dated:  March 21, 2019

Respectfully submitted,


By:    /s/ James A. Daire
       Robert W. Thielhelm, Jr.
       Florida Bar No. 889679
       P. Alexander Quimby
       Florida Bar No. 099954
       **Baker & Hostetler LLP**
       SunTrust Center, Suite 2300
       200 South Orange Avenue
       Orlando, FL 32801-3432
       Telephone: 407.649.4000
       Facsimile: 407.841.0168
       Email: rthielhelm@bakerlaw.com
       Email: aquimby@bakerlaw.com

       Scott D. Baker (admitted pro hac vice)
       James A. Daire (admitted pro hac vice)
       Christopher J. Pulido (admitted pro hac vice)
       **Reed Smith LLP**
       101 Second Street, Suite 1800
       San Francisco, CA  94105-3659
       Telephone: 415.543.8700
       Facsimile: 415.391.8269
       Email:  sbaker@reedsmith.com
       Email:  jdaire@reedsmith.com
       Email:  cpulido@reedsmith.com

       *Counsel for Siemens Energy, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 21, 2019, a true and correct copy of the foregoing was submitted to the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to the following listed counsel:

Michael R. Cherba
Robert L. Devereux
Jeffrey R. Schmitt
**Danna McKitrick, P.C.**
7701 Forsyth Blvd., Suite 800
St Louis, MO 63105
Telephone: (314) 726-1000
Fax: (314) 725-6592
Email: mcherba@dmfirm.com
Email: rdevereux@dmfirm.com
Email: jschmitt@dmfirm.com

Walter A. Ketcham , Jr.
**Grower, Ketcham, Eide, Telan & Meltz, PA**
901 N Lake Destiny Rd., Suite 450
PO Box 538065
Orlando, FL 32853-8065
Telephone: (407) 423-9545
Fax: (407) 425-7104
Email: enotice@growerketcham.com


DATED:  March 21, 2019.


*/s/ James A. Daire*
James A. Daire