UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MIDAMERICA C2L INCORPORATED, a Nevada corporation; and SECURE ENERGY, INC., a Nevada corporation, <br><br> Plaintiffs/Counter-Defendants, <br><br> v. <br><br> SIEMENS ENERGY, INC., a Delaware corporation, <br><br> Defendant/Counter-Plaintiff. | Case No. 6:17-cv-171-Orl-40LRH |

## DEFENDANT SIEMENS ENERGY, INC.'S OPPOSITION TO PLAINTIFFS' MOTIONS *IN LIMINE*

Defendant Siemens Energy, Inc. ("Defendant" or "Siemens") opposes Plaintiffs'

Motions *in Limine* ("MIL") as follows.

1.  **MIL No. 1: Evidence concerning Secure's relationship with Arc Financial should be admitted as probative of Plaintiffs' claims, Siemens' defenses and alleged causation and damages issues.**

By their first MIL, Plaintiffs seek to exclude evidence of Plaintiffs' relationship to Arc

Financial, including "evidence that Secure extinguished its debt to Arc Financial, a private

equity firm, that Arc Financial had a manager on Secure's board of directors, and that Arc

Financial held shares of Secure." D.N. 172 at p. 1. However, Siemens' theory of the case and

specific matters at issue require the entire story of: (1) why Secure never operated, and (2) the

real causes of the losses Plaintiffs claim. The Arc Financial evidence is one of the necessary

pieces to tell that story.

## A. Arc Financial evidence is probative of Siemens' theory of the case.

As the Court knows from the parties' summary judgment filings, Siemens' theory of the case is that it is a meritless money grab by Plaintiffs who purchased Siemens gasification equipment in 2007 in the hopes of building an energy plant, but then never unwrapped the equipment, or obtained the financing necessary to build, open or operate any iteration of their hoped-for plant. After Plaintiffs purchased the gasifiers—using funds borrowed for that specific purpose from Arc Financial—domestic prices for alternative energy sources plunged and the market in which Plaintiffs hoped to operate collapsed. Arc Financial—Plaintiffs' only substantial investor—saw the falling market, understood that Plaintiffs had no sustainable business or prospects, and in 2010 and 2011, decided to cut its losses, agreeing to extinguish Secure's debt and transfer its equity investment to Secure for $500,000. Exh. A (Smith Depo.) at 36:9-37:9, 37:24-40:8; Exh. B (Kenny 7/26/18 Depo.) at 114:15-115:23. Importantly, Arc Financial's decision to cut and run had nothing to do with Siemens, its equipment, or any of the "defects" Secure alleges. Exh. A (Smith Depo.) at 31:21-32:8, 40:4-8. And Plaintiffs never made any mention of equipment "defects" to Arc Financial. *Id*. In fact, it was the market's precipitous fall and Secure's own inability to obtain financing that caused Arc Financial to pull out, and which contributed to Secure's business failures. *Id*.

Against this backdrop, the Arc Financial evidence is relevant to show Siemens' equipment had no failures and aid in proof of the real cause of plaintiffs' failures. Indeed, Plaintiffs lost Arc Financial as their only substantial investor, not because of any defective Siemens equipment, but because Arc Financial could see the writing on the wall that Plaintiffs

had no business or prospects in a collapsing market. *Id*. 31:21-32:8, 40:4-8. This was the action of a savvy investor who knew that Secure's long history of failure and the weakening market conditions rendered Secure's project worthless.

Likewise, Arc Financial's conduct in investing in Secure through the dedicated use of its loan solely to purchase Siemens' equipment is probative of Siemens' good reputation in the industry. As an independent third party investor, Arc Financial lent over $40M to Plaintiffs— not for use as a common fund, but for the ***specific purpose*** of purchasing Siemens' gasifiers based, in no small part, on Siemens' solid reputation as a quality gasification company. *Id*. at 13:21-14:6, 19:8-20:7, 20:18-21:18, 22:18-23:2. And when Arc Financial decided to cut its losses, its decision had nothing whatsoever to do with Siemens, its gasifier equipment, or any alleged "fraud"—Arc had never even heard of any alleged "defects" in the gasifiers, which remained boxed up in their original wrapping. *Id*. 31:21-32:8, 40:4-8, 30:19-31:23.

