1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

. . . . . . . . . . . . . . ..

MIDAMERICA C2L, INC. and       :
SECURE ENERGY, INC.,           :
                               :
              Plaintiffs,      :
vs.                            :   Case Number
                               :   6:17-CV-171-ORL-40LRH
                               :
SEIMENS ENERGY, INC.,          :
                               :
              Defendant.       :
. . . . . . . . . . . . . . .:

TUESDAY, MAY 14, 2019; 9:34 A.M.
MOTION (DAUBERT) HEARING
BEFORE THE HONORABLE PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

PLAINTIFFS' COUNSEL:
  Robert Devereux, Esq.
  Michael Cherba, Esq.
  Walter Ketcham, Jr., Esq.

DEFENSE COUNSEL:
  James Daire, Esq.
  Jonah Mitchell, Esq.
  Robert Thielhelm, Esq.

_____
Proceedings recorded by mechanical stenography.
Transcript produced by computer.

2

1              P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  MidAmerica C2L, Incorporated

3    and Secure Energy, Inc. versus Siemens Energy, Inc., Case

4    Number 6:17-CV-171.  Counsel, please state your appearances

5    for the record.

6              MR. DEVEREAUX:  Good morning.  Robert Devereaux on

7    behalf of plaintiffs, MidAmerica C2L and Secure.

8              THE COURT:  Thank you.  Good morning.

9              MR. DEVEREAUX:  Thank you.  Good morning.

10             MR. CHERBA:  Good morning, Your Honor.  Michael

11   Cherba, also on behalf of plaintiffs.

12             MR. KETCHAM:  Walter Ketcham on behalf of

13   plaintiffs.

14             THE COURT:  And we have a corporate representative

15   with us as well, Mr. Kenny.

16             MR. KENNY:  Yes.  Good morning, Your Honor.  John

17   Kenny.

18             THE COURT:  Thank you.  Good morning, gentlemen.

19             MR. DAIRE:  Good morning, Your Honor.  Appearing for

20   defendant Siemens Energy, Inc., James Daire.  I'm here with my

21   colleague, Jonah Mitchell, our co-counsel, Rob Thielhelm, our

22   client representative Matt Julian, and Mr. Ricky Dyer will be

23   helping us in the courtroom today.

24             THE COURT:  Thank you and good morning.

25             All right.  For the benefit of the record,

1  gentlemen, I have reviewed the various challenges, the Daubert

2  challenges.  We have three that we're dealing with today.

3      I had invited the parties if they wanted to submit

4  additional evidence by way of testimony of an expert, they

5  could, but it appears we're proceeding on the pleadings, which

6  is fine.  We have a challenge at docket entry 147 by the

7  plaintiffs against defense expert Stephen Jenkins.  The

8  response is at docket entry 156.  The next challenge is by the

9  plaintiffs against John Williams.  That motion is at docket

10  148 with the response at docket entry 157.  And then, finally,

11  there is a motion at docket entry 150 by the defense against

12  plaintiffs' expert, Mr. Kosstrin.  That's K-o-s-s-t-r-i-n.

13  Response at docket entry 158.  In the various docket entries

14  that I've cited, the reports are attached, as well as

15  deposition experts -- excerpts and the like.  I have read the

16  expert reports of these three individuals.

17      I could defer to you all in the order in which we

18  take these, but let me tell you what I'm thinking.  It seems

19  that it would make sense to first address Siemens' challenge

20  against Dr. Kosstrin.  Let me tell you why.

21      Dr. Kosstrin's opinions go to whether or not there

22  was a design defect in the gasification equipment and whether

23  or not the BEDP plans and specifications were adequate.  The

24  response of experts Jenkins and Williams are designed to rebut

25  the opinions of Dr. Kosstrin, and it seems to me it makes

4

1   sense to start with the plaintiffs' expert first.  If the

2   parties agree, we'll proceed that way.  If you have a

3   different schedule in mind, then I'd be happy to hear what you

4   think.

5           MR. DEVEREAUX:  Your Honor, I'm fine with that.

6           MR. DAIRE:  Agreed, Your Honor.

7           THE COURT:  All right.  Let me give you a bit of a

8   preview as to what I'm thinking.  It may help to focus your

9   arguments.

10          In the challenge of Dr. Kosstrin, the challenge

11  addresses a number of issues, including the defendant's

12  argument that Dr. Kosstrin's opinions lack analysis or

13  evaluation of the equipment, the actual equipment sold by

14  Siemens to the plaintiffs, such that the defense argues Dr.

15  Kosstrin has not properly analyzed or evaluated the equipment

16  or the BEDP that Siemens delivered to Secure for the plant

17  that they intended to build in Illinois, that Dr. Kosstrin had

18  not inspected the actual equipment or run simulations or

19  computer modeling, and his opinions rely heavily upon

20  observations and documentation regarding a different plant in

21  China where the customer, Shenhua, S-h-e-n-h-u-a -- I'm not

22  going to get this correct, but Ningxig, I guess it's

23  pronounced, N-i-g-x-i-z -- N-i-n-g-x-i-g Coal Industry Group

24  -- I'll just call them Shenhua -- used gasifiers to process a

25  different type of coal.  And coal has its own unique property

1   in terms of moisture and the amount of ash it produces and the

2   like, and did so under different operating conditions such

3   that the argument principally by Siemens, as I comprehend it,

4   is a substantial similarity issue, and we're all familiar with

5   the case law in the Eleventh Circuit and this district as well

6   concerning what is substantially similar.

7           For purposes of dealing with what we know would be a

8   Cassisi kind of argument; see, for example, Hessen,

9   H-e-s-s-e-n, versus Jaguar Cars, 915 F.2d 641, 11th Circuit

10  1990, where the Eleventh Circuit opined that for substantially

11  similar products to be compared to the one at issue, they have

12  to be not remote in time and has to be essentially the same as

13  the incident that is in dispute.

14          In the Jaguar case, there were fuel-fed fires and

15  the issue was whether or not the fires that occurred in other

16  Jaguar vehicles, whether that component was the same, whether

17  the type of fire origin was the same, such that those prior

18  instances could be used as a comparative to the expert's

19  opinion as to how the fire originated in the case at bar.

20          And in that particular case, the Eleventh Circuit

21  concluded that substantially similar anecdotal evidence, if

22  you will, is admissible to show notice by the manufacturer of

23  the defect, the magnitude of the defect and the danger it may

24  pose, the ability to correct the defect, standard of care, and

25  causation.

1          So the first issue, of course, is what is

2    substantially similar.  See, for example, Gardner versus Ford

3    Motor Company, 166 F.Supp.3d, 1261 Middle District of Florida

4    2015, where Judge Sharp had a case involving a defective

5    product and concluded there was a lack of substantial

6    similarity.  The cases are legion in this area as to what

7    constitutes substantially similar.

8          So part of the argument, as I appreciate it, by

9    Siemens is that while the actual gasification equipment exists

10   and has been in the plaintiffs' possession for about ten

11   years, it has not been tested, put online, and taken through

12   the paces to see how it operates.

13         Instead, the allegations and the expert's theory is

14   that the product is, in fact, defective is predicated upon an

15   experience in China with what the defense calls -- pardon me

16   -- the plaintiff refers to as the identical equipment.  But

17   interestingly, I would note, Dr. Kosstrin, in his report,

18   refers to the equipment as essentially similar.  See page 5

19   of his report.  So that's part of the issue I would like to

20   hear about.

21         And then next, of course, there's challenges

22   concerning the actual opinions, whether there was substantial

23   revisions to the engineering plans that were necessary;

24   whether because of the defects in the equipment and technology

25   provided that it was not viable and, therefore, impossible for

1  Secure to get project financing for the various facilities

2  that it intended to operate over a course of time, and whether

3  or not the use of off-specification coal in the China plant

4  would have violated the license and service agreement

5  disclaimers in Siemens' warranty and performance guarantees

6  such that that goes to substantial similarity, as well as the

7  argument that Dr. Kosstrin did not conduct a root cause

8  analysis, and so forth.

9       So I say that because the substantial similarity

10  seems to be the crux of the argument.  There are a lot of

11  vignettes that kind of move from there, but that seems to be

12  the crux.  That seems to me to be perhaps the most dispositive

13  point, so I want to direct the parties, A, to that I'm focused

14  on that and, B, to encourage you to take me seriously when I

15  say I've read your materials, so please proceed when you're

16  ready.  And I don't need the black letter law on Daubert.

17       MR. DAIRE:  Thank you, Your Honor.  James Daire

18  again for Siemens Energy.  We've prepared some slides that may

19  or may not be helpful during our discussion.  I've got hard

20  copies for the Court and staff, if you'd like them, or they'll

21  be on your monitor as well.

22       THE COURT:  Thank you.  I'll take both.

23       MR. DAIRE:  Should I give them to the court security

24  officer or approach?

25       THE COURT:  If you'd hand those to Grace, that will

1    be fine.  Thank you.  You don't look that threatening to me.

2            Thank you, Grace.

3            MR. DAIRE:  So I appreciate Your Honor's summary,

4    and it's effectively dead on with Siemens's position.  I

5    think, frankly, Dr. Kosstrin's opinions are symptomatic of

6    plaintiffs' approach in this case, which is an unsupported and

7    an unsupportable money grab, and his work product reflects

8    that.

9            The fundamental comparison that Dr. Kosstrin tries

10   to make between the NCPP experiences and the hypothetical

11   experience for plaintiff lacks foundation and is not reliable.

12   As you noted, plaintiff never unpacked the equipment, never

13   operated the equipment, but Dr. Kosstrin opines that the

14   issues NCPP experienced would be experienced by plaintiffs.

15           Now the only basis -- Your Honor mentioned at the

16   start that Dr. Kosstrin relies heavily on NCPP experiences.

17   I think the only basis for Dr. Kosstrin's defect opinion is

18   the NCPP experiences.

19           Mr. Dyer, if we could have slide number 6, please.

20           I'm sorry.  It's slide number 5.

21           THE COURT:  And just so you all know, time-wise

22   we'll need to break at noon for a short meeting I have, but we

23   have the day at your disposal, so don't feel like you're under

24   pressure in terms of the clock.

25           MR. DAIRE:  Okay.  Thank you, Your Honor.

1          So, in addition to Mr. Kosstrin's report where he

2   ties each defect that he identifies to equipment at NCPP and

3   experiences at NCPP, I asked him during deposition what the

4   basis of his analysis was and he told me, we were looking at

5   the issues that had come up with the Siemens gasifiers with

6   the particular situation in China.  And then, I asked him the

7   basis of your opinion in this case are that the issues that

8   have come up with the Siemens gasifier with the particular

9   situation in China, correct?  And he told me, yes, effectively

10  with the situation they had and how they related to the two

11  gasifiers which Siemens Energy had already purchased.

12          Now in order to make that comparison, as Your Honor

13  noted, there has to be some basis in order to establish the

14  foundation to make that type of comparability.  And Dr.

15  Kosstrin has none either in his report and he offered none at

16  deposition.  Gasifiers are not mass-produced products.  Each

17  one is configured for the particular operating conditions of

18  the customer and any effort to compare the experiences of one

19  customer with the particularly hypothetical experiences of

20  another customer without controlling for those operating

21  conditions is no comparison at all.

22          THE COURT:  And where do I find that in the record?

23  Not that I doubt you, but that has been a theme that these are

24  unique, that the -- meaning, the gasifiers are unique.  The

25  way that they are operated is unique, the operating conditions

1   are unique, the type of coal used is unique and, therefore,

2   it's not a direct one-to-one comparison.

3           So, for example, if we both had Pirelli tires in our

4   cars, but you chronically ran yours under-inflated, we both

5   have Pirelli tires, but yours failed for reasons unrelated to

6   mine.  That's sort of the analogy that you seem to be

7   reaching.  So where do I find that?  I'm sure it's in the

8   record.

9           MR. DAIRE:  So, a couple of places.  There's

10  discussion in both experts' depositions about the

11  commissioning and start-up process that's bespoke to every

12  customer's installation.  I've also got a slide to help

13  illustrate the point, slide 6.

14          Mr. Dyer, if we could -- this is one of -- this is

15  actually a demonstrative taken from one of plaintiffs' trial

16  exhibits in the case, and it's a block process diagram of

17  their coal-to-methanol plant, which is what they had intended

18  around the 2011/2012 timeframe.  And Mr. Dyer -- yeah, if we

19  could blow up on the highlighted portion here.

20          What this -- the entire block diagram shows is kind

21  of the soup-to-nuts process of gasifying coal to create

22  methanol, which was their intended out-product at this time.

23  But what you see here in this diagram is that in addition --

24  before you even get to the gasification step, you have to do

25  what's -- feed air what's -- through an air separation unit.

1   And what the air separation unit does is it separates out HP

2   oxygen, that's high pressure oxygen and nitrogen, and it feeds

3   it.   The oxygen goes to the gasifier.   The nitrogen goes to

4   the coal-feeding system.   And the characteristics in the

5   qualities of these gases which are necessary in order to

6   create the reaction in the chamber that gasifies the coal

7   depends on the coal characteristics, as you would expect.

8           So the real value of the engineering services in

9   these types of business environments is to do the

10  computational fluid dynamics that are required in order to get

11  that balance correct.   It could also be called -- you've seen

12  it in the record perhaps as energy and heating balance.   So

13  the real secret sought here is getting that right, and that

14  depends on the coal characteristics.

15          That's why, for example, in the parties' contracts,

16  which were also submitted as part of the record, docket number

17  67 was when we first submitted the contracts in the case, each

18  contract has, as Appendix 2, the design basis for that

19  particular project.   And so, you would see very clearly

20  spelled out what the design coal needs to be in order for

21  Siemens to verify and guarantee its performance levels for

22  that particular customer installation.   And so, there's no

23  real question that everything about every installation is

24  bespoke and individualized to the customer.   Because if it

25  wasn't, this would just be like selling iPhones.

1   You could pick one off the -- go to Target, buy one

2   off the shelf, but that's not how gasifiers work.

3   THE COURT:  And how does that -- how does this take

4   place in the real world?  Is there -- I saw the reference to

5   sort of the lessons learned or troubleshooting that occurs.

6   Is that part of this initial set-up process we're referring

7   to?

8   MR. DAIRE:  Yes, it is.  And there is a key

9   distinction in this case, Your Honor, and I think it's been --

10  the line has been blurred, if not obliterated, by plaintiffs

11  between a design defect and iterative improvements in

12  gasification technology, which is to say in our contracts we

13  spell out exactly what's guaranteed, exactly -- and it's in

14  the form of syngas production per hour and oxygen production

15  per hour.  And we also, you know, on customer sites attempt to

16  do what we can to make that customer happy, and that includes

17  making iterative improvements in the gasifier that have

18  nothing to do with design defect, but for whatever reason the

19  customer is either unhappy with the performance or wants the

20  performance to be better.  Siemens is always committed in

21  those instances to make the gasifiers better.

22  THE COURT:  And that's part of the service

23  agreement.  That's part of what's being purchased is they come

24  back in and fine tune on an ongoing basis.

25  MR. DAIRE:  That's right, as long as Siemens gets

1    paid to do that, Your Honor.

2           THE COURT:  Right.

3           MR. DAIRE:  So -- Mr. Dyer, if we could have slide

4    7, please.

5           THE COURT:  Did you cover everything on 6 you wanted

6    to talk about?  The separation of nitrogen and hydrogen is

7    that first initial step to make sure that everything from

8    there flows.  So if you don't have the nitrogen separated

9    properly, pulverization, the processing, you know, through the

10   mechanism's going to be affected.  That may have been part of

11   the problem in China, for example.

12          MR. DAIRE:  Yeah.  And my point, Your Honor, is not

13   so much that the separation has to be effective, but that the

14   -- the oxygen flow and the nitrogen flow is part of what is

15   determined by the coal characteristics.

16          THE COURT:  Okay.

17          MR. DAIRE:  So, for example, if you've got more

18   water in your coal, you're going to need less oxygen, because

19   you've got more H2O present in the coal.  That's a simple way

20   of doing it, but the point is that that's why you make these

21   things bespoke, because everybody's operating conditions are

22   different.  And that includes -- what happens is that the

23   coal, the characteristics of the coal will have ramifications,

24   both what we call upstream from the gasifier in the air

25   separation unit and downstream from the gasifier which, in the

1   example here, is for the production of methanol in plaintiffs'

2   planned plant as of 2011 and 2012.

3          So the point is that when plaintiffs, to Your

4   Honor's point in the summation, say, well, the gasifiers were

5   identical or in Dr. Kosstrin's words, substantially the same,

6   that doesn't get them to where they need to go.

7          THE COURT:  Actually, he says essentially the same.

8          MR. DAIRE:  Essentially the same.  Thank you, Your

9   Honor.  That does not get them to where they need to go,

10  because they need to account for these different operating

11  conditions.  I mean, the way I think of it frankly is whether

12  -- and there was some discussion in plaintiffs' opposition to

13  this motion as to whether Dr. Kosstrin is a technical expert

14  or a scientific expert.  I think, frankly, that's a red

15  herring, and the distinction doesn't matter.

16         Because the way I think of this is in a scientific

17  method -- from a scientific-method point of view or a

18  technical-expert point of view, what you want to do ideally is

19  control for all variables that might affect your analysis.

20  And if you can't control for all variables, you at least want

21  to account for them.  You at least want to explain, I

22  understand that NCPP has coal that is different sub-bituminous

23  from the high quality bituminous coal that we're planning on

24  using at Secure, but that doesn't make a difference because of

25  reasons A, B, and C.

1      Or you at least want to say, I recognize that NCPP

2  didn't use the design coal that Siemens had specified, which

3  created a second problem, but that doesn't matter because of

4  reasons D, E, and F.  Or I recognize that the customer at NCPP

5  operated their gasifiers at artificially low load, below the

6  60 percent that Siemens advised.  I went over this with Mr. --

7  or with Dr. Kosstrin during his deposition, which is at 151-2,

8  and account for that and tell us why that doesn't matter.

9      Or you want to account for the fact that the

10 customer at NCPP used LPG instead of natural gas to start its

11 pilot burner, which affected the performance of the burner,

12 which affected the performance of the gasifier, which affected

13 the performance of upstream systems, like the air separation

14 unit, and downstream systems at NCPP were polypropylene.

15 You at least want to account for them.  Dr. Kosstrin did none

16 of that.

17     What I've done here, Your Honor, on this slide is

18 provide you with citations to the record that indicate these

19 four unique operating characteristics at NCPP.  There are

20 others, but these were the ones that we -- were kind of the

21 biggies, if you will.  The design coal was different than the

22 design coal for plaintiffs.  No dispute about that.

23 Plaintiffs intended to use this high-quality bituminous.

24 NCPP -- the coal that comes out of that region, which I can't

25 pronounce either, is effectively sub-bituminous, lower quality

1   coal.

2           NCPP also didn't use its design coal.  That fact is

3   also undisputed, Dr. Kosstrin admitted to me during

4   deposition.  He told me it was outside the range of the design

5   coal.

6           THE COURT:  And did that affect the operation of the

7   burners that -- with the type of gas being utilized?  Because

8   there was the issue in part of the burners having to be

9   modified or replaced at NCPP and how that might affect the

10  deliverables by Siemens.

11          MR. DAIRE:  Yes, it did.  There was an initial burn

12  modification in November of 2009 that was prior to any

13  commissioning, which was basically adding an extra layer of

14  nickel to the coating, because our engineers back in Germany

15  recognized that there was a susceptibility at particularly

16  high pressures to ignition, but that was before start-up

17  began.  It was basically sort of a recall fix.  And it -- the

18  same thing would have been done for the plaintiffs, if they

19  ever unpacked their gasifiers.

20          THE COURT:  So the burners could have been just

21  simply fixed by a -- just, like you say, a re-fit to the

22  customer in the field that before they fire up the

23  gasification equipment, so to speak, the burners would have

24  been changed out for these that have the new tip, if you will.

25          MR. DAIRE:  Yeah.  It's one additional layer of

1   coating, and that's it.  And then, once commissioning started

2   at NCPP -- that was in October of 2010 -- and at that point

3   they started to see these issues occur because they were using

4   the wrong coal, they were using the wrong fuel gas, and they

5   were operating at artificially low loads.

6          To -- what happened was we had our gasifiers up and

7   running before they had their downstream systems ready to go,

8   and so rather than producing a lot of what's called syngas --

9   that's the product that comes right out of the gasifier --

10  they wanted to basically curb that and produce less syngas per

11  hour so that it didn't overwhelm the downstream systems.  But

12  the problem with that is our calculations -- they are set

13  forth in the contracts -- as to what is necessary to achieve

14  our performance guarantees is based, in part, on a coal load

15  of 60 percent or greater.  So, NCPP experienced these issues

16  at start-up because of its own operation conditions.

17         Siemens didn't abandon NCPP or Shenhua.  Siemens

18  continued to work with them to optimize the gasifiers.  And

19  that happened September of 2011, we passed a performance test.

