**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MIDAMERICA C2L INCORPORATED
and SECURE ENERGY, INC.,

              Plaintiffs,

v.                                 Case No:  6:17-cv-171-Orl-40LRH

SIEMENS ENERGY, INC.,

              Defendant.
_____/

## ORDER

    This cause is before the Court on Defendant Siemens Energy, Inc.'s, Motion to Exclude Opinions and Testimony of Dr. Herbert Kosstrin. (Doc. 150). Plaintiff, MidAmerica C2L, Inc., et al.'s, filed a Response in Opposition (Doc. 158), and the matter is now ripe. Having reviewed the pleadings and related submissions, and with the benefit of oral argument, Defendant's motion is due to be granted.[1]

## I.    BACKGROUND

    This lawsuit arises out of a contract dispute between Plaintiffs, Secure Energy, Inc., ("**Secure**") and its subsidiary, MidAmerica C2L, Inc. ("**C2L**"), and Defendant, Siemens Energy, Inc. ("**Siemens**"). (Doc. 63, ¶¶ 5–8). On December 24, 2007, Secure and Siemens executed a contract (the "**2007 Contract**") requiring Siemens to sell certain equipment to Secure for use at a coal gasification plant located in Decatur, Illinois, where

---

[1]    The Court invited the parties to present testimony from their respective expert witnesses; however, neither party availed themselves of this opportunity. (Doc. 168). Accordingly, the Court's *Daubert* review of the expert witnesses is limited to their Rule 26 expert reports and deposition testimony.

Secure planned to operate an industrial facility for the conversion of coal into natural gas. (*Id.* ¶¶ 5, 8). Secure paid Siemens approximately $40 million for the equipment. (*Id.* ¶ 10). On March 31, 2010, Secure and Siemens executed a contract stating that both parties had fulfilled their obligations to each other under the 2007 Contract ("**2010 Completion Agreement**"). (*Id.* ¶ 11). On the same day, Secure and Siemens entered into a License and Service Agreement ("**2010 License Agreement**") whereby Siemens granted Secure a license to use certain of its patented technologies for the development, construction, and operation of the Decatur, Illinois, coal gasification plant. (*Id.* ¶ 12).

On July 18, 2012, the 2010 License Agreement was terminated by mutual agreement, and, on the same day, C2L and Siemens entered into a new License and Service Agreement ("**2012 License Agreement**") whereby Siemens granted C2L a license to use certain of its technologies for a coal gasification plant in West Paducah, Kentucky, where C2L would convert coal into methanol.[2] (*Id.* ¶ 16). In both the 2010 and 2012 License Agreements, Siemens agreed to provide technology, engineering services, technical field assistance, training, and performance guarantees relating to the Equipment conveyed in the 2007 Contract in exchange for a license fee. (*Id.* ¶¶ 12–13, 16–17). The 2007 Contract, as well as both License Agreements, guaranteed the Equipment would meet certain performance standards. (*Id.* ¶ 18).

---

[2]    Secure's attempt to operate a coal gasification plant in Decatur, Illinois, did not come to fruition, and in July 2012, Secure's focus turned to the operation of a plant in West Paducah, Kentucky to convert coal into methanol. (Id. ¶ 16). Plaintiff also attempted to employ coal gasification to manufacture gasoline and fertilizer. The Kentucky plant never materialized.

## A.      Design Defects Alleged in the Amended Complaint

Secure avers that Siemens became aware of material design defects in the equipment sold to Secure at some time between October 31, 2010, and September 2011, "based on the experience of a plant in China that used identical" equipment. (*Id.* ¶ 14). Secure argues that the design defects in the equipment and technology prevented Secure from obtaining an Engineering, Procurement, and Construction ("**EPC**") contractor which is a prerequisite to obtaining financing. Siemens has counter-sued Secure for breach of contract arising from Secure's failure to render payment for the License and Service Agreement as required. (Doc. 75, pp. 20–21). The Complaint identifies the following design defects:

> a.      The burners are improperly engineered and designed;
>
> b.      The design of the raw gas (syngas) outlet and the black water outlet is defective because the level of the black water will rise above the raw syngas outlet and prevent syngas from exiting the gasifier, greatly increasing the risk of catastrophic explosion;
>
> c.      The Basic Engineering Design Package ("**BEDP**") is defective and needs to be modified to make changes to multiple components, including, but not limited to, the coal handling system, the slag handling system, piping design, valve design, the syngas cleaning system, and the black water system; and
>
> d.      Siemens' design of the Fuel Measurement System is defective and does not work.

