# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

MIDAMERICA C2L INCORPORATED
and SECURE ENERGY, INC.,

          Plaintiffs,

v.                                    Case No:  6:17-cv-171-Orl-40LRH

SIEMENS ENERGY, INC.,

          Defendant.

_____/

## ORDER

This cause is before the Court on Plaintiff's Motion to Exclude Certain Testimony of Defendant's Expert Witness Stephen D. Jenkins. (Doc. 147). Defendant Siemens Energy, Inc., filed a Response in Opposition (Doc. 156), and the matter is now ripe. Having reviewed the pleadings and related submissions, and with the benefit of oral argument, Plaintiff's motion is due to be denied.[1]

## I.    BACKGROUND

This lawsuit arises out of a contract dispute between Plaintiffs, Secure Energy, Inc. ("**Secure**"), and its subsidiary, MidAmerica C2L, Inc. ("**C2L**"), and Defendant, Siemens Energy, Inc. ("**Siemens**"). (Doc. 63, ¶¶ 5–8). On December 24, 2007, Secure and Siemens executed a contract (the "**2007 Contract**") requiring Siemens to sell certain equipment to Secure for use at a coal gasification plant located in Decatur, Illinois, where

---

[1]    The Court invited the parties to present testimony from their respective expert witnesses; however, neither party availed themselves of this opportunity. (Doc. 168). Accordingly, the Court's *Daubert* review of the expert witnesses is limited to their Rule 26 expert reports and deposition testimony.

Secure planned to operate an industrial facility for the conversion of coal into natural gas. (*Id.* ¶¶ 5, 8). Secure paid Siemens approximately $40 million for the equipment. (*Id.* ¶ 10). On March 31, 2010, Secure and Siemens executed a contract stating that both parties had fulfilled their obligations to each other under the 2007 Contract ("**2010 Completion Agreement**"). (*Id.* ¶ 11). On the same day, Secure and Siemens entered into a License and Service Agreement ("**2010 License Agreement**") whereby Siemens granted Secure a license to use certain of its patented technologies for the development, construction, and operation of the Decatur, Illinois, coal gasification plant. (*Id.* ¶ 12).

On July 18, 2012, the 2010 License Agreement was terminated by mutual agreement, and, on the same day, C2L and Siemens entered into a new License and Service Agreement ("**2012 License Agreement**") whereby Siemens granted C2L a license to use certain of its technologies for a coal gasification plant in West Paducah, Kentucky, where C2L would convert coal into methanol.[2] (*Id.* ¶ 16). In both the 2010 and 2012 License Agreements, Siemens agreed to provide technology, engineering services, technical field assistance, training, and performance guarantees relating to the Equipment conveyed in the 2007 Contract in exchange for a license fee. (*Id.* ¶¶ 12–13, 16–17). The 2007 Contract, as well as both License Agreements, guaranteed the Equipment would meet certain performance standards. (*Id.* ¶ 18).

---

[2]  Secure's attempt to operate a coal gasification plant in Decatur, Illinois, did not come to fruition, and in July 2012, Secure's focus turned to the operation of a plant in West Paducah, Kentucky, to convert coal into methanol. (*Id.* ¶ 16). Plaintiff also attempted to employ coal gasification to manufacture gasoline and fertilizer. The Kentucky plant never materialized.

## A.    Design Defects Alleged in the Amended Complaint

Secure avers that Siemens became aware of material design defects in the equipment sold to Secure at some time between October 31, 2010, and September 2011, "based on the experience of a plant in China that used identical" equipment. (Id. ¶ 14). Secure argues that the design defects in the equipment and technology prevented Secure obtaining an Engineering, Procurement, and Construction ("**EPC**") contractor which is a prerequisite to obtaining financing. Siemens has counter-sued Secure for breach of contract arising from Secure's failure to render payment for the License and Service Agreement as required. (Doc. 75, pp. 20–21). The Complaint identifies the following design defects:

> a.    The burners are improperly engineered and designed;
>
> b.    The design of the raw gas (syngas) outlet and the black water outlet is defective because the level of the black water will rise above the raw syngas outlet and prevent syngas from exiting the gasifier, greatly increasing the risk of catastrophic explosion;
>
> c.    The Basic Engineering Design Package (BEDP) is defective and needs to be modified to make changes to multiple components, including, but not limited to, the coal handling system, the slag handling system, piping design, valve design, the syngas cleaning system, and the black water system; and
>
> d.    Siemens' design of the Fuel Measurement System is defective and does not work.

(Doc. 63, at ¶¶ 14, 33, 40, 82)

## B.    Design Defects Identified by Dr. Kosstrin

Plaintiff's gasification expert, Dr. Kosstrin, submitted an expert report and deposition testimony wherein he opines that "the equipment and BEDP delivered by Siemens to C2L [Secure] had material design defects and the equipment delivered to

Secure in 2009 required significant modifications and a new burner in order for the TBL

[technology or technology battery limits] to operate as intended." (*Id.* at p. 2). He also

concludes that the "BEDP delivered to Secure in February 2009 required substantial

revision and Siemens did not know all revisions that could be required. Furthermore, each

item of the equipment delivered to Secure in 2009 needed replacement or significant

modification, some of which could not have been implemented." (*Id.* at p. 8). These

opinions are based upon information concerning the NCPP plant's operation. (*Id.* at pp.

