**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

MIDAMERICA C2L INCORPORATED
and SECURE ENERGY, INC.,

        Plaintiffs,

v.                                                Case No: 6:17-cv-171-Orl-40LRH

SIEMENS ENERGY, INC.,

        Defendant.
                                           /

## ORDER

This cause is before the Court on Plaintiff's Motion to Exclude Certain Testimony of Defendant's Expert Witness Dr. John Williams. (Doc. 148). Defendant Siemens Energy, Inc., filed a Response in Opposition (Doc. 157), and the matter is now ripe. Having reviewed the pleadings and related submissions, and with the benefit of oral argument, Plaintiff's motion is due to be denied.[1]

**I. BACKGROUND**

This lawsuit arises out of a contract dispute between Plaintiffs, Secure Energy, Inc. ("**Secure**"), and its subsidiary, MidAmerica C2L, Inc. ("**C2L**"), and Defendant, Siemens Energy, Inc. ("**Siemens**"). (Doc. 63, ¶¶ 5–8). On December 24, 2007, Secure and Siemens executed a contract (the "**2007 Contract**") requiring Siemens to sell certain equipment to Secure for use at a coal gasification plant located in Decatur, Illinois, where

---

[1] The Court invited the parties to present testimony from their respective expert witnesses; however, neither party availed themselves of this opportunity. (Doc. 168). Accordingly, the Court's *Daubert* review of the expert witnesses is limited to their Rule 26 expert reports and deposition testimony.

Secure planned to operate an industrial facility for the conversion of coal into natural gas. (*Id.* ¶¶ 5, 8). Secure paid Siemens approximately $40 million for the equipment. (*Id.* ¶ 10). On March 31, 2010, Secure and Siemens executed a contract stating that both parties had fulfilled their obligations to each other under the 2007 Contract ("**2010 Completion Agreement**"). (*Id.* ¶ 11). On the same day, Secure and Siemens entered into a License and Service Agreement ("**2010 License Agreement**") whereby Siemens granted Secure a license to use certain of its patented technologies for the development, construction, and operation of the Decatur, Illinois, coal gasification plant. (*Id.* ¶ 12).

On July 18, 2012, the 2010 License Agreement was terminated by mutual agreement, and, on the same day, C2L and Siemens entered into a new License and Service Agreement ("**2012 License Agreement**") whereby Siemens granted C2L a license to use certain of its technologies for a coal gasification plant in West Paducah, Kentucky, where C2L would convert coal into methanol.[2] (*Id.* ¶ 16). In both the 2010 and 2012 License Agreements, Siemens agreed to provide technology, engineering services, technical field assistance, training, and performance guarantees relating to the Equipment conveyed in the 2007 Contract in exchange for a license fee. (*Id.* ¶¶ 12–13, 16–17). The 2007 Contract, as well as both License Agreements, guaranteed the Equipment would meet certain performance standards. (*Id.* ¶ 18).

---

[2]   Secure's attempt to operate a coal gasification plant in Decatur, Illinois, did not come to fruition, and in July 2012, Secure's focus turned to the operation of a plant in West Paducah, Kentucky to convert coal into methanol. (*Id.* ¶ 16). Plaintiff also attempted to employ coal gasification to manufacture gasoline and fertilizer. The Kentucky plant never materialized.

### A. Design Defects Alleged in the Amended Complaint

Secure avers that Siemens became aware of material design defects in the equipment sold to Secure at some time between October 31, 2010, and September 2011, "based on the experience of a plant in China that used identical" equipment. (*Id.* ¶ 14). Secure argues that the design defects in the equipment and technology prevented Secure obtaining an Engineering, Procurement, and Construction ("**EPC**") contractor which is a prerequisite to obtaining financing. Siemens has counter-sued Secure for breach of contract arising from Secure's failure to render payment for the License and Service Agreement as required. (Doc. 75, pp. 20–21). The Complaint identifies the following design defects:

> a. The burners are improperly engineered and designed;
>
> b. The design of the raw gas (syngas) outlet and the black water outlet is defective because the level of the black water will rise above the raw syngas outlet and prevent syngas from exiting the gasifier, greatly increasing the risk of catastrophic explosion;
>
> c. The Basic Engineering Design Package ("**BEDP**") is defective and needs to be modified to make changes to multiple components, including, but not limited to, the coal handling system, the slag handling system, piping design, valve design, the syngas cleaning system, and the black water system; and
>
> d. Siemens' design of the Fuel Measurement System is defective and does not work.

