**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| **MIDAMERICA C2L INC., et al.**, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No. 6:17-CV-171-Orl-40LRH |
| **SIEMENS ENERGY, INC.**, | ) ) ) |
| Defendant. | ) ) |

**PLAINTIFFS' SUPPLEMENTAL BRIEF
IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiffs Secure Energy, Inc. and MidAmerica C2L, Inc., ("Secure") by and through counsel, pursuant to the Court's Order (Doc. 190), submit the following supplemental brief in further support of their Motion for Partial Summary Judgment (Doc. 146) and in opposition to Defendant's Motion for Summary Judgment (Doc. 149), in light of the Court's Order excluding Plaintiffs' expert witness, Dr. Herbert Kosstrin (Doc. 188).

At its core, this is a case about breach of contract and fraud. Plaintiffs allege that Siemens breached their contract with Secure and that Siemens engaged in fraudulent conduct in the course of its dealings with Secure. Whether or not Secure's expert witness testifies or his report is introduced into evidence in this case, sufficient evidence exists to entitle Secure to summary judgment in its favor, or to at least submit the evidence to a jury. In fact, Plaintiffs relied only sparingly on their expert's testimony and opinions in the summary judgment briefing, relying instead on evidence derived directly from Siemens. The evidence in this case precludes the entry of summary judgment against Secure on its contract and fraud claims and supports rescission of the parties' agreements under several theories, as set forth in greater detail in Plaintiffs' Motion for Partial Summary Judgment (Doc. 146).

As a preliminary matter, the Court must determine what state's law should be applied to each of the claims in this case. The parties have briefed this issue extensively in their respective summary judgment motions, responses, and replies, so Secure will simply reiterate that New York law should apply to its breach of contract claim against Siemens because of the choice of law clause set forth in the 2012 License & Service Agreement (Pl. Ex. 1). Secure asserts that Missouri has the most significant contacts and Florida has the second-most significant contacts when evaluating the fraud counts in the First Amended Complaint (Doc. 63).

**1.     Misrepresentations Regarding Siemens' Experience**

Siemens fraudulently misrepresented its position and experience in the coal gasification marketplace, and that of its Equipment and Technology, from the commencement of its relationship with Secure, misleading Secure to believe that the Equipment and Technology it was required to purchase was tested, proven, industry-leading, and had an actual operational history. These misrepresentations continued throughout the duration of the Chinese project, NCPP, as Siemens learned that its product did not function, despite presenting a façade to Secure that its identical Equipment and Technology would meet and achieve all performance goals.

The overwhelming evidence in this case is that Siemens misrepresented its coal gasification experience and operating history, including false and misleading representations that Siemens' SFG gasifiers were in operation since 1984 (Pl. Ex. 106 p. 4); its "proven" design started in the mid-1970s and had more than 20 years of successful operating experience at the Schwarze Pumpe plant in Germany (*Id*. at 7); touted the flexibility of its gasifiers, stating without qualification that they could accept a wide variety of feedstocks (*Id*.); highlighted its Operations and Maintenance ("OEM") support as a crucial feature of Siemens' services (*Id*.) even though Siemens' OEM team had never performed operations and maintenance on any gasification

project (Confer Dep. pp. 36:10-37:4); and represented that it utilized a burner that was tested and used on a commercial scale, even though it was never even tested (Rüsseler 30(b)(6) Dep. pp. 79:20-80:3). Siemens employees testified that Siemens' coal gasification experience was instead gained only via a 2006 purchase from a company called Sustec, a year prior to its first agreement with Secure. Prior to this acquisition, Siemens was not advancing its own gasification technology (Hannemann Dep. p. 137:3-:20), and lacked operational coal gasification experience (*Id*. at 21:22-:25). The Schwarze Pumpe plant only gasified coal from 1985-1989 (*Id*. at 135:13-:20).

Siemens' representations regarding the coal gasification burners were also contrived. Siemens did not then, and even today does not, have a 500 MWth burner in commercial use. Rather, it developed its untested single combination burner in 2006, which proved to be unreliable despite numerous generations of attempted improvements (Pl. Ex. 48), and differed vastly from the burners used Schwarze Pumpe. Ultimately, Siemens acknowledged in 2013 that its technology was a "first time application" and not "yet completely mature" (Pl. Ex. 46). This message is vastly different than Siemens conveyed while trying to land Secure as a customer.

Siemens claims to have informed customers that its 500 MWth coal gasification combined burner had never been in operation before (Hannemann Dep. p. 194:10-:19), however, it only admits to having done so by way of inferential reasoning. Siemens' Chief Technology Officer, Frank Hannemann, testified that "it was obvious" to customers that the 500 MWth combined burner had not previously been used in commercial operation "because the Schwarze Pumpe plant was smaller and used three burners" (*Id*. at 195:9-196:5). Rolf Rüsseler, head of marketing for Siemens Fuel Gasification Technology, testified that Siemens informed Secure's representatives that Siemens' SFG-500 MWth "gasifiers were an upscale of the 200-megawatt gasifiers, that they had not been tested yet in the field, and that NCPP was the first project which

would employ these gasifiers" (Rüsseler Dep. pp. 31:7-32:7). Rüsseler went so far as to testify that Secure was aware that its 500 MWth coal gasification combination burners had not been tested (Rüsseler 30(b)(6) Dep. pp. 79:20-80:8), and even claims that in 2007 he informed Secure that the burners never previously operated in a gasifier (*Id*. at 119:9-:16). This is a disputed fact.

The significance of Siemens' admission cannot be overstated. Secure was developing a $2.7 Billion facility based upon Siemens' representations that the burners were a proven technology. Siemens' misrepresentation here is extraordinary. Siemens ignored even the possibility of risk that their upscaled gasifiers and newly-designed, first of their kind burners, placed into operation without testing, would not work as intended (Rüsseler Dep. pp. 32:10-33:02; Hannemann Dep. p. 194:20-:23). The affidavits of Secure co-founders John Kenny and Lars Scott contradict the testimony of Messrs. Hannemann and Rüsseler on this point, which state that "Siemens' representatives, Rolf Rüsseler, George Lamonettin, and Harry Morehead, repeatedly represented to Secure's representatives, prior to the 2007 Contract, that all of the equipment had been used on a commercial scale. . ." (Doc. 146-1 ¶ 8); and that Siemens did not inform Secure that its 500 MWth coal gasification Equipment and Technology had never been tested (Scott Affidavit ¶ 3). Therefore, an issue of material fact exists regarding whether Siemens informed Secure that its first of its kind single combination burners were tested or used commercially prior to Secure's entry into contracts with Siemens in 2007, 2010, and 2012.

The subjects of Siemens' misrepresentations were not limited to its representations about itself, but also what it told customers and potential customers regarding NCPP's performance. For example, during a March 15, 2012, presentation Mr. Morehead informed Secure's EPC contractor, SK E&C USA, that Siemens received its Preliminary Acceptance Certificate ("PAC") in June 2011 for coal gasification equipment in use at the NCPP plant (Pl. Ex. 21, p. 7). This is

4

patently false, because, as shown by Plaintiffs' Exhibit 47, Siemens did not receive its PAC from the owner of the NCPP plant until July 10, 2013. Siemens kept perpetuating the lies, asserting at the October 2011 Gasification Technologies Conference that the NCPP plant completed a performance test run of its gasifiers in September 2011 (Pl. Ex. 29, p. 9).

**2.**     **Failure to Inform Secure of Improvements**

There remain material fact disputes as to Siemens' failure to inform Secure of all relevant Improvements to its coal gasification Equipment and Technology, in accordance with Article 5 of the 2012 License & Service Agreement (Pl. Ex. 1). This includes those issues addressed above. As of November 22, 2012, Siemens acknowledged its obligation to inform Secure of relevant Improvements in the gasification technology (Pl. Ex. 50). And yet, in late October 2012, Messrs. Rüsseler and Morehead did not discuss product modifications during a telephone conversation with Lars Scott (Pl. Ex. 51). Never, during the entirety of its business relationship with Secure did Siemens inform Secure of any of the Equipment and Technology Improvements developed and released for commercial application (see, e.g., Rüsseler 30(b)(6) Dep. pp. 53:2-:17, 67:2-69:24).

Importantly, while downplaying the significance and similarity of the NCPP plant, Siemens' response to this claim is that it invited Secure to China to view the NCPP plant and therefore evaluate its performance. Such a response tacitly admits that Secure's gasifiers are identical to the 5 SFG-500 megawatt thermal ("MWth") gasifiers first placed into operation at the NCPP plant (Pl. Ex. 22 p. 3). Siemens even used the NCPP design for Secure's gasifiers, without modifications (Ex. 22 p. 6; Rüsseler Dep. pp. 84:20-85:6). Siemens is unaware of all the changes the Chinese made to the coal gasification Equipment and Technology at the NCPP plant (Pl. Ex. 69-2), and is therefore unable to provide them to Plaintiffs as required (Rüsseler Dep. p.

282:18-:24). The owner of the NCPP plant (Siemens' joint venture partner) pointed out that they had to make 88 modifications to the Siemens Equipment and Technology during the commissioning of their project. Of the 88 modifications, the Chinese noted that only three were proposed by Siemens (Pl. Ex. 45-1 p. 6).

Siemens' employees testified that they considered changing the control for coal mass flow in the gasifier feeding system from differential to constant pressure to be a mandatory change to Secure's equipment (Ex. 68 p. 7; Ex. 69 p. 3; Ex. 69-1 p. 4; Hannemann Dep. pp. 354:18-357:6; Rüsseler 30(b)(6) Dep. pp. 134:10-138:16). Siemens even researched whether another company patented this solution before incorporating it into its Equipment (Rüsseler 30(b)(6) Dep. pp. 136:15-137:14).

Siemens also claims it would have changed Secure's loosening elements (Pl. Ex. 36-1; Rüsseler 30(b)(6) Dep. pp. 146:2-147:6). This change would be to improve the lifetime of the components by having them made from different materials than those shipped to Secure (Rüsseler 30(b)(6) Dep. p. 148:1-:7). Mr. Rüsseler even went on to state that he would have recommended that Secure change the loosening element in the manner described in Plaintiffs' Exhibit 36-1 (*Id*. at 150:15-:23). However, Siemens never mentioned this change to Secure and there is no evidence in the record to suggest otherwise. This is another undisputed material fact supporting Secure's argument that Siemens breached its contracts by failing to advise Secure of all relevant Improvements to Siemens' Equipment and Technology, and that these changes would have necessitated an update to Secure's BEDP.

Siemens never intended to provide upgrades and Improvements to Secure, as shown when, on December 16, 2012, Mr. Rüsseler wrote that although Siemens was contractually obligated to offer Improvements to the customer, it should make the price and schedule "so

unattractive that MidAmerica cannot draw this option," and that "incorporating the NCPP Lessons Learned would tie up resources" Siemens could use to generate new hardware orders (Pl. Ex. 116; Rüsseler 30(b)(6) Dep. pp. 53:2-54:15, 70:8-:11). Even though Siemens had a contractual obligation to notify Secure of the Improvements to the gasification system, it never did so. It is a question of material fact whether or not Siemens intentionally failed to provide Secure with Improvements, as required under the contract. By March 7, 2013, Siemens acknowledged its 500 MW thermal technology was not completely mature as of execution of the NCPP plant, and that the contributions of the Chinese helped improve the reliability and availability of the Siemens Technology (Pl. Ex. 46). At that time, the Chinese were not willing to share their know-how from operations free of charge (Pl. Ex. 46; Hannemann Dep. p. 310:9-:17).

 **3.** **Defects as to Equipment and Technology Provided**

  **a.** **Burners**

Siemens did not merely scale up Sustec's 200 MW gasifier when it designed the SFG-500 gasifier, as evidenced by the fact that Siemens changed the design to employ a first of its kind top-mounted burner that integrated the main and pilot burners. The 200 MW gasifier operated at Schwarze Pumpe utilized three top-mounted main burners surrounding a central pilot burner, whereas Siemens' scaled-up 500 MW gasifier utilized a single top-mounted burner (Rüsseler Dep. pp. 24:9-25:19). Siemens' single combined burners for coal gasification were not placed into commercial operation prior to their use at NCPP (Hannemann Dep. p. 170:11-:16). In fact, it was not even commercially tested prior to delivery to NCPP (*Id*. at 160:21-:23) or prior to sale to Secure (*Id*. at 388:23-389:16). Siemens did not test their single combined burners for coal gasification because it would have cost too much money - 100 million Euros - to do so (*Id*.).

Even today, Siemens does not have a single combined 500 MWth burner for coal gasification in commercial operation. (*Id*. at 344:17-345:5, 369:10-:13).

      **b.**     <u>**Cooling Screens**</u>

It is beyond dispute that Siemens failed to adhere to its agreements and defrauded Secure by supplying Secure with gasifiers containing cooling screens with out-of-specification pins welded to them (Rüsseler 30(b)(6) Dep. pp. 217:25-218:11). Siemens learned during the fabrication of the equipment for NCPP, sometime in 2007 or early 2008, that the pin lengths on the cooling screens were too short. At that time, Siemens was in the process of having Secure Energy's cooling screens manufactured. To remedy the problem, Siemens substituted the cooling screens with the correct size pins, intended for delivery to Secure Energy, in its delivery of equipment to NCPP and then, instead of having the cooling screens remanufactured to address this defect, Siemens' executives switched and delivered the defective cooling screens, containing pins that were too short, to Secure Energy (Pl. Ex. 112-3; Hannemann Dep. pp. 213:22-218:23; Rüsseler 30(b)(6) Dep. pp. 75:13-:20, 77:17-2:5). No protocol or procedure exists from Siemens' process engineering demonstrating that Secure's gasifiers with the shorter pins can be used (Pl. Ex. 112-3; Rüsseler 30(b)(6) Dep. pp. 75:17-76:8). Thus, Siemens acknowledges that what it shipped to Secure is not what Secure ordered. Instead, it knowingly shipped defective gasifiers to Secure and never notified Secure that it switched the specified cooling screens with defective cooling screens. Siemens' blatant delivery of out-of-specification equipment to Secure, which they knew at the time was defective, is the epitome of fraudulent conduct. Had Secure built its plant and attempted to put its gasifiers into operation, it would have cost millions of dollars in delays to correct. Moreover, it is undisputed that Siemens knew of the defects but never informed Secure it shipped defective gasifiers with out-of-specification cooling screens.

8

### c. Need to Increase the Volume of the Reaction Chamber

The evidence in this case demonstrates that Siemens, prior to the execution of the 2012 License & Service Agreement, was aware that the design of its SFG-500 MWth gasifier was defective. For example, in a February 10, 2012, e-mail to Mr. Rüsseler, Dr. Jan Kollmus, COO of Siemens' Division in China, identified at least four mandatory design changes to the 500 MWth gasifier in use at NCPP (Pl. Ex. 76). On February 20, 2012, Dr. Kollmus wrote that "the NCPP reactor is history. Some design changes were mandatory," and these mandatory changes included increasing the diameter of the reaction chamber to achieve better turbulence and incorporate the fine slag particles in the liquid layer on the cooling screen (*Id.*). By February 2012, Secure's gasifiers had already been delivered, so of course, it would have been impossible for Siemens to incorporate this change into Secure's gasifiers. Dr. Kollmus's stark assessment that "we have, frankly, currently only one reactor and this is the [larger] CPI reactor," and that the 500 MWth gasifier was "history" was seconded by Mr. Rüsseler, who, on February 13, 2012, replied to Dr. Kollmus, writing "[n]o question, we use the CPI reactor" (*Id.*). These e-mails are from Siemens' own employees and these facts were undisputedly never disclosed. Siemens never disclosed any of these mandatory design changes (Pl. Ex. 51), or the need for them to Secure.

### d. Acknowledgement of Increased Dust in Syngas

The facts show that Siemens knew Secure would experience a problem with increased dust in the syngas caused by its poorly-performing first of a kind burners, which would not sufficiently convert carbon in Secure's coal. Siemens misguidedly relies upon the use of off-specification coal and operator error at NCPP in support of its assertion that nothing is wrong with its Equipment and Technology. However, this is contradicted by the acknowledgement of Mr. Rüsseler that Plaintiffs will experience a dust problem given the NCPP experience (Pl. Ex.

9

116; Rüsseler 30(b)(6) Dep. pp. 56:1-:10, 63:10). As early as December 16, 2012, Siemens apparently knew that, regardless of the quality of the coal used, Secure would experience a problem with too much dust in their syngas produced as a result of the gasification process (Pl. Ex. 116). However, Siemens was unconcerned because, as Mr. Rüsseler wrote to SFGT CEO Guido Schuld and others, "we would have the license [fee] completely in house before the topic "increased dust accumulation" would become visible" (Pl. Ex. 116; Rüsseler 30(b)(6) Dep. pp. 55:12-56:17). Siemens' plan, once the inevitable problems arose, was to reengineer the syngas scrubbing system (Pl. Ex. 116; Rüsseler 30(b)(6) Dep. p. 64:1-:13). Of course, Siemens attempted to dispute this through Mr. Rüsseler's testimony as corporate representative, who denied that Siemens believed that Secure would experience a problem with too much dust in its syngas (Rüsseler 30(b)(6) Dep. p. 51:2-:13). These statements are contradictory and Mr. Rüsseler's attempt to explain away the statements in Plaintiffs' Exhibit 116 further evidences fact disputes as to this issue, which should be left for the jury to decide.

      e.      **<u>SIS Control System was Out of Date Prior to Shipping</u>**

The evidence in this case reflects that Siemens shipped Secure outdated SIS control system hardware. The Court's Order excluding the testimony and opinions of Plaintiffs' expert, Dr. Herbert Kosstrin (Doc. 188), incorrectly states that the control system became obsolete in the last seven years (Doc. 188 p. 17:20-:23). While Secure has the utmost respect and regard for the province of the Court, the Court's characterization of the facts contained in Plaintiffs' Exhibits 109 and 110 clearly invades the province of the jury. The Court ignores Siemens' admission contained in an e-mail dated February 3, 2010, in which Ulrike Koeckert wrote to George Lamonettin and Mr. Rüsseler that "[w]e have concerns because the hardware of the SIS (already stored in Germany) is already out of date. . ." (Pl. Ex. 109; Rüsseler 30(b)(6) Dep. pp. 84:17-

85:18, 240:21-:16). The import of this statement is that the SIS control system shipped to Secure was outdated before it even left Germany. Siemens was aware of this at the time and there is no evidence in the record to support its assertion that it could be fixed with some simple software updates. Likewise, Secure respectfully states that the Court misconstrued the undisputed facts regarding the SIS control system in its Order excluding Secure's expert witness (Doc. 188).

Although Mr. Rüsseler's later assessment in his May 15, 2014, e-mail to Mr. Morehead, that Secure's "control system is outdated and should at best be sold to the scrap dealer" identifies only one component of Secure's planned facility, it is important not to ignore the preceding sentence, in which Rüsseler wrote of more than just the control system (Pl. Ex. 110). In response to Mr. Morehead's May 14, 2014, e-mail conveying Lars Scott's questions and concerns, such as "[h]e [Lars] is concerned about the $'s [sic] and how much of what they have will we be able to reuse. He noted the control system as an example," Mr. Rüsseler wrote that "very little to nothing can be re-used and we would have to start from scratch." (*Id.*). On its face, Mr. Rüsseler's statement in Plaintiffs' Exhibit 110 is not limited solely to the period of time prior to the shipment of the obsolete control system sold to Secure. The undisputed facts are that Siemens knowingly shipped outdated, obsolete, and defective Equipment to Secure, which is material, constitutes fraud and entitles Secure to rescission of all the contracts. It is undisputed that Siemens knew, prior to shipping, the control system was outdated, never notified Secure the control system was obsolete, and it should be sold to a scrap dealer.

4. **Rolf Rüsseler's E-Mails about Scrapping Secure's Equipment & BEDP**

Siemens' Basic Engineering Design Package ("BEDP") sold to Secure was flawed and Secure was waiting on Siemens to provide an updated BEDP in order to obtain a final, fixed price contract for the engineering, procurement, and construction of its plant (an "EPC

Contract"). The BEDP is the basic engineering documentation necessary for an EPC contractor to do the detailed-design, procurement and construction of a gasification plant like Secure's (Hannemann Dep. pp. 82:24-83:12).

Internal communications to Mr. Rüsseler (dated October 18, 2012) reflected that Secure essentially needed a new BEDP and that Secure's mass and energy balances had to be recreated (Pl. Ex. 75). Mr. Rüsseler wrote Torsten Bergt, Siemens' Project Engineer for the Secure Project, that "the message to Jack and Lars is, forget everything you've got from Siemens, scrap the equipment, we'll start all over again" (Pl. Ex. 78). The Court appears to not be persuaded by the implication of this e-mail, determining in its Daubert ruling (Doc. 188) that it is insignificant. However, for Secure, which needed an updated BEDP to obtain financing, this was crucial. At the very least, it is a material fact that must be decided by a jury. The Court's function in summary judgment proceedings is limited. Upon a motion for a summary judgment it is no part of the [trial] court's function to decide issues of fact, but solely to determine whether there is an issue of fact to be tried." *Tobelman v. Mo.-Kan. Pipe Line Co.*, 130 F.2d 1016, 1018 (3d Cir. 1942). It is well established that "[t]he district court's function, in a summary judgment proceeding, is not to resolve factual issues but to determine whether there exists a genuine issue of material fact. In making its determination, the court may not weigh conflicting [evidence] to resolve disputed fact issues." *Farbwerke Hoeschst A.G. v. M/V "Don Nicky"*, 589 F.2d 795, 798 (5th Cir. 1979) (internal citation omitted). "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 819 (11th Cir. 1999). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not

grant summary judgment." *Shipman v. CP Sanibel, LLC*, No. 2:18-cv-139, 2019 WL 2301599, at *1 (M.D. Fla. May 30, 2019), quoting *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1315 (11th Cir. 2007).

Siemens never informed Secure of the fact that any of its Equipment had to be scrapped or replaced in any way. In addition, Mr. Bergt's prior e-mail to Mr. Rüsseler, also in Plaintiffs' Exhibit 78, more explicitly identifies the obsolescence of the SIS control system at that date. Mr. Bergt wrote that, "the programming would have to be completely revised and the hardware I see the problem that this is not compatible with the current software and would probably have to be replaced!" (*Id*. at 1-2). Shortly thereafter, on October 31, 2012, Secure and Siemens met with several engineering contractors in Washington, D.C., in an attempt to address scope and schedule questions from the EPC contractor, SK E&C, allowing them to provide a firm EPC price and prepare for a project kickoff and restart of the various technology licensors upon securing project equity (Pl. Ex. 75; Rüsseler 30(b)(6) Dep. 73:15-:23). It is clear Siemens was aware, before the October 31, 2012, meeting with Secure and other engineering firms, that Secure's Equipment was defective and needed to be replaced. Mr. Rüsseler's cynical solution, as expressed in Plaintiffs' Exhibit 116, was to make a change order so costly it that it would discourage Secure from opting to take it (Rüsseler 30(b)(6) Dep. p. 70:8-:11). Unsurprisingly, in light of Mr. Rüsseler's cavalier attitude, Secure was never informed regarding Siemens' assessment of the SIS control system.

On May 14-15, 2014, Messrs. Rüsseler and Morehead exchanged e-mails regarding Lars Scott's continued efforts to learn when Siemens' updated BEDP and other information would be provided to Secure. These e-mails are set forth in Plaintiffs' Exhibit 110. On May 14, 2014, Mr. Morehead wrote to Mr. Rüsseler conveying Scott's questions and concerns, such as "[h]e [Lars]

13

is concerned about the $'s [sic] and how much of what they have will we be able to reuse. He noted the control system as an example" (Pl. Ex. 110). In response, on May 15, 2014, Mr. Rüsseler replied to Morehead that, "very little to nothing can be re-used and we would have to start from scratch" (Pl. Ex. 110). Neither of Mr. Rüsseler's statements, in Plaintiffs' Exhibits 78 and 110, indicate that they are limited in scope to a single component of Equipment sold to Secure. Despite the foregoing, Mr. Rüsseler testified that Secure never requested a final BEDP from Siemens, because if Secure had, then Siemens would have given them one (Rüsseler 30(b)(6) Dep. p. 69:16-:24). Moreover, Mr. Rüsseler testified that Secure never requested information regarding the changes that would need to be made in the BEDP because he did not see that as an action item in the minutes of the October 31, 2012, meeting set forth in Plaintiffs' Exhibit 75 (*Id.* at 236:21-237:4). Mr. Rüsseler's logic is flawed and his denials evidence fact disputes when weighed against the other evidence that Secure and its partners requested an updated BEDP, and when it could be expected, on several occasions (Pl. Ex. 75, 78; Clauss Affidavit ¶¶ 5-7, 10-13; Scott Affidavit ¶¶ 14-16; Sherman Affidavit ¶¶ 6-9). Regardless, Siemens never provided Secure with an updated BEDP (Rüsseler 30(b)(6) Dep. pp. 67:14-68:21; Clauss Affidavit ¶¶ 7, 13; Scott Affidavit ¶¶ 13, 16; Sherman Affidavit ¶¶ 8-9). These are undisputed material facts showing that Siemens knowingly shipped outdated, obsolete, and defective Equipment and Technology to Secure.

**5.      Fact Disputes as to Inability to Provide Contractually-Required Ongoing Support**

Siemens breached its contract with the Chinese by not making spare parts available after SFGT shut down, and nothing other than Siemens' say-so exists to dispel the expectation that the same fate will befall Secure. Siemens no longer has a fuel gasification division. The agreements between the parties require that Defendant provide Plaintiffs with ongoing support for the project

14

implementing Plaintiffs' Equipment and Technology. Siemens' own documentation suggests this was never the case, and factual disputes remain as to whether it was able to fulfill this contractual obligation to Secure. Defendant's "adequate internal plan" for ongoing support included drafting correspondence to customers that it was ceasing "<u>all activities</u> related to the coal gasification business," and other internal emails indicating that customers using its gasification equipment were on their own to deal with the manufacturers of certain components, all while recognizing this was an "unsurmountable" task (Pl. Exs. 91, 91-1). This is not evidence of a plan or even intent to support customers after shutting down a division that failed despite, according to Defendant's expert, the quadrupling of new gasification plants worldwide from 2012 to 2015 (Williams Dep. pp. 121:2-122:5). Rather, it is the culmination of a failed endeavor highlighted by defective Equipment and Technology that was engineered, manufactured, and replaced by its customers with other Equipment and Technology, and Siemens' inability to design a functioning burner and to perfect its Technology (Hannemann Dep. pp. 344:24-345:08).

The same reasons that led Mr. Rüsseler to state that Secure's Equipment needed to be scrapped and had no value led to Siemens' demise in this energy sector. Siemens simply could not place adequate Equipment and Technology into commercial application and lacked essential knowledge about modifications its Chinese joint-venture partner incorporated into the NCPP plant. Without this knowledge, operational Equipment and Technology, and a shuttered fuel gasification division, the agreements with Secure are impossible for Siemens to perform.

## CONCLUSION

The evidence presented regarding each of the foregoing areas creates, at the very least, a question of fact that must be decided by the jury. "The weighing of evidence and the consideration of the credibility thereof are issues of fact to be determined by the jury at trial."

*Natarajan v. Paul Revere Life Ins. Co.*, 720 F.Supp.2d 1321, 1326 (M.D. Fla. 2010), citing *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1299 (11th Cir. 1983). Based upon the foregoing facts and arguments, Plaintiffs respectfully request that the Court grant their Motion for Partial Summary Judgment and deny Defendant's Motion for Summary Judgment.

        Respectfully submitted,

        **DANNA McKITRICK, P.C.**

Date: June 21, 2019        BY:   /s/ Robert L. Devereux
        **Robert L. Devereux**, admitted pro hac vice
        **Jeffrey R. Schmitt**, admitted pro hac vice
        **Michael R. Cherba**, admitted pro hac vice
        7701 Forsyth Blvd., Suite 800
        St. Louis, Missouri 63105-3907
        Telephone: (314) 726-1000
        Facsimile: (314) 725-6592
        E-Mail:  rdevereux@dmfirm.com
                  jschmitt@dmfirm.com
                  mcherba@dmfirm.com

        and

        Walter A. Ketcham, Jr.
        Florida Bar No. 156630
        Grower, Ketcham, Eide, Telan & Meltz, P.A.
        901 N. Lake Destiny Rd., Suite 450
        Maitland, Florida 32751
        Telephone: (407) 423-9545
        Facsimile: (407) 425-7104
        E-Mail: waketcham@growerketcham.com

        **ATTORNEYS FOR PLAINTIFFS**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on the twenty-first day of June, 2019, a true and accurate copy of the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

| | |
|---|---|
| **Scott D. Baker** | **P. Alexander Quimby** |
| E-Mail: sbaker@reedsmith.com | E-Mail: aquimby@bakerlaw.com |
| **James A. Daire** | **Robert W. Thielhelm** |
| E-Mail: jdaire@reedsmith.com | E-Mail: rthielhelm@bakerlaw.com |
| **Jonah D. Mitchell** | Baker & Hostetler, LLP |
| E-Mail: jmitchell@reedsmith.com | 2300 SunTrust Center |
| **William R. Overend** | 200 South Orange Avenue |
| E-Mail: woverend@reedsmith.com | Post Office Box 112 |
| **Christopher J. Pulido** | Orlando, FL  32802 |
| E-Mail: cpulido@reedsmith.com | |
| Reed Smith, LLP | |
| 101 Second Street, Suite 1800 | |
| San Francisco, CA  94105-3659 | |

**ATTORNEYS FOR DEFENDANT
SIEMENS ENERGY, INC.**

                                          /s/ Michael R. Cherba