UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIDAMERICA C2L INCORPORATED, a Nevada corporation; and SECURE ENERGY, INC., a Nevada corporation,

   Plaintiffs/Counter-Defendants,

v.

SIEMENS ENERGY, INC., a Delaware corporation,

   Defendant/Counter-Plaintiff.

Case No. 6:17-cv-171-Orl-40LRH

## SIEMENS ENERGY, INC.'S RESPONSIVE SUPPLEMENTAL SUMMARY JUDGMENT BRIEF DIRECTED BY DOCKET NO. 190

**I. INTRODUCTION**

The Court instructed the parties to brief "whether there are any remaining issues to be resolved related to summary judgment or if this case should be disposed of" given Kosstrin's disqualification and the Court's underlying rationale in support of that ruling. In response, Plaintiffs[1] attempt to introduce new "expert" evidence through lay affidavits from Lars Scott, Max Sherman, and Keith Clauss. Plaintiffs' effort is unauthorized because the summary judgment record was closed long ago, and none of these witnesses submitted Rule 26 expert disclosures[2]; it is also futile because these lay "experts" opine without foundation. And at heart, Plaintiffs' submission confirms that the linchpin of their claims is the incompetent and

---

[1] The acronyms and short-form titles used in this brief are the same as those used in Siemens' motion for summary judgment at Docket Number 149.
[2] The Court reminded the parties during the *Daubert* hearing that new expert opinions absent cause are verboten. (D.N. 185 at 70:10-71:19)

- 1 -

discredited actual NCPP project/hypothetical Secure project comparison. Summary judgment in favor of Siemens on Plaintiffs' claims and on Siemens' counterclaim for breach of contract is warranted.

Plaintiffs have five remaining claims.[3] Four of these five remaining claims (Counts II, IV, V, and VI) hinge upon Plaintiffs proving that their unopened, unexamined, and untested gasification equipment is defective, based *solely* upon the experiences of the NCPP plant in China.[4] Plaintiffs conceded during the *Daubert* hearing that Kosstrin's opinion testimony was necessary to link the experiences of the Chinese plant to alleged defects in Plaintiffs' gasification equipment.[5] Because Plaintiffs are wholly without evidentiary foundation for the comparison they are required to prove, each of those four claims fails.

Plaintiffs' lone claim not scotched entirely by Kosstrin's exclusion is Count I (repudiation of the 2012 License and Service Agreement). But this Count fails for at least four independent, separate reasons (and indeed, Plaintiffs effectively concede it by devoting nary a single word to repudiation in their briefing). First, Plaintiffs concede they were not ready, willing, and able to perform C2L's obligations at the time of Siemens' alleged repudiation.[6] Second, given the stipulated facts, Plaintiffs cannot prove either: a "definite and final communication" from Siemens that Siemens did not intend to perform or; alternatively, an act rendering Siemens unable to perform.[7] Third, there was nothing for Siemens to repudiate,

---

[3] D.N. 63 ¶¶ 25-34, 42-92. Plaintiffs dismissed Count III at the pleading stage. (D.N. 72 at 6.)
[4] D.N. 63 ¶¶ 14, 33, 44, 62, 82.
[5] D.N. 185 at 69:12-70:9.
[6] A requirement under governing New York law. *See* New York Pattern Jury Instructions 4:1, an excerpt of which is submitted as Exhibit A with this brief.
[7] D.N. 169 at 20, ¶¶ 8, 10, 16; *Rachmani Corp. v. 9 East 96th Street Apartment Corp.,* 211 A.D.2d 262, 267 (1st Dep't 1995).

since the contractual deadlines had expired two months earlier (another stipulated fact).[8] And fourth, Plaintiffs have no recoverable damages because the 2012 License and Service Agreement's limitation of liability prohibits recovery of the $3.9 million in "reliance damages" that Plaintiffs claim they paid as capital costs to further their project.[9] For each of these reasons, there is simply no triable issue remaining as to Count I.

Siemens is entitled to summary judgment on its counterclaim for breach of contract. Because Siemens did not repudiate the 2012 License and Service Agreement, the contractual obligations remained enforceable.[10] As Plaintiffs concede that they did not pay the license fee or the termination fee required in the event of default by C2L[11], there is no legitimate dispute that C2L owes Siemens the unpaid €11.4M termination fee, plus pre-judgment interest.

The Court, having included the key background in this case in its *Daubert* Order, can and should dispose of this case now.[12] Kosstrin's exclusion, coupled with stipulated facts, resolves all issues necessary for a final ruling. Summary judgment in favor of Siemens on each and all of Plaintiffs' claims, as well as on Siemens' counterclaim, should be entered.

## II. THE DISQUALIFICATION OF KOSSTRIN AND THE RATIONALE THEREFOR ARE FATAL TO EACH OF PLAINTIFFS' FOUR DEFECT-DEPENDENT CLAIMS.

Plaintiffs' claims for: breach of implied warranty (Count II); fraudulent misrepresentation (Count IV); rescission-fraud (Count V); and rescission-lack of consideration (Count VI) are defect-dependent because each claim repeats the same "material design defects"

---

[8] D.N. 63-1 at 15 and 19-21, §§ 7.4.1, 7.9.3.2.
[9] D.N. 63-1 at 28, §§14.1, 14.2.
[10] D.N. 169 at 20, ¶¶ 8-16
[11] D.N. 149-2 at 177-178, 527:13-528:13; D.N. 63-1 at 25, §11.3.2.
[12] D.N. 188 at 1-2. The result is also warranted if the Court were to reach the other legal infirmities endemic to Plaintiffs' claims, which Siemens explicated in its motion for summary judgment

allegations concerning Plaintiffs' gasifiers as a necessary element. (D.N. 63 ¶¶ 14, 33, 44, 62, 82.) Proof of a design defect, in turn, requires expert testimony. *See Humphreys v. General Motors Corp.*, 839 F. Supp. 822, 826-29 (N.D. Fla. 1993), aff'd. 47 F.3d 430 (11th Cir. 1995) (granting summary judgment where plaintiff had no expert to testify as to defect). But Plaintiffs have no expert to testify. This is fatal to Plaintiffs' Counts II, IV, V, and VI.

Numerous other cases are in accord with *Humphreys*. *See, e.g., Cooper v. Old Williamsburg Candle Corp.*, 653 F. Supp. 2d 1220, 1225 (M.D. Fla. 2009) (granting summary judgment; "[plaintiff's] failure to offer expert evidence forecloses any claim based on a design defect"); *Alexander v. Danek Med., Inc.*, 37 F. Supp. 2d 1346, 1349 (M.D. Fla. 1999) (granting summary judgment; "[t]o prove a defective product, a defect must be proven by expert testimony"); *Savage v. Danek Medical. Inc*., 31 F. Supp. 2d 980, 983-85 (M.D. Fla. 1999), *aff'd.* 202 F.3d 288 (11th Cir. 1999) (granting summary judgment; "[a] defect must be proven by expert testimony"). In each of these cases, the plaintiff lacked the expert opinion necessary to show a design defect, and thus failed to survive summary judgment.

This case is no different. Without expert testimony, jurors will be unable to understand the operation of the Siemens gasification equipment or technology and the chemical and combustion engineering principles affecting the use of the Siemens gasification equipment and technology. If anything, the need for competent expert testimony is even greater here, where there is no operational history of the gasifiers sold to Plaintiffs and Plaintiffs' theory of design defect depends upon a comparison between actual NCPP plant experiences and their own hypothetical plant. Plaintiffs must first establish the relevance of evidence of the experiences at NCPP and then prove their case (and by clear and convincing evidence for Counts IV and

V, the fraud counts). The first step of establishing a foundation of substantial similarity requires an expert to analyze and compare the actual experiences at NCPP and hypothetical experiences with Plaintiffs' gasifiers. The second step would require an expert to competently opine that the NCPP experiences prove that the NCPP gasifiers themselves were defective. *See Small v. Amgen, Inc.*, 723 F. App'x 722, 726 (11th Cir. 2018) (affirming summary judgment; "in complex cases where a jury is asked to assess complex … scientific issues outside the scope of a layperson's knowledge, an expert's testimony is required").

The Court recognized during the *Daubert* hearing that Plaintiffs required expert testimony to link the issues experienced at the NCPP plant to any alleged hypothetical defect in Plaintiffs' gasifiers. And Plaintiffs conceded the point, admitting that no one other than Kosstrin could say that the issues experienced in China are somehow synonymous with the hypothetical problems at Plaintiffs' project(s). (D.N. 185 at 69:25-70:9.) Plaintiffs now have the Court's ruling on the failure of their expert to pass *Daubert*'s requirements. Plaintiffs' failure to provide any reliable expert testimony as to the existence of any design defect warrants summary judgment on Plaintiffs' Counts II, IV, V, and VI.[13]

### III. PLAINTIFFS' BREACH OF CONTRACT CLAIM (COUNT I) FAILS AS A MATTER OF LAW.

Plaintiffs' only claim that is not entirely defect (and expert)-dependent is Count I. Plaintiffs allege that Siemens' notice to Plaintiffs on February 2, 2016 that Siemens intended to exit the coal gasification market constitutes repudiation of the parties' 2012 License and

---

[13] There are several other fatal problems with Counts II, IV, V and IV which Siemens explicates in its summary judgment briefs and the parties' Joint Final Pre-trial Statement. (D.N. 148, 169.)

Service Agreement.[14] (D.N. 63 ¶¶ 22-28.) Any one of the following four independent reasons warrants summary judgment.

**First, Plaintiffs concede they were not ready, willing, and able to perform the 2012 License and Service Agreement at the time of Siemens' alleged repudiation.** (D.N. 149-9 at 234:25-235:7; D.N. 161 at 18-21.) As set forth in Siemens' motion for summary judgment, Plaintiffs must prove they were ready, willing and able to perform C2L's contractual obligations—that is, pay Siemens €12 million for its license and support—to make a viable claim of contract repudiation.[15] (D.N. 149 at 19-21; *see also* Ex. A.) Plaintiffs admit they were not ready to pay Siemens in February 2016 and Plaintiffs' financial records confirm their inability to pay at that time. (D.N. 149-9 at 234:25-235:7; D.N. 149-5 at 8-9.) Plaintiffs nevertheless contend their lack of readiness is "irrelevant" because Plaintiffs "rescinded" the 2012 License and Service Agreement in their February 11, 2016 letter—before Siemens demanded that Plaintiffs pay long past-due license fees on February 17 and, after Plaintiffs refused to pay, invoiced Plaintiffs for the license's termination fee on April 19, 2016. (D.N. 161 at 18-21.)

Plaintiffs have both the facts and the law wrong. In their February 11, 2016 letter, Plaintiffs tried to rescind the 2007 ESA[16]—not the 2012 License and Service Agreement— because of Siemens' alleged repudiation. (D.N. 169 at 20, ¶ 9; D.N. 149-7 at 66-69.) Plaintiffs

---

[14] As Plaintiffs would later stipulate, Siemens informed Plaintiffs on February 17, 2016 that Siemens would not violate any of its contractual obligations despite its planned exit, and Siemens did not actually close its gasification division until May 2018. (D.N. 169 at 20, ¶¶ 8, 10, 16.)
[15] The Court has ruled that New York law applies to Count I. (D.N. 62 fn. 2.)
[16] The parties had terminated the 2007 ESA on March 31, 2010, with both parties agreeing they had fulfilled their obligations to each other under the 2007 ESA. (D.N. 188 at 2, D.N. 67-4 at 2-3.)

did not declare that Siemens "repudiated" the 2012 License and Service Agreement until Plaintiffs filed their Complaint on July 18, 2016, three months *after* Siemens invoiced Plaintiffs because of their failure to pay license fees. Plaintiffs had an existing obligation to pay Siemens license fees at the time of the alleged repudiation.

As for the law, Plaintiffs ask to be excused for their lack of readiness, citing *Princes Point LLC v. Muss Dev., L.L.C.*, 138 A.D.3d 112, 118, 120-21 (N.Y. App. Div. 2016) and others. (D.N. 161 at 20.) But as the New York pattern jury instructions explain, those cases are limited to instances in which plaintiff's performance is conditional; e.g., plaintiff's inability to perform stems from the failure to obtain contractually-required approvals. *See* Ex. A. Here, Plaintiffs' performance—that is, their obligation to pay—was not so conditioned and therefore Plaintiffs have no such excuse as to this element of their claim. (D.N. 169 at 18.) Plaintiffs' lack of readiness is dispositive as to Count I.

**Second, the stipulated facts prove that Siemens did not repudiate the 2012 License and Service Agreement.** (D.N. 169 at 20, ¶¶ 8, 10, 16.) To establish anticipatory repudiation, Plaintiffs must prove "***a definite and final communication*** of the intention to forego performance before the anticipated breach may be the subject of legal action." *Rachmani Corp.*, 211 A.D.2d at 267 (emphasis added); *see also O'Shanter Resources, Inc. v. Niagara Mohawk Power Corp.*, 915 F.Supp. 560, 567 (W.D.N.Y. 1996) (an "overt communication" of intention not to perform is required). Plaintiffs allege that Siemens' decision to exit the coal gasification market—imparted to Plaintiffs during a phone call on February 2, 2016—constitutes repudiation of the 2012 License and Service Agreement. (D.N. 63 ¶ 26; D.N. 169 at 20, ¶8.) But Plaintiffs stipulated that: (1) Siemens next informed Plaintiffs on February 17,

2016 that Siemens would not violate any contractual obligations by its planned exit; and (2) Siemens did not close its gasification division until May 2018. (D.N. 169 at 19-20, ¶¶ 3, 8, 10, 16; D.N. 188 at 20.) The stipulated facts establish that Siemens did not definitely and finally communicate an intention to forego performance. Nor can Siemens' notification to Plaintiffs of Siemens' intent to exit the market be characterized as an act which rendered Siemens unable to perform in 2016, because Siemens stayed in the market until May 2018.

The Court drew upon these stipulated facts in its Order excluding Kosstrin, noting that Kosstrin's opinion that Siemens was incapable of contractual performance was "unreliable and demonstrably incorrect." (D.N. 188 at 20.) With Kosstrin excluded, Plaintiffs are left with Kenny's uncorroborated assertion that, during that initial February 2, 2012 phone call, Siemens told Kenny that Siemens would not honor its obligations under the 2012 License and Service Agreement. But that does not create any triable issue because it was not a "definite and final communication." The only definite and final communication occurred February 17, 2016, when Siemens informed Plaintiffs that Siemens would not violate any contractual obligations in connection with its market exit. (D.N. 169 at 20, ¶¶ 8, 10, 16.)

**Third, there was nothing for Siemens to repudiate because the contractual deadlines for Siemens' obligations had passed by February 2016.** The 2012 License and Service Agreement did not bind Siemens and Plaintiffs together forever. As Plaintiffs stipulate, the deadline for the gasifier testing necessary to verify Siemens' performance guarantees was December 31, 2015, absent some reason attributable to Siemens.[17] (D.N. 63-

---

[17] "If Performance Tests cannot be performed, for reasons not attributable to Siemens, the Acceptance Criterion shall be deemed to have been met no later than the earlier of (a) 9 months from Mechanical Completion, or (b)

1 at 20, §7.9.3.2; D.N. 169 at 20 ¶ 12.) Likewise, the deadline for Siemens' engineering services and technical field assistance warranties was also December 31, 2015. (*Id.* at 15, §7.4.1.) As the Court noted, Plaintiffs changed their business plans many times in their long-gestating project, which "never materialized" from 2006-2015. (D.N. 188 at fn. 2.) Whatever their reasons, Plaintiffs' failure to progress in their plans before December 31, 2015 is not, and cannot be, attributed to Siemens. Because the December 31, 2015 contractual deadlines had passed before any alleged "repudiation," Plaintiffs cannot survive summary judgment.

**Fourth, Plaintiffs suffered no recoverable damages.** According to Plaintiffs, they "seek reliance damages, on the … breach of contract claims, of $3,945,517.24 paid to engineering companies for work performed in furtherance of their project development." (D.N. 169 at 18.) But the 2012 License and Service Agreement contains a limitation of liability provision which states, in relevant part, that Siemens shall not be contractually liable for "any special, indirect, incidental, or consequential loss or damage whatsoever, … including but not limited to capital cost …."[18] (D.N. 63-1 at 28, §14.1.) Plaintiffs' alleged reliance damages are nothing more than the capital costs they claim to have spent in furtherance of their project(s), and therefore not recoverable under the contract. Even if Plaintiffs could cure each of the dispositive infirmities in their liability case (they cannot), there is nothing left to try because Plaintiffs suffered no recoverable damages.[19]

---

on December 31, 2015." (D.N. 63-1 at 19-20, §7.9.3.2.) "Acceptance Criterion" means that gasifier performance is within 10% of the Siemens guarantees. (*Id.* at 4, 7, §1.0.)

[18] Notably, C2L limits its own liability to Siemens in the same way. (D.N. 63-1 at 28, §14.3.)

[19] Aside from "reliance damages," Plaintiffs seek $43 million in connection with their rescission claims (effectively, Plaintiffs seek a refund for the gasifiers they bought under the 2007 ESA, even though they later terminated the 2007 ESA, agreed that Siemens had fulfilled its obligations under the 2007 ESA, and waived and released claims relating to the ESA as part of the 2010 Completion Agreement). (D.N. 169 at 18; D.N. 188 at 2;

## IV. THE UNDISPUTED FACTS ALSO WARRANT SUMMARY JUDGMENT IN FAVOR OF SIEMENS ON ITS COUNTERCLAIM.

The same undisputed facts warrant summary judgment in favor of Siemens on its breach of contract counterclaim. On February 17, 2016, Siemens notified Plaintiffs that C2L was in default for failure to pay the past-due amounts and that Siemens intended to terminate under Section 11.3. (D.N. 149-7 at 70-71.) C2L failed to pay any of the past-due amounts. (D.N. 149-2 at 177-178, 527:13-528:13.) Siemens therefore terminated the agreement and invoiced Plaintiffs for the €11.4M termination fee on April 19, 2016, which C2L also has not paid. (*Id.*; *see also* D.N. 63-1 at 25, §11.3.2.) Each of the elements of a breach of contract is satisfied. Siemens should be awarded summary judgment on its counterclaim for damages in the amount of the €11.4M termination fee, plus pre-judgment interest from May 5, 2016 to judgment.[20]

## V. PLAINTIFFS' SUPPLEMENTAL SUBMISSIONS ARE IRRELEVANT AND MERITLESS.

Plaintiffs enumerate five supposed reasons why the Court should deny summary judgment. All are untethered to Plaintiffs' claims. Some are based on claims that Plaintiffs never pleaded.[21] And each is meritless and irrelevant to summary judgment disposition.

1. "Misrepresentations Regarding Siemens' Experience" is the latest in Plaintiffs' improper efforts to inject non-pleaded fraud claims into the case—efforts that the Court has already twice rejected. (D.N.s 137, 154.) Plaintiffs do not plead in the First Amended

---

D.N 67-4 at 2-3.) Kosstrin's exclusion eliminates any rescission claim. Also, Plaintiffs have no cognizable claim for rescission-lack of consideration, their only claim that would allow a 2007 reset and refund in the first place.

[20] All invoices issued by Siemens were to be paid by C2L within 15 days of submission. (D.N. 63-1 at 11, §3.4.1.) Siemens invoiced C2L for the termination fee on April 19, 2016. (D.N. 169 at 20, ¶15.) Payment was therefore due by May 4, 2016, with interest beginning to accrue the following day.

[21] Siemens maintains its objections to Plaintiffs' non-pleaded fraud theories and objects to Plaintiffs' unauthorized attempt to supplement the summary judgment record with new evidence. (D.N. 163 fn. 4.)

Complaint that Siemens misrepresented its general gasification experience leading to Plaintiffs' 2007 purchase.[22] (D.N. 63 ¶¶ 1-24, 42-79.) Further, Plaintiffs *cannot* plead any such misrepresentations because they entered into an unequivocal release and waiver as to any claims that existed on or before March 31, 2010, as part of the parties' 2010 Completion Agreement. (D.N. 162 ¶ 4, D.N. 67-4 at 3 ¶¶ 2-3.) Indeed, Plaintiffs escaped dismissal based on release and waiver by tailoring their misrepresentation allegations to the period after March 31, 2010—specifically, on October 31, 2010 and no earlier. (D.N. 74 at 13-14.) Plaintiffs cannot inject fraud allegations they never made nor revive claims that they have expressly released—and which the Court has already found to be released. (*Id.*)[23]

2. "Failure to Inform Secure of Improvements" is also not pleaded. Plaintiffs plead only that Siemens repudiated the 2012 License and Service Agreement and breached implied warranties in delivering *existing* equipment and BEDP plans with "material design defects."[24] (D.N. 63 ¶¶25-34.) Further, there was no such breach for failure to inform of improvements in any event. Article 5 of the 2012 License and Service Agreement is limited to improvements

---

[22] Plaintiffs plead only that Siemens became aware of "material design defects" in Plaintiffs' gasifiers during start up and commissioning of the NCPP plant beginning October 31, 2010 and did not disclose them to Plaintiffs. (D.N. 63 ¶¶ 14, 49, 67.) In Scott's affidavit (though not in Plaintiffs' brief), Plaintiffs hint at another new heretofore undisclosed fraud theory, claiming that Siemens' alleged failure to update Plaintiffs about commissioning progress at the NCPP plant induced Plaintiffs to enter into the 2012 License and Service Agreement. (D.N. 197-7 ¶17.) But according to Plaintiffs' claim in the First Amended Complaint, it was solely the alleged failure to disclose design defects which purportedly induced Plaintiffs to enter into the 2012 License and Service Agreement. (D.N. 63 ¶¶ 67-74.)

[23] Though the Court need not reach the issue, Plaintiffs' newly-minted claims are meritless because Siemens never misrepresented its experience in the industry. Siemens had operational experience with coal gasification through its acquisition from Sustec/Future Energy (which included Sustec/Future Energy engineers). The experience was summarized in Siemens' public presentations that Plaintiffs attended from 2006 onward and specifically disclosed to Plaintiffs in writing. (D.N. 164-13 at 3-6 ¶¶ 4- 11, at 11-63; D.N. 165-1 at 7-8 ¶¶16-19, D.N. 165-3 at 52-63.)

[24] As for the fraud and lack of consideration counts, Plaintiffs allege design defects in the equipment and BEDP as delivered—not some hypothetical defect in some prospective updated BEDP plans. (*Id.* ¶¶ 42-92.) Siemens delivered the BEDP to Plaintiffs in 2008 and the major components of the gasification system in March 2009. (D.N. 149-2 at 184:10-185:8.)

that are "released for commercial application by Siemens." (D.N. 63-1 at 12 ¶5.1.) Plaintiffs proffer no evidence (because none exists) that iterative and "lessons learned" improvements from the NCPP experiences—which were inextricably tied to the unique conditions at the NCPP plant—were ever released for general commercial application.

Siemens nevertheless did tell Plaintiffs several times (including on October 31, 2012, November 16, 2012, and July 18, 2014) that they could buy an updated BEDP to account for all iterative improvements in the Siemens gasification technology, provided that Plaintiffs pay for the update (which Plaintiffs never did). (D.N. 197-21 at 4 (item 7); D.N. 149-2 at 420:23-424:7, 441:22-445:13.) Those discussions did not progress further because, as Kenny[25] testified, sometime between December 2012-April 2013, Plaintiffs decided of their own volition to **reject** the EPC contract that their **potential** EPC contractor SKEC had proposed, which rendered an updated BEDP moot.[26] (D.N. 149-2 at 327:7-10, 395:12-401; D.N. 149-9 at 328-6-333:9.) After Plaintiffs walked away from SKEC, they instead tried to market and sell their gasifiers and BEDP to third parties. Plaintiffs advertised that their 2007-era BEDP was "full" and "extensive," but that an update could be purchased directly from Siemens. (D.N. 148-1 at 27, ¶ 5.1.0.4.) By Plaintiffs' own admission, Siemens thus had no obligation **and no reason** to formally offer Plaintiffs improvements to the technology, including an updated BEDP. To try to suggest otherwise, Plaintiffs conscript Sherman, Clauss, and Scott into affidavits which each conclude that Siemens never provided SKEC with an updated

---

[25] Plaintiffs' co-founder, Chairman, President, CEO, and sole 30(b)(6) deponent. (D.N. 161-2 at 2, ¶ 1; 149-9 at 9:5-21.)

[26] Kenny testified that Plaintiffs "walked away" once he felt SKEC had "left [Plaintiffs] at the alter" by trying to introduce a new $100 million contingency to the deal during a late stage of negotiation. (D.N. 149-2 at 327:7-10, 395:12-401; D.N. 149-9 at 328-6-333:9.) Plaintiffs' assertion that SKEC was anything other than a potential EPC contractor misrepresents the facts.

BEDP.[27]  That is irrelevant because the following is undisputed:  (1) Plaintiffs never paid, or offered to pay, for an updated BEDP; (2) none of the lessons learned in China were released for general commercial applications (and therefore Siemens had no obligation to make an offer); and (3) Plaintiffs walked away from SKEC at the end of 2012 of their own accord and tried to sell the equipment instead.

3. "Defects as to Equipment and Technology Provided" is irrelevant for the reasons above in Section II.  But Plaintiffs' description of the SIS control system[28] merits special mention because Plaintiffs wrongly accuse the Court of error.  According to Plaintiffs, because the hardware for the SIS was already out of date by 2010, the Court's *Daubert* Order "incorrectly states that the control system became obsolete ***in the last seven years*** (Doc. 188 p. 17:20:23)."  (Emphasis added.)  That is not what the Order states.  The Court writes that "technology has changed in the intervening seven-year period [between Plaintiffs' purchase in 2007 and the May 15, 2014 Ruesseler email]."  Nothing in the Court's Order is premised on the SIS becoming outdated only sometime in the last seven years, and the 2010 email stating that Plaintiffs' SIS hardware was out-of-date is totally consistent with the Court's Order.  The fact that the SIS hardware was out-of-date 26 months after purchase does not suggest in any way that the SIS hardware has a design defect.

In addition, Plaintiffs mischaracterize the material SIS facts, which are set forth in the

---

[27] These are the affidavits which were not authorized and violate Rule 26 (e.g., Scott's foundationless conclusion that NCPP's and Plaintiffs' BEDPs are "substantially similar.")  (DN. 197-7 ¶18.)  A fourth Kenny affidavit is absent, but his testimony binds Plaintiffs.  *See Peeler v. KVH Indus., Inc.*, 2014 WL 117101 at *7 (M.D. Fla. Jan. 13, 2014).

[28] "SIS" stands for safety instrumented system, a sophisticated set of hardware and software controls for certain aspects of the gasifiers.  Plaintiffs purchased the PGL/SPPA-3000 model in 2007.  (D.N. 67-4 at 2, 7.)

2010 Completion Agreement itself: (1) in 2008-2009, the SIS was "not delivered according to the [2007] ESA by Siemens *upon Secure's request*" (Secure did not want to incur the liability for international duties or pay the storage costs since they had no project to advance; emphasis added); (2) Siemens agreed to store the SIS in Germany for Secure until a delivery date "to be mutually agreed"; and (3) by the time Secure took delivery, Siemens had released new hardware for the system. (D.N. 67-4 at 2 (3rd whereas clause), 3 (§4.2.1).) That is why Siemens was later considering whether the parties' contracts have a "state-of-art" clause (they do not), even though the SIS Plaintiffs purchased "complies with all applicable codes and rules." (D.N. 197-49 at 2.) Nor was Siemens' release of new SIS software and hardware a surprise to Plaintiffs. On July 18, 2014 (after Plaintiffs decided to market and sell the equipment and two months after the date of Plaintiffs' Exhibit 110), Siemens wrote Plaintiffs that "Siemens considers the control system hardware is obsolete per our standard product life cycle, but I will check with Rolf [Ruesseler] to see if Siemens believes there's any value for the system as spare parts for other Siemens customers with the same vintage of control's hardware."[29] (D.N. 149-2 at 441:16-443:4.) Obsolescence is not evidence of design defect. Further, Plaintiffs have no expert to opine that it (somehow) is.

  4.  "Rolf Ruesseler's Emails about Scrapping Secure's Equipment & BEDP" is a retread of the same ground the Court covered in its *Daubert* Order. (D.N. 188 at 17.) Siemens does not admit, or even suggest, that Plaintiffs gasifiers have design defects in any of the proffered emails. Plaintiffs lack any expert to testify otherwise.

---

[29] Plaintiffs assert "Secure was never informed regarding Siemens' assessment of the SIS Control System," another misrepresentation of fact that ignores Kenny's testimony. (D.N. 197 at 13; D.N. 149-2 at 441:16-443:4.)

5. "Fact Disputes as to Inability to Provide Contractually-Required Ongoing Support" is irrelevant, because it matters not a whit whether Siemens can provide support *today*. The issue is whether Siemens lacked the ability to perform in February 2016. (D.N. 63 ¶¶ 22-28.) And since Plaintiffs stipulated that Siemens told Plaintiffs that it would not violate its contractual obligations in connection with Siemens' market exit and did not actually exit until May 2018, Plaintiffs have no evidence that Siemens could not or would not perform in February 2016. (D.N. 169 at 19-20, ¶¶ 3, 8, 10, 16; D.N. 188 at 20.)

## VI. CONCLUSION

Summary judgment in favor of Siemens is the right result and the expected outcome. Plaintiffs bought gasification equipment from Siemens in 2007 (which, to this day, remains in its original packaging) and a technology license for which they did not and could not pay. Plaintiffs failed to achieve financing or make any meaningful progress in building a plant. Siemens deferred payment of the license fees for over six years as part of the serial License Agreements and Completion Agreements (which terminated the earlier agreements and included releases and waivers of claims). Then Siemens told Plaintiffs that Plaintiffs would need to finally pay the past-due license fees for Siemens to continue to support Plaintiffs, since Siemens intended to wind down its gasification division. But Plaintiffs still could not and did not pay Siemens, triggering this litigation. Plaintiffs' attempt to turn NCPP project experiences into "evidence" comparable to their own hypothetical operations and their most recent gambit to make this case about anything other than their pleaded claims do not create any dispute as to the material facts, and warrant summary judgment in Siemens' favor.

Dated: June 26, 2019

Respectfully submitted,

By: */s/ James A. Daire*
Robert W. Thielhelm, Jr.
Florida Bar No. 889679
P. Alexander Quimby
Florida Bar No. 099954
**Baker & Hostetler LLP**
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: 407.649.4000
Facsimile: 407.841.0168
Email: rthielhelm@bakerlaw.com
Email: aquimby@bakerlaw.com

Scott D. Baker (admitted pro hac vice)
James A. Daire (admitted pro hac vice)
Christopher J. Pulido (admitted pro hac vice)
**Reed Smith LLP**
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone: 415.543.8700
Facsimile: 415.391.8269
Email: sbaker@reedsmith.com
Email: jdaire@reedsmith.com
Email: cpulido@reedsmith.com

*Counsel for Siemens Energy, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 26, 2019, a true and correct copy of the foregoing was submitted to the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to the following listed counsel:

Michael R. Cherba
Robert L. Devereux
Jeffrey R. Schmitt
**Danna McKitrick, P.C.**
7701 Forsyth Blvd., Suite 800
St Louis, MO 63105
Telephone: (314) 726-1000
Fax: (314) 725-6592
Email: mcherba@dmfirm.com
Email: rdevereux@dmfirm.com
Email: jschmitt@dmfirm.com

Walter A. Ketcham , Jr.
**Grower, Ketcham, Eide, Telan & Meltz, PA**
901 N Lake Destiny Rd., Suite 450
PO Box 538065
Orlando, FL 32853-8065
Telephone: (407) 423-9545
Fax: (407) 425-7104
Email: enotice@growerketcham.com


DATED:  June 26, 2019.


                                         */s/ James A. Daire*
                                         James A. Daire