UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| MIDAMERICA C2L INCORPORATED, a Nevada corporation; and SECURE ENERGY, INC., a Nevada corporation, <br><br> Plaintiffs/Counter-Defendants, <br><br> v. <br><br> SIEMENS ENERGY, INC., a Delaware corporation, <br><br> Defendant/Counter-Plaintiff. | Case No. 6:17-cv-171-Orl-40LRH |

**SIEMENS ENERGY, INC.'S RESPONSIVE SUPPLEMENTAL SUMMARY JUDGMENT BRIEF DIRECTED BY DOCKET NO. 204**

**I.    INTRODUCTION**

The Court ordered the parties to answer "[w]hether there is evidence in the record that establishes a direct and proximate cause of damages resulting from the alleged breach set forth in Count I" (repudiation of the 2012 License Agreement).[1]  Plaintiffs fail to address, let alone answer, that question.[2]  Plaintiffs do not mention causation even once in their supplemental brief.[3]  To answer the Court's question: there is no such evidence.[4]  Indeed, all of the evidence is to the contrary.

---

[1] Doc. 204. The acronyms and short-form titles used in this brief are the same as those used in the Court's Summary Judgment Order at Docket Number 203.
[2] Doc. 206.
[3] *Id.*
[4] For the purpose of this requested supplemental briefing only, Siemens assumes *arguendo* that Plaintiffs can prove that Siemens repudiated the 2012 License Agreement as alleged in the First Amended Complaint. Plaintiffs cannot carry their burden to prove repudiation either, for the reasons described in earlier briefs. (Docs. 149, 199.)

Plaintiffs allege two categories of damages as to Count I.  First, Plaintiffs claim Siemens' February 2016 conduct eliminated any and all value of the technology and equipment they purchased under the 2007 Contract: from $40.2 million (the purchase price) to $0.  But this "refund" category goes nowhere because: (1) there is no provision in the 2012 License Agreement guaranteeing Plaintiffs' retention of their 2007 purchase value nine years later, in 2016; (2) Plaintiffs have no one to opine that the equipment and technology is worth nothing; and (3) Plaintiffs released any claims for an equipment and technology refund (which they bought under a different, 2007 Contract) as part of the 2010 Completion Agreement.

Second, Plaintiffs claim "reliance damages" (now reduced from the $46 million pleaded to $3.9 million) because they were "forced to abandon" their coal-to-methanol plant in West Paducah, Kentucky.  But that claim fails because: (1) Plaintiffs had already abandoned that plant at the time of Siemens' alleged repudiation; and (2) Plaintiffs incurred any claimed "reliance damages" before the 2012 License Agreement even existed—no reliance is possible.

Plaintiffs effectively concede these fatal defects, because they fail to identify any evidence in the record that could establish the causation they are required to prove.  Plaintiffs' inability to prove causation warrants summary judgment in favor of Siemens.

## II. PLAINTIFFS CANNOT PROVE THAT SIEMENS' ALLEGED REPUDIATION CAUSED PLAINTIFFS ANY ALLEGED DAMAGES.

### A. Plaintiffs must prove causation.

To establish a breach of contract under New York law[5], a plaintiff must prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach.  *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004).  Where actual

---

[5] New York law applies to Count I.  (Doc. 62 fn. 2.)

damages are to be proved, a plaintiff must establish a proximate causal relationship between the breach and damages. *See Jorgensen v. Century 21 Real Estate Corp.*, 217 A.D.2d 533, 534, 629 (1995) (proximate cause is requisite element of breach of contract); *Wagner Trading Co. v. Tony Walker Retail Mgmt. Co.*, 307 A.D.2d 701, 703 (2003) (damages must be the natural and probable consequence of breach).

When a plaintiff claims repudiation, the general rule is that plaintiff may seek expectation damages or restitution for the benefits plaintiff conferred on defendant. *In re Asia Glob. Crossing, Ltd.*, 404 B.R. 335, 341 (S.D.N.Y. 2009). Reliance damages may be available as an alternative to expectancy damages. *See 24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 319 (S.D.N.Y. 2008). But a plaintiff may only recover "expenses of preparation and of part performance, as well as other foreseeable expenses incurred ***in reliance upon the contract***." *Id.* (citations omitted; emphasis added); *see also Gruber v. S-M News Co.*, 126 F. Supp. 442, 446–47 (S.D.N.Y. 1954); 22 Am. Jur. 2d Damages § 51 (2010) (limiting reliance damages to "expenses incurred after an agreement has been reached"). Expenses incurred before the contract existed are not reliance damages. *See id.*

B.   **Plaintiffs cannot prove causation.**

Plaintiffs cannot prove causation of any damages under governing law, coupled with the stipulated facts in the Court's Summary Judgment Order. (Doc. 203.) Plaintiffs allege that Siemens repudiated the 2012 License Agreement in February 2016, when Siemens allegedly informed Plaintiffs that Siemens would not honor Siemens' performance guarantees, technical field assistance, or customer training obligations in the 2012 License Agreement.[6] (Doc. 63

---

[6] In February 2016, Siemens informed Plaintiffs that Siemens intended to exit the business. Siemens exited the business in May 2018. (Doc. 169 at 20, ¶¶ 8, 16.)

¶22.)  According to Plaintiffs, Siemens' conduct caused Plaintiffs two categories of damages:

> 27a. The Siemens Equipment and Technology purchased under the 2007 Memorandum of Understanding and the 2007 Contract can no longer be incorporated into any gasification plant and have, therefore, decreased in value from the $40,298,436.00 paid [under the 2007 Contract] to $0.00.
>
> 27b. Plaintiffs have been forced to abandon the development, design and engineering of the West Paducah [coal-to-methanol] plant, which was based on the Siemens Equipment and Technology that plaintiffs [*sic*] can no longer use, and for which plaintiff [*sic*] expended an additional amount in excess of $46,000,000.00.

(Doc. 63 ¶¶27, 16.)

Plaintiffs do not seek expectancy damages or restitution, since they paid Siemens nothing under the 2012 License Agreement.[7] (*Id*.)  And Plaintiffs rightly dropped the "refund" category from the Joint Final Pretrial Statement, seeking it only in connection with their rescission claims.[8] (Doc. 169 at 18.)  Plaintiffs also reduced the amount they claimed in the "reliance" category from $46 million to $3.9 million, which they claim was "paid to engineering companies for work performed in furtherance of their project development." *Id.*

### 1. Plaintiffs cannot prove Siemens' alleged repudiation eliminated all or any value of the equipment and technology.

Plaintiffs cannot prove causation as to the "refund" category for three reasons.[9] (Doc. 169 at 18.)  First, there is no causal relationship between: (a) Siemens' alleged February 2016 repudiation of the 2012 License Agreement; and (b) purported elimination of all or any value

---

[7] This, in a nutshell, is the causation problem with the "refund" category.  It could only ever be restitution for consideration paid under the 2007 Contract.  But Plaintiffs did not sue for breach of the 2007 Contract (which the parties terminated long ago).  And Plaintiffs agreed the 2007 Contract had been fully performed. (Doc. 146-14 at 3, ¶3.)

[8] Nevertheless, since Plaintiffs improperly try to revive the "refund" category as to Count I in their most recent brief, Siemens addresses it here.

[9] For the purpose of this brief only, Siemens disregards other dispositive problems with Plaintiffs' damages theories, including the limitation of liabilities provisions in the 2012 License Agreement. (Doc. 146-9 at §14.0.)

of the equipment and technology that Plaintiffs purchased nine years earlier, under the terms of a different purchase contract (the 2007 Contract). (Doc. 63 ¶27a.) There is *no provision* in the operative 2012 License Agreement which guarantees to Plaintiffs that Siemens' 2007-era equipment and technology will indefinitely retain its purchase price value. (Docs. 146-9, 146-10, 146-11, 146-12.) Alleged repudiation of one contract (the 2012 License Agreement) does not entitle Plaintiffs to a refund of the consideration they paid under a different contract (the 2007 Contract). Since Plaintiffs would not be able to recoup the purchase price they paid in 2007 had Siemens fully performed the 2012 License Agreement, Plaintiffs cannot meet their causation burden. *See W. Geophysical Co. of Am. v. Bolt Assocs., Inc.*, 584 F.2d 1164, 1172 (2d Cir. 1978) (damage award should put plaintiff in the position it would have been in absent the breach, no worse but no better); *Brown v. Lockwood,* 76 A.D.2d 721, 743 (1980) (same).

Second, Plaintiffs have no evidence that the Siemens equipment and technology lack all or any value. The Court excluded the opinion testimony of Dr. Kosstrin, who was Plaintiffs' only witness as to value of the Siemens equipment and technology. (Doc. 188.) While an owner of property may be able to give its opinion of value in an appropriate case, the owner must at minimum "be familiar with the characteristics of the property, have knowledge or acquaintance with its uses and purposes, and [have] experience in dealing with it." *Morsch v. JP Morgan Chase Bank, N.A.*, 2018 WL 5830557, at *5–6 (M.D. Fla. Nov. 7, 2018) (J. Byron) (citations omitted). Plaintiffs here concede they have no experience with the Siemens equipment and technology—indeed, Plaintiffs never unboxed the equipment or put it into operation. (Doc. 185 at 42:6-8, 47:20-48:3.) Without experience, Plaintiffs cannot testify to value.

Third, Plaintiffs waived and released any claims to a refund under the 2007 Contract. (Doc. 146-14 at 3, ¶2.) Secure and Siemens declared, as part of their 2010 Completion Agreement, that each had "fulfill[ed] all contractual obligations regarding the Equipment supply [purchased] under the [2007 Contract]" to the other. (*Id.* ¶3.) The parties also agreed in the 2010 Completion Agreement that "neither shall have ground for any claim under the [2007 Contract], the [2007] License, and/or any theory of law against the other." (*Id.* ¶2.) Releases "may not be treated lightly" and "should never be converted into a starting point for renewed litigation except under circumstances and under rules which would render any other result a grave injustice."[10] *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 189 (S.D.N.Y. 2008) (granting summary judgment based on release). The Court rejected Plaintiffs' attempt to rescind the 2010 Completion Agreement (in Count VI) and judgment was entered in favor of Siemens as to Plaintiffs' rescission claim. (Docs. 203, 204.) The release in the 2010 Completion Agreement eliminates Plaintiffs' ability to seek a refund.[11]

### 2. Plaintiffs cannot prove that Siemens' alleged repudiation caused any claimed "reliance damages."

The undisputed facts warrant summary judgment as to the "reliance" category for two reasons. First, well before Siemens' alleged February 2016 repudiation, Plaintiffs had already shifted their project from the coal-to-methanol plant they had actually licensed from Siemens to a coal-to-fertilizer plant to which they had no license. (Doc. 149-5 at 8-9; Doc. 146-9 at

---

[10] New York law also applies to the Completion Agreement. (Doc. 146-14 at 4, ¶5.)
[11] Plaintiffs also waived the "refund" category when they dropped it from the Joint Final Pretrial Statement. (Doc. 169 at 18.) Plaintiffs apparently recognized the myriad infirmities with any such request as to Count I. They requested a refund only as to their since-eliminated rescission claims. (*Id.*) *See* Local Rule 3.06(e); *Kaw v. Sch. Bd. of Hillsborough Cty., Fla.*, 2009 WL 1956683, at *1 (M.D. Fla. July 7, 2009) ("Damages not requested in the pretrial statement are considered waived.")

§§1.0 (definition of "Licensed Plant"), 4.0 ("License").) Plaintiffs' shift is undisputed. In both their December 2014 and 2015 financial statements, Plaintiffs reported that they had shifted to a coal-to-fertilizer plant (or, as an alternative, selling off their real estate and gasification assets and winding up their affairs).[12] (Doc. 149-5 at 8-9.) Indeed, Plaintiffs concede in their most recent brief that they had shifted to coal-to-fertilizer before Siemens' alleged repudiation. (Doc. 206 at 2.) Plaintiffs argue that their pre-repudiation shift "is irrelevant for purposes of Siemens' contractual obligations." (*Id.*) Plaintiffs contend their end product does not matter because "Siemens' scope of contractual obligations end at the production of syngas." (*Id.*)

Plaintiffs miss the point. The dispositive factor is the scope of ***Plaintiffs' license rights from Siemens***. (Doc. 149 at 8, fn. 6.) The license granted to C2L is "limited to the use of the Licensed Technology only for the Gasification Island at the Licensed Plant." (Doc. 146-9 at §4.0.) The "Licensed Plant" is a "Coal to Methanol Conversion Plant" at the West Paducah location. (*Id.* at §1.0.) Indeed, Plaintiffs admit the license is specific to coal-to-methanol in paragraph 16 of the First Amended Complaint. (Doc. 63 ¶16.) To use Siemens' technology in a coal-to-fertilizer plant in February 2016—as was indisputably Plaintiffs' then-existing project—Plaintiffs needed a new license. Having ***voluntarily*** abandoned their coal-to-methanol plant at least 14 months before Siemens' alleged repudiation, Plaintiffs cannot prove that repudiation "forced them to abandon" the coal-to-methanol plant in February 2016. Nor can Plaintiffs seek any "reliance damages" for building a coal-to-fertilizer plant outside the

---

[12] "In light of falling oil prices and its impact on methanol prices, the Company's management feels it is increasingly unlikely that the Company will be able to secure the debt financing and equity investment needed to see the planned coal to methanol project to fruition. Management has begun to explore the possibility of selling the Company's real estate, gasifiers, and other related equipment, while at the same time continuing to search for equity investors and for debt financing ***for a nitrogen fertilizer plant.***" (Doc. 149-5 at 8-9; emphasis added.)

scope of their license. *See Jorgensen,* 217 A.D.2d 5 at 629 (affirming summary judgment; no evidence of causation).

Second, Plaintiffs cannot prove that any of the "reliance damages" they claim were spent in reliance on the 2012 License Agreement, which is dated July 3, 2012. (Doc. 146-9 at 5.) Plaintiffs admit they incurred no obligations that required Plaintiffs to pay money after signing the 2012 License Agreement:

> Q. After MidAmerica signed the last license deal with Siemens in July of 2012, did MidAmerica or Secure ever enter into any binding contracts with plant suppliers that required Secure to pay money?
> A. After 2012, plant suppliers—you mean equipment suppliers?
> Q. Equipment suppliers.
> A. Yeah, not that I recall. I think the only equipment supplier we ever—now that I'm thinking of it, the only equipment supplier that we contracted and paid money to was Siemens.
> Q. And after the license agreement was signed in July of 2012, did Secure enter into any binding contract with plant vendors that required Secure to pay any money?
> A. So plant vendors, would that include engineers?
> Q. It would include anybody who's not a equipment supplier.
> A. Yeah, I—yeah. We had a service agreement with Sega, a continuing agreement.
> Q. That—that agreement was already in place as of July 2012?
> A. Yes.
> Q. So after July 2012, Secure didn't enter into any binding contracts with vendors that required Secure to pay money, right?
> ***
> A. Yeah, no, we did not.

(Doc. 149-2 at 468:8-469:21.)

Plaintiffs' "reliance damages" trial exhibits corroborate their testimony. (Doc. 169-2 at 14-18.) Plaintiffs list 40 invoices and payment records to non-parties they claim support their $3.9 million "reliance damages" claim. (*Id.*; from PTX 144-148.) 38 of those exhibits

contain invoices for work performed before the 2012 License Agreement existed.[13] (*Id.*) And the only two exhibits showing work that post-dates the 2012 License Agreement (reflecting a grand total of $8,914 allegedly paid) are invoices from two civil engineering vendors; *i.e.*, vendors to whom Plaintiffs admit they were already bound **before** the existence of the 2012 License Agreement. (Ex. A (PTX 183 and 184); Doc. 149-2 at 468:8-469:21.) Since Plaintiffs cannot "rely" on a contract before it existed, summary judgment is warranted. *See Gruber,* 126 F. Supp. at 446–47 (expenses incurred before contract not recoverable reliance damages).

### III. THE COURT SHOULD DISREGARD PLAINTIFFS' ATTEMPTS TO INJECT FUTILE NEW THEORIES AND REHASH OLD ARGUMENTS.

Instead of addressing causation as to Count I, Plaintiffs spend the lion's share of their brief: (1) attempting to inject new theories into the action; and (2) rehashing old arguments and motions. Siemens is mindful of the Court's admonition not to do either of those things. (Doc. 204 at 1.) The Court has already ruled (three times) that Plaintiffs are limited to Count I as pleaded.[14] (Docs. 137, 154, 204.) And judgment in favor of Siemens has been entered as to Counts II, IV, V, and VI. (Doc. 205).[15] Those matters are closed.[16]

---

[13] Siemens objected to these exhibits, and moved *in limine* to exclude them, on the grounds that they: (1) were not produced during discovery (note the absence of bates numbering in Exhibit A); and (2) pre-date Siemens' alleged fraud. (Doc. 173 at 12-13.) With the fraud counts now out of the case, there is even more reason to exclude them because they also pre-date the 2012 License Agreement.

[14] For example, Plaintiffs never pleaded that Siemens breached the 2012 License Agreement by failing to provide an updated BEDP (that Plaintiffs never paid for) or technical field assistance (for a plant that does not exist). As pleaded, Count I is for repudiation; *i.e.*, that Siemens' February 2016 disclosure of its future planned exit somehow made it impossible for Siemens to perform the 2012 License Agreement at some indefinite time in the future, assuming Plaintiffs could raise the necessary debt financing or equity investments they needed to progress in their plans. Further, Plaintiffs identify no evidence in the record suggesting Siemens cannot still perform its contractual obligations, even today, if Plaintiffs would pay their long past due license fees. Because there is none.

[15] Count III was dismissed at the pleading stage. (Doc. 74.)

[16] Plaintiffs' misrepresentations start in the first sentence of Plaintiffs' brief: Plaintiffs claim they moved for summary judgment as to Count I. (Doc. 206.) Plaintiffs did not move for summary judgment as to Count I. (Doc. 146.) And Plaintiffs' misrepresentations continue throughout, with meritless and already discredited attacks on Siemens and the Court.

At bottom, Count I emanates from Plaintiffs' pretextual efforts to regain from Siemens the losses caused by Plaintiffs' own business misjudgments—misjudgments which began when they bought the equipment in 2007, before securing financing or an EPC contractor[17]. The facts are undisputed. Plaintiffs' outside counsel sent the February 11, 2016 letter to set up their repudiation claim. (Docs. 149-7 at 66-69; 169 at 20, ¶9.) Siemens responded less than a week later, on February 17, to assure Plaintiffs that Siemens would not violate any contractual obligation by its strategic exit from the market.[18] (Docs. 149-7 at 70-71; 169 at 20, ¶10.) If Plaintiffs were interested in an adequate assurance of performance, this "dispute" would have ended there. It did not. Siemens then offered, on March 18, 2016, to extend both Plaintiffs' payment deadlines and Siemens' own performance obligations if Plaintiffs would simply pay what was already past due. (Docs. 149-7 at 72-73; 169 at 20, ¶12.) If Plaintiffs were interested in using the license they had (for a coal-to-methanol plant), Siemens' extension offer should have concluded the matter. Again, it did not. Once Plaintiffs realized their business misjudgments, they were simply not interested in Siemens' actual performance of the 2012 License Agreement. Instead, Plaintiff sought to recover "damages" to which they are not entitled as a matter of law. The Court should grant summary judgment in Siemens' favor.

---

[17] Plaintiffs were the only client Dr. Kosstrin ever had, in his 40-plus years of coal gasification experience, who took this approach. (Docs. 150-3 at 43:9-13; 185 at 73:5-74:7.)

[18] Plaintiffs call this letter "self-serving" because it came from Siemens' counsel, but ignore that it was a response to a February 11, 2016 letter from Plaintiffs' litigation counsel in this case. (Docs. 206 at 2; 149-7 at 66-69.)

Dated:  August 9, 2019

Respectfully submitted,

By: */s/ James A. Daire*
Robert W. Thielhelm, Jr.
Florida Bar No. 889679
P. Alexander Quimby
Florida Bar No. 099954
**Baker & Hostetler LLP**
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: 407.649.4000
Facsimile: 407.841.0168
Email: rthielhelm@bakerlaw.com
Email: aquimby@bakerlaw.com

Scott D. Baker (admitted pro hac vice)
James A. Daire (admitted pro hac vice)
Christopher J. Pulido (admitted pro hac vice)
**Reed Smith LLP**
101 Second Street, Suite 1800
San Francisco, CA  94105-3659
Telephone: 415.543.8700
Facsimile: 415.391.8269
Email:  sbaker@reedsmith.com
Email:  jdaire@reedsmith.com
Email:  cpulido@reedsmith.com

*Counsel for Siemens Energy, Inc.*

## CERTIFICATE OF SERVICE

  I HEREBY CERTIFY that on August 9, 2019, a true and correct copy of the foregoing was submitted to the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to the following listed counsel:

Michael R. Cherba
Robert L. Devereux
Jeffrey R. Schmitt
**Danna McKitrick, P.C.**
7701 Forsyth Blvd., Suite 800
St Louis, MO 63105
Telephone: (314) 726-1000
Fax: (314) 725-6592
Email: mcherba@dmfirm.com
Email: rdevereux@dmfirm.com
Email: jschmitt@dmfirm.com

Walter A. Ketcham , Jr.
**Grower, Ketcham, Eide, Telan & Meltz, PA**
901 N Lake Destiny Rd., Suite 450
PO Box 538065
Orlando, FL 32853-8065
Telephone: (407) 423-9545
Fax: (407) 425-7104
Email: enotice@growerketcham.com


  DATED: August 9, 2019.


                */s/ James A. Daire*
                James A. Daire