**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MIDAMERICA C2L INCORPORATED
and SECURE ENERGY, INC.,

Plaintiffs,

v. Case No: 6:17-cv-171-Orl-40LRH

SIEMENS ENERGY, INC.,

Defendant.
_________________________________/

**ORDER**

This cause is before the Court without oral argument on Defendant's Motion for Summary Judgment (Doc. 149 (the "**Motion**")), the response (Doc. 161), the reply (Doc. 166), and the supplemental briefings (Docs. 206, 207) thereto. The Court previously denied Plaintiffs' Motion for Summary Judgment and granted in part Defendant's Motion. (Doc. 203). Upon consideration and review of the record as cited by the parties in their respective briefs, the remainder of Defendant's Motion is due to be granted in part and denied in part.

## I. BACKGROUND[1]

This lawsuit arises out of a contract dispute between Plaintiffs, Secure Energy, Inc. ("**Secure**"), and its subsidiary, MidAmerica C2L, Inc. ("**C2L**"), (collectively, "**Plaintiffs**"), and Defendant, Siemens Energy, Inc. ("**Defendant**"). (Doc. 63, ¶¶ 5–8). On December 24, 2007, Secure and Defendant executed a contract (the "**2007 Contract**") requiring

---

1 The Court incorporates the factual background as stated in its previous order on summary judgment (Doc. 203) and restates only those facts as relevant to the instant order.

Defendant to sell certain equipment to Secure for use at a coal gasification plant located in Decatur, Illinois, where Secure planned to operate an industrial facility for the conversion of coal into natural gas. (Doc. 146-17; Doc. 169, p. 19, ¶¶ 1, 2). Secure paid Defendant approximately $40 million for the equipment. (Doc. 146-1, ¶ 7). Plaintiffs never obtained financing or vendor contracts required to proceed with the building of their plant. (Doc. 149-2, p. 42; Doc. 149-22, p. 8). Eventually, Plaintiffs abandoned the idea for a substitute natural gas plant and adopted a new plan for a plant in either Decatur or West Paducah, Kentucky. (Doc. 149-2, p. 73).

On March 31, 2010, Secure and Defendant executed a contract stating that both parties had fulfilled their obligations to each other under the 2007 Contract ("**2010 Completion Agreement**"). (Doc. 146-14; Doc. 169, p. 19, ¶ 4). On the same day, Secure and Defendant entered into a License and Service Agreement ("**2010 License Agreement**") whereby Defendant granted Secure a license to use certain of its patented technologies for the development, construction, and operation of the Decatur, Illinois, coal gasification plant. (Doc. 146-14; Doc. 169, p. 20, ¶ 5). By October 2011, Plaintiffs abandoned their plans for the Decatur plant and initiated a new plan to build a coal-to-methanol plant in West Paducah. (Doc. 149-9, p. 48).

On July 18, 2012, the 2010 License Agreement was terminated by mutual agreement, and on the same day, C2L and Defendant entered into a new License and Service Agreement ("**2012 License Agreement**") whereby Defendant granted C2L a license to use certain of its technologies for a coal gasification plant in West Paducah,

Kentucky, where C2L would convert coal into methanol.[2] (Docs. 146-9, 146-10, 146-11, 146-12; Doc. 169, p. 20, ¶ 6). In both the 2010 and 2012 License Agreements, Defendant agreed to provide technology, engineering services, technical field assistance, training, and performance guarantees relating to the equipment conveyed in the 2007 Contract in exchange for a license fee. (Docs. 146-9, 146-10, 146-11, 146-12, 146-14). The 2007 Contract, as well as both License Agreements, guaranteed the equipment would meet certain performance standards.

By the end of March 2015, Plaintiffs had suspended business operations and stopped paying salaried employees. (Doc. 149-9, p. 100). Plaintiffs' financial statements show that, "[T]he Company has incurred losses since inception," and that, "The Company's prior losses and other factors raise substantial doubt about the Company's ability to continue as a going concern." (Doc. 149-5, p. 8, ¶ 13). Plaintiffs were in a financial position where they needed to "obtain grants, debt financing or additional equity investment" in order to complete their intended project. (*Id.*).

On February 2, 2016, Defendant informed Secure that they would be closing the fuel gasification division of its business. (Doc. 169, p. 20, ¶ 8). On February 11, 2016, Secure demanded rescission of the 2007 Contract and return of all monies paid by Secure under the 2007 Contract. (Doc. 149-7, pp. 66–69; Doc. 169, p. 20, ¶ 9). In response, on February 17, 2016, Defendant informed Secure that they would not violate

---

[2] Secure's attempt to operate a coal gasification plant in Decatur, Illinois, did not come to fruition, and in July 2012, Secure's focus turned to the operation of a plant in West Paducah, Kentucky, to convert coal into methanol. (Doc. 63, ¶ 16; Docs. 146-9, 146-10, 146-11, 146-12; Doc. 169, p. 20, ¶ 6). Secure also attempted to employ coal gasification to manufacture gasoline and fertilizer. The Kentucky plant never materialized.

any contractual obligation by its strategic exit from the coal gasification business. (Doc. 149-7, pp. 70–71; Doc. 169, p. 20, ¶ 10). The parties met on March 2, 2016. (Doc. 169, p. 20, ¶ 11). Thereafter, on March 18, 2016, Defendant offered to extend deadlines for completion of its performance tests as defined by the 2012 License Agreement from December 31, 2015, to December 31, 2021, if Plaintiffs paid the full remaining balance of the fee required under the 2012 License Agreement on or before July 1, 2016. (Doc. 149-7, pp. 72–73; Doc. 169, p. 20, ¶ 12). Plaintiffs rejected Defendant's offer on March 31, 2016. (Doc. 149-7, p. 74; Doc. 149-8, pp. 2–3; Doc. 169, p. 20, ¶ 13). On April 14, 2016, Defendant revoked its offer and demanded payment of a termination fee pursuant to the 2012 License Agreement. (Doc. 149-8, pp. 4–6). On April 19, 2016, Defedant invoiced C2L for the termination fee. (Doc. 169, p. 20, ¶ 15). In May 2018, Defendant closed its coal gasification division. (*Id.* ¶ 16).

Plaintiffs maintain that Defendant's notification in February 2016 that they intended to close the fuel gasification of its business constitutes a repudiation of the 2012 License Agreement. (Doc. 63, ¶ 26; Doc. 169, p. 2).

Plaintiffs alleged five Counts against Defendant:[3] Breach of Contract (Count I); Breach of Warranty of Fitness for Particular Purpose (Count II); Fraudulent Misrepresentation – Failure to Disclose Defects in Technology (Count IV); Rescission – Fraud (Count V); and Rescission – Lack of Consideration (Count VI). (*Id.*). Defendant counter-sued Plaintiffs for breach of contract arising from Plaintiffs' failure to render

[3] On September 29, 2017, the Court dismissed Count III after it was voluntarily waived by Secure. (Doc. 74).

payment for the License and Service Agreement as required. (Doc. 75, pp. 20–21). Both parties moved for summary judgment. (Docs. 146, 149).

On July 26, 2019, the Court denied Plaintiffs' Motion for Summary Judgment, granted in part Defendant's instant Motion as to Counts II, IV, V, and VI, and deferred ruling on Count I and its Counterclaim. (Doc. 203). The Court directed the parties to file supplemental briefing advising the Court on the issue of "[w]hether there is evidence in the record that establishes a direct and proximate cause of damages resulting from the alleged breach set forth in Count I of the Complaint." (Doc. 204). The Court further directed the parties to avoid rehashing arguments already addressed in previously-filed briefs and issues already decided in previous orders. (*Id.*). The parties subsequently filed their respective supplemental briefing. (Docs. 206, 207). Plaintiffs continued to rely on their argument that the non-breaching party does not need to prove its ability to perform under the contract in the future and that its damages include "everything Secure spent since the beginning of its relationship with Siemens." (Doc. 206, p. 5). Defendant responded to the supplemental briefing by arguing that Plaintiffs failed to—and simply cannot—address the issue of direct and proximate causation. (Doc. 207).

## II.   STANDARD OF REVIEW

A court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to

summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). "The court need consider only the cited materials" when resolving a motion for summary judgment. Fed. R. Civ. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam) (holding that a district court does not err by limiting its review to the evidence cited by the parties in their summary judgment briefs).[4]

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta, Ga*., 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

## III. DISCUSSION

### A. Breach of Contract (Plaintiffs' Count I)

Plaintiffs assert that Defendant is in breach of contract under a theory of anticipatory repudiation. Specifically, Plaintiffs claim that "[i]n making the strategic

---

4 "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

decision to exit the coal gasification market, Siemens has engaged in conduct that demonstrates to [Plaintiffs] that Siemens will not honor its obligations under" the 2012 License Agreement. (Doc. 63, ¶ 26).

The Court has previously ruled, and the parties agree, that New York law applies to Count I. (Doc. 62, p. 4 n.2; Doc. 197, p. 2; Doc. 199, p. 6 n.15). Under New York law, "[a]nticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

> An anticipatory breach of contract—also known as an anticipatory repudiation—can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the oblige a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

*Princes Point LLC v. Muss Dev. LLC*, 87 N.E.3d 121, 133 (N.Y. 2017). For an anticipatory repudiation to occur, "the expression of intent not to perform by the repudiator must be 'positive and unequivocal.'" *Id.* (citing *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 150 (N.Y. 1978)); *see also Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 211 A.D. 2d 262, 267 (N.Y. App. Div. 1995) (requiring a "definite and final communication of the intention to forego performance before the anticipated breach may be the subject of legal action"). "Mere expression of difficulty in tendering the required performance, for example, is not tantamount to a renunciation of the contract." *Rachmani*, 211 A.D. at 267.

When faced with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options: (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, or (b) continue to treat the contract as valid and wait to bring suit until the designated time for performance. *Lucente*, 310 F.3d at 258.

However, the non-repudiating party must make an affirmative decision. *Id.* He "cannot at the same time treat the contract as broken and subsisting," for "[o]ne course of action excludes the other." *Inter-Power of N.Y., Inc. v. Niagara Mohawk Power Corp.*, 686 N.Y.S.2d 911, 913 (N.Y. App. Div. 1999).

Defendant moves for summary judgment on Count I of the Amended Complaint, arguing that Plaintiffs cannot show that they were ready, willing, and able to perform under the contract. (Doc. 149, pp. 19–21). Put another way, Defendant asserts that Plaintiffs cannot show that Defendant's alleged repudiation caused the stated damages. While an anticipatory breach obviates the need for the nonbreaching party to tender performance, to recover damages, the nonbreaching party must nonetheless demonstrate that it was "ready willing, and able to perform its obligations under the contract" at the time their performance would have been due. *Inter-Power of N.Y.*, 686 N.Y.S.2d at 913; *see also Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523.[5] This principle is merely an application of the general rule that the complaining party must demonstrate that the breach caused him injury; "[t]o do this he must prove that he intended to and was able to perform when his performance was due." *Scholle v. Cuban-Venezuelan Oil Voting Trust*, 285 F.2d 318, 320 (2d Cir. 1960).

According to Plaintiffs' Amended Complaint, they have been damaged by Defendant in the following ways: (1) the equipment and technology purchased under the 2007 agreement is no longer useful in the intended project and has therefore decreased

5 Plaintiffs attempt to argue that "ready, willing, and able" is not required in order to recover for Defendant's alleged anticipatory breach. This argument is to no effect. *See Pesa v. Yoma Dev. Grp., Inc.*, 18 N.Y.3d 527, 531–32 (N.Y. 2012) (finding the rule requiring a showing of "ready, willing, and able" to be supported by common sense and to be correct).

in value from $40,298,436.00 to $0; and (2) they can no longer use their equipment, so Plaintiffs have been forced to abandon their project for which they expended an additional $46 million. (Doc. 63, ¶ 27). Plaintiffs argue in their supplemental briefing that their damages include the purchase price of Defendant's coal gasification equipment and technology and additional engineering expenses, about $43 million and $3.9 million respectively, because these were expenses paid "in furtherance of developing its project." (Doc. 206, p. 7). As the Court has previously warned, however, Plaintiffs have alleged a breach of contract under the theory of anticipatory repudiation and are therefore confined to the law in this realm.[6] Plaintiffs must show: (1) Defendant's repudiated the 2012 License Agreement; and (2) the repudiation proximately caused Plaintiffs' damages. Instead, Plaintiffs' supplemental briefing ignored the Court's previous warnings and focused on what seems to the Court to be alternative theories of damages, including compensatory damages based on a preceding, irrelevant agreement between the parties. Plaintiffs' seeming attempt at inserting other theories will not impose liability for damages on Defendant where causation cannot be proven.

*1. Causation*

New York law states that an essential element of a breach of contract claim is damages *caused by the alleged breach*. *See Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728 (2d Cir. 1992). The plaintiff "must demonstrate that the damages were caused by and are directly traceable to the [defendant's] breach." *Id.* at 731 (2d Cir. 1992) (citing *Kenford Co. v. Cty. of Erie*, 67 N.Y.2d 257, 261 (1986) (internal quotations omitted).

[6] The Court has ruled three separate times that Plaintiffs are limited to Count I as pleaded for repudiation. (Docs. 137, 154, 204).

Where the ultimate transaction would have failed, and where the plaintiff's claimed damages would have resulted even if no breach occurred, the plaintiff cannot prove that their damages resulted from the defendant's conduct. *See Bausch*, 977 F.2d at 731 (affirming the district court judgment because the plaintiff sought "to recover for a loss on a transaction separate from the transaction that gave rise to the breach"). A plaintiff cannot blame a defendant for breach of contract and collect damages when the damages they are claiming to have suffered were not actually caused by any conduct of the defendant.

As Defendants point out, there is no causal relationship between their alleged repudiation of the 2012 License Agreement and the damages Plaintiffs seek—the purchase price of equipment purchased nine years earlier and under a different contract. (Doc. 207, p. 4). Plaintiffs did not have the financing necessary to complete their intended project, and their claimed damages—useless equipment and technology—would have resulted even if Defendant did not allegedly breach the agreement. (Doc. 149-2, pp. 57–59; Doc. 149–10; Doc. 149-11, p. 43; Doc. 149-22, p. 8). Therefore, Plaintiffs cannot prove that their damages resulted from Defendant's alleged conduct. Even after an opportunity for supplemental briefing directing the parties to brief the issue of causation of damages, Plaintiffs did not offer any record evidence that suggests that, in light of their financial standing and nonexistence of their plant, their stated damages were in fact caused by Defendant's alleged breach.

The finding that Defendant's conduct did not cause Plaintiffs harm is further supported by the fact that Defendant even offered to extend deadlines under the existing contract to continue the relationship between the parties and abide by their contractual

obligations. (Doc. 149-7, pp. 70–73; Doc. 207, p. 10). Although Plaintiffs complain of Defendant's unwillingness to perform their end of the bargain, Plaintiffs are unable to explain away the fact that they denied Defendant's offer to extend the deadlines and to continue their business relationship a mere few days after what Plaintiffs characterize as Defendant's repudiation of the agreement. (Doc. 149-7, p. 74). Plaintiffs' rejection of this offer evidences their attempt to blame Defendant for losses that Plaintiff was experiencing long before the alleged breach occurred. The Court finds that Plaintiffs would have incurred the losses they are claiming as contract damages whether or not Defendant breached the agreement.

*2. Ready, Willing, and Able*

Plaintiffs are equally unable to prove that they were ready, willing, and able to perform their obligations under the contract when their performance would have been due. *See Pesa,* 18 N.Y.3d at 531–32. (requiring a showing of "ready, willing, and able"). Plaintiffs admit, and their financial statements show, that they did not have the necessary funding for any iteration of their project and could not pay the past-due license fees under the contract. (Doc. 149-2, pp. 54–55; Doc. 149-22, RFA No. 22). Plaintiffs' argument that their performance of the licensing fee payments was not yet due because Defendant failed to invoice them misses the point. Plaintiffs need not show that their performance under the contract was *in fact due*, but they are required to prove that they *could have* met their contractual obligations when they ultimately became due. *Scholle*, 285 F.2d at 320 ("The party wronged must show, however, that the breach caused his loss. To do this he must prove that he intended to and was able to perform when his performance was due."). Plaintiffs' performance was simply not possible. Plaintiffs' project was set to fail

before any of Defendant's alleged conduct occurred. Plaintiffs had already suspended business operations and payroll, had "incurred losses since inception," and were in a position where additional debt financing or equity investment was a necessity. (Doc. 149-9, p. 100; Doc. 149-5, p. 8, ¶ 13). Plaintiffs were not in any financial condition to perform under the terms of the 2012 License and Service Agreement, as evidenced by their financial statements and their inability to perform under the two previous agreements (2007 and 2010), regardless of Defendant's alleged breach. (*Id.* at pp. 56–57). Therefore, Plaintiffs have not—and cannot—prove that they were able to perform under the contract had Defendant not allegedly breached its obligations.

The Court finds that Plaintiffs are unable to prove that the damages they seek were the direct and proximate result of Defendant's alleged conduct. Accordingly, summary judgment is due to be granted in favor of Defendant as to Plaintiffs' Count I.

**B. Defendant's Counterclaim**

Defendant asserts in its Counterclaim that Plaintiffs are in breach of contract by failing to pay the termination fee, as required under the terms of the 2012 License and Service Agreement. (Doc. 75, ¶¶ 17–20). Defendant argues that because Plaintiffs could not have terminated the 2012 License and Service Agreement pursuant to Defendant's alleged repudiation, the agreement remained enforceable by either party. (Doc. 149, p. 25). Defendant further argues that Plaintiffs' failure to pay the past due amounts and the termination fee, as required under the agreement, constitutes a breach of contract that entitles Defendant to its damages of €11.4 million. (*Id*.). In response, Plaintiffs argue that Defendant did not demand payment for the license or termination fees until after Plaintiffs

properly rescinded the operative agreement due to Defendant's alleged anticipatory repudiation. (Doc. 161, pp. 25–26).

Defendant moved for summary judgment on this counterclaim. Open issues remain regarding the circumstances around which party breached the operative 2012 License Agreement. Defendant cannot rely on Plaintiffs' inability to prove an essential element of their claim as an argument favoring summary judgment on its own distinct counterclaim for breach of contract. Defendant even admits that "[w]hether or not [Defendant's] repudiation occurred is a triable issue." (Doc. 149, p. 20 n.18). Accordingly, summary judgment is due to be denied as to Defendant's Counterclaim for breach of contract.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment (Doc. 149) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. Defendant's Motion for Summary Judgment as to Count I of Plaintiffs' Amended Complaint is **GRANTED**.

   b. In all other respects, Defendant's Motion for Summary Judgment is **DENIED**.

2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Siemens Energy, Inc., as to Count I.

**DONE AND ORDERED** in Orlando, Florida on October 15, 2019.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties