**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| **MIDAMERICA C2L INC., et al.**, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | Case No. 6:17-CV-171-Orl-40LRH |
| | ) | |
| **SIEMENS ENERGY, INC.**, | ) | |
| | ) | |
| Defendant. | ) | |

**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs **MidAmerica C2L Incorporated** and **Secure Energy, Inc.**, for their

Second Amended Complaint against Defendant **Siemens Energy, Inc.**, state to the Court

as follows:

1.     MidAmerica C2L Incorporated is a Nevada corporation with its principal

place of business in the State of Missouri. MidAmerica is a wholly owned subsidiary of

Secure Energy, Inc.

2.     Secure Energy, Inc. ("Secure") is a Nevada corporation with its principal

place of business in the State of Missouri.  MidAmerica C2L and Secure shall

collectively be referred to as "Secure."

3.     Siemens Energy, Inc. ("Siemens") is a corporation formed under the laws

of the State of Delaware, with its principal place of business in the State of Florida, and is

authorized to do business in the State of Illinois. Siemens Energy, Inc. is a wholly-owned

subsidiary of Siemens Aktiengesellschaft ("Siemens AG"), a German stock corporation

with headquarters in Berlin, Germany and Munich, Germany. Prior to October 1, 2008,

Siemens was known as Siemens Power Generation, Inc.

4.      Jurisdiction and venue are proper in this Court in that this case was transferred to this Court on Siemens' motion.

5.      In 2006, Secure and its subsidiary Secure Energy Decatur, L.L.C., began the process of development and construction of a plant in Decatur, Illinois for the conversion of coal into natural gas using coal gasification technology.

6.      In an effort to build the plant in Decatur, Secure and Secure Energy Decatur, L.L.C., entered into discussions with a number of corporations for the purchase of coal gasification technology, including equipment, engineering services, technical field assistance and training. Among the corporations Secure and Secure Energy Decatur, L.L.C., approached in seeking the aforementioned coal gasification technology, equipment, engineering services, technical field assistance and training for use in the Decatur plant was Siemens Power Generation, Inc.

7.      On July 24, 2007, Secure entered into a Memorandum of Understanding with Siemens Power Generation, Inc. memorializing the parties' desire to enter into a contract for the sale of two 500 megawatt (thermal) ("MWth") gasifiers, associated Equipment and engineering services and a contract for a process license. In connection with the Memorandum of Understanding, it was agreed that Siemens would begin described work on the Equipment and engineering in exchange for payments totaling € 9,600,000 (Nine Million, Six Hundred Thousand Euros).

8.      On or about December 21, 2007, Secure Energy Decatur, L.L.C., and Siemens Power Generation, Inc. entered into a contract entitled the "Contract Between

Secure Energy Decatur, LLC and Siemens Power Generation, Inc. for the Provision of

Engineering Services and the Supply of Equipment Related to the Coal to SNG

Conversion Project for the Decatur, Illinois Plant" (hereinafter, the "2007 Contract"). In

the 2007 Contract, Siemens agreed to supply Secure Energy Decatur, L.L.C. with the

Technology, including coal gasification Equipment, engineering services, and technical

field assistance and training in exchange for payment by Secure Energy Decatur, L.L.C.

of € 27,715,000 (Twenty-Seven Million, Seven Hundred Fifteen Thousand Euros) plus

$1,717,000.00 (One Million, Seven Hundred Seventeen Thousand Dollars).

9.      On December 31, 2007, Secure Energy Decatur, L.L.C., and Siemens

Power Generation, Inc. entered into a Project License Agreement whereby Siemens

Power Generation, Inc. granted Secure Energy Decatur, L.L.C. a license "to use the

Technology and under any Patents therefore, in order to build, have built, use and

operate" the Decatur plant in exchange for payment of a license fee.

10.     Pursuant to the 2007 Contracts, Secure Energy Decatur, L.L.C. paid all

sums due for the coal gasification Equipment and engineering Services. Siemens

delivered all Equipment and design drawings purchased by Secure Energy Decatur,

L.L.C. with the exception of a fuel measurement system and the Safety Information

System ("SIS"). Based on the exchange rate between the U.S. Dollar and the Euro at the

time of payment, Secure paid $40,298,436.00 (Forty Million, Two Hundred Ninety Eight

Thousand, Four Hundred Thirty Six Dollars) for the coal gasifiers and an additional

$228,531.00 (Two Hundred Twenty Eight Thousand, Five Hundred Thirty One Dollars)

for customs and delivery fees related to the two 500 MWth gasifiers, each of which

3

measures 5,034 mm in length and 2,590 mm in diameter, and weighs 220 tons, and for related equipment, for a total cost of $40,526,967.00 (Forty Million, Five Hundred Twenty Six Thousand, Nine Hundred Sixty Seven Dollars).

11.     On March 31, 2010, Secure, the parent company of Secure Energy Decatur, L.L.C., entered into a Completion Agreement (the "2010 Completion Agreement") with Siemens, formerly known as Siemens Power Generation, Inc. In the 2010 Completion Agreement, the parties agreed that Siemens delivered, and Secure Energy Decatur, L.L.C. had paid for, the Siemens Equipment and Technology. The parties further agreed that the 2007 Contract and the 2007 Project License Agreement were terminated.

12.     On March 31, 2010, the same day upon which the 2010 Completion Agreement was entered into, Secure and Siemens, formerly known as Siemens Power Generation, Inc., entered into a License and Service Agreement (the "2010 License and Service Agreement") which, by Agreement, superseded the 2007 Contracts, and whereby Siemens granted Secure a license "to use the Technology and under any Patents therefore, in order to build, have built, use and operate" the Decatur plant to convert coal into gasoline in exchange for payment of a license fee against Siemens' submission of one original and one copy of a commercial invoice indicating the amount to be paid.

13.     Siemens agreed in the 2010 License and Service Agreement to provide engineering services, technical field assistance, training, and performance guarantees related to the Siemens Equipment and Technology sold to Plaintiffs.

14.     Based upon the experience of a plant in China that used identical gasifiers

and related gasification Equipment and Technology, Siemens became aware of multiple material design defects in the Siemens Equipment and Technology between October 31, 2010, and September of 2011, including but not limited to:

a.      The burners are improperly engineered and designed;

b.      The design of the raw gas (syngas) outlet and the black water outlet is defective because the level of the black water will rise above the raw syngas outlet and prevent syngas from exiting the gasifier, greatly increasing the risk of catastrophic explosion;

c.      The Basic Engineering Design Package ("BEDP") is defective and needs to be modified to make changes to multiple components, including, but not limited to, the coal handling system, the slag handling system, piping design, valve design, the syngas cleaning system, and the black water system; and

d.      Siemens' design of the fuel measurement system is defective and does not work.

15.     On July 18, 2012, Siemens Energy, Inc. and Secure Energy, Inc. entered into a Completion Agreement (the "2012 Completion Agreement") superseding and terminating the 2010 License and Service Agreement.

16.     On July 18, 2012, the same day that the 2012 Completion Agreement was executed, MidAmerica, a subsidiary of Secure, and Siemens, entered into a License and Service Agreement (the "2012 License and Service Agreement") whereby Siemens granted MidAmerica a license "to use the Technology and under any Patents therefore, in

order to build, have built, use and operate" a plant in West Paducah, Kentucky to convert coal into methanol in exchange for payment of a license fee against Siemens' submission of one original and one copy of a commercial invoice indicating the amount to be paid. A partial copy of the 2012 License and Service Agreement is attached hereto as **Exhibit 1** and incorporated herein by reference.

17.     Siemens agreed in the 2012 License and Service Agreement to provide coal gasification Technology, including engineering services, technical field assistance and training, and performance guarantees related to the Equipment and Technology sold pursuant to the 2007 Contract in exchange for payment by Secure.

18.     The 2007 Contract, the 2010 License and Service Agreement and the 2012 License and Service Agreement each contained provisions in which Siemens and/or its predecessor guaranteed that the coal gasification Equipment sold under the 2007 Contract would meet certain performance standards.

19.     Based upon their dealings with Siemens Energy and Siemens' representations concerning the Technology, coal gasification Equipment, engineering services and technical field assistance, Secure and MidAmerica entered into contracts with third parties concerning the design, engineering, construction, and operation of the above-mentioned plants, including a supply agreement with Murray Energy, whereby Murray Energy would supply coal from its New Era Mine in Galatia, Illinois for use in the plant.

20.     At all times throughout its course of dealing with Secure and MidAmerica, Siemens represented that it would continue to stand by its guarantees and representations

related to the Technology, coal gasification Equipment, engineering services, and technical field assistance.

21.      Upon information and belief, as early as 2014, Siemens made the conscious decision to shutter its coal gasification division and withdraw from the market for coal gasification Equipment and Technology.

22.      On February 2, 2016, during a telephone conference, a representative of Siemens informed MidAmerica and Secure for the first time that Siemens was shuttering its coal gasification division, that Siemens would not be able to meet its obligations made in 2007 Contract, the 2010 License and Service Agreement and the 2012 License and Service Agreement, and that Siemens would not be able to provide the technical field assistance and training under the 2012 License and Service Agreement.

23.      In spite of the fact that it had made the decision years earlier, Siemens did not advise Plaintiffs of its decision to shutter its coal gasification division and to exit the market for coal gasification Equipment and Technology at any point prior to February 2, 2016.

## COUNT I
## BREACH OF CONTRACT

Plaintiffs **MidAmerica C2L Incorporated** and **Secure Energy, Inc.**, for Count I of their Complaint against **Siemens Energy, Inc.**, state to the Court as follows:

24.      Plaintiffs replead and incorporate by reference the allegations set forth in Paragraphs 1 through 23 of this Complaint as if the same were fully set forth herein.

25.      In making the strategic decision to exit the coal gasification market, Siemens engaged in conduct demonstrating to Plaintiffs that Siemens will not honor its

obligations under the 2012 License and Service Agreement. Because Siemens repudiated its obligations under the 2012 License and Service Agreement, Siemens breached the 2012 License and Service Agreement.

26.    As a direct and proximate result of Siemens' aforesaid breach of the 2012 License and Service Agreement, Plaintiffs have been damaged in the following respects:

a.    The two 500 MWth coal gasifiers, related Equipment and BEDP purchased under the 2007 Memorandum of Understanding and the 2007 Contract can no longer be incorporated into any gasification plant and have, therefore, decreased in value from the $40,526,967.00 (Forty Million, Five Hundred Twenty-Six Thousand, Nine Hundred Sixty-Seven Dollars) paid to $0.00 (Zero Dollars); and

b.    Plaintiffs have been forced to abandon the development, design, and engineering of the West Paducah plant, which was based upon the Siemens Equipment and Technology that Plaintiffs can no longer use, and for which Plaintiffs expended an additional amount in excess of $46,000,000.00 (Forty-Six Million Dollars).

27.    Plaintiffs have performed or are excused from performance of all conditions precedent under the 2012 License and Service Agreement.

WHEREFORE, Plaintiffs MidAmerica C2L, Incorporated and Secure Energy, Inc. respectfully pray this honorable Court set this matter for trial by jury pursuant to Fed.R.Civ.P. 38(b); enter judgment against Defendant Siemens Energy, Inc. in a fair and

reasonable amount in excess of $86,000,000.00 (Eighty-Six Million Dollars); award

Plaintiffs their attorneys' fees and costs; and grant such other and further relief that is just

and proper.

## COUNT II
## <u>BREACH OF WARRANTY OF FITNESS FOR PARTICULAR PURPOSE</u>

Plaintiffs **MidAmerica C2L Incorporated** and **Secure Energy, Inc.**, for Count

II of their Complaint against **Siemens Energy, Inc.**, state to the Court as follows:

28.     Plaintiffs replead and incorporate by reference the allegations set forth in

Paragraphs 1 through 27 of this Complaint as if the same were fully set forth herein.

29.     The granting of the license to use the Technology under the 2012 License

and Service Agreement constitutes a sale of goods under the Uniform Commercial Code

as it is enacted in the States of Florida, Illinois, Kentucky, and New York.

30.     At the time the 2012 License and Service Agreement was entered into,

Siemens knew that the License to use the Technology was to be used to build, have built,

use, and operate a coal to methanol conversion plant in Paducah, Kentucky.

31.     At the time the 2012 License and Service Agreement was entered into,

Siemens knew that Plaintiffs relied on Siemens' skill and judgment in selecting the

licensed Technology and in choosing to enter into the 2012 License and Service

Agreement.

32.     The Siemens Equipment and Technology licensed to Plaintiffs was unfit

for the purpose of building, having built, using, and operating a coal to methanol

conversion plant in Paducah, Kentucky in that the gasifiers and related Equipment upon

which the licensed Technology was based contained material design defects.

33.     The Siemens Equipment and Technology purchased by Plaintiffs was unfit for the purpose of building, having built, using, and operating a coal to methanol conversion plant in Paducah, Kentucky in that the Siemens Equipment and Technology upon which the licensed technology was based contained material design defects, including but not limited to:

a.      The burners are improperly engineered and designed;

b.      The design of the raw gas (syngas) outlet and the black water outlet is defective because the level of the black water will rise above the raw syngas outlet and prevent syngas from exiting the gasifier, greatly increasing the risk of catastrophic explosion;

c.      The BEDP is defective and needs to be modified to make changes to multiple components, including, but not limited to, the coal handling system, the slag handling system, piping design, valve design, the syngas cleaning system, and the black water system;

d.      Siemens' design of the fuel measurement system is defective and does not work; and

e.      The cooling screens in the gasifiers purchased by Plaintiffs were manufactured with pins that do not meet design specifications in that they are too short because, due to a manufacturing error Siemens management intentionally switched Plaintiffs' cooling screens with longer pins to the Chinese project and provided Plaintiffs with cooling screens originally manufactured for the

Chinese project with pins that are too short, that do not meet specifications, and which are thereby defective.

34.     As a direct and proximate result of the unfitness of the licensed Siemens Equipment and Technology for the purpose of building, having built, using, and operating a coal to methanol conversion plant in Paducah, Kentucky, Plaintiffs have been damaged in the following respects:

a.     The Siemens Equipment and Technology purchased under the 2007 Memorandum of Understanding and the 2007 Contract can no longer be incorporated into any gasification plant and have, therefore, decreased in value from the $40,526,967.00 (Forty Million, Five Hundred Twenty-Six Thousand, Nine Hundred Sixty-Seven Dollars) paid to $0.00 (Zero Dollars); and

b.     Plaintiffs have been forced to abandon the design and engineering of the West Paducah plant, which was based upon Siemens Equipment and Technology that Plaintiffs can no longer use, and for which Plaintiffs expended an amount in excess of $46,000,000.00 (Forty-Six Million Dollars).

WHEREFORE, Plaintiffs MidAmerica C2L, Incorporated and Secure Energy, Inc. respectfully pray this honorable Court set this matter for trial by jury pursuant to Fed.R.Civ.P. 38(b); enter judgment against Defendant Siemens Energy, Inc. in a fair and reasonable amount in excess of $86,000,000.00 (Eighty-Six Million Dollars); award Plaintiffs their attorneys' fees and costs; and grant such other and further relief that is just

and proper.

**COUNT III**
**RESCISSION AND FRAUD BY MISPRESENTATION OR OMISSION**

Plaintiffs **MidAmerica C2L Incorporated** and **Secure Energy, Inc.**, for Count

III of their Complaint against **Siemens Energy, Inc.**, state to the Court as follows:

35.    Plaintiffs replead and incorporate by reference the allegations set forth in

Paragraphs 1 through 34 of this Complaint as if the same were fully set forth herein.

36.    Plaintiffs are entitled to rescind all the contracts referenced herein for any

one or more of the following reasons:

    a.    Siemens fraudulently induced Secure into entering into the contracts;

    b.    The parties were mutually mistaken concerning the Siemens Equipment and Technology;

    c.    There is a lack of consideration;

    d.    Siemens made false representations regarding the Siemens Equipment and Technology;

    e.    There is an impossibility of performance of the contracts referenced herein; and/or

    f.    Material repudiation of the contracts by Siemens in exiting the gasification business.

37.    All of the above bases of rescission of the contracts between Secure and

Siemens are based upon a series of events and conduct on the part of Siemens that began

prior to the execution of the 2007 Contract and continued through execution of the 2012

Contract, as described herein.

### Prior to 2007 Contract

38.     When Plaintiffs negotiated the 2007 Contracts with Siemens, Siemens agents Rolf Ruesseler and Harry Morehead represented to Secure's agents, Lars Scott and Jack Kenny, that Secure was purchasing a mature technology and that Siemens had in operation, over a 20-year period, a gasification system based upon proven technology on a smaller scale in a plant located in Schwarze Pumpe, Germany.

39.     Siemens represented that all of the equipment Secure was purchasing was derived from the proven technology at the Schwarze Pumpe facility in Germany, that Siemens had scaled-up the 200 MWth equipment at Schwarze Pumpe to create a 500 MWth gasifier, and that all of the equipment, including the burners, were tested, demonstrated, used on a commercial scale, and proven to operate properly.

40.     Siemens' representations were false. Siemens employed a completely new and novel design of the gasification burner developed in Freiberg, Germany in 2006, that had never been tested, demonstrated, or used on a commercial scale, and the burner developed at Freiberg proved to be unreliable.

41.     The four burners purchased by Secure are a major component of the entire gasification system, and Siemens represented that its burners were a proven technology that had already been utilized on a commercial basis. In fact, the burners had never been used on a commercial basis for the Technology and were completely different than the burners used at Schwarze Pumpe.

42.     Siemens' representatives, Rolf Ruesseler, George Lamonettin, and Harry

Morehead, repeatedly represented to Secure's representatives, prior to the 2007 purchase of Equipment, that all of the Equipment had been used on a commercial scale and the Equipment and Technology was proven to perform properly. Attached hereto as **Exhibit 106** and incorporated herein by reference, is a true and accurate copy of a presentation made by Siemens on or about June 6, 2007, with Secure's representatives Jack Kenny and Lars Scott in attendance, which provides that the Equipment and Technology were used on a commercial scale and a proven technology.

43.     Siemens' misrepresentations were a material inducement to Secure in entering into contracts with Siemens, and Secure relied upon those misrepresentations.

44.     The burners that, starting in 2006, Siemens represented to Secure as being commercially proven, scaled-up burners from its Schwarze Pumpe facility, never operated properly at the Chinese plant.

45.     Siemens developed five generations of burners over a three- or four-year period on the Chinese project, in an attempt to manufacture a commercially operational burner, but each generation failed. Ultimately, the owners of the Chinese plant had a Chinese firm design and manufacture new burners (the "711 burners") in order for the plant to operate effectively. To this day, Siemens has yet to develop and place into commercial operation a burner that can effectively operate Siemens' 500 MWth gasification technology. Moreover, Siemens never informed Secure of the extent of the design defects in the burners sold to Secure or the fact that Siemens did not have a 500 MWth burner in commercial operation.

46.     Also, as set forth below, prior to the execution of the 2007 Contract, and

thereafter, the parties were mutually mistaken that the Siemens Technology could

properly perform as it was intended to be used by Secure and in accordance with the

performance representations and guarantees Siemens made to Secure, though in reality

the Siemens Equipment and Technology purchased by and delivered to Secure was not,

and still is not capable of performing as intended and meeting Siemens' performance

representations and guarantees.

### From Execution of 2007 Contract to Execution of 2010 Contract

47.      Prior to the execution of the 2007 Contract and through the time of

execution of the 2010 Contract, the parties were mutually mistaken that the Equipment

and Technology, as purchased, would work as it was intended to be used by Secure.

48.      At the time of execution of the 2007 and 2010 Contracts, the parties

believed that the gasification Equipment and Technology purchased by Secure could be

used consistent with the terms and conditions of the agreement to enable Secure to

manufacture the desired raw syngas. The parties were mutually mistaken that Siemens

could substantially perform the material requirements contained in the agreement, thus

representing a complete lack of consideration for the purchase price paid by Secure. It

was and is impossible for the Siemens Equipment and Technology purchased by Secure

to meet the necessary threshold requirements in the agreements because of, *inter alia*, the

following defects in the Siemens Equipment and Technology:

a.      The burners to the gasifiers are defective as evidenced by the fact

that the Chinese project had the identical gasification equipment

and experienced damage to the cooling screen after approximately

twenty (20) hours of initial operation; Siemens has never been able to commercially employ its burners in a 500 MWth coal gasification project, even after re-engineering at least five (5) generations of burners during a three- to four-year period. As of today, Siemens does not have a commercially designed and manufactured burner that could be used in Secure's Gasification project and Siemens is unable to commercially design and manufacture such a burner because it has ceased all operations relating to coal gasification and has exited the coal gasification business. The Chinese ultimately employed their own patented burners developed by a Chinese design firm;

b.   The gasifiers are defective in that, *inter alia*, the raw gas outlet (syngas) and the black water outlet were defectively designed to be only .5 meters (50 centimeters) apart, resulting in black water discharge liquid rising above the level of the raw syngas outlet, thereby preventing raw syngas from exiting the gasifier;

c.   The quench section of the gasifiers is not designed to allow for sufficient removal of particulate matter from the raw syngas, and Siemens subsequently increased the length of the gasifier from 5,034 millimeters to 5,210 millimeters and increased the diameter of the gasifier from 2,590 millimeters to 2,745 millimeters. The gasifier needs to be completely redesigned and replaced;

d.   The raw gas cleaning system is defective and needs to be redesigned and replaced;

e.   The coal feeding system is defective and requires substantial modification in order to operate based upon the modifications that proved necessary in the Chinese project utilizing the same coal feeding system;

f.   The fuel measurement system developed by Siemens could not operate in the Chinese project and the Chinese used a different fuel measurement system in order to allow the gasifiers to operate. To this date, Siemens has not commercially designed and manufactured a fuel measurement system for the gasification Technology purchased by Secure;

g.   The cooling screens had improper thermal protection, necessitating the removal and replacement of the original studs and ramming mass in order to operate the Chinese gasifiers;

h.   The design of the gasifiers is defective in that the granulated slag produced as a result of the gasification process was not properly exiting the gasifier quench section;

i.   The granulated slag produced as a result of the gasification process was environmentally hazardous in that Siemens represented to Plaintiffs that it would contain vitrified, non-leachable slag Plaintiffs intended to sell for use in road construction; however, the

slag contained unreacted carbon, would leach hazardous materials into the environment, and Plaintiffs would need to pay to dispose of it in a regulated landfill; and

j.      The BEDP Secure purchased from Siemens needed to be completely reengineered.

49.     Prior to the execution of the 2010 Contract, Siemens was also aware that the burners for the gasifiers installed at the Chinese plant had failed.

50.     When Jack Kenny and Lars Scott asked Siemens agents Ruesseler and Morehead, prior to execution of the 2010 Contract, about the status of the Chinese project, both Ruesseler and Morehead represented to Kenny and Scott that Siemens was ahead of schedule and the Siemens technology was performing better than expected.

51.     The statements of Ruesseler and Morehead were false in that there were already problems at the Chinese project, including the failure of Siemens' burners. Siemens had an obligation to advise Secure about burner failures as the burners for the Chinese project were identical to those sold to Secure.

52.     Siemens knew or intended that Secure would rely on these misrepresentations, which Secure reasonably did. These representations were material and induced Secure to enter into the 2010 Contract, and later the 2012 Contract.

53.     In addition to the foregoing, after execution of the 2007 Contracts but prior to the delivery of the gasification equipment to Secure, Siemens determined in 2008 that the pins attached to the cooling screens inside the gasifiers that were being sent to Chinese project were too short and were thereby defective. Instead of manufacturing new

cooling screens for the Chinese gasifiers with pins that were the correct size, Siemens

took the cooling screens being manufactured for Secure with correct-sized pins and

switched them to the Chinese project. Thereafter, Siemens intentionally installed the

cooling screens with defective pins that were too short in Secure's gasifiers, and shipped

the defective gasifiers to Secure. Siemens knew that the gasifiers being shipped to Secure

were defective at the time they were shipped to Secure.

54.     Siemens never notified Secure that it intentionally shipped defective

gasifiers to Secure.

55.     Secure had no way of knowing that the gasifiers were defective. The

defective pins are encapsulated within the gasifiers shipped to Secure.

### From Execution of 2010 Contract to Execution of 2012 Contract

56.     After the 2010 Contact was executed, Secure repeatedly requested

information regarding the Chinese project, such as the project's progress, how the

equipment was functioning, and the output of syngas at the Chinese facility because the

Chinese facility was the only other project in the world using the technology and

equipment on a commercial basis. During multiple conversations Harry Morehead,

George Lamonettin, and Rolf Ruesseler, repeatedly told Secure's representatives that the

Chinese project was progressing better than expected, and in fact so well that Siemens

already met its performance guarantees in September 2011. Attached hereto as **Exhibit**

**29** and incorporated herein by reference, is a true and accurate copy of a presentation in

which Siemens represented to Secure and other potential purchasers that its gasification

equipment achieved the performance guarantees at the Chinese plant as of September

2011.

57.     The foregoing representations were false and material. Attached hereto as **Exhibit 30** and incorporated herein by reference, is a true and accurate copy of the monthly executive report for the period ending September 30, 2011, indicating that Siemens had not obtained a Provisional Acceptance Certificate for the Chinese project.

58.     Siemens did not receive even a Provisional Acceptance Certificate, much less a complete Performance Acceptance Certificate from the Chinese until about July 10, 2013, nearly two years after Siemens represented it achieved performance guarantees in China. See **Exhibit 47**, attached hereto and incorporated herein by reference. This "Provisional" Acceptance Certificate states that Siemens met some of its guarantees at this time but further specified numerous equipment failures and engineering defects experienced as late as July 2013.

59.     Siemens not only failed to meet its performance guarantees, but on March 12, 2012, prior to the execution of the 2012 Contract, the owners of the Chinese plant submitted 31 claims to Siemens for defective equipment and design of its gasification technology, in an amount in excess of € 53,000,000 (Fifty-Three Million Euros).

60.     Additionally, the following events took place at the Chinese plant prior to the execution of the 2012 Contract:

>      a.      During the commissioning process in the last three months of 2010, the Siemens Monthly Executive Report (a true and accurate copy of which is attached hereto and incorporated herein as **Exhibit 28**) provides that the cooling screen in the Chinese

project's gasifier number 3 had to be repaired, that a burner had to

be repaired, that damage to the pilot burner was detected, and that

Siemens needed to modify its burner design;

b.      The repair of 59 filter candles was undertaken in October 2010

(**Exhibit 28**);

c.      In January 2011, it was determined that the quench nozzles on

gasifiers 4 and 5 were damaged (See **Exhibit 28-3**, attached hereto

and incorporated herein by reference);

d.      In January 2011, Siemens determined that the ramming mass on

the Chinese gasifiers did not meet the requirements for operation

and had to be redesigned and replaced because of the risk of

damaging the cooling screens. (See **Exhibit 28-4**, attached hereto

and incorporated herein by reference);

e.      In October 2011, the Chinese project had an urgent problem with

the raw gas cleaning efficiency that Siemens attempted to resolve

(See **Exhibit 29-3**, attached hereto and incorporated herein by

reference);

f.      In March 2012, SFGT had a liaison meeting in Beijing to address

problems with the gasifier related to, among other things, quench

level control. As a result of this meeting SFGT changed the

dimensions of the gasifier quench section, modified the design of

the raw gas cover, and relocated the raw gas outlet (See **Exhibit**

**33**, attached hereto and incorporated herein by reference);

g.      In June 2012, SNCG, the owner of the Chinese project plant, notified SFGT that the entire gasification plant was in the process of general overhaul (See **Exhibit 35**, attached hereto and incorporated herein by reference) and indicated that Siemens had not provided a burner that would make the plant operational; and

h.      On July 5, 2012, SFGT held an "NCPP Workshop" to address issues with the burner swirl angle, to attempt to advance the third generation of the Siemens burner in order to allow the Chinese project to operate, and dealt with numerous other problems such as poor slag quality and raw dust content.

61.      None of the improvements, modifications, and/or developments to the Siemens 500 MWth gasifier resulting from the events described in Paragraph 60 were ever provided or disclosed to Secure prior to Siemens inducing Secure to enter into the 2012 Contract.

62.      The equipment did not operate as Siemens represented to Secure and the material defects in Siemens' gasification Equipment and Technology were known to Siemens as early as October 2010, when identical equipment and related technology at the Chinese plant had to be completely shut down and redesigned by the Chinese after only 20 hours of operation during the plant's commissioning phase.

63.      Additionally, Siemens knew there were material problems with its burners, as it initiated a burner modification program in November 2009.

64. Siemens did not disclose to Secure the burner problem Siemens was experiencing in January 2010, or when Siemens was negotiating the Completion Agreement and License and Service Agreement that culminated the execution of the Agreements on March 31, 2010.

65. Siemens had contractual duties in the 2007, 2010, and 2012 agreements to disclose to Plaintiffs all necessary modifications to the Equipment, but failed to do so.

66. Moreover, even if Siemens did not have such a contractual duty, as set forth in the preceding Paragraph, once it disclosed information regarding the Chinese project, it owed a duty to Plaintiffs to fully disclose the truth concerning the extent of the defects in the Equipment. To date, Siemens has only indicated to Secure that in order to optimize the Technology there would be minor modifications to the Equipment, but that the minor changes would be offset financially by the corresponding deduction in some other Equipment.

67. Siemens' representations, as set forth in the preceding Paragraph, were false because Siemens knew that without completely altering or replacing the Siemens Equipment and Technology purchased by Secure, it would be impossible for Secure to operate its plant as the parties intended.

68. Moreover, before executing the 2012 Contract, Siemens never informed Secure of the defects in the Siemens gasification Equipment and Technology provided to Secure or that the Siemens Equipment and Technology purchased by Secure could not be commercially used without being replaced.

69. Siemens knew that Secure would rely upon Siemens' misrepresentations,

and Secure relied upon said misrepresentations.

70.     Based upon Plaintiffs' relationship with Siemens and Siemens' engineering capabilities, financial capacity, and materially false representations that Siemens had the most advanced, commercially proven Equipment and Technology that met its performance guarantees at the Chinese plant in September 2011, Plaintiffs were induced to enter into a new 2012 License Agreement, which unlike the prior agreements, contained no Equipment or Technology warranties.

**<u>Since Execution of 2012 Contract</u>**

71.     In order to make the Siemens equipment and technology operate in the Chinese plant, the Chinese made 85 changes to the equipment and technology because Siemens was unable to propose the necessary modifications to make the equipment and technology perform properly. The Chinese applied for and were granted 17 utility patents for the changes they made to the Siemens equipment and technology.

72.     In December 2012, Siemens was instructed to leave the Chinese project and thus had access to neither plant operations nor operating data for an extended period of time.

73.     Although Siemens is aware that changes were made at the Chinese project, Siemens does not have access to the changes made by the Chinese, and is unaware of many of the alterations and modifications the Chinese made to the Siemens equipment and technology in order for it to function. Moreover, Siemens neither advised Plaintiffs of the need for or the existence of these changes, nor of its inability to provide the technology modifications the Chinese were forced to employ in order to make the

Siemens equipment operate as intended. Siemens also did not have access to any of the Chinese patents.

74.     Siemens had demonstrably superior knowledge of the defects in the Siemens equipment and technology at the Chinese plant in that Siemens was a joint venture partner with and providing Technical Field Assistance and engineering to the Chinese company that developed that plant. At no time did Siemens notify Secure of the extent of the material defects in the Siemens equipment and technology and the BEDP.

75.     The existence of the defects in the Siemens equipment and technology were not within the fair and reasonable reach of Secure. In fact, Siemens misrepresented to the public and to Secure that Siemens met all of the performance guarantees on the Chinese project by September 2011.

76.     Secure was unable to discover the existence of the defects in the equipment and technology in spite of its reasonable diligence in questioning Siemens about the progress of the Chinese project.

77.     Siemens had ongoing duties to disclose to Secure the existence of defects discovered in a plant using equipment and technology identical to that sold to Secure, and the existence of modifications thereto, but failed to do so.

78.     Moreover, once Siemens spoke and made representations to Secure about the Siemens equipment and technology operating in the Chinese plant, it had a duty to Secure to speak the whole truth, not selective half-truths.

79.     Siemens' failure to disclose the discovery and existence of said material design defects constitutes fraudulent inducement, misrepresentation by silence and/or

omission, and fraudulent concealment.

80.     In making these representations, Siemens intended that Secure rely on the truth of the representations.

81.     Secure did not become aware of the material design defects or the problems experienced at the Chinese project until March 2016.

82.     In or about 2017, despite its position that it would maintain its obligations to Secure under the contracts, Siemens exited the coal gasification business and shuttered its fuel gasification division (SFGT), including the closure and sale of its facility in Freiberg, Germany.

83.     As a result of Siemens' exit from the fuel gasification business, in addition to the other reasons stated herein, Siemens is materially unable to meet, and has repudiated, its obligations under the contracts to provide Secure with the necessary technology, equipment, engineering, training, and technical field assistance necessary for Secure's project.

84.     As described above, because of Siemens' fraud, either by active misrepresentation or by omission, Siemens induced Secure to enter into the 2007, 2010, and 2012 Contracts, as well as the initial and continuing mutual mistake of the parties, the impossibility of performance, repudiation, and lack of consideration, Secure has the right to rescind the 2007, 2010, and 2012 Contracts and return the parties to their positions prior to the 2007 Contract.

85.     On February 11, 2016, Secure notified Siemens of its intent to rescind the 2007, 2010, and 2012 Contracts. In a subsequent meeting with Siemens on March 2,

2016, Secure requested that the contracts referenced herein be rescinded and that the Siemens Equipment and Technology be returned to Siemens.

86.    Siemens refused to rescind the 2007, 2010, and 2012 Contracts.

87.    As a direct and proximate result of its reliance upon Siemens' misrepresentations, the mutual mistake of the parties, lack of consideration, and impossibility of performance, Secure has been damaged in the following respects:

     a.    The two 500 MWth coal gasifiers, related Equipment and BEDP purchased under the 2007 Memorandum of Understanding and the 2007 Contract can no longer be incorporated into any gasification plant and have, therefore, decreased in value from the $40,526,967.00 (Forty Million, Five Hundred Twenty-Six Thousand, Nine Hundred Sixty-Seven Dollars) paid to $0.00 (Zero Dollars); and

     b.    Plaintiffs have been forced to abandon the design and engineering of the West Paducah plant, which was based upon Siemens Equipment and Technology that Secure can no longer use, and for which Secure expended an amount in excess of $46,000,000.00 (Forty-Six Million Dollars), which does not include the amount paid to Siemens.

88.    Siemens' conduct, as described above, was outrageous and exhibited a willful and wanton disregard for Plaintiffs' rights, thereby warranting the imposition of punitive damages in order to punish Siemens and to deter like conduct on the part of

others in the future.

89.    Secure has no adequate remedy at law.

90.    Secure is entitled to prejudgment interest.

WHEREFORE, Plaintiffs MidAmerica C2L, Incorporated and Secure Energy, Inc. respectfully pray this honorable Court enter judgment granting rescission of the 2007, 2010, and 2012 Contracts in favor of Plaintiffs; awarding damages against Siemens Energy, Inc. in a fair and reasonable amount in excess of $86,000,000.00; awarding Plaintiffs punitive damages in an amount sufficient to punish Siemens and to deter like conduct on the part of others in the future; awarding Plaintiffs prejudgment interest on all monies to be reimbursed by Siemens; awarding Plaintiffs their attorneys' fees and costs; and granting such other and further relief that is just and proper.

## COUNT IV
## FRAUD

Plaintiffs **MidAmerica C2L Incorporated** and **Secure Energy, Inc.**, for Count IV of their Complaint against **Siemens Energy, Inc.**, state to the Court as follows:

91.    Plaintiffs replead and incorporate by reference the allegations set forth in Paragraphs 1 through 90 of this Complaint as if the same were fully set forth herein.

92.    On or about March 31, 2010, Plaintiffs and Siemens executed a contract entitled "Completion Agreement between Siemens Energy, Inc. and Secure Energy, Inc.," ("the 2010 Completion Agreement," attached hereto as **Exhibit 3** and incorporated herein by reference).

93.    Siemens made fraudulent representations to Plaintiffs to induce Plaintiffs to execute the 2010 Completion Agreement.

94.     At the time they executed the 2010 Completion Agreement, Siemens and its agents represented to Plaintiffs that all Equipment purchased from Siemens by Plaintiffs would be workmanlike and fully-delivered.

95.     Siemens' and its agents' representations to Plaintiffs were false in that as early as November 2009, Siemens was already engaged in a burner modification program, and prior to delivery of the Equipment to Plaintiffs, Siemens intentionally substituted defective equipment manufactured for the Chinese project with non-defective equipment manufactured for Secure and installed the defective equipment in the Equipment delivered to Secure.

96.     Siemens' false representations regarding the full delivery of workmanlike Equipment to Plaintiffs were material in that Plaintiffs would not have entered into any contracts with Siemens had they known that, in exchange for tens of millions of dollars, Siemens would provide Plaintiffs with defective Equipment that could not be used for its intended purpose.

97.     At the time Siemens and its agents made the above-referenced false representations to Plaintiffs, they knew those representations were false or were ignorant of the truth in that, for example, prior to delivery of the Equipment to Plaintiffs, Siemens substituted defective equipment manufactured for the Chinese project with non-defective equipment manufactured for Secure, and installed defective equipment in the Equipment delivered to Secure.

98.     Siemens and its agents intended that their false representations would be acted upon by Plaintiffs in the manner reasonably contemplated, in that their false

representations were intended to entice Plaintiffs to enter into contracts with Siemens for the purchase of tens of millions of dollars of Siemens Equipment and Technology and enter into a license agreement with Siemens.

99.     Plaintiffs were ignorant of the falsity of Siemens' and its agents' representations regarding the full delivery of workmanlike Equipment to Plaintiffs in that, for example, they were unaware that Siemens had, as early as 2009, already engaged in a burner modification program, and prior to delivery of the Equipment to Plaintiffs, Siemens intentionally substituted defective equipment manufactured for the Chinese project with non-defective equipment manufactured for Secure and installed the defective equipment in the Equipment delivered to Secure.

100.    Plaintiffs relied on the truth of Siemens' and its agents' representations regarding the full delivery of workmanlike Equipment to Plaintiffs, as evidenced by their entry into the 2010 Completion Agreement, the 2010 Contract, and subsequent agreements with Siemens in 2012.

101.    Plaintiffs had a right to rely upon Siemens' representations regarding the full delivery of workmanlike Equipment to Plaintiffs because the parties were engaged in negotiations for Plaintiffs' purchase of Siemens Equipment and Technology for the purpose of developing an industrial facility to convert coal into chemicals. Plaintiffs expended enormous sums of money-tens of millions of dollars-for Siemens Equipment and Technology and deserved to receive in exchange equipment matching the specifications for which they paid. Additionally, Plaintiffs always negotiated with Siemens and its agents in good faith and had every right to expect that Siemens would do

the same.

102.    As a direct and proximate result of Plaintiffs' reliance upon Siemens' and its agents' fraudulent representations regarding the full delivery of workmanlike Equipment to Plaintiffs, Plaintiffs were injured in that they entered into the 2010 Completion Agreement and paid Siemens tens of millions of dollars for Equipment and Technology that was not fabricated according to the agreed-upon specifications and cannot safely be used for its intended purpose.

103.    Siemens' fraudulent actions took place prior to the execution of the 2010 Completion Agreement, as set forth herein.

104.    As a result of Siemens' fraudulent actions described herein, Plaintiffs are entitled to a declaration that the 2010 Completion Agreement is null and void.

105.    Siemens' conduct, as described above, was outrageous and exhibited a willful and wanton disregard for Plaintiffs' rights, thereby warranting the imposition of punitive damages in order to punish Siemens and to deter like conduct on the part of others in the future.

106.    Plaintiffs are entitled to prejudgment interest on all monies to be reimbursed by Siemens.

WHEREFORE, Plaintiffs MidAmerica C2L, Incorporated and Secure Energy, Inc. respectfully pray this honorable Court set this matter for trial by jury pursuant to Fed.R.Civ.P. 38(b); enter judgment in favor of Plaintiffs, declaring the 2010 Completion Agreement between the parties hereto null and void; awarding damages against Siemens Energy, Inc. in a fair and reasonable amount in excess of $86,000,000.00 (Eighty-Six

Million Dollars); awarding Plaintiffs punitive damages in an amount sufficient to punish Siemens and to deter like conduct on the part of others in the future; awarding Plaintiffs prejudgment interest on all monies to be reimbursed by Siemens; awarding Plaintiffs their attorneys' fees and costs; and granting such other and further relief that is just and proper.

## COUNT V
## FRAUDULENT INDUCEMENT

Plaintiffs **MidAmerica C2L Incorporated** and **Secure Energy, Inc.**, for Count V of their Complaint against **Siemens Energy, Inc.**, state to the Court as follows:

107.     Plaintiffs replead and incorporate by reference the allegations set forth in Paragraphs 1 through 106 of this Complaint as if the same were fully set forth herein.

108.     Siemens defrauded Secure into entering into the 2007, 2010, and 2012 Contracts.

109.     Plaintiffs are entitled to prejudgment interest on all monies to be reimbursed by Siemens.

WHEREFORE, Plaintiffs MidAmerica C2L, Incorporated and Secure Energy, Inc. respectfully pray this honorable Court set this matter for trial by jury pursuant to Fed.R.Civ.P. 38(b); enter judgment against Siemens Energy, Inc. for fraudulently inducing Plaintiffs to enter into the 2007, 2010, and 2012 Contracts; award Plaintiffs damages in a fair and reasonable amount in excess of $86,000,000.00; award Plaintiffs punitive damages in an amount sufficient to punish Siemens and to deter like conduct on the part of others in the future; award Plaintiffs their attorneys' fees and costs; and grant such other and further relief that is just and proper.

**COUNT VI**
**FRUADULENT INDUCEMENT TO ENTER INTO THE 2012 CONTRACT**

Plaintiffs **MidAmerica C2L Incorporated** and **Secure Energy, Inc.**, for Count V of their Complaint against **Siemens Energy, Inc.**, state to the Court as follows:

110.    Plaintiffs replead and incorporate by reference the allegations set forth in Paragraphs 1 through 109 of this Complaint as if the same were fully set forth herein.

111.    Siemens fraudulently induced Plaintiffs to enter into the 2012 Contract, which did not contain the Equipment and Technology warranties.

112.    As a direct result of Siemens' fraud as described herein, Plaintiffs have been damaged by being unable to enforce the Siemens Equipment and Technology warranties.

113.    Plaintiffs paid Siemens $40,500,000.00 (Forty Million, Five Hundred Thousand Dollars) for the Equipment and Technology.

114.    From July 2012, when Plaintiffs signed the 2012 Contract, through about the first quarter of 2016, Plaintiffs spent $16,000,000.00 (Sixteen Million Dollars) in furtherance of trying to develop the project.

WHEREFORE, Plaintiffs MidAmerica C2L, Incorporated and Secure Energy, Inc. respectfully pray this honorable Court set this matter for trial by jury pursuant to Fed.R.Civ.P. 38(b); enter judgment against Defendant Siemens Energy, Inc. to pay the value of the warranties, or an amount in excess of $56,500,000.00 (Fifty-Six Million, Five Hundred Thousand Dollars), for all expenditures Plaintiffs made to purchase Siemens Equipment and Technology and to develop the project after July, 2012, after Siemens became aware of its defective Equipment and Technology; awarding Plaintiffs

prejudgment interest on all monies to be reimbursed by Siemens; award Plaintiffs their

attorneys' fees and costs; and grant such other and further relief that is just and proper.

Respectfully submitted,

**DANNA McKITRICK, P.C.**

Date: October 25, 2019          BY:      /s/ Robert L. Devereux

**Robert L. Devereux**, pro hac vice
**Jeffrey R. Schmitt**, pro hac vice
**Michael R. Cherba**, pro hac vice
7701 Forsyth Blvd., Suite 800
St. Louis, Missouri  63105-3907
Telephone: (314) 726-1000
Facsimile: (314) 725-6592
E-Mail:   rdevereux@dmfirm.com
              jschmitt@dmfirm.com
              mcherba@dmfirm.com

and

Walter A. Ketcham, Jr.
Florida Bar No. 156630
Grower, Ketcham, Eide, Telan & Meltz, P.A.
901 N. Lake Destiny Rd., Suite 450
Maitland, Florida  32751
Telephone: (407) 423-9545
Facsimile: (407) 425-7104
E-Mail: waketcham@growerketcham.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the twenty-fifth day of October, 2019, a true and accurate copy of the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

**Scott D. Baker**
E-Mail: sbaker@reedsmith.com
**James A. Daire**
E-Mail: jdaire@reedsmith.com
**Jonah D. Mitchell**
E-Mail: jmitchell@reedsmith.com
**William R. Overend**
E-Mail: woverend@reedsmith.com
**Christopher J. Pulido**
E-Mail: cpulido@reedsmith.com
Reed Smith, LLP
101 Second Street, Suite 1800
San Francisco, CA  94105-3659

**ATTORNEYS FOR DEFENDANT
SIEMENS ENERGY, INC.**

**P. Alexander Quimby**
E-Mail: aquimby@bakerlaw.com
**Robert W. Thielhelm**
E-Mail: rthielhelm@bakerlaw.com
Baker & Hostetler, LLP
2300 SunTrust Center
200 South Orange Avenue
Post Office Box 112
Orlando, FL  32802

_____/s/ Michael R. Cherba_____