**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **MIDAMERICA C2L INC., et al.**, | ) |
| | ) |
| Plaintiffs/Counterclaim-Defendants, | ) |
| | ) |
| v. | )   Case No. 6:17-CV-171-Orl-40-LRH |
| | ) |
| **SIEMENS ENERGY, INC.**, | ) |
| | ) |
| Defendant/Counter-Claimant. | ) |

**JOINT FINAL PRETRIAL STATEMENT**

Pursuant to Local Rule 3.06(c) and the Court's Case Management and Scheduling Order, Doc. No. 211, the parties submit this Joint Final Pretrial Statement.

**I.     Basis of Federal Subject Matter Jurisdiction**

Complete diversity exists and the amount in controversy exceeds $75,000, exclusive of interest and costs. Pursuant to 28 U.S.C. § 1332(a), this Court has subject matter jurisdiction over this matter.

**II.     The Nature of the Action**

Plaintiffs MidAmerica C2L Inc. ("C2L") and Secure Energy, Inc. ("Secure") were customers of Siemens Energy, Inc. ("Siemens"). Secure's subsidiary (not a party here) purchased gasification equipment from Siemens in December 2007 and Secure took a series of gasification technology licenses from Siemens in 2007 and 2010. Secure formed C2L in 2011, and C2L licensed the use of Siemens' proprietary gasification technology in July 2012.

Plaintiffs brought claims for breach of the 2012 License and Service Agreement, breach of an implied warranty of fitness for a particular purpose contained in the 2012 License and Service Agreement, fraud, and rescission of the 2007 Equipment Sale Agreement for lack of

consideration and fraud. Plaintiffs asserted that Siemens' notification to Plaintiffs in February 2016 that Siemens intended to close the fuel gasification division of its business constitutes repudiation of the 2012 License and Service Agreement. Plaintiffs also asserted that, between October 31, 2010 and January of 2016, certain Siemens employees discovered alleged design defects in gasification equipment Siemens had sold to a different customer in China (the "NCPP project") but failed to disclose to Plaintiffs the alleged design defects. Plaintiffs further asserted that the gasification equipment they purchased from Siemens has the same alleged design defects. The Court has rejected all claims Plaintiffs asserted against Siemens via its prior summary judgment rulings, thereby disposing of Plaintiffs' First Amended Complaint in all respects except for the determination of Siemens' costs.[1] (Doc. 203, 205, 208 and 209).

Siemens brings a counterclaim for C2L's breach of the 2012 License and Service Agreement. Siemens asserts that C2L failed to timely make the requisite license payments after Siemens demanded payment, that Siemens properly terminated the 2012 License and Service Agreement, and that C2L failed to pay the resulting termination fee for which it was invoiced. Siemens seeks €11,481,600.00 plus interest since April 16, 2016. The Court denied Siemens' motion for summary judgment as to Siemens' counterclaim.

The only issues left for trial are Siemens' counterclaim and any defenses previously pleaded by C2L.

## III.   Statement of the Case

### 1.   Siemens' Statement of the Case

Given the Court's prior summary judgment rulings disposing of Secure and C2L's claims against Siemens and the corresponding entry of judgment (Doc. 203, 205, 208 and 209),

---

[1]   Prior to the summary judgment rulings, the Court dismissed Plaintiffs' Count III after it was voluntarily waived by Secure. (Doc. 74).

Siemens' counterclaim for breach of contract against C2L is the only claim remaining in the case.  By way of background, in December 2007, a Secure subsidiary purchased from Siemens two 500 MW$_{th}$ gasifiers for use in Secure's planned highly-sophisticated process plant (the planned output of the plant changed over time). At the same time, Secure's subsidiary also contracted for a license to use Siemens' proprietary gasification technology. But neither Secure nor any of its subsidiaries had the necessary financing to pay Siemens for Siemens' license or support at any time, let alone the financing required to meaningfully progress with their hoped-for plant. At Secure's request, Siemens agreed to a series of payment and performance guarantee extensions. Each time Secure asked for a new license (in March 2010 and again in July 2012), the parties also entered into a Completion Agreement to extinguish the old license, as follows:

2.    Termination of the License

As a result of the above mentioned statements and declarations, the License shall terminate and, except as otherwise explicitly provided herein, neither of the Parties shall have ground for any claim under the License and/or any theory of law against the other.

Per the Completion Agreements, both the 2007 and 2010 license agreements are terminated. C2L and Siemens entered the most recent license, the July 2012 License and Service Agreement, to further C2L's intention to proceed with a new energy plant in West Paducah, Kentucky.  As part of the July 2012 License and Service Agreement, Siemens again agreed to extend C2L's payment deadlines and performance guarantees.  The license fee payments were extended to February 28, 2013 (€10.9M) and December 31, 2015 (€1.25M). The performance guarantee was extended for another year, from December 31, 2014 to December 31, 2015. Secure and C2L made no meaningful progress on the plant after the parties entered into the July 2012 License and Service Agreement and C2L did not make the required February 28, 2013 and December 31, 2015 license payments to Siemens.

By mid-2015, Siemens, like Secure and C2L, saw the unfavorable market conditions for a domestic coal gasification business and decided not to take any new fuel gasification business. Thereafter, C2L (again) failed to pay the license payment by its due date – December 30, 2015. In February 2016, Siemens communicated its decision to C2L and told C2L that Siemens would still perform its future obligations under the operative license and service agreement if C2L performed its end of the deal by paying the approximately €12.2M past due license and support fee. In addition, Siemens offered to extend C2L's payment deadline again (to July 2016) and to extend the termination date for Siemens' performance guarantees by another six years (from December 2015 to December 2021). C2L refused to pay—even under the offered extended deadline—so Siemens terminated the 2012 License and Service Agreement and invoiced C2L €11.4M for the termination fee (by contract, 92% of the license fee), which C2L also failed to pay.

Siemens is entitled to enforce the termination clause of the 2012 License and Service Agreement.

Against this backdrop, Secure and C2L initiated this litigation against Siemens in an attempt to avoid their contractual obligations to Siemens and pin their self-inflicted business failures on Siemens.  The Court has rejected all claims Secure and C2L asserted against Siemens in its prior summary judgment rulings and, moreover, determined that Siemens did not breach the 2012 License and Service Agreement.  The Court found as a matter of law that:  (1) Siemens did not commit an anticipatory repudiation of the 2012 License and Service Agreement because C2L was not ready, willing and able to perform the agreement; and (2) C2L could not prove that Siemens' alleged breach caused C2L any harm. Siemens' principal legal and factual positions are summarized as follows:

- C2L breached the 2012 License and Service Agreement because it failed to pay the termination fee when invoiced; C2L owes Siemens €11.4M plus interest.

- C2L has no valid excuse for non-performance.

- C2L cannot assert, as an excuse for non-performance, that Siemens repudiated the 2012 License and Service Agreement because of the Court's prior ruling that C2L was not ready, willing and able to perform.

- C2L cannot assert, as an excuse for non-performance, that Siemens repudiated the 2012 License and Service Agreement because of C2L's prior failures to pay the license fees owed under the agreement, including C2L's failure to make the license payment on February 28, 2013, its failure to make the license payment on December 31, 2015 its failure to make the payment when Siemens demanded it on February 17, 2016, and its failure to make the termination fee payment upon Siemens invoice for it in April 2016.

C2L cannot assert, as an excuse for non-performance, that Siemens repudiated the 2012 License and Service Agreement in view of the stipulated facts set forth herein and the Court's prior findings, and the Court's prior rulings.

2.  **C2L's Statement of the Case**

Secure Energy does not owe payment of a termination fee to Siemens under the 2016 License and Service Agreement because Siemens breached the 2012 License and Service Agreement by failing to inform and provide Secure with Improvements to its entrained-flow coal gasification Equipment and Technology, and informed Secure that Siemens was exiting the business and would no longer support Secure's project. Such statements and omissions occurred prior to Siemens' invoicing Secure for the termination fee in April 2016, rendering the invoice invalid and as a consequence, Secure has no obligation to pay it.

Secure Energy was founded by Jack Kenny and Lars Scott in 2006 to develop and construct a coal gasification plant in Decatur, Illinois that would convert coal into natural gas using coal gasification technology. During the development process, it became clear that Secure Energy would need to retain an engineering, procurement, and construction ("EPC") contractor to provide those same services for the project, while at the same time guaranteeing the various aspects of the constructed plant, such as production output in the project integration of the various components of the plant. But in order to retain an EPC contractor, Secure Energy first needed a Basic Engineering Design Package ("BEDP") from one of the companies supplying gasification equipment in the marketplace. Secure Energy met with a number of manufacturers of gasification equipment and was particularly impressed with the presentations that Siemens made relating to technology advancements of employing a cooling screen design in its gasifiers instead of the older, more traditional employment of a refractory lined gasifier. Siemens emphasized that the cooling screen employed in its gasifier would last more than ten years, as opposed to the refractory-lined systems that required complete overhaul at least yearly.

After considering the various coal gasification technologies offered by a number of companies, Secure Energy decided to utilize Siemens' SFG gasification technology in its project based upon the representations made by Siemens. After selecting the Siemens gasification technology for its project, Secure Energy was informed by Siemens that Secure Energy must purchase the necessary equipment and engineering services in order to obtain a BEDP, which was necessary for Secure Energy to obtain in order to allow an EPC contractor to complete the engineering design for the overall plant and develop an EPC cost estimate that would include a guaranteed maximum price. This guaranteed maximum price contract from an EPC contractor was necessary in order to allow Secure Energy to obtain the necessary financing for the project.

As a result, Secure Energy entered into a Memorandum of Understanding with Siemens on or about July 24, 2007, which was subsequently replaced with a Project License Agreement between the parties on or about December 31, 2007. There were also subsequent agreements entered into in 2010 and 2012 regarding the Project License Agreement. The 2007, 2010, and 2012 agreements between the parties all require Siemens to inform Secure Energy of any improvements to the technology that are developed or acquired and released for commercial application by Siemens.

Secure Energy's gasifiers and related technology and equipment were delivered in January 2009, and Siemens delivered 5 identical gasifiers and related technology to the NCPP project in China in mid- to late-2008.

Siemens became aware during the fabrication of the equipment for the NCPP project, sometime in 2007 or early 2008, that the pin lengths on the cooling screens were too short. At that time, Siemens was in the process of having Secure Energy's cooling screens fabricated. To remedy the problem, Siemens merely substituted the cooling screens with the correct size pins, intended for delivery to Secure Energy, in its delivery of equipment to the NCPP project and then, instead of having the cooling screens remanufactured to address this design defect, Siemens delivered the defective cooling screens, containing pins that were too short, to Secure Energy. Siemens knowingly shipped defective gasifiers to Secure Energy and never notified Secure Energy that it replaced the specified cooling screens with defective cooling screens that were originally manufactured for the NCPP project.

Siemens also initiated a burner modification program as early as November 2009, which was approximately one year prior to the initial startup of the NCPP project in late October 2010. This burner modification had to do with employing a nickel-based material in making the

burners because there were significant oxidation problems and claim the modification was performed for safety reasons. All 10 of the burners at the NCPP project were modified. Secure Energy was never informed of this defect and Secure Energy's burners have never been modified.

In late 2009, Secure Energy decided to produce liquids (methanol and/or gasoline) at its plant instead of natural gas. This change necessitated moving the location of the Secure Energy plant from Decatur, Illinois to a larger site near Paducah, Kentucky. As a result of this change, Siemens insisted that Secure Energy enter into a new License and Service Agreement and a Completion Agreement wherein Siemens wanted to terminate the Equipment Supply Agreement and be released from the legal requirements of that contract. It is clear that Siemens insisted upon the March 31, 2010, Completion Agreement because Siemens intentionally installed defective cooling screens into Secure Energy's gasifiers prior to delivery, that Siemens knew as early as November 2009 that the burners needed to be modified, and that the safety information system ("SIS") and control systems were out of date and not state-of-the-art before shipment from Germany to Secure Energy.

Secure Energy was attempting to obtain the necessary comprehensive EPC Contract to guarantee the output of the plant and also guarantee that the plant could be built for a Guaranteed Maximum Price. In October 2012, Siemens began to waver about the status of the technology it delivered to Secure Energy based upon the experience at the NCPP plant. Secure Energy identified a contractor by the name of SK E&C (S-K) USA to provide an EPC contract. In order to finalize the contract, S-K inquired of Siemens as to the status of the BEDP Siemens provided to Secure Energy. As a result of the inquiry, Siemens, Secure Energy, S-K, and others met during an annual coal gasification conference in Washington, D.C. During that meeting, Siemens

representatives informed S-K that a number of changes would be necessary, but the overall message was that the optimization of the plant would balance itself out on a cost basis.

The representations made by Siemens during this meeting were false. Siemens' internal communications reflect that Secure Energy essentially needed a new BEDP (at additional cost to Secure Energy), the SIS and control systems shipped to Secure Energy were outdated and not state-of-the-art prior to shipment to Secure Energy, and that Siemens' employees opined that very little of the Siemens equipment and technology purchased by Secure Energy could be used and should be scrapped.

In about March of 2013, Siemens acknowledged to the Chinese that the 500 MWth technology was not yet completely mature at the time of the NCPP plan execution. Siemens also acknowledged that the contributions of the Chinese helped improve the reliability and availability of Siemens' coal gasification technology. Further, the Chinese were not willing to share their know-how free of charge. By March 2013, Siemens had lost control of its technology and did not have the wherewithal to perfect the technology it professed in 2007 was well-established and had been proven for over 20 years. It is undisputed that Siemens did not have access to all of the modifications implemented by the Chinese at the NCPP plant.

Siemens made the decision to exit the gasification industry as early as April 2014, with official disclosures confirming the closure taking place in March 2015, however Siemens did not inform Secure Energy that it was exiting the business until February 2, 2016. As late as August 2015 Siemens employees informed Secure Energy that Siemens stood ready to support Secure's continued efforts. By telephone, on February 2, 2016, SFGT's head of marketing, Rolf Rüsseler, informed Secure Energy that Siemens was exiting the coal gasification business and that Siemens would not be able to meet its obligations in the 2007 contract, the 2010 License and

Service Agreement, and the 2012 License and Service Agreement, nor could Siemens provide the necessary technical field assistance and training under the 2012 License and Service Agreement. As a result, on February 11, 2016, Secure Energy notified Siemens it rescinded the contract and terminated the agreements.

At no time during the course of their business relationship, did Siemens ever inform Secure of the existence or any details of improvements to the entrained flow coal gasification Equipment and Technology Secure purchased from Siemens, as required by Section 5.1 of the 2012 License and Service Agreement. This includes a change Siemens' own employees considered mandatory for Secure during their depositions, a change in coal feeding system mass flow control, as well as the SIS control system being out-of-date before Siemens even shipped it to Secure. Moreover, Siemens' Rule 30(b)(6) corporate representative designee, Rolf Rüsseler, even admitted that Secure's plant would experience a problem with too much coal dust in the syngas, cavalierly observing that by which time Siemens would already have the license fee from Secure "in house," so Siemens would fix it, taking a hit to their corporate earnings before income, deductions, and taxes. Finally, Siemens never provided Secure with an updated BEDP, or even an estimated cost for such an update, so that Secure could proceed with obtaining a lump-sum turnkey EPC contract and move to the next phase of their project development. All these are triable issues as noted by the Court in Doc. 208, p. 13, and constitute Siemens' material breach of the 2012 License and Service Agreement such that Secure is not required to pay the termination fee.

## IV.   Exhibit Lists

Each side's exhibit lists are attached. Siemens and C2L reserve the right to introduce any exhibit identified on the other party's exhibit list. The Joint Trial Exhibit List is attached hereto

as Exhibit 1. Siemens' Trial Exhibit List is attached hereto as Exhibit 2. C2L's Trial Exhibit List
is attached hereto as Exhibit 3.

## V.      Witness Lists

The parties' respective witness lists are attached. Siemens' Witness List is attached
hereto as Exhibit 4. C2L's Witness List is attached hereto as Exhibit 5.

## VI.     Expert Witnesses

Siemens intends to call Stephen D. Jenkins.

Mr. Jenkins is an industry expert and is expected to testify regarding background of
gasification projects, his experience with Siemens' technology, and his analysis of Secure and
C2L's project in its various iterations.   He is also expected to provide rebuttal testimony
regarding any evidence or argument by C2L to the effect that Siemens' decision to exit the
business rendered Siemens unable to perform its obligations.

## VII.    Money Damages

Siemens seeks money damages as follows: €11,481,600.00 ($12,955 837) plus accrued
interest since April 16, 2016.

## VIII.   Deposition Designations

The parties' respective deposition designations are attached hereto as Exhibit 6, subject to
further counters and objections pursuant to the Amended Case Management and Scheduling
Order.  (Docs. 215 and 216.)

## IX.     Stipulated and Previously Determined Facts Which Require No Proof at Trial

1.      On or about December 21, 2007, Secure Energy Inc.'s ("Secure") subsidiary, non-
party Secure Energy Decatur, L.L.C., and Siemens Energy, Inc. (f/k/a Siemens Power
Generation, Inc.) ("Siemens") entered into the "Contract Between Secure Energy Decatur, LLC

and Siemens Power Generation, Inc. for the Provision of Engineering Services and the Supply of Equipment Related to the Coal to SNG Conversion Project for the Decatur, Illinois Plant" (the "2007 ESA")[2] on the terms stated therein.

2.      On December 31, 2007, Secure Energy Decatur, L.L.C., and Siemens entered into a Project License Agreement (the "2007 License Agreement") on the terms stated therein.

3.      In a September 2007 Cooperation Agreement between Siemens Power Generation, Inc. and non-party Siemens Fuel Gasification Technology GmbH ("SFGT"), Siemens delegated certain obligations to provide Secure with services and equipment to SFGT. Siemens retained other obligations and remained the contracting party with Secure and its subsidiaries.

4.      On March 31, 2010, Secure entered into a Completion Agreement (the "2010 Completion Agreement") with Siemens Energy, Inc. (formerly known as Siemens Power Generation, Inc.) on the terms stated therein.

5.      Simultaneously with the 2010 Completion Agreement, Secure and Siemens entered into a new 2010 License and Service Agreement on the terms stated therein.

6.      On July 18, 2012, Secure and Siemens entered into a Completion Agreement (the "2012 Completion Agreement") on the terms stated therein.

7.      Simultaneously with the 2012 Completion Agreement, Secure's subsidiary MidAmerica C2L, Inc. ("C2L") and Siemens entered into a License and Service Agreement (the "2012 License Agreement") on the terms stated therein.

8.      By the end of 2015, Secure and C2L had suspended business operations and stopped paying salaried employees.  (Doc. 208 (citing Doc. 149-9, p. 100).

---

[2]      The ESA was a negotiated and fully integrated agreement, as was each of the contracts between the parties.

9.      Secure and C2L's financial statements for 2014 and 2015 show that, "[T]he Company has incurred losses since inception," and that "The Company's prior losses and other factors raise substantial doubt about the Company's ability to continue as a going concern." Secure and C2L were in a financial position where they needed to "obtain grants, debt financing or additional equity investment" in order to complete their intended project.  (Doc. 208 (citing Doc. 149-5, p. 8, ¶ 13).

10.      Secure and C2L were not in any financial condition to perform under the terms of the 2012 License and Service Agreement, as evidenced by their financial statements and their inability to perform under the two previous agreements (2007 and 2010).  (Doc. 208).

11.      Secure and C2L admit, and their financial statements show, that they did not have the necessary funding for any iteration of their project and could not pay the past-due license fees under the contract.  (Doc. 208).

12.      On February 2, 2016, Siemens informed Secure and C2L that Siemens would be closing the fuel gasification division of its business.

13.      By letter of February 11, 2016, Secure demanded rescission of the 2007 ESA and return of all monies paid by Secure pursuant to the 2007 ESA.

14.      By letter of February 17, 2016, Siemens informed Secure and C2L that Siemens will not violate any contractual obligation by its strategic exit from the coal gasification business.

15.      The parties met on March 2, 2016.

16.      By letter of March 18, 2016, Siemens offered to extend the deadline for completion of its Performance Tests (a defined term in the 2012 License Agreement) from December 31, 2015 to December 31, 2021, if C2L paid the full remaining balance of the fee required under the 2012 License Agreement on or before July 1, 2016.

17.     By letter of March 31, 2016, C2L rejected Siemens' offer.

18.     By letter of April 14, 2016, Siemens revoked its offer and demanded payment of a termination fee stated in the 2012 License Agreement.

19.     Siemens invoiced C2L for the termination fee on April 19, 2016.

20.     Secure and C2L initiated this lawsuit against Siemens in July 2016.

21.     Siemens closed its coal gasification division in May 2018.

## X.     Applicable Principles of Law on Which There is Agreement

The parties agree that New York state law applies.

## XI.     Issues of Fact Which Remain to be Litigated

A.     <u>Issues of Fact Siemens Asserts Remain to be Litigated</u>

1.     The amount of interest accrued on the unpaid amount of €11,481,600.00 since April 16, 2016.

B.     <u>Issues of Fact C2L Asserts Remain to be Litigated</u>

1.     Did C2L notify Siemens of its intent to rescind the contracts prior to Siemens' invoicing C2L for the contract termination fee?

2.     Did Siemens fail to inform and provide C2L with relevant upgrades to Siemens' entrained-flow coal gasification Equipment and Technology pursuant to § 5 of the 2012 License and Service Agreement prior to C2L's rescission of the 2012 License and Service Agreement?

3.     Did Siemens inform C2L that it would not perform its obligations under the 2012 License and Service Agreement?

## XII.     Issues of Law Which Remain for Determination by the Court

A.     <u>Issues of Law Siemens Asserts Remain for Determination by the Court</u>

1.     Does the Court's prior ruling that C2L was not ready, willing and able to perform its obligations under the 2012 License and Service Agreement eliminate C2L's defense that it is excused from performing due to Siemens' alleged material breach of the 2012 License and Service Agreement?

2.     Does C2L's failure to  make the license payments on February 28, 2013 and December 31, 2015 and its failure to make the payment when Siemens demanded it on February 17, 2016 C2L eliminate C2L's defense that it is excused from performing due to Siemens' alleged material breach of the 2012 License and Service Agreement?

3.     Do the stipulated facts set forth herein and the Court prior findings eliminate C2L's defense that it is excused from performing due to Siemens' alleged material breach of the 2012 License and Service Agreement?

4.     Do Siemens' rights under the 2012 License and Service Agreement to delegate performance of its obligations eliminate C2L's defense based on Siemens' alleged material breach?

B.     <u>Issues of Law C2L Asserts Remain for Determination by the Court</u>

1.     Did Siemens anticipatorily repudiate the contracts with C2L such that C2L is relieved from any obligation to pay Siemens a termination fee under the 2012 License and Service Agreement?

2.     Did Siemens' actions in not informing C2L of and providing C2L with necessary changes to the Siemens entrained flow coal gasification equipment and technology relieve C2L of any obligation to pay Siemens a license fee under the 2012 License and Service Agreement?

3.     Did Rolf Rüsseler's statement to Jack Kenny that Siemens would no longer support C2L's project constitute repudiation of the 2012 License and Service Agreement?

## XIII.   Disagreement as to the Application of the Federal Rules of Evidence or the Federal Rules of Civil Procedure

None at this time.

## XIV.   Motions or Other Matters Which Require Action by the Court

Siemens has filed a motion for reconsideration of the Court's ruling denying Siemens' motion for summary judgment with respect to its counterclaim.  (Doc. 217.)  Under New York law, a party asserting an affirmative defense of anticipatory repudiation must prove the same elements (except for causal damages) as a party asserting a claim for breach based on anticipatory repudiation, which include that the party was ready, willing, and able to perform its obligations under the contract.  New York Pattern Jury Instruction 4:1.3.  Because the Court previously found C2L cannot prove that it was ready, willing and able to perform, as a matter of law, C2L cannot prove that element of its defense that it is excused from performing due to Siemens' alleged material breach based on anticipatory repudiation.

In addition, there are issues concerning C2L's pre-trial submissions that Siemens believes will require the Court's attention.  Siemens received from C2L its exhibit list and deposition designations on the morning of November 5, 2019, the date of this filing.  From Siemens' initial review, it is evident that C2L has not complied with the Court's orders and instructions --  nor heeded the Court's warnings – to not try to re-litigate issues the Court has previously decided. (Docs. 137 (denying Plaintiffs leave to amend); 154 (denying Motion to Continue Trial Setting: "By this motion, Plaintiffs seek to circumvent Magistrate Judge Spaulding's January 1, 2019, Order [137]"); 188 (granting motion to exclude Plaintiffs' expert); 203 (granting Siemens' summary judgment as to Plaintiffs' defect-dependent claims (Counts II, IV, V and VI)); 204 (ordering supplemental briefing and noting "[t]he parties should avoid rehashing arguments

already addressed in the previously-filed briefs") 205 (entering judgment as to Counts II, IV, V and VI); 208 (granting Defendants summary judgment as to Plaintiffs' Count I); 209 (entering judgment as to Count I); 211 (Amended Case Management and Scheduling Order: "***The parties should avoid rehashing arguments already addressed in previously-filed briefs and claims already disposed of in previously-filed Orders.***"); 213 (Denying motion for leave to amend: "Plaintiffs' Motion is not well taken. Rule 15 allows amendment of pleadings to conform the pleadings to the evidence on the record, not to conform the pleadings to the Court's previous rulings and to evade summary judgment. The Court reminds Plaintiffs of its previous rulings that Plaintiffs are limited to the counts as they have been pleaded (Docs. 137, 154, 204, 208), and warns Plaintiffs that motions in this regard run dangerously close to sanctionable actions under Rule 11.")

In particular, it is apparent that C2L intends to continue to try to introduce evidence relating to the NCPP project in China, even though the purported foundation for that evidence and claims dependent thereon have long been ruled out of the case. From Siemens' perspective, there is no relevant basis for C2L's evidence concerning NCPP. And it is evident that C2L has made no effort to narrow or tailor the evidence to the lone claim remaining in the case. Rather, C2L's exhibit list is identical to the exhibit list it submitted on April 23, 2019 (Doc. 169-2). The only exceptions are six exhibits concerning the NCPP project that C2L added from the April 23, 2019 Joint Exhibit List. C2L added those exhibits to its exhibit list after Siemens advised that C2L that they were not relevant – given the Court's prior rulings – and did not belong in the case, and therefore Siemens was removing them from the Joint Exhibit List to accompany this pre-trial submission.

The same follows for C2L's deposition designations.  They are identical to the designations C2L submitted on April 23, 2019, and include vast amounts of questions and testimony concerning the NCPP project.

Similarly, C2L's Statement of the Case under Section III.A. herein includes allegations regarding the NCPP project and purported defenses based on alleged failures to inform and provide Secure with improvements.[3]  Secure and C2L attempted to advance these arguments and theories after the Court directed supplemental summary judgment briefing following its exclusion of Secure and C2L's expert, Dr. Kosstrin.  (Docs. 190 and 197 at 5-7).  Siemens exposed the fundamental flaws in each of these theories, including that they were never pleaded (Doc. 199 at 11-13), and the Court subsequently granted summary judgment in Siemens' favor on all of Secure and C2L's counts.  (Docs. 203, 205, 208 and 209.)  Secure and C2L have also attempted to inject these theories into the case via their multiple efforts to amend, all of which have also been rejected.  (*See, e.g.*, Doc. 212-1 at ¶ ¶ 60-61.; 213.)

Siemens will further address C2L's proposed exhibits, deposition designations and theories in its motions in limine and counter-designations and objections, and reserves the right to further object to C2L's pre-trial submissions given that C2L only provided most of them to Siemens at 5:30 pm Eastern on November 5, 2019, the day the pre-trial submissions were due. Siemens reserves the right to request sanctions.

The parties also anticipate filing motions *in limine* by the Court-ordered deadline.

### XV.    Proposed Jury Instructions and Verdict Form

The parties' proposed jury instructions and verdict forms (Exhibit 7) are attached hereto.

The parties are jointly submitting agreed instructions, as well as their respective contested

---

3 Although Siemens provided C2L with its draft pre-trial statement over a week ago, on Monday, October 28, C2L did not provide Siemens with its sections of the pre-trial statement until 5:30 pm Eastern on November 5, the day the pre-trial statement was due.

instructions and proposed verdict forms.  A copy of these instructions and verdict forms will be provided to the Court in Microsoft Word format and sent to the Chambers e-mail address.

### XVI.   Voir Dire Questions

The parties have attached a list of proposed voir dire questions as Exhibit 8 and request that the Court ask the venire the questions.

### XVII.  Trial Briefs

Because the Court's original Case Management and Scheduling Order (Doc. 69) provides that trial briefs in jury trials are discretionary, the parties have agreed not to file trial briefs at this time.  If helpful to the Court, the parties may seek the Court's permission to file trial briefs after the Court's ruling on the parties' Motions In Limine narrowing the issues to be presented at trial.

Date: November 5, 2019

Respectfully submitted,

**REED SMITH, LLP**
BY:  /s/ Jonah D. Mitchell
Jonah D. Mitchell
admitted pro hac vice
101 Second Street, Suite 1800
San Francisco, CA  94105-3659
Phone: (415) 543-8700
Facsimile: (415) 391-8269
E-Mail: jdaire@reedsmith.com

and

P. Alexander Quimby
Florida Bar No. 099954
Baker & Hostetler, LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Phone: (407) 649-4000
Facsimile: (407) 841-0168
E-Mail: aquimby@bakerlaw.com

**ATTORNEYS FOR DEFENDANT/**
**PLAINTIFFS/COUNTER-CLAIMANT**

**DANNA MCKITRICK, P.C.**
BY:  /s/ Robert L. Devereux
Robert L. Devereux,
admitted pro hac vice
7701 Forsyth Blvd., Suite 800
St. Louis, MO  63105-3907
Phone: (314) 726-1000
Facsimile: (314) 725-6592
E-Mail: rdevereux@dmfirm.com

and

Walter A. Ketcham, Jr.
Florida Bar No. 156630
Grower, Ketcham, Eide, Telan & Meltz, P.A.
901 North Lake Destiny Road
Suite 450
Maitland, FL  32751
Phone: (407) 423-9545
Facsimile: (407) 425-7104
E-Mail: waketcham@growerketcham.com

**ATTORNEYS FOR**
**COUNTERCLAIM-DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the fifth day of November, 2019, a true and accurate copy of the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

**DANNA McKITRICK, P.C.**

Robert L. Devereux,
admitted pro hac vice
7701 Forsyth Blvd., Suite 800
St. Louis, MO  63105-3907
Phone: (314) 726-1000
Facsimile: (314) 725-6592
E-Mail: rdevereux@dmfirm.com

and

Walter A. Ketcham, Jr.
Florida Bar No. 156630
Grower, Ketcham, Eide, Telan & Meltz, P.A.
901 North Lake Destiny Road
Suite 450
Maitland, FL  32751
Phone: (407) 423-9545
Facsimile: (407) 425-7104
E-Mail: waketcham@growerketcham.com

**ATTORNEYS FOR PLAINTIFFS/
COUNTERCLAIM DEFENDANTS**

_/s/ Jonah D. Mitchell_

4815-0768-5548, v. 1