UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| MIDAMERICA C2L INCORPORATED, a Nevada corporation; and SECURE ENERGY, INC., a Nevada corporation, | ) ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) ) | Case No. 6:17-cv-171-Orl-40LRH |
| v. | ) ) | |
| SIEMENS ENERGY, INC., a Delaware corporation, | ) ) ) | |
| Defendant/Counter-Claimant. | ) ) | |

## COUNTER-CLAIMANT SIEMENS ENERGY, INC.'S MOTIONS *IN LIMINE*

Defendant/Counter-Claimant Siemens Energy, Inc. ("Counter-Claimant" or "Siemens") files this Omnibus Motion *in Limine* and asks the Court for an Order barring Plaintiffs Secure Energy, Inc. ("Secure") and MidAmerica C2L, Inc. ("C2L") ("Plaintiffs") from introducing into evidence, making any reference to, or having any witness testify based on or regarding certain evidence at trial as to the following seven issues.

1.    **Exclusion of non-pleaded, dismissed, released, previously rejected and/or summarily adjudicated claims, theories and allegations, including alleged defects, misrepresentations and fraudulent concealments.**

The lone claim remaining in the case is Siemens' counterclaim for breach of contract based on C2L's failure to pay to Siemens the termination fee it owed under the 2012 License and Service Agreement. The Court has previously disposed of all of Plaintiffs' pleaded claims and theories via summary judgment, and has rejected in multiple rulings Plaintiffs' repeated attempts to interject new, non-pleaded claims/defenses and theories via its motions to amend

and other related motions.

As to the lone remaining claim, it is undisputed C2L did not pay the termination fee. It is also undisputed that, before it failed to pay the termination fee, C2L did not and could not pay the approximately €11.7M in license fees it owed to Siemens in February 2013 (€10.93M) and December 2015 (€1.25M).  Thus, the only issue remaining is whether C2L is excused from non-performance based on Siemens' alleged anticipatory repudiation of the 2012 License and Service Agreement via its February 2016 notification to C2L of its intention to exit the coal gasification business.  Dkt. 208 at 4 (*citing* Dkt. 63, ¶ 26; Dkt. 169, p. 2) ("Plaintiffs maintain that [Siemens'] notification in February 2016 that they intended to close the fuel gasification of its business constitutes a repudiation of the 2012 License Agreement") and 12-13 ("In response [to [Siemens'] argument for summary judgment on its counterclaim for breach of contract for failure to pay the termination fee under the 2012 License and Service Agreement], Plaintiffs argue that [Siemens] did not demand payment of the license or termination fees until after Plaintiffs properly rescinded due to [Siemens'] alleged anticipatory repudiation."); Dkt. 222 at 4 (*citing* Dkt. 169, p. 20, ¶ 15) ("If [Siemens] is found to have anticipatorily repudiated the 2012 License Agreement, its own claim for breach of contract, via the past due licensing fees and termination fee, is not viable.  It is undisputed that [Siemens] invoiced Plaintiffs for the termination fee on April 16, 2019, *after* Plaintiffs claim [Siemens] anticipatorily repudiated the 2012 Licensing Agreement.").

Nonetheless, it is evident from C2L's pre-trial statement, proposed contested jury instructions, deposition designations, exhibit list and witness list that C2L intends to attempt to depart from that narrow issue.  Indeed, C2L plans to try to introduce evidence relating to,

and to argue, defenses and theories that (1) the Court already rejected or excluded from the case, and (2) are irrelevant to the issues remaining to be tried, including multiple allegations relating to conduct that pre-dated the 2010 and 2012 License and Service Agreements, let alone the February 2016 alleged repudiation. Dkt. 218 at 5-10; *see* Dkt.218-7 at p. 45.

As noted, the Court has summarily adjudicated in Siemens' favor Plaintiffs' claims for breach of implied warranty (Count II), fraudulent misrepresentation (Count IV), rescission-fraud (Count V) and rescission-lack of consideration (Count VI). Dkt. 203, 188.[1] These claims were all premised on problems Plaintiffs alleged existed in its gasification equipment, including alleged design defects and alleged concealments or misrepresentations concerning:

- The engineering and design of the burners;

- The design of the raw gas (syngas) outlet and black water outlet;

- The Basic Engineering Design Package ("BEDP), including, but not limited to, the coal handling system, the slag handling system, piping design, valve design, the syngas cleaning system, and the black water system; and

- The design of the Fuel Measurement System. Dkt. 203 at p. 6-7; *see also* Dkt. 188 at p. 3-7.

Because each of the alleged defects, misrepresentations and/or concealments were premised on improper and unreliable comparisons of Plaintiffs' equipment with the equipment and experiences of a different Siemens customer who purchased, installed and operates Siemens' gasifiers at a plant in China – the NCPP project – the Court excluded Plaintiffs' expert, Dr. Kosstrin's proposed testimony, including concerning alleged defects and Siemens' alleged failure to inform Plaintiffs or remedy the same. Dkt. 188. The Court then summarily

---

[1] The Court dismissed Count III for fraudulent misrepresentation after Plaintiffs voluntarily waived it. Dkt. 74. The Court also summarily adjudicated Count I for breach of contract in favor of Siemens. Dkt. 208.

adjudicated Plaintiffs' defect-dependent claims in Siemens' favor.  Dkt. 203 at 6-9.

Now, C2L is trying to re-package the same unreliable evidence and theories Plaintiffs offered in support of their defect and fraud claims to argue they "constitute Siemens' material breach of the 2012 License and Service Agreement such that Secure is not required to pay the termination fee."  *See* Dkt. 218 at 10.  For example, C2L's Statement of the Case itemizes as issues for trial the alleged "design defect(s)", concealments and misrepresentations that the Court previously rejected, including: "defective cooling screens"; "defective gasifiers"; "burner modifications [and defects]" that "Secure Energy was never informed of"; and alleged "misrepresentations" concerning the allegedly outdated BEDP.  *Compare* Dkt. 169 (Jt. Final Pre-Trial Statement before *Daubert* and MSJ rulings) at 2-11 with Dkt. 218 at 5-10 (Jt. Final Pre-Trial Statement after *Daubert* and MSJ rulings).  Allegations, theories and evidence relating to the following issues C2L identified in its Statement of the Case are irrelevant and should be excluded:

- Alleged "failure to inform and provide Secure with improvements to its entrained-flow coal gasification Equipment and Technology (Dkt. 218 at 5);

- Alleged defects regarding "pin lengths on the cooling screens" and "defective cooling screens" (*id.* at 7);

- Alleged "defective gasifiers" (*id.*);

- Alleged "burner modification[s]" as a result of alleged "oxidation problems" (*id.* at 7-8);

- Alleged "false [representations] made by Siemens" regarding need for a "new BEDP" and "outdated SIS and control systems" (*id.* at 8-9);

- Allegations that "the 500 MWth technology was not yet completely mature at the time of the NCPP plan execution" and Siemens "did not have the wherewithal to perfect the technology it professed in 2007" (*id.* at 9);

- Siemens' alleged failure to "inform Secure of the existence or any details of improvements to the entrained flow coal gasification Equipment and Technology", including "a change in coal feeding system mass flow control" and the alleged "out of date" "SIS control system" (*id*. at 10).

- Alleged failure to provide "Secure with an updated BEDP" (*id*.).[2]

These theories and related evidence should be excluded for at least the following four reasons.

A.     **The Court has previously adjudicated Plaintiffs' theories and allegations in Siemens' favor, and C2L should be limited to its anticipatory repudiation defense**

First, the Court has already determined that Plaintiffs' defect and fraud-related theories lack both proper foundation and competent, record support, and fail as a matter of law.  Dkt. 188, 203.  C2L cannot resuscitate the same defect and fraud-related allegations and theories by re-packaging them as a defense to Siemens' breach of contract claim.

C2L's defenses to Siemens' breach of contract claim are (and always have been) a mirror image of Plaintiffs' affirmative claims.  With the Court having rejected Plaintiffs' defect and fraud-related allegations as a matter of law, C2L's defense to Siemens' claim for breach of contract is properly limited to Siemens' alleged anticipatory repudiation based on its notification to C2L in 2016 that it intended to leave the gasification business. Dkt. 63.  Indeed, as the Court recognized – when it ordered supplemental summary judgment briefing concerning the contract issues after disposing of the defect-dependent claims on summary judgment – that is the only theory upon which Plaintiffs predicated their breach of contract claim against Siemens in their amended complaint, and the only theory that was properly

---

[2] As set forth in MIL No. 2, evidence of these unsupported and previously rejected allegations is also inadmissible because it is improperly and unreliably based on the experience of a different Siemens customer working on a different project under different conditions in China (the NCPP project).

before the Court:

> Plaintiffs are reminded that their breach of contract claim is limited to the repudiation theory alleged in Count I.  No other theories are to be advanced at this stage.  Dkt. 204; *see also* Dkt. 63 ¶ ¶ 25-28.

Accordingly, C2L's defense should be cabined to the only theory it ever offered as to Siemens' contract claim.   All allegations and theories relating to alleged Siemens' misrepresentations, concealments or failure to inform or provide improvements that pre-date Siemens' February 2016 notification should therefore be excluded.

**B.      Evidence of non-pleaded, dismissed, released, previously rejected and/or summarily adjudicated claims, theories and allegations is irrelevant to the issues to be tried**

Second, even setting aside that all of Plaintiffs' claims have been disposed of, evidence relating to the non-pleaded, dismissed, previously rejected and/or summarily adjudicated allegations and theories are irrelevant to any of the issues remaining in the case, and should be excluded for that reason as well.  *See* Fed. R. Evid. 401–402; *see also Miller ex rel. Miller v. Ford Motor Co.*, 2004 WL 4054843 at *15 (M.D. Fla. 2004) (excluding non-pleaded claim of conspiracy and precluding plaintiff from being allowed to submit to the jury); *see also Cioffe v. Morris*, 676 F.2d 539, 541 (11th Cir. 1982) ("a judgment may not be based on issues not presented in the pleadings and not tried with the express or implied consent of the parties.") Evidence concerning alleged equipment defects supplied under an earlier agreement (the 2007 Equipment and Supply Agreement), alleged misrepresentations, concealments and failures to inform of improvements, and alleged inadequacies of the BEDP has no bearing on whether Siemens anticipatorily repudiated the later-entered 2012 License and Service Agreement when in February 2016 it notified Plaintiffs that it intended to exit the gasification business.

Moreover, the evidence is irrelevant because C2L can make no causal connection between its own failure to perform under the 2012 License and Service Agreement and alleged equipment defects, fraud, or alleged failure to inform.  As the Court found, in the 2012 License and Service Agreement, Siemens "agreed to provide technology, engineering services, technical field assistance, training, and performance guarantees relating to the equipment conveyed in the 2007 Contract in exchange for a license fee."  Dkt. 208 at 3 citing Dkt. 146-9, 146-10, 146-11, 146-12, 146-14 (emphasis added).  It is undisputed C2L did not pay the license fees it owed Siemens to obtain from Siemens access to the licensed technology and support – it did not pay the €10.93M due by February 28, 2013, or the €1.25M due by December 31, 2015.  And, as the Court found as a matter of law, Plaintiffs never had the ability to pay for any iteration of their project, including the license fees.  Dkt. 208 at 11 ("Plaintiffs admit, and their financial statements show, that they did not have the necessary funding for any iteration of their project and could not pay the past-due license fees under the contract.") *citing* Dkt. 149-2, pp. 54-55; 149-22, RFA No. 22.

Further, even assuming C2L could and would pay its long past-due license fees, C2L does not (and cannot) identify any evidence in the record suggesting Siemens could not perform its contractual obligations.  Because there is none.  In fact, the parties have stipulated that after the February 2016 notification, Siemens offered to extend the deadline for the already-expired performance guarantees from December 31, 2015 to December 2021 provided C2L pay the full remaining balance of the license fees under the 2012 License and Service Agreement on or before July 1, 2016.  Dkt. 218 at 13, #16.  C2L rejected that offer.  (*Id*. at 14, #17).  The parties also stipulated Siemens did not close its gasification division until two years

later, in May 2018.  *Id*. at # 21.

In addressing Plaintiffs' arguments about Siemens' alleged breaches/failure to perform in its Order granting summary judgment in Siemens' favor on Plaintiffs' Count I, the Court found these facts persuasive of Plaintiffs' intentions:

> Although Plaintiffs complain of [Siemens'] unwillingness to perform their end of the bargain, Plaintiffs are unable to explain away the fact that they denied [Siemens'] offer to extend the deadlines and to continue their business relationship a mere few days after what Plaintiffs' characterize as [Siemens'] repudiation of the agreement.  (Doc. 149-7, p. 74).  Plaintiffs' rejection of this offer evidences their attempt to blame [Siemens] for losses that Plaintiff[s] [were] experiencing long before the alleged breach occurred.  Dkt. 208 at 11.

In sum, evidence concerning the non-pleaded and summarily adjudicated theories and allegations is irrelevant, having no bearing on C2L's failure to perform under the agreement.

### C.    The Court has previously rejected Plaintiffs' attempts to inject new theories and allegations into the case

Third, regarding C2L's attempt to advance allegations and theories based on Siemens' alleged failure to inform and provide improvements and alleged pre-October 2010 misrepresentations and concealments, the Court has already repeatedly excluded those from the case when it rejected Plaintiffs' multiple attempts to add them to the case.  *See, e.g.*, Dkt. 74; 133; 133-1 at ¶ ¶ 17, 60-61, 65; 135; 137; 154; 204; 206 at n. 39; 206-1 at ¶ ¶ 17, 60-61, 65; 212; 212-1 at ¶ ¶ 60-61, 65; 213.

Specifically, for purported fraud and concealment that occurred *before October 2010*, Plaintiffs never alleged such facts.[3]  Indeed, as the Court determined, the only allegations that Plaintiffs asserted regarding alleged fraud arose *after March 31, 2010*.    Plaintiffs

---

[3] C2L was not even formed until 2011.  *See* Dkt. 218.

acknowledged as much and the Court has so held.  Secure entered into an unequivocal release

and waiver as to any claims that existed on or before March 31, 2010, as part of the parties'

2010 Completion Agreement.[4]  Dkt. 162 ¶ 4, Dkt. 67-4 ¶¶ 2-3.  Thus, to avoid the impact of

this release and waiver, Plaintiffs carefully alleged that Siemens' supposed fraudulent

concealments only began after March 31, 2010—specifically, on October 31, 2010 and no

earlier. Dkt. 63 ¶¶ 49, 67.  In fact, Plaintiffs' (now-defunct) claims for rescission only survived

dismissal at the pleading stage *because of* the October 31, 2010 time limitation in their

pleading.  Plaintiffs assured the Court that the facts supporting alleged fraud (which C2L now

seeks to assert as a defense to Siemens' breach of contract claim) began no earlier than October

31, 2010, and thus should not be dismissed as barred by the release in the 2010 Completion

Agreement.  Dkt. 72 at 15 ("…the claim for rescission is a claim that arose subsequent to the

2010 Completion Agreement.").  The Court therefore found that Plaintiffs released all claims,

including any fraud claims, Plaintiffs had or could have had before March 31, 2010 (the date

of the 2010 Completion Agreement) but could maintain their rescission claims (that is, until

the Court later summarily adjudicated and rejected those claims as well), as follows:

> Here, Siemens points to the release included in the 2010 Completion Agreement—
> executed March 31, 2010—to show that Count VI is barred.  ***However, according to
> the Amended Complaint, the fraudulent misrepresentations and omissions alleged in
> Count VI did not occur until October 2010. The Court finds that Plaintiffs only
> released the claims they had or could have had against Siemens before the release
> was executed.***  Dkt. 74 at 13-14 (emphasis added).

When Plaintiffs later attempted to add them to the case – along with several new

---

[4] Like the 2010 Completion Agreement, the 2012 Completion Agreement also included an unequivocal release
and waiver as to any claims or theories of law that existed *on or before July 3, 2012*.  JTX002 at ¶ 2 (". . . neither
of the Parties shall have ground for any claim under the [2010 License and Service Agreement] and/or any theory
of law against the other.").  The releases under both 2010 and 2012 Completion Agreement continue to provide
an independent basis upon which to exclude the pre-July 2012 allegations and evidence.

allegations concerning alleged failures to inform and provide improvements, including during the time period *after* October 2010 as well – via motion to amend, the Court rejected it. Plaintiffs continued to try to bring them into the case via various other motions and pleadings, and the Court also rejected all those efforts. *See* Dkt. 133; 133-1 at ¶¶ 17, 60-61, 65; 135; 137; 154; 204; 206 at n. 39; 206-1 at ¶¶ 17, 60-61, 65; 212; 212-1 at ¶¶ 60-61, 65; 213.

Notwithstanding the Court's multiple rejections of Plaintiffs' efforts to interject allegations and theories based on Siemens' alleged failure to inform and provide improvements (before and after 2010) and alleged pre-October 2010 misrepresentations, however, Plaintiffs tried to advance them during the summary judgment briefing, including after the Court ordered supplemental briefing following its exclusion of Dr. Kosstrin.  Dkt. 190; 197 at 5-7.  Plaintiffs also tried to advance them after the Court granted summary judgment on the defect-dependent claims, but ordered supplemental briefing concerning Plaintiffs' breach of contract claim.  Dkt. 204, 206 at n. 39; 206-1 at ¶¶ 17, 60-61.

In response, Siemens exposed the fundamental flaws in each of these theories, including that they were never pleaded and on the merits (Dkt. 199 at 11-13; 207 at 9-10 and n. 14)), and the Court granted summary judgment in Siemens' favor on all of Plaintiffs' counts. Dkt. 203; 205; 208 and 209.

Following summary judgment, Plaintiffs tried yet again, this time through a Renewed Motion for Leave to File an Amended Complaint.  Dkt. 212.  The Court denied the Motion, finding it amounted to an attempt "to evade summary judgment," reminding "Plaintiffs of [the Court's] previous rulings that Plaintiffs are limited to the counts as they have been pleaded (Docs. 137, 154, 204, 208)," and warning Plaintiffs that "motions in this regard run

dangerously close to sanctionable actions under Rule 11." Dkt. 213.

The Court should again reject Plaintiffs' attempt to introduce evidence to interject unsubstantiated, previously rejected, non-pleaded, and plainly irrelevant issues, theories and allegations at trial. The Court should therefore exclude any alleged Siemens wrongdoing, misrepresentations, concealments, "failures to inform" or provide improvements—as well as evidence relating to any other non-pleaded, previously rejected and/or summarily adjudicated claims, theories, or allegations.

**D.     Siemens would be severely prejudiced if evidence of non-pleaded, dismissed, released, previously rejected and/or summarily adjudicated claims, theories and allegations were admitted**

Finally, even if evidence of these previously summarily adjudicated or excluded allegations and theories was somehow relevant, which it is not (Dkt. 188, 203), the prejudice to Siemens and potential jury confusion greatly outweighs any probative value. If C2L's defense is properly cabined to anticipatory repudiation based on Siemens' February 2016 notification of its intention to exit the business, then the jury -- if required to consider evidence of the prior allegations and theories -- would have to grapple with how that evidence fits into the case – even though it far pre-dates Siemens' February 2016 notification and instead relates to alleged misrepresentations and concealments that are no longer at issue. Moreover, even if C2L was permitted to somehow present a repudiation theory inclusive of earlier events, the risk of misleading the issues and confusing the jury is still extremely high because it would require the jury to engage in a hypothetical exercise predicated upon layers and layers of assumptions that C2L would somehow pay under the 2012 License and Service Agreement and that Siemens' obligation to provide the license and support under that agreement would

thus eventually ripen, even though the Court has already found that C2L did not pay Siemens, and never had the funding necessary to proceed with its project.

**2.     Exclusion of evidence of alleged defect, misrepresentation, concealment or failure to inform based on experiences at the NCPP Project in China.**

Notwithstanding the Court's prior exclusion of Dr. Kosstrin and its summary judgment of all of Plaintiffs' defect-dependent claims, C2L continues to attempt to introduce evidence concerning alleged problems that Siemens' NCPP plant customer allegedly experienced in China with Siemens' equipment, as shown by C2L's pre-trial submissions, exhibit list and deposition designations.  Permitting the introduction of, reference to, or reliance on evidence of alleged problems, defects, misrepresentations or failures to inform or make improvements stemming from occurrences at the NCPP project in China, including as a defense to Siemens' claim for breach of the 2012 License and Service Agreement, would constitute reversible error. *See Heath v. Suzuki Motor Co*., 126 F.3d 1391, 1396 (11th Cir. 1997) (*citing Jones v. Otis Elevator Co*., 861 F.2d 655, 661 (11th Cir. 1988)) (internal citations omitted); *see also Gardener v. Ford Motor Co*., 166 F.Supp.3d 1261, 1269-70 (M.D. Fla. 2015) (granting summary judgment; evidence of other accidents inadmissible to show alleged defect where plaintiff failed to show substantial similarity to accident at issue); *Rye v. Black & Decker Mfg. Co*., 889 F.2d 100, 103 (6th Cir. 1989) (plaintiff failed to show incidents "occurred under similar circumstances or share the same cause"; exclusion appropriate because evidence did not meet "the minimal standards of relevance articulated in Federal Rules of Evidence 401 and 403."); *Galloway v. Big G Express, Inc*., 2008 WL 2704443 *2-3 (E.D. Tenn. 2008) (evidence of other Volvo windshields cracking inadmissible to show defective windshield installation

where plaintiff failed to show substantial similarity); *Calhoun v. Honda Motor Company*, 738 F. 2d 126, 131-32 (6th Cir. 1984) (affirming JNOV for defendant; finding reversible error to admit prior incident evidence where evidence "worked a grave prejudice to defendant" and its admission "may have been interpreted by the jury as a ruling by the court" that the conditions under which plaintiff operated car had same effect as the conditions under which people in prior incidents operated same type of car).

Specifically, and by way of example, the Court should prohibit C2L from arguing at trial, based on NCPP-related experience and evidence, that Siemens failed to provide or inform C2L of "improvements" to the gasifier equipment; "knowingly shipped defective gasifiers"; "install[ed] defective cooling screens"; made "false" representations about the BEDP; and provided "outdated" equipment.   (*See* Dkt. 218 at 7-10.)  Such arguments and related evidence should be excluded for at least two independent reasons.

A.     **The Court has already ruled no substantial similarity exists between the NCPP plant and the hypothetical operation of Plaintiffs' equipment and that Plaintiffs cannot proffer the requisite expert testimony to support admission of NCPP alleged defect-related evidence**

First, the alleged problems in China at the NCPP plant are inadmissible because the Court has already determined that "the NCPP plant is *not substantially similar in its operation to the gasification plant designed by Siemens for use by Secure in Illinois*."  Dkt. 188 at 19 (emphasis added) (also stating: "The NCPP plant is not essentially the same as the hypothetical Secure plant, because the Chinese operators failed to follow the design specifications.").  Thus, the Court has already decided that the evidence of alleged issues at the NCPP plant is neither relevant nor competent to show defect, fraud or any other Siemens' alleged wrongdoing in this case.   The Court, therefore, excluded Plaintiffs' expert testimony and granted summary

judgment on all of Plaintiffs' claims.  Given that the NCPP evidence was not relevant or competent to support Plaintiffs' affirmative claims, it certainly is not admissible now to support any affirmative defense to Siemens' breach of contract claim.

Similarly, the Court also previously determined that Plaintiffs have not, and cannot, proffer the requisite "expert testimony to link the issues experienced at the NCPP plant to any alleged hypothetical defect in [C2L's] gasifiers."  Dkt. 203 at 8-9.  Indeed, as this Court acknowledged, proving that Plaintiffs' equipment "is defective because the NCPP plant equipment was defective . . . [would] entail[] a complicated, multi-step analysis which would require jurors to understand the operation of the gasification equipment and the chemical and combustion engineering principles affecting its use."  *Id*.  Accordingly, the Court granted Siemens' *Daubert* motion to exclude Dr. Kosstrin.  Dkt. 188 at 18-21.

All the NCPP-related evidence that C2L hopes to use as a defense to Siemens' breach of contract claim remains inadmissible for the same reasons the Court has previously found. Thus, the Court should exclude all evidence and argument concerning alleged problems and issues at the NCPP plant, as well as all evidence and argument concerning alleged contractual breaches by Siemens that are premised on experiences at the NCPP plant.  *See* Dkt. 188, 203.

**B.      The NCPP-related evidence is irrelevant, and its admission would cause confusion and severe prejudice to Siemens**

Second, even ignoring that the Court has already determined the NCPP evidence related to alleged defects, misrepresentations, and concealments / failures to inform is incompetent and unreliable, the evidence also has no bearing whatsoever on the narrow issue that remains in the case:  whether Siemens anticipatorily breached the 2012 License and Service Agreement. Indeed, the alleged experiences of Siemens' Chinese customer at the NCPP plant, which

related to an entirely different contractual relationship and equipment operated under entirely different conditions, has nothing to do with the parties' performance or non-performance of the later 2012 License and Service Agreement between Siemens and C2L in the United States. In other words, aside from being unreliable, it is wholly irrelevant.

Moreover, its admission would cause severe prejudice to Siemens. This case is proceeding only on Siemens' breach of contract claim against C2L, and the NCPP evidence of alleged defects, misrepresentations, problems and issues is irrelevant to C2L's defense that Siemens anticipatorily repudiated the agreement in 2016 when it notified C2L that it would be exiting the gasification business. As such, admission of NCPP-related evidence would greatly confuse and mislead the jury, potentially leading it to find against Siemens based on irrelevant and unreliable alleged facts concerning an entirely different customer operating under entirely different conditions in a different country. *See Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1316 (11th Cir. 2005) (Application of the "substantial similarity" doctrine is critical to "protect parties against the admission of unfairly prejudicial evidence, evidence which, because it is not substantially similar to the accident or incident at issue, is apt to confuse or mislead the jury.") (internal quotations omitted), *citing and quoting Heath*, 126 F.3d at 1396; *Calhoun* 738 F. 2d at 131-32 (prior incident evidence "worked a grave prejudice to defendant" and its admission "may have been interpreted by the jury as a ruling by the court" concerning operation under similar conditions; *Branham v. Ford Motor Co*., 390 S.C. 203, 230-31 (2010) (other incidents have tendency to be "highly prejudicial" thus a "stringent standard of admissibility" applies.)

**3.     Exclusion of evidence, argument and theories related to alleged failure to inform or provide improvements under Section 5.1 of the 2012 License and Service Agreement**

As a "defense," C2L apparently intends to argue and offer evidence that Siemens materially breached the 2012 License and Service Agreement, Section 5.1, by failing to inform C2L of "improvements" to the gasification equipment. Dkt. 218 at 10.  In addition to the reasons set forth above in *motion in limine* numbers 1 and 2, this evidence and argument should be excluded.

Section 5.1 states, in relevant part:

> During the term of this License and Service Agreement, Siemens shall inform C2L of any Improvements to the Technology which are developed or acquired ***and released for commercial application*** by Siemens.  C2L shall at is [sic] own option agree to be licensed to such Improvements ***for an additional fee*** . . . . The terms and conditions and additional fee of such license shall be negotiated between the Parties at that time.  If C2L agrees to be licensed to such Improvements according to this Section 5.1[,] Siemens shall offer the respective engineering and equipment under a separate supply and service agreement. JTX001 at p. 11, ¶ 5.1 (emphasis added).

Section 5.1 thus expressly contemplates that for C2L to obtain any "improvements," the parties must first negotiate a separate license and C2L *must pay for such improvements*. But it is undisputed that C2L did not even pay the license fees necessary to secure access to the *existing* technology – €10.93M due by February 28, 2013 or the €1.25M due by December 31, 2015.  And the Court found Plaintiffs never had the funding necessary for any iteration of its project.  Thus, it makes no sense that Siemens was somehow legally required to offer or provide C2L any improvements at a time when C2L had never paid—and had no ability to pay—for any of Siemens' services in the first place, let alone for any improvements.  Again, the risk of confusion and misleading the issues is extreme:  the jury would have to engage in a

hypothetical exercise that C2L could somehow obtain the funding necessary to pay for the license fees, when it actually never did, and never had the ability to progress with its project.

In addition, under Section 5.1, Siemens was only required to offer improvements "which are developed or acquired and released *for commercial application* by Siemens." JTX001 at ¶ 5.1 (emphasis added). C2L proffers no evidence (because none exists) that iterative and "lessons learned" improvements from the NCPP experiences—which were inextricably tied to the unique conditions at the NCPP plant—were ever released for general commercial application.[5] Siemens nevertheless did tell Plaintiffs several times (including on October 31, 2012, November 16, 2012, and July 18, 2014) that they could buy an updated BEDP to account for all iterative improvements in the Siemens gasification technology, provided that Plaintiffs pay for the update (which they never did). Dkt. 197-21 at 4 (item 7); Dkt. 149-2 at 420:23-424:7, 441:22-445:13. Those discussions did not progress further because, according to Plaintiffs, sometime between December 2012 and April 2013, they decided of their own volition to reject the EPC contract that their potential EPC contractor SKEC had proposed, which rendered an updated BEDP moot.[6] Dkt. 149-2 at 327:7-10, 395:12-401:23; Dkt. 149-9 at 328-6-333:9. After Plaintiffs walked away from SKEC, they instead tried to market and sell their gasifiers and BEDP to third parties. Plaintiffs advertised that their 2007-era BEDP was "full" and "extensive," but that an update could be purchased directly from Siemens. Dkt. 148-1 at 27, ¶ 5.1.0.4. By Plaintiffs' own admission, Siemens thus had

---

[5] C2L's NCPP-related evidence should also be excluded based on the Court's *Daubert* ruling, as discussed above.
[6] Kenny testified that C2L and Secure "walked away" once he felt SKEC had "left [C2L and Secure] at the altar" by trying to introduce a new $100 million contingency to the deal during a late stage of negotiation. Dkt. 149-2 at 327:7-10, 395:12-401:23; Dkt. 149-9 at 328-6-333:9.

no obligation and no reason to formally offer C2L improvements to the technology, including an updated BEDP.  Accordingly, this Motion should be granted.[7]

**4.      Exclusion of any evidence or argument concerning any SEC activity, charges or complaints against Siemens-related companies or their executives or employees.**

The court should exclude any argument or evidence concerning Securities and Exchange Commission (SEC) investigations, charges, complaints or other activities involving any Siemens-related entities or their executives, as well as Siemens AG's Business Conduct Guidelines from 2009 ("2009 Conduct Guidelines").  The SEC materials C2L intends to introduce concern bribery charges and investigations that have nothing to do with any of the issues, people, companies or activities in this case.  For example, C2L's Exhibit List includes a 2008 SEC Complaint against German parent company, Siemens Aktiengesellschaft, for alleged bribery, and a 2011 SEC press release relating to bribery charges against former executives of a different subsidiary, Siemens Argentina.  *See* Dkt. 173-21 – 173-23.

None of the accused executives ever worked for Siemens Energy, Inc., were deposed in this case, or have anything to do with this case at all, let alone relate to the focused issue of alleged anticipatory repudiation of the 2012 License and Service Agreement.  *See, e.g.* Dkt. 173-25 (Morehead Depo.) at 106:23-108:1. C2L also seeks to introduce the 2009 Conduct Guidelines to improperly argue that because Siemens AG issued conduct guidelines in the wake of the SEC activity, all Siemens subsidiaries must have been corrupt or dishonest prior to issuance of the guidelines.  *Id*. (Morehead Depo.) at 106:23-113:13; Dkt. 173-24.

---

[7] This includes any evidence from Keith Clauss, the former president and CEO of SKEC.

The Court should exclude this evidence and argument because it does not tend to prove or disprove any element of C2L's defenses—the SEC charges and investigations, and any conduct guidelines, have nothing to do with the activities of Siemens Energy, any of its executives, or this case.  Moreover, introduction of these inflammatory materials and related argument would create a high risk of prejudice to Siemens Energy by confusing and misleading the jury to believe that Siemens Energy and/or its executives are or were accused of being bad actors engaged in unlawful activity that has not been alleged in this case, and is not an element of C2L's defenses.  In turn, this evidence could provide an inappropriate basis for the jury to find against Siemens Energy on its claim and to deny damages because of the risk that it drowns out the evidence actually relating to this case.  The absence of a connection between this evidence and the issues in this case is so manifest that Plaintiffs' intent to use it can be for no reason but to smear and confuse. This is precisely what Rule 403 prohibits.  *See* Fed. R. Evid. 403; *McMahan Securities Co. L.P. v. FB Foods*, Inc., 2007 WL 473667 at *1 (M.D. Fla. 2007) (excluding evidence of alleged misrepresentations by, and an SEC investigation into, the defendant's Vice President who was never deposed where neither the misrepresentations nor investigation related to events at issue in the case).

This is a commercial breach of contract case against C2L that stems from the parties' contractual relationship—it has nothing to do with any alleged bribery activities involving foreign governments, companies, or executives working for different Siemens-related entities around the world.  Introducing the SEC and conduct guideline-related evidence would not only cause extreme prejudice by erroneously painting Siemens Energy (or related companies) as corrupt, but it would also consume significant trial time needed to explain that the actions of

the SEC involve different activities at different projects, and different entities in different

countries taking actions that have nothing to do with the parties' interactions at issue in this

case.  There is no need to waste valuable time on a "trial within a trial" during which Siemens

Energy may be forced to defend foreign executives of different entities from SEC charges that

occurred years ago.  This evidence should be excluded.  *Stallworth v. Sourcecorp*, 2006 WL

2331093 at *1-2 (M.D. Al. 2006) (excluding SEC-related evidence, which could confuse and

mislead the jury and "waste of time which would be required to explain and defend against

allegations" not "connected closely" to the case).

5.     **Exclusion of Siemens Energy's and its parent and related entities' financial information including revenues, profits, wealth, assets and net worth.**

Any reference to or mention of Siemens Energy's, or its parent or affiliated companies'

revenues, profits, wealth, assets, net worth, or other financial information should be excluded

as irrelevant and prejudicial.  C2L included on its Exhibit List: (1) a 2018 Annual Report for

the Siemens Group, which includes, among other things, consolidated financials for Siemens

Energy's parent company, Siemens AG, and all its subsidiaries, segments, divisions, and

strategic units (Dkt. 173-26 – 173-30); and (2) a Q1 2019 Earnings Statement for the parent

company Siemens' AG, including all of its subsidiaries (Dkt. 173-31).  These documents,

which were not produced during discovery, reflect detailed information unrelated to any issue

in this case, including information on earnings, profits, loss, profit margins, assets, liabilities,

financial positions, cash flow, and revenues across the entire Siemens Group of companies.

Their admission could cause great prejudice through the suggestion that Siemens Energy is a

big company, or part of large group of companies, in comparison to the damages its seeks

and/or in comparison to C2L.  Moreover, the jury could be misled to find for C2L on issues of

liability, and/or reduce any damages on the basis of the Siemens Group's purported wealth alone.  Accordingly, this evidence should be excluded under Federal Rules 401, 402 and 403.  *See St. Cyr v. Flying J Inc*., 2007 WL 2696791 at * 2 (M.D. Fla. 2007) (excluding financial evidence: "If presented with information about Defendant's wealth, the jury may be tempted to render an award on the basis of that information alone. Defendant's wealth is simply not relevant to any of the issues" regarding liability and compensatory damages); *see also HTC Corporation v. Technology Properties Limited*, 2013 WL 4782598 at *6 (N.D. Cal. 2013) ("the probative value of evidence related to [the defendant's] size, wealth, or overall revenues is substantially outweighed by the risk of unfair prejudice, confusion of the issues and misleading the jury."); *Prescott v. CSX Transp., Inc*., 2013 WL 1192820 at *8 (S.D. Ga. 2013) (excluding evidence "regarding the parties' size, status, wealth, or relative financial conditions" as irrelevant and prejudicial); *Brooks v. Caterpillar Global Mining America*, LLC, 2017 WL 3401476 at *2 (W.D. Ky. 2017) (financial condition and net worth not admissible).

Again, the laser-focused and only remaining issue in this case is whether C2L can prevail on its defense that Siemens anticipatorily breached the 2012 License and Service Agreement.  That turns on whether Siemens would have performed, not the amount of money in its bank account.

Finally, the 2019 Annual Report, earnings statement and any other purported Siemens Group financial documents should be excluded because C2L's witnesses (and Siemens Energy's witnesses) have no personal knowledge or responsibility for preparing such financial records, and any testimony as to them would be inadmissible hearsay.  Fed.R.Evid. 801.

**6.      Exclusion of third party witness Keith Clauss**

C2L has indicated it intends to call at trial a third party witness named Keith Clauss.

Mr. Clauss has no relevant information to Siemens' counterclaim or C2L's pleaded defenses

and should be excluded.   As the Court may recall, Plaintiffs identified Mr. Clauss at the

*Daubert* hearing in May 2019.   Given that Plaintiffs had only previously identified Mr. Clauss

as someone they may call in their rebuttal case (and not their case-in-chief), the Court permitted

Siemens an opportunity to take his deposition after the discovery close.   *See* May 14, 2019

Transcript at 127:11-133:1.   Before Mr. Clauss's deposition was scheduled, the Court issued

its *Daubert* ruling and requested supplemental summary judgment briefing.   Plaintiffs

supplemented with a declaration from Mr. Clauss.  Dkt. 197-2.  The Court then issued its

summary judgment rulings leaving only Siemens' counterclaim for trial. [8]

Although Siemens believes Mr. Clauss does not have any knowledge that would be

pertinent to Siemens' counterclaim, following summary judgment of Plaintiffs' claims and

out of an abundance of caution, Siemens asked C2L if it had any further intention of calling

Mr. Clauss at trial.   C2L advised that it still intended to call Mr. Clauss at trial.

As set forth in his Declaration, Mr. Clauss was the President and CEO of SK

Engineering and Construction, USA ("SKEC") from August 2009 to August 2015.  Dkt. 197-

2 at ¶ 1.   SKEC was considered for an engineering, procurement and construction ("EPC

contract") for Secure's proposed plant.  *Id.* at ¶  3.   Based on his Declaration and the theories

C2L identified in its Statement of the Case, C2L apparently intends to introduce testimony

---

[8] Plaintiffs submitted an additional declaration from Mr. Clauss in Opposition to Siemens' Motion for Reconsideration of Order Denying Summary Judgment.  Dkt. 221-2.

from Mr. Clauss concerning Siemens' alleged failure to provide an updated BEDP, and that SKEC was therefore unable to provide Secure with a final guaranteed maximum EPC contract. C2L should be prohibited from introducing testimony from Mr. Clauss for the following reasons.

At the threshold, C2L never pleaded that Siemens breached the 2012 License and Service Agreement by failing to provide an updated BEDP (that Plaintiffs never paid for). Again, Plaintiffs' only theory of breach of contract is based on Siemens' alleged repudiation through its February 2016 notification of its future planned exit from the gasification business. Dkt. 63.   The Court has previously rejected, on multiple occasions, Plaintiffs' attempts to interject (via motion to amend and other pleadings) new allegations and theories, including to expand the scope of its breach theories.  *See, e.g.*, Dkt. 74; 133; 133-1 at ¶¶ 17, 60-61, 65; 135; 137; 154; 204; 206 at n. 39; 206-1 at ¶¶ 17, 60-61, 65; 212; 212-1 at ¶¶ 60-61, 65; 213. Testimony from Mr. Clauss should be excluded for this reason alone.

Regardless, testimony from Mr. Clauss is irrelevant even if it had been properly pleaded.  In his declaration, Mr. Clauss offered testimony concerning events that took place in 2012, long before Siemens' alleged repudiation in February 2016– i.e., C2L's only remaining defense to Siemens' claim.  Dkt. 197-2 at ¶¶ 4-12.  In fact, as noted, Mr. Clauss had left SKEC well before Siemens' alleged repudiation.

In addition to being irrelevant in time in relation to Siemens' claim and C2L's defense, testimony from Mr. Clauss is otherwise irrelevant to Siemens' claim or any proper C2L defense, as noted above in connection with *motions in limine* 1 and 2.  Siemens' alleged failure to provide an updated BEDP is irrelevant because, among other things, the following is

undisputed: (1) Plaintiffs never paid, or offered to pay, for an updated BEDP; and (2) Plaintiffs walked away from SKEC at the end of 2012 of their own and tried to sell the equipment instead.

Indeed, the evidence reveals that Siemens told Plaintiffs several times (including on October 31, 2012, November 16, 2012, and July 18, 2014) that they could buy an updated BEDP to account for all iterative improvements in the Siemens gasification technology, provided that Plaintiffs pay for the update (which Plaintiffs never did).  Dkt. 197-21 at 4 (item 7); Dkt. 149-2 at 420:23- 424:7, 441:22-445:13.  Those discussions did not progress further because, as Mr. Kenny testified, sometime between December 2012-April 2013, Plaintiffs decided of their own volition to **reject** the EPC contract that their ***potential*** EPC contractor SKEC had proposed, which rendered an updated BEDP moot.[9]

In light of the undisputed evidence, even if this testimony was somehow relevant (which it is not), it would only mislead and confuse the jury because there is no causal connection between any action that C2L took or did not take.

Finally, it appears that C2L may attempt to introduce expert testimony from Mr. Clauss, but he was not timely disclosed as an expert nor did C2L make the required disclosures to

---

[9] Mr. Kenny testified that Plaintiffs "walked away" once he felt SKEC had "left [Plaintiffs] at the altar" by trying to introduce a new $100 million contingency to the deal during a late stage of negotiation. Dkt. 149-2 at 327:7-10, 395:12-401; Dkt. 149-9 at 328-6-333:9.  Any assertion that SKEC was anything other than a *potential* EPC contractor misrepresents the facts.  Dkt. 149-2 at 327:7-10, 395:12-401; Dkt. 149-9 at 328-6-333:9.  After Plaintiffs walked away from SKEC, they instead tried to market and sell their gasifiers and BEDP to third parties. Plaintiffs advertised that their 2007-era BEDP was "full" and "extensive," but that an update could be purchased directly from Siemens. Dkt. 148-1 at 27, ¶ 5.1.0.4.  By Plaintiffs' own admission, Siemens thus had no obligation **and no reason** to formally offer Plaintiffs improvements to the technology, including an updated BEDP.

introduce expert opinion testimony from him.[10]  Mr. Clauss' testimony has no probative value to the remaining issues to be tried, he should be excluded from trial.

C2L has also recently indicated it has similar plans to potentially call third party witnesses Thomas Maramba, another former executive at SKEC, and Max Sherman, a former executive at Sega Engineering.  For the same reasons as Mr. Clauss, they should be excluded.

**7.      Exclusion of deposition objections and improper colloquy.**

Siemens requests the Court enter an order prohibiting the parties from referring to, reading from any transcript of, or showing any video of, any lawyer's objection(s), statements or comments in a deposition that are not in the context of a question and answer, including remarks in the nature of a sidebar.  Lawyer colloquy or soliloquy during depositions  that are not in the context of a question and answer, and particularly comments addressed to a witness or attorney in the nature of a sidebar remark (for example, C2L's common introductory phase "are you telling this jury . . . ."), are not evidence, and they are irrelevant, argumentative and would cause prejudice to Siemens.  If introduced, the prejudice to Siemens would substantially outweigh the probative value, if any, of the information.  Fed. R. Evid. 401-403.

Dated:  January 15, 2020

                                   Respectfully submitted,


                        By:    */s/ Jonah D. Mitchell*
                               Robert W. Thielhelm, Jr.
                               Florida Bar No. 889679
                               P. Alexander Quimby
                               Florida Bar No. 099954

---

[10] For instance, in his declaration, Mr. Clauss purports to offer testimony concerning the operation of Secure's gasification island and Siemens' equipment under different operating conditions, as well as alleged industry knowledge regarding operating conditions and the effect on the equipment.  Dkt. 197-2 at ¶  14.

**Baker & Hostetler LLP**
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: 407.649.4000
Facsimile: 407.841.0168
Email: rthielhelm@bakerlaw.com
Email: aquimby@bakerlaw.com

Scott D. Baker (admitted pro hac vice)
Jonah Mitchell (admitted pro hac vice)
Adaline J. Hilgard (admitted pro hac vice)
Christopher J. Pulido (admitted pro hac vice)
**Reed Smith LLP**
101 Second Street, Suite 1800
San Francisco, CA  94105-3659
Telephone: 415.543.8700
Facsimile: 415.391.8269
Email:  sbaker@reedsmith.com
Email:  jmitchell@reedsmith.com
Email: ahilgard@reedsmith.com
Email:  cpulido@reedsmith.com

*Counsel for Siemens Energy, Inc.*

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on January 15, 2020, a true and correct copy of the foregoing was submitted to the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to the following listed counsel:

Michael R. Cherba
Robert L. Devereux
Jeffrey R. Schmitt
**Danna McKitrick, P.C.**
7701 Forsyth Blvd., Suite 800
St Louis, MO 63105
Telephone: (314) 726-1000
Fax: (314) 725-6592
Email: mcherba@dmfirm.com
Email: rdevereux@dmfirm.com
Email: jschmitt@dmfirm.com

Walter A. Ketcham , Jr.
**Grower, Ketcham, Eide, Telan & Meltz, PA**
901 N Lake Destiny Rd., Suite 450
PO Box 538065
Orlando, FL 32853-8065
Telephone: (407) 423-9545
Fax: (407) 425-7104
Email: enotice@growerketcham.com


    DATED:  January 15, 2020.


                                 */s/ Jonah D. Mitchell*
                                 Jonah D. Mitchell

## **CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule 3.01(g), on January 14, 2020, Defendant's counsel conferred with Plaintiffs' counsel regarding this Motion.  Plaintiffs' counsel has stated his opposition to this Motion.


DATED:  January 15, 2020.


/s/ Jonah D. Mitchell
Jonah D. Mitchell