**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| **MIDAMERICA C2L INC., et al.**, | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 6:17-CV-171-Orl-40LRH |
| **SIEMENS ENERGY, INC.**, | ) |
| Defendant. | ) |

**COUNTERCLAIM DEFENDANTS' RESPONSE TO SIEMENS ENERGY INC.'S OMNIBUS MOTION IN LIMINE**

Plaintiff/Counterclaim Defendants Secure Energy Inc. and MidAmerica C2L, Inc. ("Secure") by and through counsel, submit their response and opposition to Defendant-Counterclaimant Siemens Energy, Inc.'s ("Siemens") Motion in Limine ("Doc. 230"). In Support hereof, Secure states to the Court as follows:

**Introduction**

Siemens has filed an Omnibus Motion in Limine[1] and has once again emphasized the theories and evidence contained in Plaintiff's prior pleadings regarding summary judgment on Secure's claims to somehow support Siemens' present claim for breach of contract against Secure. This is in direct contradiction to the Court's order (Doc. 222) of November 19, 2019, wherein the Court reiterated what it had already previously stated that "Defendant cannot rely on Plaintiff's inability to prove an essential element of their claim as an argument favoring Summary Judgement on its own distinct counterclaim for breach of contract." The Court also

---

[1] For sake of economy, Secure incorporates by reference its arguments made in its Memorandum in Opposition to Defendant Siemens Energy, Inc.'s Omnibus Motions in Limine, filed on May 20, 2019 (Doc. 180), many of which remain applicable to Siemens' current motion.

reiterated that Defendant must be able to prove every element of its own claim for Breach of Contract.

Presently before the Court is Siemens' Counterclaim against Secure for breach of the 2012 License and Service agreement that the parties entered into on or about July 3, 2012. The License and Service Agreement contains 33 pages plus 146 pages of appendices to the License and Service Agreement (the "Agreement"). Thus, there are 146 pages of documents governing the relationship and agreement between the parties. (Joint Exhibit JTX001). The cornerstone of the Agreement is that, Siemens grants to C2L a royalty bearing, non-exclusive, non-transferable limited license (the "License"), to build, have built, use and operate the licensed plant. Contrary to the assertions made by Siemens in its most recent Motion in Limine which are without foundation, Siemens must demonstrate that it performed the material terms of the Agreement to be entitled to relief. To date, the Court has not concluded that the undisputed facts support such a result and it is anticipated that the evidence at the trial of this matter will be devoted to whether Siemens fulfilled the terms of the Agreement.

It is crucial to point out that the Agreement sued upon references and defines the term "Previous Contract," "Equipment", "Engineering" and "Basic Engineering Design Package" or "BEDP" as follows:

> "Previous Contract" means the Engineering Services and Equipment Supply Contract dated December 21, 2007 between Secure Energy Decatur, LLC a Delaware limited liability company, a subsidiary of Secure Energy, Inc and Siemens Power Generation, Inc. predecessor in interest to Siemens.
>
> "Equipment"…means the equipment as described in Appendix 5 which was previously purchased by Secure Energy, Inc. or one of its subsidiaries under the Previous Contract and incorporated by C2L into the Project.
>
> "Engineering" means the PDP and BEDP provided by Siemens under the Previous Contract.

> "Basic Engineering Design Package" or "BEDP" means technical documents previously provided by Siemens pursuant to the Previous Contract, including any changes thereto required to be performed by Siemens under this Contract to be used by C2L to develop a detailed engineering design for the Line.

Joint Exhibit JTX001.

These four definitions – "Previous Contract", "Equipment", "Engineering" and "Basic Engineering Design Package" or "BEDP" were employed to incorporate the equipment Secure had previously purchased so that the terms relating to improvements, modifications and developments of the technology and equipment sold (Section 5.0) and the warranty regarding engineering services would relate to the Equipment and engineering Siemens previously provided to Secure in furtherance of the Agreement.

The Agreement addressed improvements, modifications and developments and required updates from Siemens as to improvements in the millions of dollars' worth of technology and equipment that Secure purchased:

> During the term of this License and Service Agreement, Siemens shall inform C2L of any improvements to the technology which are developed or acquired and released for commercial application by Siemens.

(JTX001, See Section 1, pages 3, 4 and 7 and Section 5.1, page 11)

The term "Improvements" is defined in the Agreement and:

> "…shall mean all technical information on improvements and or modifications relating to the technology which are released for commercial application and introduced into Siemens' manufacturing process and which Siemens develops and/or acquires during the term of this License and Service Agreement and which Siemens is entitled to disclose and License in accordance with the terms of this License and Service Agreement."

(*Id*. at page 5).  The term "Remedy" is also defined in the Agreement and "… means correction of warranty non-conformity <u>or defect</u> by Siemens in accordance with Section 7.0, by repair, replacement or modification as Siemens deems necessary to correct such non-conformity."  (*Id*.

3

at page 7) (emphasis added). The term TECHNOLOGY is also defined and …" means all industrial and intellectual property rights, including any copyright and rights in any concept, idea, invention, discovery or improvements, Patents, know-how, related technical documents, proprietary information, the PDP, the BEDP and software owned or held by Siemens and related to the Coal Gasification Process." (*Id*. at page 7).

As part of the Agreement, Siemens warranted its engineering services in Section 7.4.1 of the Agreement as follows:

> 7.4.1 Siemens warrants that the engineering services and TFA performed hereunder, including the advice and recommendations of its personnel will reflect competent professional knowledge and judgment consistent with Siemens engineering practices through the earlier of 12 months from completion of the work or December 31, 2015.

The Agreement also provides a non-waiver clause which states:

> 22.2 WAIVERS: The failure of either party to enforce at any time any of the provisions of the contract or to require at any time performance by the other party of any of such provisions, shall in no way be construed to be a waiver of such provision, nor in any way to effect the validity of the Contract, or any parts thereof, or the right of either Party thereafter to enforce each and every provision." (See Section 22.2 on Page 30 of the Agreement).

It is against this backdrop that Siemens must prove that it performed and fulfilled all of the necessary requirements contained in the License and Service Agreement. In a preemptive effort to ease its path at trial, Siemens' Motion in Limine seeks to prevent Secure from introducing any evidence that in any way contradicts or challenges that Siemens fulfilled its end of the bargain, which is also notably Siemens' own burden to prove on its counterclaim. In essence, Siemens argues that it does not have to introduce evidence of its own performance of an Agreement that Siemens contends entitles it to a multi-million dollar fee, and further, that Secure should have no ability to dispute at trial that Siemens fully performed.

1. **There is ample and reliable evidence of Siemens' failure to provide notice of "Improvements" as required by the Agreement, which directly relates to its material performance of the contract it seeks to enforce.**

    a.      <u>Undisclosed coal flow Improvements.</u>

It is anticipated that the evidence at the trial of this matter will demonstrate that Siemens failed to perform its obligations under the Agreement by failing to provide Secure with necessary Improvements to the entrained flow coal gasification equipment and technology that Secure purchased from Siemens. In addition to the contract provisions provided above, Siemens has admitted that it had the obligation to inform Secure about relevant Improvements in the Technology (Pl. Ex. 50 p. 2; Pl. Ex. 1 p. 12; Pl. Ex. 50 p. 2; Rüsseler 30(b)(6) Dep. pp. 53:2-:17, 67:2-69:24; Scott Aff. ¶¶ 12-16). There were at least 28, and as many as 41, Improvements to the SFG-500MWth gasifiers, released for commercial application, that Siemens determined it would incorporate into future projects (Ex. 36 pp. 1-7; Ex. 68 pp. 5-9; Ex. 69 pp. 1-8; Ex. 69-1 pp. 2-6). It is also uncontroverted that Siemens never provided Secure with the change to its SFG-500 entrained flow coal gasification technology that it considered mandatory, a change to the coal dust feeding system by constant pressure instead of differential pressure, as originally designed (Ex. 36 p. 3; Ex. 68 p. 7; Ex. 69 p. 3; Ex. 69-1 p. 4). Siemens acknowledged this change is absolutely necessary for Secure to build and successfully operate its facility (Hannemann Dep. pp. 354:18-357:6; Rüsseler 30(b)(6) Dep. pp. 134:10-138:16). Thus, pursuant to the "Remedy" definition, this defect should have been corrected as required by Section 7.0 – by repair replacement or modification as Siemens deems necessary to correct such nonconformity, but was never performed by Siemens and it is within the province of the jury to determine whether Siemens, in the face of this evidence, is able to establish that it performed its obligations under the Agreement.

   b. <u>Undisclosed loosening element Improvements</u>.

  Siemens, through the testimony of its corporate representative designee, Rolf Rüsseler, also indicated it would have changed the loosening elements in Secure's feeder vessels. (Rüsseler 30(b)(6) Dep. pp. 146:2-147:6; Pl. Ex. 36-1 p. 2). This change would be necessary to improve the lifetime of the components by having them made from different materials than those actually shipped to Secure. (*Id*. at 148:1-:7). Mr. Rüsseler stated that he would have recommended that Secure change its loosening elements in the manner described in Plaintiffs' Exhibit 36-1. (*Id*. at 150:15-:23). However, Siemens never notified Secure of this change and there is no evidence in the record to suggest otherwise. This is yet another material fact demonstrating that Siemens breached Section 5 of the Agreement by failing to advise Secure of all relevant Improvements to Siemens' equipment and technology. This is information the jury must consider in finding facts as to Siemens' performance of the Agreement.

   c. <u>Siemens failed to provide notice of Improvements, in part, because it could not obtain complete information about the technology required to make the Improvements properly.</u>

  There is also evidence demonstrating Siemens did not have access to information that would permit it to employ many of the Improvements, and thus was unable to fulfill its requirements under the Agreement. Secure's gasifiers are identical to the five SFG-500 megawatt thermal ("MWth") gasifiers first placed into operation at the NCPP plant in China (Pl. Ex. 22 p. 3). Siemens used the NCPP design for Secure's gasifiers, without modifications (Ex. 22 p. 6; Rüsseler Dep. pp. 84:20-85:6). However, Siemens' joint venture partner at NCPP made some 88 modifications to the Siemens entrained flow coal gasification equipment and technology (Pl. Ex. 45-1, p. 6). Siemens is unaware of all the changes its joint venture partner made to the coal gasification equipment and technology. (Pl. Ex. 69-2 p. 5; Rüsseler Dep. p. 282:18-:24). The

changes that Siemens is unaware of were made to address issues in three major areas: "fluctuations in coal feed and consequently syngas output; higher-than-expected dust content in the syngas; and trips caused by faulty instrument signals within the feed system" (Pl. Ex. 69-2 p. 5). These are all Improvement to the equipment Secure purchased that have been placed into commercial operation and therefore should have been disclosed. Siemens is therefore unable to provide them to Plaintiffs as required under the Agreement.

        d.      <u>Siemens was financially motivated to withhold Improvements from Secure in breach of its contract obligations.</u>

In addition to the mere inability to understand the breadth of possible Improvement for disclosure to Secure, there is further evidence demonstrating that Siemens did not intend to provide upgrades and Improvements regardless. This intent was evidenced on December 16, 2012, when Mr. Rüsseler wrote that, although Siemens was contractually obligated to offer Improvements to the customer, it should make the price and schedule to do so "so unattractive that MidAmerica cannot draw this option," and that "incorporating the NCPP Lessons Learned would tie up resources" Siemens could use to generate new hardware orders (Pl. Ex. 116 p. 1; Rüsseler 30(b)(6) Dep. pp. 53:2-54:15, 70:8-:11). In other words, there were financial incentives for Siemens to keep Secure in the dark about known problems with the equipment, and, if Siemens ever decided to disclose them, they would make the cost of correct so obscene that Secure would not be able to proceed.

Certain Improvements would have required an update to Secure's BEDP and Process Engineering Design Package ("PDP") but neither the change to the Equipment nor to the BEDP and PDP were addressed with Secure. Mr. Rüsseler acknowledged that Secure would experience a problem with too much dust in the syngas exiting its gasifiers, but expressed no concern for Siemens because Siemens "would have the license [fee] completely in the house before the topic

'increased dust accumulation' would become visible," and the solution would be for Siemens to "engineer the new gas purification at our expense, that is, we should then form a provision that reduces the EBIT of the license agreement." (Pl. Ex. 116 p. 2; Rüsseler 30(b)(6) Dep. p. 56:1-:5) Again, this is relevant evidence of required Improvements to the purchased technology and equipment that was never conveyed to Secure in order to protect Siemens' own financial interests, and in breach of Siemens' contractual obligations.

As of November 22, 2012, Siemens acknowledged its obligation to inform Secure of relevant Improvements in the gasification technology (Pl. Ex. 50). Yet, neither in late October 2012, nor at any other time, did Messrs. Rüsseler and Morehead discuss product modifications during a telephone conversation with Lars Scott (Pl. Ex. 51). Never, during the entirety of its business relationship with Secure did Siemens inform Secure of any of the specific equipment and technology Improvements developed and released for commercial application (*see, e.g.*, Rüsseler 30(b)(6) Dep. pp. 53:2-:17, 67:2-69:24).

By March 7, 2013, Siemens acknowledged its SFG-500 MWth entrained flow coal gasification technology was not completely mature as of execution of the NCPP plant, and that the contributions of the Chinese helped improve the reliability and availability of the Siemens technology (Pl. Ex. 46 p. 2). The Chinese were not willing to share their know-how from operations free of charge (*Id.* at 3; Hannemann Dep. p. 310:9-:17) and they never did. The jury must decide whether this evidence is a breach of the Agreement by Siemens as it relates to engineering services Siemens provided reflect competent professional knowledge as provided in Section 7.4.1.

These facts demonstrate that Siemens breached the Agreement by failing to fulfill the requirements of Section 5.1, and the jury must decide whether Siemens has failed to perform

pursuant to the "Remedy" provisions of the Agreement by failing to repair, replace or modify any defect in accordance with Section 7.0.  If Siemens is not able to repair, replace or modify the defects, then the fundamental purpose of the Agreement which is to build, have built, use and operate the licensed plant is not capable of being achieved thus the entire contract is thwarted.

2. **There was no condition precedent under the Agreement for Secure to be notified of Improvements to the equipment and technology it purchased.**

Siemens badly misconstrues the Agreement in Section 3 of its Motion in Limine (p. 16) where it argues that evidence of its own admitted failure to notify Secure of Improvements should be excluded from the trial due to the failure of an alleged condition precedent.  The relevant language of Section 5.1 is as follows:

> During the term of this License and Service Agreement, Siemens shall inform C2L of any Improvements to the Technology which are developed or acquired and released for commercial application by Siemens.  (hereinafter the "**Notice Clause**")

and

> C2L shall at is [sic] own option agree to be licensed to such Improvements for an additional fee… (hereinafter the "**Payment Clause**").

(See JTX001, p. 11).

Siemens seeks to exclude evidence of its failure to notify Secure by arguing that "for C2L to obtain any 'improvements,' the parties must first negotiate a separate license and C2L *must pay for such improvements*." (Doc. 230, p. 16) (emphasis in original).  In order to come to this conclusion, Siemens encourages the Court to disregard the fact that the Notice Clause and the Payment Clause are two independent sentences in the Agreement, and nowhere does the Notice Clause, which is Siemens' contractual obligation, require the payment of any additional funds.  Rather, the fee envisioned by the Payment Clause is only required in the event Secure wished to be licensed for those Improvements after notification by Siemens.

This pleading has described numerous failures documented in discovery by Siemens to give Secure notice of relevant Improvements throughout the parties' relationship. There is nothing in the Notice Clause that requires Secure to pay any additional fee to get those notifications from Siemens. The failure to pay a phantom, additional license fee is not a breach by Secure and does not relieve Siemens of its contractual duties to notify, particularly here, where the evidence demonstrates that Siemens was aware of the required modifications before the invoice for the initial license fee was even ever sent.

This position is further evidence of Siemens' bad faith with respect to the relationship with Secure, as evidenced by discovery in this case. Siemens is essentially taking the position with respect to the Improvements that they are going to sell Secure millions of dollars' worth of equipment and technology, and when necessary Improvements to it are known, Siemens is not required to disclose those Improvements unless Secure pays for the Improvements first, despite Secure not knowing the nature or extent of the Improvements at all. Siemens would construe its contract obligations as requiring Secure pay whatever "additional" license fee Siemens would dictate, for information that Siemens would not first disclose, no matter how de minimis. This position is not supported by the terms of the Agreement or by the notion of good faith and fair dealing, and the Court should not adopt it for purposes of excluding evidence from the jury.

**3. Siemens failed to ever update Secure's Basic Engineering Design Package.**

Siemens' employees also acknowledged that Secure's BEDP and PDP needed to be updated (Pl. Ex. 75 p. 3; Pl. Ex. 110 p. 1), with at least one even going so far as to say that it needed to be scrapped and re-done (Pl. Ex. 110 p. 1). This again is a question for the jury to decide whether Siemens breached the Agreement on this basis. Siemens' BEDP and PDP sold to Secure were flawed and Secure was waiting on Siemens to provide an updated BEDP and PDP

in order to obtain an EPC contract from SK Engineering and Construction, USA ("SK"). The BEDP is the basic engineering documentation necessary for an EPC contractor to provide the detailed design, procurement and construction of a gasification plant like Secure's (Hannemann Dep. pp. 82:24-83:12), and it is submitted that this new BEDP was required pursuant to the Agreement which required Siemens to repair, replace or modify any defective aspects of the equipment and services Siemens provided.

**4. There is no basis to exclude testimony from third-party witness Keith Clauss.**

Finally, Siemens has moved in Limine to exclude the testimony of Keith Clauss, a third-party, ostensibly asserting that Mr. Clauss' testimony would have no probative value. In this instance, Siemens has made bald-faced assertions that he has no relevant information notwithstanding the fact that Siemens has no information or evidence as to the knowledge that Mr. Clauss has related to Siemens' Breach of Contract claim. Siemens even goes so far as to indicate how Mr. Clauss will testify at the trial of this matter.

Secure has identified in its original Pretrial compliance filed with this Court on April 23, 2019, that the following witnesses among others may testify at trial – they are Keith Clauss, Max Sherman and Tom Maramba. These witnesses have always been included in Secure's Pretrial list and Secure may call these witnesses at trial to address any contested facts relating to Siemens' Breach of Contract claim. These witnesses have been identified extensively throughout discovery and Siemens has had more than ample opportunity to undertake discovery and has chosen not to take the depositions of any one of these individuals. The testimony of these three individuals is more than appropriate in this manner, and Siemens has not met the necessary standard to have the testimony of any of these individuals excluded.

|  |  |  |
|---|---|---|
|  |  | Respectfully submitted, |
|  |  | **DANNA McKITRICK, P.C.** |
| Date: January 24, 2020 | BY: | /s/ Robert L. Devereux |

                                                 **Robert L. Devereux**, admitted pro hac vice
                                                 **Jeffrey R. Schmitt**, admitted pro hac vice
                                                 7701 Forsyth Blvd., Suite 800
                                                 St. Louis, Missouri  63105-3907
                                                 Telephone: (314) 726-1000
                                                 Facsimile: (314) 725-6592
                                                 E-Mail:  rdevereux@dmfirm.com
                                                                    jschmitt@dmfirm.com

                                               and

                                               Walter A. Ketcham, Jr.
                                               Florida Bar No. 156630
                                               Grower, Ketcham, Eide, Telan & Meltz, P.A.
                                               901 N. Lake Destiny Rd., Suite 450
                                               Maitland, Florida  32751
                                               Telephone: (407) 423-9545
                                               Facsimile: (407) 425-7104
                                               E-Mail: waketcham@growerketcham.com

                                               **ATTORNEYS FOR PLAINTIFFS**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 24th day of January, 2020, a true and accurate copy of the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

**Scott D. Baker**
E-Mail: sbaker@reedsmith.com
**Jonah D. Mitchell**
E-Mail: jmitchell@reedsmith.com
**William R. Overend**
E-Mail: woverend@reedsmith.com
**Christopher J. Pulido**
E-Mail: cpulido@reedsmith.com
Reed Smith, LLP
101 Second Street, Suite 1800
San Francisco, CA  94105-3659

**ATTORNEYS FOR DEFENDANT SIEMENS ENERGY, INC.**

**P. Alexander Quimby**
E-Mail: aquimby@bakerlaw.com
**Robert W. Thielhelm**
E-Mail: rthielhelm@bakerlaw.com
Baker & Hostetler, LLP
2300 SunTrust Center
200 South Orange Avenue
Post Office Box 112
Orlando, FL  32802

/s/ Robert L. Devereux

4851-9524-1394, v. 1