UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SIEMENS ENERGY, INC., a Delaware
corporation,

                Plaintiff,

v.

MIDAMERICA C2L INCORPORATED, a
Nevada corporation,

                Defendant.

Case No. 6:17-cv-171-Orl-40LRH

## SIEMENS ENERGY, INC.'S OPPOSITION TO JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, NEW TRIAL

## I.      INTRODUCTION

MidAmerica C2L's ("C2L") Renewed Motion for Judgment as a Matter of Law ("JMOL"), or in the Alternative, New Trial ("New Trial Motion") (collectively, the "Motion") is nothing more than a re-hash of arguments C2L raised several times previously—all of which were properly rejected.  As to the JMOL, C2L ignores Siemens' evidence and wholly fails to address the principle question—*whether substantial evidence supports the Jury's verdict that C2L failed to prove that Siemens repudiated the 2012 License and Service Agreement* ("2012 License").  The answer to that question is a resounding "Yes."  Indeed, the overwhelming record evidence refutes C2L's alleged excuse for non-payment and supports the verdict finding that Siemens did not repudiate its obligations under the 2012 License.  Viewed through the proper lens, C2L's JMOL arguments fall away, and that motion fails.  As to its New Trial Motion, C2L likewise re-argues issues that the Court already carefully considered and properly ruled upon.  C2L fails to establish any error or prejudice that would justify a new trial.

## II.     FACTUAL BACKGROUND

C2L and Secure[1] initiated this lawsuit in an attempt to avoid their contractual obligations and pin their self-inflicted business failures on Siemens.  The Court previously properly disposed of C2L's affirmative claims and theories via summary judgment, and rejected its repeated improper attempts to interject new, non-pleaded claims, defenses and theories.  *See* DNs 203; 205; 208; 209; 74; 133; 133-1 at ¶¶ 17, 60-61, 65; 135; 137; 154; 204; 206 at n. 39; 206-1 at ¶¶ 17, 60-61, 65; 212; 212-1 at ¶¶ 60-61, 65; 213; 237; DN 238 at 13-

---

[1] In this brief, Secure Energy (C2L's parent) and C2L are treated interchangeably, as C2L did at trial.  Transcript of Trial Proceedings ("Tr."), Vol. I ("TR I") at 109.

14.  Judgments dismissing with prejudice C2L's affirmative claims were entered.  DNs 205; 209.  Trial proceeded on Siemens' counterclaim for breach of contract against C2L and C2L's only remaining defense – the assertion that non-payment under the 2012 License was excused due to Siemens' alleged anticipatory repudiation.

At trial, Siemens witnesses Harry Morehead, Rolf Ruesseler and Guido Schuld testified concerning (among other things):  the parties' contractual relationship starting in 2007 and continuing through Spring 2016; C2L's repeated failures to pay license fees and progress with its planned gasification plant; the severe downturn in the market for gasification projects resulting in Siemens' decision to exit the gasification business; Siemens' plans to honor existing contracts and customer communications regarding continued support; and C2L's breach of the 2012 License.  Each of these issues was evidenced by exhibits and witness testimony in the trial record, examples of which are highlighted in the paragraphs below.

Specifically, in December 2007, a Secure subsidiary purchased from Siemens two gasifiers for use in Secure's planned plant and entered a license for use of Siemen's gasification technology.  Tr. II at 25-27, 30; Tr. IV at 81-82; JTX005; JTX006.  But Secure never paid its license fees, let alone to meaningfully progress with its hoped-for plant.  Tr. IV at 83, 87; Tr. II at 31.  At Secure's request, Siemens agreed to a series of payment and performance guarantee extensions, and each time Secure asked for a new license (in March 2010 and again in July 2012), the parties also entered a Completion Agreement to extinguish the old license.  Tr. IV at 82-83, 85-87; JTX001-JTX004.  C2L was put into place as the contracting party for the 2012 License to further Secure's intention to build a new energy plant in Kentucky since its original plans for a plant in Illinois had gone nowhere.  JTX001; Tr. II at 40.

As part of the 2012 License, Siemens again agreed to extend C2L's payment deadlines and performance guarantees.  Tr. II at 47-48; Tr. IV at 86-87.  The 2012 License included two license fee installments:  (1) €10.9 million due by February 28, 2013 and (2) €1.25M due by December 31, 2015.  JTX001 § 3; Tr. II at 49-51.  Siemens also extended performance guarantees from December 31, 2014 to December 31, 2015.  JTX001 § 7.9; Tr. II at 47-48.  But C2L made no meaningful progress on its hoped-for plant, and did not pay the February 28, 2013 or December 31, 2015 license fee installments.  Tr. II at 48-49; Tr. IV at 83.  In 2014, C2L acknowledged its failure to get its project to "come to fruition" and sought Siemens' help selling the gasifiers to a third party.  PTX038; Tr. II at 55-57.  By 2015, C2L was trying to sell the gasifiers, had stopped paying employees and suspended operations.  And, C2L concedes it never had funding necessary for any iteration of the project.  Tr. IV at 83, 85; PTX040.

By mid-2015, Siemens, like C2L, saw the unfavorable market conditions for a domestic coal gasification business and decided to exit while still supporting its customers moving forward with projects, which it communicated to its customers through 2015 and 2016.  Tr. III at 61-63; *see* Tr. II at 59-64, DTX97.  In a call between C2L's principal Jack Kenny and Ruesseler on February 2, 2016, Siemens communicated its decision to C2L, reminded C2L that it had not paid the license fees owed Siemens under the 2012 License, and proposed to work on a mutual agreement to end the license.  Tr. IV at 51-56.  After C2L mischaracterized the call in a February 11, 2016 letter, on February 17, 2016, Siemens assured C2L in writing that Siemens would "not violate any contractual obligation by its strategic exit from that business."  JTX007; JTX029.

At a March 2016 meeting between the parties, C2L claimed to have renewed optimism

for its project.  Siemens again offered to extend C2L's license payment deadline (to July 2016)
and revive and extend the expired performance guarantees by another six years (to December
2021), tracking the milestone dates C2L had provided at the meeting.  Tr. II at 72-73, 78-79;
JTX008. C2L flatly rejected the offer and refused to pay, and Siemens terminated the 2012
License.  JTX009, JTX010.  In April 2016, Siemens invoiced C2L €11.4M for the contractual
termination fee, which C2L also failed to pay.  JTX026; Tr. II at 84-85.

Against this backdrop, C2L presented a single defense witness, Kenny, and the jury
returned a special verdict in Siemens' favor for its breach of contract case-in-chief and against
C2L on its repudiation defense, awarding Siemens damages of $13,200,395.50.  DN 287.  As
to C2L's defense, the jury specifically found:

> 5. Did C2L prove by a preponderance of the evidence that Siemens repudiated
> the contract in advance by clearly and unconditionally indicating, through
> words or actions or both, that it would not or, as a result of its voluntary
> actions, could not do what Siemens was required to do under the contract?
>
> YES_____          NO _✓_

*Id*.  Because it found Siemens did not repudiate, the jury did not need to reach the second prong
of C2L's anticipatory repudiation defense—whether C2L was "ready, willing and able" to
perform its obligations under the 2012 License.  *See id*. Substantial evidence supports the
verdict, and the Court's rulings were legally sound.  This Motion should be denied.

## III.    LEGAL ANALYSIS: MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.    Rule 50(b) legal standard

Judgment as a matter of law should only be granted if no objectively reasonable jury,
based on the evidence and inferences adduced at trial and through the exercise of impartial

judgment, could reach the verdict reached.  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997). Stated differently, the party moving for judgment as a matter of law must show that the trial evidence "is so overwhelmingly [in his favor] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). However, where there is substantial evidence in the trial record which would allow reasonable minds to reach different conclusions, judgment as a matter of law is inappropriate.  *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1211 (11th Cir. 2010).  In assessing a motion for judgment as a matter of law, the Court must "consider all evidence and inferences in the light most favorable to the non-moving party" and must not make credibility determinations or weigh evidence, as these are quintessential functions reserved for the jury.  *Brown*, 597 F.3d 1173; *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir.2001); *see Anderson v. Techtronic Industries North America*, 2015 WL 7429060 (M.D. Fla. 2015) (Byron, J.) (denying JMOL).

**B.      Substantial evidence supports the jury's verdict.**

C2L's JMOL should be denied because substantial evidence supports the jury's finding that Siemens did not repudiate the 2012 License —in the main, that Siemens did not clearly and unconditionally indicate that it would not or could not do what it was required to do under the 2012 License.  *See Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2002); *Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 211 A.D. 2d 262, 267-68 (N.Y. App. Div. 1995); New York Pattern Jury Instructions ("NY PJI") 4.1.3.  C2L asserted repudiation based on Siemens' notification of its decision to exit the gasification business.  But extensive evidence of Siemens'

actions and ability to honor its contracts after its decision refuted this theory:

- Siemens developed an exit plan that included honoring existing contracts.  Tr. III at 62-63 (plan identified employees "essential to continuously support ongoing activities" of customers) 65 ("Siemens never walked away from a contract, [and has] a very good reputation in the market" for honoring commitments), 72, 85 (Siemens' "overall strategy" was to support customers); Tr. II at 59-63, 82-83; JTX010; Tr. IV at 39-40, 64-65; Tr. III at 21-23, 67-70; DTX97.

- Siemens' plan included retaining gasification engineers and personnel who could project manage, commission plants and provide technical field assistance (TFA) as needed.  Tr. III at 66-68, 69 (Siemens' engineers also qualified to project manage and perform TFA), 85-86 (Siemens could "meet the obligations" of a technology license, including support and TFA, through "key personnel"); *see* Tr. II at 82, JTX010.

- Siemens' engineers with requisite expertise remained in the product business unit, were easily accessible, and had the responsibility and ability to support existing gasification contracts.  Tr. III at 44, 70-71; *see also* Tr. IV at 64-65, JTX008.

- Siemens communicated to its customers that it would provide, and in fact, has provided, ongoing support, to its gasification customers, as appropriate.  Tr. III at 71; Tr. II at 59-63, 85-87; DTX97; Tr. IV at 40-42, 43-44; JTX008.

- Siemens did not close its coal gasification division until May 2018.  Tr. IV at 84.

The parties' interactions further support the jury's finding that Siemens did not repudiate:

- In August 2015, Siemens confirmed its willingness to support C2L in response C2L's message that it "may have a new life for [its] project." JTX017 ("Naturally we are willing to support"); Tr. III at 74-79.  C2L, however, never followed-up.  Tr. III at 79.

- On the February 2, 2016 call, Ruesseler informed Kenny of the plans to exit the gasification business, reminded Kenny of C2L's unpaid license fees, proposed to negotiate a mutual end to the license, and agreed to have a follow up call in a week.  Ruesseler did not state to Kenny that Siemens would not honor its contractual obligations (and Kenny did not testify that he did).  Tr. IV at 55-56, 59; JTX029.

- On February 17, 2016, Siemens assured C2L that it would "not violate any contractual obligation by its strategic exit from that business." JTX029.

- In March 2016, after C2L represented that it believed it could finance, construct and complete its project by dates certain, Siemens offered to amend the license consistent with the projected dates, including by extending payment terms and performance guarantees.  C2L rejected the offer.  JTX008; Tr. IV at 62-63; Tr. II at 72-3, 76-79.

- Throughout their relationship, Siemens provided "fantastic support" to C2L and repeatedly made accommodations to help C2L. PTX026; Tr. V at 101-02; Tr. III at 65; Tr. II at 75-76; *see* PTX38; Tr. IV at 85-86; JTX017.

In short, the overwhelming evidence at trial supports the jury's finding of no repudiation, and

the Court should reject the two theories C2L advances in support of its JMOL.

### 1.      Siemens did not repudiate the 2012 License

First, C2L asserts "Siemens anticipatorily repudiated the 2012 License and Service

Agreement through its voluntary decision to close its gasification division." Mtn. at 5. The

jury rejected C2L's argument, and yet C2L fails to address—much less challenge—the

substantial evidence underlying the jury's verdict. JMOL should be denied on this basis alone.

Moreover, C2L's position, based on the 2012 License's TFA (technical field

assistance) provisions, that Siemens was required "to provide C2L with continuing engineering

support as [C2L's] gasification project proceeded" fails to support JMOL, and makes no sense.

Mtn. at 6. Indeed, it is doomed from the start because C2L's project never proceeded and C2L

admitted it never had the funding necessary for it to proceed. Tr. IV at 83, 85. At no time

during the parties' relationship, was Siemens required to provide (nor did C2L request) any

TFA, which, in any event, would have required C2L to pay separate and additional fees. Tr.

II at 43-44; Tr. IV at 57; JTX001 § 3.2.3, App'x. 9. Siemens' TFA only would have been

required, if at all, after financial close and once plant construction had begun. *Id.*; Tr. II at 43-

44; Tr. IV at 57. To get to that point, C2L would have needed funding for a $2B project (which

was never going to happen as C2L concedes). Tr. II at 38; Tr. IV at 83, 85. Those hurdles are

insurmountable. Moreover, the uncontroverted evidence established Siemens was prepared to

provide TFA, had C2L been in a position to go forward.[2] Tr. III at 67-70; JTX029; JTX008.

C2L's assertion by Kenny that Ruesseler "indicated that Siemens could no longer support C2L's project" in the February 2016 phone call also fails to warrant JMOL.  Mtn. at 6.  C2L made the same argument at trial, and the jury rejected it.  Tr. VI at 33-34.  Notably, Kenny never testified that Ruesseler stated Siemens would not honor its obligations under the contract (contrary to the position it took in its lawyer's letter after the call (JTX007)), casting more doubt on C2L's position that Ruesseler somehow clearly and unconditionally indicated Siemens could not or would not do what it was required to do under the 2012 License.  In any event, the jury was entitled to credit Ruesseler's testimony of the call, Siemens' prior and later conduct, and the plethora of other evidence that refutes C2L's defense.

Finally, C2L's argument that Siemens' "decision to close its gasification division *made it impossible* for Siemens to provide continuous engineering services and to notify C2L of Improvements as required under the 2012 License" is pure sophistry.  Mtn. at 7 (emphasis added).  There is zero evidence to this effect, and by contrast, abundant uncontroverted evidence Siemens was able to provide support and honor its contracts after deciding to exit the market.  *See, e.g.*, Tr. III at 66-70; Tr. IV at 64-65, 85-86.  C2L's JMOL should be denied.

**2.      C2L was obligated to perform but breached the 2012 License.**

Second, C2L posits it did not breach because it "had no obligation to perform" due to Siemens' alleged repudiation.  (Mtn. at 5, 7).  But the jury soundly rejected C2L's repudiation defense, and C2L's arguments fail to resuscitate its "no obligation" theory.

C2L argues it should not have been required to show it was ready, willing and able to

---

[2] C2L argues that Siemens recognized that its "engineering support could be necessary until the end of 2021," but C2L ignores that Siemens offered such support if *C2L would pay its license fees*, and that C2L rejected the offer.

perform to be excused from performance due to Siemens' alleged repudiation.  This argument, however, cannot possibly carry JMOL because the ready, willing and able prong *was not the basis for the jury's verdict*.  *Haynes v. City of Montgomery, Ala.*, 344 F. App'x 519, 520 (11th Cir. 2009) (court need not address JMOL argument because there was an independent basis for the jury's verdict).  Instead, the jury found C2L failed to prove that Siemens clearly and unconditionally indicated an intent not to perform.  DN 287.

Moreover, C2L is wrong on the law.  As the Court held, to excuse its own non-performance, New York law ***does*** require a non-repudiating party to prove it was ready, willing and able to perform in advance of the alleged repudiation.  Tr. V at 21-23; *Pesa v. Yoma Dev. Grp., Inc.*, 18 N.Y.3d 527, 531–32 (N.Y. 2012); NY PJI 4.1.3; *see* 13 Williston on Contracts § 39:41 (4th ed.).  Thus, it could not possibly have prevailed on its repudiation defense regardless of the jury's finding on the first prong of its defense.[3]

C2L's "ready, willing and able" argument is also specious because, contrary to C2L's assertion, there is no evidence through Kenny or otherwise that Siemens impeded C2L's ability to obtain financing or pay its license fees.[4]  C2L argues Siemens is to blame for its inability to obtain financing because C2L could not "build its plant and use the Siemens' gasifiers without Siemens (1) performance guarantees, (2) continuing engineering support, and (3) notice of Improvements."  Mtn. at 9.  But this bald assertion does not provide a causal link between Siemens' notification of its decision to exit the gasification market, on the one hand, and C2L's

---

[3] Indeed, the only evidence pertinent to the issue—and the stipulations and admissions—established that C2L was *not* ready, willing or able to pay its license fees. Thus, Siemens moved for Rule 50(a) JMOL. Tr. V at 112.
[4] In addition, the Court disposed of this argument, as a matter of law, when it granted summary judgment on C2L's affirmative breach of contract claim.  DN 208 at 9-11.

failure to obtain project financing, on the other.[5]  In any event, C2L's stipulations shut the door on this theory, as it admitted (1) C2L *never* had the financing necessary for *any* iteration of its project; and (2) C2L was not in any financial condition to perform under the 2012 License as evidenced by Secure's financial statements and Secure's inability to perform under the prior agreements.  Tr. IV at 83, 85.  The evidence undermining C2L's argument was also abundant:

- C2L had already failed to line up its financing or pay the fees due on February 28, 2013 and those due on December 31, 2015. *Id.*; Tr. II at 31, 37, 49.

- By the summer of 2014, C2L acknowledged its project "may not come to fruition" and requested Siemens' assistance in selling its gasifiers. PTX038.

- Secure's financial statements for 2014 and 2015 show that "The company has incurred losses since inception" and that "the company's prior losses and other factors raise substantial doubt about the company's ability to continue as a going concern." Tr. IV at 83; *see also, generally,* Tr. IV at 81-88; PTX123; PTX011.

- During 2015, C2L considered "closing down but for liquidation of assets", and then laid off employees and suspended operations. Tr. IV at 83; Tr. II at 92-95; PTX040.

In short, even if the jury was required to consider the "ready, willing and able" requirement—which it did not—Siemens' decision to exit the gasification business did not cause C2L's long history of failure and inability to pay fees, and JMOL should be denied.

Next, C2L argues its non-performance should be excused because, it claims, Siemens' sent the April 2016 termination invoice after Siemens' alleged repudiation (on February 2, 2016 "at the latest").  But, again, the jury found no repudiation, and thus this argument fails.  Also, Siemens presented ample evidence it timely invoiced C2L after properly terminating for

---

[5] C2L has attempted to shift the trigger for its repudiation theory away from Siemens' notification of its decision to exit via the February 2, 2016 phone call (which is the only way it pled the theory) and to an earlier point in time based on Siemens' *decision* to exit in mid-2015.  This attempt should be rejected, but is of no moment anyway because the uncontroverted evidence established Siemens' plans to honors its contracts at that point in time as well.  And, as set forth below, C2L stipulated that it never had the financing for any iteration of its project.

C2L's failure to pay the license fees. JTX009-10; JTX026; Tr. II at 52-54; Tr. IV at 84.  And there was substantial evidence there was no agreement to "extend payment dates—[or] not invoice for licensing fees." Mtn. at 10; JTX001 §§23, 22.1; Tr. III at 20-21, 48-51; Tr. II at 52.

Finally, C2L's contorted new argument that "Siemens intentionally concealed its decision to close its gasification division from C2L" and waited until after the December 31, 2015 fee payment deadline to inform C2L to "try[] to run the clock out" goes nowhere.  Mtn. at 12.  C2L's theory that it somehow could have or would have behaved differently if it had known Siemens' decision earlier cannot stand given that C2L (1) stipulated C2L *never* had the funding for any iteration of its project, let alone to pay license fees; (2) never paid the first installment fee in February 2013 (which accounted for over 90% of the total fee) or the December 2015 installment fee; and (3) rejected Siemens' offer to revive and extend the performance guarantees until 2021 if C2L paid its fees.  Moreover, the evidence demonstrated Siemens' plans to support its customers and honor its contractual commitments, which is consistent with the jury's verdict.  The jury saw through all C2L's excuses and pretexts to avoid paying fees and its verdict is based on substantial evidence.  C2L's JMOL fails.

## IV.   LEGAL ANALYSIS RE: ALTERNATIVE MOTION FOR NEW TRIAL

A district court is permitted to grant a new trial if the court erred in admitting or excluding evidence or in instructing the jury on the law, or other circumstances resulted in a patently unfair trial. Fed. R. Civ. Proc. 59(a)(1); *see also Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Lipphardt*, 267 F.3d at 1186.  "New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299,

1312–13 (11th Cir. 2013).  To determine whether an evidentiary error warrants a new trial, the district court must evaluate several factors, such as the number of errors, the significance of the error when viewed against all admissible evidence on the issue, the overall prejudicial effect of the error on the jury, and whether a limiting instruction was given.  *Anderson*, 2015 WL 7429060 at *5 (citations omitted).   An evidentiary error is harmless and insufficient to warrant a new trial, where it is "unlikely...that the jury could have been swayed erroneously by the wrongfully admitted [or excluded] evidence." *Id.* (citations omitted).

C2L raises six arguments in its motion for a new trial, all of which should be rejected.

### A.     The Court properly excluded evidence of Siemens' alleged breach.

First, C2L argues that a "new trial is warranted because the Court prevented C2L from arguing to the jury that Siemens had itself failed to perform under the contract."  Mtn. at 14. C2L asserts—as it has done many times before—that it should have been permitted to argue that Siemens breached the 2012 License "by failing to notify C2L of Equipment and Technology Improvements, and by failing to provide an updated Basic Engineering Design Package ('BEDP') and Process Engineering Design Package ('PDP')." *Id.* at 15.

This theory was properly excluded because, as the Court has repeatedly ruled, the only alleged Siemens breach that C2L properly pled was alleged anticipatory repudiation based on Siemens' notification to C2L of its intention to exit the gasification market.  *See, e.g.*, DNs 74; 133; 133-1 at ¶ ¶ 17, 60-61, 65; 135; 137; 154; 204; 206 at n. 39; 206-1 at ¶ ¶ 17, 60-61, 65; 212; 212-1 at ¶ ¶ 60-61, 65; 213; 237; DN 238 at 13-14.  Indeed, C2L's defenses to Siemens' counterclaim are (and always have been) a mirror image of its affirmative claims.  Because its fraud and defect related affirmative claims were previously dismissed with prejudice, C2L's

only remaining defense to Siemens' breach of contract claim was properly limited to alleged anticipatory repudiation.  DN 63 ¶ ¶ 25-28; *see* DN 204 ("[C2L and Secure] are reminded that their breach of contract claim is limited to the repudiation theory alleged in Count I.  No other theories are to be advanced at this stage."); DN 238 at 13-14 ("For the first time now in this posture of the case, MidAmerica is arguing that it's not just anticipatory repudiation, but it's a failure to comply with the terms of the license agreement by not advising of alleged improvements.  That defense was not pled …."; "As a result, the defense -- the posture of the case in terms of the pleadings being closed is anticipatory repudiation, period, not breach for a different and separate reason …."; "Repudiation is what was argued in response to Siemens' summary judgment.  That's where we are.  That's what's going to be argued.").

C2L's attempts to introduce arguments under Section 5.1 of the 2012 License were unavailing in any event.  Section 5.1: (1) does not include any deadline or timeframe for Siemens to provide "notice"; (2) only requires Siemens to offer improvements "which are developed or acquired and released for commercial application by Siemens"; and (3) expressly contemplates that for C2L to obtain any "improvements," the parties must first negotiate a separate license and C2L must pay for such improvements.  JTX001 at ¶ 5.1.  As such, this provision could not form the basis for any material breach sufficient to excuse C2L's failure to pay license fees for the existing Siemens technology it already had.  Put another way, it makes no sense that Siemens was somehow legally required to provide notice and offer or provide C2L any improvements when C2L had never paid—and had no ability to pay—for any of Siemens' services in the first place, let alone for any improvements.

Regardless, as explained in prior briefing, Siemens told C2L several times (including

on October 31, 2012, November 16, 2012, and July 18, 2014) it could buy an updated BEDP to account for all iterative improvements in the Siemens gasification technology, provided that C2L pay for the update (which it never did).  PTX038; Tr. III at 56-57; DN 197-21 at 4 (item 7); DN 149-2 at 420:23-424:7, 441:22-445:13.  More to the point, in 2014, when C2L sought Siemens' help to market its gasifiers for sale, C2L informed prospective purchasers that its 2007-era BEDP was "full" and "extensive," but that an update could be purchased directly from Siemens.  DN 148-1 at 27, ¶ 5.1.0.4; *see* PTX38.  By C2L's own admission, therefore, Siemens had no obligation (and no reason) to formally offer C2L improvements to the technology, including an updated BEDP, and C2L understood at all times that an updated BEDP could be purchased.  Thus there was no error, and in any event, the jury would not have been swayed even if this unpled theory had been advanced.

      **B.**    **The Court properly admitted evidence of C2L's financial condition and instructed the jury on the "ready, willing and able" requirement.**

Next, C2L asserts that the Court erred by (1) allowing evidence of C2L's "financial condition" and "inability to obtain financing for its project," and (2) instructing the jury on the "ready, willing and able" element of C2L's repudiation defense.  C2L is wrong on both counts.

      **1.**    **C2L's financial condition and inability to obtain financing**

C2L stipulated to multiple facts concerning its financial condition and inability to obtain financing, and did not object to Siemens' reading into the record those stipulations.  Tr. III at 13, 15; IV at 67, 81-84.  Nor did C2L object to Siemens reading into the record its admissions concerning its poor financial condition, to Siemens' opening statement or closing, or to Siemens' introduction into evidence of several years of its financial statements and other documents reflecting its poor financial condition.  *See id.* Tr. II at 5; Tr. III at 13, 15; Tr. IV at

84-88; PTX038; PTX040; PTX123; PTX011.  Thus, C2L waived this argument, which fails for that reason alone.[6]

Moreover, this evidence was directly relevant to the "ready, willing and able" element (on which C2L bore the burden of proof) of C2L's anticipatory repudiation defense, as C2L concedes (discussed further below), and this should, again, end this argument.  The evidence was also relevant, however, to many other issues.  It provided context for C2L's breach and explained why, at Secure's request, the parties repeatedly closed out old, and entered into new license agreements with extended payment deadlines and performance guarantees. Tr. IV at 85-86.  It also exposed C2L's motivation and pretext for trying to claim Siemens had repudiated the agreement and contextualized the timing for Siemens' notification of its decision to exit the gasification market.  Specifically, at trial, C2L challenged the timing of Siemens' notification as compared to Siemens' other customers, suggesting a nefarious (albeit unexplained) motive. *See* Tr. I at 113-14' Tr. VI at 31-32.  This evidence rebutted that narrative because, whereas some of Siemens customers' projects were progressing and viable, C2L's project had never progressed due to its inability to obtain financing.  This evidence also contextualized the February 2, 2016 call and the perspective from which the parties had that discussion.  The Court thus properly admitted this evidence.

> ## 2.      The Court properly instructed the jury on ready, willing and able.

The "ready, willing and able" element is required under New York law when the party asserting repudiation seeks to excuse its own breach and non-performance.  Tr. VI at 54; *see*

---

[6] C2L filed no motions *in limine* in connection with the trial on Siemens' counterclaim.  At the pre-trial conference, the Court stated that C2L's original motions *in limine* (DN 172) were mooted, and C2L did not contest the Court's statements, except regarding Kenny's prior SEC history.  *See* DN 238 at 3, 30-31; Tr. IV at 90-91.

*Pesa*, 18 N.Y.3d at 531-32 (citing cases); NY PJI 4.1.3; *United States v. Hon Yee-Chau,* 17 F.3d 21, 26 (2d Cir.1994); *De Forest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.,* 243 N.Y. 283, 293, 294 (1926); 13 Williston on Contracts § 39:41 (4th ed.).   Nonetheless, C2L argues that the requirement does not apply here because the 2012 License is analogous to a long-term service agreement and it would be "nearly impossible" to prove its "financial condition for years to come."  Mtn. at 19.  But C2L only would have needed to show that it was ready, willing and able to pay the agreed upon license fees under the 2012 License at the time of the alleged repudiation.   There were no, and there was no need to predict any, *future* amounts owing to Siemens—the fees C2L needed to show it could pay were fixed and already past due.  This case is thus far more akin to a real estate transaction involving payment due for a fixed sum, and C2L's argument should be rejected.  *Pesa*, 18 N.Y.3d at 532.

Next, C2L argues that the requirement does not apply in the context of an affirmative defense where the defendant does not seek damages or specific performance.  C2L is wrong. *See* N.Y. PJI 4.1.3 [Supplemental Instruction]; *Hon Yee-Chau,* 17 F.3d at 26 (2d Cir.1994) (no damages at issue).  Indeed, when asserting as a defense an alleged excuse for non-performance of a contract, the excuse—in this case alleged repudiation—must actually have materially contributed to the non-performance (or it is not an excuse).  *See Pesa*, 18 N.Y.3d at 532. If, absent the repudiation, the non-performing party was not ready, willing and able to perform, then the repudiation cannot be deemed the reason for non-performance.  *See* 13 Williston on Contracts § 39:41 (4th ed.),[7] *cited with approval in Pesa*, 18 N.Y.3d at 531-32; *De Forest,* 243

---

[7] To excuse nonperformance, "repudiation must have materially contributed to the nonperformance." *Id*. (stating that 'Premature *repudiation merely excuses subsequent acts which otherwise could have, and presumably would have, been performed*.'") (emphasis added, citations omitted.)

N.Y. at 293, 294.[8]

### C. The Court properly excluded testimony from Dr. Kosstrin and Mr. Klauss.

#### 1. Dr. Kosstrin was properly excluded.

C2L argues that the Court improperly excluded Dr. Kosstrin from testifying regarding Siemens' failure to—and inability to—perform under the contract. C2L points to Dr. Kosstrin's opinion that "[w]ithout knowledge of all the modifications to complete the BEDP and with Siemens unwilling to provide process guarantees that are in the License, [C2L] could not obtain an EPC contract and finance or build [its] project." *Id*. at 21. This argument fails.

As the Court previously ruled, Dr. Kosstrin's opinions concerning the BEDP were unsupported by a reliable methodology, and he improperly relied upon the NCPP plant to extrapolate opinions concerning the BEDP. DN 188 at 19-20. Kosstrin's BEDP-related opinions thus failed to survive *Daubert*. *Id.* Likewise, the Court found Dr. Kosstrin's opinion that Siemens was incapable of performing was unreliable and demonstrably incorrect in view of the stipulations that Siemens had informed C2L it would not violate any contractual obligation by its strategic exit. DN 188 at (citing DN 169, p. 20, ¶¶ 8, 10). Dr. Kosstrin's opinion concerning Siemens' "unwilling[ness] to provide process guarantees that are in the License" was also contradicted by the record, including the stipulations and Siemens' offer to extend performance guarantees. *See* DN 169, p. 20, ¶ 12; *see also* DN 218, p. 13, ¶ 16 (same); JTX008. As set forth more fully in the *Daubert* Order, Dr. Kosstrin was properly excluded.

---

[8] Even if there was error, which there was not, it is highly unlikely that the jury was swayed.  Indeed, the jury did not reach the ready, willing and able prong of repudiation, instead finding C2L failed to prove the first prong. And as set forth above, C2L's assertion that Siemens' decision to close the gasification division somehow "made it impossible" for C2L to pay its *past-due* license fees is not credible. C2L conceded it never had the financing for any iteration of its project, let alone the ability to pay its license fees. Tr. IV at 83.  And C2L rejected Siemens' March 2016 offer to amend the license to extend payment terms and revive performance guarantees.  JTX008.

### 2.      Mr. Clauss's testimony was properly excluded.

C2L's argument that Clauss's exclusion was error fails because C2L made no proffer regarding the testimony it intended to introduce from Clauss.  In opposition to Siemens' motion *in limine*, C2L generically argued only that it may call him "to address any contested facts relating to Siemens' Breach of Contract claim."  DN 234 at 11.  And after the Court's pre-trial conference ruling, C2L made no specific proffer.  C2L's argument is waived. Fed. R. Evid. 103; *King v. Volunteers of Am., N. Alabama, Inc.*, 614 F. App'x 449, 454 (11th Cir. 2015).

The argument also fails on the merits.  C2L now contends it intended to call Clauss to testify that Siemens' failure to provide an updated BEDP prevented C2L from obtaining a contract "for the use of the gasification equipment," citing to a Clauss declaration concerning events in October 2012.  Mtn. at 21, citing DN 197-2 at 4 (¶11).  As the Court recognized in its *in limine* ruling, these events were years before, and irrelevant to, alleged repudiation, and C2L never pled failure to update the BEDP as a defense.  DN 238 at 15:7-12.  Nor was this theory viable or relevant in any event.  Siemens told C2L several times it could buy an updated BEDP provided it pay for the update.  But C2L never paid, or offered to pay, for an updated BEDP, and tried to sell the equipment instead.  *See* above. C2L's purported BEDP-based defense thus lacked relevance or merit.  DN 230 at 22-25.

### D.      The Court properly permitted Kenny cross-examination re SEC history.

The Court's ruling permitting Siemens to cross-examine Kenny on the SEC's findings that he committed fraud and breached fiduciary duties was sound for the reasons stated on the record, including that the SEC's findings were probative of Kenny's "character for truthfulness or untruthfulness." Fed. R. Evid. 608(b).  The cross-examination was offered on the issue of

Kenny's credibility in a classic "he said / he said" relating to the February 2016 call between Kenny and Ruesseler. It was also limited and included no exhibits, and Siemens did not emphasize the facts elsewhere in the trial. Tr. IV at 90; Tr. VI at 4-29.

C2L's authority is easily distinguishable. In *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp*., 37 F.3d 1460, 1464 (11th Cir. 1994), the court ordered a new trial where *three* matters were improperly admitted and then emphasized during closing: (1) the witness' "seeking discharge in bankruptcy," which the court held showed no "disregard for truth"; (2) an *accusation* of forgery that resulted in *no sanctions* because the Florida State Bar found no probable cause to believe any violations occurred; and (3) an older sanction for "over-reliance" on a partner's work, the probative value of which was outweighed by the prejudicial effect. *Id*. at 1464-65.[9] Here, Siemens cross-examined Kenny on a *single* matter resulting in findings of fraud and fiduciary duty breaches, and severe sanctions. And Siemens did not further comment in opening or closing. The Court properly allowed this line of inquiry.[10]

### E.     The Court properly permitted cross-examination regarding Arc Financial.

C2L's relationship to Arc Financial ("Arc") came in on cross-examination and was proper after Kenny opened the door when he testified about Secure's financing, including via Arc, and that Arc "continued to finance" Secure after the 2008 financial crisis. Tr. IV at 102-04. Kenny also testified about how much Secure spent to purchase the Siemens gasification equipment and otherwise on the project. *Id*. at 97. Thus, C2L itself placed the issue of Arc's

---

[9] C2L's reliance on *U.S. v. Perrier*, 619 Fed.Appx. 792, 797-98 (11th Cir. 2015) and *U.S. v. Carter*, 516 F.2d 431 (5th Cir. 1975) is also misplaced. In those criminal cases, the government relied on old convictions to establish elements of crimes. Here, Kenny's SEC history was not part of Siemens' case-in-chief or offered to prove an element; it arose on cross-examination after Kenny disputed Ruesseler's version of the February 2, 2016 call.

[10] Moreover, given the trial record, there was overwhelming evidence Siemens did not repudiate the 2012 License.

investment and its expenditures front and center.

The Arc evidence was also probative of the context for the parties' contracting history, including fee payment extensions, and the ready, willing and able requirement.  After C2L bought out Arc, it was left with no significant investor for a proposed $2 billion project, and no realistic prospects for other institutional investors emerged.  Thus, Siemens' cross-examination, including to establish that Arc walked away from its investment and the terms on which it did so, and the source of funds for Secure's purchase of the equipment, and to rebut C2L's characterizations of its purchase—was proper.  *See* Tr. V at 89.[11]

F.    **The Court properly declined to instruct the jury on waiver.**

As the Court carefully determined, the jury should not have been instructed on waiver. The 2012 License contained no-waiver and integration clauses (Sections 22.2 and 23) that precluded any waiver defense.  Tr. V at 109-10, *citing Maxim Group, LLC v. Life Partners Holding, Inc.*, 690 F.Supp.2d 293, 309 (S.D.N.Y. 2010); *see also* Tr. III at 20-21, 49, 50, 51. Moreover, C2L never articulated any proper waiver theory, and instead improperly attempted to  recast as "waivers" the same alleged activities that formed the basis for its rejected defect- and fraud-theories, including, Siemens' alleged failure to "inform C2L of Improvements", and Siemens' provision of "an outdated SIS control system" and "cooling screens with pins that were too short."  *See* Mtn. at 25.  With no proper or admissible waiver defense, C2L fails to establish any basis for a new trial.

V.    **CONCLUSION**

For the above stated reasons, C2L's Motion should be denied.

---

[11] Even if the Arc testimony was improperly permitted, which it was not, it did not likely sway the jury because, among other things, the jury did not base its finding of no repudiation on the ready, willing and able requirement and there was overwhelming evidence on C2L's inability to pay in any event.

Dated:  April 13, 2020

Respectfully submitted,

By:     */s/ Jonah D. Mitchell*
        Robert W. Thielhelm, Jr.
        Florida Bar No. 889679
        **Baker & Hostetler LLP**
        SunTrust Center, Suite 2300
        200 South Orange Avenue
        Orlando, FL 32801-3432
        Telephone: 407.649.4000
        Facsimile: 407.841.0168
        Email: rthielhelm@bakerlaw.com

        Scott D. Baker (admitted pro hac vice)
        Jonah Mitchell (admitted pro hac vice)
        Adaline J. Hilgard (admitted pro hac vice)
        Christopher J. Pulido (admitted pro hac vice)
        **Reed Smith LLP**
        101 Second Street, Suite 1800
        San Francisco, CA  94105-3659
        Telephone: 415.543.8700
        Facsimile: 415.391.8269
        Email:  sbaker@reedsmith.com
        Email:  jmitchell@reedsmith.com
        Email: ahilgard@reedsmith.com
        Email:  cpulido@reedsmith.com

        *Counsel for Siemens Energy, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 13, 2020, a true and correct copy of the foregoing was submitted to the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following listed counsel:

Robert L. Devereux
Jeffrey R. Schmitt
**Danna McKitrick, P.C.**
7701 Forsyth Blvd., Suite 800
St Louis, MO 63105
Telephone: (314) 726-1000
Fax: (314) 725-6592
Email: rdevereux@dmfirm.com
Email: jschmitt@dmfirm.com

Michael H. McGinley
**DECHERT LLP**
2929 Arch Street
Philadelphia, Pennsylvania 19104-2808
Phone: (215) 994-4000
Fax: (215) 994-2222
E-Mail: michael.mcginley@dechert.com

Walter A. Ketcham , Jr.
**Grower, Ketcham, Eide, Telan & Meltz, PA**
901 N Lake Destiny Rd., Suite 450
PO Box 538065
Orlando, FL 32853-8065
Telephone: (407) 423-9545
Fax: (407) 425-7104
Email: enotice@growerketcham.com

DATED:  April 13, 2020.

*/s/ Jonah D. Mitchell*
Jonah D. Mitchell