**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

SIEMENS ENERGY, INC.,

      Plaintiff,

v.                                      Case No: 6:17-cv-171-Orl-40LRH

MIDAMERICA C2L INCORPORATED,

      Defendant.
_____/

## ORDER

This cause is before the Court on Defendant's Renewed Motion for Judgment as a Matter of Law under Rule 50(b), Alternative Rule 59 Motion for New Trial. (Doc. 298). Plaintiff field a Response in Opposition (Doc. 303), and the matter is now ripe. Having reviewed the submissions, Defendant's motion is due to be denied.

**I.     BACKGROUND**

This lawsuit arises out of a contract dispute between Plaintiff Siemens Energy, Inc. ("**Siemens**") and Defendant MidAmerica C2L, Inc. ("**C2L**"). (Doc. 63, ¶¶ 5–8). On December 24, 2007, C2L and Siemens executed a contract (the "**2007 Contract**") requiring Siemens to sell certain equipment to C2L for use at a coal gasification plant in Decatur, Illinois, where C2L planned to operate an industrial facility for the conversion of coal into natural gas. (Doc. 146-17; Doc. 169, p. 19, ¶¶ 1, 2). C2L paid Siemens about $40 million for the equipment. (Doc. 146-1, ¶ 7). The parties entered into a License Agreement by which Siemens agreed to provide technology, engineering services, technical field assistance, training, and performance guarantees relating to the equipment

conveyed in the 2007 Contract in exchange for a license fee. (Docs. 146-9, 146-10, 146-11, 146-12, 146-14).

On February 2, 2016, Siemens informed C2L that Siemens would be closing the fuel gasification division of its business. (Doc. 169, p. 20, ¶ 8). On February 11, 2016, C2L demanded rescission of the 2007 Contract and return of all monies paid by C2L under the 2007 Contract. (Doc. 149-7, pp. 66–69; Doc. 169, p. 20, ¶ 9). In response, on February 17, 2016, Siemens informed C2L that Siemens will not violate any contractual obligation by its strategic exit from the coal gasification business. (Doc. 149-7, pp. 70–71; Doc. 169, p. 20, ¶ 10). The parties met on March 2, 2016. (Doc. 169, p. 20, ¶ 11). Later, on March 18, 2019, Siemens offered to extend deadlines for completion of its performance tests as defined by the 2012 License Agreement from December 31, 2015, to December 31, 2021, if C2L paid the full remaining balance of the fee required under the 2012 License Agreement on or before July 1, 2016. (Doc.149-7, pp. 72–73; Doc. 169, p. 20, ¶ 12). C2L rejected Siemens' offer on March 31, 2016. (Doc. 149-7, p. 74; Doc. 149-8, pp. 2–3; Doc. 169, p. 20, ¶ 13). On April 14, 2016, Siemens revoked its offer and demanded payment of a termination fee under the 2012 License Agreement. (Doc. 149-8, pp. 4–6). On April 19, 2019, Siemens invoiced C2L for the termination fee. (Doc. 169, p. 20, ¶ 15). In May 2018, Siemens closed its coal gasification division. (*Id.* ¶ 16).

The Court ultimately granted summary judgment for Siemens as to all counts of the complaint brought by C2L and its parent company, Secure Energy, Inc. (Docs. 204, 208), and the case went to trial on Siemens counterclaim. After a three-day trial, the jury returned a verdict for Siemens finding that C2L breached the contract with Siemens, that

Siemens did not repudiate the contract, and awarding damages in the amount of $13,200,395.50. (Docs. 281, 287).

C2L argues they are entitled to judgment as a matter of law ("JMOL"), because Siemens repudiated the License and Service Agreement through its decision to close its gasification division. (Doc. 298, p. 5). C2L also, curiously, argues they entitled to JMOL because New York law does not impose an obligation upon them to prove they were ready, willing, and able to perform under the contract.[1] (*Id.* at p, 7). That said, the jury did not reach this issue, having found no repudiation by Siemens. (Doc. 287). Alternatively, C2L contends they are entitled to a new trial because of various evidentiary rulings. (Doc. 298, pp. 13-25).

## II.  LEGAL STANDARDS

### A.  Judgment as a Matter of Law

Judgment as a matter of law should be granted only if no objectively reasonable jury, based on the evidence and inferences adduced and through exercising impartial judgment, could reach the verdict rendered. Fed. R. Civ. P. 50; *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997). Put another way, the party moving for judgment as a matter of law must show that the trial evidence "is so overwhelmingly [in his favor] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). Yet, where substantial evidence in the trial record would allow reasonable minds to reach different conclusions, judgment as a matter

---

[1]  Defendant is incorrect. Under New York law, which the parties agree applies here, to excuse non-performance a non-repudiating party must prove it was ready, willing and able to perform. *Pesa v. Yoma Dev. Grp., Inc.*, 18 N.Y.3d 527, 531-32 (N.Y. 2012).

of law is inappropriate. *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1211 (11th Cir. 2010). In considering a motion for judgment as a matter of law, the district court must review the record and draw all reasonable inferences derived therefrom in the light most favorable to the non-moving party. *Brown*, 597 F.3d at 1173. The district court must not make credibility determinations nor weigh evidence, as these are functions reserved for the jury. *Id.*

### B. Motion for New Trial

A district court may grant a new trial for a variety of reasons, including when the verdict is against the great weight of the evidence, the damages awarded by the jury are excessive, the court erred in admitting or excluding evidence or in instructing the jury on the law, or other circumstances led to a patently unfair trial. Fed. R. Civ. P. 59; *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). Whatever its reason, "a district court may, in its discretion, grant a new trial 'if in [the court's] opinion, the verdict . . . will result in a miscarriage of justice, even though there may be substantial evidence'" which would preclude the entry of judgment as a matter of law. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984)). Unlike a motion for judgment as a matter of law made under Rule 50, the court "is free to weigh the evidence" in assessing whether to grant a new trial under Rule 59. *Id.* (quoting *Rabun v. Kimberly-Clark Corp.*, 678 F.2d 1053, 1060 (11th Cir. 1982)).

### III.   DISCUSSION

#### A.   JMOL

The jury heard extensive testimony that Siemens' exit from the gasification market would be conducted in a manner to ensure continued support to its customers, as summarized by Siemens in their response:

- Siemens developed an exit plan that included honoring existing contracts. Tr. III at 62–63 (plan identified employees "essential to continuously support ongoing activities" of customers), 65 ("Siemens never walked away from a contract, [and has] a very good reputation in the market" for honoring commitments), 72, 85 (Siemens' "overall strategy" was to support customers); Tr. II at 59–63, 82–83; JTX010; Tr. IV at 39–40, 64–65; Tr. III at 21–23, 67–70; DTX97.

- Siemens' plan included retaining gasification engineers and personnel who could project manage, commission plants and provide technical field assistance (TFA) as needed. Tr. III at 66–68, 69 (Siemens' engineers also qualified to project manage and perform TFA), 85–86 (Siemens could "meet the obligations" of a technology license, including support and TFA, through "key personnel"); *see* Tr. II at 82, JTX010.

- Siemens' engineers with requisite expertise remained in the product business unit, were easily accessible, and had the responsibility and ability to support existing gasification contracts. Tr. III at 44, 70–71; *see also* Tr. IV at 64–65, JTX008.

- Siemens communicated to its customers that it would provide, and in fact, has provided, ongoing support, to its gasification customers, as appropriate. Tr. III at 71; Tr. II at 59–63, 85–87; DTX97; Tr. IV at 40–42, 43–44; JTX008.

- Siemens did not close its coal gasification division until May 2018. Tr. IV at 84.

(Doc. 303, p. 6).

Additionally, Mr. Morehead, retired Siemens' senior regional manager for technical sales for power generation opportunities, testified at trial and explained coal gasification technology to the jury. He also discussed the License and Service Agreements executed

5

in 2007, 2010, and 2012 between Siemens and C2L and how Siemens would continue to support ongoing gasification customers. Defense exhibit 97, addressed by Mr. Morehead, includes an email dated August 4, 2015, in which Siemens personnel are drafting language to advise its customer–Summit Texas Clean Energy Project–that Siemens is committed to providing support to their gasifier project despite their exit from the market. (Def. Ex. 97, Bates 262469-70). Mr. Morehead acknowledged on cross-examination that he was not privy to how Siemens would fulfill these obligations, but the next witness called by Siemens explained the details.

Mr. Schuld, former CEO of Siemens Fuel Gasification Technology from 2007 through May 2018. He testified that in January 2016, Siemens had 50 employees in gasification, down from 75. Mr. Schuld told the jury Siemens continued to service existing contracts, being mindful of their reputation in the market. He explained that before C2L's default, Siemens had two projects in the United States: Summit and Secure (C2L's parent) and two projects in China. Mr. Schuld identified 10 employees servicing these projects. He further explained that of 380,000 people employed by Siemens world-wide, about 40% are engineers. Mr. Schuld testified that a few hundred of those engineers are qualified to serve as project managers and a similar number could serve in a Technical Field Assistance capacity. Siemens therefore had the capacity to perform under the License and Service Agreement had C2L tendered the required payment. Similarly, Mr. Ruesseler, a senior and experienced Siemens executive, testified that he communicated Siemens' exit from the gasification market to their customers and reassured them that Siemens would continue to support ongoing projects.

Siemens cites additional record evidence presented to the jury that shows a lack of repudiation by Siemens of their obligations under the License and Service Agreement. (Doc. 303, pp. 6–8). It is undisputed that neither C2L nor Secure paid the fee required by the License and Service Agreement. In fact, Siemens and C2L stipulated that Secure and C2L were financially unable to perform (pay) under the terms of the 2012 License and Service Agreement, and the jury was so advised. The jury was presented with ample evidence from which to find that Siemens did not repudiate or breach the agreement and that C2L failed to perform as required. For these reasons, Defendant's motion for judgment as a matter of law is denied.

**B.    New Trial**

*1.    Siemens' alleged breach*

C2L argues that the Court erred by excluding theories of defense not properly asserted by C2L, including that Siemens breached the 2012 License and Service Agreement by failing to notify C2L of Equipment and Technology Improvements, failing to provide an updated Basic Engineering Design Package ("BEDP") and Process Engineering Design Package. (Doc. 298, p. 15). However, the only properly plead alleged breach by Siemens was alleged anticipatory repudiation. (Docs. 204; 238-1: 9:19-12:14; 13:4-14:4). As the Court discussed at the final pretrial conference, when addressing Siemens' motions in limine, the new defense of alleged breach of the License and Service Agreement is untimely and does not articulate a material breach. (Doc. 238-1; 13:4-14:4). Siemens correctly observes that Section 5.1 of the 2012 agreement does not establish a deadline for Siemens to provide notice of improvements; only requires Siemens to offer improvement that are ready for commercial application; and required C2L to pay for the

improvements, which the Defendant stipulated was an impossibility. Similarly, to the extent that C2L wanted an updated BEDP, they had to pay for it. C2L lacked a viable gasification project, rendering an updated BEDP useless. This basis for a new trial lacks merit.

*2.     C2L Finances*

C2L argues that they were prejudiced, because the Court "allowed Siemens to harp repeatedly on C2L's inability to obtain financing for its project." (Doc. 298, p. 17). This ignores the joint final pretrial statement in which C2L agreed to the following stipulated facts:

> 8. By the end of 2015, Secure and C2L had suspended business operations and stopped paying salaried employees. (Doc. 208 (citing Doc. 149-9, p. 100).
>
> 9. Secure and C2L's financial statements for 2014 and 2015 show that, "[T]he Company has incurred losses since inception," and that "The Company's prior losses and other factors raise substantial doubt about the Company's ability to continue as a going concern." Secure and C2L were in a financial position where they needed to "obtain grants, debt financing or additional equity investment" in order to complete their intended project. (Doc. 208 (citing Doc. 149-5, p. 8, ¶ 13).
>
> 10. Secure and C2L were not in any financial condition to perform under the terms of the 2012 License and Service Agreement, as evidenced by their financial statements and their inability to perform under the two previous agreements (2007 and 2010). (Doc. 208).
>
> 11. Secure and C2L admit, and their financial statements show, that they did not have the necessary funding for any iteration of their project and could not pay the past-due license fees under the contract. (Doc. 208).

(Doc. 218).

Nor did C2L object when Siemens read the stipulated facts to the jury and failed to object to Siemens' references to their financial condition during their opening statement and

closing argument. Even so, C2L's financial condition was directly relevant to whether they defaulted under the License and Service Agreement. The Agreement clearly provided that C2L was obligated to pay a sum certain and failed to do so. C2L's inability to perform under the contract was directly relevant to the issues in dispute.[2]

### 3. Dr. Kosstrin

Defendant asserts that the Court erred by excluding Dr. Kosstrin. The Court discusses Dr. Kosstrin's opinions—and the failure of his methodology—at length in the Order granting Siemens' *Daubert* challenge. (Doc. 188). In summary, the Court found that Dr. Kosstrin's defect opinions lacked reliable methodology, in part over his reliance on the history of a gasification plant operating in China with non-conforming coal. In excluding his opinions on the need for an updated BEDP, the Court observed:

> Dr. Kosstrin opines that the BEDP delivered by Siemens to Secure had material design defects (Doc. 150-3, p. 70:20–23), but he fails to compare the Secure BEDP to any other BEDP for coal gasification. (*Id.* at 78:2–7). His opinion that the BEDP was defective is based upon the NCPP plant.
>
> Siemen's expert in gasification equipment, Stephen Jenkins, reviewed the BEDP provided to Secure and compared it to other BEDPs for coal gasification plants and the BEDP Siemens developed for Summit Power's TCEP. (Doc. 147-1, p. 42). Mr. Jenkins lists the contents of the Secure BEDP and opines that it meets or exceeds industry standards. (*Id.* at p. 44). Mr. Jenkins also notes that Dr. Kosstrin prepared an Independent Engineer's Report for the Secure project in 2009, assessing the technology, the primary systems and equipment, and the scale up of the equipment. (*Id.* at p. 48). Dr. Kosstrin opined in his earlier report that "[t]he several technologies that are proposed to be incorporated into the [Secure] Facility are sound and proven technologies to produce SNG, argon and sulfur." (*Id.* at pp. 48–49). The

---

[2] The Court has previously addressed Defendant's incorrect analysis of ready, willing, and able.

9

> about-face in Dr. Kosstrin's opinions is based upon the NCPP plant.

(Doc. 208, pp. 16–17). Accordingly, Dr. Kosstrin was properly excluded.

### 4. Mr. Clauss

Defendant argues that they were prejudiced when the Court ruled that Mr. Clauss could not testify. (Doc. 298 p. 21). C2L claims that Mr. Clauss would have testified, if permitted, that his firm was negotiating for an engineering, procurement, and construction contract for C2L's proposed plant. (*Id.*). Mr. Clauss would have testified that the failure of Siemens to provide an updated BEDP prevented C2L from getting a contract for the use of the gasification equipment with a company called SKEC. (*Id.*).

In their motion in limine, Siemens argued that Mr. Clauss' proffered testimony is irrelevant, "because, among other things, the following is undisputed: (1) Plaintiffs never paid, or offered to pay, for an updated BEDP; and (2) Plaintiffs walked away from SKEC at the end of 2012 of their own and tried to sell the equipment instead." (Doc. 230, p. 24). In fact, Mr. Kenny, the CEO of Secure, testified in his deposition that Secure and C2L "walked away" once he felt SKEC had "left [them] at the altar" by trying to introduce a new $100 million contingency to the deal during a late stage of negotiation. (*Id.*, p. 24, fn. 9) (record citations omitted). Siemens also told Secure and C2L "several times (including on October 31, 2012, November 16, 2012, and July 18, 2014) that they could buy an updated BEDP to account for all iterative improvements in the Siemens gasification technology, provided that Plaintiffs pay for the update (which Plaintiffs never did)." (*Id.*) (record citations omitted).

In response to Siemens' motion in limine, C2L argues that they properly disclosed Mr. Clauss, but they failed to proffer his anticipated testimony. (Doc. 234, p. 11). So at

the final pretrial conference, the Court granted Siemens' motion in limine. Mr. Clauss' anticipated testimony was not relevant to whether Siemens repudiated the License and Service Agreement. Additionally, C2L never paid for an updated BEDP and could not properly argue to the jury that Siemens should have provided one for free.

### 5. Impeachment with Finding of Fraud

Next, C2L argues that the Court erred when it ruled Siemens could, if they so choose, impeach Mr. Kenny with the fact that the SEC determined, after affording him due process, that he had committed a scheme to defraud his investors. The Court noted at the final pretrial conference that Fed. R. Evid. 608(b)(1) provides:

> "Specific instances of conduct except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the Court may on cross examination allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of, one, the witness."

(Doc. 238-1; 27:6–13).

When Mr. Kenny took the stand on behalf of C2L, his attorney brought out the SEC violation, which Siemens then addressed on cross-examination. While it is likely counsel for Siemens would have covered this ground, defense counsel preempted the issue and now complains that their tactical decision created prejudice. Rather, the Defendant has waived this issue. In any case, Siemens correctly framed the dispute between Mr. Kenny and Mr. Ruesseler as classic he said/ he said, so credibility was therefore relevant. Unlike *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1464 (11th Cir. 1994), cited by C2L, the SEC's finding that Mr. Kenny committed fraud— confirmed on appeal—is probative of his truthfulness and outweighed any prejudicial effect.

11

### 6. *Arc Financial*

Secure and C2L move in limine to prevent Siemens for presenting testimony or evidence the Arc Financial provided the money used to purchase the gasification equipment. (Doc. 172). C2L argued that the only reason to present such evidence is to portray Secure/C2L as having lost nothing from their dealings with Siemens. (*Id.*, at p. 5). During the trial, Mr. Kenny testified on direct examination about Secure's financing including through Arc Financing and discussed the amount Secure paid for the gasification equipment. (Doc. 303, p. 19). Once Mr. Kenny "opened the door" about Secure's financial relationship with Arc Financial, Siemens' counsel asked about their relationship. Doing so was not improper, nor was it prejudicial. To the extent that C2L desired to portray themselves as having lost over 40 million dollars in their dealings with Siemens, Siemens had a right to develop the record briefly on that point.

### 7. *Failure to give waiver instruction*

C2L urged the Court to instruct the jury on waiver. That is, that Siemens waived their rights under the contract by failing to provide C2L support under the License and Service Agreement (the repudiation argument); failing to provide improvements to gasification equipment (the defective equipment argument); and by providing an outdated SIS control system. (Doc. 298, p. 25). In other words, C2L wanted the jury instructed that alleged failures by Siemens in performing under the contract constitute waiver by conduct, showing that Siemens gave up their right to payment. Without addressing whether such words or deeds constitute waiver, the simple fact is that the record did not support the instruction. C2L's expert on the defective equipment theory was stricken, and the jury correctly found Siemens did not repudiate its obligation under the contract.

The uncontroverted evidence showed Siemens, while accommodating C2L by extending deadlines for payment under the Agreement, never knowingly, voluntarily and intentionally abandoned their rights under the Agreement. To the contrary, the 2012 License and Service Agreement contains a no-waiver and integration clauses (Sections 22.2 and 23) (Joint Ex. 3). *See, Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1013 (S.D.N.Y.1995) ("No waiver can have occurred here, however, because [the agreement provides] 'No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by Employee and an officer of Employer,' and defendant has not produced a written waiver"). C2L does not argue that any words or deeds by Siemens which allegedly constitute a waiver were reduced to writing as required by their agreement. C2L's request for a waiver instruction was properly denied.

## IV.   CONCLUSION

For these reasons, C2L's Motion for Judgment as a Matter of Law or Alternatively for New Trial (Doc. 298) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on May 4, 2020.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties