UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIDAMERICA C2L INCORPORATED, a )
Nevada corporation; and SECURE ENERGY, )
INC., a Nevada corporation, )
                                   )
            Plaintiffs, )
                                   )         No.: **6:17-CV-00171-PGB-LHP**
v. )
                                     )        <u>**Dispositive Motion**</u>
SIEMENS ENERGY, INC., a Delaware )
corporation, )
                                     )
            Defendant. )
                                     )

<u>**SIEMENS ENERGY, INC.'S RENEWED MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**</u>

Defendant Siemens Energy, Inc. ("Siemens Energy"), pursuant to Federal Rule of

Civil Procedure 56, hereby submits its Renewed Motion for Summary Judgment and

Memorandum of Law in Support.

## I.     INTRODUCTION

This Court previously rejected the plaintiffs' case as a matter of law for its apparent

lack of merit.  And, previously, three judges on the Eleventh Circuit unanimously agreed

with that result.  Unfortunately, due solely to an appellate procedural quirk, this Court will

have to decide some of plaintiffs' claims again.[1]  Yet, as the Eleventh Circuit's second

opinion presages, when the merits are revisited, the result should be the same.  The record

and law have not changed and plaintiffs' remanded claims still are subject to summary

judgment as a matter of fact and law.

---

1 As set forth in more detail below, the Eleventh Circuit's second opinion affirmed this Court's exclusion of
Secure's expert, summary judgment of plaintiffs' Count I, denial of leave to amend, and exclusion of Secure's
unpled defense at trial. Left for this Court to decide are plaintiffs' defect-based claims (Counts II, IV-VI).

To briefly review the bidding, this Court determined on summary judgment that Secure Energy, Inc. and MidAmerica C2L, Inc.'s (collectively "Secure") could not prove their claims, and after a trial, the jury awarded Siemens Energy over $13M on its counterclaim. On appeal, the Eleventh Circuit affirmed across the board, finding that summary judgment on Secure's equipment defect-based claims was proper based in part on arguments raised by Siemens Energy in its summary judgment motion, which this Court elected not to address. *See* Appendix A ("Apdx. A").

Over a year later, relying on a prudential forfeiture rule announced in an *en banc* ruling in another case issued after its original opinion in this case, the Eleventh Circuit determined that it could not consider the alternative grounds for summary judgment after all because, while Siemens Energy made them in its summary judgment motion to this Court, they had not been raised on appeal. The Eleventh Circuit remanded for that reason, while confirming that its procedural ruling was "*for purposes of this appeal*" only.  Apdx. B at 32 (emphasis in original). The Court went on to expressly endorse Siemens Energy "re-assert[ing] the alternative arguments it made below to the district court as a basis for summary judgment on those claims, should it choose to do so."  *Id*. at 32, 46. That is, moreover, precisely what Siemens Energy is doing now — reasserting the grounds for summary judgment that the Eleventh Circuit already considered and deemed meritorious, with additional supporting arguments as well.

Specifically, this motion takes aim at Secure's remanded claims for breach of implied warranty, fraud, and recission-lack of consideration.  In its initial decision, based on the record-supported arguments Siemens Energy advanced, the Eleventh Circuit

determined that:  (1) Count II for breach of implied warranty fails because the parties' contract contains an implied warranty disclaimer and Secure cannot show that the disclaimer was unconscionable; (2) Counts IV and V for fraud are barred by Florida's independent tort doctrine which precludes claims that are not separate and distinct from defendants' performance under the contract; and (3) Count VI for recission-lack of consideration fails because Florida law does not recognize such claim and because Secure cannot show that "legal relief would be insufficient." Apdx. A at 33-37. These grounds are just as dispositive now as they were when the Eleventh Circuit embraced them, and summary judgment is compelled for those reasons alone.

Beyond that, Secure's fraud claims also fail on several additional, and equally dispositive grounds, derived from the settled record and controlling law.  Here, Secure's allegations fail to support any actionable "misrepresentation by omission," reliance on the alleged "misrepresentation by omission," or any duty to disclose. There also is no basis to rescind the parties' contract because no fraud occurred and, in any event, Secure cannot show lack of adequate legal remedies.  In the same vein, Secure's rescission-lack of consideration claim fails because it is time-barred, there *was* consideration for the parties' contracts, and the parties already had terminated the 2007 contract at the heart of this claim.  Finally, Secure's breach of warranty and fraud claims must be rejected because Secure has no expert or other evidence to establish that alleged defects or Siemens Energy's conduct caused its alleged injury.  Causation is, however, an essential element of these claims and the absence of any relevant or credible supporting evidence independently puts those claims to rest.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

The record that led this Court to grant summary judgment on Secure's claims in the first instance, and the Eleventh Circuit initially to affirm in the second, is settled and will not change. That is why the Eleventh Circuit invited Siemens Energy to renew its motion for summary judgment. The context for Siemens Energy's renewal is set forth below.

### A.      Facts leading to this renewed motion

As the Court will recall, this lawsuit stems from failed efforts by Secure to launch an energy-related business.  Secure's business plan went through multiple iterations starting out as "self-build" project to produce town-gas, morphing to a plan to build a coal-to-substitute natural gas plant in Decatur, Illinois, and then morphing again to a plan for a coal-to-gasoline plant in either Decatur or West Paducah, Kentucky.  DN 149-2 at 47:13-50:18, 56:25-59:8, 180:20-185:24, 221:23-223:9, 285:15-21.  Finally, in 2012, Secure hatched yet another plan (its fourth) to build a coal-to-methanol plant in West Paducah using a new subsidiary—C2L.  *Id*. at 118:24-119:24.

As the Court is also aware, the common threads in all of Secure's plans involved (i) two gasifiers purchased from Siemens Energy and (ii) a license for the technology and support to set up, operate, and repair the gasifiers. Both threads, in turn, were reflected in a series of written contracts, starting with the parties' 2007 Equipment Supply Agreement ("2007 ESA") and Project License Agreement. *Id*. at 180:20-185:24; 199:23-200:25; DN 149-3—149-4 at 72.[2] The 2007 ESA included limited-duration equipment warranties and performance guarantees. DN 149-3 at 20, 24-26 [§§ 5.1.1, 5.5.3].  Siemens Energy

---

[2] Cited exhibit page numbers refer to the pdf page numbers of previously-filed exhibits and pleadings.

delivered the gasifiers in 2009, but Secure never unpacked them. DN 149-2 at 180:20-185:24; DN 185 at 47-48. Nor did Secure pay its license fees. *Id*. at 199:23-200:25.

When Secure changed its business plan after 2007, it requested a new license. DN 149-22 at 5 [RFA Nos. 10-13]. Thus, the parties terminated their 2007 contracts, agreed that Siemens Energy had fulfilled its obligations under those contracts, and entered into two new contracts. *Id*.; DN 149-2 at 281:7-10, 283:8-285:7-21; Apdx. B at 7. In the 2010 "Completion Agreement" that followed, the parties acknowledged that neither had any claim under the contracts **and/or any theory of law against the other** and that Secure needed the payment deadline extension because of its failure to pay. DN 149-4 at 73-82.

In the companion 2010 License and Service Agreement ("2010 LSA"), Siemens Energy extended the performance guarantees, equipment warranties, and Secure's deadline to pay the (already past due) license fees. DN 149-22 at 5 [RFA Nos. 10-13]; *see* DN 149-5 at 19-22, 25-34 [§§ 3.0, 3.2.1, 7.0]; *compare with* DN 149-3 at 11-18, 20-28 [§§ 3.0-3.4, 5.0-5.8]. The equipment warranty extension was made on condition that Secure pay an extension fee of €1.0M by August 30, 2011. DN 149-5 at 19, 21 [§§ 3.1.1, 3.2.2]. Secure never paid the fee, thereby abandoning the warranty. DN 149-2 at 282:12-15.

As before, Secure failed to pay its license fees under the 2010 LSA. DN 149-10 at 14. Instead, it changed its plans again, asked for another new license, and in July 2012, the parties executed another Completion Agreement, terminating the 2010 LSA, stating again that neither had any claims against the other, and releasing all claims. DN 149-7 at 63; DN 149-2 at 118:24-119:24. They also entered a companion 2012 LSA[3], which extended the

---

[3] C2L is the contracting party for the 2012 LSA. Secure and C2L are collectively referred to herein as Secure.

performance guarantees and license fee payment deadlines. DN 149-5 at 47–DN 149-7 at 62; DN 149-22 at 5 [RFA Nos. 10-13]; DN 149-23 at 4-5 [¶¶ 9, 10]. Secure agreed to make payments in 2013 and 2015 but missed both deadlines. DN 149-5 at 5, 56; DN 218 at 13.

In early 2016, Secure expressed renewed hope for another new project and Siemens Energy offered to again extend guarantees and the fee payment deadline. When Secure declined, Siemens Energy terminated the 2012 LSA and invoiced Secure for the termination fee. DN 149-7 at 70-73; DN 149-8 at 4-6; DN 218 at 13-14. A few months later, Secure responded with this lawsuit.

B.      Secure's claims and the district court litigation

In its First Amended Complaint (FAC), Secure alleged (1) breach of contract based on alleged repudiation of the 2012 LSA (Count I), and (2) breach of implied warranty of fitness for a particular purpose in the 2012 LSA (Count II), fraud (Counts IV and V) and rescission (Count VI) based on alleged "design defects" in the gasification equipment Siemens Energy supplied and Secure never unpacked.[4]  DN 63 at 7-10, 11-22. Siemens Energy counterclaimed for breach of contract based on Secure's failure to pay the termination fee. DN 75.

At the pleading stage, this Court limited Secure's fraud claims to those arising *after March 31, 2010* because, as part of the 2010 Completion Agreement, Secure waived and released any claims existing before then.  DN 74 at 13-14; DN 63 at 13, 17. Secure's fraud claims, therefore, only purport to implicate the 2012 LSA and do not reference any of the preceding contracts that the parties had closed down. DN 63 at 11-19.

---

[4] Secure voluntarily dismissed its Count III.

To support its claims as redefined, Secure proffered its expert, Dr. Herbert Kosstrin, who opined that its gasification equipment was worth only "scrap value" and had multiple "material design defects" that would have prevented Siemens Energy from meeting performance guarantees and Secure from obtaining project financing. DN 150-2 at 5-14.

After discovery concluded, Siemens Energy filed substantive motions challenging the admissibility of Dr. Kosstrin's opinions and for summary judgment. DN 149; DN 150. In its *Daubert* motion (and later at the hearing), Siemens Energy demonstrated why Dr. Kosstrin's opinions lacked foundation. DN 150; DN 185. Most fundamentally, he had never inspected Secure's gasifiers and instead based his opinions concerning defects on the experiences of a different Siemens Energy customer operating gasifiers under different and out-of-specification conditions. He was also unqualified to appraise the gasifiers. DN 150.

As for its summary judgment motion, Siemens Energy established why each Count in the FAC failed as a matter of fact and law. DN 149; DN 166; DN 207. Count I, for breach of contract, failed because Secure could not prove causation. DN 207. Count II, for breach implied warranty, failed because the 2012 LSA expressly disclaims implied warranties, and Secure could not prove that the disclaimer was unconscionable. DN 149 at 21-23; DN 166 at 9. Counts IV and V, for fraud, were barred by the economic loss rule or independent tort doctrine because they are essentially co-extensive with contract claims, grounded in contractual duties and performance standards, and compensable under contract law. DN 149 at 12-18; DN 166 at 4-7. These claims also failed because they are based on a future promise and Secure could not establish reliance or causation. DN 149 at 18-19. Finally, Count VI, for rescission-lack of consideration, failed because neither Florida nor

Missouri law[5] recognize such claim, and it is time-barred.  DN 149 at 23; DN 166 at 9-10.

With the infirmities of its case exposed, Secure began filing late and unsupported motions for leave to amend to add new theories and allegations related to fraud and its theory that Siemens Energy breached Section 5.1 of the 2012 LSA by failing to inform Secure of improvements to the gasifiers.  DN 133; DN 133-1; DN 145; DN 212. This Court denied each of Secure's improper maneuvers as untimely, unsupported by the relevant legal standard, and lacking any good cause. DN 137; DN 154; DN 213.

Turning to Siemens Energy's *Daubert* motion, this Court made a comprehensive ruling stating why Dr. Kosstrin's opinions were unreliable and why he was unqualified to appraise the gasifiers. Controlling case law accordingly compelled his exclusion. DN 188.

After granting Siemens Energy's *Daubert* motion, the Court requested supplemental briefing on the impact of its exclusionary ruling on Siemens Energy's pending summary judgment motion. DN 190. Siemens Energy responded that Secure's defect-based claims should fail because Secure had no expert to prove its alleged "material design defects." DN 199.  This Court subsequently granted summary judgment on Secure's defect-based claims (Counts II, IV-VI) for that reason. DN 203 at 6-8.  This Court later granted summary judgment on Secure's breach of contract claim (Count I) because Secure could not present evidence that its alleged damages were caused by Siemens Energy's alleged contract repudiation.  DN 208 at 10.[6]

Before trial on Siemens Energy's counterclaim, Secure again tried to squeeze its

---

[5] On summary judgment, Secure argued that Missouri law applied to this claim (DN 161 at 11), and Siemens Energy argued that either Missouri or Florida law applied. DN 149 at 23. Neither party argued for New York law; the Court had already ruled it did not apply. DN 74 at 13-14.

[6] Secure also could not prove repudiation because it could not perform under the contract. *Id*. at 12.

unpled Section 5.1 theory into the case via pretrial disclosures. *See* DN 218 at 10. Siemens Energy filed a motion *in limine* to exclude the theory, and the Court granted that motion. DN 238 at 12-14. After trial, the jury returned a verdict providing for Siemens Energy to recover the $13M termination fee. DN 287. Secure then filed a motion for new trial arguing it should have been permitted to present its new Section 5.1 defense. DN 298. The Court denied the motion for a new trial. DN 305.

### C.     Secure's appeal and the Eleventh Circuit's decisions

Secure appealed this Court's decisions denying leave to amend, excluding Secure's expert, granting summary judgment of Secure's claims in Siemens Energy's favor, excluding Secure's Section 5.1 theory, and denying its motion for a new trial. The Eleventh Circuit's three judge panel unanimously affirmed. Apdx. A.   In analyzing Siemens Energy's summary judgment motion, the Panel noted that this Court "granted summary judgment against Secure on [its defect-based claims] based solely on the theory that, because these claims were premised on a design defect, Secure needed an expert to witness to testify as to the defect." *Id*. at 28. The Panel then held, however, that Florida law did not require "plaintiffs in contract cases to prove the defective nature of the product at issue with expert testimony." *Id*. at 29. Although the Panel concluded that "the district court's reason for granting summary judgment [on these claims] was incorrect," it recognized that it could affirm summary judgment "on any basis supported by the record." *Id*. at 29.   The Panel then analyzed and found that each of Secure's claims was properly dismissed:

- Count I: The Panel affirmed summary judgment on breach of contract because the record established, as this Court held, that Secure could not prove causation.

- Count II: The Panel affirmed summary judgment on breach of warranty based

on the warranty disclaimer and Secure's failure to prove unconscionability.

- Counts IV and V: The Panel affirmed summary judgment on fraud based on the independent tort doctrine because these claims were "in essence" a restatement of contract/warranty claims, the parties' relationship was contractual, and Siemens Energy's duties arose from contracts, not common law. *Id*. at 35, 36.[7]

- Count VI: The Panel affirmed summary judgment on rescission-lack of consideration because Florida law does not recognize that type of claim and Secure did not show "legal relief would be insufficient." *Id*. at 37.

The Panel also affirmed the (1) exclusion of Dr. Kosstrin because his opinions were without foundation, and he was unqualified as an appraiser; (2) denials of leave to amend because Secure's motions were untimely and without cause; and (3) exclusion of Secure's Section 5.1 theory and denial of a new trial because Secure's theory lacked merit, was not properly pled, and "Siemens *did* provide Secure notice of design improvements." *Id*. at 38-47 (emphasis in original). The findings on Secure's Section 5.1 theory, in turn, compelled the affirmance of Siemens Energy's $13M judgment on its counterclaim.[8] *Id*. at 47.

Secure petitioned for a rehearing based, in part, on an *en banc* decision, *United States v Campbell*, 26 F.4th 860 (11th Cir. 2022), that came down after the Panel's decision. In *Campbell*, the Eleventh Circuit held *en banc* that "failure to raise an issue in an initial brief on direct appeal should be treated as a forfeiture of the issue," and therefore, the issue may be raised by the court *sua sponte* only in extraordinary circumstances. *Id*. at 873-75. Secure argued that Siemens Energy had forfeited the alternative grounds on which the Panel had relied to affirm summary judgment on Secure's defect-based claims by not

---

[7] The Panel incorrectly noted that Secure had "voluntarily dismissed its claim for fraudulent inducement" of the 2007 LSA, but its error was immaterial because it *correctly* noted that Secure waived any such claim in the 2010 Completion Agreement. *Id*. Secure also did not claim fraudulent inducement of the 2007 LSA.

[8] Secure asked for reversal of the motion for new trial (and judgment on Siemens Energy's counterclaim) "based only the [Section 5.1] theory it sought to add" as a defense. Apdx. A at 43, 47; Apdx. B at 42, 46.

raising those grounds in its appellate brief. The Panel agreed and issued a new opinion applying *Campbell*'s forfeiture principle.   Appendix B ("Apdx. B").   That opinion incorporated the same factual background, and restated and confirmed other rulings set forth in its initial opinion, specifically with reference to Dr. Kosstrin's exclusion, summary judgment of Count I, the denials of leave to amend, the exclusion of Secure's Section 5.1 theory, and the judgment on Siemens Energy's counterclaim. *Id*. The Panel also emphasized, however, that Siemens Energy, on remand, was free to revisit the alternate grounds for summary judgment the Panel previously relied on in rejecting Secure's case on the merits. *Id*. at 32, 46.

Secure again petitioned for rehearing arguing that the new opinion contained "factual inaccuracies." Its petition was denied. USCA11 Case: 20-11266, DN 77, 78-2.

## III.    LEGAL ARGUMENT AND CITATION TO AUTHORITY

Summary judgment is appropriate where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "citing to particular parts of materials in the record" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

As Siemens Energy's prior motion established (DN 149), and the Eleventh Circuit

likewise observed (Apdx. A), there are no genuine factual disputes presented on Secure's remanded claims.  The record and applicable law are settled, and the result must be as well.

### A.      Secure's breach of implied warranty claim fails

Secure's claim for breach of the implied warranty of fitness for a particular purpose in the 2012 LSA (Count II) fails as a matter of law because, as the Eleventh Circuit observed, the 2012 LSA expressly disclaims all implied warranties.  Apdx. A at 34. Under New York law, to disclaim the implied warranty of fitness for a particular purpose, it is sufficient for the contract to state that "there are no warranties that extend beyond the description on the face hereof."  N.Y. U.C.C. §2–316(2). If the written disclaimer is agreed-upon, a "party cannot justifiably rely on a representation that is specifically disclaimed in an agreement …."  *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 785 (2d Cir. 2003); *Maltz v. Union Carbide Chemicals & Plastics* Co., 992 F. Supp. 286, 304 (S.D.N.Y. 1998) (implied warranty of fitness claims fail where disclaimed).

In this case, the parties agreed to a clear and conspicuous disclaimer of the implied warranty of fitness for purpose (among others), in Section 7.12 of the 2012 LSA[9]:

> THE WARRANTIES AND GUARANTEES PROVIDED ARE IN LIEU OF ALL OTHER WARRANTIES AND GUARANTEES, WHETHER STATUTORY, EXPRESSED OR IMPLIED, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PURPOSE, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.

DN 149-5 at 68, §7.12.  At the pleading stage, this Court denied dismissal of Count II reasoning that Secure may challenge the disclaimer as unconscionable.  DN 62 at 6. But Secure did not do that; it did not plead unconscionability in the FAC.[10] DN 63. No assertion

---

[9] The same disclaimer is in the 2007 ESA and 2010 LSA.  DN 149-3 at 28, §5.8; DN 149-5 at 34, §7.12.

[10] No amendment of the FAC is possible. The Court rejected Secure's untimely and meritless efforts to amend and the Eleventh Circuit affirmed its rulings. The allegations in the FAC accordingly define the substance of

of unconscionability accordingly should be considered. None is possible in any event.

An unconscionable bargain is one that "no person in his or her senses and not under delusion would make on the one hand, and as no honest and fair person would accept on the other". *Christian v. Christian*, 42 N.Y.2d 63, 71 (1977) (internal quotation marks and brackets omitted). The gravamen of unconscionability is the absence of meaningful choice by one of the parties together with contract terms unreasonably favorable to the other party. *Simar Holding Corp. v. GSC*, 87 A.D.3d 688, 689 (2011); *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988); *see Ng v. HSBC Mortg. Corp.*, 2011 U.S. Dist. LEXIS 88549, at *24 (E.D.N.Y. Aug. 10, 2011) (granting summary judgment; contract must "unreasonably favor one party" and process "must have deprived the disadvantaged party of meaningful choice"). Thus, to prove unconscionability, Secure must show that, at the time of execution, the 2012 LSA warranty disclaimer was both procedurally and substantively unconscionable. *Simar,* 87 A.D.3d at 690; Ng, 2011 U.S. Dist. LEXIS 88549 at *24. "[U]nconscionability is a matter of law for the court to decide." *Simar*, 87 A.D.3d at 690 (internal quotation marks omitted).

Here, Secure cannot show either procedural or substantive unconscionability. It had its own technical consultant and was represented by counsel during the parties' contract negotiations. DN 149-22 at 6 [RFA No. 14]; DN 149-2 at 173:17-179:22; DN 149-14 at 168:11-173:18, 175:15-176:22, 180:3-25. It also had "meaningful choice," choosing to purchase and license from Siemens Energy in 2007 after considering at least five other

Secure's claims. When opposing summary judgment the first time around, Secure pointed to no evidence of unconscionability, instead arguing that the issue was "not ripe for resolution" based on improper fraud allegations it tried to interject via unsuccessful motions for leave to amend. DN 161 at 22; DN 166 at 9.

suppliers, and the parties' subsequent agreements were entered at Secure's request after its plans changed and it could not pay the license fees. DN 149-22 at 5, 7 [RFA Nos. 10, 11, 17-19]; 149-13 at 15. The 2012 LSA's terms also did not unreasonably disfavor Secure, which received extended performance guarantees and deadlines to pay outstanding license fees, as well as Siemens Energy's commitment to make repairs as needed to ensure performance tests were met—all making the implied warranty disclaimer entirely enforceable as a matter of law. DN 149-5 at 54, 56, 64-67 [§§ 1.0 ("Remedy"), 3.2.1, 7.9, 7.9.3.2] DN 149-22 at 7 [RFA Nos. 17-19].

### B.      Counts IV and V for fraud fail as a matter of law

Secure's fraud claims are barred for the reasons the Eleventh Circuit adopted and they lack merit for additional reasons as well.

#### 1.      Florida's independent tort doctrine bars Counts IV and V

To start with, Secure's fraud claims, Count IV for "fraudulent misrepresentation—failure to disclose defects in technology" and Count V for "rescission-fraud," are barred, as the Eleventh Circuit previously held, by Florida's independent tort doctrine. Under that doctrine, a plaintiff may not recover in tort for a contract dispute unless the tort is independent of any breach of contract. *Island Travel & Tours, Ltd. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1239 (Fla. 3d Dist. Ct. App. 2020) (fraudulent inducement claim barred by doctrine). Thus, unless tort "allegations are separate and distinct from defendants' performance under the contract," the doctrine applies to prevent recovery on a tort claim. *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1031 (11th Cir. 2017). Where the plaintiff's "fraudulent misrepresentation claims against [the defendant] arise out of

alleged contractual duties alone," the doctrine precludes those claims. *Brooks v. Brooks Consultants, Inc.*, 2022 U.S. Dist. LEXIS 202498, at *17 (M.D. Fla. Nov. 7, 2022). This is because "when a contract is breached, the parameters of a plaintiff's claim are defined by contract law, rather than by tort law." *Peebles v. Puig*, 223 So. 3d 1065, 1068 (Fla. 3d Dist. Ct. App. 2017) (reversing fraud finding where alleged damages arose from a contractual breach). Thus, "a plaintiff may not pursue a tort theory of relief where a contract created the duty to act, performance is measured against the contractual obligations, and the contract provides the remedy for defective performance." *Nat'l Fire Ins. Co. v. Johnson Controls Fire Prot. LP*, 2019 U.S. Dist. LEXIS 67157, at *4-6 (S.D. Fla. Apr. 18, 2019) (dismissing tort claim where contract defined the defendant's obligations, and alleged "defective performance concerns [defendants'] contract with [its customer]").

Here, as the Eleventh Circuit made clear:

> Secure's two fraud claims—for which it seeks both damages and recission of the contract—are premised on the same theory: because Siemens was "aware of several material design defects in the" gasifiers that were not discoverable by Secure and "had demonstrably superior knowledge of the materials defects," Siemens had a "duty to disclose to plaintiffs the existence of [the] material design defects."

Apdx. A at 34-35. Thus, as the Panel found, Secure's fraud claims are "premised solely on the notion that the gasifiers are, in fact, defective," and they fail "because they are, in essence, simply a restatement of Secure's contract and breach of warranty claims." *Id.*

Indeed, Secure's fraud claims necessarily arise from *contractual* duties. *Id*. Thus, as the Eleventh Circuit pointed out, Secure's fraud claims "are not—and indeed could not—be premised on any fraudulent misrepresentation or omission that pre-dated the parties' contractual relationship" because "the 2010 Completion Agreement released both

parties of any claims that pre-dated that agreement." *Id*. at 36. Accordingly, during the relevant time period, "where did Siemens's duty of disclosure come from—was it the common law duty to disclose (as required for a fraud claim) or its contractual duty to perform (which would foreclose a fraud claim)? The answer is obviously the latter." *Id*. In short, Siemens Energy's "duty to share information . . . and to deliver conforming products, arose" from the parties' contracts, including the 2010 LSA, not common law. *Id*.[11]

Beyond that, Secure's fraud theory is based on Siemens Energy's alleged failure to *contractually* perform. Specifically, the alleged design defects depend on, and directly relate to, performance guarantees that were in place throughout the parties' relationship. DN-63 at ¶¶ 44, 62; DN 149-14 at 110:10-118:25. In fact, Secure's proffered expert confirmed that Secure's defect theories are *measured by* Siemens Energy's contractual performance; and he *defined* a design defect to be any change to the equipment *required to meet contractual performance guarantees*. DN 149-14 at 110:10-118:25. In sum, because the parties' *contract itself* defines "design defect," Secure's fraud claims are not independent, and must be barred. *Id*. at 113:24-114:22, 116:15-117:5. *See Monsoon, Inc. v. BizJet Int'l Sales & Support, Inc.* 2017 U.S. Dist. LEXIS 26987, at *26 (S.D. Fla. Feb. 27, 2017) (misrepresentations made before and after contract formation concerning "heart of the parties' agreement . . . cannot [] give rise to an independent cause of action in tort").

---

[11] Fraud in the inducement can be an independent tort but only where the alleged misrepresentation is unrelated to contractual obligations and induced entry into the contract. *See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So. 2d 1238, 1239 (Fla. 1996). Here, Secure did not adequately plead (and cannot prove) "fraudulent inducement" of the 2012 LSA (as set forth below), but even if it did, its fraud claims are "clearly duplicative" of its warranty claim because before the 2012 LSA, Siemens Energy was contractually obligated to perform under the 2010 LSA, and the alleged failure to disclose defects relates to its contractual performance obligations. *See* Apdx. A at 36; *Island Travel*, 300 So. 3d at 1239.

By the same token, the parties' contracts include remedies for non-performance and that likewise shows that Secure's fraud claims are not independent. That is, Siemens Energy was contractually required to ensure proper gasifier operation, and if defects prevented the gasifiers from passing performance tests, Siemens Energy was required repair, replace, or modify them.   DN 149-5 at 18, 27, 31-33, 54, 62, 65-67 [§§ 1.0 ("Remedy"), 7.5.4, 7.9.3.2] (2010 and 2012 LSAs obligating Siemens Energy to ensure gasifiers meet performance guarantees, pass performance tests, and "[r]emedy the nonconformity," defined as "**correction of** warranty nonconformity or **defect** … by repair, replacement or modification") (emphasis added)).[12] The parties' contracts also include liquidated damages and limitation of liability provisions for failures to perform. DN 149-5 at 34, 40, 68 [§§ 7.10.2, 14]; DN 149-6 at 5 [§ 14]. And relatedly, the damages Secure alleges for fraud – loss in equipment value and spend on the project – are identical to the damages it alleges for its contract claim for breach of implied warranty, further confirming that its fraud theory is not an independent tort. DN-63 ¶¶34, 58.  *See E-Professional Techs., LLC v. Primehealth of Ill. Inc.*, 2022 U.S. Dist. LEXIS 190530, at *3–4, 14, 22-23 (M.D. Fla. June 15, 2022) (fraud claim barred where it related to contractual performance and alleged same damages as contract claim).

In short, wherever one looks – from Siemens Energy's contractual duties, to the contract-based measure of performance, to the contractual remedies available if the gasifiers did not pass muster – the conclusion is the same: Secure's fraud claims are not based on independent torts, and dismissal is required. *See Kaye v. Ingenio, Filiale de Loto–*

---

[12] Secure has also argued Section 5.1 is a *contractual* source of disclosure obligations. *See* Apdx. B at 40-41.

*Quebec, Inc.*, 2014 U.S. Dist. LEXIS 73180, at *11-13 (S.D. Fla. May 29, 2014);  *Island Travel,* 300 So. 3d at 1239.

### 2.        Secure's fraud claims also fail because it cannot prove fraud

Secure's fraud claims also fail because it has not pled and cannot prove the necessary elements of fraud.

### a.        Secure's claims are confined to the only alleged omission it pled with particularity, which fails to support fraud

Under Florida law, "[t]he elements of a claim for fraudulent inducement are: (1) a false statement [or concealment] of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment." *Sokolow v. Damico,* 2019 U.S. Dist. LEXIS 220849, at *9 (S.D. Fla. Dec. 26, 2019) (*quoting Sena v. Pereira*, 179 So. 3d 433, 435-36 (Fla. Dist. Ct. App. 2015) (*quoting Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. Dist. Ct. App. 2012))).  "A defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose." *Id*. at *9-10 (*quoting TransPetrol, Ltd. v. Radulovic*, 764 So. 2d 878, 879-880 (Fla. Dist. Ct. App. 2000)).

Here, Secure did not plead any affirmative misrepresentations, and the only "misrepresentation by omission" pled with the requisite particularity under Federal Rule of Civil Procedure 9(b) allegedly occurred at an October 2012 meeting when Siemens Energy did not disclose alleged "design defects." DN 63 at ¶¶49-50, 67-68. At that meeting, Siemens Energy responded to a question from Secure's potential vendor, SK—as follows:

SK (Igor Ribakovs) asked if Siemens will incorporate lessons learned from their Chinese gasifiers.  Siemens (Rolf Rüsseler) stated that these design improvements will be included in the MidAmerica C2L design, subject to Midamerica C2L paying for the re-engineering (item 5) .

DN 149-16 at 4; DN 149-9 at 363:15-365:15 (Secure concedes minutes are accurate).

No other allegations in Secure's FAC pass muster, and no further allegations can be considered; the time to amend is over and done with.  *Ziemba v. Cascade Int'l, Inc.* (11th Cir. 2001) 256 F.3d 1194, 1202 (analyzing Rule 9(b) and rejecting fraud theories not pled with particularity).  Moreover, with respect to this single adequately alleged "misrepresentation by omission," it manifestly fails, at the threshold, to support the fraud claim Secure urges – fraudulent inducement of the 2012 LSA.  The October 2012 meeting took place three months *after* the parties signed the 2012 LSA, and thus Secure has not and cannot show it was fraudulently induced into that contract based on a meeting that occurred three months later. DN-63 ¶¶ 54, 68.[13]

### b.     Secure also cannot prove a duty to disclose

Secure's fraud claims also fail for the independent reason that it cannot prove that Siemens Energy had a common law "duty to disclose," which arises only "when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them."  *Sokolow*, 2019 U.S. Dist. LEXIS 220849,

---

[13] To the extent Secure argues that it was "induced" to take other action, Secure did not plead with particularity any such action or what Siemens Energy "obtained as a consequence."  *Ziemba*, 256 F.3d at 1202. Any assertion that Secure was "fraudulently induced" to make project investments also fails to support Secure's claim for the added reason that the record shows that its project investments occurred *before* the October 2012 meeting (and before the 2012 LSA) and thus could not possibly have been "induced" by the alleged omission, which had not yet occurred.  DN 149-22 at 8 [RFA No. 21]; *see* DN 207 at 8-9 (explaining that invoices pre-dated 2012 LSA except a few, which were for vendors already retained pre-2012 LSA); *see* DN 169-2 at 14-18; PPX 144-48, DN 207-1 (PTX 183 and 184); DN 149-2 at 468:8-469:21.

at *9-10 (citation and internal quotations omitted).[14]  In this case, the relationship between the parties is neither confidential, nor one of trust, nor one in which Siemens Energy owed fiduciary duties to Secure. Rather, as the Eleventh Circuit determined, Siemens Energy's duties to Secure were laid out in commercial contracts. Apdx. A at 36-37. The parties managed their relationship at every step, by negotiating new agreements to close out old ones and executing new fully integrated licenses in response to Secure's shifting plans. DN 149-22 at 5-7 [RFA Nos. 10-15, 17-20]. Secure's principal agreed he was a sophisticated businessperson with extensive experience negotiating commercial contracts, and throughout the parties' relationship, Secure also had its own attorney and consultants. *Id*. at 6 [RFA No. 14]; DN 149-2 at 173:17-179:22; DN 149-14 at 168:11-173:18, 175:15-176:22, 180:3-25. The undisputed facts thus "evince an arms-length transaction between equals, not a relationship of trust and confidence. Therefore, the alleged material omissions cannot support a fraudulent inducement claim." *Sokolow,* 2019 U.S. Dist. LEXIS 220849, at *9-12 (granting summary judgment; plaintiff failed to present disputed facts regarding existence of a fiduciary, confidential, or trust relationship at time of the parties' contract).

   c.   **A promise of future action fails to support fraud claims**

      Secure's fraud claims also are improperly based on a promise of future action. "[N]either an opinion nor a promise of future action (or an omission about a future event) supports a claim of fraud …." *Drilling Consultants, Inc. v. First Montauk Sec. Corp.* 2012 U.S. Dist. LEXIS 114250, at *13-14 (M.D. Fla. Aug. 14, 2012). It is undisputed that the

---

[14] At the pleading stage, this Court recognized that there generally is no duty to disclose in an arms-length transaction but noted that Secure might be able to prove that Siemens Energy voluntarily undertook to disclose information relating to the alleged equipment defects at the October 2012 meeting. DN 74 at 11.

alleged "omission" in this case was made when promising *future* action—to incorporate

lessons learned.  DN 149-9 at 364:16-365:15. That future promise (which was contingent

on future payment by Secure) thus fails to support fraud.[15]

### d.      Secure cannot prove lack of adequate legal remedies

Finally, Secure's Count V for fraud – rescission of 2012 LSA fails because Secure

cannot show the lack of an adequate legal remedy. Rescission is an equitable remedy

requiring the plaintiff to show, among other elements, that legal remedies are inadequate.

*Sokolow*, 2019 U.S. Dist. LEXIS 220849, at *14  (citing *Lustig v. Bear Stearns Residential*

*Mortg. Corp.*, 2010 U.S. Dist. LEXIS 151423, at *9 (S.D. Fla. Jan 13, 2010)). In this case,

Secure brought a fraud claim for damages based on the same allegations it uses to support

its fraud-rescission claim. Secure also brought a warranty claim seeking the same damages

as it seeks for fraud. Thus, Secure has an adequate legal remedy which precludes rescission."

*See id.* at *17 (summary judgment granted where plaintiff asserted damages for breach of

contract thus had adequate legal remedy "which independently precludes rescission.").

### C.      Count VI for Rescission-Lack of Consideration fails

Count VI—in which Secure seeks to rescind the 2007 ESA and all subsequent

agreements for lack of consideration—fails for at least five independent reasons. First, as

the Eleventh Circuit observed, Florida law does not recognize a claim for rescission based

on lack of consideration. Apdx. A at 37 (*citing Webb v. Kirkland*, 899 So. 2d. 344, 346

(Fla. Dist. Ct. App. 2005) ("With respect to recission, a court of equity will ordinarily

---

[15] Secure may argue that Siemens Energy omitted that incorporating lessons learned somehow would be impossible due to alleged defects, but "an omission about a future event" cannot form the basis for Secure's fraud claim, and there's no evidence Siemens Energy could not, or believed it could not, incorporate lessons learned if Secure paid for them. *Drilling Consultants*,  2012 U.S. Dist. LEXIS 114250, at *13-14.

rescind or cancel an instrument only for fraud, accident or mistake and not because of the mere want or failure of consideration" (internal quotation marks omitted))).

Second, on this equitable claim, as the Panel noted, there's no showing that "legal relief would be insufficient". *Id*.; *see also Sokolow*, 2019 U.S. Dist. LEXIS 220849, at *17.

Third, Count VI is time-barred. The statute of limitations under Florida law is four years for an action to rescind a contract.  Fla. Stat. § 95.11(3).  Secure filed its case in July 2016, more than eight years after executing the contract at the heart of this claim, the 2007 ESA (and almost six years after the 2010 LSA). DN 1-2 at 1; DN 63 at 2-3 [¶ 8].

Fourth, Count VI fails because the parties' contracts, in fact, *did have* consideration and Secure cannot prove otherwise. *See* DN 163 at 17-18. A promise, no matter how slight, qualifies as consideration for a contract if the promisor agrees to do something that he or she is not already obligated to do. *Crystal Colony Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 6 F. Supp. 3d 1295, 1299 (S.D. Fla. 2014). "The consideration required to support a contract need not be money or anything having monetary value; [it] may consist of either a benefit to the promisor or a detriment to the promisee." *Owings v. T-Mobile USA, Inc.,* 978 F. Supp. 2d 1215, 1220 (M.D. Fla. 2013) (internal quotation marks omitted). "To conclude that consideration is fair or unfair, rather than merely extant, is not the proper province of the court." *Diaz v. Rood*, 851 So. 2d 843, 846 (Fla. Dist. Ct. App. 2003).

Here, Secure received consideration under the parties' 2007 contract: (1) Siemens Energy agreed to and did deliver gasification equipment to Secure even though it was not obligated to do so before the parties' contract; (2) Secure concedes its financial statements in 2016 and 2017 (prepared after it initiated this litigation) value its Siemens Energy

gasification equipment in excess of $40M (DN 149-9 at 305:9-310:11); and (3) there is no evidence that the equipment was worthless when Secure purchased it in 2007 (and Siemens Energy's expert opined that they have substantial value). *See* DN 148-1 at 23-58; DN 163 at 17-18. The parties' 2010 and 2012 LSAs and their companion Completion Agreements also had consideration: These contracts were a detriment to Siemens Energy and benefitted Secure, who requested them because of its changing plans and inability to pay; Secure obtained extensions to pay (past due) license fees and extended performance guarantees. DN 149-22 at 4-7 [RFA Nos. 9-14, 17-20]; *see* DN 149-5–DN 149-7; DN 149-4 at 73-82.

Finally, in the 2010 Completion Agreement, the parties terminated the foundational contract, the 2007 LSA, that Secure seeks to rescind. As the Panel noted, Secure also waived all claims under the 2007 ESA. Apdx. A at 37; DN 149-2 at 281:7-286:10.

### D.    Secure's damages claims also fail because it cannot prove causation

Secure's claims for breach of implied warranty and fraud (Counts II and IV) fail for the additional and independent reason that Secure cannot present evidence that alleged design defects or Siemens Energy's alleged wrongdoing proximately caused it any harm. *Casey v. Welch*, 50 So. 2d 124, 124-25 (Fla. 1951) (per curiam) (reversing fraud finding; plaintiff could not prove damage and record was "devoid of evidence that plaintiff was injured" by alleged misrepresentations); *Plemmons v. Steelcase Inc*., 2007 U.S. Dist. LEXIS 22954, at *8-9, 16 (S.D.N.Y. Mar. 29, 2007) (breach of warranty claim requires proof that "the defect is the proximate cause of the accident.")

Secure's alleged damages are its lost project investments. Secure tries to tie these losses to the alleged defects and Siemens' Energy's conduct by asserting that the alleged

defects rendered the gasifiers unusable, thereby forcing Secure "to abandon the development, design and engineering" of its plant and preventing it from obtaining financing. DN 63 at 9-10 [¶¶ 34, 58]; DN 150-2 at 11.[16] However, Secure's gasifiers never operated, malfunctioned, or caused any harm; it never took them out of the crating, let alone installed or operated them. As a result, expert testimony would be required to show that the alleged lost investment or inability to obtain funding were reasonably certain to have followed from the allegedly defective equipment. That showing, in turn, requires an expert, or at a minimum, some other competent evidence. But Secure has no expert, there is no such evidence, and there is no genuine dispute of fact regarding causation. *See Aldon Industries, Inc. v. Don Myers & Associates, Inc.* 517 F.2d 188, 191-92 (5th Cir. 1975) ("Proof must show with reasonable certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of defendant's wrongful conduct."); *Mama Jo's, Inc. v. Sparta Ins. Co.*, 2018 U.S. Dist. LEXIS 201852, at *22 (S.D. Fla. June 11, 2018) ("While an expert is not necessary in all breach of contract cases, here the crucial question [of causation] is not one a lay witness can answer.")

What's more, causation is a factual impossibility. Secure concedes that it did not even "become aware of the material design defects . . . until March of 2016," which is *well after* Secure repeatedly failed to make license fee payments or obtain financing. DN 63 at

---

[16] Secure reduced the amount claimed under its "lost investment" theory from $46M to $3.9M which was allegedly paid to "companies for work performed in furtherance of [its] project development," and Secure also waived its claim for alleged lost equipment value from $40.2M to $0. DN 169 at 18 (theory confined to rescission claims); DN 207 at 4-5; *Kaw v. Sch. Bd. of Hillsborough Cty., Fla.*, 2009 U.S. Dist. LEXIS 62041, at *2 (MD Fla. 2009) ("Damages not requested in the pretrial statement are considered waived."). Secure also could not prove its "lost value" theory; it lacks an expert and the experience it would need to testify on value. *Morsch v. JP Morgan Chase Bank, N.A.*, 2018 WL 5830557, at *5–6 (M.D. Fla. 2018); DN 207 at 5.

19 [¶ 75]). Yet, Secure concedes its 2014 and 2015 financial statements (DN 164-2 at 35) show it "'incurred losses since inception'" and state that its "prior losses and other factors raise substantial doubt about the Company's ability to continue as a going concern." DN 218 at 13. Secure concedes it also was unable, and not in "any financial condition", to perform under *any* of parties' licenses, and never had "the necessary funding for any iteration of [its] project." *Id*. Given that it did not know of alleged defects while its business collapsed, Secure cannot prove causation. After it failed to pay license fees in 2015, Secure also declined Siemens Energy's 2016 offer to again extend the deadline and guarantees. *Id*.

Finally, the record establishes that Secure's failures were of its own making: (1) it's principal's checkered history with the Securities and Exchange Commission adversely impacted efforts to obtain funding;[17] (2) its discussions with potential financier SK failed because Secure decided of its own volition to reject SK's proposed contract;[18] and (3) the Department of Energy rejected its 2009 loan guarantee application due to deficient business and operational plans. DN 149-2 at 229:4-266:25; DN 164-2 at 1-15; DN 163 at 13-15. There is no causal connection to Siemens Energy's conduct for this reason as well.

## IV.    CONCLUSION

This Court and the Eleventh Circuit rejected Secure's case once and there are ample reasons to do so again. Siemens Energy respectfully requests that this Motion be granted.

Dated:  August 25, 2023.

---

[17] An administrative law judge in an SEC action found that Secure's principal, Jack Kenny, engaged in a scheme to defraud and breached fiduciary duties; the Eighth Circuit affirmed the findings. Secure disclosed these facts to potential investors, which Secure's principals conceded interfered with fundraising efforts. DN 179 at 11-16; 179-8, 179-9, DN 179-3 at 552:20-554:13; DN 179-6 at 100:23-101:24; DN 179-10.

[18] Kenny testified that Secure "walked away" from SK, which "left [Secure] at the altar" by introducing a $100M contingency late in deal negotiations. DN 149-2 at 327:7-10, 395:12-401:9; DN 149-9 at 328:6-333:9.

Respectfully submitted,

BY:  /s/    *Jonah D. Mitchell*
Jonah D. Mitchell, *admitted pro hac vice*
Adaline Hilgard, *admitted pro hac vice*
101 Second Street, Suite 1800
San Francisco, CA  94105-3659
Phone: (415) 543-8700
Facsimile: (415) 391-8269
E-Mail: jmitchell@reedsmith.com
            ahilgard@reedsmith.com

and

Robert W. Thielhelm, Jr.
Florida Bar No. 889679
**BAKER & HOSTETLER, LLP**
SunTrust Center, Suite 2300  .
200 South Orange Avenue
Orlando, FL  32801-3432
Phone: (407) 649-4000
Facsimile: (407) 841-0168
E-Mail: rthielhelm@bakerlaw.com

**Attorneys for Defendant &  Counterclaimant
Siemens Energy, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 25, 2023, a true and correct copy of the foregoing was submitted to the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following listed counsel:

Robert L. Devereux
**DANNA MCKITRICK, P.C.**
7701 Forsyth Blvd., Suite 800
St Louis, MO 63105
Telephone: (314) 726-1000
Fax: (314) 725-6592
Email: rdevereux@dmfirm.com
Email: jschmitt@dmfirm.com

Michael H. McGinley
**DECHERT LLP**
2929 Arch Street
Philadelphia, Pennsylvania 19104-2808
Phone: (215) 994-4000
Fax: (215) 994-2222
E-Mail: michael.mcginley@dechert.com

Anthony G. Simon
Jeremiah W. Nixon
**THE SIMON LAW FIRM, P.C.**
800 Market Street, Suite 1700
St. Louis, MO 63101
Phone: (314) 241-2929
Fax: (314) 241-2029
E-Mail: asimo@simonlawpc.com
E-Mail: jnixon@simonlawpc.com

Walter A. Ketcham , Jr.
**GROWER, KETCHAM, EIDE, TELAN & MELTZ, PA**
901 N Lake Destiny Rd., Suite 450
PO Box 538065
Orlando, FL 32853-8065
Telephone: (407) 423-9545
Fax: (407) 425-7104
Email: enotice@growerketcham.com

A copy was also served via U.S. Mail and e-mail:

Walter A. Ketcham, Jr.

**FISHER RUSHMER, P.A.**
200 E. Robinson St.. Suite 800
Orlando, FL  32751
Email:  wketcham@fisherlawfirm.com

DATED:  August 25, 2023.                    */s/ Jonah D. Mitchell*
                                            Jonah D. Mitchell.

# APPENDIX A

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11266

_____

MIDAMERICA C2L INCORPORATED,
a Nevada corporation,

Plaintiff-
Counter Defendant-
Appellant,

SECURE ENERGY, INC.,
a Nevada Corporation,

Plaintiff-Appellant,

*versus*

SIEMENS ENERGY INC.,
a Delaware corporation,

2                    Opinion of the Court                    20-11266

Defendant-

Counter Claimant-

Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 6:17-cv-00171-PGB-LRH

_____

Before Newsom, Branch, and Lagoa, Circuit Judges.

Lagoa, Circuit Judge:

This case is about a business relationship gone bad.  In 2006, Secure Energy, Inc.—with the intention of opening a coal gasification plant in Illinois—approached Siemens Energy, Inc., about purchasing some gasifiers and other related equipment.  By 2007, the parties had entered into a formal contract, under which Secure would buy the equipment on a payment plan and Siemens would continue to provide updates and repairs to the gasification reactors.

Two problems quickly arose.  First, the price of natural gas fell in 2009.  As a result, Secure had to change its business plan multiple times and could not keep up with its payments to Siemens.  Second, Siemens's gasification equipment began having problems,

as discovered by one of Siemens's other clients in 2010. By 2012, Siemens began implementing several substantial modifications to its gasifiers in order to get them working properly, but, because Secure had never gotten its plant up and running, Siemens left Secure out of the loop. In 2015, Siemens decided to exit the gasification market entirely, but promised to continue supporting its existing projects, including Secure's.

These problems created the perfect storm for litigation. Secure—never having opened, let alone used, its gasification equipment—was commercially failing. Secure still owed Siemens millions of dollars for the equipment and had just become aware that the equipment it purchased years earlier had issues. In 2016, after Siemens decided to leave the gasification market, Secure and its subsidiary MidAmerica C2L Incorporated[1] sued Siemens, bringing various fraud- and contract-based claims. Siemens—which was still owed some thirteen million dollars under the contract and which had given Secure multiple payment extensions on that amount—filed a counterclaim against Secure for breach of contract.

Years into the litigation, Secure sought leave to amend its complaint, which the district court denied due to its untimeliness. Later, the district court excluded Secure's expert witness, Dr. Herbert Kosstrin, for relying on an unreliable methodology, and granted summary judgment in Siemens's favor on each of Secure's

---

[1] For purposes of this opinion, we refer to MidAmerica as Secure unless otherwise expressly noted.

affirmative claims.  The case thus proceeded to trial only on Siemens's counterclaim.  Prior to trial, the district court excluded evidence Secure sought to introduce in support of its breach-of-contract affirmative defense.  The jury returned a full verdict in Siemens's favor on its counterclaim, and Secure timely appealed.

On appeal, we are asked to determine four discrete issues: (1) whether the district court abused its discretion in excluding Secure's expert witness; (2) whether the district court erred in entering summary judgment in Siemens's favor; (3) whether the district court abused its discretion in denying Secure leave to amend its complaint; and (4) whether the district court abused its discretion in excluding certain evidence at trial and afterwards denying Secure's motion for a new trial.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Secure was formed in 2006[2] for the purpose of developing and constructing a facility in Decatur, Illinois, to convert coal into synthetic natural gas using a process called coal gasification.[3]  To that end, Secure began shopping around for a Basic Engineering

---

[2] Secure's subsidiary, Secure Energy Decatur, LLC, was formed shortly after this time and was the original entity contracting with Siemens.

[3] Gasification converts carbonaceous, fossil-fuel based material (e.g., coal) into gas (e.g., synthetic natural gas) by feeding pulverized coal (called feedstock) into large pieces of equipment called gasifiers.  *See* Ronald W. Breault, *Gasification Processes Old and New: A Basic Review of the Major Technologies*, 3 *Energies* 216, 218 (2010), https://www.mdpi.com/1996-1073/3/2/216.

Design Package ("BEDP") and Product Design Package ("PDP") from a coal gasification technology provider, eventually contacting Siemens.  Lars Scott and Jack Kenny, the two founders of Secure, met with Rolf Rüsseler and Harry Morehead of Siemens.  During these meetings, Siemens represented to Secure that Secure was purchasing a proven technology from Siemens, as it started the equipment's design in the mid-1970s and it had over twenty years of experience in coal gasification.  Additionally, Siemens represented that its current 500-megawatt gasifiers—which Secure was interested in—employed a technologically advanced cooling-screen system that accepted a wide range of feedstock and could achieve "up to >99%" carbon conversion rates.  And Siemens had already sold the 500-megawatt gasifiers to one customer in China.

Impressed with these representations, Secure decided to use Siemens for its equipment and technology needs.  On July 24, 2007, Secure and Siemens entered into a "Memorandum of Understanding" memorializing the parties' intention for Secure to purchase from Siemens two 500-megawatt gasifiers, associated equipment, engineering services, and a process license.

On December 21, 2007, Secure and Siemens entered into a formal contract (the "2007 Contract") whereby Secure would purchase Siemens's products and services for €27,715,000 plus $1,717,000—in total, approximately $40 million.  The 2007 Contract and every subsequent contract at issue here included a merger clause, which stated that neither "party will be bound by any prior obligations, conditions, warranties or representations."  Secure

promptly paid to Siemens the $40 million called for in the 2007 Contract.

Secure and Siemens also entered into a licensing agreement (the "2007 LSA") whereby Secure licensed Siemens's technology for approximately €11.7 million. Secure was to pay the €11.7 million licensing fee pursuant to an agreed upon fee schedule within the 2007 LSA.

The burners—a core component of Siemens's gasifiers—were delivered to Secure in Decatur, Illinois, in March 2009. Secure alleges that the pins in the cooling screen of the burners were too short and out of specification, although Siemens disputes this characterization. However, Secure only became aware of this alleged defect during the litigation—it never actually opened or put into operation the Siemens gasifiers after it took possession of them.

The price of natural gas dropped precipitously in 2009; as a result, Secure abandoned its original plan of converting coal to natural gas and began planning to build a coal-to-gasoline gasification plant instead. But because the plot of land Secure had acquired in Decatur could not accommodate this change, Secure decided to move its plant to West Paducah, Kentucky.

Secure's new plans in Kentucky required no changes to the Siemens gasification equipment, and the parties continued their business relationship. On March 31, 2010, Secure and Siemens entered into a Completion Agreement (the "2010 Completion

Agreement"), which terminated the parties' previous agreements in the 2007 Contract and 2007 LSA, as well as a new License Agreement (the "2010 LSA"). The 2010 Completion Agreement also stipulated that Siemens had met its performance goals under the 2007 Contract and 2007 LSA and released both parties from *any claim* related to those contracts. In addition, the 2010 LSA included a warranty extension on the gasifiers (which would have otherwise expired in 2011) upon Secure's payment of a €1 million fee, but Secure never paid the fee. The 2010 LSA also set forth terms for paying the licensing fee under the agreement, requiring: (1) Secure to pay Siemens €300,000 at the "Contract Date"; (2) €700,000 within five business days of the date of "Closing of New Equity" or July 31, 2010, whichever was later; (3) €10.2 million upon "Financial Close," but no later than August 30, 2011 (unless otherwise agreed to by the parties); and (4) €1.2 million when "Acceptance" occurred, but no later than December 31, 2014.

At around the same time Siemens was working with Secure, Siemens sold five 500-megawatt burners to a client which installed the burners at its coal to polypropylene plant in China ("NCPP"). These burners were first used in October 2010. Immediately, there were problems. The burners that Siemens had used were having trouble converting the Chinese coal into synthetic gas. The pilot burner was also "unreliable" and had to be removed twenty-five times on two of the gasifiers at NCPP in the first two months. The cooling screens also had issues, with the flame from the burner hitting them at an awkward angle.

Siemens explains away these problems by referring to the fact that the Chinese client used below-grade coal in the gasifiers at NCPP and loaded the incorrect fuel source into the burners. And Siemens admits that some of the parts of the gasifiers required repair but maintains that none of the gasifiers were defective. In any event, it is beyond dispute that, from 2010 to 2012, NCPP experienced numerous problems and the Chinese client went forward and made "optimizations and modifications" at NCPP. At one point, the Chinese client sought payment from Siemens for the issues it corrected related to NCPP, and by 2014, the Chinese client had replaced its Siemens burners with burners from a Chinese engineering firm.

Internal Siemens documents from this time period identified the problems. In October 2012, Rüsseler sent an internal Siemens email in which he explained that the "message" to Secure should be to "scrap the equipment, we'll start over again." On November 13, 2012, Siemens circulated an internal memo discussing the needed improvements to the burners, which estimated that the improvements would take 8,520 engineering hours. At this point, Secure had changed its business plan again, this time planning a coal-to-methanol plant at its Kentucky location.

On July 18, 2012, Secure and Siemens entered into a new Completion Agreement ("2012 Contract") and License Agreement ("2012 LSA") (collectively, "2012 Contracts"). The 2012 LSA included a merger clause that terminated all prior agreements. Pursuant to the 2012 LSA, Secure was required to pay Siemens a €12.48

million licensing fee.  The 2012 LSA recognized that Secure had already paid €300,000 in 2010, meaning that Secure still owed Siemens €12.18 million under the 2012 LSA.  Secure was required to pay the remaining €12.18 million as follows:  (1) €10.932 million upon "Financial Close"—defined as the moment "construction financing for the [p]roject ha[d] been arranged," i.e., once Secure had secured financing—but no later than February 28, 2013; and (2) €1.248 million when "Acceptance" occurred—defined by the parties as once specified reliability and performance tests were successfully completed and demonstrated— but no later than December 31, 2015.  The 2012 LSA also provided that, in the event Secure fails to make payment when due, and after the 15-business-day cure period, Siemens would have the right to terminate the agreement and Secure would owe Siemens ninety-two percent of the licensing fee if Financial Close had not yet occurred.  The 2012 Contracts substituted MidAmerica, Secure's subsidiary, for Secure as the contracting party.

Not long thereafter, Secure sought to obtain a construction and financing contract for its plant from a company called SK Engineering & Construction.  Siemens agreed to meet with SK and Secure to help Secure acquire that agreement.  During the meeting, Siemens communicated with SK that Siemens would be implementing the improvements it learned at NCPP so long as Secure agreed to pay for them.  Siemens estimated that it would take around 8,500 engineering hours to complete.  In December 2012, however, Siemens suggested internally that incorporating these

changes would "tie up resources at a time when [Siemens] need[ed] them more urgently elsewhere" and that, when offering these changes to Secure, Siemens should make "the price and schedule for this change order . . . so unattractive that [Secure] cannot draw th[e] option."

In early 2013, Siemens was in the process of pitching to a new client—the Texas Clean Energy Project ("TCEP"). Because it used a Chinese contractor, TCEP was aware of the problems the Siemens's burners had at NCPP and asked for reassurance that there were solutions to the problems that occurred with the equipment there. Siemens responded that there were, detailing twenty-eight changes to the design—the design that Secure still had—that would be implemented before the TCEP project got underway.

Secure did not make the license fee payment that came due on February 28, 2013. At the time, the Siemens gasifiers Secure purchased had not been opened. And by now, Secure's business was crumbling, with internal documents indicating "substantial doubt about [Secure's] ability to continue as a going concern." Indeed, as of December 2012, Secure admitted that, "[i]n order to continue the coal gasification project, [it must] obtain grants, debt financing or additional equity investment."

In May 2014, Secure emailed Siemens asking when Secure could expect an updated BEDP and asking about the viability of its equipment. Internally, Siemens stated that "very little to nothing can be re-used [sic] and we would have to start from scratch."

By March 2015, Secure stopped making payroll payments to its employees. In July 2015, Secure advised Siemens that there might be "new life for [its] project," as SK had introduced Secure to a group in Houston that were interested in partnering with it on the Kentucky plant. But Secure was never able to obtain the necessary financing for a coal-to-fertilizer plant at the Kentucky site that it hoped would give it that new life. Secure then missed the December 2015 licensing fee payment due to Siemens under the 2012 LSA. By the end of 2015, Secure had not paid any of the licensing fees under the 2012 Contracts, except for the down payment, and it had suspended its business operations.

At the same time, the market constraints that were squeezing Secure had the same effect on Siemens. By mid-2015, Siemens decided to exit the gasification market. On a February 2, 2016, call between Secure and Siemens, Siemens told them of its decision. Secure interpreted the call as an anticipatory repudiation of the contract—i.e., Secure believed that Siemens was communicating it would not honor the contract.

On February 11, 2016, Secure demanded recission of the 2007 Contract and the return of all monies paid by Secure to Siemens pursuant to that contract. On February 17, 2016, Siemens informed Secure that Siemens would not violate any contractual obligation even though Siemens was closing its coal gasification business.

In March 2016, Siemens proposed extending the license fee payment deadline and the deadline for completing "performance

tests." Secure rejected the offer, so Siemens revoked it and demanded payment of the approximately €11.5 million termination fee owed pursuant to the 2012 LSA.

Secure filed suit against Siemens in July 2016, in Illinois state court. Siemens removed the case to federal court, and the case was transferred to the Middle District of Florida. Secure amended its complaint on April 21, 2017. Secure brought six counts: (1) breach of contract; (2) breach of warranty of fitness; (3) fraudulent misrepresentation by Siemens as to support of the project; (4) fraudulent misrepresentation for failure to disclose defects[4]; (5) recission for fraud, and (6) recission for lack of consideration. All in all, Secure sought approximately $86 million in damages—$40 million for the loss of value of the equipment and technology it purchased and $46 million for its expenses designing and engineering its plants—and claimed that Siemens anticipatorily repudiated by exiting the gasification market. Siemens answered and asserted a counterclaim for breach of contract, seeking payment of the termination fee owed under the 2012 LSA plus interest. Secure filed a reply to Siemens's counterclaim which asserted various affirmative defenses, including that Siemens "materially breached the terms and conditions" of the 2012 LSA.

Secure voluntarily dismissed its fraudulent misrepresentation claim for support of project. In an order on Siemens's motion

---

[4] The fraudulent misrepresentation claim for Siemens's alleged failure to disclose design defects was voluntarily dismissed.

for partial dismissal, the district court determined that Secure's rescission for lack of consideration claim was limited to misrepresentations and omissions following March 31, 2010 (the date the parties entered into the 2010 Contract) because the 2010 Contract waived and released all previous claims.

The litigation moved into discovery. Over a year and a half after the deadline to amend pleadings had passed—and just two weeks before the close of fact discovery—Secure asked the district court for leave to amend its complaint so that it could plead new facts and alternative legal theories of recovery. Secure based its motion exclusively on Federal Rule of Civil Procedure 15, concerning leave to amend, but did not address Federal Rule of Civil Procedure 16, which concerns modifications to scheduling orders. The magistrate judge denied the motion. The magistrate judge explained that the motion was brought under the wrong rule, noting that Secure failed to address the requirements of Rule 16(b)(4), and concluded that Secure had not demonstrated good cause to support belated amendment of the complaint. On February 5, 2019, Secure moved to continue the trial date in order to file an amended complaint. That motion was also denied for failure to provide good cause. After summary judgment was entered in Siemens's favor on Secure's affirmative claims, Secure renewed its motion to continue the trial and amend its complaint. And again, its motion was denied.

Because Secure's claims were premised in large part on defects in the BEDP and the gasification burners, it retained an expert,

Dr. Herbert Kosstrin, to testify as to their defective nature. Dr. Kosstrin was prepared to testify that (1) Siemens's BEDP and gasification equipment were defective; and (2) their defective nature prevented Secure from obtaining financing to complete their plants; and (3) the gasification equipment was worthless except for scrap value. Siemens moved to exclude Dr. Kosstrin under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), arguing that he did not inspect the equipment purchased by Secure, that he utilized an unreliable methodology, and that his testimony would be unhelpful to the jury. The district court granted the motion and excluded Dr. Kosstrin's expert opinion and testimony. In its order, the district court explained that Dr. Kosstrin's opinion was not based on any reliable methodology, e.g., by testing or conducting computer modeling on the equipment; was gleaned exclusively from internal Siemens documents that the jury could view itself; did not adequately compare the Secure project to the NCPP project, including because his comparison lacked sufficient analysis and he failed to consider the data regarding the coal used at NCPP; and that his conclusions consisted entirely of his own *ipse dixit*.

The district court also excluded Dr. Kosstrin's opinion regarding the value of the equipment because it found he lacked the requisite qualification to testify as an expert on the value of the equipment and he never conducted an appraisal analysis. Following the exclusion of Dr. Kosstrin, the district court took up the parties' cross motions for summary judgment. The district court denied Secure's motion for summary judgment. The district court

granted Siemens's motion for summary judgment in part and dismissed all of Secure's affirmative claims against Siemens.  The district court held that four of the claims—breach of implied warranty, fraudulent misrepresentation, recission-fraud, and recission-lack of consideration—were premised on the "same 'material design defects' allegations" and that, because Secure had no expert to testify that the gasification equipment was in fact defective, Secure had no evidence to support these claims.

With respect to Secure's breach of contract claim, the district court held that Secure's breach of contract claim was limited to the repudiation theory it alleged in its Complaint and that Secure failed to prove that its damages were the direct and proximate result of Siemens's alleged conduct to support that theory of liability. The district court denied Siemens's motion for summary judgment on Siemens's counterclaim.

Following the summary judgment orders, the case proceeded to trial only on Siemens's counterclaim for breach of contract, premised on the 2012 LSA.  Prior to trial, Siemens filed a motion in limine seeking to exclude: (1) nonpleaded, dismissed, released, or rejected claims including alleged defects, misrepresentations, fraudulent concealments, and any theory that Secure is excused from nonperformance of the 2012 LSA except for the anticipatory repudiation theory; (2) evidence concerning alleged problems at the NCPP plant; and (3) evidence related to the alleged failure to inform or provide improvements under the 2012 LSA; as well as other evidence that Siemens argued was irrelevant to its

counterclaim and Secure's defenses.  The district court granted Siemens's motion, thereby limiting Secure's affirmative defense that Siemens breached the 2012 LSA to Secure's anticipatory repudiation theory.

At the conclusion of trial, Secure made a motion for judgment as a matter of law—arguing that the evidence demonstrated that Siemens repudiated the 2012 LSA and that Secure did not breach the agreement.  The district court denied the motion.

The jury returned its verdict on March 4, 2020, in which it rejected Secure's anticipatory repudiation defense and awarded Siemens $13,200,395.50 in damages.  After the jury verdict, Secure renewed its motion for judgment as a matter of law and, in the alternative moved for a new trial because, among other reasons, the district court excluded evidence that Siemens failed to perform under the 2012 LSA.  The district court denied both motions and held, with respect to the exclusion of evidence related to Siemens' alleged breach, that Secure's new defense of an alleged breach unrelated to anticipatory repudiation was untimely and failed to articulate a material breach.  Secure filed this timely appeal.

## II.    STANDARDS OF REVIEW

We review for abuse of discretion a district court's decisions regarding the admissibility of expert testimony.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43 (1997); *accord United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) ("This Court has uniformly applied the deferential abuse-of-discretion review that

*Joiner* mandates."). We will find an abuse of discretion only if the district court's ruling was "manifestly erroneous." *Joiner*, 522 U.S. at 142 (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 658 (1878)); *Frazier*, 387 F.3d at 1258. A district court of course abuses its discretion when it applies the wrong legal standard. *Frazier*, 387 F.3d at 1259.

We review an order granting summary judgment *de novo*, applying the same legal standards as the district court. *Amy v. Carnival Corp.*, 961 F.3d 1303, 1308 (11th Cir. 2020). We view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in his favor. *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009) (quoting *Haves*, 52 F.3d at 921); Fed. R. Civ. P. 56(a)).

We review a district court's denial of a motion for a new trial for abuse of discretion. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1255 (11th Cir. 2016). "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312–13 (11th Cir. 2013) (quoting *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1200 n. 16 (11th Cir.2009)). Relatedly, we review the district court's grant of a motion in limine for abuse of discretion. *Cabello v. Fernandez-Larios*, 402 F.3d

1148, 1161 (11th Cir. 2005) (per curiam).  Under the abuse-of-dis-cretion standard, we may reverse a decision of the district court only if the court applies an incorrect legal standard, follows improper procedures in making its determination, or makes findings of fact that are clearly erroneous.  *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1311 (11th Cir. 2019).  And, a "district court has wide discretion in determining the relevance of evidence produced at trial."  *Cabello*, 402 F.3d at 1161.  Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, . . . undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

## III.  ANALYSIS

On appeal, Secure contends that the district court erred in: (1) excluding Dr. Kosstrin's testimony; (2) granting summary judgment; (3) denying its requests to file an amended complaint; and (4) denying Secure's motion for a new trial on the grounds that Secure was barred from presenting evidence that Siemens breached the 2012 LSA.  We address each argument in turn.

### A.  Did the district court err in excluding Dr. Kosstrin?

Our analysis regarding the admissibility of expert testimony begins with Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other special-ized knowledge will help the trier of fact to under-stand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

As explained by the Supreme Court, the purpose of the ex-pert admissibility rules is to enlist the federal courts as "gatekeep-ers" tasked with screening out "speculative" and "unreliable expert testimony." *Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1335 (11th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993)). In this Circuit, we have distilled the expert admissibil-ity inquiry into the following three factors:

(1) the expert is qualified to testify competently re-garding the matters he intends to address;

(2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and

(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized ex-pertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). We have also noted that "[w]hile

there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)).

Here, the district court rested its exclusion of Dr. Kosstrin's opinions on the qualifications and reliability prongs.  Regarding an expert's qualifications, we have explained that:

> we observe that experts may be qualified in various ways.  While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status.  In fact, the plain language of Rule 702 makes this clear: expert status may be based on "knowledge, skill, *experience,* training, or education." (emphasis added).  The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 advisory committee's note (2000 amends.).

> Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express.  As we observed in *Quiet Technology,* "while an expert's overwhelming qualifications may bear on the reliability of his proffered

testimony, they are by no means a guarantor of relia-
bility. . . . [O]ur caselaw plainly establishes that one
may be considered an expert but still offer unreliable
testimony." 326 F.3d at 1341–42. Quite simply, un-
der Rule 702, the *reliability* criterion remains a dis-
crete, independent, and important requirement for
admissibility.

*Id.* at 1260–61 (alterations in original).

As to the reliability prong, we have noted that "[r]ulings on
admissibility under *Daubert* inherently require the trial court to
conduct an exacting analysis of the proffered expert's methodol-
ogy." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257
(11th Cir. 2002). The Supreme Court has identified a number of
factors for courts to consider in conducting that analysis, including:
(1) whether the theory or technique can be, and has been, tested;
(2) whether the theory or technique has been subjected to peer re-
view and publication; (3) the known or potential rate of error; and
(4) whether the theory has attained general acceptance in the rele-
vant scientific community. *See Daubert*, 509 U.S. at 593–94. Im-
portantly, "nothing in either *Daubert* or the Federal Rules of Evi-
dence requires a district court to admit opinion evidence that is
connected to existing data only by the *ipse dixit* of the expert," and
the "court may conclude that there is simply too great an analytical
gap between the data and the opinion proffered." *Joiner*, 522 U.S.
at 146.

In this case, Secure retained Dr. Kosstrin to testify as to three
issues: (1) "the defects in the Siemens Equipment and

Technology—as evidenced by Siemens's first test of its designs at NCPP—prevented Appellants' gasifiers from meeting their contractually-guaranteed performance"; (2) "the defects prevented [Secure] from obtaining financing for their project"; and (3) "in light of the defects, the Equipment and Technology have only scrap value."

Dr. Kosstrin, who holds a Ph.D. in Mechanical and Aerospace Engineering from Cornell University, has forty years of experience in the alternative energy field, including alternative fuels. In preparing his testimony and reaching his conclusions, he reviewed a number of documents that Siemens produced in discovery, including documents related to the design of the gasifiers.  In his report, Dr. Kosstrin makes clear that this is *all* he reviewed, stating "the basis for this opinion is a review of exhibits and information concerning the NCPP plant's operations up to the signing of the 2012 [LSA]."

Dr. Kosstrin's methodology was as follows.  Because Siemens had shipped nearly identical burners to their Chinese client at NCPP, Dr. Kosstrin hypothesized that, if those burners were experiencing problems, then the Secure burners would as well.  His report thus detailed the design of the NCPP burners, explained the problems experienced at NCPP, and stated that Secure would have experienced the same problems with its Siemens burners, if Secure had ever opened and used them.

The district court excluded Dr. Kosstrin's expert testimony, and in its order, identified a number of problems with Dr.

Kosstrin's testimony: (1) "Dr. Kosstrin did not perform any testing on the Secure equipment, because it was never installed"; (2) "Dr. Kosstrin did not conduct any computer modeling or simulations of the Secure equipment's performance . . . , and he did not communicate with anyone involved in the NCPP plant to determine why they made changes to the equipment"; (3) Dr. Kosstrin's expert report contained "no opinions on how the coal at the NCPP plant compared to the design coal for the Secure project"—i.e., while acknowledging that the NCPP plant used a grade of coal that was outside the range specified by Siemens in the contract with NCPP, Dr. Kosstrin did not account for how this might affect the performance of the burners; (4) Dr. Kosstrin did not conduct an individual cost analysis for the hypothetical corrective measures and could not say whether the modifications were inexpensive; (5) Dr. Kosstrin knew that the Chinese operators ran the gasifier at below minimum load but "did not perform an analysis to determine whether NCPP was complying with the minimum load case, or the impact on operations"; (6) Dr. Kosstrin "did not consider alternative designs that Siemens should have employed"; and (7) he failed "to compare the Secure BEDP *to any other BEDP for coal gasification.*" (emphasis added).  In short, the district court excluded Dr. Kosstrin's testimony as to design defects because he did not run any analysis on the equipment at issue and compared the equipment to the NCPP equipment in a manner that failed to account for two variables that Siemens listed *in the contract* as causing problems with the burners.

As to the third issue on which Dr. Kosstrin sought to testify—that the equipment had only "scrap value"—the district court found that Dr. Kosstrin lacked the requisite qualifications to testify on the subject, noting that Kosstrin is "not a certified appraiser" and "has never performed an appraisal analysis."

Under our deferential standard of review, we cannot conclude that the district court abused its discretion in excluding Dr. Kosstrin's testimony.  Our caselaw makes clear that, in order for a methodology to be reliable, the expert must be able to adequately explain how the data he relied on led him to his conclusions.  In a case such as this one—where the expert notes that many factors could have contributed to the defect at issue—this means the expert must be able to explain his consideration of the other alternative causes.  *See, e.g.*, *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (per curiam) (noting that an expert "need not rule out all possible alternative causes," but "must at least consider other factors that could have been the sole cause of the plaintiff's injury"). Caselaw on this point is legion.

*Frazier* is one such case.  There, the expert was prepared to testify as to the transfer of hairs and bodily fluids during a sexual assault.  387 F.3d at 1252.  But the expert "offered precious little in the way of a reliable foundation or basis for his opinion." *Id.* at 1265.  While the expert was eminently qualified to testify and formed his opinion based on his experience in the field, we affirmed the exclusion of his testimony because he never explained *how* he was able to reach his opinion.  *Id.* Because he did not so explain,

we said that "it would be very difficult indeed for the district court (or for that matter the jury) to make even an informed assessment, let alone to verify" that the opinion was reliable. *Id.* We reemphasized that "it remained the burden of the proponent of this testimony to explain how that experience led to the conclusion he reached." *Id.*

*Hughes v. Kia Motors Corp.*, 766 F.3d 1317 (11th Cir. 2014), is another such example. In *Hughes*, the expert sought to testify that the plaintiff would not have sustained a fatal injury had her automobile been equipped with a "shut-off switch," claiming to have reached this conclusion "based on the scientific method" but "without further explaining how he tested his hypothesis to support his conclusions." *Id.* at 1329–30. Relying on *Frazier*, we concluded that the district court did not abuse its discretion in excluding the expert's testimony. *Id.* at 1329. And we noted that the expert was unable to account for other factors that contributed to the death, such as the impact of the semi-truck, admitting that he lacked sufficient information to rule out *any* other causes. *Id.* at 1330.

Both cases hold obvious relevance to the issue presented. In both *Frazier* and *Hughes*, we affirmed the exclusion of expert evidence because the proponent of that testimony was unable to link the expert's methodology—or lack thereof—to his conclusions. The same is true here. The district court concluded that Dr. Kosstrin was unable to adequately explain *how* he reached his conclusions other than by pointing to the NCPP plant—which, as

already mentioned, had a slew of additional variables not present in the Secure situation. As we have previously stated, "[s]omething [does not] become 'scientific knowledge' just because [it is] uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were derived by the scientific method be deemed conclusive." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (quoting *Daubert*, 43 F.3d at 1315–16). Indeed, the "trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citing *Daubert*, 43 F.3d at 1319). Here, Dr. Kosstrin provided nothing but his word and own *ipse dixit*. He pointed to the NCPP plant and said, without any verifiable methodology or consideration of the factors unique to that plant, that Secure would have experienced the same problems. The district court thus did not abuse its discretion by excluding his testimony.

The same is also true of the district court's decision to exclude Dr. Kosstrin's testimony related to the value of the burners. Even setting aside the district court's ruling as to qualifications on this issue, Dr. Kosstrin's valuation of the gasifiers was based exclusively on his conclusion that the gasifiers were defective. Because that opinion was unreliable, his opinion as to value is also necessarily so.

## B. Did the district court err in granting summary judgment?

As noted above, the district court entered summary judgment in Siemens's favor on each of Secure's claims against it.

Before analyzing the claims on a count-by-count basis, however, two preliminary issues bear mentioning.

First, the parties have both waived any arguments regarding which state's law should apply.  In the district court, the parties disputed whether the law of Kentucky, Missouri, or Florida should apply to the non-contract claims.[5]  In the district court's order granting summary judgment, the court applied Florida law to each of the non-contract claims.  And on appeal, neither party argues that the district court erred in doing so.

Choice of law is not jurisdictional. *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 778 (1984) ("The question of the applicability of New Hampshire's statute of limitations to claims for out-of-state damages presents itself in the course of litigation only after jurisdiction over respondent is established, and we do not think that such choice of law concerns should complicate or distort the jurisdictional inquiry.").  And, as such, it is waivable if the parties abandon the issue on appeal.  *See Mesa Air Grp., Inc. v. Delta Air Lines, Inc.,* 573 F.3d 1124, 1128 (11th Cir. 2009) (finding that where a party had failed to present a choice-of-law issue to the trial court, the issue was waived on appeal).  Accordingly, we apply Florida law to all of the non-contract claims.

Second, the district court granted summary judgment against Secure on four of its claims—breach of implied warranty of

---

[5] There is no dispute that New York law applies to the contract claims.

fitness, fraudulent misrepresentation, recission-fraud, and recission-lack of consideration—based solely on the theory that, because these claims were premised on a design defect, Secure needed an expert witness to testify as to the defect. And because Dr. Kosstrin had been excluded—properly, as we have already concluded—Secure had no such expert testimony. The district court, however, did not identify a single case holding that a plaintiff is required to present expert testimony to bring a claim for fraud or breach of implied warranty. Instead, the district court borrowed language from cases discussing the causation element in *negligence* and *strict liability* actions and applied it here. For example, the district court cited *Small v. Amgen, Inc.*, 723 F. App'x 722, 726 (11th Cir. 2018), an unpublished products liability case from this Court, for the proposition that "in complex cases where a jury is asked to assess complex medical or scientific issues outside the scope of a layperson's knowledge, an expert's testimony is required." In doing so, the district court ignored the first clause of the sentence stating "[r]egarding discovery and proof of causation." Indeed, each of the cases cited by the district court (and Siemens) were focused *only* on the element of causation in tort suits.

In *Lucas v. Firestone Tire & Rubber Co.*, 458 F. 2d 495, 497 (5th Cir. 1972),[6] we were confronted head-on with the task of

---

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit prior to October 1, 1981).

"mak[ing] the initial determination as to the state of Florida law governing breach of implied warranty cases as that law applies to the question presented, i.e., whether plaintiff must introduce the testimony of an expert that the [product] was defective." We answered that question in the negative: "There is no burden on plaintiff to prove a specific defect by an expert witness as distinguished from other proof. The fact of a malfunction and also of a defect may be proven by direct or circumstantial evidence." *Id.* We are aware of no case post-dating *Lucas* that stands for the contrary position, and neither party has directed our attention to one. As such, we apply the rule of *Lucas* and hold that Florida law does not require plaintiffs in contract cases to prove the defective nature of the product at issue with expert testimony.

Although the district court's reason for granting summary judgment was incorrect, we can, of course, affirm on any basis supported by the record. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001). We thus will analyze each of Secure's claims to determine whether the district court correctly granted summary judgment.

### 1. *Count 1: Anticipatory Repudiation*

The parties agree that New York law governs the contract claims in this case, including Secure's anticipatory repudiation claim. Under New York law, "[a]nticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

An anticipatory breach of contract—also known as an anticipatory repudiation—"can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach."

*Princes Point LLC v. Muss Dev. L.L.C.*, 87 N.E.3d 121, 133 (N.Y. 2017) (quoting *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 659 (N.Y. 1998). For an anticipatory repudiation to occur, "the expression of intent not to perform by the repudiator must be 'positive and unequivocal.'" *Id.* (quoting *Tenavision, Inc. v. Neuman*, 379 N.E.2d 1166, 1168 (N.Y. 1978)); *see also Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 211 A.D. 2d 262, 267 (N.Y. App. Div. 1995) (requiring a "definite and final communication of the intention to forego performance before the anticipated breach may be the subject of legal action"). "Mere expression of difficulty in tendering the required performance, for example, is not tantamount to a renunciation of the contract." *Rachmani*, 211 A.D. at 267.

While an anticipatory breach obviates the need for the nonbreaching party to tender performance, the nonbreaching party must nonetheless demonstrate that it was "ready, willing[,] and able to perform its obligations under the contract" at the time its performance would have been due in order to recover damages. *Inter-Power of N.Y. Inc. v. Niagara Mohawk Power Corp.*, 686

N.Y.S.2d 911, 913 (N.Y. App. Div. 1999); *accord Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d. Cir. 1990). This principle is merely an application of the general rule that the complaining party must demonstrate that the breach caused him injury; "[t]o do this he must prove that he intended to and was able to perform when his performance was due." *Scholle v. Cuban-Venezuelan Oil Voting Tr.*, 285 F.2d 318, 320 (2d Cir. 1960).

In addition, causation is an essential element of the claim. *See Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728, 731 (2d Cir. 1992). The plaintiff "must demonstrate that the damages were caused by and are 'directly traceable to the [defendant's] breach.'" *Id.* at 731 (alteration in original) (quoting *Kenford Co. v. County of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986)). Where the ultimate transaction would have failed, and where the plaintiff's claimed damages would have resulted even if no breach occurred, the plaintiff cannot prove that his damages resulted from the defendant's conduct. *See id.* (affirming the district court judgment because the plaintiff sought "to recover for a loss on a transaction separate from the transaction that gave rise to the breach").

Secure claims that Siemens anticipatorily breached by leaving the coal gasification market because, in doing so, Siemens demonstrated that it would not honor its obligations under the 2012 LSA. The district court identified two problems with the anticipatory repudiation claim: (1) that Secure could not prove causation, and (2) that Secure could not prove it was ready, willing, and able to perform. We agree with the district court.

First, Secure is unable to prove causation. The district court determined that there was no evidence of a causal relationship between Siemens's anticipatory repudiation and the damages Secure sought because Secure, at the time of the alleged repudiation, had not obtained the necessary financing for its project. Furthermore, the district court noted that Secure's claimed damages from the "useless equipment and technology" would have resulted regardless of whether Siemens exited the gasification market. Secure responds by pointing to the fact that their proposed EPC financiers were troubled by the performance of the Siemens gasifiers. But there is an obvious problem with Secure's theory: the discussion with the financiers occurred in 2012 while the alleged repudiation occurred more than three years later, in February 2016. Secure has not presented any record evidence tying an inability to secure financing *after* Siemens's alleged breach and, as such, has no evidence of causation. We can affirm on this basis alone.

Second, the "ready, willing, and able" requirement also bars recovery. New York law requires the "plaintiff alleging an anticipatory breach of contract [to] show (1) that the defendant insisted upon terms not contained in the contract; and (2) that the plaintiff was 'ready, willing, and able to perform its own obligations under the contract when performance was due.'" *United States v. Hon*, 17 F.3d 21, 26 (2d Cir. 1994) (quoting *Towers Charter*, 894 F.2d at 523). The district court concluded that Secure was not ready, willing, and able to perform because Secure was in financial ruin and had missed multiple payments on the contract before the alleged

repudiation.  We agree.  For Secure to succeed on its anticipatory repudiation claim under New York law, Secure had to show that, at the time Siemens exited the gasification market (and thus, in Secure's telling, anticipatorily repudiated the contract), Secure was able to perform its own obligations.  But because Secure had already missed *multiple* payments under the contract at that time, Secure itself was already in breach, and thus *un*ready and *un*able to perform.  And finally, we note that when Siemens decided to exit the gasification market in 2015, it promised to continue supporting its existing projects, including Secure's.

Therefore, the district court did not err in granting summary judgment as to Count 1.

### 2. *Count 2: Breach of Implied Warranty*

Under New York law, a contract may explicitly disclaim any implied warranties.  To disclaim a warranty of fitness for purpose, it is sufficient for the contract to state that "[t]here are no warranties which extend beyond the description on the face hereof."  *See* N.Y. U.C.C. § 2–316(2).  If the written disclaimer is agreed-upon, "a party cannot justifiably rely on a representation that is specifically disclaimed in an agreement."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 785 (2d Cir. 2003); *see also, e.g.*, *Maltz v. Union Carbide Chems. & Plastics Co.*, 992 F. Supp. 286, 304 (S.D.N.Y. 1998) (relying on New York law and explaining that implied warranty of fitness for a particular purpose claims fail as matter of law if purchase agreement specifically disclaims them).

In this case, the 2012 LSA—as well as the initial 2007 Contract and the 2010 LSA—contained a disclaimer of any implied warranties, including for a particular purpose. Specifically, the contracts disclaimed, in all capital letters, "all other warranties and guarantees, whether statutory, expressed or implied, including all implied warranties of merchantability and fitness for purpose, and all warranties arising from course of dealing or usage of trade."

The district court denied Siemen's motion to dismiss this claim so that Secure could pursue a theory that the contract was unconscionable. Secure, however, failed to do so in the district court and does not attempt to do so here. Unable to show unconscionability, Secure's claim must fail. Because the contract disclaims any warranties of fitness, the breach of implied warranty claim was appropriately dismissed at summary judgment.

As discussed earlier, we apply Florida law to the remainder of Secure's claims. And as previously noted, Secure voluntarily dismissed Count 3, which asserted fraudulent inducement based on Siemens's alleged misrepresentations regarding its support for the project after it had already made the strategic decision to exit the gasification business, and is not a subject of this appeal.

3. *Count 4 & Count 5: Fraudulent Misrepresentation – Failure to Disclose Defects & Recission - Fraud*

Secure's two fraud claims—for which it seeks both damages and recission of the contract—are premised on the same theory: because Siemens was "aware of several material design defects in

the" gasifiers that were not discoverable by Secure and "had de-monstrably superior knowledge of the material defects," Siemens had a "duty to disclose to plaintiffs the existence of [the] material design defects." These fraud claims are thus premised solely on the notion that the gasifiers are, in fact, defective.

These claims fail because they are, in essence, simply a re-statement of Secure's contract and breach of warranty claims. Flor-ida's independent-tort doctrine requires a fraud claim to be "inde-pendent of a breach of contract claim"—i.e., for the "fraud allega-tions" to be "separate and distinct from defendants' performance under the contract." *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1031 (11th Cir. 2017). This is because a "breach of con-tract, alone, cannot constitute a cause of action in tort. . . . It is only when the breach of contract is attended by some additional con-duct which amounts to an independent tort that such a breach can constitute [a separate action in tort]." *Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.*, 482 So.2d 518, 519 (Fla. Dist. Ct. App. 1986); *ac-cord HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) (noting that the independent tort doc-trine "requires proof of facts separate and distinct from the breach of contract").

Florida courts routinely apply the independent tort doctrine to dismiss tort claims that are in fact founded on a contractual duty. In *Electronic Security Systems*, for example, a corporation entered into a contract with the Southern Bell telephone company for the placement of an advertisement in the yellow pages. 482 So. 2d at

518.  That contract had a limited liability provision that limited the corporation's remedy to liquidated damages.  *See id.* at 519.  When the advertisement did not appear in the directory, as contemplated by the contract, the corporation sued Southern Bell under both contract and tort theories.  *See id.*  The Florida appellate court summarily dismissed each of the corporation's tort claims under the independent tort doctrine, concluding that the only duty at issue in the case was contractual.  *See id.*

The same is true here.  Recall the relevant facts.  The fraud claims are not—and indeed could not—be premised on any fraudulent misrepresentation or omission that pre-dated the parties' contractual relationship.  This is because the 2010 Completion Agreement that the parties signed released both parties of any claims that pre-dated that agreement.  In other words, Secure's claim is that the fraud post-dated the *2010 Completion Agreement* and predated the *2012 Completion Agreement and 2012 LSA*.  The question thus becomes: before the 2012 Completion Agreement and 2012 LSA were signed, where did Siemens's duty of disclosure come from—was it the common law duty to disclose (as required for a fraud claim) or its contractual duty to perform (which would foreclose a fraud claim)?  The answer is obviously the latter.  Before the 2012 Completion Agreement and 2012 LSA were signed, Siemens's duty to share information with Secure, and to deliver conforming products, arose from the parties' 2010 and 2007 agreements.  This was the preliminary opinion formed by the district court at the motion to dismiss stage, and Secure has not presented evidence or legal

authority establishing an independent common-law duty to disclose since that time.  Siemens's performance guarantees and disclosure guarantees were duties it owed to Secure by contract.  And, even if Secure was fraudulently induced into the original 2007 agreement, Secure not only waived all fraud claims in the 2010 Contract, but it voluntarily dismissed its claim for fraudulent inducement during the course of this litigation.  Therefore, the district court did not err in granting summary judgment on this claim.

### 4. *Count 6: Recission-Lack of Consideration*

Turning to the last count, Florida law does not recognize the claim of recission based on lack of consideration.  *See Webb v. Kirkland*, 899 So. 2d 344, 346 (Fla. Dist. Ct. App. 2005) (noting that, "[w]ith respect to recission, a court of equity will ordinarily rescind or cancel an instrument only for fraud, accident or mistake and not because of the mere want or failure of consideration" (quoting *Rennolds v. Rennolds*, 312 So. 2d 538, 541 (Fla. Dist. Ct. App. 1975))). While the caselaw does hypothesize that a case *might* exist where lack of consideration should result in equitable, rather than legal, relief, Secure does not identify any case in which a Florida court has granted such relief.  And, in any event, Secure does not even attempt to show that legal relief would be insufficient here.

* * *

Accordingly, although the district court erred in its conclusion that Florida law requires expert testimony regarding the defective nature of a product in contract-based actions, we affirm the

district court's grant of summary judgment in Siemens's favor on Secure's claims.

## C.  Did the district court err in denying leave to amend?

Next, we address the district court's denials of Secure's motions for leave to amend.  As noted above, we "will only reverse a district court's denial of a motion to amend in instances in which the district court has clearly abused its discretion." *Henson v. Columbus Bank & Tr. Co.,* 770 F.2d 1566, 1574 (11th Cir. 1985).  Normally, to acquire permission to amend one's pleading, a litigant need only establish the relatively lenient standard of Rule 15(a), which states that leave shall be granted "when justice so requires." However, when a party moves to amend their complaint after the deadline for doing so set by the district court in its scheduling order, a litigant must also "show good cause why leave to amend the complaint should be granted." *Smith v. Sch. Bd. of Orange Cnty.,* 487 F.3d 1361, 1366 (11th Cir. 2007) (per curiam); *see also* Fed. R. Civ. P. 16(b); *Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1419 (11th Cir.1998) (per curiam) ("If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.").  We have recognized that Rule 16's "good cause standard precludes modification [of the scheduling order] unless the schedule cannot be met despite the diligence of the party seeking the extension." *See Sosa,* 133 F.3d at 1418 (quoting Fed. R. Civ. P. 16 advisory committee's note); *see also Johnson v. Mammoth*

*Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir. 1992) ("If [a] party was not diligent, the [good cause] inquiry should end.").

In this case, Secure filed its first amended complaint on April 21, 2017.  Following a scheduling conference, the district court entered a scheduling order on May 18, 2017, which set a deadline to amend pleadings for June 1, 2017.  Due to joint motions by the parties, the scheduling order was twice amended, but neither amendment changed the deadlines for amending pleadings.

Secure first moved for leave to amend its complaint on December 28, 2018—already more than a year after the deadline to amend pleadings had passed.  Secure sought leave to amend its complaint to add new factual allegations and legal theories of recovery, based largely on having finally completed its review of the large amount of documents produced to it by Siemens, as well as the depositions of current and former Siemens employees.  The magistrate judge denied that motion, noting that "the breadth of document production was directly related to the breadth of [Secure's] discovery requests, and Secure could not cry foul over getting what it asked for.  Nor did Secure identify any testimony from the depositions that related to the proposed amendments.  In addition, the magistrate judge noted that discovery had already been ongoing for two years, and Secure provided no explanation as to why it was unable to uncover the information sooner.  Finally, the magistrate judge noted that Secure had relied on the incorrect legal standard—Rule 15 instead of Rule 16.

40                    Opinion of the Court                    20-11266

Just a few days later, Secure moved to extend the trial date, in what it now admits was nothing but a ruse to amend its complaint. Because this was nothing more than an attempt to circumvent the court's previous order, it was summarily denied for essentially the same reasons.

Eventually, the district court granted Siemens's motion for summary judgment and denied Secure's motion for summary judgment. After those rulings—and more than two years after the deadline to amend pleadings had passed, and just a few weeks before trial was scheduled to commence—Secure moved for leave to amend its complaint a *third* time. The district court denied that request. In its denial, the district court forcefully reminded Secure that its litigation tactics "in this regard run dangerously close to sanctionable actions under [Federal Rule of Civil Procedure] 11."

We had occasion to apply Rule 16 to similar circumstances to these in *Smith v. School Board of Orange County*. There, the plaintiff sought leave to amend his complaint (after the deadline for doing so set by the scheduling order) because, in his view, discovery had "produced new violations of the [l]aw that must be addressed within the counts of the complaint." 487 F.3d at 1367 (alteration in original). The district court denied leave to amend because the defendant's motion for summary judgment had already been pending for a month and because the plaintiff failed to explain why the facts underlying the amendment were undiscoverable previously. *See id.* We affirmed, noting the "extreme untimeliness of

[the plaintiff's] motion and his lack of a complete showing of good cause." *Id.*

The district court's rulings here were not an abuse of discretion for the same reasons articulated in *Smith*. To satisfy Rule 16, a litigant must show that it could not meet the scheduling order "despite the diligence of the" litigant. *Sosa*, 133 F.3d at 1418. Here, Secure was seeking leave to replead already-dismissed claims and add new facts and theories of recovery, including a fraudulent inducement claim that Secure says it was able to plead "with greater particularity," more than a year after the deadline to amend pleadings had passed. But, as Secure admitted, the facts that formed the basis of its amendment were available "at the earliest just *prior* to the amendment deadline." (emphasis added). What Secure actually complains of, then, is not that the facts were *not* ascertainable, but that it took Secure too long to conduct discovery. That is not due diligence. And it is thus not good cause. We affirm the district court's denials of leave to amend.

### D. Did the district court err in denying Siemens's ability to present its affirmative defense?

The final issue for our consideration concerns the district court's order denying Secure's motion for a new trial and the district court's related ruling on Siemens's motion in limine. At issue is the scope of evidence Secure was permitted to present at trial. As noted previously, the only *affirmative* breach-of-contract claim that Secure advanced throughout the trial was an anticipatory repudiation claim. However, *defensively* (i.e., in response to

42                    Opinion of the Court                    20-11266

Siemens's breach of contract counterclaim regarding the 2012 LSA), Secure asserted a broader breach-of-contract based affirmative defense. As its eighth affirmative defense, Secure asserted that "[t]o the extent Siemens seeks recovery in contract, Siemens materially breached the terms and conditions of said contract and is entitled to no relief thereon."

In its motion in limine, Siemens sought clarification as to whether Secure would present evidence only of anticipatory repudiation or whether Secure would be permitted to present evidence of other alleged breaches of contract, which Secure had not yet raised in the litigation. Specifically, the other theories that Secure sought to introduce evidence of were: (1) Siemens breached the contracts by delivering defective gasification equipment; and (2) Siemens breached the contracts by failing to inform Secure of available improvements to the gasification equipment and technology.

The district court granted Siemens's motion in limine and excluded any evidence Secure sought to present regarding the above-listed theories of breach of contract. Thereafter, Secure re-raised this issue in its motion for a new trial. In granting Siemens's motion in limine and denying Secure's motion for a new trial, the district court gave a number of justifications for its decision to exclude this evidence. First, the district court noted that Secure was attempting to advance a trial-by-surprise strategy. This affirmative defense, and the facts related to that defense, were not pled. And Secure's own affirmative claim for breach of contract was premised exclusively on Siemens's alleged anticipatory repudiation.

Therefore, to allow Secure to present both a defense based on both anticipatory repudiation and other alleged breaches of contract was, in the eyes of the district court, fundamentally unfair to Siemens.  Second, the district court noted that the failure to provide notice of improvements was not a material breach of the contract at issue.  Third, and perhaps most importantly, the district court found that the evidence was not relevant, noting that Secure's new theories of breach of contract (very much unlike the anticipatory-repudiation theory) could not have excused its performance under Siemens's counterclaim because that counterclaim was only for the termination fee under the 2012 LSA.

On appeal, Secure asks for reversal based only on the second theory it sought to add as part of its affirmative defense, arguing that the district court erred when it excluded evidence related to Siemens's alleged breach in failing to notify Secure of improvements.

We find no abuse of discretion in the district court's ruling based on the relevant facts at issue here.  On July 3, 2012, the parties entered into the 2012 LSA.  That contract terminated and released all claims under the previous agreements between the parties and required Secure to make an approximately €12 million license fee payment.  Two provisions of that contract are at issue here.  First, under § 5.1, the 2012 LSA required Siemens to inform Secure "of any Improvements to the Technology which are developed or acquired and released for commercial application by Siemens," and Secure had an option to contract for those improvements for an

additional fee.  Second, under § 11.3.1, the 2012 LSA allowed Siemens to terminate the contract if Secure "fails to make any payment when due" provided Siemens provided Secure a fifteen-day cure period.  If Siemens exercised that option, the 2012 LSA provided that Secure would owe to Siemens ninety-two percent of the licensing fee (more than €11 million).  After Secure missed the deadline on its license fee payment, Siemens, in February 2016, offered Secure an extension on the deadline to pay.  After Secure refused that extension, Siemens exercised its option to terminate the contract and, after providing Secure a cure period, invoiced Secure for ninety-two percent of the licensing fee.

The issue is whether Siemens's alleged breach of § 5.1 might somehow excuse Secure's performance under § 11.3.1.  As an initial matter, we agree with the district court that Secure should not be permitted to raise this theory because Secure had not put Siemens on notice of it.  *See Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1350 (11th Cir. 2007) ("In deciding waiver issues under [Fed. R. Civ. P.] Rule 8(c), this Court [examines] whether a plaintiff had notice of the unpled defense or was prejudiced by the lack of notice.").  The Federal Rules of Civil Procedure make clear that a defendant raising an affirmative defense must "affirmatively state" it.  Fed. R. Civ. P. 8(c).  And this requires, at the minimum, putting the plaintiff on notice of the nature of the defense.  *See Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971) ("The purpose of [Fed. R. Civ. P. 8(c)] is to give the opposing party notice.").

In this case, Secure asserted a boilerplate affirmative defense, alleging only that Siemens's breached the contract without any identification of either the legal theory of breach or the contractual provision at issue. And when Siemens moved for summary judgment on its breach of contract counterclaim regarding the 2012 LSA, Secure responded to that motion without referencing § 5.1 of the contract. Given that Secure's theory of breach of contract, as shown by its affirmative claim and its response to Siemens's motions, was premised only on anticipatory repudiation, we cannot say that the district court abused its considerable discretion on evidentiary matters by excluding Secure's evidence relating to different breach-of-contract theories at trial.

Moreover, the district court was also correct that the defense was legally inadequate, and therefore irrelevant. "In diversity actions, we look to state law to inform the determination of whether a certain defense is 'any other matter constituting an avoidance or affirmative defense' under the federal rule." *Proctor*, 494 F.3d at 1350 (quoting *Troxler v. Owens-Illinois, Inc.*, 717 F.2d 530, 532 (11th Cir. 1983) . Here, New York law, which governs the contract claims, allows breach of contract to be raised as an affirmative defense. *See L & L Excavating Corp. v. Abcon Assocs., Inc.*, 594 N.Y.S.2d 818, 820 (N.Y. App. Div. 1993). However, a "party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (applying

New York Law).  In other words, "a non-breaching party's obliga-
tion to perform is excused only when there is a material breach by
the other party."  *AKTIV Assets LLC v. Centerbridge Partners,
L.P.*, No. 653259/2019, 2019 WL 7165927, at *7 (N.Y. Sup. Ct. Dec.
24, 2019) (citing *Smoley v. Carole Hochman Design Grp., Inc.*, 79
A.D.3d 540, 541 (1st Dep't 2010)).  And whether a breach is material
can be decided as a matter of law.  *See id.*; *Cont'l Ins. Co. v. RLI
Ins. Co.*, 555 N.Y.S.2d 325, 328 (N.Y. App. Div. 1990); *see also Frank
Felix Assocs.*, 111 F.3d at 289.  "[I]n determining whether [a] mate-
rial breach relieves non-breaching party's obligation to perform,
'the extent to which the agreement provides for performance with-
out delay' should be considered."  *Frank Felix Assocs.*, 111 F.3d at
289 (quoting Restatement (Second) of Contracts § 242(c)).

        The district court ruled that, as a matter of law, the breach
asserted by Secure was not material, in part because the 2012 LSA
did not impose any deadline on Siemens to provide notice of the
improvement and Secure had to pay for any improvements.  *Id.*
("In determining if [Siemens's] breach defeated the object of the
[2012 LSA], we must consider the special purpose of the contract"
and look to "the extent to which the injured party will be deprived
of the benefits [it] reasonably expected"(citing Restatement (Sec-
ond) of Contracts § 241)).  Moreover, the record evidence estab-
lishes that Siemens *did* provide Secure notice of design improve-
ments on October 31, 2012, during a call between SK, Siemens, and
Secure, in which Siemens indicated that it would include the design
improvements if Secure paid for the re-engineering.  At the time of

20-11266                Opinion of the Court                47

Secure's breach, then, Secure was already aware of the improve-
ments.  Secure, however, missed its licensing fee payments due in
February 2013 and December 2015 after Siemens provided notice
of the improvements.  Indeed, Secure stipulated that it was unable
to perform under the terms of the 2012 LSA and therefore could
not have paid for the improvements, as the district court held, even
if Secure had chosen to obtain them.  As such, the notice for those
improvements could not have been the reason Secure itself
breached the contract.

The district court was thus right to conclude that Siemens's
alleged breach—not providing notice of the improvements
*sooner*—was not material to the contract.  Because the contract did
not impose any time limitation on when notice of improvements
should be given, and because the record evidence established that
Secure had notice of the improvements before Secure failed to ten-
der payment, Siemens's breach was irrelevant to the claim pre-
sented.

## IV.   CONCLUSION

For the foregoing reasons, we affirm.

**AFFIRMED.**

# APPENDIX B

[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-11266

_____

MIDAMERICA C2L INCORPORATED,
a Nevada corporation,

Plaintiff-
Counter Defendant-
Appellant,

SECURE ENERGY, INC.,
a Nevada Corporation,

Plaintiff-Appellant,

*versus*

SIEMENS ENERGY INC.,
a Delaware corporation,

2                    Opinion of the Court                    20-11266

                                                        Defendant-

                                                        Counter Claimant-

                                                        Appellee.

————————————

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 6:17-cv-00171-PGB-LRH

————————————

Before NEWSOM, BRANCH, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

We GRANT IN PART Secure Energy, Inc.'s petition for
panel rehearing, vacate our prior opinion in this appeal, and substitute in its place the following opinion.

This case is about a business relationship gone bad. In 2006,
Secure Energy, Inc.—with the intention of opening a coal gasification plant in Illinois—approached Siemens Energy, Inc., about purchasing some gasifiers and other related equipment. By 2007, the
parties had entered into a formal contract, under which Secure
would buy the equipment on a payment plan and Siemens would
continue to provide updates and repairs to the gasification reactors.

Two problems quickly arose.  First, the price of natural gas fell in 2009.  As a result, Secure had to change its business plan multiple times and could not keep up with its payments to Siemens.  Second, Siemens's gasification equipment began having problems, as discovered by one of Siemens's other clients in 2010.  By 2012, Siemens began implementing several substantial modifications to its gasifiers in order to get them working properly, but, because Secure had never gotten its plant up and running, Siemens left Secure out of the loop.  In 2015, Siemens decided to exit the gasification market entirely, but promised to continue supporting its existing projects, including Secure's.

These problems created the perfect storm for litigation.  Secure—never having opened, let alone used, its gasification equipment—was commercially failing.  Secure still owed Siemens millions of dollars for the equipment and had just become aware that the equipment it purchased years earlier had issues.  In 2016, after Siemens decided to leave the gasification market, Secure and its subsidiary MidAmerica C2L Incorporated[1] sued Siemens, bringing various fraud- and contract-based claims.  Siemens—which was still owed some thirteen million dollars under the contract and which had given Secure multiple payment extensions on that amount—filed a counterclaim against Secure for breach of contract.

_____

[1] For purposes of this opinion, we refer to MidAmerica as Secure unless otherwise expressly noted.

Years into the litigation, Secure sought leave to amend its complaint, which the district court denied due to its untimeliness. Later, the district court excluded Secure's expert witness, Dr. Herbert Kosstrin, for relying on an unreliable methodology, and granted summary judgment in Siemens's favor on each of Secure's affirmative claims. The case thus proceeded to trial only on Siemens's counterclaim. Prior to trial, the district court excluded evidence Secure sought to introduce in support of its breach-of-contract affirmative defense. The jury returned a full verdict in Siemens's favor on its counterclaim, and Secure timely appealed.

On appeal, we are asked to determine four discrete issues: (1) whether the district court abused its discretion in excluding Secure's expert witness; (2) whether the district court erred in entering summary judgment in Siemens's favor; (3) whether the district court abused its discretion in denying Secure leave to amend its complaint; and (4) whether the district court abused its discretion in excluding certain evidence at trial and afterwards denying Secure's motion for a new trial.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Secure was formed in 2006[2] for the purpose of developing and constructing a facility in Decatur, Illinois, to convert coal into

---

[2] Secure's subsidiary, Secure Energy Decatur, LLC, was formed shortly after this time and was the original entity contracting with Siemens.

20-11266                 Opinion of the Court                 5

synthetic natural gas using a process called coal gasification.[3]  To that end, Secure began shopping around for a Basic Engineering Design Package ("BEDP") and Product Design Package ("PDP") from a coal gasification technology provider, eventually contacting Siemens.  Lars Scott and Jack Kenny, the two founders of Secure, met with Rolf Rüsseler and Harry Morehead of Siemens.  During these meetings, Siemens represented to Secure that Secure was purchasing a proven technology from Siemens, as it started the equipment's design in the mid-1970s and it had over twenty years of experience in coal gasification.  Additionally, Siemens represented that its current 500-megawatt gasifiers—which Secure was interested in—employed a technologically advanced cooling-screen system that accepted a wide range of feedstock and could achieve "up to >99%" carbon conversion rates.  And Siemens had already sold the 500-megawatt gasifiers to one customer in China.

Impressed with these representations, Secure decided to use Siemens for its equipment and technology needs.  On July 24, 2007, Secure and Siemens entered into a "Memorandum of Understanding" memorializing the parties' intention for Secure to purchase

──────────────

[3] Gasification converts carbonaceous, fossil-fuel based material (e.g., coal) into gas (e.g., synthetic natural gas) by feeding pulverized coal (called feedstock) into large pieces of equipment called gasifiers.  *See* Ronald W. Breault, *Gasification Processes Old and New: A Basic Review of the Major Technologies*, 3 *Energies* 216, 218 (2010), https://www.mdpi.com/1996-1073/3/2/216.

from Siemens two 500-megawatt gasifiers, associated equipment, engineering services, and a process license.

On December 21, 2007, Secure and Siemens entered into a formal contract (the "2007 Contract") whereby Secure would purchase Siemens's products and services for €27,715,000 plus $1,717,000—in total, approximately $40 million.  The 2007 Contract and every subsequent contract at issue here included a merger clause, which stated that neither "party will be bound by any prior obligations, conditions, warranties or representations."  Secure promptly paid to Siemens the $40 million called for in the 2007 Contract.

Secure and Siemens also entered into a licensing agreement (the "2007 LSA") whereby Secure licensed Siemens's technology for approximately €11.7 million.  Secure was to pay the €11.7 million licensing fee pursuant to an agreed upon fee schedule within the 2007 LSA.

The burners—a core component of Siemens's gasifiers—were delivered to Secure in Decatur, Illinois, in March 2009.  Secure alleges that the pins in the cooling screen of the burners were too short and out of specification, although Siemens disputes this characterization.  However, Secure only became aware of this alleged defect during the litigation—it never actually opened or put into operation the Siemens gasifiers after it took possession of them.

The price of natural gas dropped precipitously in 2009; as a result, Secure abandoned its original plan of converting coal to natural gas and began planning to build a coal-to-gasoline gasification plant instead. But because the plot of land Secure had acquired in Decatur could not accommodate this change, Secure decided to move its plant to West Paducah, Kentucky.

Secure's new plans in Kentucky required no changes to the Siemens gasification equipment, and the parties continued their business relationship. On March 31, 2010, Secure and Siemens entered into a Completion Agreement (the "2010 Completion Agreement"), which terminated the parties' previous agreements in the 2007 Contract and 2007 LSA, as well as a new License Agreement (the "2010 LSA"). The 2010 Completion Agreement also stipulated that Siemens had met its performance goals under the 2007 Contract and 2007 LSA and released both parties from *any claim* related to those contracts. In addition, the 2010 LSA included a warranty extension on the gasifiers (which would have otherwise expired in 2011) upon Secure's payment of a €1 million fee, but Secure never paid the fee. The 2010 LSA also set forth terms for paying the licensing fee under the agreement, requiring: (1) Secure to pay Siemens €300,000 at the "Contract Date"; (2) €700,000 within five business days of the date of "Closing of New Equity" or July 31, 2010, whichever was later; (3) €10.2 million upon "Financial Close," but no later than August 30, 2011 (unless otherwise agreed to by the parties); and (4) €1.2 million when "Acceptance" occurred, but no later than December 31, 2014.

At around the same time Siemens was working with Secure, Siemens sold five 500-megawatt burners to a client which installed the burners at its coal to polypropylene plant in China ("NCPP"). These burners were first used in October 2010. Immediately, there were problems. The burners that Siemens had used were having trouble converting the Chinese coal into synthetic gas. The pilot burner was also "unreliable" and had to be removed twenty-five times on two of the gasifiers at NCPP in the first two months. The cooling screens also had issues, with the flame from the burner hitting them at an awkward angle.

Siemens explains away these problems by referring to the fact that the Chinese client used below-grade coal in the gasifiers at NCPP and loaded the incorrect fuel source into the burners. And Siemens admits that some of the parts of the gasifiers required repair but maintains that none of the gasifiers were defective. In any event, it is beyond dispute that, from 2010 to 2012, NCPP experienced numerous problems and the Chinese client went forward and made "optimizations and modifications" at NCPP. At one point, the Chinese client sought payment from Siemens for the issues it corrected related to NCPP, and by 2014, the Chinese client had replaced its Siemens burners with burners from a Chinese engineering firm.

Internal Siemens documents from this time period identified the problems. In October 2012, Rüsseler sent an internal Siemens email in which he explained that the "message" to Secure should be to "scrap the equipment, we'll start over again." On November

13, 2012, Siemens circulated an internal memo discussing the needed improvements to the burners, which estimated that the improvements would take 8,520 engineering hours. At this point, Secure had changed its business plan again, this time planning a coal-to-methanol plant at its Kentucky location.

On July 18, 2012, Secure and Siemens entered into a new Completion Agreement ("2012 Contract") and License Agreement ("2012 LSA") (collectively, "2012 Contracts"). The 2012 LSA included a merger clause that terminated all prior agreements. Pursuant to the 2012 LSA, Secure was required to pay Siemens a €12.48 million licensing fee. The 2012 LSA recognized that Secure had already paid €300,000 in 2010, meaning that Secure still owed Siemens €12.18 million under the 2012 LSA. Secure was required to pay the remaining €12.18 million as follows: (1) €10.932 million upon "Financial Close"—defined as the moment "construction financing for the [p]roject ha[d] been arranged," i.e., once Secure had secured financing—but no later than February 28, 2013; and (2) €1.248 million when "Acceptance" occurred—defined by the parties as once specified reliability and performance tests were successfully completed and demonstrated— but no later than December 31, 2015. The 2012 LSA also provided that, in the event Secure fails to make payment when due, and after the 15-business-day cure period, Siemens would have the right to terminate the agreement and Secure would owe Siemens ninety-two percent of the licensing fee if Financial Close had not yet occurred. The 2012 Contracts

substituted MidAmerica, Secure's subsidiary, for Secure as the con-
tracting party.

Not long thereafter, Secure sought to obtain a construction
and financing contract for its plant from a company called SK En-
gineering & Construction. Siemens agreed to meet with SK and
Secure to help Secure acquire that agreement. During the meeting,
Siemens communicated with SK that Siemens would be imple-
menting the improvements it learned at NCPP so long as Secure
agreed to pay for them. Siemens estimated that it would take
around 8,500 engineering hours to complete. In December 2012,
however, Siemens suggested internally that incorporating these
changes would "tie up resources at a time when [Siemens] need[ed]
them more urgently elsewhere" and that, when offering these
changes to Secure, Siemens should make "the price and schedule
for this change order . . . so unattractive that [Secure] cannot draw
th[e] option."

In early 2013, Siemens was in the process of pitching to a
new client—the Texas Clean Energy Project ("TCEP"). Because it
used a Chinese contractor, TCEP was aware of the problems the
Siemens's burners had at NCPP and asked for reassurance that
there were solutions to the problems that occurred with the equip-
ment there. Siemens responded that there were, detailing twenty-
eight changes to the design—the design that Secure still had—that
would be implemented before the TCEP project got underway.

Secure did not make the license fee payment that came due
on February 28, 2013. At the time, the Siemens gasifiers Secure

purchased had not been opened.  And by now, Secure's business was crumbling, with internal documents indicating "substantial doubt about [Secure's] ability to continue as a going concern."  Indeed, as of December 2012, Secure admitted that, "[i]n order to continue the coal gasification project, [it must] obtain grants, debt financing or additional equity investment."

In May 2014, Secure emailed Siemens asking when Secure could expect an updated BEDP and asking about the viability of its equipment.  Internally, Siemens stated that "very little to nothing can be re-used [sic] and we would have to start from scratch."

By March 2015, Secure stopped making payroll payments to its employees.  In July 2015, Secure advised Siemens that there might be "new life for [its] project," as SK had introduced Secure to a group in Houston that were interested in partnering with it on the Kentucky plant.  But Secure was never able to obtain the necessary financing for a coal-to-fertilizer plant at the Kentucky site that it hoped would give it that new life.  Secure then missed the December 2015 licensing fee payment due to Siemens under the 2012 LSA.  By the end of 2015, Secure had not paid any of the licensing fees under the 2012 Contracts, except for the down payment, and it had suspended its business operations.

At the same time, the market constraints that were squeezing Secure had the same effect on Siemens.  By mid-2015, Siemens decided to exit the gasification market.  On a February 2, 2016, call between Secure and Siemens, Siemens told them of its decision. Secure interpreted the call as an anticipatory repudiation of the

contract—i.e., Secure believed that Siemens was communicating it would not honor the contract.

On February 11, 2016, Secure demanded recission of the 2007 Contract and the return of all monies paid by Secure to Siemens pursuant to that contract.  On February 17, 2016, Siemens informed Secure that Siemens would not violate any contractual obligation even though Siemens was closing its coal gasification business.

In March 2016, Siemens proposed extending the license fee payment deadline and the deadline for completing "performance tests."  Secure rejected the offer, so Siemens revoked it and demanded payment of the approximately €11.5 million termination fee owed pursuant to the 2012 LSA.

Secure filed suit against Siemens in July 2016, in Illinois state court.  Siemens removed the case to federal court, and the case was transferred to the Middle District of Florida.  Secure amended its complaint on April 21, 2017.  Secure brought six counts: (1) breach of contract; (2) breach of warranty of fitness; (3) fraudulent misrepresentation by Siemens as to support of the project; (4) fraudulent misrepresentation for failure to disclose defects[4]; (5) recission for fraud, and (6) recission for lack of consideration.  All in all, Secure sought approximately $86 million in damages—$40 million for the

---

[4] The fraudulent misrepresentation claim for Siemens's alleged failure to disclose design defects was voluntarily dismissed.

loss of value of the equipment and technology it purchased and $46 million for its expenses designing and engineering its plants—and claimed that Siemens anticipatorily repudiated by exiting the gasification market.  Siemens answered and asserted a counterclaim for breach of contract, seeking payment of the termination fee owed under the 2012 LSA plus interest.  Secure filed a reply to Siemens's counterclaim which asserted various affirmative defenses, including that Siemens "materially breached the terms and conditions" of the 2012 LSA.

Secure voluntarily dismissed its fraudulent misrepresentation claim for support of project.  In an order on Siemens's motion for partial dismissal, the district court determined that Secure's rescission for lack of consideration claim was limited to misrepresentations and omissions following March 31, 2010 (the date the parties entered into the 2010 Contract) because the 2010 Contract waived and released all previous claims.

The litigation moved into discovery.  Over a year and a half after the deadline to amend pleadings had passed—and just two weeks before the close of fact discovery—Secure asked the district court for leave to amend its complaint so that it could plead new facts and alternative legal theories of recovery.  Secure based its motion exclusively on Federal Rule of Civil Procedure 15, concerning leave to amend, but did not address Federal Rule of Civil Procedure 16, which concerns modifications to scheduling orders.  The magistrate judge denied the motion.  The magistrate judge explained that the motion was brought under the wrong rule, noting

that Secure failed to address the requirements of Rule 16(b)(4), and concluded that Secure had not demonstrated good cause to support belated amendment of the complaint.  On February 5, 2019, Secure moved to continue the trial date in order to file an amended complaint.  That motion was also denied for failure to provide good cause.  After summary judgment was entered in Siemens's favor on Secure's affirmative claims, Secure renewed its motion to continue the trial and amend its complaint.  And again, its motion was denied.

Because Secure's claims were premised in large part on defects in the BEDP and the gasification burners, it retained an expert, Dr. Herbert Kosstrin, to testify as to their defective nature.  Dr. Kosstrin was prepared to testify that (1) Siemens's BEDP and gasification equipment were defective; and (2) their defective nature prevented Secure from obtaining financing to complete their plants; and (3) the gasification equipment was worthless except for scrap value.  Siemens moved to exclude Dr. Kosstrin under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), arguing that he did not inspect the equipment purchased by Secure, that he utilized an unreliable methodology, and that his testimony would be unhelpful to the jury.  The district court granted the motion and excluded Dr. Kosstrin's expert opinion and testimony.  In its order, the district court explained that Dr. Kosstrin's opinion was not based on any reliable methodology, e.g., by testing or conducting computer modeling on the equipment; was gleaned exclusively from internal Siemens documents that the jury could view

itself; did not adequately compare the Secure project to the NCPP project, including because his comparison lacked sufficient analysis and he failed to consider the data regarding the coal used at NCPP; and that his conclusions consisted entirely of his own *ipse dixit*.

The district court also excluded Dr. Kosstrin's opinion regarding the value of the equipment because it found he lacked the requisite qualification to testify as an expert on the value of the equipment and he never conducted an appraisal analysis. Following the exclusion of Dr. Kosstrin, the district court took up the parties' cross motions for summary judgment. The district court denied Secure's motion for summary judgment. The district court granted Siemens's motion for summary judgment in part and dismissed all of Secure's affirmative claims against Siemens. The district court held that four of the claims—breach of implied warranty, fraudulent misrepresentation, recission-fraud, and recission-lack of consideration—were premised on the "same 'material design defects' allegations" and that, because Secure had no expert to testify that the gasification equipment was in fact defective, Secure had no evidence to support these claims.

With respect to Secure's breach of contract claim, the district court held that Secure's breach of contract claim was limited to the repudiation theory it alleged in its Complaint and that Secure failed to prove that its damages were the direct and proximate result of Siemens's alleged conduct to support that theory of liability. The district court denied Siemens's motion for summary judgment on Siemens's counterclaim.

Following the summary judgment orders, the case proceeded to trial only on Siemens's counterclaim for breach of contract, premised on the 2012 LSA.  Prior to trial, Siemens filed a motion in limine seeking to exclude: (1) nonpleaded, dismissed, released, or rejected claims including alleged defects, misrepresentations, fraudulent concealments, and any theory that Secure is excused from nonperformance of the 2012 LSA except for the anticipatory repudiation theory; (2) evidence concerning alleged problems at the NCPP plant; and (3) evidence related to the alleged failure to inform or provide improvements under the 2012 LSA; as well as other evidence that Siemens argued was irrelevant to its counterclaim and Secure's defenses.  The district court granted Siemens's motion, thereby limiting Secure's affirmative defense that Siemens breached the 2012 LSA to Secure's anticipatory repudiation theory.

 At the conclusion of trial, Secure made a motion for judgment as a matter of law—arguing that the evidence demonstrated that Siemens repudiated the 2012 LSA and that Secure did not breach the agreement.  The district court denied the motion.

Following the summary judgment orders, the case proceeded to trial only on Siemens's counterclaim for breach of contract, premised on the 2012 LSA. Prior to trial, Siemens filed a motion in limine seeking to exclude: (1) nonpleaded, dismissed, released, or rejected claims including alleged defects, misrepresentations, fraudulent concealments, and any theory that Secure is excused from nonperformance of the 2012 LSA except for the anticipatory repudiation theory; (2) evidence concerning alleged problems at the NCPP plant; and (3) evidence related to the alleged failure to inform or provide improvements under the 2012 LSA; as well as other evidence that Siemens argued was irrelevant to its counterclaim and Secure's defenses. The district court granted Siemens's motion, thereby limiting Secure's affirmative defense that Siemens breached the 2012 LSA to Secure's anticipatory repudiation theory.

The jury returned its verdict on March 4, 2020, in which it rejected Secure's anticipatory repudiation defense and awarded Siemens $13,200,395.50 in damages.  After the jury verdict, Secure renewed its motion for judgment as a matter of law and, in the alternative moved for a new trial because, among other reasons, the district court excluded evidence that Siemens failed to perform under the 2012 LSA.  The district court denied both motions and held,

with respect to the exclusion of evidence related to Siemens' alleged breach, that Secure's new defense of an alleged breach unrelated to anticipatory repudiation was untimely and failed to articulate a material breach. Secure filed this timely appeal.

## II.    STANDARDS OF REVIEW

We review for abuse of discretion a district court's decisions regarding the admissibility of expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43 (1997); *accord United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) ("This Court has uniformly applied the deferential abuse-of-discretion review that *Joiner* mandates."). We will find an abuse of discretion only if the district court's ruling was "manifestly erroneous." *Joiner*, 522 U.S. at 142 (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 658 (1878)); *Frazier*, 387 F.3d at 1258. A district court of course abuses its discretion when it applies the wrong legal standard. *Frazier*, 387 F.3d at 1259.

We review an order granting summary judgment *de novo*, applying the same legal standards as the district court. *Amy v. Carnival Corp.*, 961 F.3d 1303, 1308 (11th Cir. 2020). We view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in his favor. *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009) (quoting *Haves*, 52 F.3d at 921); Fed. R. Civ. P. 56(a).

We review a district court's denial of a motion for a new trial for abuse of discretion. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1255 (11th Cir. 2016). "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312–13 (11th Cir. 2013) (quoting *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1200 n. 16 (11th Cir.2009)). Relatedly, we review the district court's grant of a motion in limine for abuse of discretion. *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005) (per curiam). Under the abuse-of-discretion standard, we may reverse a decision of the district court only if the court applies an incorrect legal standard, follows improper procedures in making its determination, or makes findings of fact that are clearly erroneous. *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1311 (11th Cir. 2019). And, a "district court has wide discretion in determining the relevance of evidence produced at trial." *Cabello*, 402 F.3d at 1161. Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, . . . undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## III.   ANALYSIS

On appeal, Secure contends that the district court erred in: (1) excluding Dr. Kosstrin's testimony; (2) granting summary judgment; (3) denying its requests to file an amended complaint; and

(4) denying Secure's motion for a new trial on the grounds that Secure was barred from presenting evidence that Siemens breached the 2012 LSA.  We address each argument in turn.

## A.  Did the district court err in excluding Dr. Kosstrin?

Our analysis regarding the admissibility of expert testimony begins with Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

As explained by the Supreme Court, the purpose of the expert admissibility rules is to enlist the federal courts as "gatekeepers" tasked with screening out "speculative" and "unreliable expert testimony."  *Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1335 (11th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).  In this Circuit, we have distilled the expert admissibility inquiry into the following three factors:

(1) the expert is qualified to testify competently re-
garding the matters he intends to address;

(2) the methodology by which the expert reaches his
conclusions is sufficiently reliable as determined by
the sort of inquiry mandated in *Daubert;* and

(3) the testimony assists the trier of fact, through the
application of scientific, technical, or specialized ex-
pertise, to understand the evidence or to determine a
fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th
Cir. 1998) (footnote omitted).  We have also noted that "[w]hile
there is inevitably some overlap among the basic requirements—
qualification, reliability, and helpfulness—they remain distinct con-
cepts and the courts must take care not to conflate them." *Frazier*,
387 F.3d at 1260 (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK
Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)).

Here, the district court rested its exclusion of Dr. Kosstrin's
opinions on the qualifications and reliability prongs.  Regarding an
expert's qualifications, we have explained that:

we observe that experts may be qualified in various
ways.  While scientific training or education may pro-
vide possible means to qualify, experience in a
field may offer another path to expert status.  In fact,
the plain language of Rule 702 makes this clear: expert
status may be based on "knowledge, skill, *experi-
ence,* training, or education." (emphasis added).  The
Committee Note to the 2000 Amendments of Rule

702 also explains that "[n]othing in this amendment is
intended to suggest that experience alone . . . may not
provide a sufficient foundation for expert testimony."
Fed. R. Evid. 702 advisory committee's note (2000
amends.).

Of course, the unremarkable observation that an ex-
pert may be qualified by experience does not mean
that experience, standing alone, is a sufficient founda-
tion rendering reliable *any* conceivable opinion the
expert may express. As we observed in *Quiet Tech-
nology,* "while an expert's overwhelming qualifica-
tions may bear on the reliability of his proffered testi-
mony, they are by no means a guarantor of reliabil-
ity. . . . [O]ur caselaw plainly establishes that one may
be considered an expert but still offer unreliable testi-
mony." 326 F.3d at 1341–42. Quite simply, under
Rule 702, the *reliability* criterion remains a discrete,
independent, and important requirement for admissi-
bility.

*Id.* at 1260–61 (alterations in original).

As to the reliability prong, we have noted that "[r]ulings on
admissibility under *Daubert* inherently require the trial court to
conduct an exacting analysis of the proffered expert's methodol-
ogy." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257
(11th Cir. 2002). The Supreme Court has identified a number of
factors for courts to consider in conducting that analysis, including:
(1) whether the theory or technique can be, and has been, tested;
(2) whether the theory or technique has been subjected to peer

review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community. *See Daubert*, 509 U.S. at 593–94. Importantly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and the "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

In this case, Secure retained Dr. Kosstrin to testify as to three issues: (1) "the defects in the Siemens Equipment and Technology—as evidenced by Siemens's first test of its designs at NCPP— prevented Appellants' gasifiers from meeting their contractually-guaranteed performance"; (2) "the defects prevented [Secure] from obtaining financing for their project"; and (3) "in light of the defects, the Equipment and Technology have only scrap value."

Dr. Kosstrin, who holds a Ph.D. in Mechanical and Aerospace Engineering from Cornell University, has forty years of experience in the alternative energy field, including alternative fuels. In preparing his testimony and reaching his conclusions, he reviewed a number of documents that Siemens produced in discovery, including documents related to the design of the gasifiers. In his report, Dr. Kosstrin makes clear that this is *all* he reviewed, stating "the basis for this opinion is a review of exhibits and information concerning the NCPP plant's operations up to the signing of the 2012 [LSA]."

Dr. Kosstrin's methodology was as follows.  Because Siemens had shipped nearly identical burners to their Chinese client at NCPP, Dr. Kosstrin hypothesized that, if those burners were experiencing problems, then the Secure burners would as well.  His report thus detailed the design of the NCPP burners, explained the problems experienced at NCPP, and stated that Secure would have experienced the same problems with its Siemens burners, if Secure had ever opened and used them.

The district court excluded Dr. Kosstrin's expert testimony, and in its order, identified a number of problems with Dr. Kosstrin's testimony: (1) "Dr. Kosstrin did not perform any testing on the Secure equipment, because it was never installed"; (2) "Dr. Kosstrin did not conduct any computer modeling or simulations of the Secure equipment's performance . . . , and he did not communicate with anyone involved in the NCPP plant to determine why they made changes to the equipment"; (3) Dr. Kosstrin's expert report contained "no opinions on how the coal at the NCPP plant compared to the design coal for the Secure project"—i.e., while acknowledging that the NCPP plant used a grade of coal that was outside the range specified by Siemens in the contract with NCPP, Dr. Kosstrin did not account for how this might affect the performance of the burners; (4) Dr. Kosstrin did not conduct an individual cost analysis for the hypothetical corrective measures and could not say whether the modifications were inexpensive; (5) Dr. Kosstrin knew that the Chinese operators ran the gasifier at below minimum load but "did not perform an analysis to determine

whether NCPP was complying with the minimum load case, or the impact on operations"; (6) Dr. Kosstrin "did not consider alternative designs that Siemens should have employed"; and (7) he failed "to compare the Secure BEDP *to any other BEDP for coal gasification.*" (emphasis added). In short, the district court excluded Dr. Kosstrin's testimony as to design defects because he did not run any analysis on the equipment at issue and compared the equipment to the NCPP equipment in a manner that failed to account for two variables that Siemens listed *in the contract* as causing problems with the burners.

As to the third issue on which Dr. Kosstrin sought to testify—that the equipment had only "scrap value"—the district court found that Dr. Kosstrin lacked the requisite qualifications to testify on the subject, noting that Kosstrin is "not a certified appraiser" and "has never performed an appraisal analysis."

Under our deferential standard of review, we cannot conclude that the district court abused its discretion in excluding Dr. Kosstrin's testimony. Our caselaw makes clear that, in order for a methodology to be reliable, the expert must be able to adequately explain how the data he relied on led him to his conclusions. In a case such as this one—where the expert notes that many factors could have contributed to the defect at issue—this means the expert must be able to explain his consideration of the other alternative causes. *See, e.g., Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (per curiam) (noting that an expert "need not rule out all possible alternative causes," but "must at

least consider other factors that could have been the sole cause of
the plaintiff's injury"). Caselaw on this point is legion.

*Frazier* is one such case. There, the expert was prepared to
testify as to the transfer of hairs and bodily fluids during a sexual
assault. 387 F.3d at 1252. But the expert "offered precious little in
the way of a reliable foundation or basis for his opinion." *Id.* at
1265. While the expert was eminently qualified to testify and
formed his opinion based on his experience in the field, we affirmed
the exclusion of his testimony because he never explained *how* he
was able to reach his opinion. *Id.* Because he did not so explain,
we said that "it would be very difficult indeed for the district court
(or for that matter the jury) to make even an informed assessment,
let alone to verify" that the opinion was reliable. *Id.* We reempha-
sized that "it remained the burden of the proponent of this testi-
mony to explain how that experience led to the conclusion he
reached." *Id.*

*Hughes v. Kia Motors Corp.*, 766 F.3d 1317 (11th Cir. 2014),
is another such example. In *Hughes*, the expert sought to testify
that the plaintiff would not have sustained a fatal injury had her
automobile been equipped with a "shut-off switch," claiming to
have reached this conclusion "based on the scientific method" but
"without further explaining how he tested his hypothesis to sup-
port his conclusions." *Id.* at 1329–30. Relying on *Frazier*, we con-
cluded that the district court did not abuse its discretion in exclud-
ing the expert's testimony. *Id.* at 1329. And we noted that the ex-
pert was unable to account for other factors that contributed to the

death, such as the impact of the semi-truck, admitting that he lacked sufficient information to rule out *any* other causes. *Id.* at 1330.

Both cases hold obvious relevance to the issue presented. In both *Frazier* and *Hughes*, we affirmed the exclusion of expert evidence because the proponent of that testimony was unable to link the expert's methodology—or lack thereof—to his conclusions. The same is true here. The district court concluded that Dr. Kosstrin was unable to adequately explain *how* he reached his conclusions other than by pointing to the NCPP plant—which, as already mentioned, had a slew of additional variables not present in the Secure situation. As we have previously stated, "[s]omething [does not] become 'scientific knowledge' just because [it is] uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were derived by the scientific method be deemed conclusive." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (quoting *Daubert*, 43 F.3d at 1315–16). Indeed, the "trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citing *Daubert*, 43 F.3d at 1319). Here, Dr. Kosstrin provided nothing but his word and own *ipse dixit*. He pointed to the NCPP plant and said, without any verifiable methodology or consideration of the factors unique to that plant, that Secure would have experienced the same problems. The district court thus did not abuse its discretion by excluding his testimony.

The same is also true of the district court's decision to exclude Dr. Kosstrin's testimony related to the value of the burners. Even setting aside the district court's ruling as to qualifications on this issue, Dr. Kosstrin's valuation of the gasifiers was based exclusively on his conclusion that the gasifiers were defective. Because that opinion was unreliable, his opinion as to value is also necessarily so.

## B. Did the district court err in granting summary judgment?

As noted above, the district court entered summary judgment in Siemens's favor on each of Secure's claims against it. Before analyzing the claims on a count-by-count basis, however, two preliminary issues bear mentioning.

First, the parties have both waived any arguments regarding which state's law should apply. In the district court, the parties disputed whether the law of Kentucky, Missouri, or Florida should apply to the non-contract claims.[5] In the district court's order granting summary judgment, the court applied Florida law to each of the non-contract claims. And on appeal, neither party argues that the district court erred in doing so.

Choice of law is not jurisdictional. *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 778 (1984) ("The question of the applicability of New Hampshire's statute of limitations to claims for out-of-state damages presents itself in the course of litigation only after

---

[5] There is no dispute that New York law applies to the contract claims.

28                    Opinion of the Court                    20-11266

jurisdiction over respondent is established, and we do not think that such choice of law concerns should complicate or distort the jurisdictional inquiry."). And, as such, it is waivable if the parties abandon the issue on appeal. *See Mesa Air Grp., Inc. v. Delta Air Lines, Inc.,* 573 F.3d 1124, 1128 (11th Cir. 2009) (finding that where a party had failed to present a choice-of-law issue to the trial court, the issue was waived on appeal). Accordingly, we apply Florida law to all of the non-contract claims.

Second, the district court granted summary judgment against Secure on four of its claims—breach of implied warranty of fitness, fraudulent misrepresentation, recission-fraud, and recission-lack of consideration—based solely on the theory that, because these claims were premised on a design defect, Secure needed an expert witness to testify as to the defect. And because Dr. Kosstrin had been excluded—properly, as we have already concluded—Secure had no such expert testimony. The district court, however, did not identify a single case holding that a plaintiff is required to present expert testimony to bring a claim for fraud or breach of implied warranty. Instead, the district court borrowed language from cases discussing the causation element in *negligence* and *strict liability* actions and applied it here. For example, the district court cited *Small v. Amgen, Inc.*, 723 F. App'x 722, 726 (11th Cir. 2018), an unpublished products liability case from this Court, for the proposition that "in complex cases where a jury is asked to assess complex medical or scientific issues outside the scope of a layperson's knowledge, an expert's testimony is required." In

doing so, the district court ignored the first clause of the sentence stating "[r]egarding discovery and proof of causation." Indeed, each of the cases cited by the district court (and Siemens) were focused *only* on the element of causation in tort suits.

In *Lucas v. Firestone Tire & Rubber Co.*, 458 F. 2d 495, 497 (5th Cir. 1972),[6] we were confronted head-on with the task of "mak[ing] the initial determination as to the state of Florida law governing breach of implied warranty cases as that law applies to the question presented, i.e., whether plaintiff must introduce the testimony of an expert that the [product] was defective." We answered that question in the negative: "There is no burden on plaintiff to prove a specific defect by an expert witness as distinguished from other proof. The fact of a malfunction and also of a defect may be proven by direct or circumstantial evidence." *Id.* We are aware of no case post-dating *Lucas* that stands for the contrary position, and neither party has directed our attention to one. As such, we apply the rule of *Lucas* and hold that Florida law does not require plaintiffs in contract cases to prove the defective nature of the product at issue with expert testimony.

Although the district court's reason for granting summary judgment was incorrect, we can, as a general principle, affirm on any basis supported by the record. *See Lucas v. W.W. Grainger,*

---

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit prior to October 1, 1981).

*Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001). But, following the issuance of our prior opinion in this case, this Court issued its *en banc* decision in *United States v. Campbell*, 26 F.4th 860 (11th Cir. 2022) (en banc). In *Campbell*, this Court held that "the mere failure to raise an issue in an initial brief on direct appeal should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* in extraordinary circumstances after finding that one of our [*Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324 (11th Cir. 2004),] forfeiture exceptions applies." *Id.* at 873. The *Access Now* exceptions are:

> (1) the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice; (2) the party lacked an opportunity to raise the issue at the district court level; (3) the interest of substantial justice is at stake; (4) the proper resolution is beyond any doubt; or (5) the issue presents significant questions of general impact or of great public concern.

*Id.* (citing *Access Now*, 385 F.3d at 1332).

Under *Campbell*, however, our analysis does not stop at whether one of the *Access Now* exceptions applies. If we find that one of the forfeiture exceptions applies, we still must decide "whether the issue is extraordinary enough for us to exercise our discretion and excuse the forfeiture."[7] *Id.* at 875. And, "[i]n most

---

[7] Siemens contends that *Campbell* did not "rob" us of the principle that we may affirm on any ground presented by the record, even those not considered

cases, "an issue abandoned on appeal should still be dismissed without reaching the merits." *Id.*

As Secure notes, Siemens failed to brief the alternative arguments on appeal it raised below in support of its motion for summary judgment on Counts 2, 4, 5, and 6. Therefore, we must first consider whether any of the forfeiture exceptions apply. Turning to the forfeiture exceptions, only the fourth exception—whether the proper resolution of the issue is beyond any doubt—arguably applies here. But, even assuming the fourth exception applies, we consider whether Siemens has not demonstrated "an extraordinary circumstance such that we should exercise our discretion to excuse [its] forfeiture." *See id.* at 877. In *Campbell*, we found that there were extraordinary circumstances present where: (1) this Court had "an extraordinary interest in protecting the public and encouraging good police work by ensuring that evidence obtained in good faith reliance on binding appellate precedent is not excluded"; (2) the district court had correctly denied the motion to suppress, and this Court was "loathe" to reverse where the issue was inadequate defense of the district court's correct judgment; (3) the case was "a good-faith exception case in which there are no material factual disputes," i.e., a "pure question of law"; and (4) the appellant's

―――――――――――――――――

or relied upon by the district court, as elucidated by cases such as *Lucas*, 257 F.3d at 1256. While we generally agree, in cases where one of the parties has not raised issues on appeal that they made below in support of affirmance or reversal, we must apply *Campbell*'s two-step analysis in considering whether to exercise our discretion to hear forfeited issues.

arguments to the panel placed the issue before the Court.  *See id.* at 877–79.

By contrast, this case presents a commercial dispute between two parties, with the forfeited arguments concerning a motion for summary judgment.  None of the public policy considerations present in *Campbell* exist here.  Further, the district court did not consider Siemens's alternative arguments in its order granting summary judgment, and Siemens will be able to raise those arguments again to the district court, should it choose to do so.  While Siemens contends that not considering its unbriefed, alternative arguments would be a waste of judicial (and the parties') resources "and would 'reward[]'" Secure for "creating word constraints by advancing meritless arguments," it does not cite to any authority suggesting that this constitutes extraordinary circumstances.  And we decline to do so under the circumstances of this particular case.

Accordingly, we conclude that, *for purposes of this appeal*, Siemens has forfeited its alternative grounds for affirming the district court's grant of summary judgment as to Secure's claims in Counts 2, 4, 5, and 6.  On remand, Siemens can re-assert the alternative arguments it raised below to the district court as a basis for summary judgment on those claims, should it choose to do so.

Having resolved the *Campbell* issue as to Counts 2, 4, 5, and 6, we now turn to whether the district court correctly granted summary judgment on Secure's claim for anticipatory repudiation in Count 1. The parties agree that New York law governs the contract claims in this case, including Secure's anticipatory repudiation

claim.  Under New York law, "[a]nticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

> An anticipatory breach of contract—also known as an anticipatory repudiation—"can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach."

*Princes Point LLC v. Muss Dev. L.L.C.*, 87 N.E.3d 121, 133 (N.Y. 2017) (quoting *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 659 (N.Y. 1998)).  For an anticipatory repudiation to occur, "the expression of intent not to perform by the repudiator must be 'positive and unequivocal.'" *Id.* (quoting *Tenavision, Inc. v. Neuman*, 379 N.E.2d 1166, 1168 (N.Y. 1978)); *see also Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 211 A.D. 2d 262, 267 (N.Y. App. Div. 1995) (requiring a "definite and final communication of the intention to forego performance before the anticipated breach may be the subject of legal action").  "Mere expression of difficulty in tendering the required performance, for example, is not tantamount to a renunciation of the contract." *Rachmani*, 211 A.D. at 267.

While an anticipatory breach obviates the need for the nonbreaching party to tender performance, the nonbreaching party

must nonetheless demonstrate that it was "ready, willing[,] and able to perform its obligations under the contract" at the time its performance would have been due in order to recover damages. *Inter-Power of N.Y. Inc. v. Niagara Mohawk Power Corp.*, 686 N.Y.S.2d 911, 913 (N.Y. App. Div. 1999); *accord Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d. Cir. 1990). This principle is merely an application of the general rule that the complaining party must demonstrate that the breach caused him injury; "[t]o do this he must prove that he intended to and was able to perform when his performance was due." *Scholle v. Cuban-Venezuelan Oil Voting Tr.*, 285 F.2d 318, 320 (2d Cir. 1960).

In addition, causation is an essential element of the claim. *See Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728, 731 (2d Cir. 1992). The plaintiff "must demonstrate that the damages were caused by and are 'directly traceable to the [defendant's] breach.'" *Id.* at 731 (alteration in original) (quoting *Kenford Co. v. County of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986)). Where the ultimate transaction would have failed, and where the plaintiff's claimed damages would have resulted even if no breach occurred, the plaintiff cannot prove that his damages resulted from the defendant's conduct. *See id.* (affirming the district court judgment because the plaintiff sought "to recover for a loss on a transaction separate from the transaction that gave rise to the breach").

Secure claims that Siemens anticipatorily breached by leaving the coal gasification market because, in doing so, Siemens demonstrated that it would not honor its obligations under the

2012 LSA.  The district court identified two problems with the anticipatory repudiation claim: (1) that Secure could not prove causation, and (2) that Secure could not prove it was ready, willing, and able to perform.  We agree with the district court.

First, Secure is unable to prove causation.  The district court determined that there was no evidence of a causal relationship between Siemens's anticipatory repudiation and the damages Secure sought because Secure, at the time of the alleged repudiation, had not obtained the necessary financing for its project.  Furthermore, the district court noted that Secure's claimed damages from the "useless equipment and technology" would have resulted regardless of whether Siemens exited the gasification market.  Secure responds by pointing to the fact that their proposed EPC financiers were troubled by the performance of the Siemens gasifiers.  But there is an obvious problem with Secure's theory: the discussion with the financiers occurred in 2012 while the alleged repudiation occurred more than three years later, in February 2016.  Secure has not presented any record evidence tying an inability to secure financing *after* Siemens's alleged breach and, as such, has no evidence of causation.  We can affirm on this basis alone.

Second, the "ready, willing, and able" requirement also bars recovery.  New York law requires the "plaintiff alleging an anticipatory breach of contract [to] show (1) that the defendant insisted upon terms not contained in the contract; and (2) that the plaintiff was 'ready, willing, and able to perform its own obligations under the contract when performance was due.'"  *United States v. Hon*,

17 F.3d 21, 26 (2d Cir. 1994) (quoting *Towers Charter,* 894 F.2d at 523). The district court concluded that Secure was not ready, willing, and able to perform because Secure was in financial ruin and had missed multiple payments on the contract before the alleged repudiation. We agree. For Secure to succeed on its anticipatory repudiation claim under New York law, Secure had to show that, at the time Siemens exited the gasification market (and thus, in Secure's telling, anticipatorily repudiated the contract), Secure was able to perform its own obligations. But because Secure had already missed *multiple* payments under the contract at that time, Secure itself was already in breach, and thus *un*ready and *un*able to perform. And finally, we note that when Siemens decided to exit the gasification market in 2015, it promised to continue supporting its existing projects, including Secure's.

Therefore, the district court did not err in granting summary judgment as to Count 1. Accordingly, we affirm the district court's grant of summary judgment as to Count 1 and reverse its grant of summary judgment as to Counts 2, 4, 5, and 6.

## C. Did the district court err in denying leave to amend?

Next, we address the district court's denials of Secure's motions for leave to amend. As noted above, we "will only reverse a district court's denial of a motion to amend in instances in which the district court has clearly abused its discretion." *Henson v. Columbus Bank & Tr. Co.,* 770 F.2d 1566, 1574 (11th Cir. 1985). Normally, to acquire permission to amend one's pleading, a litigant need only establish the relatively lenient standard of Rule 15(a),

which states that leave shall be granted "when justice so requires." However, when a party moves to amend their complaint after the deadline for doing so set by the district court in its scheduling order, a litigant must also "show good cause why leave to amend the complaint should be granted." *Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1366 (11th Cir. 2007) (per curiam); *see also* Fed. R. Civ. P. 16(b); *Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1419 (11th Cir.1998) (per curiam) ("If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure."). We have recognized that Rule 16's "good cause standard precludes modification [of the scheduling order] unless the schedule cannot be met despite the diligence of the party seeking the extension." *See Sosa,* 133 F.3d at 1418 (quoting Fed. R. Civ. P. 16 advisory committee's note); *see also Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir. 1992) ("If [a] party was not diligent, the [good cause] inquiry should end.").

In this case, Secure filed its first amended complaint on April 21, 2017. Following a scheduling conference, the district court entered a scheduling order on May 18, 2017, which set a deadline to amend pleadings for June 1, 2017. Due to joint motions by the parties, the scheduling order was twice amended, but neither amendment changed the deadlines for amending pleadings.

Secure first moved for leave to amend its complaint on December 28, 2018—already more than a year after the deadline to

amend pleadings had passed.  Secure sought leave to amend its complaint to add new factual allegations and legal theories of recovery, based largely on having finally completed its review of the large amount of documents produced to it by Siemens, as well as the depositions of current and former Siemens employees.  The magistrate judge denied that motion, noting that "the breadth of document production was directly related to the breadth of [Secure's] discovery requests, and Secure could not cry foul over getting what it asked for.  Nor did Secure identify any testimony from the depositions that related to the proposed amendments.  In addition, the magistrate judge noted that discovery had already been ongoing for two years, and Secure provided no explanation as to why it was unable to uncover the information sooner.  Finally, the magistrate judge noted that Secure had relied on the incorrect legal standard—Rule 15 instead of Rule 16.

Just a few days later, Secure moved to extend the trial date, in what it now admits was nothing but a ruse to amend its complaint.  Because this was nothing more than an attempt to circumvent the court's previous order, it was summarily denied for essentially the same reasons.

Eventually, the district court granted Siemens's motion for summary judgment and denied Secure's motion for summary judgment.  After those rulings—and more than two years after the deadline to amend pleadings had passed, and just a few weeks before trial was scheduled to commence—Secure moved for leave to amend its complaint a *third* time.  The district court denied that

request.  In its denial, the district court forcefully reminded Secure that its litigation tactics "in this regard run dangerously close to sanctionable actions under [Federal Rule of Civil Procedure] 11."

We had occasion to apply Rule 16 to similar circumstances to these in *Smith v. School Board of Orange County*.  There, the plaintiff sought leave to amend his complaint (after the deadline for doing so set by the scheduling order) because, in his view, discovery had "produced new violations of the [l]aw that must be addressed within the counts of the complaint."  487 F.3d at 1367 (alteration in original).  The district court denied leave to amend because the defendant's motion for summary judgment had already been pending for a month and because the plaintiff failed to explain why the facts underlying the amendment were undiscoverable previously.  *See id.*  We affirmed, noting the "extreme untimeliness of [the plaintiff's] motion and his lack of a complete showing of good cause."  *Id.*

The district court's rulings here were not an abuse of discretion for the same reasons articulated in *Smith*.  To satisfy Rule 16, a litigant must show that it could not meet the scheduling order "despite the diligence of the" litigant.  *Sosa*, 133 F.3d at 1418.  Here, Secure was seeking leave to replead already-dismissed claims and add new facts and theories of recovery, including a fraudulent inducement claim that Secure says it was able to plead "with greater particularity," more than a year after the deadline to amend pleadings had passed.  But, as Secure admitted, the facts that formed the basis of its amendment were available "at the earliest just *prior to*

the amendment deadline." (emphasis added). What Secure actu-
ally complains of, then, is not that the facts were *not* ascertainable,
but that it took Secure too long to conduct discovery. That is not
due diligence. And it is thus not good cause. We affirm the district
court's denials of leave to amend.

### D. Did the district court err in denying Siemens's ability to present its affirmative defense?

The final issue for our consideration concerns the district
court's order denying Secure's motion for a new trial and the dis-
trict court's related ruling on Siemens's motion in limine. At issue
is the scope of evidence Secure was permitted to present at trial.
As noted previously, the only *affirmative* breach-of-contract claim
that Secure advanced throughout the trial was an anticipatory re-
pudiation claim. However, *defensively* (i.e., in response to Sie-
mens's breach of contract counterclaim regarding the 2012 LSA),
Secure asserted a broader breach-of-contract based affirmative de-
fense. As its eighth affirmative defense, Secure asserted that "[t]o
the extent Siemens seeks recovery in contract, Siemens materially
breached the terms and conditions of said contract and is entitled
to no relief thereon."

In its motion in limine, Siemens sought clarification as to
whether Secure would present evidence only of anticipatory repu-
diation or whether Secure would be permitted to present evidence
of other alleged breaches of contract, which Secure had not yet
raised in the litigation. Specifically, the other theories that Secure
sought to introduce evidence of were: (1) Siemens breached the

contracts by delivering defective gasification equipment; and (2) Siemens breached the contracts by failing to inform Secure of available improvements to the gasification equipment and technology.

The district court granted Siemens's motion in limine and excluded any evidence Secure sought to present regarding the above-listed theories of breach of contract. Thereafter, Secure re-raised this issue in its motion for a new trial. In granting Siemens's motion in limine and denying Secure's motion for a new trial, the district court gave a number of justifications for its decision to exclude this evidence. First, the district court noted that Secure was attempting to advance a trial-by-surprise strategy. This affirmative defense, and the facts related to that defense, were not pled. And Secure's own affirmative claim for breach of contract was premised exclusively on Siemens's alleged anticipatory repudiation. Therefore, to allow Secure to present both a defense based on both anticipatory repudiation and other alleged breaches of contract was, in the eyes of the district court, fundamentally unfair to Siemens. Second, the district court noted that the failure to provide notice of improvements was not a material breach of the contract at issue. Third, and perhaps most importantly, the district court found that the evidence was not relevant, noting that Secure's new theories of breach of contract (very much unlike the anticipatory-repudiation theory) could not have excused its performance under Siemens's counterclaim because that counterclaim was only for the termination fee under the 2012 LSA.

On appeal, Secure asks for reversal based only on the second theory it sought to add as part of its affirmative defense, arguing that the district court erred when it excluded evidence related to Siemens's alleged breach in failing to notify Secure of improvements.

We find no abuse of discretion in the district court's ruling based on the relevant facts at issue here. On July 3, 2012, the parties entered into the 2012 LSA. That contract terminated and released all claims under the previous agreements between the parties and required Secure to make an approximately €12 million license fee payment. Two provisions of that contract are at issue here. First, under § 5.1, the 2012 LSA required Siemens to inform Secure "of any Improvements to the Technology which are developed or acquired and released for commercial application by Siemens," and Secure had an option to contract for those improvements for an additional fee. Second, under § 11.3.1, the 2012 LSA allowed Siemens to terminate the contract if Secure "fails to make any payment when due" provided Siemens provided Secure a fifteen-day cure period. If Siemens exercised that option, the 2012 LSA provided that Secure would owe to Siemens ninety-two percent of the licensing fee (more than €11 million). After Secure missed the deadline on its license fee payment, Siemens, in February 2016, offered Secure an extension on the deadline to pay. After Secure refused that extension, Siemens exercised its option to terminate the contract and, after providing Secure a cure period, invoiced Secure for ninety-two percent of the licensing fee.

The issue is whether Siemens's alleged breach of § 5.1 might somehow excuse Secure's performance under § 11.3.1. As an initial matter, we agree with the district court that Secure should not be permitted to raise this theory because Secure had not put Siemens on notice of it. *See Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1350 (11th Cir. 2007) ("In deciding waiver issues under [Fed. R. Civ. P.] Rule 8(c), this Court [examines] whether a plaintiff had notice of the unpled defense or was prejudiced by the lack of notice."). The Federal Rules of Civil Procedure make clear that a defendant raising an affirmative defense must "affirmatively state" it. Fed. R. Civ. P. 8(c). And this requires, at the minimum, putting the plaintiff on notice of the nature of the defense. *See Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971) ("The purpose of [Fed. R. Civ. P. 8(c)] is to give the opposing party notice.").

In this case, Secure asserted a boilerplate affirmative defense, alleging only that Siemens's breached the contract without any identification of either the legal theory of breach or the contractual provision at issue. And when Siemens moved for summary judgment on its breach of contract counterclaim regarding the 2012 LSA, Secure responded to that motion without referencing § 5.1 of the contract. Given that Secure's theory of breach of contract, as shown by its affirmative claim and its response to Siemens's motions, was premised only on anticipatory repudiation, we cannot say that the district court abused its considerable discretion on

evidentiary matters by excluding Secure's evidence relating to different breach-of-contract theories at trial.

Moreover, the district court was also correct that the defense was legally inadequate, and therefore irrelevant. "In diversity actions, we look to state law to inform the determination of whether a certain defense is 'any other matter constituting an avoidance or affirmative defense' under the federal rule." *Proctor*, 494 F.3d at 1350 (quoting *Troxler v. Owens-Illinois, Inc.*, 717 F.2d 530, 532 (11th Cir. 1983)). Here, New York law, which governs the contract claims, allows breach of contract to be raised as an affirmative defense. *See L & L Excavating Corp. v. Abcon Assocs., Inc.*, 594 N.Y.S.2d 818, 820 (N.Y. App. Div. 1993). However, a "party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (applying New York Law). In other words, "a non-breaching party's obligation to perform is excused only when there is a material breach by the other party." *AKTIV Assets LLC v. Centerbridge Partners, L.P.*, No. 653259/2019, 2019 WL 7165927, at *7 (N.Y. Sup. Ct. Dec. 24, 2019) (citing *Smoley v. Carole Hochman Design Grp., Inc.*, 79 A.D.3d 540, 541 (1st Dep't 2010)). And whether a breach is material can be decided as a matter of law. *See id.*; *Cont'l Ins. Co. v. RLI Ins. Co.*, 555 N.Y.S.2d 325, 328 (N.Y. App. Div. 1990); *see also Frank Felix Assocs.*, 111 F.3d at 289. "[I]n determining whether [a] material breach relieves non-breaching party's obligation to perform,

'the extent to which the agreement provides for performance without delay' should be considered." *Frank Felix Assocs.*, 111 F.3d at 289 (quoting Restatement (Second) of Contracts § 242(c)).

The district court ruled that, as a matter of law, the breach asserted by Secure was not material, in part because the 2012 LSA did not impose any deadline on Siemens to provide notice of the improvement and Secure had to pay for any improvements. *Id.* ("In determining if [Siemens's] breach defeated the object of the [2012 LSA], we must consider the special purpose of the contract" and look to "the extent to which the injured party will be deprived of the benefits [it] reasonably expected"(citing Restatement (Second) of Contracts § 241)). Moreover, the record evidence establishes that Siemens *did* provide Secure notice of design improvements on October 31, 2012, during a call between SK, Siemens, and Secure, in which Siemens indicated that it would include the design improvements if Secure paid for the re-engineering. At the time of Secure's breach, then, Secure was already aware of the improvements. Secure, however, missed its licensing fee payments due in February 2013 and December 2015 after Siemens provided notice of the improvements. Indeed, Secure stipulated that it was unable to perform under the terms of the 2012 LSA and therefore could not have paid for the improvements, as the district court held, even if Secure had chosen to obtain them. As such, the notice for those improvements could not have been the reason Secure itself breached the contract.

The district court was thus right to conclude that Siemens's alleged breach—not providing notice of the improvements *sooner*—was not material to the contract.  Because the contract did not impose any time limitation on when notice of improvements should be given, and because the record evidence established that Secure had notice of the improvements before Secure failed to tender payment, Siemens's breach was irrelevant to the claim presented.

## IV.    CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment as to Secure's claims in Counts 2, 4, 5, and 6, and remand for the district court for further proceedings. On remand, Siemens can re-assert the alternative arguments it made below to the district court as a basis for summary judgment on those claims, should it choose to do so.  We affirm the district court's grant of summary judgment as to Count 1 and affirm as to all other issues.

**AFFIRMED IN PART, REVERSED IN PART.**