UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIDAMERICA C2L INC., and
SECURE ENERGY, INC.,

Plaintiffs,

v.

SIEMENS ENERGY, INC.,

Defendant.

No. **6:17-cv-00171-PGB-LHP**

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

Plaintiffs MidAmerica C2L Inc. and Secure Energy Inc. (collectively "Secure"), respond in opposition to Defendant's Motion for Summary Judgment (Doc. 336).

## I.   INTRODUCTION

This case is about how Siemens, a global engineering giant, defrauded a clean-energy startup by continually touting industry-leading gasification experience and equipment that didn't exist. To induce Secure to enter into a series of contracts and pay Siemens tens of millions of dollars, Siemens repeatedly lied about its gasification technology. Instead of 20 years of proven operating experience, Siemens had zero experience. Instead of operating ahead of schedule and exceeding expectations, the burners in Siemens' Chinese plant never worked. Even today, Siemens has zero burners in operation; Siemens will never have a single burner in operation because it closed its gasification business without a working model.

Following a prior grant of summary judgment based on lack of expert testimony, the Eleventh Circuit reversed and remanded Secure's claims for fraudulent inducement, breach of implied warranty, and recission. The appellate court held that expert testimony is not required and that Secure may prove its claims through direct or circumstantial evidence. When analyzing this case based on the evidence—instead of a *per se* requirement for expert testimony—it is easy to see that a reasonable jury could find in favor of Plaintiffs. Now, instead of addressing that evidence, Defendant asks this Court to grant summary judgment based on a vacated opinion, misstatements of the record, and faulty legal arguments.

The technology that Siemens marketed to Plaintiffs never actually existed. Like

1

Theranos[1] with its blood tests, Siemens may have genuinely desired to create the technology it marketed to Plaintiffs. But that does not excuse Siemens' actions or allow it to avoid liability. After Siemens attempted to design and build the gasifiers and knew for certain that the gasifiers were fatally flawed, Siemens hid that information and continued to lead Secure along, inducing a belief that Secure possessed proven, industry-leading gasifiers.

Summary judgment is not the arena for balancing the evidence or making credibility determinations; the relevant inquiry is simply whether record evidence exists—viewed in the light most favorable to Secure—so that a reasonable jury could find in favor of Plaintiffs. Because record evidence supports each of Secure's remaining claims, this Court should deny Siemens' motion for summary judgment.

## II.   BACKGROUND

### A.   Factual Background

Siemens' initial misrepresentations convinced Secure to buy its gasifiers. (Ex. A at 86:10-87:10; Ex. B at 16:14-17). Then, Siemens' repeated lies and omissions induced Secure to continue its relationship, signing contract after contract. (Ex. C at 138:9-140:21). In a few short years, Siemens jumped into the coal gasification business without any experience, convinced developers to spend millions on Siemens' equipment and technology, represented that its gasifiers worked as promised while concealing fatal flaws, and, ultimately, shuttered its gasification business without ever

---

[1] *See e.g.*, *In re Arizona Theranos, Inc. Litig.*, No. 2:16-CV-2373, 2023 WL 3246811, at *1 (D. Ariz. May 4, 2023).

producing a commercially viable gasification burner or fuel management system. (Doc. 146-41; Ex. F at 137:3-18; 345:3-17). In the end, by Siemens' own telling, its SFG-500 gasifier was no more than a "Potemkin Village." (Doc. 146-42).

    **(1)**    ***Turning coal into syngas***. Decades of coal-fired power plants spewing pollutants into the atmosphere created demand for cleaner manufacturing and power generation. (Ex. C at 31:4-33:23; Ex. H at 2). While coal-fired power generation is declining, coal is still a cheap, abundant resource with a mining infrastructure already in place. (Ex. I). To capitalize on this abundant resource, in 2006, Lars Scott and Jack Kenny founded Secure Energy to build and operate a clean coal gasification plant. (Doc. 146-20). Here is a basic diagram of Secure's planned gasification plant:



Like any industrial facility, a coal gasification plant is made up of many components, sometimes called "islands." (Ex. J). Every island is necessary for the plant to operate, but the gasifier and its key component—the burner—function as the "engine" of the plant. (Ex. E at 292:7-8). Secure's goal was to turn abundant,

midwestern coal into "syngas."[2] (Ex. K; Doc. 146-13 at 3-4). Syngas is extremely useful, because with a little extra processing, manufacturers can turn it into a diverse spectrum of useful end products. (Doc. 146-46 at 18). Regardless of the end product, and whether the plant was located in Decatur or Paducah, Siemens' gasification block did not change—the *same* Siemens gasification equipment was going to use the *same* Illinois Basin coal to produce the *same* amount of syngas. (Doc. 221-2, ¶ 14; Doc. 221-20, ¶ 11; Ex. A at 352:18-22).[3]

(2)    ***"The salesman starts dreaming…."*** Secure is not a global engineering giant like Siemens; Secure is a project development company. (Doc. 146-1, ¶ 3; Ex. A at 276:6-22; Ex. C at 40:18-20). Its project required three fundamental pieces: (1) the gasification and other plant technology pieces; (2) an Engineering, Procurement, and Construction contract ("EPC Contract"), which is a third-party contract to construct the complete facility; and (3) after Secure received a final EPC Contract price, Secure could then finance and build its facility. (Ex. C at 133:4-21).

Shortly after its founding, Secure researched and met with gasification companies across the globe including Conoco Phillips, U-Gas, General Electric, British Gas Lurgi, Sasol-Lurgi, Shell, and Siemens. (Ex. C at 56:5-18). Seeing prey in the water, the former sales employees[4] now running Siemens' gasification division

---

[2] The names are similar, but "syngas" and "synthetic natural gas" are two distinct products.

[3] Moreover, the ability to change the end product made Secure's business more agile. As Siemens itself recognized, Secure could shift with changing market conditions to produce more profitable end products. (Doc. 146-34 at 13).

[4] For example, CEO Guido Schuld was in sales and marketing for power plants prior to Siemens choosing him to lead Siemens Fuel Gasification. (Ex. D at 14:8-17:14).

plotted "to get away with an equipment contract and maybe reduced availability guarantees." (Ex. L). As they put it, when describing the opportunity with Secure, "the salesman starts dreaming…." *Id.* Knowing that Secure planned to build a plant to convert coal into syngas, Siemens pitched its "20 years of proven" gasification operating experience. (Doc. 146-46 at 8). Additionally, Siemens represented that its gasifiers were very reliable, accepted a wide variety of coal, had no restrictions on ash content, had quick start up times and high availability, employed a cooling screen with a lifetime of greater than ten years, and had carbon conversion efficiency near 100%. (Doc. 146-46 at 5, 8, and 12; Ex. C at 58:9-21; Ex. A at 86:20-87:4). Siemens made these representations while omitting that they did not actually have the experience or data to back up their claims. (Ex. M; Doc. 146-45). After meeting with each company and considering options, Secure saw only one choice: Siemens. (Ex. A at 177:16-21).

(3)   ***Siemens wins, Secure chooses Siemens over other suppliers***. To make the burner for its 500-megawatt gasifier, Siemens claimed that it "scaled up" the 200-megawatt designs it purchased.[5] (Ex. E at 24:9-25:7). Siemens named this 500-megawatt gasifier the "SFG-500." (Doc. 146-46 at 8). Although it marketed "proven" technology to Secure, Siemens cut corners with its "scaled up" version by redesigning a cheaper, untested burner. (Ex E at 25:2-19; Ex. F at 75:21-78:6; Doc. 146-45 at 9;

---

[5] In 2006, Siemens purchased gasifier technology from a plant named "Schwarze Pumpe." (Ex. F at 137:22-138:2). Decades ago, under the East German government, Schwarze Pumpe developed a 200-megawatt gasifier that operated on lower-quality lignite coal. (Ex. F at 139:13-140:2; Ex. D at 45:13-20). Schwarze Pumpe's coal gasification operation ceased in 1989, the year the Berlin Wall fell, so Siemens did not have the relevant data. (Doc. 146-45 at 8; Ex. D at 75:16-24).

Ex. D at 64:17-25). The burner design was completely new; Siemens ditched Schwarze Pumpe's design—three burners with a separate pilot burner—and designed a single combination burner with the pilot burner inside the main burner. (Doc. 146-45 at 9).

Siemens sold the first five SFG-500s to a plant in China, named NCPP, and then it sold numbers six and seven to Secure. (Doc. 146-46 at 7; Doc. 146-20 at 4). All seven SFG-500s were identical. (Doc. 146-20 at 4; Ex. D at 114:2-11; 175:25-176:5). Despite knowing that its equipment and technology were novel and untested, (Doc. 146-3 at 21-22; Ex. D at 43:2-8), Siemens required the purchase of two gasifiers and related equipment for over $40 million *before* it would provide the initial basic engineering design package ("BEDP") (Ex. A at 268:2-23, 448:2-11; Doc. 149-14 at 13; Doc. 149-2 at 69).

      **(4)**    ***Siemens continually misrepresents that the equipment and technology will function as promised***. Siemens' initial misrepresentations covered up the fact that it fabricated information about non-existent gasifiers. (Doc. 146-46 at 5-12). Over time, the misrepresentations shifted. After NCPP installed Siemens' SFG-500 gasifiers, problems arose immediately when the equipment failed on startup. (Doc. 146-25; Doc. 167-16; Doc. 146-25). Siemens now had additional data points demonstrating that the equipment and technology it sold Secure could not carry out its intended purpose. (Ex. C at 138:9-140:21). Internal documents reveal the extent of Siemens' problems. *See e.g.*, (Doc. 146-42) ("I would rather not show any pictures than risking someone finds out that we are showing a 'Potemkin village.'"); (Doc. 146-33) (March 2012 letter listing 30 necessary modifications at NCPP totaling more than $60 million); (Doc. 146-

41) ("The message to Jack and Lars is, forget everything you've got from Siemens so far, scrap the equipment, we'll start all over again"). In addition to the initial misrepresentations about its capabilities, by 2011-12 Siemens had tangible evidence proving that its gasifiers did not work. (Doc. 146-24).

Yet, Siemens continued to induce Secure to enter numerous contracts and spend tens of millions of dollars by painting a picture that did not match reality. Siemens omitted the fact that the SFG-500s set up in China failed, while falsely representing that its gasifiers had received their performance acceptance certificate. (Doc. 146-19). In truth, Siemens did not receive the performance acceptance certificate until July 10, 2013. Even then, the certificate attached an "Open Items List" of problems, including with the feeding systems, burners, dust accumulation, quench, and black water systems. (Doc. 146-37). Siemens course of conduct painted this rosy picture of its SFG-500 gasifiers to induce Secure to enter into additional contracts, including the 2012 License and Service Agreement ("2012 LSA"). (Ex. C at 138:9-140:21; 167:4-18).

(5) *The fallout*. Secure never built its gasification plant. (Ex. C at 140:22-25). Years of work obtaining permits, financing, finding vendors, and developing its business, were all undone by Siemens' bad acts and failures. (Ex. A at 536:5-539:18). None of the SFG-500 burners ever worked; Siemens has zero operational burners in coal gasification plants. (Ex. F at 344:17-345:5). NCPP salvaged some of the Siemens parts, but all of the burners were replaced with new burners manufactured by a Chinese company referred to as "711." (Ex. N; Doc. 158-14). The "proven" design marketed by Siemens did not exist; Siemens was never able to build

7

the product it marketed. (Ex. F at 344:17-345:5; Ex. A at 536:5-539:18; Doc. 146-25).

After selling gasifiers to NCPP and Secure, Siemens gasification business dried up because it was "well known in the whole industry that NCPP is not successful." (Ex. O). Siemens never received another gasifier order after 2012. (Ex. D at 181:15-16). Eventually, Siemens gave up and exited the gasification business. (Ex. P).

### B.    Procedural Background

This case is back before this Court on remand following reversal of its summary judgment decision with respect to Counts 2, 4, 5, and 6. Far from "an appellate procedural quirk," (Doc. 336 at 1) the Eleventh Circuit vacated its initial opinion and reversed summary judgment on those claims based on "well settled" precedent. Ex. G at 30; *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004). On appeal, Siemens forfeited certain issues—including the independent tort doctrine and unconscionability—so the Eleventh Circuit concluded that its original opinion was invalid, vacated that opinion, and remanded for this Court to consider the remaining claims afresh. (Ex. G at 30-32).[6] Because it is both vacated and replete with misstatements of the record, that vacated opinion has no bearing on this Court's resolution of the issues on remand. For example, and critically, the vacated opinion's analysis was premised on the inaccurate statement that Secure "voluntarily dismissed

---

[6] Because there can be confusion between "forfeiture" and "waiver," the Eleventh Circuit clarified that Siemens can "re-assert" arguments on remand; it did not endorse Siemens' position. (Ex. G at 46); *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022). But, especially given the Eleventh Circuit's misstatement as to which of Secure's claims had been dismissed, its operative opinion provides no substantive direction to this Court as to how it should resolve the remaining claims on remand.

its claim for fraudulent inducement during the course of this litigation." (Doc. 336, Apdx. A at 37). That is simply untrue, as Siemens' own summary judgment motion acknowledges, (Doc. 336 at 10 n.7, 18).[7] After realizing its error, the Eleventh Circuit remanded Counts 2, 4, 5, and 6, so Secure could have a fair chance to present its claims based on an accurate record. (Ex. G at 32).

## II.   LEGAL STANDARD

To prevail on summary judgment on any claim, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015) (citation omitted). The Court does "not weigh conflicting evidence or make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016). Courts should grant summary judgement only when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltc. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. ARGUMENT

### A.   Record evidence supports all four of Secure's remaining claims

---

[7] Secure dismissed its fraud claim in Count 3, but Counts 4 and 5 expressly allege fraudulent inducement. *See* Doc. 63 ¶¶ 55, 73, and 76.

### (1)   *Count 2: Breach of Implied Warranty*

The elements for breach of implied warranty of fitness for a particular purpose are: (1) the seller, at the time of contracting, has reason to know the particular purpose for which the goods are required, (2) the seller has reason to know that the buyer is relying on the seller's skill and judgment to select suitable goods for the specified purpose, and (3) the buyer did in fact rely on that skill or judgment. *Simmons v. Washing Equip. Techs.*, 51 A.D.3d 1390, 1391 (N.Y. App. Div. 2008); Fla. Stat. § 672.315.

The record evidence plainly enables a reasonable jury to conclude that Siemens breached its implied warranty of fitness for a particular purpose: (1) Siemens knew that Secure was using the two SFG-500 gasifiers to convert coal into syngas (Doc. 146-13 at 5; Ex. A at 268:1-23); (2) Siemens held itself out as an industry leader with 20 years of "proven" gasification experience, (Doc. 146-46 at 5, 8; Ex. A at 86:10-87:10), knowing that Secure relied on Siemens' purported skill or judgment when choosing gasification equipment and entering contracts for Siemens' technology (Ex. A at 268:2-269:12); and (3) Secure did in fact rely on Siemens' skill or judgment when choosing the SFG-500 gasifiers for the coal gasification plant. (Ex. A at 268:2-269:12).

Secure did not purchase the gasifiers to use as a theatre set; Siemens knew the SFG-500 gasifiers' purpose was to serve as the "engine" for Secure's gasification plant. (Doc. 146-13). To be sure, the facts are vehemently disputed, but that only confirms that summary judgment is inappropriate. Although Siemens disputes that equipment was defective, a jury presented with Siemens' own documents could reasonably find for Secure. Internal Siemens documents and testimony in this case show that Siemens

10

itself knew that the SFG-500's fundamental flaws rendered the gasifiers unfit for Secure's operation. (Doc. 146-41; Doc. 146-49). Thus, the equipment and technology Siemens sold to Plaintiffs was incapable of accomplishing its intended purpose. (Doc. 146-41; Doc. 197-39). And Siemens knew that when inducing Secure into a series of contracts, including the 2012 LSA.

Reversing this Court's prior grant of summary judgment, the Eleventh Circuit held that Secure does not need any expert testimony to prove that Siemens' gasifiers didn't work. (Ex. G at 29). "There is no burden on plaintiff to prove a specific defect by an expert witness as distinguished from other proof. The fact of a malfunction and also of a defect may be proven by direct or circumstantial evidence." *Lucas v. Firestone Tire & Rubber Co.*, 458 F.2d 495, 497 (5th Cir. 1972) (cited in Ex. G at 29). The evidence on this point is overwhelming. Secure's SFG-500s could not serve as the engine for their coal gasification facility—for the same reasons that those exact gasifiers failed to perform when fired up at the Chinese plant. (Doc. 146-25; Ex. N). Additionally, Siemens intentionally installed out of specification cooling screens in Secure's equipment. (Doc. 146-50). And the evidence shows that, when Siemens finally contemplated telling Secure that it needed to scrap everything and start over, Siemens' best plan was to get Secure's co-founder drunk to soften the blow. (Doc. 146-41). But, in fact, Siemens never shared this sobering message. Instead, it continued to conceal the fatal flaws of Secure's $40.3 million equipment. (Doc. 197-38).

### (2) *Count 4: Fraudulent Misrepresentation*

Count 4 alleges fraud in the inducement. *See* (Doc. 63 ¶ 55). The elements are:

(1) a false statement of a material fact; (2) that the defendant knew or should have known was false; (3) that was made to induce the plaintiff to enter into a contract; and (4) that proximately caused injury to the plaintiff when acting in reliance on the misrepresentation. *Bradley Factor, Inc. v. United States*, 86 F. Supp. 2d 1140, 1146 (M.D. Fla. 2000). In its FAC, Secure alleges (1) Siemens omitted material facts and misrepresented its equipment and technology; (2) Siemens knew the impression created by this omission was a false sense of material facts; (3) Siemens intended that its misrepresentations induce Secure into agreeing to the 2012 LSA; and (4) Secure relied on these misrepresentations in its decision to enter into the 2012 LSA and suffered harm as a result. (Doc. 63 ¶¶ 51-58). Siemens' own documents produced in discovery support these allegations.

"The requirement of a false statement includes material misrepresentations *or omissions of fact.*" *Bradley Factor, Inc.*, 86 F. Supp. 2d at 1146 (emphasis in original). As logic[8] dictates in a fraudulent inducement claim, "Florida law does not recognize a stark distinction between fraud by commission and fraud by omission." *Woods v. On Baldwin Pond, LLC*, 634 F. App'x 296, 298 (11th Cir. 2015). "[W]here failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative representations is tenuous." *Johnson v. Davis*, 480 So. 2d 625, 628 (Fla. 1985).

---

[8] "All misrepresentations are also nondisclosures, at least to the extent that there is a failure to disclose which facts in the representation are not true." *Prentice v. R.J. Reynolds Tobacco Co.*, 338 So. 3d 831, 842 n.3 (Fla. 2022) (*quoting Little v. First Cal. Co.*, 532 F.2d 1302, 1304 n.4 (9th Cir. 1976)).

Siemens attempts to graft an extra "duty"[9] requirement onto Secure's fraudulent inducement claims. (Doc. 336 at 20-21). But the law includes no additional duty requirement in this context. There is a distinction between passive nondisclosure and fraudulent inducement. For fraudulent inducement, misrepresentations and omissions are two sides to the same coin. *Woods*, 634 F. App'x 296, 297 (11th Cir. 2015). Siemens' misrepresentations are a classic example of fraud in the inducement. Siemens marketed "20 years of proven" operating experience and reliable equipment while omitting that it merely acquired incomplete information from an East German plant that did coal gasification for a few years in the 1980s. (Doc. 146-46 at 8; Doc. 146-3 at 11-12).[10] To further induce Secure to enter the 2012 LSA, Siemens represented that the NCPP's identical gasifiers were operating ahead of schedule and exceeding expectations, while omitting that Siemens' staff was kicked off site, the equipment could not function without significant mandatory changes, and NCPP substituted burners from a different manufacture. (Doc. 146-24; Doc. 146-19 at 8; Doc. 158-25). Continued misrepresentations compounded.

Presented with these facts, a reasonable jury could rule in Secure's favor.

### (3)   *Count 5: Rescission—Fraud*[11]

---

[9] Siemens relies on the vacated opinion to argue that Secure's fraud claims arise from contractual duties. (Doc. 336 at 16). This is wrong. The vacated opinion based its analysis on the mistaken premise that Secure had dismissed its fraudulent inducement claims. (Doc. 336, Apdx. A at 37).

[10] Siemens described data availability as "problematic" and merely had liquid feedstock data from 2003-06, almost 15 years after Schwarze Pumpe's brief operation with lignite coal. (Doc. 146-45 at 8).

[11] Like Count 4, Count 5 alleges fraud in the inducement. *See* Doc. 63 ¶¶ 73, 76, 77. The elements for fraudulent inducement are the same as listed for Count 4 above and the same record evidence enables a reasonable jury to find in favor of Plaintiffs.

Courts may employ rescission as a remedy for fraudulent inducement. *See St. Francis Holdings, LLC v. MMP Cap., Inc.*, No. 20-CV-4636 (MKB), 2022 WL 991980, at *16 (E.D.N.Y. Mar. 31, 2022). Under New York law,[12] "[t]he elements of a claim for rescission based on fraud are misrepresentation, concealment or nondisclosure of a material fact; an intent to deceive; and an injury resulting from justifiable reliance by the aggrieved party." *Id.* (quotation omitted). In *St. Francis Holdings*, the plaintiffs alleged they did not have a "complete and adequate" remedy at law because they were unable to return equipment purchased from defendant. *Id.* Likewise, Secure has two 220-ton gasifiers and two 100-ton feeder vessels stored in Decatur, Illinois; 109 crates of equipment—including four 7-ton burners—in Effingham, Illinois; and additional crates of control room equipment stored in Wichita, Kansas. (Ex. B at 463:23-464:5; Ex. Q). Additionally, rescission will remove any rights or claims Siemens has based on the 2012 LSA. Plaintiffs allege grounds for rescission and have evidentiary support; the precise equitable relief provided should be reserved for a later stage. Doc. 63 ¶¶ 60-92.

### (4)    *Count 6: Rescission—Failure of Consideration*[13]

As with Count 5 above, Plaintiffs have no adequate remedy at law for rescission of the 2007 Contract and all subsequent contacts arising from Secure's course of dealing with Siemens. *See* Doc. 63 ¶¶ 80-92. Under New York law, a "contract may be rescinded for failure of consideration … for such a breach as substantially defeats its

---

[12] The 11th Circuit found that New York law applies to the contract claims in this case. (Ex. G at 32).
[13] Siemens mischaracterizes Secure's claim as "lack of consideration." Doc. 336 at 21-23.

purpose, including breaches that were so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Courchevel 1850 LLC v. Wisdom Equities LLC*, 846 F. App'x 33, 35 (2d Cir. 2021). Further, failure to perform in every respect is not essential, but a failure which leaves the subject of the contract substantially different from what was contracted for is sufficient. *Id.* (emphasis added). Specifically, where the "consideration appears to be valuable and sufficient, but turns out to be wholly false, or a mere nullity … the consideration wholly fails … and the party paying or depositing money upon it can recover it back." *Id.* Consideration failed catastrophically in this case. Starting in 2007, all of the contracts between Secure and Siemens were premised on failed consideration. (Doc. 158-10).

Additionally, contract recission is necessary to invalidate all claims, releases, and waivers to the extent they are otherwise valid. Secure executed contracts relying on Siemens' representations about their equipment and technology. (Ex. C at 138:9-140:21). Internal documents reveal that the seven gasifiers—five sold to NCPP and two sold to Secure—did not work. (Doc. 146-33). NCPP was first in time, and after NCPP set up its plant and had to completely overhaul its gasification island, it made a claim to Siemens for over $60 million. *Id.* Secure is not required to incur additional damages just to confirm what is known. Based on the evidence, a reasonable jury could find for Secure on factual issues, and all contracts from 2007 through 2012 could be rescinded to restore the parties precontract positions.

**B.    The independent tort doctrine does not bar Secure's fraudulent inducement claims (Counts IV and V)**

Siemens is wrong as a matter of law to assert that Secure's claims are barred by the independent tort doctrine. On the contrary, "[f]raudulent inducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract." *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996). Here, Siemens intended to deceive Secure about the viability of its gasifiers, using misrepresentations and omissions to induce Secure into entering contracts and acting to their detriment. *See* Doc. 63 ¶¶ 55, 73, 76-77. That culpable state of mind is required for a fraudulent inducement claim, but not a breach of contract claim.[14]

Siemens relies on the Eleventh Circuit's vacated opinion to support its independent tort doctrine arguments. Yet, the vacated opinion based its analysis on a critical error: it mistakenly stated that Secure had dismissed its fraudulent inducement claim. (Doc. 336, Apdx. A at 34, 37). This mistake completely undermines the appellate court's analysis and illustrates why the party presentation rule is not a mere "procedural quirk." Because Siemens did not address the issue on appeal, the appellate court mistakenly thought Count 3 was Secure's fraudulent inducement claim. *Id.* This was an error and has since been vacated. Both Counts 4 and 5 allege live fraudulent inducement claims—as Siemens' own summary judgment briefing recognizes. (Doc. 336 at 10 n.7; Doc. 63 ¶¶ 55, 73, 76-77).

Counts 4 and 5 for fraudulent inducement are independent torts because they

---

[14] Compare *Hillcrest Pacific Corp. v. Yamamura*, 727 So.2d 1053, 1055 (Fla. Dist. Ct. App. 1999) (fraudulent inducement elements) with *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. Dist. Ct. App. 2017) (breach of contract elements).

assert claims separate and distinct from a breach of contract. *Id.*; *See HTP, Ltd.*, 685 So. 2d at 1239. Eleventh Circuit precedent emphasizes that proving a fraudulent inducement claim is independent of a breach of contract claim is a "minimal requirement" which can be "readily met." *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1031 (11th Cir. 2017). Where an agreement is procured by fraud or misrepresentation, every part of the contract is vitiated because "a party cannot contract against liability for his own fraud." *Id.* at 1027.

## C.   The 2012 LSA's waiver provision is unconscionable

Even when a disclaimer of warranties meets all the basic criteria required by law, a court may deem the clause void if it is unconscionable. *See Catalano v. MarineMax*, 590 F.Supp.3d 487, 503 (E.D.N.Y. 2022). Here, the Court denied Siemens' motion to dismiss Secure's claim for breach of implied warranty on the grounds that Secure has a right to argue the disclaimer is unconscionable. (Doc. 62 at 6).[15] Unconscionability is a fact-intensive determination that the Court should reserve for trial. *See State of New York v. Wolowitz*, 468 N.Y.S.2d 131, 146 (1983).[16]

When one party has fraudulently induced the other party to contract, effectively

---

[15] Siemens assertion that the FAC is deficient was rejected at the motion to dismiss stage and is not the proper subject of its motion for summary judgment. (Doc. 62 at 5-6; Doc. 336 at 12-13).

[16] With mixed issues of fact and law, trial is the appropriate arena for unconscionability determinations because parties must have an opportunity to present evidence "with regard to the circumstances of the signing of the contract, and the disputed terms' setting, purpose and effect." *Simar Holding Corp. v. GSC*, 87 A.D.3d 688, 690 (2011). Likewise, Secure prevailing on either of its live recission claims, (Doc. 63 ¶¶ 60-92), will render the release of implied warranties in the 2012 LSA moot. The interplay between claims in this case necessitates that the Court reserve judgment on unconscionability for a later stage. *See King v. Fox*, No. 97 CIV. 4134, 2007 WL 4207202, at *2 (S.D.N.Y. Nov. 20, 2007) ("[A]ny factual dispute relating to unconscionability will be resolved for the jury.").

eliminating the aggrieved party's ability to make an informed decision, this manipulative business practice will not be validated, and a claim of unconscionability is proper. *M&T Mortg. Corp. v. Miller*, 323 F.Supp.2d 405, 413 (E.D.N.Y. 2004). To demonstrate unconscionability, a party can show an absence of meaningful choice, in combination with contract terms that unreasonably favor the other party. *M&T Mortg. Corp.*, 323 F.Supp.2d at 412. These two elements—procedural and substantive unconscionability—work together on a sliding scale where greater evidence of absence of meaningful choice requires less evidence of unreasonable contract terms, and vice versa. *Hojnowski v. Buffalo Bills, Inc.*, 995 F.Supp.2d 232, 238 (W.D.N.Y. 2014).

The test for procedural unconscionability is whether, "in light of all the facts and circumstances, a party lacked 'a meaningful choice.'" *Brennan v. Bally Total Fitness*, 198 F.Supp.2d 377, 382 (S.D.N.Y. 2002) (citation omitted). Procedural unconscionability arises during contract formation when the process has been tainted by fraud or misrepresentation. *M&T Mortg. Corp.* 323 F.Supp.2d at 412. Demonstrations of procedural unconscionability include, among other things, "deceptive practices and language" and "imbalance in the understanding and acumen of the parties." *Id*. Caselaw illustrates that a disclaimer of warranty can be unconscionable when equipment delivered is useless and the purchaser had little bargaining power in purchasing the equipment. *See Industralease Automated & Scientific Equipment Corp. v. R.M.E. Enterprises, Inc.*, 396 N.Y.S.2d 427, 432 (1977).

In the present case, a reasonable jury could find that Siemens put Secure under pressure to sign the 2012 LSA. (Doc. 221-2, ¶¶ 5-13). Siemens preyed on Secure's lack

of bargaining power, essentially forcing them into a room with no escape with the only option being to sign the 2012 LSA. Siemens disputes this fact by claiming that, because Secure had a technical consultant and counsel, the 2012 LSA was not unconscionable. (Doc. 336 at 13).[17] But that cynical argument ignores the fact that Siemens had actively misrepresented and omitted key facts pertaining to their own equipment's fatal flaws—which enabled Siemens to create and then take advantage of a gross imbalance of information. Granting summary judgment would thus violate Rule 56, while rewarding Siemens for its manipulative business practices.

### D.   Siemens' own admissions and documents prove causation

In direct conflict with the Eleventh Circuit's clear holding that Secure's claims do not require expert testimony, Defendant maintains that Secure needs expert testimony to prove causation. (Doc. 336 at 24). But no such expert testimony is necessary because the record evidence, including Siemens' own documents, is sufficient to establish causation. For instance, a reasonable juror can conclude that a bank would not finance a project built around equipment that needed to be "scrapped." (Doc. 146-41; Doc. 146-49; Doc. 158-25). Likewise, the President and CEO of Secure's EPC contractor, SK, knew that the gasifiers were flawed—because Siemens admitted as much—and without required modifications, SK could not provide Secure with a final maximum EPC contract price. (Doc. 221-2, ¶¶ 5-13; Doc.

---

[17] Siemens also argues that Secure had meaningful choice in signing the 2012 LSA because Secure considered other suppliers before signing the 2007 contracts. (Doc. 336 at 13-14). But that choice was five years in the past at the time of the 2012 LSA. When it signed the 2012 LSA Secure was tied to Siemens and no longer had the option of utilizing other suppliers because Secure already had $40 million worth of equipment sitting in storage. (Doc. 336 at 13).

221-7, ¶¶ 10-16; Doc. 221-20, ¶¶ 5-9). Even though SK and Secure repeatedly asked for the mandatory changes, Siemens never provided them. (Doc. 221-2, ¶¶ 5-13; Ex. C at 179:23-185:14; Doc. 221-7, ¶¶ 10-16; Doc. 221-20, ¶¶ 5-9). At the time, Secure did not know the severity of the problems with its equipment, but SK had enough information about the NCPP project by early 2012 that it required answers before agreeing to a final EPC price. (Doc. 221-2, ¶¶ 5-13). And Secure, a project development company, could not obtain the necessary financing[18] without SK's final EPC price. (Doc. 221-7, ¶ 9; Doc. 221-2, ¶¶ 5-13). Siemens argues that Secure has no damages because it never operated its gasifiers. (Doc. 336 at 24). But Siemens' own counsel admitted that it would cost at least $80 to $100 million just to test the gasifiers—double the price of the equipment. (Doc. 185 at 76). The law does not require Plaintiffs to incur an additional $100 million in damages to corroborate what is already clear.[19] These are not complex chemistry issues; these are factual issues for a lay jury.

## IV.   CONCLUSION

The Court should deny Defendant's Renewed Motion for Summary Judgment because Defendant has failed to meet its burden, because there are various issues of material fact, and because Defendant is not entitled to judgment as a matter of law.

---

[18] Siemens includes a non sequitur attacking Jack Kenny's credibility based on a prior SEC action. Doc. 336 at 25. If anything, this merely highlights another of the numerous factual disputes that preclude summary judgment. Jack Kenny's credibility is an issue for the jury and his history with the SEC did not hinder Secure's ability to finance its project. (Ex. C at 105:3-11).

[19] Moreover, contrary to Siemens assertion (Doc. 336 at 17), overlap between breach of implied warranty and fraudulent inducement damages is a non-issue. *See Gonzalez v. Indep. Ord. of Foresters*, No. 22-CV-23513, 2023 WL 1796452, at *3 (S.D. Fla. Feb. 7, 2023) (Explaining that although double recovery is not allowed, Plaintiffs may seek recovery for the same damages under different theories).

Dated:  October 6, 2023

Respectfully submitted,

*/s/ Jeremiah W. Nixon*

Anthony G. Simon (admitted pro hac vice)
Jeremiah W. Nixon (admitted pro hac vice)
THE SIMON LAW FIRM, P.C.
800 Market Street, Suite 1700
St. Louis, Missouri 63101
Phone: (314) 241-2929
Fax: (314) 241-2029
asimon@simonlawpc.com
jnixon@simonlawpc.com

Walter A. Ketcham, Jr.
Fisher Rushmer, P.A.
200 E. Robinson St., Suite 800
Orlando, Florida 32801
(407) 843-2111
wketcham@fisherlawfirm.com

Michael H. McGinley (admitted pro hac vice)
DECHERT LLP
2929 Arch Street
Philadelphia, Pennsylvania 19104-2808
Phone: (215) 994-4000
Fax: (215) 994-2222
michael.mcginley@dechert.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that I caused true and correct copies of the

foregoing document to be served upon the parties receiving notice through the Court's

ECF system by filing with the Court's ECF system on this 6th day of October 2023.

Jonah D. Mitchell
Adaline Hilgard
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Phone: (415) 543-8700
Facsimile: (415) 391-8269
E-Mail: jmitchell@reedsmith.com
ahilgard@reedsmith.com

Robert W. Thielhelm, Jr.
Florida Bar No. 889679
Baker & Hostetler, LLP
SunTrust Center, Suite 2300 .
200 South Orange Avenue
Orlando, FL 32801-3432
Phone: (407) 649-4000
Facsimile: (407) 841-0168
E-Mail: rthielhelm@bakerlaw.com

*/s/ Jeremiah W. Nixon*
Anthony G. Simon (admitted pro hac vice)
Jeremiah W. Nixon (admitted pro hac vice)
THE SIMON LAW FIRM, P.C.
800 Market Street, Suite 1700
St. Louis, Missouri 63101
Phone: (314) 241-2929
Fax: (314) 241-2029
asimon@simonlawpc.com
jnixon@simonlawpc.com