The Arc Financial-related evidence is also probative on the issue of changing market conditions, which together with Plaintiffs' incompetence, was the real cause of Plaintiffs' failures. Indeed, in 2006 and 2007, during the timeframe when Siemens sold the gasifiers to Secure, Arc Financial (and Plaintiffs) perceived that a coal-to-natural gas project could be an economic winner assuming continued high prices for natural gas. *Id*. 14:7-19. But by the time of Plaintiffs' buyback in 2010, the market had collapsed, and Arc Financial understood that its only way out of the market was to cut its losses by extinguishing Plaintiffs' debt and transferring its investment for a comparative pittance. *Id*. at 26:16-29:15, 30:19-31:23. The market never recovered, Plaintiffs were never able to find any other significant investor or financing, and a few years later, Secure contemplated winding up. Market conditions also

affected Siemens, and it later decided to exit the market (while continuing to support its customers in the field). It was only after Siemens informed Plaintiffs that Siemens intended to exit that Plaintiffs hatched their plan to blame Siemens' equipment for their business failures, including Plaintiffs' inability to obtain an EPC contract, financing, partners and investors. Accordingly, Arc Financial, and its decision to stop financing Plaintiffs' project for reasons having nothing to do with Siemens, is highly relevant to Siemens' theory of the case, including on issues of causation, Siemens' reputation, and market conditions.

**B.     Arc Financial evidence is also probative of specific issues, including damages and claim elements that Plaintiffs must prove to prevail.**

The Arc Financial evidence is also probative of specific issues in dispute, including damages. On their "rescission claims," Plaintiffs are seeking restitution of $43,040,115.64, which amounts to a refund for the gasifiers Plaintiffs purchased in 2007. D.N. 169 at 18.[1] As set forth in Siemens' motion *in limine* number four (D.N. 173 at 13-14), the Court should exclude any evidence or argument related to Plaintiffs' $43M "rescission claims." Since the claims are equitable in nature, they are for the Court to decide, not the jury. But however tried, if Plaintiffs are allowed to present their request for a refund, the Court and/or jury should also hear that Plaintiffs themselves did not lose $43M when they purchased the gasifiers.[2]

The money came from Arc Financial, and Plaintiffs were never required to pay back the loan, or otherwise reimburse Arc Financial for the $43M. Instead, Plaintiffs extinguished all of their loan debt to Arc Financial in 2011 (in addition to Arc Financial's equity investment)

---

[1] On their rescission and breach of contract claims, Plaintiffs are also seeking "reliance" damages of $3,945,517.24.

[2] If the Court excludes evidence regarding the $43M "rescission claims" as is warranted, the Arc Financial-related evidence would still be relevant for the reasons set forth in Section 1.A.

for a mere $500,000.  Exh. B (Kenny 7/26/18 Depo.) at 114:15-115:23.  As Secure put it in a presentation to prospective investors in 2012, MidAmerica C2L "was able to acquire the Siemens' state-of-the-art gasification equipment with an estimated market value of approximately $80 million *for less than $1 million*" as result of the buyout of Arc Financial. Exh. D (Project Presentation) at 12 (emphasis added); Exh. E (Scott Depo.) at 159:3-20.  By their own admission, Plaintiffs were no more than $500,000 out-of-pocket for their gasifiers, and it would be a windfall of over $43M dollars if Plaintiffs were awarded a restitution remedy. Restatement (Second) Contracts § 373 (where applicable, restitution permits an injured party to recover only for "any benefit that he has conferred on the other party by way of part performance or reliance."); *see also United States v. Adejumo*, 848 F.3d 868, 870 (8th Cir. 2017) ("[r]estitution for funds not actually lost by a victim would be an impermissible windfall") (citations omitted).

Further, contrary to Plaintiffs' assertion that their "project financing" is "collateral matter" (D.N. 172 at p. 4), Plaintiffs themselves place this issue front and center by asserting, in support of their repudiation, breach of implied warranty, and fraud claims, that as a result of the allegedly defective gasification equipment that Siemens provided, Plaintiffs were injured by being unable to obtain financing for their project.  *See* D.N. 150-2 at 11 (Plaintiffs' expert opining that the Siemens "equipment and technology provided to Secure was not viable, thus making it *impossible for Secure to obtain project financing for its contemplated facility*." (emphasis added)); *see* D.N. 63 at ¶¶ 27(a), 34(b), 58(b).  The Arc Financial evidence disproves these specific allegations, and Siemens must be permitted to show that the real cause of any "injury" was Plaintiffs' troubled project financing history, including the unceremonious end of

their relationship with Arc Financial. Regardless of any gasification equipment Siemens delivered or any alleged "defects," Plaintiffs lost their primary investor, struggled to obtain any other financing, and did not ever attempt to complete their proposed plant.

Finally, the Arc Financial evidence is also probative of Plaintiffs' breach of contract claim based on alleged repudiation, which requires Plaintiffs to establish, among other things, that they were "ready, willing and able" to meet their contractual obligation to pay Siemens license fees of €12.18M "in no event later than December 31, 2015." *See* D.N. 173-15-16 (2012 License and Service Agreement) at § 3.2.1; *Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 523 (2d Cir. 1990); *In re Randall's Island Family Golf Ctr.*, 272 B.R. 521, 524 (S.D.N.Y. 2002). Siemens must be permitted to defend itself by presenting Plaintiffs' project financing history, including the Arc Financial transactions and relationship, to show that, in fact, Plaintiffs were not "ready, willing or able" to meet their obligation to make the requisite €12.18M license payment by December 31, 2015. After Plaintiffs' bought out Arc Financial, they were left with no significant investor for a proposed $2 billion project, and no realistic prospects for any other institutional investors ever emerged.

**C.    The "collateral source" rule, and its rationale for exclusion, do not apply because the $43M saved in the buyout of Arc Financial is not "collateral source"—that is, Plaintiffs received no collateral compensation for any alleged injury caused by Siemens.**

Plaintiffs argue that their buyout of Arc Financial's investment for $500,000 is analogous to the "collateral source" rule, and thereby should be excluded. But neither the rule nor its underlying rationale applies because Arc Financial's discounted buyout was not offered to Plaintiffs to cover any alleged "injury" by Siemens. Instead, Arc Financial agreed to the buyout for the purpose of cutting *its own* losses and getting out of the collapsing market. Exh.

A (Smith Depo.) at 26:16-29:15, 30:19-31:23. The buyout, in fact, occurred long before Plaintiffs ever even tried to blame Siemens for their losses. *Id*. at 31:21-32:8, 40:4-8; *see Schwartz v. Hasty*, 175 S.W.3d 621, 626 (Ky. App. 2005) (rule operates under certain circumstances to ensure that "benefits received by an injured party *for his injuries* from a source wholly independent of, and collateral to, the tortfeasor will not be deducted from or diminish the damages otherwise recoverable from the tortfeasor."), *citing* Restatement (Second) of Torts § 920A(2). Here, there is simply no collateral source of recovery for Plaintiffs' alleged injuries, such as insurance benefits. Moreover, the collateral source rule applies only in limited circumstances where plaintiffs seek compensatory damages, and here, Plaintiffs seek restitution. Thus, the rule is inapplicable for this reason as well. *See id*.; *Hardaway Management Co. v. Southerland, Ky.,* 977 S.W.2d 910, 918 (1998).

> **D.** **The Arc Financial evidence will not cause jury confusion, and its exclusion would unduly prejudice Siemens.**

There is no legitimate risk of "jury confusion" because the Arc Financial evidence is well-documented, overlaps with evidence of the parties' contracting history over the years, and simply tells the story of Arc Financial's relationship to Plaintiffs, including that it invested in and loaned money to Plaintiffs to purchase Siemens equipment, and then when the market collapsed and it saw no prospects for Plaintiffs, extinguished Plaintiffs' debt and transferred its investment to Plaintiffs for $500,000.

Finally, undue prejudice will result if Siemens is precluded from introducing this evidence in support of both its broad factual theories and specific defenses. Siemens would be left without highly relevant evidence to rebut Plaintiffs' themes and claims. Accordingly, this MIL should be denied.

2.     **MIL No. 2:** **Evidence that Plaintiffs failed to secure financing for their plant is directly relevant to their claims and alleged damages.**

Plaintiffs' second MIL seeks to exclude "evidence that Secure did not obtain the entire $2 billion necessary to build its facility and that Secure did not build its facility, prior to Siemens' exit of the gasification business." D.N. 172 at p. 6. Plaintiffs' MIL is nothing more than an unsupported effort to exclude highly relevant evidence because it runs counter to Plaintiffs' theory that Siemens and "defective" gasifiers are to blame for Plaintiffs' failures. Siemens is entitled to present its competing theory, and this evidence is useful to understand that Plaintiffs, not Siemens, are to blame for any losses because Plaintiffs never ***did anything*** to advance their project—they left their equipment in its original packaging, never obtained necessary financing, never paid their license fees, and never built, opened or operated any iteration of their plant for over 10 years.

The project financing evidence is also probative of both contract claims: Plaintiffs' claim for breach of contract based on repudiation, and Siemens' counterclaim for breach of contract. As set forth above, the repudiation claim requires Plaintiffs to prove that they were "ready, willing, and able" to perform their obligations under the 2012 License and Service Agreement, including by paying the €12.18M license fee "in no event later than December 31, 2015." *See* D.N. 173-15-16 (2012 License and Service Agreement) at § 3.2.1; *Towers Charter,* 894 F.2d at 523. Similarly, Siemens' counterclaim stems from Plaintiffs' failure to pay the license fee upon demand, which led Siemens to terminate the Agreement and demand payment of the termination fee, which Plaintiffs also never paid.[3] The evidence Plaintiffs seek to

---

[3] Contrary to Plaintiffs' assertion that "Secure is not on trial in this lawsuit" (D.N. 172 at 7), Siemens' counterclaim seeks more than $12M from Secure based on breach of contract.

exclude supports that Plaintiffs were ***not*** (and could not be) ready, willing or able to pay their license fee—thereby defeating Plaintiffs' repudiation claim. The evidence also supports Siemens' justification for termination of the Agreement and demand for termination fees, after nine years of uncompensated support. Plaintiffs have argued that Siemens' termination was pre-textual. This evidence is necessary to rebut Plaintiffs' arguments, and illustrate that Siemens' termination followed nine years of accommodations to Plaintiffs, including in view of their difficulties obtaining the financing necessary to move forward with their planned plant. *See* D.N. 149-22 (RFA No. 22); D.N. 164-2 at SECURE006369, SECURE006383-84; Exh. E (Scott Depo.) 162:13-164:16; Exh. F (Scott Depo. Exh. 91.)

What's more, Secure conceded in deposition the direct connection between their inability and failure to pay the license fees, on the one hand, and the construction of their proposed plant, which of course, would require financing, on the other hand:

> Q. Did Secure ask Siemens not to invoice it under the 2012 License and Service Agreement? Or was it Siemens' idea?
> A. I don't recall -- I don't recall who initiated it. I mean, it was known that we weren't under construction, we weren't building, we weren't operating, we weren't owning a plant. . . . But we were ready at the appropriate time when they were invoiced to pay those invoice fees. . . .
> Q. What do you mean you were ready at the appropriate time?
> A. When we were under construction, building a plant.
> Q. **So from Secure's point of view, it would have been ready to pay the license fees when Secure was under construction, building a plant?**
> A. **Absolutely.**
> Q. **And not before?**
> A. **That's correct.** Exh. C (1/29/2019 30(b)(6) Kenny Depo.) at 234:6-235:7 (emphasis added).

Thus, the Court should reject Plaintiffs' assertion that their inability to secure financing and failure to build the plant are "irrelevant" to key issues when, in fact, both squarely relate to trial themes in general, and the contract claims specifically.

The evidence is also probative of Plaintiffs' breach of implied warranty and fraud claims, and the alleged "injury" Plaintiffs assert. Remarkably, Plaintiffs allege in the operative First Amended Complaint ("FAC"), and their expert included in his report, ***the very facts*** that they now seek to exclude—that is, that Plaintiffs never built their proposed power plant and failed to secure project funding. Specifically, in the FAC, Plaintiffs alleged that Siemens' "defective" equipment forced them "to abandon the development, design and engineering of the West Paducah plant," and in his expert report, Plaintiffs' expert opines that the defects made "it impossible for Secure to obtain project financing for its contemplated facility." *See* D.N. 63 at ¶¶ 27(a), 34(b), 58(b); *see also* D.N. 150-2 at 11. It makes no sense, and would be unduly prejudicial to Siemens, to exclude evidence related to issues which Plaintiffs themselves expressly allege and rely upon in support of their claims. Through no fault of Siemens, Plaintiffs struggled to obtain financing and never built their proposed plant.

Moreover, the evidence of Plaintiffs' financing difficulties and failure to build their plant is also directly relevant to the reasonableness of Plaintiffs' "reliance" damages of $3,945,517.24—the only damages claim that is triable to the jury—that Plaintiffs claim to have "paid to engineering companies for work performed in furtherance of their project development." D.N. 169 at 18. Siemens must be permitted to contradict Plaintiffs' assertion that they reasonably made such investments by showing that, in fact, at no time, did Plaintiffs have the financing to build out their project—even when they repeatedly promised Siemens they would meet extended deadlines for payment of license fees.[4]

_____

[4] Plaintiffs' theory that Siemens is "victim-blaming" provides no legitimate basis on which to exclude relevant evidence that happens to not fit Plaintiffs' theory of the case. D.N. 172 at 9.

Finally, the evidence Plaintiffs seek to exclude is foundational and provides important context to help the jury understand the serial completion, release, and license agreements the parties entered into from 2007 to 2012. For example, because Plaintiffs did not receive needed financing, they, in turn, could not proceed with building their proposed plant and required multiple extensions of time to pay the fees they owed to Siemens. In response, Siemens assisted Plaintiffs in seeking investors and agreed to re-work the parties' contracts to delay deadlines for payment, including as set forth in the 2012 License and Service Agreement. Because the evidence is closely connected to and intertwined with the factual background concerning the parties' relationship, and is necessary to explain the motivation for re-working their contracts over and over again, exclusion would cause jury confusion and prejudice to Siemens, which must be permitted to defend itself against Plaintiffs' claims.

3.     **MIL No. 3:** **Evidence of John Kenny's SEC history is relevant and admissible.**

By their third MIL, Plaintiffs seek to exclude highly relevant evidence concerning John Kenny, Plaintiffs' principal fundraiser and investor liaison, which includes the SEC's findings and determinations of fraud and breach of fiduciary duty (affirmed by the Eighth Circuit), which adversely impacted Secure's efforts to obtain necessary funding for any project. Because Secure claims that it is Siemens' fault that Plaintiffs' project was not viable, Kenny's saga of investment fraud is highly relevant, so much so that Secure included it in disclosures to potential investors, along with a letter from their lawyer arguing the injustice of the judicially confirmed findings. In deposition, Kenny himself admitted that his past had an adverse impact on Secure's ability to raise financing. Against this backdrop, Kenny's SEC history is probative on key disputed factual issues and should be admitted.

First, as set forth in opposition to Plaintiffs' MIL Nos. 1 & 2, Plaintiffs' breach of contract claim based on alleged repudiation and Siemens' counterclaim squarely place at issue Plaintiffs' inability to obtain financing for their project, and one reason for that inability was Kenny's SEC history. Specifically, Plaintiffs were not "ready, willing and able" to pay their license fees, and failed to pay their fees, because they could not to obtain financing on account of investor reluctance to do business with a company whose CEO and co-founder was found to have committed fraud and breach of fiduciary duty.

Second, Plaintiffs' breach of implied warranty and fraud claims also directly place at issue the reasons *why* Plaintiffs were unable to follow through with their plans for a plant in West Paducah, Kentucky. For example, Plaintiffs allege they were injured by being forced "to abandon the development, design and engineering of the West Paducah plant," and their expert states Plaintiffs were unable "to obtain project financing" for their plant, because the gasifiers Siemens supplied to Plaintiffs contained design defects. D.N. 63 at ¶¶ 34(b), 58(b); D.N. 150-2 at 11. Thus, Plaintiffs have made their inability to "obtain project financing" or continue with development of their plant issues in the case, and they seek to blame Siemens for this alleged "injury"—but in fact, Kenny's SEC background is a real and concrete cause for Plaintiffs' lack of funding for, and progress on, its hoped-for plant.

Third, Plaintiffs seek so-called "reliance damages" of $3,945,517.24 that they claim to have "paid to engineering companies for work performed in furtherance of their project development." D.N. 169 at 18. Plaintiffs' damages claim puts at issue the reasonableness of any alleged reliance, since an honest and reasonable assessment of Plaintiffs' ability to "further" their project development would have to account for Kenny's checkered history with

the SEC and Plaintiffs' resulting inability to raise money for project development.

Siemens must be permitted to counter Plaintiffs' claims, alleged "injury," and "reliance" damages by presenting evidence concerning the ***real*** reasons why Plaintiffs failed to obtain financing for their project, chief among them being Kenny's SEC history. For example, at least one potential investor expressly pulled back its contemplated investment in Secure's project in 2012 after learning of Kenny's SEC background. *See* Exhs. G, H. Kenny has also conceded that his SEC history affected Secure's ability to secure funding:

> Q. Okay. And the proceedings were held before the United States Securities and Exchange Commission, correct?
> A. Well, **it was a security – United States Securities Exchange Commission action**.
> * * *
> Q. Okay. **Do you recall one allegation being that you were involved in a scheme to defraud**?
> A. **I do.**
> Q. **That you had misrepresented material facts to two individuals in violation of the antifraud provisions of the federal security laws**?
> A. **I do.**
> Q. **That you were involved in a scheme to defraud two insurance companies**?
> A. **I recall, yes.**
> Q. That your capital management company Nicholson/Kenny had an investment advisory relationship with one of the insurance companies and **that you breached your fiduciary duty to the insurance company**?
> A. **That was -- yes.**
> Q. **And the decision of the administrative law judge was that you had committed those offenses, correct?**
> A. **Correct.**
> ***
> Q. **Do you think that those aspects of your background affected Secure's ability to raise financing either through investments or through debt?**
> A. **On occasion**. Exh. B (Kenny Depo. 7/27/18) at 552:20-554:13.

Finally, Secure itself foresaw and determined that it would need to publicize and explain

Kenny's SEC history. In 2010, Secure commissioned preparation of an opinion of counsel[5], called a "white paper", designed to disclose that history to potential investors and lenders in an effort to take away the sting of the judicial result. *See* Exh. E (Lars Scott Depo.) at 100:23-101:24, Exh. I ("White Paper".)[6]

Thus because Plaintiffs' alleged "injuries" include their inability to obtain financing, Kenny's SEC background is in fact, a real and different reason for Secure's inability to obtain financing. Siemens should be permitted to present this evidence to meet Plaintiffs' claims. Excluding it would cause undue prejudice to Siemens by leaving Siemens without key rebuttal to Plaintiffs' allegation that their inability to obtain project financing was somehow caused by alleged "defects" in the gasifiers—as opposed to investor concern over lending up to $2 billion dollars to a company whose CEO and co-founder was forced to relinquish his securities license after the SEC found that he had committed fraud and breached fiduciary duties in his client dealings. Notably, when offered for this purpose, there is no threat of any lengthy "trial within a trial" on the merits of the SEC findings because the relevant facts are simply that the SEC made findings, and those findings compromised Secure's ability to progress with their

---

[5] Plaintiffs' lead litigation counsel in this case authored the opinion. *See* Exh. I at Memorandum & "White Paper" pp. 1, 21.

[6] As set forth above, Kenny's SEC history is clearly relevant and closely connected to the issues in this case. In contrast, the SEC-related evidence that Plaintiffs seek to introduce concerning executives of Siemens' parent and sister companies is totally unrelated to Siemens Energy, or any of the issues in this case. Whereas Kenny's SEC history involves a trial witness and is directly relevant to Plaintiffs' inability to obtain funding for the project at issue, the SEC-related evidence Plaintiffs seek to introduce relates to bribery charges against *foreign* executives working for *third party* companies who were *never deposed* in this case and that have *no connection* to Plaintiffs' project or the facts of this case. *See* D.N. 173 at pp. 15-17. Accordingly, Plaintiffs' MIL to exclude evidence of Kenny's SEC background should be denied, and Siemens' MIL to exclude evidence of SEC activity against foreign and unrelated executives should be granted. *Id.*

project(s).  The issue is not whether Kenny was fairly stripped of his license.  It is only whether the findings and punishment negatively impacted potential investment in Secure.

Although Siemens intends to introduce Kenny's SEC background for the purpose of defending against Plaintiffs' specific allegations, the evidence is also independently admissible on the issue of Kenny's credibility under Fed. R. Evid. 608(b), which permits cross-examination as to specific conduct probative of a witness' character for untruthfulness:

> (b) Specific Instances of Conduct. Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, **on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of (1) the witness** . . . .

F.R.E. 608(b)(1) (emphasis added).[7]  If any of Plaintiffs' claims survive summary judgment, whether they can prove certain elements of their claims may boil down to whether the jury believes Kenny or a Siemens' witness,[8] and Kenny's credibility will be a crucial matter for the jury's determination.  There can be no doubt that the findings that Kenny committed fraud and misrepresentation are probative of his character for truthfulness or untruthfulness.[9]

---

[7] Notably, in a different federal lawsuit in which Kenny's truthfulness also was at issue, Plaintiffs lost a MIL to exclude his SEC history under Fed. R. Evid. 608(b).  *See* Exhs. J, K (*Secure Energy, Incorporated et al v. Coal Synthetics, LLC et al.;* Case No. 08-cv-01719-JCH (E.D. Missouri) (D.N. 312, 315).)

[8] Among the many topics on which Kenny and a Siemens witness are likely to testify is whether in February 2016, Siemens did, or did not, inform Plaintiffs that it would no longer support Plaintiffs after exiting from the gasification market.

[9] Plaintiffs' reliance on *Green v. Croft*, which addressed a very different set of facts, is misplaced.  Unlike Kenny's fraud and breaches of fiduciary duties, the *Green* witness' 13 prior felonies were "not crimes inherently involving dishonesty, fraud or making false statements." 347 F. Supp. 3d 1156, 1161 (S.D. Fla. 2018).  And the *Green* court still allowed introduction of the 13 prior felonies, with a limiting instruction, to attack the witness' credibility.  *Id.*

Moreover, Plaintiffs' assertion that Kenny's SEC history is too "remote" or stale to be presented to the jury is undercut by the facts that, while it was engaged with Siemens and attempting to fund its proposed energy plant, Secure deemed it necessary in 2010 to prepare a "white paper" explaining Kenny's SEC background to prospective investors, and as recently as 2012, actually lost a prospective investor on account of Kenny's SEC background. Exhs. G-I, E (Lars Depo.) at 100:23-101:24. If it is not too "remote" for prospective investors and Secure during the relevant time period, then it can hardly be deemed too remote to present in this case. Further, this case involves interactions between the parties that span over twelve years, and the jury already will be focused on historical facts, including Plaintiffs' project history, an integral part of which is how Kenny's SEC history impacted Secure's ability to raise funds. And if Plaintiffs deem it necessary, Kenny can testify as to when these events took place and what, if anything, he believes to be erroneous about the SEC's findings. Ultimately, the jury is capable of determining questions of credibility, and the evidence should be admitted.

Finally, Plaintiffs' assertion that Kenny's SEC history should be excluded due to potential "jury confusion" because "[t]he jurors may not be able to maintain the distinctions between Kenny, his SEC history, and Secure" should be rejected outright. D.N. 172 at p. 15-16. In fact, Kenny's SEC history and its close connection to the facts of this case are easily understood. Kenny will be a witness at trial, and the jury can easily understand that prior to co-founding Secure, in an SEC action, he was found liable for fraud, misrepresentation and breach of fiduciary duty, and was fined and lost his securities license as a result. Thereafter, Kenny co-founded Secure, which has since been forced to address Kenny's SEC background when seeking financing from potential investors. This story is simple, highly relevant to

multiple issues in the case, and should be admitted.

4.     **MIL No. 4:** **Evidence of NCPP's use of off-specification coal and fuel is highly relevant to a finding of no gasifier defect, if NCPP evidence is allowed at all.**

Plaintiffs assert an NCPP theory of comparability with no foundation whatsoever (and there is none) and then request, by their fourth MIL, that Siemens rebut that theory without access to the evidence of what really happened at the NCPP site. The Court should not allow the theory to go forward at all,[10] but if it does, evidence that the customer at the NCPP plant intentionally operated its gasifiers using out-of-specification parameters has to be allowed. Plaintiffs' unsupported attempt to exclude only the selective portion of the NCPP evidence showing that "the owner of the NCPP plant used off-specification coal in its gasifiers and used off-specification liquid propane gas in starting up its pilot burners" should be seen for what it truly is—a baseless attempt to suppress evidence merely because it does not fit within Plaintiffs' theory of the case. D.N. 172 at pp. 16-19. Plaintiffs' MIL No. 4 should be denied for at least three reasons.

First, all the NCPP plant-related evidence should be excluded for the purpose of

_____

[10] As set forth in more detail in Siemens' MIL No. 2, to establish admissibility of the NCPP evidence, it is Plaintiffs' burden to make an affirmative showing of substantial comparability between the NCPP plant gasifier experience and Plaintiffs' hypothetical gasifier plant plans, and Plaintiffs fail for at least three reasons. D.N. 173 at pp. 3-12. First, Plaintiffs never unpacked or operated their own gasifiers—under any conditions. With no evidence of any gasifier operation or performance at Plaintiffs' (hypothetical) plant, there is no proper foundation for finding comparability. *Id*. at pp. 6-8. Second, even if the Court compared the purely hypothetical operation of Plaintiffs' gasifiers with the operation of the NCPP plant gasifiers, Plaintiffs cannot show that the gasifiers would have operated under substantially similar conditions because, among other things, the NCPP gasifiers were to be used with different feedstocks, and the NCPP operator used off-specification coal and fuel, which impacts performance, and would not have occurred at Plaintiffs' project. *Id*. at pp. 8-11. Plaintiffs had contractually agreed to a different configuration for higher grade feedstock and better performance for their gasifiers. Third, none of the NCPP plant evidence proves that a "defect" caused any problems, or that Plaintiffs' gasifiers are defective. *Id*. at 11-12. In short, it is Plaintiffs' burden to establish admissibility, and they fail.

proving "defect", but if it is admitted, there is no basis to isolate and exclude only that portion that points to operator error and adverse conditions of gasifier operation—as opposed to alleged "defects"—as the cause of any issues with gasifiers at NCPP plant. Plaintiffs' arguments that the use of off-specification coal and fuel "at the NCPP plant [has] nothing to do with whether Siemens' coal gasification equipment and technology will work" and "does not make it any less likely . . . that Siemens' coal gasification equipment contained design defects" are flat-out wrong. Plaintiffs concede that Siemens' gasifiers are not generic products—they are customized to a particular agreed set of parameters as to design coal and fuel, and Siemens specially commissions, configures and optimizes each one to meet heavily negotiated performance guarantees based on specific feedstock and fuel requirements, among other things. A key variable in the configuration and operation of a gasifier is the chemical composition of the coal the customer intends to use. As such, Siemens: (1) configures the operating conditions for each gasifier according to the specific design coal to be used by each of its customers; (2) makes the specific design coal a material term in each of its customer's agreements; and (3) disclaims any warranties or performance guarantees in the event its customers use off-specification coal because doing so can dramatically affect the gasifier's performance after it has been configured and commissioned for use with the particular coal specified. *See* D.N. 173-3 at SECURE000193; D.N. 173-10 at SECURE000979-80; D.N. 173-15 at SECURE000172; D.N. 173-2 at 124:20-126:20 (conceding that vendors void guarantees where off specification feedstock is used and that such voided guarantees are industry-standard).

Thus, where, as at the NCPP plant, a Siemens customer uses off-specification and lower

grade coal and fuel, that fact is highly relevant to the cause of any performance issues experienced. The evidence of off-specification operation provides important context for the jury to evaluate the conditions under which the NCPP customer operated its gasifiers, and challenges Plaintiffs' unsupported conclusion that alleged "defects"—as opposed to operator error and adverse conditions—actually caused any issues experienced at the NCPP plant.[11]

Second, Plaintiffs' argument that off-specification coal and fuel at the NCPP plant "will have no bearing on the jury's determination of how to resolve the disputed claims for breach of contract [and] fraud" is meritless. To the contrary, Plaintiffs must prove by clear and convincing evidence that there are material defects in the Secure gasifiers to prevail on their fraud claims (Counts IV and V), as well as on their claim for breach of implied warranty of fitness for a particular purpose (Count II). To establish their fraud claims, Plaintiffs must also prove, among other things, that Siemens knew of such alleged defects when interacting with Plaintiffs and intentionally hid them from Plaintiffs. Again, if the Court allows NCPP to be a "trial within our trial," then NCPP's use of off-specification coal and fuel relates squarely to the issue of whether defects in the NCPP gasifiers exist in the first place, and whether Siemens was aware of such defects.[12] Evidence of off-specification coal and gas use at NCPP goes to

---

[11] Plaintiffs' expert defines gasifier "design defects" as any "shortfalls" in meeting contractual performance guarantees. *See* D.N. 173-2 (Siemens MIL Exh. A at 113:24-114:22, 116:15-117:5). Thus, where, as at the NCPP plant, a customer voids performance guarantees by using off-specification coal, no guarantees remain to measure against in order to find alleged "defects." To the extent the Court admits the NCPP plant-related evidence, Siemens is entitled to argue that use of off-specification coal and fuel at the NCPP plant voided performance guarantees, and thus cannot support a finding of alleged "defect," as defined by Plaintiffs.

[12] Plaintiffs assert that admitting evidence of operating conditions at NCPP will result in a "mini-trial." But the only risk of any "mini-trial" here emanates from Plaintiffs' effort to rely solely upon the NCPP experience to prove defects in their own equipment. Plaintiffs have not and cannot met their burden to show substantial similarity. Further, if a "mini-trial" on the NCPP plant is permitted before the jury, evidence of conditions would be simple and

the very heart of Plaintiffs' case and is definitionally, manifestly relevant. Simply put, Plaintiffs claim that supposed problems at NCPP show Plaintiffs' equipment was defective; Siemens will prove NCPP created those problems by feeding the equipment inferior raw materials and fuel. The off-specification evidence thus speaks directly to Plaintiffs' claim, and it becomes all the more important considering that Plaintiffs have no evidence whatsoever of any alleged "defects" as to their own gasifiers—and none of their lay or expert witnesses ever operated, performed tests, or inspected any Siemens gasifier to identify any alleged defects. Plaintiffs cannot seek to admit any of the NCPP plant evidence, on the one hand, while seeking to exclude evidence of the actual operating conditions and operator error, on the other hand.

Finally, to the extent that the jury hears any NCPP plant-related evidence, there is no additional danger of "jury confusion" if the jury hears that the gasifiers at the NCPP plant were operated using off-specification coal and fuel. To the contrary, if the jury hears only the Plaintiffs' hand-selected portions of the NCPP plant-related evidence, the jury would likely be more confused and more likely to assume, without evidentiary foundation, that the unproven "cause" of problems at the NCPP plant was alleged design defects rather than, for example, operator error and the unusual and off-specification conditions under which the gasifiers operated. In short, the Court should exclude all evidence of the experiences at the NCPP plant, as set forth in Siemens' MIL No. 2, and if any such evidence is presented, Siemens must be permitted to also present evidence of the use of off-specification coal and fuel in the gasifiers at the NCPP plant. Plaintiffs' Motion should be denied.

---

straightforward—the evidence of NCPP's different feedstock and fuel, and off-specification coal usage, is clear cut and undisputed.

Dated:  May 20, 2019

Respectfully submitted,


By:     /s/ James A. Daire
        Robert W. Thielhelm, Jr.
        Florida Bar No. 889679
        P. Alexander Quimby
        Florida Bar No. 099954
        **Baker & Hostetler LLP**
        SunTrust Center, Suite 2300
        200 South Orange Avenue
        Orlando, FL 32801-3432
        Telephone: 407.649.4000
        Facsimile: 407.841.0168
        Email: rthielhelm@bakerlaw.com
        Email: aquimby@bakerlaw.com

        Scott D. Baker (admitted pro hac vice)
        James A. Daire (admitted pro hac vice)
        Christopher J. Pulido (admitted pro hac vice)
        **Reed Smith LLP**
        101 Second Street, Suite 1800
        San Francisco, CA  94105-3659
        Telephone: 415.543.8700
        Facsimile: 415.391.8269
        Email:  sbaker@reedsmith.com
        Email:  jdaire@reedsmith.com
        Email:  cpulido@reedsmith.com

        *Counsel for Siemens Energy, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 20, 2019, a true and correct copy of the foregoing was submitted to the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to the following listed counsel:

Michael R. Cherba
Robert L. Devereux
Jeffrey R. Schmitt
**Danna McKitrick, P.C.**
7701 Forsyth Blvd., Suite 800
St Louis, MO 63105
Telephone: (314) 726-1000
Fax: (314) 725-6592
Email: mcherba@dmfirm.com
Email: rdevereux@dmfirm.com
Email: jschmitt@dmfirm.com

Walter A. Ketcham , Jr.
**Grower, Ketcham, Eide, Telan & Meltz, PA**
901 N Lake Destiny Rd., Suite 450
PO Box 538065
Orlando, FL 32853-8065
Telephone: (407) 423-9545
Fax: (407) 425-7104
Email: enotice@growerketcham.com


DATED: May 20, 2019.


*/s/ James A. Daire*
James A. Daire