20  In August of 2012, we passed the second performance test.  And

21  then, we got the preliminary acceptance certificate, which was

22  their certificate that we had achieved all performance

23  guarantees in July of 2013.  Again, none of that is in dispute

24  either.  So what we're left with is --

25         THE COURT:  I'm sorry to interrupt you, but what

1   would prevent plaintiff from -- prior to the initiation of

2   suit or even after filing suit of operating the gasification

3   equipment to see if it actually worked?

4           MR. DAIRE:  Nothing, Your Honor.

5           THE COURT:  Other than expense.  But it could be put

6   online -- if you bought a substation for your local utility

7   company and you were concerned it wasn't going to operate

8   properly, couldn't it be just put online and see if it works?

9   There would be some expense, but it could be done.

10          MR. DAIRE:  Yes, Your Honor.  They would have to

11  have the expense of building out the other systems, as you

12  indicate, but nothing prevents it from happening.  They've

13  chosen to keep their gasifiers under what's called a nitrogen

14  blanket, which basically preserves the gasifiers for possible

15  sale.  That's been their choice.

16          THE COURT:  All right.

17          I'm sorry to interrupt you.  Keep going.

18          MR. DAIRE:  So, what we've done here is just pulled

19  out a few portions of Dr. Kosstrin's deposition that we think

20  are worthy of note, because they basically reflect that he did

21  no analysis of the NCPP operating conditions at all.  And he

22  told me the reason he didn't do that was because he didn't

23  have the data until the day before the deposition.  We had

24  produced this information over a year before his deposition.

25  It was also part of -- made record as part of another

1    deposition.  I don't know why he didn't see this data until

2    the day before, but he did no analysis with it.

3           The only thing he was able to offer me during

4    deposition that he had done was to roughly calculate an

5    average or a mean of how far outside the ash content by

6    percentage of weight and the volatility matter by percentage

7    of weight was kind of outside the leather of the design coal

8    for NCPP.  And his conclusion was it's not that far out, and I

9    don't think that would matter.

10          THE COURT:  All right.  So we're looking at slide 9

11   now, and the question you asked of Dr. Kosstrin is if he used

12   any data points for the quality of the coal in his report and

13   opinion, meaning quality of coal for China?

14          MR. DAIRE:  That's correct, Your Honor.

15          THE COURT:  And the response is, no.  The

16   information was in the exhibits -- that was in the exhibits

17   is fairly clear that the ash content was higher than expected

18   which, as I read your papers, the ash content is higher due to

19   the nature of the coal being used, not the equipment itself.

20          MR. DAIRE:  That's correct, Your Honor.  So what

21   happens is -- if we could go back, Mr. Dyer, to slide 6, and

22   if we could zoom in on the far left-hand side of the

23   plaintiffs' diagram.  So -- and down a little bit on the

24   diagram.  So you can see, Your Honor, there that arrow 1 is

25   coal being fed into the coal handling system.

1        THE COURT:  Okay.

2        MR. DAIRE:  And so this is -- and then coal is

3  pulverized and fed into the coal gasification system.

4        The highlight in the box that says Coal

5  Gasification, that's what Siemens was providing for plaintiffs

6  and for NCPP for that matter.  The other systems are built out

7  to the basic engineering and design package so that's

8  basically an instruction manual, if you will, as to what is

9  necessary to work with our gasifiers.

10        So, Your Honor's question about the weight of the

11  ash content of the coal by a percentage of weight volatility

12  matter, that impacts 1 and it impacts coal preparation being

13  fed into the gasifier.  It's sometimes referred to as raw into

14  the system and then air-dryed, which is what happens when it

15  gets into our gasifier.

16        THE COURT:  As I understood it, some of the points

17  raised by Dr. Kosstrin was that the pulverization and the rate

18  at which it was being fed into the gasifier was other than

19  what was anticipated which rendered it difficult to get

20  financing and so forth.  In other words, that was one of the

21  theories that he advanced is that the rate of conveying the

22  raw material was not what was anticipated and, therefore, it

23  renders the equipment not useful.  I'm saying that pretty

24  inartfully, but that's -- was one of the points he was making.

25        MR. DAIRE:  Yeah.  I think that's his point, too,

1    but I'm not sure to be quite honest with Your Honor.

2          And the reason I'm not sure is because there's just

3    no logical connection between the experiences at NCPP, on the

4    one hand, and any financial difficulties that plaintiffs were

5    having, on the other.  There's just no basis to draw that

6    logical conclusion, and Dr. Kosstrin doesn't do it in his

7    report and couldn't do it for me at deposition.

8          In fact, there are parts of the deposition where I

9    asked him, do you know if plaintiffs suffered any adverse

10   consequence in terms of finding the EPC contractor because of

11   the condition of the Siemens equipment and he said, no; I

12   don't know.  So it's not clear to me that plaintiffs are

13   continuing to pursue that theory.

14         THE COURT:  Doesn't Dr. Kosstrin take the view, one

15   of his opinions, that the gasifier has only scrap value?

16         MR. DAIRE:  He does, Your Honor.

17         THE COURT:  And if so, did you inquire of him in

18   deposition why it's being kept in a nitrogen blanket if it

19   only has scrap value?

20         MR. DAIRE:  He didn't know the answer to that

21   question, Your Honor.

22         The other thing about scrap value, if I could move

23   to that aspect of it, is -- and we raised this in our papers

24   -- it's removed from the foundation and reliability question

25   of his report.  And I'm happy to answer any other questions

1   Your Honor has about that.  So this is kind of one of the

2   sub-issues, if you will.  Would it be appropriate to move to

3   that now?

4           THE COURT:  If you'd like to, sure.

5           MR. DAIRE:  Okay.  So with respect to the valuation

6   question -- let's see, Ricky, if I could have slide 14,

7   please.

8           So, Your Honor, I'm sure is very familiar with the

9   qualifications that an expert needs to have in order to render

10  a real valuation opinion, and so we won't belabor those, too.

11  But the issue with his scrap value opinion is less about

12  reliability and foundation, more about basic qualifications.

13          He's not a certified appraiser.  He's never actually

14  appraised any industrial equipment before this case, let alone

15  gasifiers.  And he's never participated in the analysis of any

16  appraisal whatsoever.  His work has been limited to

17  supervising as a project manager the work of others.  When I

18  asked him if he had any role in the analysis other than

19  supervision, he told me no.  And the citation for that is

20  there.  So we cited a case in our papers called Spanger, which

21  I'm sure Your Honor is familiar with, which stands for the

22  proposition that you've got to have some qualifications,

23  either a certification or some experience in the field in

24  order to render that type of opinion.

25          And so, we think, for reasons different from the

1    reliability and foundational questions that, frankly, permeate

2    his entire set of opinions that the -- in addition to that he

3    ought not be allowed to testify about any value question as a

4    consequence of just not being qualified.

5            I did now want to return slightly to a point on the

6    foundation question, if I could.  Dr. Kosstrin told me at

7    deposition that in his view the data he had looked at the day

8    before the deposition really didn't matter, because he had

9    calculated these averages on the fly and decided that the

10   average of the ash content by weight and volatility matter by

11   weight wasn't that far outside the leather of the design

12   basis.  And I think rather than buttress or support his

13   opinions in any way, that underscores the foundational and

14   unreliability problem with his opinions.

15           The reason for that is because averages don't tell

16   us anything.  If Siemens' gasifiers can work on the average

17   basis, that would be in the performance guarantees and in the

18   contracts.  And the way I think about it is if myself and

19   Mr. Mitchell were back in law school, I get an F in Contracts,

20   he gets an A, we average out to a C, well that's pretty close

21   to a B, but that doesn't excuse or take care of the

22   consequences of me getting an F.

23           The same thing applies when you're averaging out

24   volatility matter and the ash content of coal.  If you miss

25   one day by a lot but everything else is clustered, that's a

1    problem for operation of the gasifiers.

2           And factually, that's actually not what happened

3    here.  We -- our experts did an analysis of all the samples

4    that were available from the plant.  And in each case, it was

5    over 90 percent of the samples taken were either outside the

6    range for the ash content or outside the range for the

7    volatility matter.  But merely saying, ah, it's an average and

8    it's close, one, it doesn't change what's in the contracts in

9    terms of what the performance guarantees are; and two, it

10   doesn't account for the differences in the operating

11   conditions that we went over before.  So it doesn't help

12   establish any reliable basis for Dr. Kosstrin's opinions.

13          THE COURT:  So, Siemens actually took coal samples

14   from the NCPP plant, conducted an analysis to see if they were

15   within or outside of the ranges that were specified and

16   determined that 90 percent of the time they were outside of

17   the range?

18          MR. DAIRE:  That's correct.  So --

19          THE COURT:  And your position is that Mr. Kosstrin

20   -- Dr. Kosstrin did not do that and, instead, he takes sort of

21   an average approach, an averaging approach, which doesn't

22   assist in substantial similarity analysis.

23          MR. DAIRE:  It doesn't assist in substantial

24   similarity analysis, and it doesn't provide any basis to open

25   the gate for purposes of Daubert.

1          Mr. Dyer, if you could pull up docket number 157-2.

2          I'm sorry.  It's 157-3.

3          This is a sample page, Your Honor, from a much

4 larger spreadsheet.  That is the NCPP coal data.  And you can

5 see that on particular days different variables were measured

6 over time, and it was over a four-year period at the NCPP

7 plant.  So this is the -- the type of data that our experts

8 looked at and Dr. Kosstrin did not.

9          THE COURT:  And it was available to Dr. Kosstrin,

10 if he wanted it?

11          MR. DAIRE:  Yes, Your Honor.

12          THE COURT:  And this is made in real time?  This

13 would be a sheet that's being prepared by Siemens as the

14 factory's operating to deal with any issues it may have of

15 production going forward?

16          MR. DAIRE:  That's correct, Your Honor, and, by the

17 way, not unusual.  Siemens wants to get to the bottom of

18 issues when they arise for their customers, and so it does

19 something, typically what's called a root cause analysis, as

20 to what the -- what caused the issue.

21          And as a consequence of looking at data like this,

22 they were able to verify that the issues encountered during

23 NCPP's start-up and operation had everything to do with NCPP's

24 decisions or Shenhua's decisions on how to operate the

25 gasifiers and nothing to do with any design defect by Siemens.

1    So, Siemens' position on this, Your Honor, is, it's

2 not that under no set of circumstances could plaintiffs make a

3 real comparability analysis between the experiences of NCPP

4 and still hypothetical experiences at their plant.  But they

5 didn't do near enough to get it admitted in this particular

6 case.  As I say, there is no factual question about the

7 disparate operating conditions at NCPP and there was no

8 attempt to account for them, let alone control them, in Dr.

9 Kosstrin's report.

10    I also want to mention one other thing in connection

11 with this reliability and foundation question, and then I'll

12 move on to kind of another sub-issue, which is there's no

13 analysis at all in his report.  All it is, is a summary of his

14 gloss of e-mails that he's read.

15    He doesn't do any computational fluid dynamics.

16 He doesn't do any computer modeling.  He doesn't do any

17 modeling of any kind.  He doesn't resort to any principles of

18 engineering or gasification or combustion to explain how he

19 reached his opinions.  He merely cites to exhibits that

20 plaintiffs introduced at various factual depositions

21 throughout the case about the NCPP experience.  That's it.

22    THE COURT:  Internal documents from Siemens

23 personnel saying that we have to start over or do things

24 differently or words to that effect?

25    MR. DAIRE:  In some cases, internal Siemens

1    documents.  In other cases, correspondence from the customer

2    that was trying to get a discount from us on different

3    gasifiers at the time, but, yeah, it's documents that Siemens

4    produced in the case.  So, there's no analysis.

5            And I think -- you know, Your Honor is obviously

6    familiar with Daubert -- there's also cases that are replete,

7    which basically say anybody can read an e-mail, and that's not

8    helpful to the jury.  And I read Dr. Kosstrin's 13 pages of

9    opinion, and my conclusion is all he's done is read e-mails

10   and is providing his gloss on them.  So that's a separate

11   issue with respect to his opinions even if they could get over

12   this basic foundational problem that they have in terms of

13   comparing the apple of NCPP with the hypothetical orange of

14   plaintiffs' plan.

15           THE COURT:  Is there agreement between the parties

16   that the gasifier in China and the gasifier sold to Secure

17   are, in fact, the same, but it's the -- it's the way that it

18   -- the start-up process, the way it was operated, the type of

19   coal used, the operating conditions that distinguishes them?

20           MR. DAIRE:  Yeah.  I would say they're functionally

21   the same.  They're the same class, 500 megawatt thermal

22   gasifiers.  They were sourced to -- different components of

23   the gasifier were sourced to different manufacturers so there

24   could be, you know, effectively manufacturing differences, but

25   they're both intended to work as 500 megawatt thermal

1   gasifiers.

2          THE COURT:  All right.  And I think that's one of

3   the points you made in your motion is that while the gasifiers

4   are of the same class, gasifiers must be configured and

5   optimized for the design parameters of each individual

6   project.  Start-up periods, commissioning periods, et cetera,

7   are discussed, and then you speak about Dr. Kosstrin conceding

8   that the NCPP plant used coals outside the range, which would

9   have violated the license and service agreement, the

10  warranties provided by Siemens, they would have been

11  disclaimed based on the kind of coal being used.

12         MR. DAIRE:  That's correct, Your Honor.  But again

13  note, Siemens didn't walk away from a project and say, your

14  guarantees are voided.  We're out.  They said, let's work with

15  you.  Let's make this work to your specifications, which are

16  different than what we designed for, but we're going to work

17  with you.  That's -- if any such issue had occurred, which are

18  -- we're now speculating on top of speculation, but if any

19  issue like that had occurred with plaintiffs' project,

20  assuming they had got an EPC contractor and the funding to

21  build their plant and the operating capital they needed, we

22  would have done the -- and they paid us the $12 million they

23  owed us, we would have done the same thing for them.

24         THE COURT:  And that's true regardless of Siemens

25  exiting this particular industry at some point in time.

1          MR. DAIRE:  That's correct, Your Honor.

2          In the record in our submission in connection with

3    the Kosstrin motion, we submitted the parties' correspondence

4    on this issue in February and April of 2016.  We actually

5    offered to -- there's another wrinkle to this, frankly, is

6    that in the 2012 license and service agreement, the deadline

7    for payment is December 2015.  That's also the deadline by

8    which we're supposed to achieve our performance guarantees.

9    In the event that those guarantees aren't run, the tests

10   aren't run by December of 2015 through no fault of Siemens,

11   they're deemed accepted.

12          So you'd be talking February, March, we actually

13   didn't have an obligation to perform.  Nevertheless, we

14   offered to extend the deadline on condition that they get real

15   about their project from the end of 2015 to the end of 2021

16   for the performance guarantees, and our condition to that was

17   you need to pay us what you owe us by July of 2016.  They

18   couldn't do it.  They wouldn't do it.  They told us no.

19          I'd like to move on if I could, Your Honor, to a

20   couple of the other sub-issues raised by our papers,

21   appreciating that you've already read them and digested them.

22   But one of the other sub-issues has to do with Dr. Kosstrin's

23   opinion that Your Honor identified earlier, that the cause of

24   their failure to progress with what's called an EPC contract,

25   which is engineering, procurement, and construction and/or to

1    get financing to build their plant was somehow the fault of

2    Siemens.  We raised an issue with this opinion or with this

3    opinion separate and apart from what we've already discussed.

4              Mr. Dyer, if I could have slide 15, please.

5              And the reason I raise this now, Your Honor, is it

6    dovetails with what we've just been discussing.

7              Dr. Kosstrin's entire EPC-based opinion, which

8    that's what I'll refer to that set of opinions as, is based

9    solely on his statement that Siemens was exiting the business

10   in 2016.  That's what's in his report, that we exited the

11   business in 2016.  That's flat wrong.  And it's flat wrong,

12   because the parties have stipulated that Siemens exited the

13   business in May of 2018.  That's document number 169, the

14   parties' pre-trial statement.  At page 20, it's stipulated

15   fact number 16.  So not only is it just based on a fact --

16   no review of documents, no analysis -- the fact is wrong.

17   He failed to rule out, let alone -- consider, let alone rule

18   out any other causes.  We provide a deposition cite to hear --

19             THE COURT:  I'm sorry.  When did the parties

20   stipulate they exited the market?

21             MR. DAIRE:  2018.  May of 2018, Your Honor.

22             And then, he also told me at deposition that he

23   failed to review the documents that we have just been

24   discussing in February of April 2016, so he was unable to tell

25   me if those would affect his opinion one way or the other.

1          That's kind of classic ipse dixit, in my view.

2    It's exactly what is unable to be questioned on cross

3    examination.  He just says it.  We couldn't get an EPC

4    contractor when Siemens exited the business.  There's no

5    statement from an EPC contractor saying, we would really like

6    to do business with plaintiffs, but Siemens' equipment's no

7    good.  There's no statement from a potential investor saying,

8    I was ready to do this deal with plaintiffs, but Siemens is

9    exiting the market, nothing like that.

10          THE COURT:  And so what is -- this notion that an

11   EPC contract could not be obtained, this engineering,

12   procurement, and construction agreement could not be obtained,

13   help me to understand where this fits into the -- to the

14   project come to fruition.  So you have the equipment.  You

15   have whatever you're going to produce, whatever the product is

16   you're going to make, which I know changes based on changing

17   market conditions, so there has been three or four different

18   iterations of how this equipment will be used.  When, in the

19   life of the project, does the EPC agreement get secured?

20   And how is it used?  You may have addressed this, but it's a

21   little fuzzy to me.

22          MR. DAIRE:  No problem, Your Honor.  So there's --

23   I'd like to answer that question by kind of making two

24   categorical distinctions -- category one, the way it's

25   supposed to be; category two, the way, frankly, plaintiffs did

1  it.

2       So, the way it's supposed to be is you get your

3  financing and your EPC contractor in place first, because the

4  value of an EPC contractor is to either provide a guaranteed

5  not to exceed price so that investors can basically price that

6  risk, and vendors for that matter as well, or a guaranteed

7  price that they will wrap -- what's called wrap with a w-r-a-p

8  -- wrap the whole project, and say, you know, we will

9  guarantee that this project comes in at this number or these

10  consequences will follow.  And that allows investors, vendors

11  to price risk.

12       What plaintiffs did in this case was they decided to

13  buy their gasification equipment first before having an EPC

14  contract in place.  You may have seen in connection with

15  Mr. Jenkins' motion that the DOE had some very pointed

16  questions to plaintiffs about that business decision.

17       But what happened here is an example of why you

18  don't do it that way, frankly, because what started for

19  plaintiffs as a project in 2006 at a cost of $50 million to

20  deliver town gas across the street to Archer Daniels Midlands

21  became a $2 billion project by 2014, '15 to deliver gasoline,

22  methanol, nitrogen fertilizer.  That was their plan at that

23  point.

24       So imagine, if you will, you're an investor, you're

25  dubious about the prospects of this project in 2006/2007, when

1   it's relatively small scale.  Now you're being asked to invest

2   in a $2 billion project in 2015, '16.  So that's the way it's

3   supposed to work is you get the EPC contract and the financing

4   in place first.

5          Now, how this relates to Dr. Kosstrin's opinion, if

6   I could bring it back to that, Your Honor, is what Dr.

7   Kosstrin says is Siemens would need to update the basic

8   engineering and design package in order for plaintiff to

9   achieve financing and get an EPC contractor in place.  And the

10  sole basis, again, to bring it back to where we started, the

11  sole basis of that are a few e-mails and a few documents that

12  he reviewed.  There's no analysis of the actual basic

13  engineering and design package in this case.  In fact, I asked

14  him about that, Your Honor.

15         Mr. Dyer, if we could play the Kosstrin deposition

16  from 48:23 to 49:6.

17     (Deposition excerpt plays.)

18         The important point there is he did no analysis --

19  no review, no analysis of the BEDP in connection with his

20  litigation opinions.  He did do a review of the basic

21  engineering and design package back in 2008 and 2009 when he

22  was also working for plaintiff to help them with their

23  Department of Energy application.  You may have seen some

24  reference to that in the record.  But what he did at that

25  point was produce an independent engineer's report to the DOE

1    and to others that said, pronounce the Siemens technology

2    good.  And that's when he actually did the review of the basic

3    engineering and design package, nothing in connection with

4    this litigation opinions.

5           So how that relates to the issue Your Honor raised

6    is how can you decide, make the opinion, declare, that Siemens

7    would need to update and couldn't update the basic engineering

8    and design package in order for us to achieve our financing

9    and our EPC contract when you haven't looked at the BEDP in

10   ten years.

11          THE COURT:  And from what you're saying, Dr.

12   Kosstrin had not spoken with any representatives in the

13   industry, any EPC contractors, any traditional industry

14   financiers to say, you know what, we wouldn't be interested

15   in this project as it currently exists?

16          MR. DAIRE:  That's correct, Your Honor.  And not

17   only that, it would be -- two steps removed, he didn't do that

18   and he didn't make any effort to say or to find somebody who

19   would say, yeah, we would have done it but for Siemens, which

20   there's nothing in the record to support that.

21          So one other kind of corner issue, if I could, Your

22   Honor, that we raised in the brief, it has to do with Dr.

23   Kosstrin's characterization of plaintiffs' reliance and state

24   of mind, which -- Mr. Dyer, if you could show slide 16 -- just

25   a couple of quick points on that, Your Honor.

1          I think, frankly, that plaintiffs concede it's

2    improper.  They simply accuse us of hypervigilance in their

3    own papers.  And another issue just with the basic work

4    product that Dr. Kosstrin did here, his reliance opinion is

5    based on plaintiffs' Exhibit 21, which was a presentation that

6    was made to SKEC.  I know it's acronym soup a little bit in

7    this case, but SKEC was a potential EPC contractor that

8    Siemens had actually introduced Secure to.  And it was a

9    presentation we were making in connection with letting them

10   know about our general capabilities in connection not only

11   with the potential Secure opportunity, but another project

12   that was happening in Texas.  So it wasn't even a presentation

13   that was made to plaintiffs is the takeaway there.  No

14   foundation, no analysis, no review of the actual materials.

15         Last point I'll make, Your Honor, and it's not

16   raised by our papers, because it's something that's come to

17   our attention as a consequence of the pre-trial statement.

18         If you could put up the last slide, Mr. Dyer.

19         THE COURT:  Before we turn to this, the deposition

20   video clip that you showed, do you have -- is that in your

21   PowerPoint presentation, meaning the actual language?  I'm

22   just thinking about the court reporter and the record to make

23   sure you have that properly transcribed.

24         MR. DAIRE:  Oh, sure.  It's not in the PowerPoint

25   presentation, but the deposition cite is 48:23 to 49:6, and

1   the deposition transcript is attached as docket number 150-3.

2           THE COURT:  Thank you.  All right.  Please continue

3   with the point regarding the pre-trial statement.

4           MR. DAIRE:  So, this was plaintiffs' recitation of

5   their damages claim, so it's what they think is left in the

6   case in the pre-trial statement that was filed a couple of

7   weeks ago, and they've got what they call two categories of

8   monetary damages.

9           One is what they say on their rescission claims,

10  $43 million.  That's effectively they're asking for a refund

11  for the gasifiers in 2007; and then, two, they've got what

12  they call reliance damages of $3.9 million.

13          So a couple of points there, Your Honor.  The first

14  thing is there's no damage theory on this failure to get an

15  EPC contract in place, failure to get financing in place.

16  Their only damages claims are what they call their rescission

17  damages and what they call their reliance damages.

18          Second thing -- so, in my view, that renders this

19  whole discussion of Siemens not getting an EPC contract

20  irrelevant, even if you can get past the foundational issues.

21  Second thing is on this $43 million rescission claim, the only

22  claim in the case for rescission that goes back to 2007 is for

23  lack of consideration.

24          Dr. Kosstrin has nothing to offer on that question.

25  Even if you get over the gatekeeping as to his total lack of

1    qualifications to opine on scrap value, he's doing an analysis

2    of scrap value in 2016 based on what he calls Siemens'

3    decision to exit the business in 2016.  He doesn't do any

4    analysis, doesn't even do any e-mail reading of the value of

5    the equipment, either at the time of the contract or at the

6    time it was delivered by Siemens which, in and of itself,

7    establishes consideration in March of 2009 or at the time

8    plaintiffs engaged Siemens to try and help them sell the

9    equipment in January of 2014.

10           So even if you get through all of the other issues

11   on his report, it's got nowhere to go, because their only

12   remaining damages claims are a $43 million refund for a

13   contract that was -- they said was fully performed and

14   released and waived all claims in 2010 and the 3.9 in what

15   they call reliance damages, which he also has no opinions on.

16           THE COURT:  And the reliances, what does that mean?

17           What is the reliance damages?

18           MR. DAIRE:  So as I understand it, the reliance

19   damages are basically the money they spent -- and this is from

20   2006 to the present -- in furtherance of their project, either

21   in Decatur or in West Paducah.  Now, there's all sorts of

22   contractual issues with trying to state those claims.  But

23   effectively what it is, is they're saying we relied on these

24   gasifiers to produce a result.  We spent money on vendors to

25   the tune of $3.9 million, and we ought to be able to recover

1    for that.

2         Dr. Kosstrin has nothing to say on that issue, and

3    he's got nothing to say that could possibly support a claim

4    for rescission for a lack of consideration.

5         THE COURT:  If he takes the view that the equipment

6    is defective, and if it's his opinion, if his opinion is allow

7    [sic] that it's defective and that the BEDP, you know, was

8    willfully inadequate and there would be all this money spent

9    to re-do it and that these problems generated difficulty with

10   financing and getting an EPC contractor and, therefore, the

11   project never got off the ground, wouldn't that be his basis

12   for the rescission, that there is a lack of consideration,

13   because the product doesn't meet its design specification?

14        MR. DAIRE:  No, Your Honor, that wouldn't be enough.

15   To establish a lack of consideration you have to go back to

16   '07.  You have to establish that this written contract which

17   recited consideration --

18        THE COURT:  At the time.

19        MR. DAIRE:  -- at the time and which we -- so what

20   our expert attempted to do was obviously we didn't have the

21   equipment built at that point, so he did an assessment of the

22   value of the equipment when it was delivered in March of 2009.

23   That's what Dr. Williams did.  And then, just because we

24   frankly weren't sure what Dr. Kosstrin was really saying, we

25   also did an evaluation of the value of the equipment in 2014,

1   which is when they made efforts to start selling it and at the

2   time of the alleged repudiation in February of 2016.

3          THE COURT:  I understand.

4          MR. DAIRE:  The last point, Your Honor, and then

5   I'll sit down.  Something that struck me in reading

6   plaintiffs' papers was a citation to Daubert, the Daubert

7   opinion itself.  And what plaintiffs say in their papers is

8   that the scientific validity and, thus, evidentiary relevance

9   and reliability of FRE 72 is the key inquiry, and that's the

10  key takeaway here.  There is no scientific validity to Dr.

11  Kosstrin's approach.  It's, therefore, unreliable.  When

12  testing a hypothesis, whether it's a technical hypothesis or a

13  scientific hypothesis, you want to control as many variables

14  as possible.  And if you can't control for the variables, you

15  at least want to account for them.  Dr. Kosstrin did neither.

16         THE COURT:  Thank you.  Let's take a 10-minute

17  break, and then we'll come back in for the response by the

18  defense.  This is a pretty dense subject matter, so I want

19  to give my court reporter periodic breaks.  Is there another

20  point you wanted to touch on before we do?

21         MR. DAIRE:  My co-counsel has corrected me that the

22  Kosstrin deposition is 157, not 150.

23         THE COURT:  Thank you.

24         MR. DAIRE:  I apologize, Your Honor.

25         THE COURT:  Thank you very much.

1        All right.  We'll take ten minutes, let her keyboard

2    stop smoldering for a moment, and we'll come back and

3    continue.  Thank you.

4        (Recess from 10:33 a.m. to 10:46 a.m.)

5            All right.  Thank you.  And we have Mr. Devereaux?

6            MR. DEVEREAUX:  Yes, Your Honor.

7            THE COURT:  Thank you.

8            Mr. Devereaux, whenever you're ready.

9            MR. DEVEREAUX:  Thank you.

10           Your Honor, the foundation for Dr. Kosstrin's

11   opinions derives from the data from Siemens and NCPP.  And his

12   opinions are based upon the evidence that's been developed in

13   this matter.  I want to talk a minute quickly about this

14   substantial similarity issue.

15           All of the cases cited by the defendant are in the

16   context of product liability cases.  It is our position that

17   this is not a product liability case.  And typically, when

18   you're dealing with product liability cases you're dealing

19   with mass-produced products -- automobiles, toasters, things

20   of that nature.

21           In this instance, the gasifiers, the burners, the

22   feeder vessels, they're not mass produced items like cars, so

23   it kind of begs the question whether or not the substantial

24   similarity context is even applicable in this matter.

25           THE COURT:  Then, let me take you back to the point

1    I asked of your colleague, Mr. -- is it pronounced Daire?

2            MR. DAIRE:  Yes, Your Honor.

3            THE COURT:  -- Mr. Daire.

4            What I asked him earlier in his argument is whether

5    or not this particular gasifier was tested, because it would

6    appear to me that the best way to know if a product is

7    defective is to unbox it, put it online, see if it works,

8    which is typically what's done.

9            In defective product cases that I've experienced

10   throughout my life, if a product is defective, often it's

11   damaged during the course of its use, and then what the

12   plaintiff does is purchase an exemplar of that product and

13   puts it through the same stresses to see if it fails or

14   performs --

15           MR. DEVEREAUX:  Right.

16           THE COURT:  -- and then looks at anecdotal evidence

17   to see if it's a one-off or if it's consistent with a pattern,

18   whether they're mass produced or not.  So in this case, it

19   would seem that the best test for whether the gasifier works

20   is to use it and that had not been done, so now we're left

21   looking at China and asking whether or not the manner in which

22   it was placed into operation in China is the same as it would

23   have been placed in operation in one of the various

24   anticipated uses by the plaintiff and whether, if so, they

25   would have had the same results or different results and

1    whether any of that even equals a defect.

2         So the first question is why not just unbox it, put

3    it online, and see if it works however it's intended?

4         I know it's expensive, but there's a burden of proof

5    that's attendant to bringing the case.

6         MR. DEVEREAUX:  So, Your Honor, the first answer to

7    that is -- is based upon -- and let me back up.  We believe

8    the Chinese project is the laboratory, and --

9         THE COURT:  Why, though?  If it's different coal, if

10   the coal is outside of the specifications, if the coal that's

11   being utilized would have violated the warranties, how is that

12   the laboratory?

13        MR. DEVEREAUX:  Your Honor, number one, in going

14   through all this evidence -- and I'll cite to you a root cause

15   analysis that Siemens performed -- there is not one scintilla

16   of evidence that the coal being out of spec was a problem.

17   And, in fact, in subsequent marketing materials that Siemens

18   put together, they point out glowingly the fact that the ash

19   content of the coal that's employed by any user is really

20   immaterial up to, I believe, 27 percent ash content.  And so,

21   we're dealing with ash contents at the NCPP project and at the

22   Secure project far less than 20 percent.

23        THE COURT:  What does Dr. Kosstrin say is the

24   specific defect?  What is wrong with the equipment that

25   renders it to be defective and, therefore, gives rise to the

1    various causes of action that are brought?

2           MR. DEVEREAUX:  Well, there are many.  It begins

3    with the fact that Siemens was never able to perfect this

4    technology.

5           THE COURT:  Isn't it still working in China right

6    now?

7           MR. DEVEREAUX:  Well, Your Honor, it is working in

8    China due to the changes in the major modifications that the

9    Chinese had to make in order to make it work, and in our brief

10   we talked about that.  There's evidence that the Chinese were

11   upset because they had to make 88 modifications to the

12   equipment, and Siemens was only able to find a solution for

13   three of those modifications.  We also have communications --

14          THE COURT:  But which of those modifications go to

15   the gasifiers as opposed to some other portion of this

16   process?  Because the process has the gasifier and a bunch of

17   other component parts.

18          MR. DEVEREAUX:  So this -- the entire 88

19   modifications go to the gasi- -- we're only dealing with the

20   gasification block in this situation with Siemens.  And I

21   think it's important to point out, and we believe the evidence

22   will be uncontroverted at trial, that the gasification process

23   only deals with one thing and that is gasifying coal and

24   producing syngas, okay?  Syngas is the necessary fuel in order

25   to allow the rest of the processes to take place.

1    Those other end processes, whether you're making

2  gasoline, methanol, fertilizer, ammonia, have no effect on

3  what we're dealing with, with respect to the gasification

4  block.  So we had the first problem, the changes.  The second

5  problem is the evidence at trial will reflect that Siemens has

6  never been able to perfect its burner in this matter.

7    THE COURT:  But what -- I'm sorry to interrupt, but

8  the modifications in China, what evidence is there in the

9  record that those modifications are due to a problem with the

10 design of the gasifier as opposed to the way in which it was

11 being used, you know, the purification process, the

12 pulverization of the coal, the speed with which it was being

13 fed, the type of gas being utilized in China versus what's

14 called for in the specs.

15    MR. DEVEREAUX:  Right.

16    THE COURT:  What evidence is there that those

17 problems exist apart from the operational choices of China?

18 Because that distinguishes what you have in a nitrogen blanket

19 right now stored away and what's happening in China.

20    MR. DEVEREAUX:  Right.  So let me -- let me begin by

21 stating, we have a situation.  If, in fact, the coal had been

22 the problem, we believe we would have seen evidence, we would

23 have seen communication, we would have seen notifications to

24 the Chinese project that you're using out-of-spec coal, and

25 you can't use it.

1    THE COURT:  Wasn't I just shown a graphic that

2 demonstrated that there's a root cause analysis that came to

3 that conclusion?  There was a graph handed up to me by

4 Mr. Daire, and he has in it the breakdown of the issues with

5 the coal.  I could go back to my notes and find the specific

6 page.

7    MR. DEVEREAUX:  Well, Your Honor, I believe the

8 evidence will demonstrate that the -- at the NCPP project,

9 the ash content was engineered to be approximately 16 percent.

10 And I believe the exhibit that Mr. Daire is talking about

11 turns out -- if you take the average of that coal, it turns

12 out to be 16 percent.  But we also have additional evidence.

13 We have these marketing materials.  We have communications

14 from Siemens employees that reflect that, yes, there was

15 out-of-spec coal, but it didn't affect the ability of the

16 Chinese plant to gasify the coal.  That was not an issue.

17    With respect to -- you asked about the burners and

18 that situation.  We have a situation where the burners never

19 worked that were provided by Siemens.  When it was initially

20 started up in October of 2010, within a very short period,

21 within 24 hours, the way the burner was designed caused the

22 cooling screen to be damaged.  It basically burned a hole in

23 the cooling screen.

24    THE COURT:  Isn't that what the service agreement

25 is for, though, that there -- because, as you indicated, these

1    are unique sort of one-off equipment pieces that are designed

2    and engineered for specific processing in specific

3    environments that what -- part of what you're buying is the

4    continuing expertise of Siemens to come in and troubleshoot

5    these issues.

6          For example, if you have a transformer in a

7    substation and it locks out, one of the things you buy is

8    experts coming in to figure out why it's locking out.  Is it

9    the -- is it the way it was plugged into the system?  Is it

10   something with the equipment itself?  And they troubleshoot it

11   until it's online working properly.  Isn't that anticipated in

12   the industry that it's not, as you indicated, mass produced,

13   it requires some massaging and technical support and that's

14   why you buy that ongoing support, to fix these problems that

15   arise in the unique environments in which you find that unit

16   operating?

17         MR. DEVEREAUX:  That may be partially correct, but

18   on the other hand --

19         THE COURT:  But that reality is being framed as a

20   defect as opposed to a component of what you paid for, that

21   these do have a life of adjustment, you know, that adjustment

22   troubleshooting period, that start-up period, prior to it

23   going online and operating fully functionally that there is a

24   period of time that engineers adjust, fix, adapt, for that

25   unique environment.

1          MR. DEVEREAUX:  Sure, Judge.

2          THE COURT:  And how is that defective as opposed

3    to --

4          MR. DEVEREAUX:  There's a commissioning period.

5    It's supposed to be between four and six months, okay.  And

6    after that period, it is expected that you would receive the

7    performance achievements.

8          THE COURT:  Right.

9          MR. DEVEREAUX:  And I want to be very clear with

10   respect to our position there.  In no uncertain terms will the

11   evidence at trial demonstrate that Siemens achieved any kind

12   of performance goals or achievements in either August of 2011

13   or September of 2012.

14         THE COURT:  As relates to your client or China?

15         MR. DEVEREAUX:  Relating to the Chinese project.

16   And I think it's important to point out there's a difference

17   between technical field assistance and whether or not the

18   equipment works.  In this instance with respect to the Chinese

19   project --

20         THE COURT:  Can I ask you why it was never unboxed

21   and put into operation for purposes of this litigation?  Why

22   not just do that to see if it actually works or not?

23         MR. DEVEREAUX:  Well, Your Honor, there were some

24   problems with respect to, you know, moving the project

25   forward.  We had the greatest downturn, you know, since the

1    great depression in 2008, and it was really about it coming

2    together.  I think a very other important point about this is

3    -- and I want to back up just a minute and talk --

4           THE COURT:  But between 2008 and today, it's never

5    been put into operation.

6           MR. DEVEREAUX:  Well, Your Honor, I was going to

7    finish -- yes, that's correct.  But in 2014 -- we had had

8    interim meetings with Siemens in 2012, that's Exhibit 75, and

9    in 2014, in which we were waiting to get the basic engineering

10   design package that -- the revised one -- in order to give it

11   to our EPC contractor to get the guaranteed maximum price.

12   The problem you have is that the basic engineering design

13   package is the nucleus for how you build this entire plant,

14   and you can't do anything without that.

15          THE COURT:  Is it being revised because there's

16   problems with the way it was originally written or because

17   your clients and usage of the equipment was changing?

18          MR. DEVEREAUX:  Your Honor, it's our position that

19   the end use product, as I previously indicated, has nothing to

20   do with the change in the BEDP.  It had to be changed because

21   of all of the problems associated with the Chinese project.

22          And I want to take just a minute, because I think

23   this is an important point, and that is with respect to the

24   purchase of the equipment.  The equipment was purchased by

25   Secure, because Secure was informed by Siemens that you had to

1  purchase the equipment in order to get the basic engineering

2  design package.  And we needed the basic engineering design

3  package in order to advance the project, to do the additional

4  engineering, to go ahead and connect the other components that

5  we were going to employ in order to advance the project.

6          And with respect to the BEDP being updated, we have

7  at least two, maybe three instances where we have

8  communications that clearly demonstrate that the Secure Energy

9  basic engineering design package has to be revised.  It's been

10  referred to it should be scrapped, it's useless, and as a

11  result of that, that has been one of the reasons why Secure

12  has been unable to advance the project.

13          THE COURT:  And are there witnesses to that effect?

14  Is there somebody who has been deposed in this case who will

15  testify that we did not issue an EPC contract or financing

16  because the design package was being revised or because there

17  were these start-up issues in China?

18          MR. DEVEREAUX:  We anticipate having that evidence

19  at trial, Your Honor.

20          THE COURT:  Is discovery closed in the case?

21          MR. DEVEREAUX:  Yes, Your Honor.

22          THE COURT:  All right.  So how is that possible if

23  you haven't named that witness and --

24          MR. DEVEREAUX:  We have named the witness, Your

25  Honor.

1          THE COURT:  All right.  So there's been a witness

2    that's been made available to Siemens to depose on this very

3    point?

4          MR. DEVEREAUX:  Yes, Your Honor.

5          Now, I also want to talk a minute about the other

6    evidence in the case.  So in March of -- I'm sorry.  In June

7    of 2013, we have admissions by Siemens and acknowledgments

8    about the fact that the Chinese made some significant changes

9    to the feed system, the gasification island, and syngas

10   processing.  These are all part of the gasification process.

11         And Siemens --

12         THE COURT:  I'm sorry to interrupt one more time,

13   but to this day we're left with a bit of a quandary, which is

14   if these are one-off pieces of equipment, isn't it just as

15   likely that to the extent that there have been problems with

16   the Chinese equipment, that that equipment was defective and

17   yours is fine, but yours has not been operated?  How do we

18   know that that's not the fact?  Do you see what I'm saying?

19         MR. DEVEREAUX:  No.

20         THE COURT:  I have never come across a case where

21   the actual equipment that is claimed to be defective is in

22   one's possession and not tested, never.  So if there is --

23   whether it's a vacuum tube or whatever it may be, they are

24   typically tested through a mutual protocol with everyone's

25   expert watching to see if it performs to the standards one

1    would expect.

2              So here, the premise is that there are problems in

3    China with the same kind of equipment and, therefore, our

4    equipment is bad.  Isn't it just as likely that the equipment

5    in China is bad and yours is fine, assuming that there is a

6    problem with the Chinese equipment?

7              MR. DEVEREAUX:  No, Your Honor.  I think that's

8    where the evidence comes in.  And, you know, this -- a good

9    example would be, you know, the Corvair.  You know, as a

10   result of, you know, what transpired with the Corvair, we know

11   that it was an unsafe vehicle, and we have the same situation

12   here as a result of what transpired.  This was a first

13   generation.  It was the first time Siemens had ever designed

14   and built a megawatt gasifier system.  We know that there are

15   so many defects that this equipment will not work.  They don't

16   even know the necessary changes that SNCG or the Chinese made

17   in order to make it work.  And they don't have a -- as we sit

18   here today, they don't have a commercial burner in operation

19   that could be employed in our gasification system.

20             THE COURT:  Did -- does Dr. -- since we're talking

21   about Daubert and not about -- not the merits of the case in

22   a global sense --

23             MR. DEVEREAUX:  Yep.

24             THE COURT:  -- has your expert in this case, Dr.

25   Kosstrin, has he articulated in his report -- and I looked at

1  his report -- and it's Exhibit A at docket 150-2 -- it's about

2  13 pages long.

3         MR. DEVEREAUX:  Yes, Your Honor.

4         THE COURT:  I did not see -- okay.  He goes through

5  a bullet point of what issues there were that needed

6  correction at NCPP.  So starting at page 5, the main burner

7  and pilot burner had poor -- the main burner had poor carbon

8  conversion creating more dust that needed to be removed.  The

9  pilot burner experienced repeat damage due to inadequate

10 cooling and required more repair than expected.  But he

11 doesn't indicate what analysis was done to determine whether

12 that's a process issue or an equipment issue, a design issue

13 or a utilization issue.

14        So that -- if we're talking about Daubert, he needs

15 to ground his opinions in something that is repeatable,

16 objective, reliable, you know, the typical measure of an

17 expert's opinion, as opposed to simply listing, here are

18 problems that were related by a different user.  He needs to

19 create an analysis that indicates how that is attributable to

20 the equipment and not to some exterior source.  And all I hear

21 and read him saying is that, that Siemens had concerns

22 regarding the viability of the burner prior to the first fire

23 at -- of NCPP.  There was a new burner, a Gen-5 burner

24 developed in November 2014.  He -- and here's a concern I have

25 with his opinion.

1        On page 5, he states, the deposition of

2   Mr. Morehead, and he cites the pages, states that the

3   gasification system and the license was essentially similar to

4   the units of NCPP.  Mr. Schuld, S-c-h-u-l-d, who is a chief

5   executive officer, stated in his deposition, the burners sold

6   to Secure were identical to NCPP burners.  This confirms that

7   Secure would experience similar problems as NCP [sic], if not

8   corrected.  But there's no analysis as to the type of material

9   used.  There's no analysis as to the type of gas used to fire

10  up.  There's no analysis as to the cleanliness of the

11  environment in which it's used, the skill of the operators.

12       He simply, then, goes from there to say that there

13  is a list of problems that NCPP identified, including the

14  burners, which I spoke about.  The coal feeding moisture

15  content is noted as a problem.  That's unique to the coal.

16  There are issues with agitators in the feeder vessels.  That

17  can be based on not being properly maintained.

18       I mean, he doesn't rule out or rule in any of the

19  human error, human attributes, or anything that could be a

20  but-for cause for the problems -- the cooling screen being

21  damaged, the quench section, you know, all the different

22  aspects that he speaks about on pages 5 through 7.

23       So, he basically states that because these things

24  occurred in China, they would replicate in America without

25  considering any of the unique factors or any testing,

1   modeling, statistical data.  I mean, other than simply saying

2   there are problems and, therefore, they must recreate, I can

3   say that.  So how does that -- where is his opinion grounded

4   in methodology that helps a jury to understand?

5            Because if we took him out of the equation, you

6   could have any person come in and say, in China there were the

7   following list of problems, therefore, our equipment's no

8   good.  He needs to bring more to the table than that, and

9   that's what I'm -- that's what seems to be lacking from his

10  analysis.

11           MR. DEVEREAUX:  Okay.

12           THE COURT:  So, you can't just say there's a problem

13  somewhere else, therefore, there'd be a problem here.  There

14  requires a scientific method --

15           MR. DEVEREAUX:  Right.

16           THE COURT:  -- and I'm just not seeing it.

17           MR. DEVEREAUX:  Okay.

18           THE COURT:  So help me to find it.

19           MR. DEVEREAUX:  Sure.  I want to first address this

20  substantially similar equipment.

21           THE COURT:  Well, it's not just equipment.  It's the

22  entire proc- -- it's a process here.

23           MR. DEVEREAUX:  Correct.

24           THE COURT:  The equipment is part of the process.

25           MR. DEVEREAUX:  Yes.  Yes.

1        But the point is, is, you know, we talk in terms of

2   substantially similar, because basically the Siemens witnesses

3   initially would not acknowledge that it was the exact same

4   equipment.  A good analogy would be if you had, you know, two

5   Chevrolet Impalas, the same year.  Those are built from the

6   same plans and from the same, you know, assembly line.

7        In this case, the plans are identical.  And they --

8   they use this nuance that it's not possible that they could be

9   identical -- they're similar -- because when you build

10  something, it's not always exactly the same.  But the point is

11  the exact same engineering, the exact same equipment was

12  manufactured from the same specifications.  That's the first

13  thing.

14       Now with respect to, you know, the testing aspects

15  of this, the situation we have is it's not only impossible,

16  but also futile to try to go to the Chinese project because,

17  as the evidence in this case demonstrates, there were so many

18  changes made by the Chinese to make it work that it would be

19  impossible to compare to the equipment that Secure was

20  providing.

21       THE COURT:  That takes me back to why wasn't the

22  equipment in your box tested?

23       MR. DEVEREAUX:  Your Honor --

24       THE COURT:  If that is the best evidence, then why

25  isn't that tested as opposed to relying on something that you

1    arguably cannot --

2           MR. DEVEREAUX:  Well, Your Honor, that would require

3    Secure to expend more than $2 billion to find out the exact

4    same problems that the Chinese had.  And, I want to be very

5    clear here, this is equipment that was supposed to achieve its

6    performance guarantees in China in four to six months, and it

7    took more than 30 months.

8           THE COURT:  But again, that again, can be because of

9    the way in which it was being utilized in China as opposed to

10   the equipment itself, and Dr. Kosstrin does not rule out

11   misuse.  So one of the fundamental principles in product

12   defect litigation and substantial similarity is whether the

13   products, which are identical, are being used in the same way

14   or misused.  A misused product is not defective.

15          Going back to my tire analogy, if I have a tire

16   that's manufactured the same as the tire on your car, but I

17   run it chronically under-inflated, I'm going to have a failure

18   eventually of that tire, perhaps.  I'm certainly increasing

19   the likelihood, because I've misused it, which is why we now

20   have tire sensor pressuring and all the other things that we

21   do, the history of warning related to tires, it's all because

22   use matters.  And here, what I'm not hearing Dr. Kosstrin say

23   in his opinion is how he's ruled out misuse, abuse, or other

24   problems that are not germane to the equipment itself, but are

25   more inherent in the material used and the manner in which the

1   material is being used.

2           MR. DEVEREAUX:  Right.  So in this case --

3           THE COURT:  I mean, has there been anyone who has

4   inspected the factory to see what it looks like and how it's

5   done?

6           MR. DEVEREAUX:  Well, Your Honor, what I was going

7   to say is, is that Siemens, the engineers at Siemens,

8   undertook a number of root cause analysis to find out what the

9   problems were.  And we point out on a number of occasions --

10  you know, you alluded to, and I wrote this down, the

11  cleanliness, the skill, and things of that nature.  And, you

12  know, one of their biggest defenses is that it was out-of-spec

13  coal, and the ash content being higher resulted in there being

14  more dust.

15          THE COURT:  There's also a moisture issue which

16  affects --

17          MR. DEVEREAUX:  Well --

18          THE COURT:  -- the industry and production.

19          MR. DEVEREAUX:  Well, the moisture issue, you know,

20  should have taken care of itself because the coal is dried

21  before it is processed and placed into the gasifier, so that's

22  merely an issue of, you know, undertaking the process to do

23  that.  But where I was going with the root cause analysis of

24  this dust problem, which really deals with the fact that we

25  have unconverted carbon in the coal that's going into the

1   syngas.  The root cause analysis does not point out that

2   there's any problem with the ash at all.  It points out other

3   things that had to do with the design and the engineering of

4   the gasifiers.  And so that is really our best evidence that

5   the -- the evidence that we've submitted to you are a number

6   of analyses that Siemens has undertaken to try to figure out

7   what the problem is.  And when you go through that --

8          THE COURT:  But does Dr. Kosstrin, his opinion,

9   utilize those root cause analyses to reach his conclusions --

10          MR. DEVEREAUX:  Yes.

11          THE COURT:  -- and does he somehow verify them or

12  vet them or put them into, you know, any context?  Because I

13  just didn't see that.

14          MR. DEVEREAUX:  The answer is yes, Your Honor.

15          He reviewed the evidence, he analyzed the evidence,

16  and basically he's validating the evidence in the conclusions

17  that Siemens has reached.  And he's been forced to do that

18  because Siemens, in defending this case, now wants the

19  evidence to be something different than what really transpired

20  there.  And that's going to be the difference between the

21  expert testimony here.

22          Our expert's testimony is based upon a review of the

23  evidence and what has transpired, and we'll get into the other

24  experts, but you're going to find that their testimony just

25  completely ignores all these problems.

1          And they indicate, oh, I took it into consideration,

2     but not a problem.  Well, what's that based upon?  Why isn't

3     there a problem?  Well, it's just not.  And so --

4          THE COURT:  In Dr. Kosstrin's equipment and design

5     package required revisions, page 8 and 9 -- his entire report

6     consists of one, two, three, four, five, six paragraphs as to

7     revisions.

8          MR. DEVEREAUX:  Right.

9          THE COURT:  All of what he opines in terms of -- of

10    the problems identified with the equipment in China, Dr.

11    Kosstrin identifies solutions and the costs related thereto,

12    right?  Why wouldn't that be part of what's covered by Siemens

13    in their service agreement with you?  And how does that render

14    the equipment defective as opposed to it just being a set-off

15    from the price or something of that nature?

16          If we're talking about defect, we mean it no longer

17    is capable of performing its designed function, and that's

18    what Dr. Kosstrin is saying is that this is, you know, a

19    worthless piece of equipment that cannot not work, yet at

20    pages 8 and 9, he's saying exactly how it can be remedied and

21    the costs related.

22          MR. DEVEREAUX:  Right.

23          THE COURT:  Aren't those mutually inconsistent

24    theories?

25          MR. DEVEREAUX:  No, I don't believe so, Your Honor.

1          I think the conclusion that Dr. Kosstrin comes to is

2     consistent with the conclusion that a number of the Siemens

3     executives have come to, and that is we just need to scrap it

4     and start over.  And what they're saying there is it would be

5     cheaper to start all over than to try to make this equipment

6     work because there's so many changes.  They include making the

7     gasifier larger, which is a monumental task and a real safety

8     issue.  It includes, you know, from top to bottom really

9     starting over.  And that's what the evidence at this trial, I

10    think, will reflect.

11         And Dr. Kosstrin's opinion is -- is consistent with

12    the evidence that's been adduced, both through the Siemens

13    employees and through the documentary evidence with respect to

14    Siemens trying to determine what the problems were at the NCPP

15    project.

16         THE COURT:  You admitted a comment that testing the

17    actual piece of equipment you have would cost $2 billion.

18    What do you base that upon?

19         MR. DEVEREAUX:  Your Honor, in order to test it, we

20    would have to just build the plant.  You cannot just, you

21    know, hook these things up.  They are -- you know, we're

22    dealing with something that's probably several stories tall

23    and it begins with a concrete foundation and doing all the

24    analysis as to the strength of that foundation, and you'd have

25    to do coal feeding.

1        You would have to build the entire plant in order to

2   test our equipment.  There is no other way to do this.

3        Now, you could stop at the gasification block and

4   just produce syngas, but then what would you have?  You might

5   save a couple hundred million dollars, but you wouldn't have

6   anything.  All you would do is spend well over, well over a

7   billion dollars to demonstrate what we already know and that

8   is the equipment doesn't work and that, you know --

9        THE COURT:  Except it is operating in China right

10  now and they've ordered, what, 24 or more or something of that

11  nature, some large number?

12       MR. DEVEREAUX:  It is operating in China based upon

13  the efforts, the very large efforts that were taken --

14  undertaken by the Chinese.  It took them almost three years to

15  perfect it and they had to retain a Chinese institute, design

16  institute, to design and manufacture burners.  It's called the

17  7-Eleven burner.  And until that point in time, these -- this

18  project limped along and had availability output of, you know,

19  in the 20 to 30 percent range, which is -- after three years

20  is totally unsatisfactory.

21       And in the case of Secure Energy based upon

22  financially engineering this project, Secure would have -- and

23  any other project developer -- would have, you know, been in

24  bankruptcy, if they had the same performance that the Chinese

25  had.  And I think it's also important that if we don't have

1    the final plans from Siemens, we can't even begin to start the

2    process.  And most important of all, we can't get the EPC

3    contractor, because he's not going to give us a price until

4    such time as we have a final basic engineering design package

5    that we can move forward in advance.

6         (Pause in proceedings.)

7              THE COURT:  Bear with me for one moment.

8              MR. DEVEREAUX:  Sure.

9              THE COURT:  Are there any other topics you would

10   like to cover in your response to defendant's Daubert

11   challenge?

12             MR. DEVEREAUX:  Yes, Your Honor.

13             THE COURT:  Okay.  I'll ask you what I asked

14   Mr. Daire.  If the equipment has nothing but scrap value, why

15   is it being kept in a nitrogen blanket?  Why not have done

16   something else with it, disposed of it by now, recouped some

17   money, something of that nature?

18             MR. DEVEREAUX:  Well, Your Honor, I guess I have a

19   couple of answers to that.

20             Number one, in this case, Siemens has insisted that

21   this gasification system is merchantable, is marketable and,

22   as a result, you know, we have kept it under the nitrogen

23   blanket.  What I will tell you as a result of the institution

24   of this litigation, in a review of the evidence, once we

25   determined all the problems and once we determined that this

1  gasification system would not work, Secure Energy ceased all

2  steps to determine whether or not there was a prospective

3  purchaser out there, and I think that's an important point.

4  And that is -- that's why Dr. Kosstrin came to the

5  conclusion that this gasification system has no value for a

6  lot of reasons, the first being Siemens does not have the

7  necessary -- the necessary answers to the problems.  They

8  don't have the necessary engineering necessary to do what the

9  Chinese did and that is to make the equipment work.  And it's

10  evidenced by the fact that Siemens went through five

11  generations of their burner.  The last burner was never even

12  tested.  In the deposition of the chief technology officer at

13  Siemens, Frank Hannemann indicated that he's unsure whether or

14  not that burner will work either.  And I think that's an

15  important point.  But with respect to the nitrogen blanket,

16  we're just trying to maintain the status quo.

17  There's also a lot made about the fact that Dr.

18  Kosstrin did not do any testing.  And I alluded to this

19  earlier.  It's impossible to do any testing because of all

20  the design changes that NCPP made.

21  THE COURT:  Has Dr. Kosstrin communicated with

22  anybody at NCPP to figure out why they made the design

23  changes?  To hear from them what the reason was for the

24  change?

25  MR. DEVEREAUX:  No, Your Honor.

1      THE COURT:  In terms of whether it was unique to the

2  downstream needs of consumers, anything of that nature?

3      MR. DEVEREAUX:  No, Your Honor.  And I think it's

4  important to point out that defendant's experts did not do any

5  testing either.

6      THE COURT:  They're not offering Dr. Kosstrin as an

7  expert, though.

8      MR. DEVEREAUX:  I understand, Your Honor.  But I'm

9  trying to point out the fact that doing any testing was an

10 impossibility based upon the circumstances.

11     THE COURT:  Why is it an impossibility?  What is to

12 preclude one from saying to NCPP, you know, we'd like to

13 inspect your factory.  We'd like to sit down with your people.

14 I mean, there is -- obviously, there are Hague convention

15 provisions for taking the deposition.  In auto products cases,

16 for example, where the manufacturers are in Japan, there are

17 mechanisms for deposing the people in Japan.  The engineers

18 could be deposed.  There's nothing to preclude the proponent

19 of the expert who's trying to accumulate the data upon which

20 the expert relies from deposing the engineers who did the

21 modifications in China to determine whether they were

22 process-specific or product-specific, meaning is it unique to

23 the needs in China or is it unique to the design and

24 manufacture of the equipment.  Those people that are typically

25 deposed.  The engineering plans are obtained through a request

1   for production.  That can be obtained through the Hague

2   convention or other mutual treaties, and then those source

3   documents are there, as opposed to e-mails from a -- an

4   employee saying, boy, we should start over which could be

5   hyperbole, you know, as opposed to an engineering decision.

6   So, Dr. Kosstrin does seem to me to be looking at a list of

7   problems in China, but he has not determined for himself the

8   origin of those problems or the, you know, why the

9   modifications were made.

10          MR. DEVEREAUX:  So a couple of responses.

11          Number one, I think it's important to point out

12   these communications about starting over.  You know, we've

13   taken extensive depositions, and we've tested that evidence.

14   And based upon that evidence that was developed that was how

15   Dr. Kosstrin was able to render his opinion.

16          With respect to the Chinese project, you must

17   understand that many of these changes -- and there are

18   exhibits that show this --

19          THE COURT:  Can't his opinion be predicated solely

20   on someone in sales or marketing saying that they think

21   there's going to be problems with burners or someone in some

22   other component saying, you know, we need to start over as

23   opposed to some methodology of his own?

24          MR. DEVEREAUX:  Your Honor, we're not dealing with,

25   you know, just any employees.  We're dealing with the chief

1   executive officer, the chief technology officer, and the

2   number two person that had the most knowledge and the

3   authority to act on behalf of the company.

4           THE COURT:  And where does Dr. Kosstrin cite this in

5   his report?  Because he's limited to his report since he's not

6   here to testify.

7           MR. DEVEREAUX:  Well, he relied on the exhibits that

8   were indicated in his report and that was backed by, you know,

9   the evidence with respect to the depositions we took.

10          I want to talk a minute about the Chinese project,

11  because you need to understand that in order to learn of their

12  changes and what have you, we have a situation where you would

13  just about have to cut the gasifiers open to see all the

14  design changes they had to make.

15          THE COURT:  Absolutely.  What's wrong with doing

16  that?

17          MR. DEVEREAUX:  Well, number one, we didn't ask the

18  Chinese, but I'm sure no manufacturer or no process company

19  would allow you to come in and cut open their gasifiers.

20          THE COURT:  I'm sorry.  I don't mean the ones in

21  China.  Certainly, they would not allow that.  But the one you

22  have, to open it up, to look at how it currently exists and

23  see what changes were made, either by obtaining design

24  diagrams from the Chinese.  I mean, you can get their source

25  documents, if you wanted, so that's not impossible.

1          MR. DEVEREAUX:  Well, Your Honor, I would, I guess,

2    kind of beg to differ.  We have a situation in China where,

3    you know, they are unwilling to share documentation.  I did

4    some preliminary research regarding discovery in China and I

5    came across some material that indicated that it would be a

6    crime for a Chinese citizen to even sit for a deposition.  And

7    the last problem is we have a tremendous language barrier with

8    the Chinese project.

9          And I think lastly and probably most importantly is

10   the evidence that we've discovered and that we've advanced

11   really demonstrates that we don't need to do that because we

12   have, in this situation, the testimony of the Siemens

13   engineers, executives testifying about what happened at the

14   Chinese project, and we believe that that's reliable

15   testimony.

16          THE COURT:  But this is not a small point.  Under

17   the rules that govern the disclosure of an expert, everything

18   that they're going to opine upon has to be in their report.

19          MR. DEVEREAUX:  Right.

20          THE COURT:  They can't just give a laundry list of

21   50 items and say, it's in there somewhere.  They have to

22   state, this is what my opinion is based upon.

23          MR. DEVEREAUX:  Right.

24          THE COURT:  And I do not see, unless I'm missing it,

25   a discussion by Dr. Kosstrin as to how comments from Siemens

1   executives support his conclusion that the problems in China

2   are due to the design of the equipment as opposed to their

3   implementation, other than sort of an -- you know, general

4   illusion in one instance, for example.

5           MR. DEVEREAUX:  Well, certainly, Your Honor, I think

6   it's very difficult to, you know, to attempt to cover

7   everything in a report, and that's why we have depositions --

8           THE COURT:  Defense reports are 80 pages long.

9   This one's 13.

10          MR. DEVEREAUX:  Correct.  But it was certainly

11  subject to cross examination and it was based upon, you know,

12  the evidence in this case.  And I do think it's more than

13  sufficient and it demonstrates, you know, based upon sound

14  engineering principles what his opinion is with respect to the

15  status of this equipment.

16          THE COURT:  All right.  If -- and I have not reached

17  a decision.  These hearings are very important to me or I

18  would not have had it.  I would just rule on the paper.  But

19  if for some reason Dr. Kosstrin is not permitted to express

20  some or all of these opinions, what impact does that have on

21  plaintiffs' case?  Does the case rise or fall with Dr.

22  Kosstrin?

23          MR. DEVEREAUX:  Not necessarily, but we do believe

24  it is beneficial to help educate the jury on matters before

25  the Court.  And --

1          THE COURT:  I mean, what other evidence of a defect

2     would there be for, you know, for rescission or for whatever

3     other causes of action we're talking about?  I have an outline

4     of the complaint in front of me.  I'm just trying to remember.

5     You have breach of contract, fraud, rescission, et cetera.

6          MR. DEVEREAUX:  Yeah.

7          THE COURT:  Fraudulent misrepresentation was

8     dismissed previously by the plaintiff at docket entry 74,

9     but these are contract-related causes of action based on the

10    product being defective.

11         MR. DEVEREAUX:  Right.

12         THE COURT:  So if he is the witness who speaks to

13    defect, what is left of the case in the absence of Dr.

14    Kosstrin?

15         MR. DEVEREAUX:  Well, I mean, we have a whole litany

16    of evidence from Siemens reflecting that the equipment's

17    defective.  But I think it's important to point out in --

18         THE COURT:  Reflecting the equipment in China has

19    problems.

20         MR. DEVEREAUX:  Correct.

21         THE COURT:  And it would require an expert to link

22    that to the equipment in your possession, custody, or control?

23         MR. DEVEREAUX:  I'm sorry.  What did you say, Your

24    Honor?

25         THE COURT:  Wouldn't it take an expert to link the

1    statements -- if we're going to make a comparison to the

2    Chinese experience to the equipment sold to you, it requires

3    an expert to make that link, doesn't it?  Who else could do

4    that?  Who else could possibly say that the problems

5    experienced in China are, in fact, synonymous with what was

6    an anticipated problem here in America?

7            MR. DEVEREAUX:  Well, certainly that's going to come

8    down to how you rule on that.

9            THE COURT:  Okay.

10           MR. DEVEREAUX:  We believe that the link is there.

11   We believe that Dr. Kosstrin's testimony is appropriate and is

12   sufficient to pass the Daubert muster.  But I also wanted to

13   point out that there were a number of issues that have come

14   up, engineering issues such as, you know, that the -- the

15   employment of a different feed stock that Secure was going to

16   make that will become an issue at the trial that I believe the

17   experts should have the right to opine on.

18           And some of these --

19           THE COURT:  That they have not already opined on in

20   their reports?

21           MR. DEVEREAUX:  Correct.

22           THE COURT:  So you're asking basically for

23   re-opening the expert reports?

24           MR. DEVEREAUX:  No, I'm not asking to re-open the

25   expert reports.  I'm asking that if there are issues that come

1    up at trial that are relevant and contested that the experts

2    would be able to testify about them.

3            THE COURT:  Which is essen- -- well, we're getting

4    into pre-trial issues now aside from Daubert, but it is highly

5    unusual and highly unlikely for experts to be able to modify

6    opinions during the course of a trial because some fact

7    witness says something that they didn't anticipate when they

8    were rendering their opinions.

9            MR. DEVEREAUX:  Your Honor, I'm not suggesting for

10   one moment that we're modifying the opinion.  I'm suggesting

11   that there may be additional issues that the experts will be

12   called upon to opine about.

13           THE COURT:  They're not supposed to.  That's why we

14   have the reports.  They are limited to the four corners of

15   their report.  If they didn't think to speak about it in their

16   report, didn't disclose those theories perhaps in deposition

17   by the consent of the parties, then that's the limit of what

18   they get to speak to, but we'll address those at a pre-trial

19   hearing.

20           MR. DEVEREAUX:  Okay.

21           THE COURT:  In terms of Dr. Kosstrin's ability to

22   testify regarding the value of the equipment sold, what

23   expertise does he have other than concluding that if he thinks

24   it's defective it, therefore, has no value?  What else does he

25   have?

1      MR. DEVEREAUX:  So we have a situation where the

2  equipment is in a state that it's not even salable, okay.

3  It's not salable --

4      THE COURT:  My question is why Dr. Kosstrin --

5      MR. DEVEREAUX:  -- for the purpose it was intended.

6      Pardon me?

7      THE COURT:  I'm sorry.  My question is why Dr.

8  Kosstrin is qualified to make that opinion as opposed to that

9  being a fact witness?  Any person in the company who could

10  say, I can't sell it because, you know, I can't.

11      MR. DEVEREAUX:  Right.

12      THE COURT:  How does Dr. Kosstrin --

13      MR. DEVEREAUX:  Well, Dr. Kosstrin goes through the

14  analysis and determines and talks about the fact that it's

15  useless because, as even Siemens has pointed out, we need to

16  scrap it and start over.  And the cost to make this equipment

17  operable is going to be greater than starting over and just

18  manufacturing two new gasifiers and re-engineering it.

19      THE COURT:  So, essentially what you're saying is

20  that Dr. Kosstrin's opinion regarding the value, the inherent

21  value of the product that you have, is based upon his view

22  that it's defective, cannot work and, therefore, that's it.

23  But in terms of appraising what it would sell on the market in

24  its current condition, that's not within his wheelhouse?

25      MR. DEVEREAUX:  That's correct.  He's not appraising

1   the value of it.  He is indicating that the value is worthless

2   except for scrap value, because the necessary modifications

3   you have to make would exceed the cost of getting some new

4   ones.

5          THE COURT:  Aren't there people more qualified to

6   opine on, well, what the secondary market is for this

7   equipment than Dr. Kosstrin, who's simply saying, you know,

8   because it doesn't work for its intended purpose, according to

9   his interpretation, it has no value, as opposed to someone

10  skilled in the field of dealing with a secondary market for

11  this equipment, it should have some value that can be

12  articulated.  What training, experience, or education does

13  Dr. Kosstrin have to address the secondary market value of

14  this product?

15         MR. DEVEREAUX:  So his training goes to over his 40

16  years of experience with coal gasification and what it would

17  take to make this equipment work, and I think that's an

18  important aspect to this.  You have to engage the analysis of

19  what it would take to make it work to determine the value.

20  And when you undertake that analysis and you determine that

21  the cost of making the repairs is far greater than just

22  getting a new one, that's when you come to the conclusion that

23  it's useless and, you know, consumers are faced with that all

24  the time.

25         I just had a situation with my daughter who ran the

1   car out of oil, and we concluded that the cost of a new engine

2   exceeded the value of the car, and that's exactly what we have

3   here.  In order to -- to sell this, it has to work, and

4   Siemens has never been able to perfect this technology.  It

5   doesn't have a burner.  It needs numerous changes,

6   modifications, and as the evidence will demonstrate, it needs

7   a whole new BEDP to even move it forward.

8           THE COURT:  In the life of the projects that were

9   being contemplated was Siemens ever given the opportunity to

10  go through a start-up in a real environment with this

11  equipment to see if, A, the problems occurred and, B, whether

12  they could fix them in the environment where it was being

13  used?

14          MR. DEVEREAUX:  No, Your Honor.  That's an

15  impossibility.  As I indicated before, it would cost hundreds

16  of millions of dollars, even over a billion dollars to even

17  get to that point.  You have to completely construct a ten or

18  twelve-story edifice to even set the gasifier to begin doing

19  this, and so it's an impossibility, just not possible.

20          And it's very similar to the testimony that we

21  adduced during deposition about why Siemens did not test its

22  first-of-a-kind burner prior to providing them to the Chinese

23  project and to Secure Energy.  And in that instance, you know,

24  Siemens indicated it would cost over $100 million to just test

25  that.

1          THE COURT:  Because the build-out that's necessary

2   to put this in a real environment?

3          MR. DEVEREAUX:  Correct.

4          THE COURT:  Okay.  Thank you.  Anything else?

5          MR. DEVEREAUX:  If you would give me just a minute,

6   Your Honor?

7          THE COURT:  Yes.  I think the other two experts are

8   less thorny, because they deal with more limited areas that

9   are being objected to, so we should be able to get through

10  those a little quicker.

11         MR. DEVEREAUX:  I think that's all I have, Your

12  Honor.  Thank you.

13         THE COURT:  Thank you very much.

14         Mr. Daire, any short response?

15         MR. DAIRE:  Thank you, Your Honor.

16         THE COURT:  Whenever you're ready.

17         MR. DAIRE:  I want to start by addressing a question

18  you posed to Mr. Devereaux, which is if Mr. -- if Dr.

19  Kosstrin's opinions are excluded in whole or in part, what's

20  left.  The answer, I think, is nothing.  The reason for that

21  is the same issue affects all of the evidence in terms of

22  comparing -- the attempt to compare the NCPP experiences with

23  their own hypothetical project.  We've got in limine motions

24  down the road on that.  But the point is, as Your Honor

25  pointed out, there's not an expert to connect those.

1        The same substantial similarity issue affects all of

2    that evidence at the start and only gets worse unless

3    attenuated from an admissibility point of view or more

4    attenuated from an admissibility point of view in terms of

5    using that evidence to prove some issue with their stuff.

6        The second question you posed to Mr. Devereaux that

7    I wanted to comment on was the cost of testing the equipment.

8    It's not $2 billion.  That's the cost of testing it in the

9    current plans that plaintiffs say they have in place to build

10   their plant.  The cost to test it would be something more in

11   the order of $80 to $100 billion, which is a lot, but it's --

12   in the grand scheme of things, it's basically 2X the cost of

13   the gasifiers themselves.  So, if you're testing a $50,000 car

14   and it costs you $100,000, it's not an exorbitant amount of

15   money in terms of the same percentage.

16       I also want to make this distinction between testing

17   it from a -- we're going to set it up in a plant and run coal

18   through it versus the testing that Siemens did and the testing

19   that was the precursor to the design basis, both for NCPP and

20   for Secure, which is computational fluid dynamics, computer

21   modeling, and energy and mass balances to say -- to show,

22   okay, if I've got this much oxygen coming into the system,

23   I've got this much nitrogen coming into the system, I know the

24   coal characteristics are A, B, and C, what do I have to do to

25   ensure that I can achieve the performance guarantees that I've

1   promised to this customer?

2        So, plaintiffs have a choice here.  They could have

3   gone to China and tried to get discovery that way or they

4   could have tested their own equipment, and what they chose to

5   do is try and take the NCPP evidence and extrapolate it to

6   their project with no foundation and reliability.

7        Again, it's not Siemens's position that that's

8   impossible to do, but in this particular instance, there's no

9   question based on Dr. Kosstrin's report that he didn't do it.

10       You asked Mr. Devereaux what is the scientific

11  method that Dr. Kosstrin brought to his analysis.  I don't

12  believe you ever got an answer to that question.

13       THE COURT:  One point made by Mr. Devereaux is that

14  Dr. Kosstrin looks at the list of modifications made in China,

15  which he lists over a couple of pages in his report that I

16  mentioned, burners and other changing -- changes that were --

17  burners that were modified and other changes.

18       So just to be a little bit more precise, on pages 5,

19  6, and 7, Dr. Kosstrin speaks about changes that were made in

20  the China project between burners and fluctuations in coal

21  flow causing damage to the cooling screen, that there was

22  insufficient turbulence, again, going back to the burner, that

23  coal feeding had issues.  He articulates some of these

24  including problems with scrubbers and a quench section, et

25  cetera.

1          The position taken by your colleague is that Siemens

2     is unable to identify the reason for these changes by China

3     because China -- the Chinese plant did it on their own without

4     the assistance of Siemens and, therefore, if he [sic] were to

5     start to use this equipment in a similar way, for

6     gasification, that some of these problems would arise and

7     Siemens would not be able to provide an engineering solution,

8     because they were not privy to the corrections made in China.

9     Is that accurate or inaccurate?  And how does that weigh into

10    the matrix, if it does?

11          MR. DAIRE:  It's inaccurate.  It's wrong.  And to

12    tether it to Daubert, the way to think of it is that the

13    starting place for NCPP was different from the hypothetical

14    starting place for plaintiffs in terms of chemical

15    characteristics of the coal, operating conditions of the

16    plant, fuel gas for the burner, loads that the Chinese

17    customer were operating with during start-up and

18    commissioning.  And so, to make the conclusion unsupported and

19    unsubstantiated, I might add, but to make the conclusion that

20    Dr. Kosstrin and Mr. Devereaux articulated here this morning,

21    you'd have to assume that the starting point was the same.

22    Otherwise, this list of changes that occurred wouldn't be

23    relevant to plaintiffs at all.  That's the --

24          THE COURT:  And could --

25          MR. DAIRE:  -- fundamental problem with that.

1            I'm sorry, Your Honor.

2            THE COURT:  All right.  No, I appreciate your point.

3            MR. DAIRE:  The other point I would add on that is

4    this is an excellent illustration of why all Dr. Kosstrin does

5    is summarize his gloss on documentation.

6            That passage you referred to cites to, among other

7    things, Plaintiffs' Exhibit 85.  We've got that submitted.

8            Mr. Dyer, if you could pull up document 154.

9            I'm sorry.  It's 150-4.

10           And if you could pull the first page there, the

11   next.  I'm sorry.  And it's page 31 of the docket entry, 31 of

12   93.  So this is Exhibit 85.  It's the face page.

13           This is not a Siemens document.  This is a document

14   that was prepared by the customer that we had in our

15   possession, so we produced it, but it's got nothing to do with

16   any Siemens affirmation of root cause analysis.  Mr. Devereaux

17   said, without citation to the record, there's tons of

18   documents, Siemens root cause analysis, pointing to defect in

19   the gasifiers.  In fact, there are none.

20           And, Mr. Dyer, if you could pull -- turn to -- it's

21   page 35 of the same document.  This is -- and then, kind of

22   zoom in, if we could, on the text.

23           This is an issue that even the customer's reporting

24   that the problems they're having unconnected to the guarantee

25   Siemens provided, but problems they're having in terms of

1   gasification operation, status, stability, and the like, has

2   to do with coal feeding fluctuation; that is, we're operating

3   at low loads, lower loads than what Siemens told us.

4          The same issue, just to round this out -- if you

5   could pull document 158-7, please, Mr. Dyer.  And this will be

6   on page 6 of 18.  Just for orientation purposes, this is a

7   letter that -- a draft letter that Siemens' sales and

8   marketing person provided to someone about the NCPP project

9   and issues encountered there.

10         And if you could zoom in on the first paragraph of

11  this page, Mr. Dyer.

12         So this is from 2013.  And what we're saying there,

13  contemporaneous record, that we achieved our performance

14  guarantees which was remarkable considering the fact that the

15  coal used during the test and day-to-day operations has a

16  seven percent higher ash content than specified in the

17  contract.  Mr. Devereaux -- and I wrote this down -- said

18  there was not a scintilla of evidence to suggest any

19  contemporaneous material supported the idea that this had to

20  do with operating conditions at NCPP.  That's erroneous.

21         And I would also add that, yeah, in our marketing

22  materials subsequent to this, we said we can handle higher ash

23  content, because Siemens was proud of the fact that we stuck

24  with the job, we were getting paid by the customer, and we

25  were able to make the gasifiers work and achieve the

1   performance guarantees.  Now all of this is of record, but

2   Dr. Kosstrin doesn't deal with it at all, just doesn't deal

3   with it.

4           The last point I'll make, and it was a question you

5   had posed to Mr. Devereaux as well, which is this idea of

6   mutually inconsistent theories in terms of you never gave

7   Siemens the opportunity to actually work with the equipment,

8   and so I can suss out what's performance guarantee and what's

9   design defect.

10          Mr. Dyer, if you could play Dr. Kosstrin's

11  deposition from 116:15 to 118:16.

12      (Deposition excerpt plays.)

13          So the answer to your question, Your Honor, is there

14  is no difference.  The design defects that are articulated by

15  Dr. Kosstrin in his report, which are really just recitations

16  of what he's seen in an e-mail or thinks he's seen in an

17  e-mail is performance guarantees.

18          THE COURT:  Meaning that if there are failures to

19  meet performance then that invokes the agreement for Siemens

20  to come in and make the necessary changes at their expense?

21          MR. DAIRE:  That's how it should work, yes.  But

22  what Dr. Kosstrin is saying without foundation or analysis or

23  any real backing for his opinion is that that means it's a

24  design defect, and I'm not going to tell you what degree

25  difference the performance guarantee offset matters.

1        If you miss by one unit of syngas per hour, design

2   defect, I guess.  Thank you, Your Honor.

3        THE COURT:  Thank you.

4        MR. DEVEREAUX:  Your Honor, may I?

5        THE COURT:  I don't usually go back and forth too

6   much, but go right ahead.  And then, what we'll do, folks, is

7   we'll break for an hour for lunch and we'll come back on the

8   other two, or let me talk about the other two before we break

9   and we'll make a collective decision here.

10        MR. DEVEREAUX:  Okay.

11        THE COURT:  Go right ahead, please.

12        MR. DEVEREAUX:  So, Your Honor, the cost of testing

13   the equipment, whether it's over a billion or whether it's

14   eighty to a hundred million, when we're dealing with a forty

15   million dollar case, I don't think -- I think everybody can

16   agree that it's not feasible to undertake that testing,

17   because it would cost more than twice what we're talking about

18   in this case.  I want to talk a minute about --

19        THE COURT:  What about the -- what about the notion

20   that there's something short of physical testing, this

21   computational dynamics, computer modeling, energy and mass

22   balances, you know, the sense that an expert sits down and

23   says in this, you know, hypothetical real-world environment

24   based on what I now know, this is how the machine should

25   operate --

1          MR. DEVEREAUX:  Right.

2          THE COURT:  -- the sort of engineering, you know,

3    rubric that they go through before they actually start

4    constructing --

5          MR. DEVEREAUX:  Right.

6          THE COURT:  -- this is what it's supposed to look

7    like in the real world.  Has there -- was there any analysis

8    by Dr. Kosstrin to say, I've conducted an independent analysis

9    and here's where I see the faults in this design or

10   manufacturing, you know, construct?

11         MR. DEVEREAUX:  So, Judge, I'm glad you asked that,

12   because that was my next point.  When we talk about this

13   computational fluid testing and computer modeling, that's what

14   Siemens did originally.  And what we know from that is it just

15   didn't work, not even close to working.

16         We have a situation where they took what was a

17   burner that had three burners and a pilot burner, so a total

18   of four, and they combined it and made a single combined pilot

19   and main burner.  And you can do all the computational testing

20   you want, but the simple fact of the matter is the computer

21   modeling and the stuff that they did, I guess, electronically

22   just didn't work, and that's the problem with what we're

23   dealing where we're.

24         I also want to talk a minute about the starting

25   points being the same, because I think this is quite

1   important, and Mr. Daire alludes to this coal feeding

2   fluctuation.  And --

3          THE COURT:  And the use of LP gas and some of the

4   other things that may affect the functioning of the burners

5   that may not be utilized in any one of the iterations that

6   your client was going to use it for.

7          MR. DEVEREAUX:  Right.  But in this case,

8   Mr. Russeler testified that number 8, dealing with the coal

9   feeding fluctuation, the coal feeding, was a mandatory change

10  that had to be made to the Secure project.  It's a mandatory

11  change, so they had the exact same problem.

12         The other thing about this is we have extensive

13  testimony and documentation regarding the lessons learned.

14  And so, we have documents that reflect lessons learned that

15  will be employed by the second NCPP project and we have

16  lessons learned for a project here in Texas called the Texas

17  Clean Energy Project.  And if you look at those documents and

18  you compare them, the lessons learned are the same.  And this

19  notion that they're so different or we start from a different

20  point, it's just contrary to what's been developed in this

21  case.

22         THE COURT:  But Dr. Kosstrin doesn't incorporate

23  that as a basis for his opinion.  Again, let's stay focused on

24  where we are.  It's a Daubert challenge, which is focused on

25  the four corners of his report --

1          MR. DEVEREAUX:  Right.

2          THE COURT:  -- because that's what's before me is

3     the four corners of his report.

4          MR. DEVEREAUX:  Right, but I point this out to

5     emphasize that we're not starting from different loads.

6     We're not starting from different positions, because if we

7     were those lessons learned and those applications would have

8     been different.

9          THE COURT:  But here's the problem.  This statement

10    is a very large statement that has to be unpacked to have a

11    specific comparison of Texas, the second NCPP project, et

12    cetera.  I mean, to be able to say that the same problems

13    replicated not only in the first China project, but were going

14    to be -- were anticipated in the second and, therefore, dealt

15    with and were going to be present in a Texas project and,

16    therefore, dealt with requires, you know, a lining up of

17    exactly what we're talking about to see it's a one-to-one

18    comparison.

19          Very generalized statements are things that I've

20    learned to -- you know, they prick my ears, because very few

21    things in the world operate on sort of a general level.  And

22    what we do comparing an expert's opinion based on anecdotal

23    evidence, you know, you have to line it up one for one to make

24    sure it really, really fits --

25          MR. DEVEREAUX:  That's correct.

1          THE COURT:  -- substantially similar, and resist

2     that temptation to say close enough, and that's what I'm

3     concerned about.

4          Dr. Kosstrin hasn't engaged in this methodology.

5     It's his opinion we're worried about right now, not his

6     opinion in the context of a bigger case, which is a Rule 50

7     kind of argument, you know, later in the process.  But for

8     purposes of Daubert, I'm looking only at and can only -- I'm

9     only permitted to look at is his opinion predicated upon the

10    proper analysis envisioned by Daubert and its progeny?  And if

11    not, it fails.

12          MR. DEVEREAUX:  Right.

13          THE COURT:  If yes, it survives.

14          MR. DEVEREAUX:  Right.

15          THE COURT:  I can't reach outside of what he said

16    and say, had he considered the following, it would be great.

17          MR. DEVEREAUX:  Right.

18          THE COURT:  I have to look at what he actually does.

19          MR. DEVEREAUX:  Right.  And I would --

20          THE COURT:  And that's why have to put up blinders

21    to some extent, because it's unfair to all the parties if I

22    reach outside of an expert's opinion and say I could bolster

23    it if he only had thought to do the following.

24          MR. DEVEREAUX:  Well, I would point out to you that

25    we're dealing with identical equipment, and we're dealing with

1    the exact same process of gasifying coal.  And the evidence

2    that we've developed here is not generalized, it's specific.

3    And it applies not only to the NCPP project, it applies to the

4    lessons learned, and it applies to the Secure Energy project

5    and it applies to the equipment and the engineering that was

6    provided to Secure Energy.

7            THE COURT:  And where does Dr. Kosstrin speak about

8    this in his report?

9            MR. DEVEREAUX:  He speaks about it by addressing the

10   evidence and then coming to the conclusion that Secure would

11   have the exact same issues that they had at NCPP.  That's how

12   he ties it together.

13           THE COURT:  I mean, but what page?  That's a very

14   general statement.  Where do I find it?  If I'm going back and

15   I'm parsing out what he said in the bases of his opinions,

16   where do I find this?

17           MR. DEVEREAUX:  So, he begins on page 8.  And he has

18   the opinion that it required substantial revision, and Siemens

19   did not know all the revisions.  Further, each item of the

20   equipment delivered to Secure needed replacement or

21   significant modification, some of which could not be

22   implemented.  And then, he goes through and talks and

23   addresses the basis for his opinion as a result of reviewing

24   Exhibit 85, which is this coal feeding fluctuations that I've

25   alluded to, which the evidence in this case will be that it

1    was a mandatory change at the Secure project.  And then the --

2            THE COURT:  Wasn't Exhibit 85 a Chinese-generated

3    document?  It's generated by China, not by Siemens.

4            MR. DEVEREAUX:  That's correct.

5            THE COURT:  Okay.

6            MR. DEVEREAUX:  In addition, Dr. Kosstrin -- and

7    you'll see this in his deposition, page 39, line 7, that he

8    reviewed 112 to 114 documents and as a result of that review

9    he goes on and talks about Plaintiffs' Exhibit number 69 and

10   69-2, which dealt with the 29 improvements are the lessons

11   learned, as Siemens refers to it, and that the fact that

12   Siemens was not privy to all the modifications to the feed

13   system, the gasification system, and syngas processing.

14           And then, he goes on to state that since Secure had

15   already purchased the gasifier reactors and feeder vessels,

16   the following modifications would not be possible without

17   replacing the purchased equipment or making essential and

18   material modifications to the equipment.

19           And then, he lists the five material changes, which

20   included increasing the volume of the gasifier reaction

21   chamber, adding two coils to the cooling screen, changing the

22   number of inlet and outlet nozzles to the cooling coils,

23   adding an additional manhole in the quench zone, and changing

24   the location of the raw syngas outlet nozzle.  And as a result

25   of that and what is also contained in his report, he opines

1   that these required changes in the 500 megawatt gasifier

2   render the equipment already delivered to Secure useless.

3          Finally, I want to talk about the gasifier

4   performance 'cause Mr. Daire has pointed this out twice today,

5   and he has pointed it out in a number of the pleadings.  We

6   believe unequivocally that the evidence will demonstrate that

7   Siemens did not acquire any kind of performance test in August

8   of 2012.  It just didn't happen.  There is no documentation to

9   reflect that.  And the overwhelming evidence is that the

10  preliminary acceptance certificate did not take place until

11  July of 2013.  Thank you, Your Honor.

12          THE COURT:  Thank you very much.

13          Let's talk about what we'll be doing this afternoon.

14  Is one hour adequate for lunch?  There's nothing really nearby

15  here, so if you need a little bit more time, I'm fine with

16  that.  We could go an hour and 15 minutes, if that makes it a

17  little bit easier.

18          MR. DAIRE:  An hour is fine with us, Your Honor.

19          THE COURT:  An hour is fine.

20          MR. DEVEREAUX:  Yes, Your Honor.

21          THE COURT:  So let's plan to be back at, let's say,

22  1:10.  When it comes to the remaining expert reports, we have

23  the challenge of Stephen Jenkins and John Williams.

24          I've reviewed -- as I've stated with the last

25  expert, I've reviewed the reports and the challenges and

1    responses to them.  They seem to be more narrow in scope.

2    Part of it goes to the history of gasification and whether

3    that's relevant, as well as opinions concerning the ability to

4    obtain financing and what precipitated those issues, and then

5    obviously rebuttal to Dr. Kosstrin's opinions and then with

6    Mr. Williams.  Of course, he's more in terms of the appraisal

7    and his understanding of the appraisal value taken at various

8    time -- timelines, including whether or not there are design

9    defects which would affect the appraisal, the value of the

10   license agreement, and so forth.  So these are much more

11   narrow in scope.  I think we can dispose of them a lot more

12   quickly than we did so far today.

13           What time does everyone have flights today so I'm

14   not holding you all up?  I'll make sure we move expeditiously.

15           MR. DEVEREAUX:  Your Honor, we have a 5:00 flight.

16           THE COURT:  Okay.  So you need to be out of here by

17   three.

18           MR. DAIRE:  I think ours is 4:30, Your Honor.

19           THE COURT:  4:30.  So let's say 2:30.

20           I'll be able to focus you pretty quickly on the

21   issues.  I will tell you, gentlemen, just as a preview, I

22   don't see a lot of issues with the scope of the expert

23   opinions.  Not to steal anyone's thunder, but with

24   Mr. Jenkins, for example, his report, he speaks that he has

25   43 years' experience in processing chemical plant and power

1    generation industries, including 26 years of direct experience

2    in coal gasification.  His company does consulting worldwide.

3    He's worked on Siemens's gasification technology.  His

4    opinions in a very detailed report speak to the BEDP package

5    and equipment as being sound and that the equipment was

6    bankable, meaning you can get financing for it.  He concludes

7    that Secure's problem with financing is due to lack of

8    experience or inadequate plans and changing market conditions.

9            While he's speaking on a number of topics, part of

10   it is the history of gasification, to which there was an

11   objection.  I think the history would be perhaps limited

12   somewhat more than what is in his report, but the history goes

13   to this process of how gasification works and something you

14   all agree to, which is that they are uniquely designed for

15   specific applications and that there is a start-up process,

16   which a lay jury would not know.  They would have no way of

17   knowing how this equipment works in the real world.

18           So, there could be some narrowing so we don't get

19   into -- you know, we want to know what time it is not when the

20   sundial was created.  So there would be some narrowing of the

21   scope, but a jury needs to understand what this industry is

22   and how it works.  As they do in many industries, they get

23   some background and history to get context that matters.

24           You know, in a tire failure case you'll hear about

25   early tires and then compounding and what they look like now

1   and steel-belted radial and, you know, all these movements

2   along the technology which help the lay jury understand how we

3   are where we are today.  So those sorts of things generally

4   make sense, the history of gasification being helpful to the

5   jury to understand both of the parties' perspectives.  And I

6   would note that the defense indicates that Dr. Kosstrin

7   admitted that Mr. Jenkins was well-qualified in this area.

8          Then, of course, we get into opinions on financing.

9   That may be an issue that the parties will discuss after lunch

10  a bit on Mr. Jenkins' comments regarding the financing issues,

11  which are brought into question by the plaintiff arguing that

12  the device and the BEDP were defective or deficient and,

13  therefore, made it impossible to get the contractors and

14  subsequently the financing that they needed to get the project

15  off the ground.

16         So, I'm more than happy to hear argument on

17  Mr. Jenkins' qualifications to render an opinion in that --

18  that narrow area, but the historical background with some

19  limitation makes good sense.

20         Dr. Williams speaks as an appraiser on the value of

21  the equipment provided by Siemens to Secure at three different

22  times.  His appraisals presume that the equipment is not

23  defective, therefore, he gives some opinions as to the value.

24  And he gives -- embedded within his value of the equipment, he

25  speaks to whether or not there were design defects, because it

1    goes to the value, as well as the value of the license

2    agreement.   The appraisal section of his opinions ends on page

3    56.   Design defects are covered in 58 through 67.

4           There's an issue of whether this section of the

5    report exceeds the scope of his disclosure, so I'd be happy to

6    hear about that, and then we'll be talking about the value of

7    the equipment and the financing issue.   Those are the last

8    sections that he has.   So we can -- I think we can narrow in

9    on these pretty quickly.

10          It will be the plaintiffs' motion to exclude them.

11   But as I did with the defense, I want to kind of keep us

12   focused on things that matter.   So the history of the

13   gasification, not such a big deal.   With some limitations,

14   we can take up at a later date.   But the other opinions on

15   Jenkins speaking to response or rebuttal to Kosstrin's

16   testimony, whether there's a challenge to his methodology,

17   whether there's a challenge to any of the typical predicates,

18   those should be easier to deal with.

19          And Williams, in particular, should be easier to

20   deal with.   It's a scope.   He clearly has expertise.   It's

21   does he have -- was he disclosed for a more limited scope.

22   I don't have the expert disclosure, so I don't know.   And

23   perhaps you all filed it, but I don't think I saw it.   And

24   the report is pretty exhaustive.   And some of Dr. Williams'

25   testimony concerning defect analysis and other things are

1   embedded in his concept of what's the value of the equipment

2   depends on if it's defective or not.  So, we can take that up

3   when we get back in one hour.

4        All right.  And I'll make sure you all -- remind me

5   of your timing so I can make sure you all don't miss your

6   flights.  All right.  Thank you very much.  Have a good lunch.

7      (Lunch recess 12:12 p.m. to 1:09 p.m.)

8        THE COURT:  The record should reflect the parties

9   are present.  Let's pick up, if we can, please, with the

10  motion as to Mr. Jenkins at docket entry 147, with the

11  response at 156.

12       MR. DEVEREAUX:  Thank you, Your Honor.

13       Okay.  We're here to talk about the motion to

14  exclude the testimony of Stephen Jenkins in this matter.

15       I think it's important to point out that the seminal

16  issue in this case is whether or not the equipment and

17  technology provided by Siemens contained material and

18  fundamental design defects which, in turn, resulted in Siemens

19  not providing a final basic engineering package to allow

20  Secure to properly advance its project.  And the whole purpose

21  of ordering the equipment and getting the BEDP was so that

22  Secure could begin the process of getting a fixed price

23  contract from an engineering, procurement, and construction

24  contractor.  And I think that issue is important as we address

25  Mr. Jenkins' expert report.

1          Judge, you spoke briefly right before we took lunch,

2     and so I'm not going to spend a whole lot of time on this.

3     And I want you to know we appreciate the fact that you've done

4     such a fine job reviewing all this documentation.  We don't

5     come across that very often, so I will -- I'll move through

6     this.  With respect to the -- I want to begin with the history

7     of gasification.  And it's our position that that information

8     has nothing to do with the Siemens equipment and the basic

9     engineering design package that was provided to Secure Energy

10    and whether or not the equipment is defective.

11         I think the history of gasification adds nothing to

12    this case and could only serve to possibly confuse the jury

13    talking about what has transpired in the industry, because

14    it's really of no moment as it relates to this case.

15         THE COURT:  Wouldn't the jury be entitled, though,

16    to some basic description by whoever's expert it is as to what

17    gasification is, like you've given me, you know, like what

18    gasification is, how it works, how these are unique products

19    and not an off-the-shelf product and the start-up process,

20    that is, part of the licensing and service agreement?  I mean,

21    how do they -- how do they understand the context if they

22    don't have that?  Because they need to know these terms of art

23    are --

24         MR. DEVEREAUX:  Right.

25         THE COURT:  -- and, you know, can visualize the

1   whole process.

2            MR. DEVEREAUX:  Right.  I would submit to you that

3   the Siemens employees would be doing that.  They're the ones

4   that are most familiar with it, and we're dealing with the

5   Siemens procedures.  So -- and by the Siemens employees doing

6   it, we're able to test the evidence as it relates to the

7   Siemens' gasification equipment.

8            THE COURT:  To the extent that Mr. Jenkins is going

9   to be a rebuttal witness to Dr. Kosstrin, wouldn't it be part

10  of Mr. Jenkins' responsibility to explain why the experience

11  at NCPP is unique, not necessarily relatable?

12           Because even if I allow an expert opinion, it's for

13  the jury to give weight to it, so they can have the contrary

14  points of view, assuming I find that Kosstrin's methodology is

15  sufficient, then the jury would have the contrary points of

16  view as to whether or not the NCPP plant is relatable to the

17  product that your client bought.  The jury would have to

18  decide whether or not this fine tuning process is envisioned

19  and understood amongst the parties and, therefore, not

20  defective to have some modification app, you know, post-sale.

21  How do they know that if we don't have somebody who is an

22  expert in the field explain that, whether it's your witness or

23  theirs?

24           MR. DEVEREAUX:  So just a point of clarification,

25  Your Honor.  Are we still dealing with the history of

1   gasification?

2           THE COURT:  Yes.  Yes, because part of the history

3   of gasification as -- again, what I mentioned before we got

4   started, we don't need to go back to the sundial.  You know,

5   we can talk about gasification and when it sort of arose as a

6   technology and how it's, you know, become present so that

7   people will know what this means, because odds are no one's

8   going to have heard of this before, and so they need some

9   context as to how it works.

10          MR. DEVEREAUX:  Okay.

11          THE COURT:  And to the extent that naturally leads

12  to an understanding of how these devices are implemented,

13  used, fine-tuned, you know, brought online, assuming the

14  history covers that, then that would be context.

15          MR. DEVEREAUX:  Well, Your Honor, it would be --

16  still be my position that, you know, the Siemens employees

17  would do it and that evidence, you know, has been developed

18  during discovery, and it applies to the case at hand for which

19  Mr. Jenkins, you know, really has no connection to but for,

20  you know, his review as an expert witness here.

21          THE COURT:  Okay.  So we've kind of touched on the

22  history of gasification.  The next objection you have to

23  Mr. Jenkins' testimony.

24          MR. DEVEREAUX:  So the next issue deals with, in

25  paragraphs 86 through 89 of his report, he opines that the

1    basic engineering design package provided by Siemens to Secure

2    Energy meets or exceeds industry standards.  I think it's

3    important to point out all he has done is reviewed the basic

4    engineering design package, the general categories that you

5    would typically see in it, and he has said, oh, it's just

6    fine.

7            Our -- we take issue with this opinion for a number

8    of reasons.  He did not take into consideration the necessary

9    changes that Siemens has admitted must be made to the basic

10   engineering design package, and he did not review any test

11   results in coming to his conclusions regarding the BEDP.

12           And I would point out again, you know, this is a

13   situation that we touched on this morning and that is the

14   difficulty of both parties being able to, you know, test the

15   evidence because of the unique characteristics that we're

16   dealing with here.

17           We have a plant in China that has had numerous,

18   numerous changes.  There were 88 changes.  And it goes from

19   there to the fact that they ultimately ended up changing out

20   the burners in the gasifiers.  It's also important to point

21   out that the Chinese project had five gasifiers, and Secure

22   Energy was gasifier number six and seven of a total of nine

23   gasifiers that Siemens built during this first go-round.  And

24   it really comes down to the fact that his expert testimony

25   does not take into consideration the facts that exist at the

1    NCPP project in formulating his opinion.

2          THE COURT:  In what way, though?  I noticed -- well,

3    rather than put words in your mouth, what do you contend are

4    lacking?  You say that he has not considered any test results

5    in coming to his conclusions regarding the BEDP?

6          MR. DEVEREAUX:  Right.

7          THE COURT:  What test results should he have looked

8    at that you think are missing?

9          MR. DEVEREAUX:  The test results from the NCPP

10   project.  The test results that are contained in the exhibits

11   that have been developed during discovery and --

12         THE COURT:  The root cause analysis?

13         MR. DEVEREAUX:  Some of those, yes, Your Honor.

14         And beginning on page 10, we list at least 12

15   different items that we believe he should have considered in

16   rendering his opinion, and I'll just briefly touch on it,

17   because it is contained in our brief, but, you know -- and

18   this is Siemens' own documentation.

19         In number one, Siemens employed a technology

20   step-out from the Schwarze Pumpe plant.  As I indicated

21   before, they changed the design of the burner from three

22   top-mounted burners around a removable central pilot burner

23   to a burner combining the pilot and main burners in a single

24   unit.  The biggest distinction -- I alluded to this earlier

25   this morning -- is that Dr. Kosstrin's opinion is based upon

1    the facts in this matter.  Mr. Jenkins' opinion completely

2    ignores and does not take into consideration the actual facts

3    in this case.  And as a result, we don't believe his testimony

4    is relevant to the task at hand, as required by Daubert.

5          Let me talk a minute about the financing.  In his

6    opinion, Mr. Jenkins also talks about the Secure Energy

7    project failing, because Secure did not take the necessary

8    steps to get the necessary financing.

9          Number one, you know, it's my understanding that

10   Mr. Jenkins has been retained to render engineering opinions,

11   and obtaining financing doesn't fall into that category.

12         Number two, whether or not Secure Energy obtained

13   financing is really of no moment as to whether or not the

14   Siemens equipment and the engineering provided is defective.

15         THE COURT:  Isn't Mr. Jenkins, though, responding to

16   claims by Mr. Kosstrin that the financing was not possible

17   because the equipment was defective, the BEDP was inadequate

18   and had to be revised and, therefore, they could not get, you

19   know, a contractor, which is a prerequisite to getting

20   financing?  So, Jenkins is responding by saying, I disagree,

21   the equipment is fine.  The BEDP was consistent with industry

22   standards for the Illinois plant, and the difficulties with

23   financing were unrelated to the equipment or the BEDP.  Isn't

24   that what he's articulating?  And if so, how is that not --

25         MR. DEVEREAUX:  Well, I think he goes one step

1  further to talk about the financing as opposed to addressing,

2  you know, the central issue, which is whether or not the

3  equipment is defective, and I believe that's where his area of

4  expertise ends.

5         THE COURT:  But doesn't Kosstrin raise the same

6  point?  Because this is a rebuttal witness.  So if Kosstrin

7  were not to say that Secure could not obtain financing because

8  the equipment and the BEDP were inadequate or defective,

9  there'd be no need for Jenkins to respond saying, no, I

10  disagree, the equipment is fine, the BEDP is fine, and any

11  failure is unrelated to those devices.

12         MR. DEVEREAUX:  Well, a couple of responses.

13         First of all, Dr. Kosstrin has served as a banker's

14  engineer on coal gasification projects for more than 30 years.

15  And in that role, he is familiar with the necessary elements

16  that are necessary to get financing.  And with respect to

17  Mr. Jenkins, I don't see any evidence that he's ever dealt

18  with the financing issues of a gasification plant.  And I

19  think that's the difference.

20         THE COURT:  Mm-hmm.  Jenkins does state in his

21  qualifications that his company, ECC, consults worldwide on

22  gasification, that he has 20 years of -- 26 years of direct

23  experience in the coal gasification industry.  One would

24  assume that that would include financing because, as you've

25  indicated, you know, quite clearly that absent financing and

1    the critical contractors, having the contractors on board,

2    the project can't get off the ground.  But I do appreciate

3    your point that -- perhaps I'll have to go back and look more

4    closely at his qualifications.

5         MR. DEVEREAUX:  Judge, I don't think we can assume

6    that he has the expertise.  In my review of the CV, it appears

7    that his expertise is related to engineering matters, and I

8    think that's an important distinction.

9         THE COURT:  All right.  Thank you.

10        MR. DEVEREAUX:  I have one other major -- not major,

11   but on page 9, Mr. Jenkins always -- also travels into

12   irrelevant areas with respect to, you know, testifying about

13   Secure's lack of experience in the industry and with

14   self-management, et cetera.  This is an interesting endeavor

15   that he's undertaken, because it was Secure Energy's intention

16   to employ Siemens to provide operations and maintenance for

17   the plant.

18        And my point about this is that there were going to

19   be companies, subcontractors, entities, that were going to be

20   hired to perform that function.  Because they are correct, you

21   know, this takes a certain amount of expertise.  But to

22   suggest that Secure does not have that expertise is just

23   misplaced.  And it's just, number one, irrelevant and it

24   assumes facts not in evidence with respect to the way in which

25   Secure Energy was going to proceed.  And finally, I don't

1   think it really adds anything to the issues that are before

2   the case [sic] which I've indicated deal with whether or not

3   the Siemens equipment is defective.

4           THE COURT:   I would think that to the extent that

5   Mr. Jenkins is permitted to testify about the problems with

6   financing being unrelated to the equipment and the BEDP, that

7   his comments about Secure's experience in the industry would

8   be used to demonstrate that it was a lack of proper

9   positioning in the market as opposed to the equipment that

10  caused the financial difficulties that they found themselves

11  in, so I will go back and look at his report more closely for

12  whether he has laid a foundation for that, that sort of

13  competency.

14          MR. DEVEREAUX:   Okay.

15          THE COURT:   Any challenge to Mr. Jenkins' ability to

16  provide rebuttal testimony concerning whether or not the NCPP

17  plant was substantially similar, whether there were defects?

18  You had raised this point on page 9, I think --

19          MR. DEVEREAUX:   Yeah.

20          THE COURT:   -- of your motion.

21          MR. DEVEREAUX:   Yeah, this is the essence of our

22  challenge.  And on page 9 and 10 and 11, we point out the

23  factors that he didn't take into consideration.

24          And it's our position that Mr. Jenkins, in order to

25  render the opinion, has to take into consideration and give an

1    explanation, one way or the other, as to how it affected his

2    testimony in this case.  And that's really the onus of what

3    we're claiming.  You know, if you don't testify based upon

4    the facts in the matter it really renders the testimony

5    irrelevant, because he just glosses over and indicates that,

6    you know, there are no defects.  Well, what about these ten

7    items?  What about these twelve items?  And that is the

8    essence of why we think it should be stricken.

9           THE COURT:  Does Mr. Jenkins take the view, though,

10   that the modifications in China were not related to the design

11   of the gasifier, but rather to the manner in which it was

12   being used?  And if so, if he believes that there's a -- I

13   wouldn't say a misuse, but a categorically different use in

14   China than you would expect in your initial project, what

15   would be the benefit to discounting factors that he feels are

16   not present in your case?  If I'm clear on that.

17          So, in other words, you're identifying a number of

18   factors starting on page 9 --

19          MR. DEVEREAUX:  Right.

20          THE COURT:  -- present in the Chinese plant.

21          For example, bullet point number one, that Siemens

22   employed a technology step-out that changed the design of the

23   burner from three top-mounted burners around a removable

24   central pilot to a burner combining the pilot and mine burners

25   in a single -- main burners, rather, in a single unit.

1          And then, you speak about the burners at some

2     length, that the pilot burner at the Chinese plant was a

3     problem, et cetera, and you're taking the view that if

4     Mr. Jenkins didn't consider these factors --

5               MR. DEVEREAUX:  Right.

6               THE COURT:  -- the problems that arose in China and

7     the responses to those problems, that his opinion that Dr.

8     Kosstrin's defect theories were deficient shouldn't be

9     allowed.  Where it seems like what Mr. Jenkins is doing is

10    saying, I've looked at Dr. Kosstrin's defect theories and I

11    challenge them because Dr. Kosstrin didn't consider X, Y, and

12    Z.  So it's a matter of being an attacking witness, perhaps,

13    rather than a corroborative one.  So here, this expert is not

14    -- Mr. Jenkins is not opining why these issues in China are

15    irrelevant.  He's opining why Dr. Kosstrin has failed to make

16    a proper comparison.  Is that a difference or does it really

17    not matter?

18              MR. DEVEREAUX:  Well, if, in fact, he doesn't think

19    it was a proper comparison, I would submit that he needs to

20    testify to that effect.  The -- the evidence -- he -- when you

21    go through these items, he doesn't take issue with whether or

22    not they were a good comparison.  And I want to point out

23    again the comparison is replete -- will be replete in the

24    evidence in this matter, because we have lessons learned.

25    We have items that were changed from NCPP to CTL and also for

1    the Texas Clean Energy Project, and they're identical.

2          And I believe that he needs to step up.  And in

3    order to render that opinion, he needs to be able to testify

4    why these differences don't matter, why these factual

5    predicates don't matter as it relates to the Secure Energy

6    equipment and the engineering.  And why, when the Siemens

7    executives are opining that to Secure, we need to tell them to

8    scrap the equipment and start over, why that's not -- why that

9    does not affect his opinion.

10         THE COURT:  All right.  Very good.  Anything else

11   concerning Mr. Jenkins before we -- I hear from your

12   colleague, and then we go to the next one?

13         MR. DEVEREAUX:  No, Your Honor.

14         THE COURT:  All right.  Thank you.

15         Who will be speaking for Siemens?  Mr. Mitchell?

16         MR. MITCHELL:  Yes.  Good afternoon, Your Honor.

17         THE COURT:  Good afternoon.  Just for the best use

18   of time, let's start with the thorniest problem which is

19   whether or not Mr. Jenkins should be addressing in his report

20   the issues experienced at NCPP, as well as other -- the Texas

21   plant and the second NCPP project that was alluded to by your

22   colleague, and give me some context as to why those should be

23   discounted, assuming he hasn't done that already.

24         MR. MITCHELL:  On NCPP?

25         THE COURT:  On all the -- the general objection by

1  the plaintiff is that Mr. Jenkins, in dealing with the defect

2  analysis, that is, in rebutting Mr. Kosstrin's theory that the

3  equipment was defective and the BEDP was inadequate due to the

4  need for revisions, that Mr. Jenkins is looking at Kosstrin's

5  opinions and saying those are not reliable, and he articulates

6  the reasons why.  The objection by plaintiffs' counsel is that

7  Mr. Jenkins, in defending the design of the equipment and the

8  BEDP, is not taking into consideration the litany of issues

9  experienced at the China plant.

10          MR. MITCHELL:  Okay.  And Mr. Jenkins takes those

11  issues head on at really kind of the outset.  If we're talking

12  about NCPP, I think that's the lead paragraph to his

13  assessment of that analysis.  And I think you heard a lot of

14  it earlier today in the context of the Daubert on Dr. Kosstrin

15  in the operational issue -- operational error issues by the

16  customer there, and I think it's paragraph 128 of Mr. Jenkins'

17  report.  But he launches right in as to the problems that

18  we're talking about here are off specification coal -- off

19  specification fuel.  That's what led to the problems at NCPP.

20          So I don't think that -- that's how you deal with

21  that issue.  In other words, he sees it differently and that's

22  what -- the position that he is in is a rebuttal, but no.

23  He looked at those issues independently and looked at the

24  evidence and came to his own opinions on those particular

25  issues, but he takes them head on.

1        As to -- and I know in the -- in kind of the last

2    stage of plaintiffs' motion with respect to Mr. Jenkins, does

3    characterize that he didn't consider certain things and I

4    would take issue with those and we've responded to those in

5    our briefing, of course, and introduced the evidence from the

6    record.  I do think that there is some liberties taken with

7    how the record was portrayed.

8        Mr. Jenkins considered everything.  The issue that

9    they have with him is they don't like where his conclusions

10   are, but that's an issue for cross examination, not for

11   Daubert.  And so that's kind of how -- where we end up on the

12   -- on Mr. Jenkins' rebuttal opinions as to the NCPP and the

13   defect issues that they're trying -- that the plaintiffs are

14   trying to advance in this case.

15       THE COURT:  All right.  And I'm sorry, I had started

16   you off probably in the middle of your argument, if you want

17   to go back to where you were going to.

18       MR. MITCHELL:  Sure, no problem.  And I'll try and

19   be brief on some of this 'cause I think that some of the

20   Court's questions on these issues do take us where we need to

21   go, which is, you know, starting with the history issues.  And

22   I do think it's important to have the foundation in context to

23   ultimately get to the later opinions.  In other words, how

24   does this equipment operate?  What are the types of issues

25   that come into play when you're bringing this type of

1    equipment online, the size and scope of these projects, the

2    other equipment that's involved outside of Siemens?

3            There are a lot of issues that I don't think are

4    going to be familiar with to a lay jury, and that's the work

5    that Mr. Jenkins does at the beginning of his report to then

6    to set up his rebuttal opinions that come later.  And so,

7    that's kind of where we, you know, stand on the history and

8    background that he builds into his opinions.  And then, I know

9    there were some questions about Mr. Jenkins' opinions with

10   respect to financing issues.  And I think the Court hit on

11   those issues.

12           Now, Mr. Jenkins is in a rebuttal position in

13   addressing what -- we heard from Dr. Kosstrin in the positions

14   that plaintiffs is trying to advance that ultimately defects

15   in equipment led to their inability to get financing to secure

16   an EPC contract.  And he is -- he's got decades of experience.

17   And his experience is not just as an engineer.  That's where

18   he -- he is a chemical engineer, what his degree is in, but it

19   is decades of experience.

20           Of course, you've seen the issues from kind of soup

21   to nuts in terms of he's been involved in getting, you know,

22   DOE loan applications.  He's been involved in contracting with

23   EPC contractors.  Those are the types of experiences that are

24   touched upon, and it's laid out in his CV where he's done

25   that.

1    One exemplary project is the summit project that

2    we've heard about a little bit today, but he was involved in

3    that project which landed an EPC contract on the basis of the

4    Siemens gasifiers.  And so, he's got that base line.  And he

5    looks at -- he does come in as an engineer, but he has the

6    necessary tools to know what are the processes, vendors,

7    milestones that you need to achieve along the way to be in a

8    position to land your financing, and that's what he is

9    commenting on, looking at the industry expectation standard

10   custom and applying that to what he observed with respect to

11   Secure's conduct in this case.

12       And so that's kind of where we are on the financing

13   piece of things.  And I think that's really all I have unless

14   the Court has further questions for me.

15       THE COURT:  I don't.  Thank you very much.

16       MR. MITCHELL:  Thank you.

17       THE COURT:  Let's turn to Mr. Williams.  I think I

18   have a pretty good handle on Mr. Jenkins.  If there's some

19   poignant point that you think, Mr. Devereaux, that was not

20   covered on Mr. Jenkins, you can certainly touch on it, but --

21       MR. DEVEREAUX:  Your Honor, just very briefly.

22       THE COURT:  Go right ahead.

23       MR. DEVEREAUX:  So the interesting aspect about

24   Mr. Jenkins is, you know, he wrote this glowing report and

25   talked about how, you know, supportive and how great he

1    thought the Siemens technology was.

2           And if you look at his CV, Noah [sic] just referred

3    to the, you know, the Texas Clean Energy Project, and this is

4    on the first page of his CV.  And while he talks glowingly

5    about it, he also indicates in his CV with respect to the

6    Texas Clean Energy Project that the project was first designed

7    to use Siemens fuel gasification technology and later

8    Shenhua's gasification technology.

9           And I just think that it's kind of ironic that he

10   would go through and talk about Siemens like that.  And then

11   -- when he's the onerous engineer for the Texas Clean Energy

12   Project, he recommends that SNCG or the Chinese operator be

13   the technology provider.

14          One other important point that I think I overlooked

15   this morning that I do think is relevant, when you were asking

16   about documentation, we didn't have a documentation issue in

17   this case because Siemens and the Chinese operator, SNCG

18   Shenhua, they were joint venture partners in providing the

19   gasification equipment to the NCPP project and Shenhua was

20   also the owner of that project.  So as far as documentation

21   was concerned, we were able to get all that documentation

22   through the joint venture and through what has transpired.

23          Thank you.

24          THE COURT:  Thank you.  And who will be speaking on

25   the Daubert challenge as to Mr. Williams?

1          MR. DEVEREAUX:  I will.

2          THE COURT:  Okay.

3          MR. DEVEREAUX:  You ready for me?

4          THE COURT:  Yes, I am.

5          MR. DEVEREAUX:  Okay.

6          THE COURT:  One of the issues you had raised was

7    whether Mr. Williams was disclosed only to deal with appraisal

8    value of the equipment and whether he had exceeded the scope

9    of his disclosure by getting into the other topics that I

10   summarized before we took a lunch break.  So can you help me

11   to -- direct me to where his disclosure is located, other than

12   his report?

13         MR. DEVEREAUX:  Your Honor, that's the only

14   disclosure that I know is available.

15         THE COURT:  All right.  I didn't know if there had

16   been some preview by the parties where the parties said, I'm

17   going to call the following witnesses --

18         MR. DEVEREAUX:  No.

19         THE COURT:  -- for example, Rule 26, and here is

20   what the expert will say, and here is the limited scope.

21         MR. DAIRE:  Yeah, there was no such preview.

22         THE COURT:  So I just look at his CV and the list of

23   his opinions and go from there?

24         MR. DAIRE:  That's correct, Your Honor.

25         THE COURT:  All right.  Thank you.

1          MR. DEVEREAUX:  So with respect to Dr. Williams,

2     we believe that his methods and opinions, you know, just fail

3     every test for scientific reliability.

4          Let's start with his appraiser.  He was, number one,

5     retained to serve as an appraiser of the gasification

6     equipment.  His appraisal does not appraise the equipment

7     based upon the present status of the equipment and the

8     engineering at the time of the appraisals, but instead assumes

9     that the equipment is not defective.  We believe, you know,

10    the seminal issue is, you know, what is the value of the

11    defective equipment if, in fact, he's going to perform an

12    appraisal.

13         THE COURT:  Wouldn't the process be, though, that if

14    Dr. Williams is of the view that the Siemens equipment is not

15    defective --

16         MR. DEVEREAUX:  Right.

17         THE COURT:  -- then, wouldn't he give an appraisal

18    of its current market value without being defective and then

19    you would have a contrary expert saying it's defective and,

20    therefore, we think the value is something grossly different,

21    Mr -- Dr. Kosstrin, for example, being the person who's

22    opining that because it's defective, it has nothing but scrap

23    value.

24         MR. DEVEREAUX:  Right.

25         THE COURT:  So you're not asking Dr. Kosstrin to say

1   alternatively if it's -- if it's not defective, I think the

2   value is something greater.  So both of these witnesses being

3   competi- -- you know, competing experts are looking at it from

4   the perspective of defective, not defective.  If they agreed

5   on the condition of the equipment, you know, you wouldn't have

6   any issue --

7          MR. DEVEREAUX:  Yeah.

8          THE COURT:  -- but they disagree on the condition.

9          MR. DEVEREAUX:  So, two responses.  Number one, if

10  it's defective -- and I alluded to this earlier -- then we

11  need to know why -- if it's not defective, excuse me, we need

12  to know why it's not defective.

13         THE COURT:  Right.

14         MR. DEVEREAUX:  Number two, the appraisal should

15  have been based upon the Secure Energy equipment and BEDP

16  provided.  He inspected the equipment and, you know, it should

17  have been based upon the equipment at that point in time

18  and --

19         THE COURT:  But what are you saying is different?

20  You're saying at the point in time of the appraisal, it's your

21  position it was defective and, therefore, the appraisal should

22  be lower, or am I missing the point?

23         MR. DEVEREAUX:  I'm saying that the appraisal's

24  really not based upon anything.  A good example would be if I

25  had my home appraised and the appraiser came in and said,

1    okay, it's worth $200,000, and there's a huge crack in the

2    basement, that if you took that into consideration the house

3    might only be worth $100,000.

4            THE COURT:  Okay.  So you --

5            MR. DEVEREAUX:  So the point is --

6            THE COURT:  You're being more literal saying he did

7    not lay eyes on the equipment.

8            MR. DEVEREAUX:  Well, he, you know, did a two-hour

9    inspection.  But I want to point out that an inspection of

10   this equipment is very difficult, because you can't get into

11   it -- to really inspect it, I mean, I think you had alluded to

12   it, you need to cut it in half and figure out all the aspects

13   of it, and inspecting it when it's not operating is also more

14   difficult.  But the point is, is his opinion in his report

15   assumes that the equipment is not defective.  Okay.  And I

16   think that's very different than putting in the report, I

17   reviewed and examined the -- and appraised the Secure Energy

18   equipment, without qualification.  And in his report, he made

19   it a qualification.  And he does not opine about the value of

20   the equipment, if it were defective, only it's not defective.

21           THE COURT:  But is it the -- is it the

22   responsibility of the appraisal to give the alternative

23   theories?  Isn't that what the adversarial system envisions,

24   that your expert on appraisal will give an opinion that, you

25   know, if it's defective, it's worth X?

1          And these experts sometimes have their own inherent

2    expertise to talk about the issue of defect, but often experts

3    in this field, like an economist, takes certain facts as true.

4    So they -- they're presented with the, you know, hypothetical.

5    Let's go for a simple case, a medical malpractice case, where

6    a person has diminished earning potential into the future and

7    you want to reduce that to present value, that economist is

8    going to say, you know, based on the -- if the jury were to

9    conclude that there was medical negligence which resulted in

10   the person being unable to work, I crunched the numbers as

11   follows.  So they often render their opinions based on

12   assuming the following, which the jury will then conclude yes

13   or no.

14          So it's rare -- I've never yet seen an economist

15   come in and say, if there is medical malpractice, the loss

16   earning potential is X.  If there was none, it's Y.  That's

17   cross examination, you know, where the opposing counsel gets

18   on the, you know, to the podium and says, you're predicating

19   your opinion on the notion that this jury will find medical

20   negligence.  If they find no negligence, you would agree that

21   there's no damages.  Yes.  I mean that's -- that's the normal

22   back and forth that occurs, so I have not yet seen an expert

23   who is giving competing opinions within their report.  They

24   pick a horse, then they -- and they take it to its logical

25   conclusion economically.

1    MR. DEVEREAUX:  Well, I harken back to my example.

2  And when we're talking about a value of a home and when you

3  don't take into consideration the crack in the basement, that

4  renders the appraisal really useless.  And that's our point

5  here, that the appraisal should have been based upon the

6  Secure Energy equipment.  It should not have been based upon

7  the fact that it was not defective, and that's the difference.

8  It would be like appraising a car with an engine -- that had

9  no engine and saying, well, yeah, this car is worth $10,000

10  when you don't take into consideration the fact that the

11  engine doesn't work, and that's our position with respect to

12  the appraisal aspect of it.

13    THE COURT:  All right.  And what's the next point?

14    MR. DEVEREAUX:  So I don't want to spend a lot of

15  time on Section B, which talks about pre-judgment interest,

16  because it's just based upon, you know, a faulty premise.

17  Mr. Williams even acknowledges that he didn't know when the

18  money was due.  And he goes all the way back to 2013, and he

19  claims that interest is due when it's clear under the

20  agreement that the payment wasn't due until such time as

21  Siemens provided an invoice and that invoice was provided

22  after Secure had already rescinded the contract in March of

23  2016.

24    THE COURT:  Right.

25    MR. DEVEREAUX:  So, I'm not going to spend a lot of

1    time on that.

2          THE COURT:  Right.  No, I appreciated your point.

3    You argued in your papers that Siemens invoiced Secure April

4    19th, 2016, but Dr. Williams calculates interest on the

5    license agreement starting February 2013 which is, you know,

6    obviously about three years before.

7          MR. DEVEREAUX:  Right.

8          THE COURT:  And you make the point that pre-judgment

9    interest is typically a decision for the Court, but

10   post-verdict.  So the jury would determine when the invoice

11   was presented or when payment was due, whatever that

12   triggering mechanism is.

13         MR. DEVEREAUX:  Right.

14         THE COURT:  Maybe that's an interrogatory verdict

15   form.  And then, the math is the math based on the amount

16   that's determined by the jury.

17         MR. DEVEREAUX:  Okay, moving right along.

18         The other assets of our complaint with Dr. Williams'

19   report is that he attempts to apply engineering calculations

20   without having any kind of engineering standards, anything

21   other than it just being his professional opinion with respect

22   to his opinion.  And --

23         THE COURT:  Well, the next opinion that you

24   addressed in your motion is that the BEDP opinion is not based

25   on a thorough review of the substance of the BEDP, if I --

1    if I'm not skipping over anything.

2            And you speak about the fact that the --

3    Dr. Williams finds that the NCPP project is substantially

4    different from the instant case, that it's not related to the

5    value of the equipment.  And then, you stated that his opinion

6    is based on general engineering knowledge and not testing, so

7    the same critique or questioning that I have regarding

8    Mr. Kosstrin's testing or lack thereof, you raise that as to

9    Dr. Williams, whether he actually engaged in testing or

10   somehow differentiated NCPP from the subject device and --

11           MR. DEVEREAUX:  That's one part of it, but it also

12   goes to reviewing the evidence in this case in formulating his

13   opinion.  If you don't review the evidence and you just sit

14   down and read the BEDP, I don't think you've done anything to,

15   number one, base your opinion and, number two, assist the

16   jury.  You know, he only talks about, oh, the basic

17   engineering design package contained 18 categories that you

18   would normally see in a BEDP.  There is nothing that this

19   opinion is based upon.

20           And then there are -- back on page 13, we talk about

21   -- or, excuse me -- Dr. Williams talks about, you know, once

22   again this failure to get financing.  And it's an interesting

23   dilemma, because he claims that Secure did not get financing

24   because of its own failures to properly obtain EPC

25   contractors.

1          We believe the evidence in this matter will

2   demonstrate that in 2014, we were waiting for Siemens to

3   provide the BEDP.  And there's e-mail traffic to reflect that

4   in order to get the information to our EPC contractor and this

5   was, as it turns out, never provided.  And Dr. Williams'

6   opinion is based nothing more than upon his engineering

7   experience.  And I think it's also important that, you know,

8   Secure had been waiting for this BEDP since 2012, and there

9   will be evidence to that effect also.

10         THE COURT:  I think in the response to your motion,

11  though, didn't Siemens conclude that Dr. Williams does not

12  opine on why Secure failed to get financing for their project

13  and they defer to Mr. Jenkins on that point arguing that there

14  is no opinion to exclude relative to Dr. Williams, because

15  he's not raising the financing issue?  That's something that

16  Jenkins will be raising.

17         MR. DEVEREAUX:  Okay.  So is it my understanding

18  that that's not going to be part of it?

19         THE COURT:  I guess I'll find out when I ask them.

20         MR. DEVEREAUX:  Okay.  Perfect.

21         THE COURT:  Anything else regarding Dr. Williams?

22         MR. DEVEREAUX:  Your Honor, on page 14, we also

23  point out that Dr. Williams, once again, as we've indicated

24  with respect to Mr. Jenkins, you know, they just didn't take

25  into consideration the facts that transpired in this matter.

1  And if there's no foundation to render an opinion, we believe

2  it's without foundation and should be stricken.

3          The biggest problem with Dr. Williams is the fact

4  that every one of his -- virtually every one of his opinions

5  is solely based upon his experience and nothing else and made

6  it impossible to test the evidence and to understand the basis

7  of his opinion, because it wasn't based upon anything.

8          THE COURT:  Mm-hmm.  All right.

9          MR. DEVEREAUX:  Thank you.

10          THE COURT:  Thank you.

11          Who will be speaking for Siemens on Dr. Williams?

12          MR. DAIRE:  I will be, Your Honor.

13          THE COURT:  Mr. Daire.  We'll start with the last

14  question, which is the issue of whether or not Dr. Williams

15  will be rendering the opinion on financing or whether that's

16  within Mr. Jenkins' wheelhouse.

17          MR. DAIRE:  He -- Dr. Williams will not be offering

18  an opinion on finance.

19          THE COURT:  All right.  So then we're dealing really

20  with the issue of design defects, appraisal of equipment,

21  value of license agreement.

22          MR. DAIRE:  That's right, Your Honor.

23          THE COURT:  Okay.

24          MR. DAIRE:  And I'd like to start with what Your

25  Honor started with in his comments prior to lunch about this

1   disclosure issue, because I think it's illustrative of the

2   liberties that plaintiffs' counsel is taking in the record and

3   the evidence in this case.  There is no improper disclosure

4   issue in this case.  Under the Court's orders, we were obliged

5   to provide our reports and disclosures on January 4th.  We did

6   that.

7           I pulled the e-mail at lunch and, quoting from that

8   e-mail, told Mr. Devereaux and his colleagues that the

9   information required by FRCP 26(a)(2)(b) is contained in the

10  report.  So the report contains the complete description

11  disclosure of his opinions, both with respect to appraisal,

12  with respect to his analysis of the design defect claims made

13  by Dr. Kosstrin and plaintiffs, and with respect to the other

14  issues covered in his report.  There is no issue there.

15          THE COURT:  All right.  Thank you.

16          MR. DAIRE:  To go through the points raised by

17  Mr. Devereaux in order.  First, he criticized Dr. Williams for

18  simply assuming that the equipment was not defective.  That is

19  not what Dr. Williams did.  He did an appraisal analysis.

20          He noted that functional obsolescence is one

21  consideration under well-established appraisal techniques.

22  And he did an evaluation based on his own technical expertise

23  of the defect claims made by Dr. Kosstrin and plaintiffs.

24  You noted prior to the break that those opinions are

25  summarized in pages 58 through 60 of his report, and so he

1    didn't just simply assume that the equipment was non-defective

2    for purposes of an opinion.

3           In fact, as a factual matter, we anticipated there

4    being a legitimate critique to Dr. Williams' opinions if he

5    had not addressed the issue of defect, and so he did that, and

6    he did it with respect to the evidence.  This is a microcosm,

7    the same complaint that plaintiffs raised with Mr. Jenkins,

8    that although they considered all the evidence, they just

9    don't like the outcome of their opinions.

10          I do want to take a minute and just, again,

11   emphasize these liberties with the record.  This idea that

12   there was a root cause analysis prepared by Siemens that

13   suggests that some defect in the equipment was to blame for

14   any issue at NCPP is just not true, period.  I can't cite you

15   to any evidence in the record, because it doesn't exist.

16          The point on interest is a little bit more nuanced

17   than Mr. Devereaux suggested in his presentation.  And the

18   reason for that is because what happened here is not that we

19   invoiced plaintiffs in April for the license fee.  We invoiced

20   them for the termination fee.  And what Dr. Williams does is

21   reconstruct the hypothetical world that would exist if either

22   Siemens improperly terminated the contract or the contract

23   wasn't terminated at all, because the first obligation between

24   the parties in this case is for plaintiffs to pay Siemens.

25   That's a condition to getting an updated BEDP.

1          The facts are we provided a basic engineering and

2     design package in 2008 under the original contract.  That

3     engineering and design package was pronounced good by the

4     plaintiffs.  There was a completion agreement memorializing

5     that all material obligations, including with respect to the

6     BEDP had been performed, and then plaintiffs changed their

7     plan, and then plaintiffs changed their plan again, and then

8     plaintiffs changed their plan again, and something else

9     happened which was the passage of time.

10          From 2008, when we delivered the BEDP, to 2015 and

11    '16, there were advances in gasification technology.  They

12    wanted an updated BEDP.  They knew that we would provide an

13    updated BEDP to either plaintiffs or to the purchaser of their

14    gasifier, if we were paid for it.  They actually noted that in

15    the ad they put out in the trades, which is referenced in

16    Dr. Williams' report, that an updated BEDP would be available

17    from Siemens.  So this whole notion that for some -- some

18    reason that there is evidence in the record to suggest the

19    BEDP that we delivered in 2007 is defective is just not true.

20          THE COURT:  So you're saying that the need for

21    revisions were either predicated upon or changed in the

22    business plans of the plaintiff or a change in technology in

23    the industry?

24          MR. DAIRE:  That's right, including experiences in

25    China, right?

1           We got an acceptance certificate from the customer

2   in China, but as a result of the experiences that we learned

3   about from the operational conditions there, we were able to

4   advance the technology, because that's what a good engineering

5   company like Siemens does.  But that doesn't prove or even

6   suggest the presence of a defect in the original BEDP, and

7   that's kind of the fundamental issue we've got in this case.

8           I do -- I also wanted to note while we're on this

9   subject, with some irony, you quoted plaintiffs' headnote from

10  their motion in this case on the BEDP to the effect that they

11  criticized Dr. Williams for not doing a thorough review of the

12  BEDP.  Remember, we heard from Dr. Kosstrin in the morning.

13  He didn't review the BEDP at all, not since 2009.  So in the

14  context of a rebuttal to the opinions that are offered by

15  Dr. Kosstrin, it's a little tough to shoot at something when

16  their expert didn't review it at all.

17          So what did Dr. Williams do on this point?  I've got

18  one slide that may be of use to the Court, if I may approach?

19          THE COURT:  Yes, you may.

20          MR. DAIRE:  And Mr. Dyer, if we could have slide 7

21  of the presentation.

22          So this is just a graphical representation of what

23  Dr. Williams did do and what's -- what he recounts in his

24  report, which is the original contract between the parties

25  from '07.  Among its many appendices is Appendix, I think it's

1   6, and it states what is an industry standard BEDP in the 2006

2   to 2007 timeframe.  And it doesn't go into great detail.  It

3   just basically says, here's everything you need.  You need a

4   documentation for process, description systems, you need one

5   for P and Ds, and it goes on and on and on.

6          And what Dr. Williams did -- and he summarized this

7   in his report -- is he took that and he looked at all 2,800

8   pages of the BEDP that we provided to Secure in this case that

9   they have in their offices in St. Louis, and he made a

10  determination as to whether or not the items that are listed

11  in column -- on the column on the right-hand side were

12  accounted for in the BEDP that we put together over the course

13  of from December of 2007 to mid 2008, six to nine months, I

14  believe it was, for the plaintiffs, and he said there's

15  nothing suggesting defect in this BEDP.

16         So as opposed to Dr. Kosstrin, who never looked at

17  the BEDP in the first place, Dr. Williams did a thorough

18  analysis based on the objective evidence of what was intended

19  to be stated in the BEDP.

20         THE COURT:  As I appreciate what you're saying is

21  that Dr. Williams did not limit his review of the BEDP to

22  saying that there are X number of categories of data, which

23  is expected and they're present; therefore, that's good

24  enough.  He went to the framework of what's expected in the

25  industry for a BEDP, then looked at all the underlying source

1  document and said, yes, it's adequate based on the totality of

2  the actual report and not just the categories of information.

3            MR. DAIRE:  That's correct, Your Honor.  And you may

4  remember from his report he actually said there was actually

5  one thing that's missing in this BEDP, but it's not material,

6  and he explained why that was.  So that is a true, independent

7  analysis of a basic engineering and design package, and it's

8  exactly the kind of testimony that the jury ought to hear in

9  terms of deciding this issue of defect.

10           THE COURT:  Anything else?

11           MR. DAIRE:  Just one thing I forgot to raise this

12  morning, Your Honor.  With respect to a witness on EPC

13  contract --

14           THE COURT:  Correct.

15           MR. DAIRE:  -- Mr. Devereaux didn't say who the

16  witness was.

17           THE COURT:  No.

18           MR. DAIRE:  Their witness list that was filed has

19  three witnesses -- Mr. Kenny, who is present in the courtroom,

20  he's a co-founder of the company; Mr. Scott, another

21  co-founder of the company; and then Dr. Kosstrin.  There's no

22  witness from an EPC contractor on Mr. Devereaux's witness

23  list, so -- and I had specifically raised this in our

24  pre-trial meeting, if there's some surprise witness that I

25  don't know about, I'd like to know who that is.

1          THE COURT:  Well, there is no such thing as surprise

2     witnesses.  If they're not on the list, they don't testify.

3          MR. DAIRE:  Thank you, Your Honor.

4          THE COURT:  All right.

5          MR. DEVEREAUX:  May I, Your Honor?

6          THE COURT:  Yes, you may.  I want you to get your

7     2:30 departure time, so we have about 17 minutes.

8          MR. DEVEREAUX:  Judge, with respect to the witness

9     that Mr. Daire just alluded to, on our disclosure we indicated

10    that Keith Clauss may testify, and I don't think I could be

11    any clearer about that.  I provided that to Mr. Daire in our

12    in-person meeting on April 8th, and that hasn't changed.

13          As we had moved through that, I originally disclosed

14    to him that I thought he would be used on rebuttal, but it's

15    become apparent that that is, again, going to be an issue that

16    will be at the trial and he will be appearing and testify,

17    so I just want to make that clear.

18          This opinion by Mr. -- or Dr. Williams that the

19    BEDP, you know, is -- there's nothing wrong with it doesn't

20    take into account what the situation is.  It would be like

21    somebody reviewing the plans for the Corvair and indicating

22    that there's no problem with the Corvair; it's safe, as

23    opposed to analyzing what the aspects of the Corvair are with

24    respect to its crash worthiness and its general safety.  And

25    to just sit there and review a plan and say, oh, it's fine,

1   and ignore all the evidence is -- doesn't help the jury at

2   all, and it's not based upon anything.

3          I also want to talk about -- and I think this is

4   really important.  You know, Siemens has gone out of their way

5   to talk about changing the plan.  And I want to -- I want to

6   make this clear, because the evidence at trial will be

7   unequivocal that we're dealing with a gasification island,

8   we're dealing with the same coal, and we're dealing with the

9   same process regarding the gasification island.  And I alluded

10  to it earlier.  All we're dealing with is the gasification of

11  the coal and the production of syngas.  And this notion that,

12  you know, the BEDP changes because of that is just wrong.

13  It won't be in evidence that the BEDP changes because of the

14  end product.

15          Also, I want to point out that he also indicated

16  that there were changes in technology and advancements in the

17  technology.  There was a meeting November 8th, 2012, which is

18  Plaintiffs' Exhibit 75.  And this was a meeting between

19  Siemens, between MidAmerica, and SKE&C USA, which was our EPC

20  contractor.  And at that meeting, Siemens disclosed that there

21  were changes that were going to be made.  And they indicated

22  that the completion of the heat and material balance and

23  updates to the PDP will require four to five months and the

24  process will produce revised PFDs, and every data sheet will

25  be reviewed.

1          The next item says, Siemens, (Rolf Russeler),

2   stated that there should be some optimization of the plant

3   arrangement as part of their final review.  The adds and

4   deducts for equipment are expected to balance out.

5          That happened in 2012, and that was the meeting in

6   which Secure was waiting to get this revised BEDP, and there

7   is no mention that there was a material change in the

8   technology.  There is no mention that changing the end product

9   would require the new BEDP, and the evidence in this matter

10  will not reflect that.  And Siemens continues to talk about

11  the equipment.  But the evidence that we have submitted to

12  you, the overwhelming evidence, demonstrates that the

13  equipment is defective.  Thank you, Your Honor.

14          THE COURT:  Thank you.

15          MR. DAIRE:  Your Honor, may I be just heard briefly

16  on the --

17          THE COURT:  You may.

18          MR. DAIRE:  So, Mr. Devereaux slipped in that he had

19  previously disclosed Mr. Clauss as a potential expert on

20  rebuttal.  He did give me a list of about two dozen names

21  initially at our meeting that he said was a potential call,

22  and I clarified with him afterwards, because none of those

23  folks had been the subject of deposition.

24          And I told him, if you're intending to call anybody

25  as part of your case in chief, I need to know that now so that

1   they can be deposed.  And he wrote me an e-mail back and said,

2   only for purposes of potential rebuttal.  So, Mr. Clauss was

3   not identified as a trial witness on either a may call or an

4   intend-to-call basis, point one.

5          Now for purpose of Daubert --

6          THE COURT:  The -- I'm sorry, but for the purposes

7   of the pre-trial statement, there should be a list of

8   witnesses per side.  Will I see Mr. Clauss's name on there?

9          MR. DAIRE:  I don't -- he may be on the B list, the

10  may-call list, but again, I clarified that in an e-mail and he

11  said, I don't intend to call anybody on the B list, except for

12  rebuttal purposes, and I'd be happy to submit that e-mail to

13  the Court at your convenience.

14         THE COURT:  Bear with me one second.

15     (Pause in proceedings.)

16         Clauss is on the B list, may be called.

17         MR. DAIRE:  Yeah.  So what I -- 'cause I wanted to

18  make sure that anybody we knew about in advance to be deposed.

19         THE COURT:  Right.

20         MR. DAIRE:  And I asked him, is anybody on the B

21  list coming for part of your case in chief, and he told me no,

22  only for potential purposes of rebuttal.

23         So in terms of supporting this idea of defect in the

24  first place, I mean, what he's told me is he has ruled it out

25  of his case in chief.  And then, particularly as it's -- you

1   know, we may have a fight about that witness later, but to

2   tether it to the Daubert, the point is Dr. Kosstrin didn't

3   talk to Mr. Clauss, didn't interview Mr. Clauss.  There's

4   nothing in his report or in his deposition to suggest any

5   statement by Mr. Clauss, which would be, of course, hearsay

6   anyway, but he can utilize for purposes of his report was any

7   part of the basis of his opinions.  So it doesn't help for

8   purposes of today's proceedings anyway.

9           THE COURT:  Yes.  I think the way the whole thing

10  came up is there was a question raised about whether anyone

11  would link the equipment or the BEDP to a lack of financing

12  and so when the -- when plaintiffs' counsel, I believe

13  Mr. Devereaux, would be Mr. Devereaux, when he re-took the

14  lectern I asked him, do you have anyone, and he said, yes, I

15  do, and then here we are.

16          Obviously, I don't want to get too ahead of myself,

17  but for Daubert, you know, I've made it very clear I look at

18  the limited scope that is proper for me.  And when it comes to

19  dealing with opening discovery to allow a deposition, if a

20  person's been moved from a may-call and there is, in fact, an

21  e-mail saying don't worry about this person, it's rebuttal

22  only, that I think would be good cause for taking the

23  deposition of that person.

24          MR. DAIRE:  Thank you, Your Honor.

25          THE COURT:  It's just fair to everybody.

1         MR. DEVEREAUX:  Yeah.  That's fine, Your Honor.

2         MR. DAIRE:  And just a couple of housekeeping issues

3 apart from the motions that are on calendar for today.

4         The parties have due today the -- their opposition

5 to Mills and plaintiffs have due their opposition to the

6 motion to bifurcate.  I've conferred with opposing counsel.

7 If it's okay with Your Honor, we'd like to file those tomorrow

8 rather than today, just for the flight purposes.

9         THE COURT:  You can file them in a few days.

10         I don't know off the top of my head, because I don't

11 have the Case Management and Scheduling Order open when you're

12 set for trial, but we are horrifically backed up at the

13 moment --

14         MR. DAIRE:  Okay.

15         THE COURT:  -- for reasons that I won't bore you

16 with.  It's judicial vacancy and senior judges who are doing a

17 great job, but they only take cases, you know, periodically.

18 So, I think my colleagues and I have all picked up 50 new

19 cases in the last month, you know, civil cases, and we have

20 our criminal docket.  So it's -- we're going to get to you as

21 quickly as we can, but I don't believe you should have an

22 artificial deadline, either of you, for filing these motions

23 if it's not going to be outcome-determinative right now.

24         When is the case set for trial?

25         THE COURTROOM DEPUTY:  July, Your Honor, a June

1    pre-trial conference date.

2          THE COURT:  We'll see how that goes.  We'll do the

3    best we can, but hopefully, that will work.

4          MR. DAIRE:  Understood, Your Honor.  The other

5    thing --

6          THE COURT:  I think it's okay if you get those all

7    filed by -- what's today, Tuesday?

8          MR. DAIRE:  Today is Tuesday.

9          THE COURT:  By Friday will be fine.

10         MR. DAIRE:  Okay.

11         THE COURT:  We're not going to get to those until

12   closer to pre-trial conference anyway, so there's -- by the

13   time you travel back and, you know, get some sleep and

14   everything else, there's no reason to be inhumane.  So Friday,

15   Monday, something like that, it's not -- don't worry about it.

16         MR. DAIRE:  Thank you, Your Honor.

17         And then with respect to the pre-trial statement --

18   and this dovetails with what you've just said, the parties

19   anticipated filing effectively updated jury instructions,

20   verdict form once we got rulings related to choice of law

21   issues and summary judgment.  I anticipate what we will just

22   do is file a joint motion on that issue once Your Honor is

23   able to reach those motions.

24         THE COURT:  No, that makes sense.  I anticipate --

25   and I will tell you, folks, I am good about getting these

1   things off my desk once we have these hearings.  I don't like

2   them to sit because, you know, none of us remember things as

3   well.  And the transcript is great, but it's good in real

4   time.  On complicated issues like this, I typically have

5   orders out in under five work days.  So you could very well

6   have an order on these experts by Friday, Monday at the

7   latest.  I thought the staging of the motions that are pending

8   made sense to have these dealt with before summary judgment

9   since it could impact the analysis one way or the other.

10          So the notion is to go through Daubert into summary

11   judgment, and then we'll be going forward from there.

12   Obviously, summary judgment is choice of law issues you all

13   have been discussing, so all of those will kind of unfold now

14   that we have this.

15          MR. DAIRE:  Thank you, Your Honor.

16          MR. DEVEREAUX:  So, Your Honor, obviously on behalf

17   of plaintiffs we're very eager to get our case to trial, but I

18   think I want to be practical.  You moved the case to July 1st.

19   Do you think there's a reasonable probability that we'll --

20   we'll get to that case on July 1st?

21          THE COURT:  July or August.  I mean, I wouldn't be

22   surprised if it's August simply because -- here's the real

23   interesting dynamic of being in the district court is that we

24   handle criminal and civil cases.

25          MR. DEVEREAUX:  Right.

1      THE COURT:  And I have no conception from one day to

2  the next how many criminal cases will come, how many will not

3  plead guilty and go to trial and they -- you know, they make

4  life a nightmare for civil litigants, because we have to take

5  them first due to speedy trial.  But I will tell you this, and

6  it's something that I've been happy about.  I've given

7  everyone, so far, a date certain trial and I think we're the

8  second busiest federal trial court in the country, from what

9  I'm hearing, statistically.  I typically try 15 trials a year,

10 which is a lot for federal court, not a lot for state court.

11     MR. DEVEREAUX:  Right.

12     THE COURT:  And everyone gets -- so far has gotten a

13 date certain, so I work with you.  And if you have summer

14 vacations coming, your experts are unavailable, you know,

15 there has to be some flexibility built into this process,

16 because you just can't control every single thing in your

17 case.  So, we will be talking about that, if you're planning a

18 family vacation, if an expert is not going to be present, you

19 know, I will work with you on getting a trial date that makes

20 everyone's life, you know, as pleasant as can be.

21     MR. DEVEREAUX:  Because, you know, when we look at

22 July 1st, that's a Monday, and then we have the 4th of July

23 on a Thursday.

24     THE COURT:  Oh, yeah.  No, it would never be that

25 week, because honestly that's crazy.

1    MR. DEVEREAUX:  Okay.

2    THE COURT:  Nobody -- no juror is going to want to

3  sit there, and you're going to have the 4th of July holiday

4  coming up.  I mean, it's really -- I could seat a jury July

5  1st, but it sounds like a bad idea.

6    MR. DEVEREAUX:  Right.

7    THE COURT:  So I don't think I've done a trial

8  that's not been a bench trial or a very short one starting

9  on the first.  Usually, it's a little bit after.

10    MR. DEVEREAUX:  Okay.

11    THE COURT:  I shouldn't say that.  My very first

12  trial when I came onboard was literally July 1st.  It was a

13  bench trial between a venture capital group and a bank, so

14  they were fine, but yeah.  But, otherwise, we do try to apply

15  a little common sense to getting these things done.

16    MR. DEVEREAUX:  Okay.  Great.  Thank you.

17    MR. DAIRE:  Thank you again for your time and

18  attention.

19    THE COURT:  My pleasure.

20    Safe travels to all of you.  Thank you, gentlemen.

21    (Adjourned at 2:25 p.m.)

22              * * * * * *

23

24

25

1                    Certificate of Official Reporter

2      I certify that the foregoing is a correct transcript, to the

3      best of my ability, of the record of proceedings held in the

4      above-entitled matter.

5      s/Koretta Stanford_____
       Official Court Reporter
6      United States District Court
       Middle District of Florida      Date:  5/24/19
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25