(Doc. 63, at ¶¶ 14, 33, 40, 82)

## B.      Design Defects Identified by Dr. Kosstrin

Plaintiff's gasification expert, Dr. Kosstrin, states in his expert report that pursuant to the License and Service Agreement dated July 3, 2012, Siemens was obligated to provide a gasification system that would produce the following:

1. A guaranteed syngas (carbon monoxide plus hydrogen) output of 260,000 normal cubic meters per hour ("$Nm^3$/hr") using two gasifiers and the guaranteed coal;

2. A guaranteed oxygen usage of 389 $Nm^3$/1000 $Nm^3$ of guaranteed syngas output; and

3. A guaranteed coal usage of 590 kilograms ("kg")/1000 $Nm^3$ of guaranteed syngas output.

(Doc. 150-2, pp. 2–3)

Dr. Kosstrin opines that "the equipment and BEDP delivered by Siemens to C2L [Secure] had material design defects and the equipment delivered to Secure in 2009 required significant modifications and a new burner in order for the TBL [technology or technology battery limits] to operate as intended." (*Id.* at p. 2). He also concludes that the "BEDP delivered to Secure in February 2009 required substantial revision and Siemens did not know all revisions that could be required. Furthermore, each item of the equipment delivered to Secure in 2009 needed replacement or significant modification, some of which could not have been implemented." (*Id.* at p. 8). These opinions are based upon information concerning the NCPP plant's operation. (*Id.* at pp. 2, 8).

Dr. Kosstrin identifies the following material design defects reported by NCPP which he contends prevented the equipment from meeting the specifications set forth above:

Burner

1. The Main Burner ("**MB**") and the Pilot Burner ("**PB**") were contained in the single unit. In general, the MB had poor carbon conversion, thus creating more dust that needed to be removed from the syngas, and caused problems with the downstream syngas cleaning systems. The PB experienced repeated damage due to inadequate cooling and required more repair than expected;

2.      The PB had leaks in the cooling jacket requiring repairs, had problems with ignition of the flame, and was unreliable. The MB had cooling jacket leaks and needed repair at the three-month point;

3.      The MB experienced fluctuations in coal flow causing damage to the gasifier cooling screen and had carbon conversion less than 98 percent, causing more dust carryover to the black water and syngas scrubbing systems; and

4.      The MB had insufficient turbulence, and Siemens kept changing the swirl angle in an attempt to maintain the flame in the proper location. At low loads, the burner flame caused cooling screen damage.

(*Id.* at pp. 5–6)

Coal Feeding:

1.      The moisture content of the coal needed to be reduced to less than the design value of 6 percent. A moisture content of 5 percent was acceptable, however, lower was better;

2.      There were issues with the agitators in the feeder vessels, and the feeder vessels were identified as being too small. Furthermore, small leaks in the valves led to fluctuations in the coal feed rate;

3.      The control of the feed rate was identified as an issue; and

4.      There were failures in the loosening elements in the coal feeding bins.

(*Id.* at pp. 6–7)

Cooling Screen:

The cooling screen experienced significant damage, required repair and a modification in the covering refractory, because coal feed fluctuations caused the burner flame to widen out and hit the top of the cooling screen.

Quench Section:

The quench section of the gasifier required modifications to address particulate carryover that was a result of increased dust loading from the burner. A hood was placed over they

syngas exit and the locations of the quench nozzles were changed. A longer quench zone is required.

Venturi Scrubbers:

The venturi scrubbers to clean the syngas were not able to handle the dust that was produced in the gasifiers, and Siemens added a jet scrubber between the gasifiers and the venturis to address this issue.

(*Id.* at p. 7)

Dr. Kosstrin further opines that Siemens did not fix the root cause of the problem which he identifies as being the burners. (*Id.*).

BEDP:

Dr. Kosstrin examined the BEDP sold by Siemens to Secure in February 2008, and opines that it required substantial revision. (*Id.* at p. 8).  The "BEDP package refers to the design package that includes all the necessary information required by an EPC or detailed engineering firm to develop the final engineering of the plant." (Doc. 147-1, p. 35).

Inability to Secure Financing:

Dr. Kosstrin opines that Secure needed to obtain an EPC contract that had a fixed price, a guaranteed schedule, and process guarantees to be able to obtain financing for the project. (Doc. 150-2, p. 10). Because the equipment and technology provided by Siemens was "not viable," it was impossible for Secure to obtain financing for its contemplated facility. (*Id.*). Dr. Kosstrin explained that lenders look to the EPC contractor to provide guarantees on the price of the project, on whether the plant will meet projected financial projections, and a date certain commercial operation commencement. (*Id.*). In turn the EPC must have confidence that the equipment will achieve their guarantees. (*Id.*).

Dr. Kosstrin submits that Secure was working with an EPC contractor, SKEC, but Siemens did not produce a final BEDP.[3] (*Id.* at p. 11).

### C.     Foundation for Dr. Kosstrin's Opinions

Dr. Kosstrin's material design defect opinions are based on a "review of exhibits and information concerning the NCPP plant's operations up to the signing of the 2012 License Agreement." (*Id.* at p. 4). Dr. Kosstrin describes the plant in China—the NCPP plant—as having a gasification system that was "essentially similar" to the system sold to Secure.[4] (*Id.*). Since the burners sold to Secure were "identical to the NCPP burners," Dr. Kosstrin concludes that "Secure would experience similar problems as NCPP if not corrected." (*Id.*). Accordingly, Dr. Kosstrin's opinions concerning how the Secure gasification equipment would function, had it ever been placed into operation, is premised upon issues experienced at the plant in China. In deposition, counsel for Siemens and Dr. Kosstrin engage in the following exchange:

> Q.     Were the specifications for the design coal at the Secure project relevant to your analysis?
>
> A.     No.
>
> Q.     Why not?

---

[3]   Plaintiff's expert, Dr. Kosstrin, testified that Secure is the only client he has represented who purchased a gasifier before the plan was financed. (Doc. 150-3, 43:9–13). Dr. Kosstrin observed that "if you can't finance a plant, if you don't have the money to build the facility, why would you want to buy a piece of it." (*Id.* at 44:2–4). Hence, the industry practice is to obtain financing and they purchase the gasification equipment. (*Id.* at 43:16–24).

[4]   The NCPP project in China was coal-to-polypropylene. (Doc. 150-3, 50:17–19). References to SNCG and SNCC are the Siemens' customer in China. (*Id.* at 51:2–15).

> A.      Because we were looking at the issues that had come up with the Siemens gasifier with the particular situation in China.
>
> Q.      And the basis for your opinions in this case are the issues that had come up with the Siemens gasifier with the particular situation in China, correct?
>
> A.      With the situation thay had and how that related to the two gasifiers which Secure Energy had already purchased.
>
> (Doc. 150-3, Kosstrin depo 57:20–58:15).

To underscore the importance of the Chinese [NCPP] plant, at the *Daubert* hearing counsel for Secure describes the Chinese project as the laboratory with the results obtained there being indicative of results expected in Secure's hypothetical plant. (Doc. 185, 42:6-8).

## II.      THE ISSUE

The issue before this Court is whether Dr. Kosstrin's comparison of the NCPP plant to the hypothetical operation of the gasifier sold to Secure constitutes a sufficiently reliable methodology and is, therefore, of assistance to the trier of fact. A related issue is whether Dr. Kosstrin is competent to render an opinion as to why Secure was unable to secure financing for their project.

## III.     THE *DAUBERT* ANALYSIS

The Federal Rules of Evidence allow a witness who is qualified as an expert because of his "knowledge, skill, expertise, training, or education" to offer opinion testimony where certain requirements are satisfied.  Fed. R. Evid. 702.  Under Rule 702 and the United States Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), district courts act as "gatekeepers" to "ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that

accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005), cert. denied, 546 U.S. 935 (2005) (internal quotation marks omitted).  To do this, district courts must engage in a rigorous three-part inquiry, which requires the court to ask whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* at 1291–92 (internal quotation marks omitted).

In evaluating the reliability of a method as required by *Daubert*, the Supreme Court suggests that a trial court consider certain factors, including: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community. See *Daubert*, 509 U.S. at 593–94. These factors are not exhaustive, and the Eleventh Circuit has also considered whether an expert relied on anecdotal evidence such as case reports, temporal proximity, and improper extrapolation. See *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir.1999). The Court's inquiry under Rule 702 must focus on the methodology, not conclusions, but the Court is not required to admit opinion testimony only connected to existing data by an expert's unsupported assertion. See *Daubert*, 509 U.S. at 595; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"Of particular relevance to an expert proffered for his experience, the court notes that neither Daubert nor its progeny preclude experience-based testimony…" *Butler v.*

*First Acceptance Ins. Co., Inc.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. 2009) (quoting *Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999)). Additionally, an expert is permitted to form conclusions by extrapolating from existing data. *Id.* (quoting *Joiner*, 522 U.S. at 146). However, "[a]n expert's opinion becomes inadmissible…where it is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 1271–72 (italics in original) (quoting *Joiner*, 522 U.S. at 146); *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1113 (11th Cir. 2005). When an expert relies primarily on experience, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* at 1272 (quoting *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004)). This is because "[a]n expert's qualification and experience alone are not sufficient to render his opinions reliable," and expert testimony that is nothing more than what lawyers can argue in closing does not help the trier of fact. *Id.*

In forming the basis of his opinion, an expert may rely on "facts or data in the case that the expert has been made aware of or personally observed."[5]  Fed. R. Evid. 703.  To that end, the facts or data on which an expert forms his opinion need not be admissible for his opinion to be admitted as long as these facts and data are of the type that experts in his field normally rely upon in forming an opinion on the subject at hand.  *Id.*  However, an expert witness may not disclose otherwise inadmissible facts or data to the jury unless

---

[5]  Pursuant to Fed. R. Civ. Pro. 26(a)(2)(B)(i), the expert's report must contain a "complete statement of all opinions the witness will express and the basis and reasons for them. An expert may not simply submit voluminous records in lieu of a summary. *Kondragunta v. Ace Doran Hauling & Rigging Co.*, No. 1:11-cv-01094-JEC, 2013 WL 1189493, at *6 (N.D. Ga., Mar. 21, 2013).

the probative value of the information substantially outweighs any prejudicial effect. *Id.* Finally, an expert's opinion is not inadmissible simply because the expert opines on an ultimate issue in the case. Fed. R. Evid. 704(a).

In determining the admissibility of expert evidence, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Rosenfield v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation marks omitted). Indeed, cross-examination, contrary evidence, and instruction on the burden of proof are the proper tools for challenging questionable expert evidence. *Id.* It is ultimately the burden of the party who offers the expert to show that his opinion is admissible, and the party must do so by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

## IV.    DISCUSSION

### A.    Gasification Equipment and BEDP

Defendant Siemens argues that the opinions set forth in Dr. Kosstrin's 13-page report are "bereft of any analysis or evaluation of the equipment and the BEDP that Siemens delivered to Secure for the plant that Secure intended to build in Illinois." (Doc. 150, p. 2). Siemens contends that Dr. Kosstrin never inspected the equipment at issue and never ran simulations or computer modeling to support his opinions. (*Id.*).  Siemens avers, and Dr. Kosstrin acknowledged, that the expert opinions are predicated upon Dr. Kosstrin's "observations concerning documentation about a different plant in China where a different Siemens customer (Shenhua Ningxia Coal Industry Group ("**Shenhua**")) used gasifiers to process different coal using different fuel gas to produce a different product . . ." (*Id.*). Siemens emphasizes that the coal used in the China project was outside the

design specifications that Siemens provided for the project, which is not taken into consideration by Dr. Kosstrin. (*Id.*)

      1.    *Methodology*

Dr. Kosstrin did not perform any testing on the Secure equipment, because it was never installed. (Doc. 150-3, 77:6–9). Dr. Kosstrin did not conduct any computer modeling or simulations of the Secure equipment's performance (*Id.* at 77:14–18), and he did not communicate with anyone involved in the NCPP plant to determine why they made changes to the equipment. (Doc. 185, p. 63:21–25). In Appendix 2 — Design Basis, the contract between Secure and Siemens provides the specifications for coal to be used during gasification, including the particle size distribution, moisture content, temperature of pulverized coal, and the content of oxygen in coal transport gas from Battery Limits. (Doc. 150-5, p. 45, Bates SECURE 000978). "The coal to be used in the Plant shall be free from iron and non-iron metals and contaminants with the exception of those stated in the table below under 'Ash composition Analysis'. The dried coal shall be provided by Purchaser and shall meet the" specifications. (*Id.*). The contract further cautions that "[t]he plant design and all calculations 'shall' be based on the feedstock composition as listed below." (*Id.*). This caution is followed by a table detailing the moisture, ash, volatile matter, fixed carbon, hydrogen, nitrogen, sulphur, oxygen, and chlorine of the guaranteed coal. (*Id.*).

The contract includes the following disclaimer: "Operating the plant with coal that does not meet the Fuel Specifications shall void Siemens' Warranties and Performance Guarantees." (*Id.* at p. 46, Bates SECURE 000980). Dr. Kosstrin acknowledges in deposition that the coal used in the China plant was outside the range specified by

Siemens. (Doc. 150-3, p. 71:15–72:4). Yet, Dr. Kosstrin's expert report contains "no opinions on how the coal at the NCPP plant compared to the design coal for the Secure project." (Id. at 77:2–5). In deposition, Dr. Kosstrin admits that in preparing for his expert opinions, he "did have the information that the coal [at NCPP] had certain characteristics which claimed to cause problems." (*Id.* at 56:15–22). However, his report does not address the impact of the coal characteristics on the operation of the NCPP plant. When asked if the NCPP plant used the coal it was designed for, Dr. Kosstrin replies: "I can't tell you that because we don't have any data to say what they used — what they used at any particular time." (*Id.* at 71:15–24).

While Dr. Kosstrin cites generally to Plaintiff's Exhibit 69-2 in support of his opinion that the BEDP delivered to Secure by Siemens required substantial revisions, his expert report does not comment upon the following statements included in Siemens' draft letter to Texas Clean Energy Project ("**TCEP**")[6]:

> TCEP will use coal that has 10% lower ash content then the SNCG coal. The Cordero Rojo coal is higher quality coal compared to the Ningxia project. The TCEP coal is better quality than the Ningxia coal in many aspects, including sulfur, ash content and other constituents . . . Based on this, Siemens view is there is no reason to believe, nor any correlation or conclusion one can make, that infers the TCEP operation will be compromised by the feedstock quality.

> It is important to understand that Siemens designed the gasifiers for SNCG under the assumption that the coal quality used for commissioning, testing and operation would be the same coal as specified in the Siemens contract. This was not the case.

> … Siemens has described operational issues associated with the higher ash content using the current SNCG coal. This

---

[6]   TCEP was a prospective Siemens' customer for gasification equipment to whom Siemens prepared a letter regarding the issues experienced at the SNCG (NCPP) project.

> higher ash content caused a higher dust concentration in the
> syngas and affected the performance of the CO shift. … In
> summary Siemens and Summit believe that TCEP coal is of a
> higher quality than used by SNCG, and there is no reason to
> believe the TCEP coal will cause any unusual operating
> characteristics.

(Doc. 158-7, pp. 6–7)

Dr. Kosstrin also reviewed Plaintiff's Exhibit 75 (SIEMENS_EN_011372-77) (Doc.

158-8, pp. 1–2) consisting of minutes of a meeting attended by Secure, Siemens, SK E&C

USA, and others, on October 31, 2012, concerning questions from the EPC wherein

Siemens states:

> [T]hey [Siemens] may be making some changes to their
> Project Design Package (PDP) as a result of using the
> alternate coal to the gasifier. These changes could affect the
> following Siemens systems:
>
> a.    Black water quantity and pipe sizes.
>
> b.    Soot removal system.
>
> c.    Small valves in the fuel system.
>
> d.    Remove small tank in black water treatment.
>
> e.    Add a 6.5 $m^3$ vessel; delete scrubber and a partial
>        condenser.

These documents support the language contained in the contract between Secure

and Siemens emphasizing the significance of using specification-conforming coal to the

successful operation and design of the gasification equipment.[7] Dr. Kosstrin uses the

NCPP plant as the "laboratory"; that is, a substantial similar plant, in laying the foundation

---

[7]    These records also contradict Plaintiff's assertion at the Daubert hearing that "there is
        not one scintilla of evidence that the coal being out of spec was a problem." (Doc. 185,
        p. 42:15–16).

for his opinions without analyzing the impact of the use of non-conforming coal by NCPP.[8]

Dr. Kosstrin did not "do any comparisons of the data that was available as to the coal that was used and the design coal at the NCPP plant," because his attorney did not provide him with that data until the day before his deposition. (Doc. 150-3, p. 72:17–25). Similarly, Dr. Kosstrin saw for the first time the day before his expert deposition data that clearly shows "the ash content was higher than expected." (*Id.* at 228:23–229:11). He acknowledged at deposition that increased ash in the coal feedstock will lead to increased dust loading on the burner, "depend[ing] on how much of the coal dust gets slagged." (*Id.* at 104:4–8). Dr. Kosstrin lacked the opportunity to analyze that data, since it came into his possession the day previous. (*Id.* at 228:23–229:11). For the same reason, Dr. Kosstrin was unable to determine whether the coal conversion experienced at the NCPP plant satisfied the performance guarantees that Siemens made to SNCG. (*Id.* at 88:24–89:10). Also absent from Dr. Kosstrin's expert report is the conclusion, offered at deposition, that "the Chinese . . . found that low moisture contents made the feed system easier to operate." (*Id.* at 92:19–24). Therefore, without possessing or analyzing all the relevant data, Dr. Kosstrin concludes that performance issues and corrective measures necessitated at the NCPP plant would, as a matter of course, arise during the operation of Secure's hypothetical gasification plant. Furthermore, while Dr. Kosstrin opines that the corrective measures undertaken in China rendered the Siemens gasification technology "not viable" (Doc. 150-2, p. 10), he did not conduct an individual cost analysis for the

---

[8] Dr. Kosstrin's report "contains no analysis of the effect of consistently using coal that was within the design basis for the NCPP project on the Venturi scrubbers." (Doc. 150-3, p. 107:4–8).

hypothetical corrective measures. (Doc. 150-3, p. 105:3–9). That is, he cannot say whether the modifications are inexpensive or prohibitive.

Dr. Kosstrin also acknowledges that the minimum load case for the NCPP project was 60 percent. (*Id.* at 90:4–10). He knew that "the Chinese operators ran the gasifier — a gasifier, maybe more than one of the gasifiers at below minimum load." (*Id.* at 91:6–10). However, Dr. Kosstrin did not perform an analysis to determine whether NCPP was complying with the minimum load case, or the impact on operations. (*Id.* at 90:11–16). Counsel for Siemens established that Dr. Kosstrin "did not conduct any independent root cause analysis as to any of the issues [he] identified in [his] report." (*Id.* at 89:11–25). Siemens pressed this point in deposition by asking Dr. Kosstrin if he conducted an analysis for his opinion that "unless an increase to the volume of the gasifier reaction chamber is made in the Secure gasification equipment it will not be able to achieve 260,000 units of guaranteed syngas output." (*Id.* at 118:17–24). Dr. Kosstrin replies, "there's no analysis given in the report [as to how the volume of the gasifier reaction chamber affects the syngas output of the gasifier] . . ." (*Id.* at 119:1–7). Siemens asks if "the same is true with respect to all of the defects identified in your report." (*Id.* at 119:8–19). And Dr. Kosstrin concedes that "I will grant you I did not provide an analysis." (*Id.*).

It is clear from Dr. Kosstrin's expert report and his deposition that he also did not consider alternative designs that Siemens should have employed. (Doc. 150-2, generally; Doc. 150-3, pp. 78:8–79:5). Finally, Dr. Kosstrin opines that the BEDP delivered by Siemens to Secure had material design defects (Doc. 150-3, p. 70:20–23), but he fails to compare the Secure BEDP to any other BEDP for coal gasification. (*Id.* at 78:2–7). His opinion that the BEDP was defective is based upon the NCPP plant.

Siemen's expert in gasification equipment, Stephen Jenkins, reviewed the BEDP provided to Secure and compared it to other BEDPs for coal gasification plants and the BEDP Siemens developed for Summit Power's TCEP. (Doc. 147-1, p. 42). Mr. Jenkins lists the contents of the Secure BEDP and opines that it meets or exceeds industry standards. (*Id.* at p. 44). Mr. Jenkins also notes that Dr. Kosstrin prepared an Independent Engineer's Report for the Secure project in 2009, assessing the technology, the primary systems and equipment, and the scale up of the equipment. (*Id.* at p. 48). Dr. Kosstrin opined in his earlier report that "[t]he several technologies that are proposed to be incorporated into the [Secure] Facility are sound and proven technologies to produce SNG, argon and sulfur." (*Id.* at pp. 48–49). The about-face in Dr. Kosstrin's opinions is based upon the NCPP plant.

Plaintiff places great stock in an email from Rolf Ruesseler, Director Sales, Fuel Gasification Technology, dated October 18, 2012, in which he writes: "The message to Jack and Lars [Secure] is, forget everything you've got from Siemens so far, scrap the equipment, we'll start all over again." (Doc. 158-9, p. 2). However, this email comes approximately five years after Siemens sold the equipment to Secure and in the context of a significant project change by Secure both as to the location and coal, necessitating changes to the media and other process parameters. (*Id.*). The second such email is dated May 15, 2014, and by this time Mr. Ruesseler opines that "[t]he control system is outdated and should at best be sold to the scrap dealer." (Doc. 158-10). Unsurprisingly, technology has changed in the intervening seven-year period. This is hardly an indictment of the technology and BEDP sold by Siemens on December 24, 2007. Neither of these emails are a smoking gun whereby Siemens admits to design defects.

2.    *Application of Daubert*

Dr. Kosstrin's opinions concerning the "material design defects" in both the equipment and BEDP are unreliable.[9] While the gasification equipment sold by Siemens for the NCPP project and to Secure are "essentially similar" (Doc. 150-2, p. 4), and the burners are identical to the NCPP burners (*Id.*), this is simply not enough to support Dr. Kosstrin's expert opinions. Dr. Kosstrin's expert report is devoid of analysis aside from citing operational problems experienced in China. He readily admits that he never inspected the equipment in China, never operated the equipment sold to Secure which continues to sit under a nitrogen blanket (Doc. 185, p. 44:16–19), did not perform computer modeling or simulation to support his opinions, and failed to conduct a root cause analysis. Dr. Kosstrin freely admits at deposition that he does not provide an analysis in support of his defect theories. Dr. Kosstrin's opinions therefore rest upon his experience and documents related to the NCPP project, and correspondence addressing lessons learned in China—a plant operated contrary to design specifications.

More concerning is what Dr. Kosstrin lacked in forming his opinions. Until the day prior to his expert deposition, Dr. Kosstrin did not have the data regarding the coal used at NCPP as compared to the design coal.[10] He also lacked the data regarding ash content in the coal used at NCPP, although he acknowledges that ash content can adversely affect the burner performance. Dr. Kosstrin knew that Chinese operators ran the gasifiers below the minimum load specified by Siemens, but he performed no analysis of the impact

---

[9]    Defendant does not challenge Dr. Kosstrin's qualifications to render opinions as to the equipment or the BEDP. Siemens' challenge to these opinions is confined to the absence of a reliable methodology.

[10]    Siemens produced this data on December 13, 2017. (Doc. 135-4).

of those operational decisions. Similarly, Dr. Kosstrin knew the coal used at NCPP plant was non-conforming and caused problems with the operation of the plant, but he failed to analyze the scope of this operational choice as a causative factor in the difficulties experienced at the NCPP plant. The importance of using conforming coal feedstock is abundantly clear from the warranty contained in Appendix 2 of the Contract. In short, Dr. Kosstrin's opinions as to the technology and the BEDP sold by Siemens to Secure are unsupported by a reliable methodology, and rest primarily on the *ipse dixit* of the expert.

While Dr. Kosstrin possesses relevant experience in the field of gasification, his experience is not reliably applied to the facts of this case, because the NCPP plant is not substantially similar in its operation to the gasification plant designed by Siemens for use by Secure in Illinois. *Hessen v. Jaguar Cars*, 915 F.2d 641 (11th Cir. 1990) (substantial similarity requires the comparison to be not remote in time and essentially the same as the incident in dispute). The NCPP plant is not essentially the same as the hypothetical Secure plant, because the Chinese operators failed to follow the design specifications.[11] Due to the deficiencies in Dr. Kosstrin's analysis, including having not been provided relevant data until the day prior to his expert deposition, his opinions concerning the BEDP and technology sold to Secure shall be excluded.

### B.    Inability to Finance the Secure Project

Siemens does not contest the accuracy of Dr. Kosstrin's statement that Secure needed an EPC contract with a fixed price, guaranteed schedule, and process guarantees

---

[11] The Court also notes that Dr. Kosstrin's report purports to rely upon 178 source documents (Doc. 158-1, Exhibit A), but his report only discusses a small sub-set of these source materials. An expert may not simply submit voluminous records in lieu of a summary. *Kondragunta v. Ace Doran Hauling & Rigging Co.*, No. 1:11-cv-01094-JEC, 2013 WL 1189493, at *6 (N.D. Ga., Mar. 21, 2013).

to obtain financing. (Doc. 158-1, p. 10). The *Daubert* challenge focuses upon Dr. Kosstrin's opinion that "the operation of the NCPP plant and the required fixes established that the equipment and technology provided to Secure was not viable, thus making it impossible for Secure to obtain project financing for its contemplated facility." (*Id.*). This opinion is predicated upon the faulty comparison of the NCPP plant to the hypothetical Secure facility. Because Dr. Kosstrin's opinions regarding the technology and BEDP sold to Secure by Siemens are unreliable, his opinion that those design defects rendered the equipment and BEDP "not viable" fail to survive scrutiny under *Daubert*.

To the extent that Dr. Kosstrin opines that Siemens was incapable of performing under the 2012 Service Agreement, because Siemens left the gasification market, this assumption is incorrect. The parties stipulated that "[o]n February 2, 2016, Siemens informed Secure that Siemens would be closing the fuel gasification division of its business [,and on] February 17, 2016, Siemens informed Secure that Siemens will not violate any contractual obligation by its strategic exit from the coal gasification business." (Doc. 169, p. 20, ¶¶ 8, 10). Siemens ultimately closed its coal gasification division in May 2018. (*Id.* at ¶ 16). Hence, this opinion is unreliable and demonstrably incorrect.

## C.    Value of Gasifiers

Dr. Kosstrin opines the gasifiers only have scrap value. (Doc. 150-2, p. 12). This opinion rests solely upon Dr. Kosstrin's conclusion that the defects in the BEDP and technology prevented Secure from obtaining financing, thereby reducing the value of the equipment to scrap value. (*Id.*). Dr. Kosstrin is not a certified appraiser. (Doc. 150-3, p. 13:4–6). He has never performed an appraisal analysis. (*Id.* at 13:17–22).  Accordingly, Dr. Kosstrin lacks the requisite qualifications to testify as an expert on the issue of the

appraised value of the subject equipment. To the extent Dr. Kosstrin's valuation opinion rests upon his opinion that the technology and BEDP are not viable due to the experiences at the NCPP plant, the Court has rejected that methodology as unreliable. Therefore, the valuation opinion cannot stand upon that foundation.[12]

## V.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Siemens' Motion to Exclude the Opinions and Testimony of Dr. Kosstrin (Doc. 150) is **GRANTED**.

**DONE AND ORDERED** in Orlando, Florida on June 7, 2019.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[12] As Dr. Kosstrin volunteered in deposition, Secure is the only client he has ever represented who purchased gasifiers before securing an EPC contractor and financing. Dr. Kosstrin attempts to place the cart before the horse by blaming the experiences at the Chinese plant with a lack of funding for the Secure plant. Had Secure followed industry standards, funding would have been in place prior to the purchase of the gasifiers.