2, 8).[3]

Dr. Kosstrin identified several alleged material design defects reported by NCPP

which he contends prevented the equipment from meeting the specifications and which

prevented Secure from obtaining financing for its proposed gasification plant. (Doc. 150-

2, pp. 5–7, 10).

## C.     *Daubert* Challenge to Dr. Kosstrin's Opinions

Dr. Kosstrin's material design defect opinions are based on a "review of exhibits

and information concerning the NCPP plant's operations up to the signing of the 2012

License Agreement." (*Id.* at p. 4). Accordingly, Dr. Kosstrin's opinions concerning how the

Secure gasification equipment would function, had it ever been placed into operation, is

premised upon issues experienced at the plant in China. (Doc. 150-3, Kosstrin depo

57:20–58:15). The Court granted Siemens' *Daubert* challenge as to all of Dr. Kosstrin's

opinion testimony. It is within this context that Plaintiffs *Daubert* challenge of Mr. Jenkins

---

[3]     As more fully discussed in this Court's Order granting Siemens' *Daubert* challenge
against Dr. Kosstrin, Siemens sold gasification technology and a BEDP to NCPP
which is a Chinese plant. (Doc. 188).

must be viewed. (*see* Doc. 188 for a detailed discussion of the Court's *Daubert* analysis and ruling).

### D.     Mr. Stephen Jenkins' Opinions

Mr. Jenkins' expert report is 85 pages long, and on page 4 there is a summary of his opinions. (Doc. 147-1).  Mr. Jenkins opines that (1) the BEDP and equipment sold by Siemens to Secure was state-of-the-art and would have worked for its intended purpose; (2) the BEDP and equipment were bankable and Secure's difficulty in obtaining financing was due to their inexperience, inadequate planning, and changing market conditions; (3) the issues encountered at NCPP do not support Kosstrin's design defect theories, and (4) there is no evidence of defects in the BEDP or the equipment. (*Id.* at pp. 4–5; 41–65). Mr. Jenkins also provides a "History of Gasification Technology and its Implementation" in his report. (*Id.* at pp. 6–37).

Secure argues that (1) Mr. Jenkins' History of Gasification is irrelevant (Doc. 147, p. 4); (2) Mr. Jenkins' opinions that Secure failed to take the necessary steps to obtain financing are irrelevant (*Id.* at p. 6); and (3) Mr. Jenkins' rebuttal report must be excluded because he failed to address the facts in this matter. (*Id.* at p. 9).

## II.     THE *DAUBERT* ANALYSIS

The Federal Rules of Evidence allow a witness who is qualified as an expert because of his "knowledge, skill, expertise, training, or education" to offer opinion testimony where certain requirements are satisfied. Fed. R. Evid. 702. Under Rule 702 and the United States Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), district courts act as "gatekeepers" to "ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that

accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005), cert. denied, 546 U.S. 935 (2005) (internal quotation marks omitted). To do this, district courts must engage in a rigorous three-part inquiry, which requires the court to ask whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* at 1291–92 (internal quotation marks omitted).

In evaluating the reliability of a method as required by *Daubert*, the Supreme Court suggests that a trial court consider certain factors, including: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community. See *Daubert*, 509 U.S. at 593–94. These factors are not exhaustive, and the Eleventh Circuit has also considered whether an expert relied on anecdotal evidence such as case reports, temporal proximity, and improper extrapolation. See *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). The Court's inquiry under Rule 702 must focus on the methodology, not conclusions, but the Court is not required to admit opinion testimony only connected to existing data by an expert's unsupported assertion. *See Daubert*, 509 U.S. at 595; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"Of particular relevance to an expert proffered for his experience, the court notes that neither Daubert nor its progeny preclude experience-based testimony…" *Butler v.*

*First Acceptance Ins. Co., Inc.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. Aug. 17, 2009) (quoting *Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999)). Additionally, an expert is permitted to form conclusions by extrapolating from existing data. *Id.* (quoting *Joiner*, 522 U.S. at 146). However, "[a]n expert's opinion becomes inadmissible…where it is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 1271-72 (italics in original) (quoting *Joiner*, 522 U.S. at 146); *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005). When an expert relies primarily on experience, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* at 1272 (quoting *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004)). This is because "[a]n expert's qualification and experience alone are not sufficient to render his opinions reliable," and expert testimony that is nothing more than what lawyers can argue in closing does not help the trier of fact. *Id.*

In forming the basis of his opinion, an expert may rely on "facts or data in the case that the expert has been made aware of or personally observed."[4] Fed. R. Evid. 703. To that end, the facts or data on which an expert forms his opinion need not be admissible for his opinion to be admitted as long as these facts and data are of the type that experts in his field normally rely upon in forming an opinion on the subject at hand. *Id.* However, an expert witness may not disclose otherwise inadmissible facts or data to the jury unless

---

[4] Pursuant to Fed. R. Civ. Pro. 26(a)(2)(B)(i), the expert's report must contain a "complete statement of all opinions the witness will express and the basis and reasons for them. An expert may not simply submit voluminous records in lieu of a summary. *Kondragunta v. Ace Doran Hauling & Rigging Co.*, No. 1:11-cv-01094-JEC, 2013 WL 1189493, at *6 (N.D. Ga., Mar. 21, 2013).

the probative value of the information substantially outweighs any prejudicial effect. *Id.* Finally, an expert's opinion is not inadmissible simply because the expert opines on an ultimate issue in the case. Fed. R. Evid. 704(a).

In determining the admissibility of expert evidence, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Rosenfield v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation marks omitted). Indeed, cross-examination, contrary evidence, and instruction on the burden of proof are the proper tools for challenging questionable expert evidence. *Id.* It is ultimately the burden of the party who offers the expert to show that his opinion is admissible, and the party must do so by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

## III. DISCUSSION

Plaintiff does not contest Mr. Jenkins qualifications as an expert in the gasification industry, because Mr. Jenkins is in fact highly qualified to render expert opinions in this field. Mr. Jenkins is the Principal of Energy & Chemicals Consulting, LLC. (Doc. 147-1, p. 1). He has 43 years of experience in the process chemical plant and power generating industries, including 26 years of direct, hands-on experience in the coal gasification industry. (*Id.*). Since 1992, Mr. Jenkins has worked on a wide variety of gasification projects, and he holds a B.S in Chemical Engineering. (*Id.*). His consulting firm provides engineering and technical services to the worldwide gasification industry. (*Id.*). In short, Mr. Jenkins is an expert.

The parties agree that the gasification industry is complex, and the technology and BEDPs sold to consumers like Secure are not "off-the-shelf." Each system is uniquely

designed for specific applications and there is a start-up process often involving troubleshooting. (Doc. 185, p. 91:1–8). Mr. Jenkins possesses the scientific education, training, and experience to allow him to provide a history of the gasification industry. Such testimony will assist the trier of fact to understand the how gasification plants, and the related technology, is designed, constructed, commissioned, and operated. The Court advised the parties at the *Daubert* hearing that Mr. Jenkins' expert testimony concerning the history of the gasification industry is relevant and helpful to the jury. (*Id.* at p. 91:18–20). The Court will limit the scope of Mr. Jenkins historical overview to a reasonable length, as discussed during the hearing, closer to trial. Accordingly, Plaintiff's challenged to Mr. Jenkins' historical expert testimony is denied.

Plaintiff next challenges Mr. Jenkins' expert testimony that:

> Any problems that Secure had with financing its projects are not attributable to Siemens' technology but instead were caused by Secure's inadequate plans and lack of experience in the planning, development, engineering and contracting for large-scale coal gasification plants, plus changing market conditions for coal gasification projects.

(Doc. 147, Appendix A, p. 4). On the record before the Court it appears that Plaintiff's challenge to Mr. Jenkins' testimony concerning Secure's inability to obtain financing is moot. Dr. Kosstrin is the only witness offering testimony on how the alleged material design defects in the technology and BEDP rendered it "not viable," thereby depriving Secure of the ability to secure an EPC contractor and financing. (Doc. 188). Mr. Jenkins' expert opinions on this subject appear under the section of his report entitled "Rebuttal to Dr. Kosstrin's Opinions." (Doc. 147-1, pp. ii, 55). Since Dr. Kosstrin's opinions have been

excluded, Mr. Jenkins has nothing to rebut. Accordingly, Plaintiff's *Daubert* challenged to Mr. Jenkins' opinions on this subject is denied as moot.[5]

Similarly, Plaintiff's motion to exclude Mr. Jenkins' rebuttal opinions concerning Dr. Kosstrin's opinions is now moot. (Doc. 147, pp. 9–12). Secure argues that Mr. Jenkins did not consider certain facts, circumstances, or events that took place at the Chinese plant in reaching his rebuttal opinions. (*Id.*). All of Mr. Jenkins' opinions in this section of his report are offered to rebut Dr. Kosstrin's "claims that Siemens' BEDP and Equipment contained material design defects or required substantial repairs" based on the NCPP plant. (Doc. 147-1, p. 45). Since Secure no longer has an expert witness who can compare the NCPP experience to a hypothetical gasification plant operated by Secure, the challenge to Mr. Jenkins' rebuttal opinions is moot.

## IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Secure's Motion to Exclude the Opinions and Testimony of Mr. Jenkins (Doc. 147) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on June 7, 2019.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[5]    In the event Plaintiff's Rule 26 disclosures identifies other witnesses who may offer testimony on how the BEDP and technology sold by Siemens impacted their ability to obtain financing, the Court will address the merits of this argument. However, Mr. Jenkins' opinions are in rebuttal to a now excluded expert.