(Doc. 63, ¶¶ 14, 33, 40, 82)

### B. Design Defects Identified by Dr. Kosstrin

Plaintiff's gasification expert, Dr. Kosstrin, submitted an expert report and deposition testimony wherein he opines that "the equipment and BEDP delivered by Siemens to C2L [Secure] had material design defects and the equipment delivered to

3

Secure in 2009 required significant modifications and a new burner in order for the TBL [technology or technology battery limits] to operate as intended." (*Id.* at p. 2). He also concludes that the "BEDP delivered to Secure in February 2009 required substantial revision and Siemens did not know all revisions that could be required. Furthermore, each item of the equipment delivered to Secure in 2009 needed replacement or significant modification, some of which could not have been implemented." (*Id.* at p. 8). These opinions are based upon information concerning the NCPP plant's operation. (*Id.* at pp. 2, 8).[3]

Dr. Kosstrin identified several alleged material design defects reported by NCPP which he contends prevented the equipment from meeting the specifications and which prevented Secure from obtaining financing for its proposed gasification plant. (Doc. 150-2, pp. 5–7, 10).

### C.    *Daubert* Challenge to Dr. Kosstrin's Opinions

Dr. Kosstrin's material design defect opinions are based on a "review of exhibits and information concerning the NCPP plant's operations up to the signing of the 2012 License Agreement." (*Id.* at p. 4). Accordingly, Dr. Kosstrin's opinions concerning how the Secure gasification equipment would function, had it ever been placed into operation, is premised upon issues experienced at the plant in China. (Doc. 150-3, Kosstrin depo 57:20–58:15). The Court granted Siemens' *Daubert* challenge to all of Dr. Kosstrin's opinion testimony. It is within this context that Plaintiffs *Daubert* challenge of Mr. Jenkins

---

[3]    As more fully discussed in this Court's Order granting Siemens' *Daubert* challenge against Dr. Kosstrin, Siemens sold gasification technology and a BEDP to NCPP which is a Chinese plant. (Doc. 188).

must be viewed. (*see* Doc. 188 for a detailed discussion of the Court's *Daubert* analysis and ruling).

### D.  Dr. Williams' Opinions

Dr. Williams' expert report is 113 pages long, and on page 5 there is a summary of his opinions. (Doc. 148-1).  Dr. Williams opines that (1) the BEDP for the Secure project is customary in breath and detail; and provides a reasonable degree of specificity; (2) there is no proof of the alleged material design defects at the NCPP project as claimed by Plaintiff's expert, Dr. Kosstrin, or in the equipment purchased by Secure; (3) the fair market value of the gasification technology is $48,143,923, $35,658,458, and $30,127,261 as calculated on February 28, 2009, July 31, 2014, and February 28, 2016; (4) there is nothing about the current state of the Siemens gasification equipment which would impede a sale of that equipment by Secure; and (5) Secure owes Siemens $13,060.320 as of April 19, 2016, if the License Agreement was terminated, and $17,828.220, if the license was not terminated. (*Id.* at p. 4). At the *Daubert* hearing, counsel for Siemens stated that Dr. Williams will not be offering opinions on why Secure failed to secure financing for their gasification plant. (Doc. 185, 120:10–18; 121:13–18). Dr. Williams' opinions will be limited to design defects, appraisal of the technology, and the value of the license. (*Id.* at 121:19–22).

Secure argues that (1) the appraisal testimony is irrelevant, because Dr. Williams bases his valuation opinion on the premise that the equipment is not defective; (2) Dr. Williams improperly attaches prejudgment interest to the value of the License

Agreement[4];   (3) Dr. Williams' opinions concerning alleged design defects are inadmissible, because he is attempting to apply engineering calculations with no known standards; (4) Dr. Williams' evaluation of the BEDP is not based on a thorough review of the substance of the BEDP; (5) Dr. Williams' opinion that the NCPP plant was substantially different and used different coal is improperly based on general engineering knowledge without reference to methods or facts; and (6) his opinion on why Secure was unable to obtain financing is speculative. (Doc. 148, pp. 5–12). As previously noted, this final opinion has been withdrawn by Siemens.

## II.   THE *DAUBERT* ANALYSIS

The Federal Rules of Evidence allow a witness who is qualified as an expert because of his "knowledge, skill, expertise, training, or education" to offer opinion testimony where certain requirements are satisfied.  Fed. R. Evid. 702. Under Rule 702 and the United States Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), district courts act as "gatekeepers" to "ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005), *cert. denied*, 546 U.S. 935 (2005) (internal quotation marks omitted). To do this, district courts must engage in a rigorous three-part inquiry, which requires the court to ask whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert

---

[4]  To the extent that Dr. Williams offers an opinion as to prejudgment interest, the parties agree this is a matter for the Court to decide post-trial. (Doc. 185, p. 118:8-17). Accordingly, the Court defers ruling upon this aspect of the *Daubert* challenge until such time as prejudgment interest becomes relevant.

reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* at 1291–92 (internal quotation marks omitted).

In evaluating the reliability of a method as required by *Daubert*, the Supreme Court suggests that a trial court consider certain factors, including: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community. See *Daubert*, 509 U.S. at 593–94. These factors are not exhaustive, and the Eleventh Circuit has also considered whether an expert relied on anecdotal evidence such as case reports, temporal proximity, and improper extrapolation. See *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir.1999). The Court's inquiry under Rule 702 must focus on the methodology, not conclusions, but the Court is not required to admit opinion testimony only connected to existing data by an expert's unsupported assertion. See *Daubert*, 509 U.S. at 595; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"Of particular relevance to an expert proffered for his experience, the court notes that neither Daubert nor its progeny preclude experience-based testimony…" *Butler v. First Acceptance Ins. Co., Inc.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. Aug. 17, 2009) (quoting *Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999)). Additionally, an expert is permitted to form conclusions by extrapolating from existing data. *Id.* (quoting *Joiner*, 522 U.S. at 146). However, "[a]n expert's opinion becomes inadmissible…where it is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 1271–72 (italics

7

in original) (quoting *Joiner*, 522 U.S. at 146); *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005). When an expert relies primarily on experience, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* at 1272 (quoting *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004)). This is because "[a]n expert's qualification and experience alone are not sufficient to render his opinions reliable," and expert testimony that is nothing more than what lawyers can argue in closing does not help the trier of fact. *Id.*

In forming the basis of his opinion, an expert may rely on "facts or data in the case that the expert has been made aware of or personally observed."[5] Fed. R. Evid. 703. To that end, the facts or data on which an expert forms his opinion need not be admissible for his opinion to be admitted as long as these facts and data are of the type that experts in his field normally rely upon in forming an opinion on the subject at hand. *Id.* However, an expert witness may not disclose otherwise inadmissible facts or data to the jury unless the probative value of the information substantially outweighs any prejudicial effect. *Id.* Finally, an expert's opinion is not inadmissible simply because the expert opines on an ultimate issue in the case. Fed. R. Evid. 704(a).

In determining the admissibility of expert evidence, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."

---

[5] Pursuant to Fed. R. Civ. Pro. 26(a)(2)(B)(i), the expert's report must contain a "complete statement of all opinions the witness will express and the basis and reasons for them. An expert may not simply submit voluminous records in lieu of a summary. *Kondragunta v. Ace Doran Hauling & Rigging Co.*, No. 1:11-cv-01094-JEC, 2013 WL 1189493, at *6 (N.D. Ga., Mar. 21, 2013).

*Rosenfield v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation marks omitted). Indeed, cross-examination, contrary evidence, and instruction on the burden of proof are the proper tools for challenging questionable expert evidence. *Id.* It is ultimately the burden of the party who offers the expert to show that his opinion is admissible, and the party must do so by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

## III.   DISCUSSION

### A.   Appraisal

Dr. Williams possesses a B.S. in Chemistry, an M.S. and Ph.D. in Chemical and Fuels Engineering, an MBA in finance, and has had a 32-year industrial career. (Doc. 148-1, Attachment D). Dr. Williams is responsible for over 20,000 machinery and equipment appraisals and has led his firm since 1995 in delivering engineering, procurement, and construction services ("**EPC**") for numerous industries. (*Id.*). His engineering experience includes gasification technologies. (*Id.*) He holds professional engineering licensure in the industry (including hands-on experience with gasification and combustion systems like the Siemens gasifiers at issue here), and active membership in five professional engineering societies, including recognition as a Fellow of the American Institute of Chemical Engineers. Dr. Williams is an Accredited Senior Appraiser in machinery and equipment valuation. (*Id.*). During the course of Williams' 32-year career as a practicing engineer plus seven years of University research, he has worked on several projects involving the coal flow technology that forms a basis of Siemens' proprietary gasification technology, including at least three different entrained flow

systems involving gasification (of either coal or biomass, another possible feedstock in a gasification system). (Doc. 157-2; Williams Depo. 55:2-58:25).

Secure does not challenge Dr. Williams' qualification to offer an expert opinion on the appraised value of the technology purchased from Siemens. Rather, the Plaintiff argues Dr. Williams' testimony is not helpful to the jury, because he fails to assess the appraised value of the equipment in a defective state. (Doc. 148, p. 5). Plaintiff also offers, without explanation, that "Dr. Williams also 'appraises' the value of the engineering services provided by Siemens to Secure, but the value is its contract price. [And] [a]nyone without specialized knowledge can read what the contract price is for the engineering services." (*Id.* at p. 6).

Plaintiff's objection to the relevance of Dr. Williams' appraisal opinions is misplaced. First, Dr. Williams reached the conclusion that the equipment and BEDP do not suffer from material design defects. (Doc. 148-1, pp. 25–27, 58–67). Accordingly, his appraisal starts from the premise that the technology and BEDP sold by Siemens to Secure are not defective. Secondly, Plaintiff will have the opportunity to cross-examine Dr. Williams (and had this opportunity in deposition) to present the hypothetical question of how a finding of material design defects impacts his appraisal. Dr. Williams has the requisite qualifications to offer expert opinions as to the appraised value of the equipment, his methodology is sound (cost and sales comparison approaches and income approach)—which is not challenged by Plaintiff, and his opinions are helpful to the jury. That Dr. Williams does not conduct an appraisal based upon a premise with which he

disagrees; that is, the presence of design defects, does not render his opinions inadmissible. Accordingly, the challenge to Dr. Williams' appraisal opinions is denied.[6]

**B.     Prejudgment Interest Opinion**

The parties and the Court agree the jury is not tasked with assessing prejudgment interest. The Court will undertake this analysis when appropriate. Accordingly, the objection to Dr. Williams' opinion concerning prejudgment interest is deferred until after trial should Defendant prevail on their counterclaim.

**C.     Rebuttal to Plaintiffs' Defect Theory**

Secure argues Dr. Williams was "disclosed as an appraisal expert." However, there is no pleading that limits the scope of Dr. Williams' opinions except for his expert report, and it does not confine Dr. Williams to appraisal opinions. Plaintiff claims Dr. Williams does not provide an engineering basis for his opinions. (Doc. 148-1, p. 10). However, it is important to recall that Dr. Williams' opinions concerning the alleged material design defects are offered in rebuttal to Plaintiff's expert, Dr. Kosstrin. (*Id.* at pp. 59–67). Since the Court granted Siemens' *Daubert* challenge and has excluded Dr. Kosstrin's testimony, Plaintiff's objection to Dr. Williams' rebuttal opinions on this point is moot.[7] While Dr. Williams' appraisal is based upon the equipment being defect-free, Plaintiff carries the

---

[6] The Court agrees with Plaintiff that the License Agreement speaks for itself; however, Dr. Williams' opinions take into consideration fees owned if the contract was terminated and where it has not been terminated. This testimony, while basic, is not readily apparent from the contract, is helpful to the jury, and is most efficiently presented by Dr. Williams in the context of his financial analysis. The testimony will be allowed.

[7] Should Plaintiff identify other witnesses disclosed pursuant to Rule 26 who can competently testify concerning the alleged design defect, the Court will revisit this motion.

11

burden of establishing a design defect to prove its damages claim. Because the Secure equipment was never placed into operation, and due to the lack of evidence that the Secure equipment was defective, Dr. Williams may properly assume the equipment is defect-free.

### D.     Evaluation of the BEDP

Dr. Williams' opinion that the BEDP supplied by Siemens was engineered to a reasonable degree of specificity for the gasification technology as contracted on December 21, 2007, is offered in response to Dr. Kosstrin's claims that the BEDP was inadequate. (*Id.* at p. 26, ¶ 5.5.0.5). For the reasons given in the preceding section, Plaintiffs' challenge to Dr. Williams' opinion regarding the BEDP is moot.

### E.     Functional Obsolescence and Evaluation of Coal Feedstock

Secure objects to Dr. Williams' methodology in section 10.2 of his expert report where he opines that the fuel stock used at the NCPP plant are a typical root cause of plant performance and operational issues. For the reasons stated in section C, infra, Plaintiffs' challenge to this opinion is moot.[8]

## IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Secure's Motion to Exclude the Opinions and Testimony of Dr. Williams (Doc. 148) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on June 7, 2019.

---

[8]   Dr. Williams' analysis of the operational coal data was thorough. This is the precise analysis that was conspicuously absent from Dr. Kosstrin's expert report.

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties